1  THE WEISER LAW FIRM, P.C.
   KATHLEEN A. HERKENHOFF (168562)
2  12707 High Bluff Drive, Suite 200
   San Diego, CA 92130
3  Telephone: (858) 794-1441
   Facsimile: (858) 794-1450
4  kah@weiserlawfirm.com

5  Attorneys for Plaintiff

6  [Additional counsel appear on signature page]

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10  WILLA ROSENBLOOM, derivatively      Case No. SACV10-01352 DOC (MLGx)
    on behalf of ALLERGAN, INC.,
11                                       VERIFIED SHAREHOLDER
                         Plaintiff,      DERIVATIVE COMPLAINT FOR
12                                       VIOLATIONS OF § 14(A) OF THE
         vs.                             EXCHANGE ACT, BREACH OF
13                                       FIDUCIARY DUTY, AND UNJUST
    DAVID E.I. PYOTT, HERBERT W.         ENRICHMENT
14  BOYER, M.D., LOUIS J. LAVIGNE,
    JR., GAVIN S. HERBERT, STEPHEN
15  J. RYAN, M.D., LEONARD D.
    SCHAEFFER, MICHAEL R.
16  GALLAGHER, ROBERT A. INGRAM,
    TREVOR M. JONES, PH.D., DAWN E.
17  HUDSON, RUSSELL T. RAY, and
    DEBORAH DUNSIRE, M.D.,
18
                         Defendants,
19
    – and –
20
    ALLERGAN, INC., a Delaware
21  corporation,

22                  Nominal Defendant.

23                                       JURY TRIAL DEMANDED

24

25

26

27

28

                          COMPLAINT

Plaintiff Willa Rosenbloom ("Plaintiff"), by and through her undersigned attorneys, hereby submits this Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Allergan, Inc. ("Allergan" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2000 to the present (the "Relevant Period").

## JURISDICTION AND VENUE

1.      This Court has jurisdiction of this action under federal question jurisdiction pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States.  This Court has exclusive jurisdiction, pursuant to §27 of the Securities Exchange Act, 15 U.S.C. §§78aa, because this action asserts claims under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and has supplemental jurisdiction over the non-federal claims asserted herein under 28 U.S.C. §1367(a). This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

2.      Venue is proper in this District pursuant to 28 U.S.C. §1391(a). Substantial acts in furtherance of the alleged wrongdoing and/or their effects have occurred within this District, and nominal defendant Allergan, Inc.'s corporate officers are in Irvine, California.

## NATURE AND SUMMARY OF THE ACTION

3.      This action seeks to remedy defendants' breaches of fiduciary duty and unjust enrichment arising out of a scheme and wrongful course of business whereby Allergan's directors and top officers: (a) unlawfully promoted its biological product, Botox® Therapeutic, for uses not approved as safe and effective (including headache, pain, spasticity and juvenile cerebral palsy) by the Food and Drug Administration ("FDA"); (b) for exploiting its on-label cervical dystonia ("CD") indication to grow off-label pain and headache sales; (c) for lobbying government health care programs to expand coverage for off-label uses of Botox®; (d) for

COMPLAINT

1   directing physician workshops and dinners focused on off-label uses of Botox®; (e)
2   for paying doctors to attend "advisory boards" promoting off-label uses of Botox®;
3   and (f) for creating a purportedly independent online neurotoxin education
4   organization to stimulate increased use of Botox® for off-label purposes.

5        4.      Problems for the Company really materialized when, on September 1,
6   2010, the U.S. Department of Justice ("DOJ") issued a press release wherein it
7   announced that the Company had agreed "to plead guilty and pay $600 million to
8   resolve its criminal and civil liability arising from the company's unlawful promotion
9   of its biological product, Botox® Therapeutic, for uses not approved as safe and
10  effective by the Food and Drug Administration."

11       5.      Most egregiously, defendants had previously received numerous
12  "warnings letters" from the FDA for the very same activities they are now causing the
13  Company to expend $600 million for.  Thus, despite being put on notice of problems
14  regarding the Company's marketing activities for years, Defendants caused the
15  Company to continue to engage in these illicit practices.

16       6.      Further, this scheme at Allergan surreptitiously and illegally lined the
17  pockets of top Company insiders through incentive-based compensation and caused
18  Allergan to issue inaccurate information to the investing public.

19       7.      Accordingly, as a result of defendants' actions, the Company has
20  been damaged.

21                                **PARTIES**

22       8.      Plaintiff Willa Rosenbloom is a shareholder of nominal defendant
23  Allergan and has held continuously since 1989.

24       9.      Nominal defendant Allergan is a Delaware corporation with its
25  principal executive offices located at 2525 Dupont, Irvine, California.  According to
26  its public filings, Allergan is a "multi-specialty health care company focused on
27  developing and commercializing innovative pharmaceuticals, biologics and medical
28  devices."  Allergan operates in more than 100 countries around the world and its

1  product lines include "specialty pharmaceutical, medical device and over-the-counter
2  products for the ophthalmic, neurological, medical aesthetics, medical dermatology,
3  breast aesthetics, obesity intervention, urological and other specialty markets."

4        10.    Defendant David E.I. Pyott ("Pyott") has served as Chief Executive
5  Officer ("CEO") of Allergan since 1998.  In addition, defendant Pyott has served as
6  Chairman of the Board since 2001.  Further, defendant Pyott also served as President
7  of the Company from 1998 through 2006.

8        11.    Defendant Louis J. Lavigne, Jr. ("Lavigne") has served as a director
9  of Allergan since 2005.  In addition, defendant Lavigne has served on the Board's
10 Audit & Finance Committee (the "Audit Committee") during the Relevant Period.

11       12.    Defendant Herbert W. Boyer, Ph.D., ("Boyer") has served as a
12 director of Allergan since 1994.  In addition, defendant Boyer has served as Vice-
13 Chairman of the Board since 2001 and has served on the Board's Corporate
14 Governance Committee (the "Governance Committee") during the Relevant Period.

15       13.    Defendant Deborah Dunsire, M.D. ("Dunsire") has served as a
16 director of Allergan since 2006.  In addition, defendant Dunsire has served as a
17 member of the Governance Committee during the Relevant Period.

18       14.    Defendant Michael H. Gallagher ("Gallagher") has served as a
19 director of Allergan since 1998.  In addition, defendant Gallagher has served as a
20 member of the Audit Committee during the Relevant Period.

21       15.    Defendant Gavin S. Herbert ("Herbert") is the founder of Allergan
22 and has served as Chairman Emeritus since 1996.  Defendant Herbert was first elected
23 to the Board in 1950, served as CEO for 30 years and as Chairman from 1977 through
24 1996.

25       16.    Defendant Dawn E. Hudson ("Hudson") has served as a director of
26 Allergan since 2008.  In addition, defendant Hudson has served on the Audit
27 Committee during the Relevant Period.

28

17.     Defendant Robert A. Ingram ("Ingram") has served as a director of Allergan since 2005.  In addition, defendant Ingram currently serves as Chair of the Governance Committee and has previously served as the Company's Vice Chairman, Chief Administrative Officer, General Counsel and Secretary during the Relevant Period.

18.     Defendant Trevor M. Jones, Ph.D. ("Jones") has served as a director of Allergan since 2004.  In addition, defendant Jones has served on the Governance Committee during the Relevant Period.

19.     Defendant Russell T. Ray ("Ray") has served as a director of Allergan since 2003.  In addition, defendant Ray currently serves as Chair of the Audit Committee.

20.     Defendant Stephen J. Ryan, M.D. ("Ryan") has served as a director of Allergan since 2002.  In addition, defendant Ryan has served as a member of the Audit Committee during the Relevant Period.

21.     Defendant Leonard D. Schaeffer ("Schaeffer") has served as a director of Allergan since 1993.  In addition, defendant Schaeffer has served as a member of the Governance Committee during the Relevant Period.

22.     Collectively, defendants Pyott, Boyer, Lavigne, Herbert, Ryan, Schaeffer, Gallagher, Ingram, Jones, Hudson, Ray, and Dunsire are referred to as "Defendants."

23.     Collectively, defendants Lavigne, Gallagher, Hudson, Ray, and Ryan are referred to as the "Audit Committee Defendants."

24.     Collectively, defendants Boyer, Dunsire, Ingram, Jones, and Schaeffer are referred to as the "Governance Committee Defendants."

## DEFENDANTS' DUTIES

25.     By reason of their positions as officers, directors, and/or fiduciaries of Allergan and because of their ability to control the business and corporate affairs of Allergan, Defendants owed Allergan and its shareholders fiduciary obligations of

good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Allergan in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Allergan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Allergan and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26. Defendants, because of their positions of control and authority as directors and/or officers of Allergan, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Allergan, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

27. To discharge their duties, the officers and directors of Allergan were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Allergan were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

28.   For example, defendant Pyott discusses Allergan's commitment to corporate ethics for each and every employee and director in the "Letter from the Chief Executive Officer" found in Allergan's Code of Business Conduct & Ethics (the "Code")[1]. As defendant Pyott notes in closing, **THERE IS NO RIGHT WAY TO DO A WRONG THING"** (Emphasis in original):

> A large part of Allergan's success may be attributed to our reputation in the marketplace for the quality and safety of our products and for the values and principles that guide our business relationships, including our strong sense of ethics.   This Code of Business Conduct & Ethics represents our formal commitment to the principles of honesty, integrity, and fairness in everything we do, so that as a company our activities reflect positively on our stockholders, the marketplaces we serve, the community, and on ourselves. These principles are not new at Allergan. They are simply the restatements of our long-standing policy that all business conducted by Allergan employees and representatives will be conducted ethically and in compliance with all applicable laws.
>
> One simple reason for upholding the law is that our continued success as a company depends on it. In the health care business, any legal or ethical violation has the potential to harm patients and damage our reputation. I believe that the best reason for abiding by the law and the principles contained in this Code of Business Conduct and Ethics is that it is simply the right thing to do. We all want to work for a company that we believe consistently strives to do the right thing. The best way to ensure that

---

[1]   Available at < http://www.allergan.com/assets/pdf/agn_code_of_ethics.pdf> (revised, according to the document, in 2007).

- 6 -
COMPLAINT

Allergan does the right thing is for each employee to obey the law in his or her own job responsibilities and to help others do what is right.

29.     The Code notes that all directors, officers, employees and independent consultants are required to "comply with all applicable laws and regulations." In addition, the Code notes that "know[ing] and observ[ing] applicable laws and regulations and Allergan policies" is a "condition of employment" and that "failure to do so could subject an employee [defined earlier as an officer, director, employee or independent consultant] and Allergan to sanctions, could harm Allergan's reputation and competitive position, and could result in disciplinary measures up to and including the termination of employment."  The Code also required annual certification by all members of the Board and all other key employees.

30.     Moreover, the Code requires directors and officers to "ensur[e] compliance with worldwide clinical and regulatory standards, including conduct of clinical studies, *marketing approvals*, good manufacturing practice requirements, labeling and advertising controls, and other mandated product regulations." (Emphasis added).

31.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are specifically required, *inter alia*, to:

(a)     Review the integrity of the Company's financial statements, financial reporting process and systems of internal controls regarding finance, accounting and legal compliance;

(b)     Assist the Board in its oversight of the Company's compliance with legal and regulatory requirements;

(c)     Establish, review and update periodically the Company's Code of Business Conduct and Ethics policy and ensure that management has established a system to enforce the Code.

32.     Pursuant to the Governance Committee's Charter, the members of the Governance Committee are specifically required, *inter alia*, to:

(a)     Review comprehensive reports from management regarding compliance-related matters affecting the Company and provide general compliance oversight to Allergan.

## SUBSTANTIVE ALLEGATIONS

33.     Pursuant to the provisions of the Food, Drug, and Cosmetic Act ("FDCA") and accompanying FDA regulations, a manufacturer is prohibited from marketing or promoting a drug for any uses other than the uses indicated on the approved drug's application.   The FDA approves drugs for specific uses and at specific dosages. Use of regulated drugs outside the scope of FDA's approved use is known as "off-label use."   While a physician may prescribe a drug for a use other than one for which it is approved, the FDCA prohibits a drug manufacturer from marketing or promoting a drug for non-approved uses under 21 U.S.C. § 331(d), 355(a).

34.     The dissemination of information or materials by a pharmaceutical manufacturer of any unapproved or off-label use, also known as "misbranding" constitutes unlawful promotional advertising of the drug and violates the FDCA.

35.     In addition to prohibiting manufacturers from directly marketing and promoting a product's unapproved use, Congress and the FDA have acted to prevent manufacturers from employing indirect methods to accomplish the same end.   For example, the FDA regulates two of the most prevalent indirect promotional strategies: (1) manufacturer dissemination of medical and scientific publications concerning the off-label use of their products; and (2) manufacturer support for Continuing Medical Education programs that focus on off-label uses.   As alleged in numerous *qui tam* actions against Allergan, Defendants used both the above mechanisms to promote off-label use of Botox®.

36.     Botox® is a prescription-only medical product that contains small amounts of highly purified botulinum toxin protein refined from the bacterium,

1  *clostridium botulinum.*  When injected at approved and labeled doses into a specific
2  muscle or gland, Botox® is expected to produce a localized and temporary reduction
3  in the overacting muscle or gland.

4        37.  Botox® first received FDA approval for the treatment of the eye
5  disorders strabismus and blepharospasm.  Botox® is also approved to treat the
6  abnormal head position and neck pain caused by adult cervical dystonia, symptoms of
7  severe underarm sweating, and muscle stiffness in elbow, wrist and finger muscles in
8  adults suffering from upper limb spasticity.  More recently, Botox® received FDA
9  approval to treat glabellar lines (the smooth area between the eyebrows just above the
10  nose) under the trade name Botox® Cosmetic.

11        38.  Today, Botox® is widely known for its cosmetic uses.  However, for
12  at least six years Defendants made it a top corporate priority to maximize sales in off-
13  label markets, specifically for non-FDA approved therapeutic treatments.  The
14  September 1, 2010 DOJ press release states:

15      In 2003, Allergan doubled the size of its reimbursement team to assist
16      doctors in obtaining payment for off-label Botox® injections.  Allergan
17      held workshops to teach doctors and their office staffs how to bill for
18      off-label uses, conducted detailed audits of doctors' billing records to
19      demonstrate how they could make money by injecting Botox®, and
20      operated the Botox® Reimbursement Hotline, which provided a wide
21      array of free on-demand services to doctors for off-label uses.  Allergan
22      also lobbied government health care programs to expand coverage for
23      off-label uses, directed physician workshops and dinners focused on off-
24      label uses, paid doctors to attend "advisory boards" promoting off-label
25      uses, and created a purportedly independent online neurotoxin education
26      organization to stimulate increased use of Botox® for off-label
27      indications.

28

39.     The press release quotes Daniel R. Levinson, Inspector General of the U.S. Department of Health and Human Services as saying, "[f]raudulent marketing of drugs through off-label promotion or kickbacks to prescribers undermines the protections afforded by the drug approval process and medical decision-making. This conduct will not be tolerated." Also quoted was Brian D. Lamkin, Special Agent in Charge, FBI Atlanta, who noted "[t]his was a complex investigation that required much in terms of investigative resources in order to conduct the many interviews and document reviews needed to get us where we are today. The FBI, through its vast experience investigating health care fraud, is not only able to provide such resources, but is also able to recognize which circumstances need those resources the most. *The off-label marketing tactics employed by Allergan was one of those aforementioned circumstances*." (Emphasis added).

40.     According to Sally Yates, U.S. Attorney for the Northern District of Georgia, "[t]he FDA had approved therapeutic uses of Botox for only four rare conditions, yet *Allergan made it a top corporate priority to maximize sales of far more lucrative off-label uses that were not approved by FDA*. Allergan further demanded tremendous growth in these off-label sales year after year, even when there was little clinical evidence that these uses were effective. The FDA approval process ensures that pharmaceutical companies market their medications for uses that are proven to be safe and effective, and this case demonstrates that companies that fail to comply with these rules face criminal prosecution and stiff penalties." (Emphasis added).

41.     Most shockingly, this is not the first time that Defendants have been put on notice of potential off-label marketing and misbranding problems. Specifically, these problems were widespread at the Company from at least 2003 through 2009. In particular, Defendants have received the following FDA Warning Letters informing them of misbranding and other potential violations of the FDCA:

- **June 23, 2003 BOTOX® COSMETIC Botulinuni Toxin Type A Warning**

**Letter:** directly sent to Peter A. Kresel, former Senior Vice President of Global Regulatory Affairs at Allergan to inform the Company of violations of the FDCA regarding BOTOX® COSMETIC Botulinum Toxin Type A by: (1) disseminating false or misleading advertisement that falsely identify the product as a cosmetic treatment, (2) failing to reveal material facts about the product's use, and (3) minimizing the risk information presented.

- **September 6, 2005 Lumigan® (bimatoprost ophthalmic solution) 0.03% Warning Letter:** directly sent to defendant Pyott, who at the time was the President and Chief Executive Officer of the Company and Chairman of the Board, to inform Allergan of misbranding Lumigae by distributing sales aids that are misleading because they present unsubstantiated superiority claims in violation of the FDCA.

- **August 17, 2009 ACZONE® (dapsone) Gel, 5% Warning Letter:** directly sent to the attention of defendant Pyott, CEO and Chairman of the Board, to inform Allergan of violations of the FDCA and FDA implementing regulations regarding ACZONE® by: (1) false or misleading advertising overstating the efficacy of ACZONC®; and (2) omitting material facts and important risk information associated with the use of the product.

42.    Notwithstanding these prior warnings, the government's civil complaint states that Defendants had yet again "illegally, vigorously, and without any thought to the possible negative health effects to which [they] subjected patients, promoted" Botox® for uses that had not been deemed safe by the FDA. Federal prosecutors specifically accused Defendants of teaching doctors how to obtain reimbursement from Medicare and Medicaid for off-label uses by putting in the codes for an approved treatment. Also according to the government's civil complaint, from

- 11 –

2002 through 2006, Medicaid paid approximately $77 million for Botox® treatments, much for unapproved uses. Included was a citation to a 2004 Allergan presentation indicating that 86% of Botox® treatments reimbursed by Medicaid were for children, primarily for cerebral palsy, an off-label use.

43.   Defendants have agreed to plead guilty to a criminal misdemeanor for misbranding Botox® in violation of the FDCA. Under the plea agreement, the Company will pay a criminal fine of $375 million, which includes forfeiting assets of $25 million.[2]

44.   Allergan currently estimates that it will record total non-recurring pre-tax charges of between approximately $610 million and $615 million in its third fiscal quarter in connection with the global settlement with the DOJ. This amount includes estimated interest and certain attorneys' fees that Allergan is obligated to pay in connection with the global settlement, but does not include ongoing administrative legal fees and other costs. The Company expects to pay the global settlement costs in its fourth fiscal quarter of 2010.

45.   Additionally, as part of the resolution, Allergan entered into a corporate integrity agreement ("CIA") with the Department of Health and Human Services' Office of the Inspector General ("OIG") that requires the Company to submit compliance reports, and to post on its website any payments to doctors, such as honoraria, travel or lodging. Specifically, the CIA will require Allergan to maintain its current compliance program and undertake a series of compliance-related obligations, including additional monitoring, maintenance of specific written standards, auditing, training, education, reporting and disclosure, for five years. The CIA also provides for

[2]   This figure does not include $225 million payment to various states also involved in this litigation. The total figure is approximately $600 million.

1    an independent third-party review organization to assess and report on Allergan's

2    compliance program.

3         46.     Based upon the foregoing, Defendants caused to be implemented a

4    scheme whereby the Company engaged in a systematic program to illegally promote

5    off-label uses for its Botox® drug, the result of which has caused the Company to be

6    damaged.

### DEFENDANTS CAUSE ALLERGAN TO DISSEMINATE
### MATERIALLY FALSE AND MISLEADING PROXY STATEMENTS

47.     Allergan's Annual Proxy Statements filed on SEC form DEF 14A on

or about March 21, 2007 (the "2007 Proxy Statement"), March 20, 2008 (the "2008

Proxy Statement"), and March 19, 2009 (the "2009 Proxy Statement") each were

materially inaccurate in that they failed to disclose numerous highly material facts and

circumstances. The materially inaccurate Proxy Statements caused direct harm to the

Company in that, among other things, Defendants' omissions perpetuated the

systematic legal violations within the Company, which brought about the severe fines,

penalties, and other liabilities to which the Company was ultimately subjected.

48.     Each of the Proxy Statements was intended to, and did, procure

Allergan's shareholders' votes with respect to matters materially affecting the

Company that legally required shareholder approval. All three Proxy Statements

sought and obtained election of the Defendants by shareholder vote, in each case upon

the Board's explicit recommendation as to which directors should be elected.

49.     Each director on the Board was duty-bound – pursuant to their

general fiduciary duties under Delaware law, the specific duties applicable of directors

set forth in the Company's foundational corporate documents, and by the clear

provisions of the federal securities laws – to fully disclose all information material to

shareholders' decision concerning how to cast their votes in connection with the

election of Board directors in 2007, 2008, and 2009.

50.     The Board was also subject to an explicit affirmative disclosure duty under the Code, which governed the Board's discharge of its duties.  As described above, pursuant to the Code, the Board was required to, among other things, ensure legal compliance within Allergan, report any suspicions of non-compliance, and ensure that there were effective mechanisms in place so that misconduct would be reported to executive management and/or the Board.  The Code further required that the Board was obligated to disclose to shareholders any waiver of or deviation from the terms of the Code:

> Waivers of this Code will be granted will be granted on a case-by-case basis.  Waivers of this Code for employees may be made only by the Ethics Officer. ***Any waiver of this Code for our Directors or Executive Officers (including our Principal Financial Officers) may be made only by our Board of Directors or the appropriate committee of the Board of Directors and will be promptly disclosed to the public.*** (Emphasis added)

51.     The meaning, purpose, and intent of this express disclosure provision is clear: to ensure that the Board was either performing the specific functions set forth in the Code, or directly informing shareholders that the Board was declining to do so.  Indeed, the explicit inclusion in the Code of this affirmative disclosure obligation demonstrates that the other provisions of the Code – *e.g.*, those requiring the Board to report any suspicions of legal compliance – were highly material to shareholders, such that any deviation therefrom required express disclosure.  This disclosure provision also demonstrates the significant reliance placed by shareholders on the Board's discharge of the duties articulated in the Code.   In other words, the Board's obligations under the Code were regarded as so important that the Board could not deviate from them in any way without specifically informing shareholders of that decision.

52.    Despite its obligations under fiduciary duty, the federal securities laws, and the Code, the Board caused the Company to file and disseminate the materially inaccurate Proxy Statements.  As discussed above, in Allergan's definitive Proxy Statements, Defendants provided materially similar information and disclosures concerning the Company, the general responsibilities of the Board and its Committees, and the basis upon which the members of the Board (or prospective members of the Board) were seeking election to another (or initial) term of office. However, in the Proxy Statements, Defendants uniformly did not disclose material information to shareholders concerning critical aspects of the Board's responsibilities and activities – such as the Board's obligation to assure compliance with applicable drug marketing laws and regulations.

53.    The 2007 through 2009 Proxy Statements were false and misleading because, among other things, Defendants failed to disclose:

(a)    The extent to which the Company's financial performance depended on the Company's off-label marketing of Botox® drugs—which exposed the Company and its shareholders to tremendous regulatory, reputational and financial risk;

(b)    The circumstances surrounding the Board's waiver or constructive waiver of explicit provisions of the Code – including with respect to Defendants' duties to ensure legal compliance, to ensure the reporting of legal violations, and to themselves report suspected non-compliance – even though the Board had waived or otherwise determined to deviate from these clear requirements;

(c)    The nature of the Board's performance of their duties under the charters of the Board's various committees, including the reason for the then-current directors' decision to allow continued off-label and otherwise improper marketing despite the risks to the Company, its shareholders, or its patients;

(d)    The numerous instances in which the Board was informed of legal compliance violations concerning the unlawful marketing of Botox® drugs.

54. In light of Defendants' highly material omissions from the Proxy Statements, the votes and the consequent election of directors to the Board were obtained on the basis of inaccurate disclosures. Had shareholders been provided with complete and accurate information concerning the Board's performance of its duties – including with respect to presiding over the Company's extensive criminal violations – the members of the Board would not have been elected (or reelected).

55. The election (or reelection) of Defendants inflicted significant harm on the Company. In essence, the Board—by declining to actually perform the affirmative legal and compliance obligations as mandated by the Code and various committee charters – directly caused and perpetuated the Company's continued violation of the drug marketing rules. The consequent criminal and civil penalties levied upon the Company, as well as the numerous other liabilities to patients and other third parties, were a direct result of the Board's perpetuation of the Company's misconduct, which was only made possible by the false and misleading statements that caused defendants' election to the Board.

56. Further, had shareholders been provided with complete and accurate disclosures, Allergan shareholders would have likely chosen not to increase the compensation of employees, officers, and directors who participated in illegal marketing misconduct, and thereby reward them for their illegal activity. Rather, Allergan's shareholders would have instead demanded that appropriate legal action be taken against those employees, officers and outside directors who participated in this widespread misconduct.

57. Accordingly, Allergan has been damaged by the materially inaccurate statements and omissions in the 2007, 2008 and 2009 Proxy Statements that procured the reelection of Defendants to the Board, thus perpetuating their misconduct.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

58.    Plaintiff brings this action derivatively on behalf of the Company. Plaintiff is a current shareholder of the Company and has been so continuously since 1989 and during which the actions complained of herein were committed.

59.    Plaintiff will adequately and fairly represent the interests of Allergan and its shareholders in enforcing and prosecuting its rights, and it has retained counsel experienced in prosecuting this type of action.

60.    At the time this action was initiated, the Board was comprised of twelve (12) members: defendants Pyott, Boyer, Lavingne, Herbert, Ryan, Schaeffer, Gallagher, Ingram, Jones, Hudson, Ray and Dunsire.

## DEMAND IS EXCUSED BECAUSE DEFENDANTS' CONDUCT WAS NOT A VALID EXERCISE OF BUSINESS JUDGMENT

61.    Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of criminal activity, including knowingly and consciously presiding over the Company's systematic violations of the drug marketing laws and regulations, particularly in light of the prior warnings they received.

62.    The Board affirmatively adopted, implemented and condoned a business strategy based on deliberate, widespread and criminal violations of law. Breaking the law cannot and is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand upon the entire Board is excused.

63.    A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment – conduct for which the Board should face potential personal liability.   Simply put, committing crimes, approving the commission of crimes by others, or looking the other way while refusing to prevent others under the Board's control from committing crimes are all forms of misconduct that cannot under any circumstances be examples of legitimate business conduct. The

- 17 -
COMPLAINT

1   protections of the "business judgment rule" do not extend to such malfeasance.  Nor

2   can such malfeasance ever constitute the "good faith" required of corporate

3   fiduciaries.  Even if one considers that such conduct occurred solely from 2000-2005,

4   ten of the twelve current members of the Board served during which the unlawful

5   conduct occurred, thus making a majority unable to disinterestedly consider a

6   shareholder demand.

7       64.   Moreover, this action does not arise from an anomalous incident of

8   misconduct within the Company or from the acts of a rogue employee or division

9   within the Company. Rather, as alleged herein, serious violations of the drug

10  marketing laws occurred systematically and at every level of the Company as a direct

11  result of the Board's decision to embrace a policy of calculated legal violations as the

12  Company's deliberate business strategy. There is no legitimate "business judgment"

13  involved in devising or carrying out such an unlawful policy. It goes without saying

14  that the above violations of law also run afoul of the Code – a document to which each

15  Board member is purportedly required to follow.  Accordingly, demand on the Board

16  is futile and excused.

17  **DEMAND IS EXCUSED BECAUSE A MAJORITY OF THE CURRENT**
    **BOARD MEMBERS FACE A SUBSTANTIAL LIKELIHOOD OF**
18  **LIABILITY ARISING FROM THEIR MISCONDUCT**

19      65.   Every member of the Board was aware of, or should have been aware

20  of, numerous red flags regarding the Company's illicit marketing practices.

21  Specifically, as discussed above, the Company received numerous FDA warning letters

22  concerning off-label marketing and misbranding.  Despite clearly being placed on

23  notice of these illicit practices, Defendants consciously disregarded their fiduciary

24  duties to Allergan when, under their direction, the Company continued to expend

25  resources to market its products for "off-label" uses and engage in other illicit

26  marketing activities.

27      66.   Defendants Lavigne, Gallagher, Ray, Hudson, and Ryan are unable to

28  disinterestedly consider a shareholder demand because they each face a substantial

- 18 –
COMPLAINT

1   likelihood of liability as a result of their conduct on the Audit Committee.  Each of the
2   foregoing has served as a member of the Audit Committee at various times during
3   which the alleged unlawful conduct took place.

4          67.    As set forth above, the Audit Committee's charter imposes specific
5   duties on members of this committee to ensure the Company and the Board's
6   compliance with laws, regulations, and internal procedures. The members of the Audit
7   Committee violated their fiduciary duties to act in good faith to address the violations
8   complained of herein. Accordingly, defendants Lavigne, Gallagher, Ray and Ryan
9   face a substantial likelihood of liability and cannot appropriately consider a demand,
10  and therefore demand is excused with respect to these Defendants.

11         68.    Further, defendants Boyer, Ingram, Dunsire, Jones, and Schaeffer are
12  unable to disinterestedly consider a shareholder demand because they each face a
13  substantial likelihood of liability as a result of their conduct on the Governance
14  Committee.  Each of the foregoing served as a member of the Governance Committee
15  at various times during which the alleged unlawful conduct took place.

16         69.    As set forth above, the Governance Committee's charter imposes
17  specific duties upon its members to review comprehensive reports from management
18  regarding compliance-related matters affecting the Company and provide general
19  compliance oversight to the Company.  The members of the Governance Committee
20  violated their fiduciary duties to act in good faith to address the violations complained
21  of herein.  Accordingly, defendants Boyer, Ingram, Jones and Schaeffer face a
22  substantial likelihood of liability and cannot appropriately consider a demand, and
23  therefore demand is excused with respect to these Defendants.

24         70.    Finally, all the Defendants bear a substantial likelihood of liability
25  arising from their violation of the federal securities laws in connection with their
26  issuance of the Proxy Statements.  The Proxy Statements constituted solicitations by
27  Defendants, as applicable, for which they may be held personally liable under the
28  federal securities laws.  As set forth above, the Proxy Statements were materially

inaccurate and incomplete, which caused significant harm to the Company. As a result, Defendants each bear a substantial likelihood of liability for their violations of the federal securities laws, are conflicted and not disinterested with respect to such claims, and are, fundamentally disabled from impartially considering a demand to impose liability on themselves for violating their own statutory disclosure obligations.

## DEMAND IS EXCUSED ON DEFENDANTS PYOTT, HERBERT, AND INGRAM BECAUSE THEY LACK INDEPENDENCE FROM DEMONSTRABLY INTERESTED DIRECTORS

71.     Defendants Pyott, Herbert and Ingram are not independent directors and, thus, cannot consider a demand.  Defendant Pyott's principal occupation is as Allergan's CEO, and, as such, he lacks independence from the numerous demonstrably interested directors referenced above, rendering him incapable of impartially considering a demand to prosecute this action.   Similarly, defendant Herbert, who founded the Company and for much of his adult life constituted his principal occupation, lacks independence from the numerous demonstrably interested directors referenced above.   Defendant Herbert has also continued to serve as Chairman Emeritus of the Company.  Defendant Ingram is a past Executive Vice President, Chief Administrative Officer, General Counsel and Secretary of the Company.    Thus, defendant Herbert lacks independence from the numerous demonstrably interested directors referenced above.

## COUNT I

### Derivative Claim for Violations of §14(A) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Based Upon Material Misstatements in and Omissions From Allergan's 2007-2009 Proxy Statements

72.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

73.     Defendants caused Allergan to issue the 2007 Proxy Statement, the 2008 Proxy Statement, and the 2009 Proxy Statement to solicit shareholder votes for the election of directors.

74.     As alleged in detail above, these Proxy Statements contained materially inaccurate and incomplete disclosures. The inaccuracies and omissions in each Proxy Statement concerned matters of material importance to the Company and were material to shareholders in response to the solicitations embodied in each Proxy Statement. The Proxy Statements were an essential link in Defendants' conscious disregard for Allergan's known illegal sales and promotion practices, as disclosure to the shareholders of the truth would have brought an end to shareholders' endorsement of Defendants as fiduciaries and termination of the Company's compensation policies.

75.     Defendants' failure to include these material facts in the 2007 through 2009 Proxy Statements rendered the Proxy Statements materially inaccurate and incomplete, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

76.     As a direct and proximate result of the issuance of false and misleading Proxy Statements, Allergan suffered direct and significant damages in the form of, *inter alia*, the perpetuation of the widespread misconduct committed in the Company's name, substantial fines and penalties inflicted on the Company for this misconduct, and substantial additional liabilities related to numerous *qui tam* "whistleblower suits," and other lawsuits and investigations, as well as significant expenses related thereto.

77.     In connection with the improper acts alleged under this Count, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

78.     This count is only alleged against Defendants as to those proxies that were issued during their terms as directors on the Board.

## COUNT II

### Derivative Claim for Breach of Fiduciary Duties for Disseminating False and Misleading Statements

79.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

80.     As alleged in detail herein, each of the Defendants had a duty to ensure that Allergan disseminated accurate, truthful and complete information to its shareholders.

81.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Allergan shareholders materially misleading and inaccurate information through, *inter alia*, the Proxy Statements and other Company filings.  These actions could not have been a good faith exercise of prudent business judgment.

82.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT III

### Derivative Claim for Breach of Fiduciary Duty for Causing the Company to Engage in Unlawful Conduct and/or Consciously Disregarding Widespread Violations of Law

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     Defendants all owed and owe fiduciary duties to Allergan and its shareholders. By reason of their fiduciary relationships, Defendants specifically owed and owe Allergan the highest obligation of good faith and loyalty in the administration of the affairs of Allergan, including the oversight of Allergan's compliance with federal laws governing the marketing of pharmaceuticals.  Moreover, the Board had specific fiduciary duties as defined by the Code and various Board committee charters that, had they been discharged in accordance with the Board's obligations, would have

1  necessarily prevented the misconduct and consequent harm to the Company alleged
2  herein.

3        85.    Defendants consciously violated their corporate responsibilities in at
4  least the following ways:

5            (a)    Affirmatively and repeatedly declining to stop and prevent
6  Allergan's illegal marketing of off-label uses of Botox®;

7            (b)    Deciding not to act to stop and prevent Allergan's illegal kickbacks
8  to health professionals for prescribing Botox® for off-label uses, and/or consciously
9  disregarding such reports and activity; and

10           (c)    Approving and/or consciously disregarding Allergan's business
11  plan of marketing its drugs through the widespread illegal promotion of off-label uses
12  and through illegal kickbacks to healthcare professionals in order to maximize
13  Allergan's short-term profit but at the expense of shareholder's long-term interests
14  and Allergan's reputation and goodwill.

15       86.    As a direct and proximate result of Defendants' conscious failure to
16  perform their fiduciary obligations, Allergan has sustained significant damages, not
17  only monetarily, but also to its corporate image and goodwill.  Such damage included,
18  among other things, the substantial penalties, fines, liabilities and expenses referenced
19  above.  To date, these sums represent more than $600 million.

20       87.    As a result of the misconduct alleged herein, Defendants are liable to
21  the Company.

22                              **COUNT IV**

23            **Derivative Claims for Breach of Fiduciary Duty**

24       88.    Plaintiff incorporates by reference and realleges each and every
25  allegation contained above as though fully set forth herein.

26       89.    By reason of their positions as fiduciaries of the Company,
27  Defendants owed duties of good faith, loyalty, and truthful disclosure.  Defendants
28  were all aware of and educated concerning the relevant laws and regulations

1  concerning pharmaceutical marketing and were duty-bound to abide by the laws and
2  regulations and to enforce compliance therewith.

3        90.   Defendants consciously violated and breached these duties by
4  causing Allergan to employ a deliberate and systematic business plan of artificially
5  increasing sales by engaging in unlawful sales and promotion practices by numerous
6  Allergan employees for a prolonged period of time in violation of FDA requirements,
7  Federal healthcare program requirements and/or the Federal anti-kickback statute.

8        91.   Defendants authorized and implemented Allergan policies and
9  practices of encouraging the widespread illegal marketing and promotion of off-label
10 uses and dosages of Allergan drugs, as well as the payment of illegal kickbacks to
11 healthcare professionals to induce the prescription of Allergan's drugs.

12       92.   As a direct and proximate result of Defendants' breaches of fiduciary
13 duty, the Company has sustained, and will continue to sustain, substantial harm.

14       93.   Defendants are liable to the Company as a result of the acts alleged
15 herein.

16                **COUNT V**

17         **Derivative Claim for Unjust Enrichment**

18       94.   Plaintiff incorporates by reference and realleges each and every
19 allegation set forth above, as though full set forth herein.

20       95.   By their wrongful acts and omissions, Defendants were unjustly
21 enriched at the expense of and to the detriment of Allergan.

22       96.   Plaintiff, as shareholder and representative of Allergan, seeks
23 restitution, damages, an order of this Court disgorging all profits, benefits and other
24 compensation obtained by these defendants from their wrongful conduct and fiduciary
25 breaches, and other relief for the Company, in an amount to be proven at trial.

26               **RELIEF REQUESTED**

27     WHEREFORE, Plaintiff demands judgment as follows:

28

1      A.    Determining that this action is a proper derivative action maintainable

2 under law and demand is excused;

3      B.    Awarding, against all defendants and in favor of Allergan, the damages

4 sustained by the Company as a result of Defendants' breaches of fiduciary and

5 contractual duties;

6      C.    Awarding to Allergan restitution from defendants, and from each of

7 them, and ordering disgorgement of all profits, benefits and other compensation

8 obtained by the Defendants during the Relevant Period;

9      D.    An Order invalidating the election of directors to the Board pursuant to

10 the 2009 Proxy Statement;

11      E.    Directing Allergan to take all necessary actions to reform and improve its

12 corporate governance and internal procedures to comply with the Company's existing

13 governance obligations and all applicable laws and to protect the Company and its

14 shareholders from a recurrence of the damaging events described herein;

15      F.    Awarding to Plaintiff the costs and disbursements of the action, including

16 reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

17      G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

19    Plaintiff demands a trial by jury.

DATED:  September 9, 2010

THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)

KATHLEEN A. HERKENHOFF

12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858-794-1441
Facsimile: 858-794-1450

1

2                           THE WEISER LAW FIRM, P.C.

3                           ROBERT B. WEISER
                            BRETT STECKER

4                           JEFFREY CIARLANTO
                           121 North Wayne Avenue, Suite 100

5                           Wayne, PA 19087
                           Telephone: (610) 225-2616

6                           Facsimile:  (610) 225-2678

7                           THE SHUMAN LAW FIRM
                           KIP B. SHUMAN

8                           RUSTY GLENN
                           885 Arapahoe Avenue

9                           Boulder, CO 80302
                           Telephone: (303) 861-3003

10                         Facsimile: (303) 484-4886

11                         LAW OFFICE OF DEBRA S. GOODMAN
                           P.C.

12                         DEBRA S. GOODMAN
                           1301 Skippack Pike

13                         Suite 7A #133
                         Blue Bell, PA 19422

14                         Telephone: (610) 277-6057
                         Facsimile:  (484) 231-1922

15                         Counsel for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

## ALLERGAN, INC. VERIFICATION

I, Willa Rosenbloom, hereby verify that I am familiar with the allegations in the

Complaint, and that I have authorized the filing of the Complaint, and that the foregoing

is true and correct to the best of my knowledge, information, and belief.

Date: _9/9/10_____

_Willa S. Rosenbloom_
Willa Rosenbloom

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself □)

Willa Rosenbloom, derivatively on behalf of
ALLERGAN, INC

**DEFENDANTS**

David E.I. Pyott, Herbert W. Boyer, M.D., Louis J. Lavigne, Jr., Gavin S.
Herbert, Stephen J. Ryan, M.D., Leonard D. Schaeffer, Michael R. Gallagher,
Robert A. Ingram, Trevor M. Jones, Ph.D., Dawn E. Hudson, Russell T. Ray,

Deborah Dunsire, M.D. and Allergan, Inc., a Delaware Corporation

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing
yourself, provide same.)

Kathleen A. Herkenhoff, The Weiser Law Firm, P.C.
12707 High Bluff Drive, Suite 200
San Diego, California 92130; Tel: 858 794-1441

**Attorneys** (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

□ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S.
                                    Government Not a Party)

□ 2 U.S. Government Defendant   □ 4 Diversity (Indicate Citizenship
                                    of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | □ 1 | □ 1 | Incorporated or Principal Place of Business in this State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original      □ 2 Removed from    □ 3 Remanded from   □ 4 Reinstated or   □ 5 Transferred from another district (specify):   □ 6 Multi-       □ 7 Appeal to District
     Proceeding        State Court          Appellate Court      Reopened                                                              District          Judge from
                                                                                                                                      Litigation        Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  □ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** □ Yes  ☑ No          □ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Jurisdictionally under 28 U.S.C. §1311; The action arises under §14(a) of the Exchange Act, 15 U.S.C. 78n(a).

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| □ 400 State Reapportionment | □ 110 Insurance | □ 310 Airplane | □ 370 Other Fraud | □ 510 Motions to | □ 710 Fair Labor Standards Act |
| □ 410 Antitrust | □ 120 Marine | □ 315 Airplane Product Liability | □ 371 Truth in Lending | Vacate Sentence Habeas Corpus | □ 720 Labor/Mgmt. Relations |
| □ 430 Banks and Banking | □ 130 Miller Act | □ 320 Assault, Libel & Slander | □ 380 Other Personal Property Damage | □ 530 General | □ 730 Labor/Mgmt. Reporting & Disclosure Act |
| □ 450 Commerce/ICC Rates/etc. | □ 140 Negotiable Instrument | □ 330 Fed. Employers' Liability | □ 385 Property Damage Product Liability | □ 535 Death Penalty □ 540 Mandamus/ | □ 740 Railway Labor Act |
| □ 460 Deportation | □ 150 Recovery of Overpayment & Enforcement of Judgment | □ 340 Marine | BANKRUPTCY | Other | □ 790 Other Labor Litigation |
| □ 470 Racketeer Influenced and Corrupt Organizations | □ 345 Marine Product Liability | □ 422 Appeal 28 USC 158 | □ 550 Civil Rights | □ 791 Empl. Ret. Inc. Security Act |
| □ 480 Consumer Credit | □ 151 Medicare Act | □ 350 Motor Vehicle | □ 423 Withdrawal 28 USC 157 | □ 555 Prison Condition | PROPERTY RIGHTS |
| □ 490 Cable/Sat TV | □ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | □ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | □ 820 Copyrights |
| □ 810 Selective Service | □ 360 Other Personal Injury | □ 441 Voting | □ 610 Agriculture | □ 830 Patent |
| □ 850 Securities/Commodities/ Exchange | □ 153 Recovery of Overpayment of Veteran's Benefits | □ 362 Personal Injury- Med Malpractice | □ 442 Employment | □ 620 Other Food & Drug | □ 840 Trademark |
| □ 875 Customer Challenge 12 USC 3410 | □ 160 Stockholders' Suits | □ 365 Personal Injury- Product Liability | □ 443 Housing/Acco- mmodations | □ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY □ 861 HIA (1395ff) |
| □ 890 Other Statutory Actions | □ 190 Other Contract | □ 368 Asbestos Personal Injury Product Liability | □ 444 Welfare | □ 862 Black Lung (923) | |
| □ 891 Agricultural Act | □ 195 Contract Product Liability | IMMIGRATION | □ 445 American with Disabilities - Employment | □ 630 Liquor Laws | □ 863 DIWC/DIWW (405(g)) |
| □ 892 Economic Stabilization Act | □ 196 Franchise | □ 462 Naturalization Application | □ 446 American with Disabilities - Other | □ 640 R.R. & Truck □ 650 Airline Regs | □ 864 SSID Title XVI □ 865 RSI (405(g)) |
| □ 893 Environmental Matters | REAL PROPERTY □ 210 Land Condemnation | □ 463 Habeas Corpus- Alien Detainee | □ 440 Other Civil Rights | □ 660 Occupational Safety /Health | FEDERAL TAX SUITS □ 870 Taxes (U.S. Plaintiff or Defendant) |
| □ 894 Energy Allocation Act | □ 220 Foreclosure | □ 465 Other Immigration Actions | | □ 690 Other | □ 871 IRS-Third Party 26 USC 7609 |
| □ 895 Freedom of Info. Act | □ 230 Rent Lease & Ejectment | | | | |
| □ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | □ 240 Torts to Land □ 245 Tort Product Liability | | | | |
| □ 950 Constitutionality of State Statutes | □ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**  Case Number: **SACV10-01352 DOC (MLGx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                              CIVIL COVER SHEET                              Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No  ☐ Yes
If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No  ☐ Yes
If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
  ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
  ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
  ☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Philadelphia, PA |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
  ☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange |  |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
  **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _Matthew Herbert_     Date September 9, 2010

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but _is_ used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

Kathleen A. Herkenhoff (SBN 168562)
The Weiser Law Firm, P.C.
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Tel: 858 794-1441; email: kah@weiserlawfirm.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Willa Rosenbloom, derivatively on behalf of ALLERGAN, INC | CASE NUMBER |
| **PLAINTIFF(S)** | **SACV10-01352 DOC (MLGx)** |
| v. | |
| David E.I. Pyott, Herbert W. Boyer, M.D., Louis J. Lavigne, Jr., Gavin S. Herbert, Stephen J. Ryan, M.D., (additional names appear on Attachment A) | |
| **DEFENDANT(S).** | **SUMMONS** |

TO:    DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Kathleen A. Herkenhoff_____, whose address is _12707 High Bluff Drive, Suite 200, San Diego, California 92130_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___SEP -9 2010___

By: ___ROLLS ROYCE PASCUAL___
          Deputy Clerk

          *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                        **SUMMONS**

## Attachment A

### Continuation of Defendants from Summons:

Leonard D. Schaeffer

Michael R. Gallagher

Robert A. Ingram

Trevor M. Jones, Ph D.

Dawn E. Hudson

Russell T. Ray

Deborah Dunsire, M.D.


And

ALLERGAN, INC., a Delaware corporation,

Nominal Defendant

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV10- 1352 DOC (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[X] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.