1  ROBBINS UMEDA LLP
   BRIAN J. ROBBINS
2  FELIPE J. ARROYO
   ARSHAN AMIRI
3  600 B Street, Suite 1900
   San Diego, CA 92010
4  Telephone: (619) 525-3990
   Facsimile:  (619) 525-3991
5  brobbins@robbinsumeda.com
   farroyo@robbinsumeda.com
6  aamiri@robbinsumeda.com

7  Lead Counsel for Plaintiffs

8  [Additional lead counsel appear on signature page]

9

10                 UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12                       SOUTHERN DIVISION

13  IN RE ALLERGAN, INC.              )  Master File No. SACV10-01352-
    SHAREHOLDER DERIVATIVE            )  DOC (MLGx)
14  LITIGATION                        )

15  WILLA ROSENBLOOM, DANIEL          )  VERIFIED SHAREHOLDER
    HIMMEL, POMPANO BEACH             )  DERIVATIVE CONSOLIDATED
16  POLICE & FIREFIGHTERS'            )  COMPLAINT FOR VIOLATIONS
    RETIREMENT SYSTEM and             )  OF FEDERAL SECURITIES LAWS,
17  WESTERN WASHINGTON                )  VIOLATIONS OF CALIFORNIA
    LABORERS-EMPLOYERS PENSION        )  CORPORATIONS CODE, BREACH
18  TRUST, Derivatively on Behalf of  )  OF FIDUCIARY DUTY, WASTE
    ALLERGAN, INC.,                   )  OF CORPORATE ASSETS, AND
19                                    )  UNJUST ENRICHMENT
                Plaintiffs,           )
20                                    )
         v.                           )
21                                    )
    DAVID E. I. PYOTT, HERBERT W.     )
22  BOYER, DEBORAH DUNSIRE,           )
    GAVIN S. HERBERT, LEONARD D.      )
23  SCHAEFFER, MICHAEL R.             )
    GALLAGHER, STEPHEN J. RYAN,       )
24  RUSSELL T. RAY, TREVOR M.         )
    JONES, ROBERT A. INGRAM,          )
25  LOUIS J. LAVIGNE, JR., DEBORAH    )  DEMAND FOR JURY TRIAL
    DUNSIRE, DAWN HUDSON,             )
26  HANDEL E. EVANS, RONALD M.        )
    CRESSWELL, LOUIS T. ROSSO,        )
27  KAREN R. OSAR, and ANTHONY H.     )
    WILD,                             )
28                                    )

────────────────────────────────────────────
        VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1

Defendants,                          )
                                     )
2        -and-                       )
                                     )
3  ALLERGAN, INC., a Delaware        )
   corporation,                      )
4            Nominal Defendant.      )

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

Willa Rosenbloom, Daniel Himmel, Pompano Beach Police & Firefighters' Retirement System, and Western Washington Laborers-Employers Pension Trust ("Plaintiffs"), by their attorneys, submit this Verified Shareholder Derivative Consolidated Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action on behalf of nominal defendant Allergan, Inc. ("Allergan" or the "Company") against its entire Board of Directors (the "Board") and its Chief Executive Officer, David E.I. ("Pyott") (collectively the "Individual Defendants") for, among other things, violations of Section 14(a) of the Securities Exchange Act of 1934 (and Rule 14a-9 promulgated thereunder), breach of fiduciary duty and corporate waste. By this action, Plaintiffs seek to recover damages and obtain other relief against the Individual Defendants for illegally promoting Allergan's flagship product Botox for uses not approved by the U.S. Food and Drug Administration ("FDA"). The Individual Defendants' actions are responsible for severely damaging Allergan's once valuable corporate franchise by showing a pattern and practice of violating federal regulations and failing to comply with various FDA rules and regulations.

2.     This derivative action arises from the Individual Defendants actions in knowingly causing and permitting the Company to engage in a decade long systematic illegal marketing and promotion scheme for its most important product, Botox, and certain other drugs. On September 1, 2010, the U.S. Department of Justice (the "DOJ") announced a $600 million sanction to resolve civil and criminal claims against Allergan concerning the Company's promotion of Botox for unapproved uses.

3.     Towards the end of the drug development process, pharmaceutical companies submit drugs for approval to the FDA. When a pharmaceutical company submits a drug, it specifies the particular purpose for which the drug is to be used. Usually, there is extensive testing of the drug to support its use for this purpose. If it

1  finds the drug's benefits outweigh the risks, the FDA approves its use for the specified
2  purpose.  The specific approved use is called the "indication" for which the drug may
3  be prescribed.  The FDA specifies particular dosages determined to be safe and
4  effective for each indication.

5      4.    Even though the FDA approves a drug for a particular use, doctors,
6  however, are free to prescribe it for other uses, known as "off-label" use.  Off-label
7  prescriptions of a drug can significantly increase its use, and correspondingly, the
8  income to the pharmaceutical company that makes the drug.  There are obvious
9  dangers in prescribing a drug for unapproved, and many times untested, use.
10  Accordingly, the Food, Drug, and Cosmetics Act ("FDCA") prohibits a pharmaceutical
11  company from promoting the off-label use of its drug or from making misleading
12  claims as to a drug's safety or effectiveness.

13      5.    The penalties for violating the FDCA are harsh.  In addition to substantial
14  criminal and civil penalties and fines, violators of the FDCA can be excluded from
15  participation in Medicare Program ("Medicare") and Medicaid Program ("Medicaid").
16  Exclusion from these government run insurance programs would cripple almost all
17  medical companies, as they would no longer be able to access the largest potential
18  source of revenues.

19      6.    Here, in order to push sales of Botox, the defendants devised,
20  implemented, and allowed a Company-wide scheme to convince medical providers to
21  use Botox in unapproved ways.  And the Individual Defendants were aware that the
22  marketing and promotional practices they caused Allergan to engage in were improper
23  and violated applicable federal law.  Indeed, the Individual Defendants and Allergan
24  (collectively " Individual Defendants") were notified of these improper practices on
25  several occasions.

26      7.    Despite the serious perils to Allergan and its shareholders of illegal off-
27  label marketing practices, the Board permitted the Defendants to cause the Company to
28  engage in a decade long scheme to misbrand Botox and other drugs.  Allergan's

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1    systematic disregard of the laws was widespread and blatant.  Allergan doubled the
2    size of its support staff assisting doctors in obtaining payment for off-label Botox use,
3    implemented Company-wide initiatives to expand Botox's off-label use, which
4    included coordinated efforts by three different divisions in the Company, created
5    allegedly "independent" educational organizations that promoted the off-label use of
6    Botox, and paid doctors to attend elaborate dinners and retreats focused on off-label
7    uses for Botox.  According to the DOJ, "Allergan made it a *top corporate priority* to
8    maximize sales of far more lucrative off-label uses that were not approved by FDA."
9    Making this off-label marketing of Botox even worse is that "there was little clinical
10   evidence that these [off-label] uses were effective."  The wrong-doing at the Company
11   was so widespread that five different whistleblowers filed *qui tam* actions on behalf of
12   the United States alleging violations of the False Claim Act.  Moreover, *since 2003,*
13   *the FDA has sent the Company at least three warning letters complaining about the*
14   *marketing practices at the Company*, including a letter in June 2003 that stated the
15   Company issued false and misleading advertising about Botox.

16       8.    While the Individual Defendants were each sufficiently aware of the
17   illegal off-label marketing scheme at the Company, Allergan's shareholders were not.
18   In seeking reelection to their lucrative positions and increased benefits under a
19   shareholder approved incentive plan, each of the Individual Defendants (and in
20   particular, the Board) failed to disclose material information to the Company's
21   shareholders necessary to make an adequately informed decision in violation of federal
22   law.  As a result, the Company's shareholders reelected members of the Board and
23   approved the incentive plans, allowing these defendants to continue to harm the
24   Company, and reap undeserved compensation.

25       9.    Despite the above warnings, Defendants continued their illegal and
26   improper off-label sales and marketing practices.  And it was only a matter of time
27   until investigative authorities learned of Defendants' ongoing scheme.  It started with
28   several "whistleblowers" filing *qui tam* actions:

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1      •      *United States ex rel. Lang, et al. v. Allergan, Inc.*, Case No. 1:07-cv-

2 01288 (N.D. Ga. June 5, 2007), alleging violations of the False Claims Act, 31 U.S.C.

3 §§3729-3733 ("Civil Action I")

4      •      *United States ex rel. Beilfuss, et al. v. Allergan, Inc.*, Case No. 1:08-

5 cv-10305 (D. Mass., Feb. 22, 2008), alleging violations of the False Claims Act, 31

6 U.S.C. §§3729-3733 ("Civil Action II")

7      •      *United States ex rel. Hallivis v. Allergan, Inc.*, Case No. 8:09-cv-

8 02817 (D. Md., Oct. 26, 2009), alleging violations of the False Claims Act, 31 U.S.C.

9 §§3729-3733 ("Civil Action III")[1]

10      10.     The DOJ then intervened on behalf of the United States in Civil Action I

11 and Civil Action II on April 2, 2010.

12      11.     On August 31, 2010, a Settlement Agreement was entered between the

13 United States, the individuals who filed the Civil Qui Tam Actions as "relators" and

14 Allergan to resolve the Civil Qui Tam Actions. The Settlement Agreement addresses

15 Defendants' conduct from January 1, 2001 through at least December 31, 2008, in

16 which Defendants: (i) promoted Botox for off-label indications that were not medically

17 accepted and therefore not covered by federal health care programs; (ii) made

18 unsubstantiated and misleading statements about the safety and efficacy of Botox for

19 off-label indications; (iii) instructed doctors to miscode Botox claims for uncovered

20 indications using inappropriate diagnosis codes to ensure payment by government

21 health care programs; and (iv) provided inducements to doctors to promote and/or

22 prescribe more Botox (collectively referred to as the "Covered Conduct")[2].

23

24

25 [1] Civil Action I, II, and III are collectively referred to herein as the "Civil Qui Tam Actions".

26 [2] The Settlement Agreement details that the Covered Conduct period extends from January 1, 2001
27 to December 31, 2009 and concerns Defendants' illegal and improper conduct, which includes
miscoding of claims for Botox submitted to Medicare, Medicaid, or Other Federal Health Care
28 Programs with diagnosis codes for overactive bladder and neurogenic bladder conditions.

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

12.     The Settlement Agreement sets forth in detail the lengths Defendants went to cause false or fraudulent claims for Botox to be submitted to, or caused to be purchased by, the Medicare Program, the Medicaid Program, and certain defined "Other Federal Health Care Programs".  The Settlement Agreement requires the Company to pay $225 million (plus accrued interest) to the United States and to various state governments referred to in the Settlement Agreement as the "Medicaid Participating States." Allergan also agreed to plead guilty to a criminal misdemeanor for misbranding Botox in violation of the FDCA.

13.     Further, on August 30, 2010, the Company also entered into a five year corporate integrity agreement ("CIA") with the Department of Health and Human Services' Office of Inspector General (the "OIG").  Under the CIA, the Company will have to submit compliance reports to the OIG and undertake additional compliance related activities, such as additional monitoring, auditing, and training.

14.     On September 1, 2010, the DOJ filed a Criminal Information (or the "Information") against Allergan in the United States District Court for the Northern District of Georgia in an action entitled *U.S.A. v. Allergan, Inc.*, Criminal Action No. 1:10-CR-375 (N.D. Ga., Sept. 1, 2010) (the "Criminal Action").  The Information charges the Company with "Distribution of a Misbranded Drug/Biologic" in violation of provisions of the FDCA (including 21 U.S.C. §§331(a) and 352(f)(1)) during the period from January 1, 2000 through December 31, 2005.  On October 5, 2010, Allergan entered a Guilty Plea And Plea Agreement ("Guilty Plea") wherein it admitted that the Company was pleading guilty "because it is in fact guilty of the crime charged in Count One of the Criminal Information" during the period from 2000 through 2005 (the "Criminal Conduct").  Allergan agreed to pay a criminal fine of $375 million in connection with its Guilty Plea.

15.     Allergan's core business rests upon the marketing of its drugs, not only to consumers, but also to doctors.  As pointed out by the DOJ's September 1, 2010 press release (the "DOJ Press Release") announcing the $600 million in sanctions and fines

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

(the "Civil and Criminal Settlements") to resolve the Civil Qui Tam Actions and the Criminal Action: "Allergan made it a ***top corporate priority*** to maximize sales of Botox for off-label uses." In order to accomplish this task, the Individual Defendants caused and permitted Allergan to openly violate and evade the legal marketing restrictions applicable to its products pursuant to the FDCA.

16.    The DOJ Press Release also quotes Daniel R. Levinson, Inspector General of the U.S. Department of Health and Human Services as saying, "[f]raudulent marketing of drugs through off-label promotion or kickbacks to prescribers undermines the protections afforded by the drug approval process and medical decision-making. This conduct will not be tolerated." Also quoted in the DOJ Press Release was Brian D. Lamkin, Special Agent in Charge, FBI Atlanta, who noted "[t]his was a complex investigation that required much in terms of investigative resources in order to conduct the many interviews and document reviews needed to get us where we are today. The FBI, through its vast experience investigating health care fraud, is not only able to provide such resources, but is also able to recognize which circumstances need those resources the most. ***The off-label marketing tactics employed by Allergan was one of those aforementioned circumstances***."

17.    As further explained by the United States Attorney in the DOJ Press Release:

> The FDA had approved therapeutic uses of Botox for only four rare conditions, yet Allergan made it a ***top corporate priority to maximize sales of far more lucrative off-label uses that were not approved by FDA***. Allergan further demanded tremendous growth in these off-label sales year after year, even when there was little clinical evidence that these uses were effective. The FDA approval process ensures that pharmaceutical companies market their medications for uses that are proven to be effective, and this case demonstrates that companies

- 6 -

1     that fail to comply with these rules face criminal prosecution and stiff
2     penalties.
3          Under the Food, Drug and Cosmetic Act (FDCA), a company in its
4     application to the FDA must specify each intended use of a biological
5     product.  After the FDA approves the product as sale and effective for a
6     specified use, any promotion by the manufacturer for other uses – known
7     as "off-label" uses – renders the product misbranded.

8     18.     Accordingly, as a result of the Individual Defendants' illegal scheme to
9 boost Botox sales via off-label sales and marketing, the Company has been forced to
10 pay $600 million (excluding any applicable interest) to resolve both the Criminal
11 Action and the Civil Qui Tam Actions via the Civil and Criminal Settlements.

12     19.     Plaintiffs now bring this litigation on behalf of Allergan and seek to
13 rectify the conduct of the Individual Defendants, who each bear ultimate responsibility
14 for the harm to the Company.  As directors on the Board and/or senior management of
15 the Company, the Individual Defendants must be held responsible for the harm they
16 have caused Allergan to suffer so that Allergan may recover for the damages it
17 sustained due to defendants' violations of state and federal law, breaches of fiduciary
18 duty, unjust enrichment, and waste of Company assets.

19                     **JURISDICTION AND VENUE**

20     20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331
21 and §1332 (a)(2), in that this complaint presents a federal question and the plaintiffs
22 and defendants are citizens of different states and the matter in controversy exceeds
23 $75,000, exclusive of interests and costs.  This Court has supplemental jurisdiction
24 over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is
25 not a collusive one to confer jurisdiction on a court of the United States which it would
26 not otherwise have.

27

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

21.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  Several defendants either reside in or maintain executive offices in this County, and have received substantial compensation in this County by engaging in numerous activities and conducting business here, which has an effect in this District.

## THE PARTIES

22.     Plaintiff, Willa Rosenbloom ("Rosenbloom"), has continuously been a shareholder of Allergan since at least 1989.  Plaintiff Rosenbloom is a citizen of Pennsylvania.

23.     Plaintiff, Daniel Himmel ("Himmel"), has continuously been a shareholder of Allergan since at least 2005.  Plaintiff Himmel is a citizen of Florida.

24.     Plaintiff, Pompano Beach Police & Firefighters' Retirement System ("Pompano Beach"), has continuously been a shareholder of Allergan since at least 2003.  Plaintiff Pompano Beach is a citizen of Florida.

25.     Plaintiff, Washington Laborers-Employers Pension Trust ("Washington Laborers"), has continuously been a shareholder of Allergan since 2004.  Plaintiff Washington Laborers is a citizen of Washington.

26.     Nominal defendant Allergan is incorporated under the laws of the State of Delaware

(a)     Allergan is a global, multi-specialty health care company. The Company specializes in specialty pharmaceuticals (primarily eye care, skin care, and neuromodulators) and medical devices (primarily breast implants, gastric bands for obesity surgery, and injectable dermal fillers used on facial wrinkles).  The Company offers a number of specialty products, including: Botox® (onabotulinum toxin A); RESTASIS® (cyclosporine ophthalmic emulsion); LUMIGAN® (bimatoprost

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1  ophthalmic solution); Botox Cosmetic (onabotulinum toxin A); the JUVEDERM

2  family of dermal fillers; and the LAP-BAND® Adjustable Gastric Banding System.

3          (b)     Allergan maintains its principal executive office at 2525

4  Dupont Drive, Irvine, California, and its primary administrative and research facilities

5  are located in Irvine, California.  Allergan also utilizes additional facilities in

6  California to provide administrative, research and raw material support, manufacturing,

7  warehousing, and distribution. Outside of California, Allergan's only facility, located

8  in Texas, is used for manufacturing and warehousing.

9      27.    Defendant David E.I. Pyott ("Pyott") is Allergan's Chief Executive

10  Officer ("CEO") and has been since January 1998. Pyott is also Allergan's Chairman

11  of the Board and has been since 2001 and a director and has been since 1998. Pyott

12  was Allergan's President from January 1998 to February 2006. Pyott was a director

13  when the 2008, 2009, and 2010 proxy statements were released. Defendant Pyott also

14  sold over 1.34 million shares of Allergan stock, for unlawful insider trading proceeds

15  of almost $85 million, based upon his knowledge of material nonpublic information

16  regarding the illegal sales and marketing scheme in breach of his fiduciary duties and

17  the securities laws. Defendant Pyott is a citizen of California.

18      28.    Defendant Herbert W. Boyer ("Boyer") is Allergan's Vice Chairman and

19  has been since 2001; Lead Independent Director and has been since at least March

20  2004; and a director and has been since 1994. Boyer was also Allergan's Chairman of

21  the Board from 1998 to 2001. Boyer is a member of Allergan's Corporate Governance

22  and Science and Technology Committees and has been since at least March 1999.

23  Boyer was a director when the 2008, 2009, and 2010 proxy statements were released.

24  Defendant Boyer is a citizen of California.

25      29.    Defendant Gavin S. Herbert ("Herbert") is Allergan's Chairman Emeritus

26  and has been since 1996 and a director and has been since 1950. Herbert was also

27  Allergan's Chairman of the Board from 1977 to 1996; CEO from 1961 to 1991; and

28  President from 1961 to 1977.  Herbert is a member of Allergan's Science and

- 9 -

1  Technology Committee and has been since at least March 1999 and was a member of
2  the Audit and Finance Committee from at least March 1999 to September 2004.
3  Herbert founded Allergan.  Herbert was a director when the 2008, 2009, and 2010
4  proxy statements were released.  Defendant Herbert also sold over 147,000 shares of
5  Allergan stock, for unlawful insider trading proceeds exceeding $8.5 million, based
6  upon his knowledge of material nonpublic information regarding the illegal sales and
7  marketing scheme in breach of his fiduciary duties and the securities laws.  Defendant
8  Herbert is a citizen of California.

9       30.    Defendant Leonard D. Schaeffer ("Schaeffer") is an Allergan director and
10  has been since 1993.  Schaeffer is also a member of Allergan's Corporate Governance
11  Committee and has been since April 2003 and was a member of the Audit and Finance
12  Committee from at least March 1999 to April 2003.  Schaeffer was a director when the
13  2008, 2009, and 2010 proxy statements were released.  Defendant Schaeffer is a citizen
14  of California.

15       31.    Defendant Michael R. Gallagher ("Gallagher") is an Allergan director and
16  has been since 1998.  Gallagher is also a member of Allergan's Audit and Finance
17  Committee and has been since at least March 2005 and was a member of the Corporate
18  Governance Committee from at least March 1999 to January 2005.  Gallagher was a
19  director when the 2008, 2009, and 2010 proxy statements were released.  Defendant
20  Gallagher is a citizen of California.

21       32.    Defendant Stephen J. Ryan ("Ryan") is an Allergan director and has been
22  since September 2002.  Ryan is also Chairman of Allergan's Science and Technology
23  Committee and has been since at least March 2004 and a member and has been since
24  September 2002.  Ryan is a member of Allergan's Audit and Finance Committee and
25  has been since September 2002.  Ryan was a director when the 2008, 2009, and 2010
26  proxy statements were released.  Defendant Ryan is a citizen of California.

27       33.    Defendant Russell T. Ray ("Ray") is an Allergan director and has been
28  since April 2003.  Ray is also Chairman of Allergan's Audit and Finance Committee

- 10 -

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1 and has been since at least March 2005 and a member and has been since April 2003.

2 Ray was a director when the 2008, 2009, and 2010 proxy statements were released.

3 Defendant Ray is a citizen of Massachusetts.

4      34.    Defendant Trevor M. Jones ("Jones") is an Allergan director and has been

5 since July 2004. Jones is also a member of Allergan's Corporate Governance and

6 Science and Technology Committees and has been since at least March 2004. Jones

7 was a director when the 2008, 2009, and 2010 proxy statements were released.

8 Defendant Jones is a citizen of the United Kingdom.

9      35.    Defendant Robert A. Ingram ("Ingram") is an Allergan director and has

10 been since January 2005. Ingram is also Chairman of Allergan's Corporate

11 Governance Committee and has been since May 2007 and a member and has been

12 since January 2005. Ingram was a member of Allergan's Science and Technology

13 Committee from at least March 2005 to May 2007. Ingram was a director when the

14 2008, 2009, and 2010 proxy statements were released. Defendant Ingram is a citizen

15 of North Carolina.

16      36.    Defendant Louis J. Lavigne, Jr. ("Lavigne") is an Allergan director and

17 has been since July 2005. Lavigne is also a member of Allergan's Audit and Finance

18 and Science and Technology Committees and has been since at least March 2006.

19 Lavigne was a director when the 2008, 2009, and 2010 proxy statements were released.

20 Defendant Lavigne is a citizen of California.

21      37.    Defendant Deborah Dunsire ("Dunsire") is an Allergan director and has

22 been since December 2006. Dunsire is also a member of Allergan's Corporate

23 Governance and Science and Technology Committees and has been since December

24 2006. Dunsire was a director when the 2008, 2009, and 2010 proxy statements were

25 released. Defendant Dunsire is a citizen of Massachusetts.

26      38.    Defendant Dawn Hudson ("Hudson") is an Allergan director and has been

27 since January 2008. Hudson is also a member of the Audit and Finance Committee

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1   and has been since January 2008. Hudson was a director when the 2008, 2009, and

2   2010 proxy statements were released. Defendant Hudson is a citizen of New York.

3            39.    Defendant Handel E. Evans ("Evans") was an Allergan director from

4   1989 to May 2007. Evans was also Chairman of Allergan's Corporate Governance

5   Committee from at least March 2001 to May 2007 and a member of the Audit and

6   Finance Committee from at least March 1999 to at least March 2001. Defendant Evans

7   is a citizen of Pennsylvania.

8            40.    Defendant Ronald M. Cresswell ("Cresswell") was an Allergan director

9   from 1998 to July 2004. Cresswell was also Chairman of Allergan's Science and

10  Technology Committee from at least March 2000 to July 2004 and a member from at

11  least March 1999 to July 2004. Cresswell was a member of Allergan's Corporate

12  Governance Committee from at least March 1999 to at least March 2004. Defendant

13  Cresswell is a citizen of Michigan.

14           41.    Defendant Louis T. Rosso ("Rosso") was an Allergan director from 1989

15  to April 2005. Rosso was also a member of Allergan's Audit and Finance Committee

16  from at least March 1999 to April 2005 and served as Chairman of the Committee from

17  at least March 1999 to at least March 2000. Rosso was a member of Allergan's

18  Science and Technology Committee from at least March 2001 to April 2005.

19  Defendant Rosso is a citizen of California.

20           42.    Defendant Karen R. Osar ("Osar") was an Allergan director from 1998 to

21  September 2005. Osar was also Chairman of Allergan's Audit and Finance Committee

22  from at least March 2001 to September 2005. Defendant Osar is a citizen of

23  Connecticut.

24           43.    Defendant Anthony H. Wild ("Wild") was an Allergan director from 2000

25  to September 2002. Wild was also a member of Allergan's Audit and Finance

26  Committee in at least 2002 and a member of the Science and Technology Committee

27  from at least March 2001 to at least March 2002. Defendant Wild is a citizen of New

28  York.

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

44.    The defendants identified in ¶¶27-43 are referred to herein as the "Director Defendants."  The defendant identified in ¶27 is referred to herein as the "Officer Defendant."  The defendants identified in ¶¶29-33, 36, 38-39, 41-43 are referred to herein as the "Audit Committee Defendants."  The defendants indentified in ¶¶27-38 are referred to herein as the "Proxy Defendants." The defendants identified in ¶¶27, 29 are referred to herein as the "Insider Selling Defendants" Collectively, the Director Defendants, the Officer Defendant, the Audit Committee Defendants, the Proxy Defendants, and the Insider Selling Defendants are referred to herein as the "Individual Defendants."  The Individual Defendants and Allergan are collectively referred to herein as the "Defendants".

## DUTIES OF THE DEFENDANTS

45.    By reason of their positions as officers, directors, and/or fiduciaries of Allergan and because of their ability to control the business and corporate affairs of Allergan, the Individual Defendants owed Allergan and its shareholders fiduciary obligations of trust, loyalty, and good faith, and were and are required to use their utmost ability to control and manage Allergan in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Allergan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

46.    Each director and officer of the Company owes to Allergan and its shareholders the fiduciary duty to exercise good faith in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

47.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Allergan, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

48.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of Allergan, and was at all times acting within the course and scope of such agency.

49.    To discharge their duties, each of the Individual Defendants, as officers and/or directors of Allergan, was required to supervise the management, policies, practices, and controls of the financial affairs of the Company in good faith. By virtue of such duties, the Individual Defendants were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets; and

(c)    remain informed as to how Allergan conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws and regulations.

50.    The Company states that it is committed to ethically selling its products and has noted the importance of its reputation. In Defendant Pyott's "Letter from the Chief Executive Officer" found in Allergan's Code of Business Conduct and Ethics (the "Code"), he notes that, **"THERE IS NO RIGHT WAY TO DO A WRONG THING."** In addition, he states that:

A large part of Allergan's success may be attributed to our reputation in the marketplace for the quality and safety of our products and for the values and principles that guide our business relationships, including our strong sense of ethics. This Code of Business Conduct and Ethics represents our formal commitment to the principles of honesty, integrity, and fairness in everything we do, so that as a company our activities

- 14 -

reflect positively on our stockholders, the marketplaces we serve, the community, and on ourselves. These principles are not new at Allergan. They are simply the statements of our long-standing policy that all business conducted by Allergan employees and representatives will be conducted ethically and in compliance with all applicable laws.

One simple reason for upholding the law is that our continued success as a company depends on it. In the health care business, any legal or ethical violation has the potential to harm patients and damage our reputation. I believe that the best reason for abiding by the law and the principles contained in this Code of Business Conduct and Ethics is that it is simply the right thing to do. We all want to work for a company that we believe consistently strives to do the right thing. The best way to ensure that Allergan does the right thing is for each employee to obey the law in his or her own job responsibilities and to help others do what is right.

51.    The Code notes that all directors, officers, employees, and independent consultants are required to "comply with all applicable laws and regulations." In addition, the Code states that "know[ing] and observ[ing] applicable laws and regulations and Allergan policies" is a "condition of employment" and that "[f]ailure to do so could subject an employee [defined earlier as an officer, director, employee, or independent consultant] and Allergan to sanctions, could harm Allergan's reputation and competitive position, and could result in disciplinary measures up to and including the termination of employment." The Code also required annual certification by all members of the Board and all other key employees.

52.    Moreover, the Code requires directors and officers to "ensur[e] compliance with worldwide clinical and regulatory standards, including conduct of clinical studies, *marketing approvals*, good manufacturing practice requirements, labeling and advertising controls, and other mandated product regulations."

- 15 -

53.     In addition to their fiduciary duties as directors and those imposed by the Code, certain of the Director Defendants were members of committees that placed additional duties on them.  For example, the Audit Committee Defendants were bound to adhere to the Audit and Finance Committee's Charter, which specifically required its members to:

(a)     Review the integrity of the Company's financial statements, financial reporting process and systems of internal controls regarding finance, accounting and legal compliance;

(b)     Assist the Board in its oversight of the Company's compliance with legal and regulatory requirements; and

(c)     Establish, review, and update periodically the Company's Code of Business Conduct and Ethics policy and ensure that management has established a system to enforce the Code.

54.     Pursuant to the Corporate Governance Committee's Charter, the members of the Corporate Governance Committee are specifically required, *inter alia*, to, "Review comprehensive reports from management regarding compliance-related matters affecting the Company and provide general compliance oversight to Allergan."

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

55.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was engaging in the off-label and illegal marketing program

1   described herein; (ii) enhance the Individual Defendants' executive and directorial

2   positions at Allergan and the profits, power, and prestige that the Individual

3   Defendants enjoyed as a result of holding these positions; and (iii) deceive the

4   investing public, including shareholders of Allergan, regarding the Individual

5   Defendants' management of Allergan's operations.   In furtherance of this plan,

6   conspiracy, and course of conduct, the Defendants, collectively and individually, took

7   the actions set forth herein.

8       57.    The Individual Defendants engaged in a conspiracy, common enterprise,

9   and/or common course of conduct during the relevant period.   During this time, the

10  Defendants concealed the true fact that Allergan was misrepresenting its business

11  prospects and methods.

12      58.    The purpose and effect of the Individual Defendants' conspiracy, common

13  enterprise, and/or common course of conduct was, among other things, to disguise the

14  Individual Defendants' violations of federal law, breaches of fiduciary duty, waste of

15  corporate assets, and unjust enrichment; and to conceal adverse information concerning

16  the Company's operations, financial condition, and future business prospects.

17      59.    The Individual Defendants accomplished their conspiracy, common

18  enterprise, and/or common course of conduct by reviewing, participating in, and/or

19  allowing the Company to purposefully or recklessly engage in the illegal activity

20  described herein.   Because the actions described herein occurred under the authority of

21  the Board, each of the Individual Defendants was a direct, necessary, and substantial

22  participant in the conspiracy, common enterprise, and/or common course of conduct

23  complained of herein.

24      60.    Each of the Individual Defendants aided and abetted and rendered

25  substantial assistance in the wrongs complained of herein.   In taking such actions to

26  substantially assist the commission of the wrongdoing complained of herein, each

27  Individual Defendant acted with knowledge of the primary wrongdoing, substantially

28

- 17 -

1    assisted the accomplishment of that wrongdoing, and was aware of his or her overall

2    contribution to and furtherance of the wrongdoing.

3                    **BACKGROUND ON ALLERGAN AND BOTOX**

4         61.    Allergan is a Delaware incorporated company based in Irvine, California.

5    The Company specializes in manufacturing and marketing specialty pharmaceuticals

6    (primarily eye care, skin care, and neuromodulators) and medical devices (primarily

7    breast implants, gastric bands for obesity surgery, and injectable dermal fillers used on

8    facial wrinkles).

9         62.    Botox is a prescription-only medical product that contains tiny amounts of

10   highly purified botulinum toxin protein relined from the bacterium, *Clostridium*

11   *botulinum*.  In other words, Botox is a purified toxin.  When injected at approved and

12   labeled doses into a specific muscle or gland, Botox neurotoxin is expected to diffuse

13   locally, safely, and effectively by producing a localized and temporary reduction in the

14   overacting muscle or gland, usually lasting up to approximately three to six months

15   depending on the individual patient and indication.  Allergan markets and sells the

16   toxin under two distinct trade names "Botox" and "Botox Cosmetic," although these

17   products are exactly the same.

18        63.    Though Botox is widely known for its cosmetic use, the FDA has

19   approved the drug for therapeutic treatment of a few limited indications.  In 1989, the

20   FDA first approved Allergan's Biological License Application ("BLA") to distribute

21   and market Botox for the treatment of strabismus (Crossed-eyes) and blepharospasm

22   (involuntary eyelid muscle contractions) associated with dystonia.  In December 2000,

23   the FDA approved Allergan's supplemental BLAs to distribute and market BOTOX for

24   the treatment of cervical dystonia (involuntary neck muscle contractions) in adults.  In

25   July 2004, the FDA approved Allergan's BLA to distribute and market BOTOX to treat

26   axillary hyperhidrosis (excessive sweating) that cannot be managed effectively by

27   topical treatments.  In March 2010, the FDA approved the use of BOTOX for the

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1 │ treatment of increased muscle stiffness in the elbow, wrist and finger muscles in adults

2 │ with upper limb spasticity.

3 │     64.    During the relevant time period, one vial of Botox cost approximately

4 │ $400 to $500 for 100 units, and treatment of most off-label uses of Botox required

5 │ injections of anywhere between 100 and 400 units or more.  Since Botox's effect on a

6 │ muscle wears off over time, patients require re-injection at periodic intervals, generally

7 │ every three months.  Botox is a "buy and bill" drug, meaning that doctors purchase

8 │ Botox directly from Allergan and assume the risk that they will get reimbursed on the

9 │ back end by a healthcare payer after submitting the claim.  Consequently, doctors

10 │ would not inject Botox for off-label uses if they were not sure that they could be

11 │ reimbursed.

12 │     65.    The significance of the Botox product line to Allergan is indisputable and

13 │ was well-known to the Individual Defendants.  Botox has been one of the Allergan's

14 │ top-selling specialty pharmaceutical products for nearly a decade, and has comprised a

15 │ major source of revenue for the Company.  During the years 2000 to 2009, Allergan's

16 │ total net sales of Botox were $240 million, $310 million, $440 million, $564 million,

17 │ $705 million, $831 million, $982 million, $1.21 billion, $1.3 billion, and $1.31 billion,

18 │ respectively.  Expressed as a percentage of the Company's total net sales across all

19 │ product lines, this equates to 24%, 27%, 32%, 34%, 36%, 33% (37% of total specialty

20 │ pharmaceutical sales), 32% (39% of total specialty pharmaceutical sales), 30% (37% of

21 │ total specialty pharmaceutical sales), and 29% (36% of total specialty pharmaceutical

22 │ sales).

23 │     66.    According to Allergan's 10-K filed February 26, 2010, "Botox was the

24 │ only neuromodulator approved by the FDA until December 2000," and the Individual

25 │ Defendants were fully aware that sales of Botox could be materially and negatively

26 │ impacted by competition from other companies that might obtain FDA approval to

27 │ market a neuromodulator similar to Botox.  The threat of potential competition put

28 │ pressure on the Defendants to maintain and increase its more than 80% worldwide

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1   market share for neuromodulators.  Due to the fact that Botox therapeutic was only

2   approved for four relatively rare indications, the Individual Defendants knew that the

3   Company's Botox therapeutic sales figures and growth targets required massive

4   marketing and sales for off-label uses.

5        67.    Sales of Botox therapeutic have historically constituted a significant

6   portion of Allergan's total Botox sales.  For example, in 2002 and 2003, sales of Botox

7   therapeutic were $264 million and $338 million, respectively, which represented 60%

8   of the Company's total Botox sales for those years.   However, the pressure to

9   aggressively market Botox therapeutic was amplified as sales of Botox therapeutic and

10  Botox cosmetic started to level out between 2006 and 2008.

11        68.    Further, according to the Civil Qui Tam Actions, the majority of

12  Allergan's sales of Botox therapeutic have been for off-label uses, and approximately

13  80% of government or insurance company reimbursements for Botox have been for

14  off-label prescriptions.  According to the Civil Qui Tam Actions, Medicaid paid more

15  than $76 million between 2002 and 2006 for Botox treatments that generally would not

16  have  otherwise  been  reimbursed  "had  the  responsible  agencies  known  the

17  circumstances under which such prescriptions were written."  The off-label treatments

18  and prescriptions that were most commonly reimbursed by government healthcare

19  programs have generally been for adult spasticity, pediatric cerebral palsy, and

20  headaches.

21           **THE EXTENSIVE REGULATION OF THE COMPANY**

22        69.    Allergan's business is the focus of extensive regulation and regulatory

23  oversight by the FDA.  The FDCA, 21 U.S.C. §301 *et seq.*, regulates the development,

24  manufacturing, and distribution of all drugs in the United States.

25        70.    Prior to 1962, pharmaceutical companies were permitted to promote drugs

26  for any use in the United States.  Congress banned the practice in 1962, however, after

27  the disastrous consequences of the drug Thalidomide, a sedative that was widely

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1   prescribed to thousands of women suffering from morning sickness during pregnancy.
2   The drug caused tragic birth defects in thousands of babies.  As a result of this
3   calamity, and in a legislative effort to prevent similar occurrences, the FDCA was
4   enacted, requiring drug companies to scientifically establish that their drugs are safe
5   and effective for specified intended uses and prohibiting the marketing of drugs for any
6   use other than as specifically approved.

7        71.    Under the FDCA, drug companies are not allowed to market a drug until
8   the drug has been approved by the FDA.  Even once approved, the marketing of the
9   drug must be confined to the approved use and dosage, as described on the drug's label.
10  Drug companies may not engage in marketing or promoting unapproved or "off -
11  label" uses or dosages, i.e, uses or dosages for which the drug has not been approved
12  by the FDA and that are not on the label, because such off-label uses or dosages have
13  not been proven safe and effective.

14       72.    The FDCA also prohibits the marketing or promotion of any drug that is
15  misbranded. A drug is misbranded if the labeling or the advertising for the drug is false
16  or misleading, or if the labeling or the advertising contains inadequate directions for
17  the drug's intended use. Because the FDA will not approve labels with directions for
18  off-label uses or dosages, off-label marketing also violates the FDCA's prohibition on
19  the marketing or promotion of drugs that are misbranded.

20       73.    Proving that a specific use or dosage is safe and effective for large
21  numbers of patients requires lengthy clinical trials and is very expensive. On the other
22  hand, drug companies derive immediate and substantial profits from off-label
23  prescriptions. As a result, executives at drug companies have a substantial short-term
24  financial incentive to break the law by marketing and promoting their drugs for uses
25  and dosages that are not proven to be medically safe and effective in treating large
26  numbers of patients in order to reap outsized incentive compensation, such as bonuses.
27  For the same reasons, these executives have a short-term financial incentive to
28  improperly provide gifts, money, and other kickbacks to doctors to induce and

- 21 -

1   encourage off-label prescriptions. The resulting improper prescriptions are frequently
2   reimbursed by federal healthcare programs such as Medicaid and Medicare, which in
3   turn subjects the perpetrator to liability under the False Claims Act and Federal anti-
4   kickback statute.

5       74.   Drug companies that violate the FDCA prohibition against misbranding or
6   introducing drugs, uses or dosages without FDA approval, are also subject to criminal
7   prosecution and, if convicted, face exclusion or "debarment" from Federal healthcare
8   programs.   Such federal debarment would result in catastrophic damage to the
9   Company and its shareholders because Medicaid and Medicare would no longer cover
10  the costs of any Allergan drug and most patients would therefore find an alternative
11  drug sold by a competitor or would forego treatment altogether.

12  **THE INDIVIDUAL DEFENDANTS' ILLEGAL MARKETING SCHEME**
13      75.   As detailed herein, the Defendants were keenly aware of the prohibitions
14  in the FDCA and other applicable law concerning promoting and marketing a drug or
15  biologic in interstate commerce for off-label uses. Indeed, Allergan admits that it
16  enacted written standards and procedures "regarding key FDA and healthcare
17  compliance risks as early as 1997, when it issued the 'Principles Concerning Off-
18  Labeled Uses of BOTOX,' which explicitly prohibited 'the improper dissemination of
19  off-labeled use information concerning BOTOX." See October 4, 2010 Memorandum
20  of Defendant Allergan, Inc. In Support Of Recommended Sentence ("*Allergan*
21  *Criminal Memo*") filed in the Criminal Action. The *Allergan Criminal Memo*
22  continues on in a section labeled "Overview of Compliance Activities 1997-2005" to
23  state:

24          In January 1998, Allergan's CEO [i.e. Defendant Pyott] distributed
25      to all employees a comprehensive Code of Ethics that was approved by
26      Allergan's Board of Directors.   During this period, Allergan also
27      instituted a compliance hotline ("EthicsHelp").  Allergan continued to

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1    update and disseminate comprehensive written policy manuals

2    throughout the period covered by the [Guilty] Plea [i.e. 2000 to 2005],

3    focusing its compliance efforts on emerging risk areas.

4          In 2002, Allergan issued a "Field Reference Guide," which flatly

5    prohibited promotion of "any Company product for uses that are not

6    addressed in the approved product labeling or package insert."   The

7    Company also adopted and distributed to all sales and marketing

8    personnel the Code on Interactions with Healthcare Professionals

9    promulgated by the leading industry organization, the Pharmaceutical

10   Research and Manufacturers of America.

11         In January 2003, the Allergan Field Reference Guide was updated

12   to prohibit sales representatives from making joint calls on healthcare

13   providers with medical scientific liaisons.   By April 2003, sales

14   representatives also were prohibited from being present with

15   reimbursement personnel during any off-label discussion with a

16   healthcare provider.

17         In June 2003, Allergan issued a comprehensive "Best Practices

18   Guide" that was specific to the activities of the Company's medical

19   scientific liaisons. [According to Allergan,] [t]he Guide was explicit that

20   the medical scientific team "does not engage in soliciting or promoting

21   'off-label'" and "[t]here will be no joint calls with sales for this activity."

22   In many instances, the compliance policies and controls adopted by

23   Allergan exceeded industry standards.   For example, effective January

24   2004, Allergan changed its compensation plan so that the sales

25   representatives' compensation was not primarily based upon their own

26   territory sales, which would have included both on and off-label sales to

27   physicians.   In July 2004 . . .Allergan took the significant step of

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT