1  prohibiting its sales personnel from responding to questions regarding

2  off-label uses of BOTOX.

3             \*          \*          \*

4  In June 2005, to formalize the separation of its promotional and

5  medical scientific activities, Allergan's Global Medical Affairs

6  department was created to serve as the interface regarding medical

7  information.  At the same time, a Grant Review Committee was created

8  to exercise control over the grant review process for medical education.

9  The Committee included members of the scientific, legal and regulatory

10  departments.

11  76.  The *Allergan Criminal Memo* also provides an "Overview Of Compliance

12  Enhancements 2006-Present" as follows:

13  By the Fall of 2005, in light of the Company's rapid growth in personnel,

14  Allergan recognized the need to consolidate its compliance policies in a

15  comprehensive manual. . . . Allergan's comprehensive Healthcare Law

16  Compliance Program Manual . . . was rolled out in the Fall of 2006.

17  The Compliance Program Manual, which Allergan continues to update

18  regularly, contains 22 detailed compliance sections addressing all of the

19  risk areas identified in the Department of Health and Human Services

20  Office of Inspector General's 2003 Compliance Program Guidance for

21  Pharmaceutical Companies, as well as other agency and industry

22  guidance.  68 Fed. Reg. 23731, 23731-43 (May 5, 2003).

23             \*          \*          \*

24  There are now 12 full-time employees in the Compliance

25  Department.  These individuals report to a Chief Compliance Officer who

26  reports directly to the Chief Executive Officer [i.e. Pyott], and oversight

27  of the program is provided by a Corporate Compliance Committee and

28  the Board of Directors.

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1    Allergan's investment in compliance has included major
2    technology projects designed to embed compliance in everyday business
3    practices. Allergan developed and implemented an automated electronic
4    compliance tool called the Business Execution Automated Compliance
5    Navigator ("BEACON"). BEACON embeds compliance controls at
6    virtually every step of key business processes. BEACON fosters
7    compliance through up-front controls such as spending caps and approval
8    requirements for speaker programs, advisory boards, engagement of
9    healthcare professionals, and expenditures on meals and educational
10   items. It also provides real-time monitoring and facilitates more frequent
11   and effective compliance auditing, and it has built-in "red flags" and
12   "hard stops" to prevent approval when a compliance limit is exceeded.
13   The total cost to purchase, test, and implement BEACON is estimated at
14   $9.3 million.

15       77.   Not only did the Defendants directly acknowledge that off-label
16   marketing (including in the forms documented in the Covered Conduct and Criminal
17   Conduct) was illegal by affirmatively creating written policies and programs
18   supposedly designed to prevent such conduct from occurring, but Allergan's SEC Form
19   10-K annual report to shareholders for the calendar year ending December 31, 2004,
20   also acknowledged the promotional ban on off-label marketing: ". . . the FDA does
21   restrict a manufacturer's communications on the subject of off-label use. Companies
22   cannot actively promote FDA-approved pharmaceutical, biologic or medical device
23   products for off-label uses . . . .[if] our promotional activities fail to comply with the
24   FDA's . . . regulations or guidelines, we may be subject to warnings from, or
25   enforcement action by, the FDA or another enforcement agency." Similar language
26   appears in the 2005, 2006, and 2007 Form 10-K filings by Allergan.

27       78.   Individual, despite expending significant time and financial resources to
28   put into place these "compliance" mechanisms to purportedly prevent violations of the

1  FDCA and other applicable law, the Defendants knew that they had to maximize sales
2  of BOTOX via off-label sales in order to achieve future growth opportunities for
3  Allergan. Indeed, since as early as its 1997-2001 Strategic Plans, the Individual
4  Defendants made it a top corporate priority to maximize sales of Botox for spasticity,
5  migraine headache and pain, none of which were approved by the FDA. This was
6  because, among other reasons, the Defendants' yearly strategic plans for Allergan
7  forecast that Botox's on-label sales would shrink and that all incremental growth would
8  come from off-label sales.

9      79.    Indeed, not only do the Civil and Criminal Settlements document that the
10  Individual Defendants in fact caused Allergan to engage in the Covered Conduct and
11  Criminal Conduct, but the Individual Defendants were on contemporaneous notice
12  throughout the relevant period that they were directing and/or causing Allergan to
13  engage in such activity. For example, on August 22, 2001, Defendants received a
14  letter addressed to David Garbe, Director, Scientific Information and Medical
15  Compliance, informing Defendants that the FDA had reviewed Allergan's Botox
16  "promotional activities and materials and … concluded that they are misleading and
17  lacking in fair balance within the meaning of 21 U.S.C. §352(a) of the Federal Food,
18  Drug, and Cosmetic Act (the Act)." The letter cautioned:

19      You have engaged in repeated promotional activities that suggest
20      the amount of protein in BOTOX minimizes the formation of antibodies.
21      No formal clinical studies have been performed to study BOTOX
22      treatment with different amounts of protein with respect to the formation
23      of antibodies. Additionally, you have repeatedly included favorable data
24      or conclusions from nonclinical studies of BOTOX in a way that suggests
25      they have clinical significance when, in fact, no such clinical significance
26      has been demonstrated. We have previously objected to these activities
27      in Review Memoranda dated December 12, 1998 and September 25,

28

- 26 -

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1    2000, and untitled letters dated November 7, 2000, February 14, 20001,

2         and April1 2, 2001.

3    The FDA concluded by stating that "[t]he violations noted in this letter represent

4    continuing examples of violative promotion or advertising materials disseminated by

5    Allergan," and explaining that a "written response with the specific steps that you have

6    taken to correct the violation should be submitted to this office within 10 working days

7    of receipt of this letter."

8         80.    On June 23, 2003, Defendants received another FDA Warning Letter

9    ("Warning Letter") informing Defendants that several of Allergan's "advertisements are

10   false and/or misleading because they falsely identify [Botox] as a cosmetic treatment,

11   fail to reveal material facts about the product's use, and minimize the risk information

12   presented." The Warning Letter referenced another earlier letter from the FDA dated

13   September 5, 2002, which also objected to Allergan's promotional materials.

14        81.    Nevertheless, in the face of Allergan's own compliance measures

15   purportedly designed to ferret out and prevent off-label marketing (including the

16   Covered Conduct and Criminal Conduct), Defendants' affirmative acknowledgements

17   in the Company's Form 10-K filings as to the illegality of off-label marketing, and the

18   repeated warnings from the FDA received during the relevant period, the Individual

19   Defendants affirmatively caused Allergan to use a variety of tactics to cause Allergan

20   to carry out the illegal off-label marketing strategy, including the Covered Conduct and

21   Criminal Conduct. As detailed herein, these strategies included, but were not limited

22   to: (i) providing "value-added" reimbursement support service; (ii) lobbying healthcare

23   payers to expand coverage for off-label uses; (iii) funding and controlling continuing

24   medical education programs on off-label uses; and (iv) paying doctors to attend

25   advisory boards on off-label uses, hosting promotional dinners to highlight Botox's

26   efficacy for off-label uses, and creating and funding organizations to promote off-label

27   uses of Botox. Indeed, for most of the relevant time period, Defendants had in place

28   Botox "Customer Team Units," or "CTUs," which coordinated sales initiatives among

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

numerous different departments, including its sales/marketing, medical affairs (purportedly independent scientific advisors), and reimbursement divisions in order to permit more focused communication of the Individual Defendants' off-label marketing messages. Details concerning such conduct are provided in the Criminal Information and in the October 4, 2010 Government Memorandum In Support Of Binding Plea And Sentencing Memorandum ("*October 4 Government Memo*") (collectively the "*DOJ Facts*")[3]. Specifically, the Individual Defendants caused Allergan to engage in the following conduct during the relevant period:

## A.    Allergan Targeted Off-Label Specialties

82.    According to the *DOJ Facts,* Allergan promoted Botox to medical specialists who did not routinely treat patients with any of the conditions that Botox was approved to treat, including patients at headache clinics, anesthesiologists, pain specialists, and pediatricians. One example offered in the *DOJ Facts* is that in 2001, Allergan sought to establish Botox in the "back pain market" by calling on "1,000 pain specialists." *See October 4 Government Memo* (*citing* Botox Therapeutic Team 2004 Marketing Plan, which reportedly identifies Allergan's 2003 goals for new injectors by medical practice category, including a target of 110 new pediatrician injectors and 230 new pain specialty injectors)). Allergan's 2007 Call Plan reportedly targets 20% more pain and headache specialists and pediatricians than the Company had targeted in 2006.

83.    Allergan also leveraged other companies' relationships with doctors in off-label specialties by entering into "co-promotion" agreements. For example, the *October 4 Government Memo* recites that in 2002, Allergan agreed to sell another manufacturer's medical device to doctors who treated spasticity, thereby giving

---

[3] Indeed, the *October 4 Government Memo* details that as a result of off-label marketing, Botox sales "skyrocketed": "Between 1999 and 2006, spasticity sales grew by 332 percent, headache sales grew by 1,407 percent, and pain sales grew by 504 percent. By 2007, Allergan had over $500 million in annual Botox sales for therapeutic uses, and 70 to 80 percent of those sales were attributable to off-label indications, primarily for spasticity, headache and pain."

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1   Allergan representatives an opportunity to discuss Botox as an adjunctive therapy for
2   spasticity and pain.   Similarly, in 2006, Allergan entered into a co-promotion
3   agreement with an undisclosed top-tier pharmaceutical company to gain an audience
4   with neurologists who treated headache.  Allergan reportedly had no drug approved for
5   the treatment of headache, but agreed to double its sales force to sell the top-tier
6   pharmaceutical company's headache drugs to the top-tier pharmaceutical company's
7   neurologists. Although Allergan was eligible to receive a $10 million "performance
8   payout" from this top-tier pharmaceutical company if it met certain sales targets,
9   internal documents obtained by the DOJ from Allergan (as summarized in the *DOJ*
10  *Facts*) reflect that a significant motivation for the deal was to "Allow us [i.e. Allergan]
11  to Sell More Botox! ! !" According to the *DOJ Facts*, when Allergan was not on track
12  to meet either the 2006 or 2007 sales targets of the top-tier pharmaceutical company,
13  Allegan's Senior Director of Marketing reported that "there was no concern expressed"
14  by Allergan's executives because "we've seen the positive impact the deal has had on
15  Botox." Ultimately, the DOJ found that Allergan was successful in converting the top-
16  tier pharmaceutical company's neurologists to Botox, and about half of its new Botox
17  injectors in 2007 were the top-tier pharmaceutical company's targets. The *DOJ Facts*
18  note that, upon the DOJ's review of internal Allegan documents, the DOJ discovered
19  that: "Indeed, based on the 'success in Neurology following the [top-tier
20  pharmaceutical] expansion,' Botox Marketing Department executives requested
21  additional funding to expand its sales force to call on more physical medicine and
22  rehabilitation doctors ("PM&Rs")."

### B.   Allergan Promoted Botox When the Efficacy of the Drug had Not Been Demonstrated

84.   According to the *DOJ Facts*, Allergan aggressively promoted Botox for
unapproved uses such as headache and pain at a time when the efficacy of the drug to
treat those conditions had not been demonstrated by clinical trials. For example, the
DOJ reportedly obtained from Allergan an internal document instructing its sales

- 29 -

1    representatives to promote the message that BOTOX "works!" for pain management.
2    According to the *DOJ Facts*, Allergan reportedly stated in the same internal document
3    that there was no clinical support and "a lack of successful [Double-Blind, Placebo-
4    Controlled] trial(s)" for using Botox injections to relieve pain." *See October 4*
5    *Government Memo* (*citing* Allergan internal document entitled "Key Pain Messages
6    Neurology - It works");("Clinical Data Support is Modest");("Teach [sales
7    representatives] how to discuss the role of Botox in pain management"; "Lack of peer
8    reviewed, credible data to support this use"). As further detailed in the *DOJ Facts*,
9    after years of clinical trials involving the treatment of back pain, Allergan placed its
10   FDA application in inactive status in 2003 after its Phase 3 studies were "[n]ot
11   successful."  Despite these negative results, Allergan sought to "drive market
12   development of back pain" by "focus[ing] on areas where there is the path of least
13   resistance 'upper back' lower back."  The DOJ reports in its *October 4 Government*
14   *Memo* that in 2007, Allergan itself recognized that for more than a decade, it had
15   marketed Botox in "areas where there was not even supportive clinical literature, such
16   as 'pain.'"

17         85.    Likewise, Allergan aggressively promoted Botox to treat several different
18   types of headache conditions, in addition to chronic headache, and caused sales for that
19   indication to increase over 1,400 percent.  At the same time, according to the *DOJ*
20   *Facts*, Allergan recognized that it lacked scientific evidence that Botox was more
21   effective in treating headache than a placebo.  Allergan's phase 2 FDA headache trials
22   were not successful.  According to the *DOJ Facts*, nine out of ten trials failed to meet
23   their primary endpoint and Allergan concluded that these trials were "negative."  In
24   December 2004, the FDA agreed, finding that the "Botox headache primary efficacy
25   results for the extensive phase 2 development plan have been largely negative." The
26   FDA also expressed its concern about the existing public perception about the "broad
27   utility" of Botox, and required Allergan to refrain from funding any medical education
28   programs for headache until it had published all of the phase 2 headache studies.

- 30 -

1    Allergan published the studies, but according to the DOJ, Allergan directed its

2    employees to refer to the trials as "inconclusive" - not "negative."

3    **C.    Allergan Coached and Encouraged Doctors to Diagnose Headache and Pain as "Symptoms" of Cervical Dystonia**

4

5    86.    Another tactic utilized by the Individual Defendants to boost off-label

     sales of BOTOX was to encourage doctors to diagnose headache and pain as symptoms

6    of its on-label cervical dystonia ("CD") indication.  CD, also known as "spasmodic

7    torticollis," is a rare movement disorder, the number of people in the United States that

8    currently have the condition is approximately 27,000 individuals.  However, with its

9    headache development program in jeopardy and no prospect of obtaining a pain

10   indication, the Individual Defendants caused Allergan to exploit its approved CD

11   indication to grow headache and pain sales.  In 2003, Allergan developed the "CD/HA

12   Initiative" as a "rescue strategy in the event of negative phase II data" and a "backup

13   strategy to ensure continued expansion into the headache market" with the goal of

14   establishing a connectivity between CD and headache to "augment existing use of

15   Botox in the treatment of headache and give an entry point for use of Botox in

16   headache for skeptical markets."  As part of this initiative, Allergan asked the FDA to

17   expand the Botox label to include treatment of headache associated with CD and the

18   treatment of "pain" - not merely "neck pain" - associated with CD.  The FDA rejected

19   both requests, and according to the *DOJ Facts*, an Allergan executive pondered how to

20   proceed: "It's too bad that there is no easy way to obtain 'headache' in our label (even

21   as part of CD). . . . Has the US Marketing group exploited the notion of much higher

22   prevalence of CD in the population?"

23

24   87.    As detailed in the *DOJ Facts*, Allergan thereafter launched a new Botox

25   marketing campaign premised on the idea that CD is "underdiagnosed" and

     "misdiagnosed" and to "strategically move toward emphasizing symptoms of

26   mild/moderate CD (i.e., HA, Pain, Tremors) instead of severe CD."  The company's

27

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1   "key messages" for the campaign emphasized that doctors could diagnose CD based on

2   headache and pain symptoms, even when a doctor "doesn't see any cervical dystonia."

3       88.    As outlined in the *October 4 Government Memo*, Allergan's new CD

4   campaign worked. Allergan acknowledged that the sales and reimbursement teams had

5   successfully convinced doctors to change patients' diagnoses from headache to CD.

6   Specifically, upon learning that one doctor was audited by Medicare and asked to pay

7   back over $120,000 for purported "CD claims," Allergan sales and marketing

8   management called for the field to "be more aggressive during their consults" with

9   doctors.  Management emphasized that sales representatives should stress "the need for

10   more thorough chart documentation in order to justify a CD diagnosis, especially in

11   those situations where a patient may have been diagnosed with headache previously,

12   but the doctor is changing the diagnosis based upon a better understanding of CD and

13   how a patient may present with CD (we are routinely reviewing with a physician the

14   symptoms of CD - HA, muscle contractions, abnormal posture, pain, etc.)" Allergan's

15   VP of Neurosciences listed the "CD expansion campaign" as one of the "key drivers"

16   for Botox sales, but at the same time worried whether Allergan could "actually defend

17   [723.5] 'unspecified torticollis' as a labeled indication?"

18       **D.**    **Allergan Used a Variety of Tactics to Carry Out Its Unlawful, Off-**
19              **Label Marketing Scheme**

20       89.    In addition to directing Allergan's sales representatives to promote

21   BOTOX to doctors as a safe and effective treatment for headache, pain and spasticity

22   and undertaking the CD Initiative, the Individual Defendants caused Allergan to use a

23   variety of additional tactics to carry out its illegal off-label marketing campaign. As

24   summarized above, Allergan promoted its off-label pitches through mechanisms

25   including: providing "value-added" reimbursement support services; lobbying

26   healthcare payers to expand coverage for off-label uses; funding and controlling

27   continuing medical education programs; paying doctors to attend Advisory Boards,

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1  promotional dinners, and creating and funding organizations to promote off-label uses
2  of Botox.

3      90.    Indeed, documents reportedly obtained by the DOJ during its
4  investigation reflect that marketing guided Allergan's headache development program.
5  The *DOJ Facts* include a description of an e-mail from the lead scientist for Allergan's
6  headache development program to the Marketing Department inquiring: "if both
7  trial[s] failed to meet the primary [endpoint], would marketing want to give up pursuit
8  of the indication?"    Likewise, an Allergan executive reported that Allergan
9  reimbursement personnel planned to develop a "Headache Contingency Plan," which
10 she described as "critical communication and key activities for payers to maintain
11 current coverage and continue to gain coverage for headache," even if "phase II data
12 [is] not positive."

### 1.    Allergan Provided "Value-Added" Reimbursement Support Services to Grow Off-Label Sales

13
14
15     91.    The commercial success of Botox heavily depended on the ability of
16 doctors to obtain reimbursement from federal healthcare programs. Botox is an
17 expensive treatment considering the high drug and administration costs and the fact
18 that its effects are temporary and palliative (not curative). During the relevant time
19 period, one vial of Botox cost approximately $400-$500 for 100 units, and treatment of
20 most off-label uses of Botox required injections of anywhere between 100 to 400 units
21 or more. Since Botox's effect on a muscle wears off over time, patients have to get re-
22 injected at periodic intervals, generally every three months. Doctors can also bill a
23 healthcare payer for the cost of performing the Botox injection procedure, and any
24 associated diagnostic tests, which provide a source of revenue for a doctor's practice.
25 However, unlike most drugs where the doctor writes a prescription and the patient
26 purchases the drug from a pharmacy, Botox is a "buy and bill" drug, meaning that
27 doctors purchase Botox directly from Allergan and assume the risk of reimbursement
28 on the back-end by a healthcare payer after submitting the claim. Consequently,

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1  common sense dictates that doctors were not going to inject Botox for off-label uses if
2  they could not get reimbursed.

3      92.    Indeed, the Individual Defendants recognized that Allergan's "biggest
4  obstacle" to growing Botox sales was the lack of reimbursement for off-label uses.
5  Even though Government and private healthcare payers covered Botox for every FDA-
6  approved indication, Allergan doubled the size of its reimbursement support team in
7  2003 to "minimize customer barriers" for headache, pain and spasticity. The Botox
8  reimbursement team was an extension of the sales force, and its express goal was to
9  "Improve Injector Economics = (Sell More Botox)." According to materials uncovered
10 by the DOJ, the pitch for the Botox reimbursement programs was collectively referred
11 to as the "Botox Advantage Program" and the message was: "Improving the
12 Reimbursement Environment for Today and For the Future by Providing
13 Comprehensive Reimbursement Assistance, Reducing Reimbursement Issues, Saving
14 You Time and Effort!"

15     93.    Through the Botox Advantage Program, Allergan provided customized
16 reimbursement support services to doctors and their office practice managers,
17 expended millions of dollars each year to operate the Botox Reimbursement Hotline,
18 and performed detailed audits (or "interventions") of physician billing records to
19 demonstrate "the value of Botox to their practice" (i.e., you can make money injecting
20 Botox).  According to the *DOJ Facts*, Allergan cited "high value [reimbursement]
21 services" as a key driver of Botox sales, and touted their reimbursement support as one
22 of the "most valued services Allergan provides." Indeed, Allergan was able to quantify
23 the success of its reimbursement services, noting that on average, accounts with an
24 intervention grew by $6,000 versus $1,000 at accounts without an intervention.

25     **2.    Allergan Lobbied Healthcare Payers to Expand Coverage for
26          Off-Label Uses**

27     94.    Notwithstanding the lack of scientific support for headache or pain,
28 Allergan initiated a carefully orchestrated campaign to (1) expand Botox coverage for

- 34 -

1    off-label uses, and (2) eliminate any payer-imposed limitation on the amount of Botox
2    injected into patients (i.e., "dosing caps"). *See October 4 Government Memo* (citing an
3    Allergan document entitled: "Reimbursement Operations, Deployment 2006," with a
4    notation for September 12, 2005 observing that "[w]ithout indications or significant
5    Double-Blind/Placebo-Controlled data, challenging to block competitors and grow
6    coverage at the same time")). Accordingly, the Individual Defendants caused Allergan
7    to recruit and use physician "advocates" to lobby Medicare and Medicaid decision-
8    makers to expand coverage for off-label uses. Allergan also funded and controlled a
9    patient advocacy group, which is an organization whose mission is to "expand patient
10   access to Botox." Doctors were paid $1,000 each to attend regional physician
11   advocacy workshops where Allergan reimbursement personnel coached them how to
12   successfully lobby healthcare payers to cover off-label uses of Botox.

13        95.    Defendants viewed physician advocates as the ultimate "critical success
14   factor" for Allergan gaining policy expansions for pain and headache and referred to
15   the advocates as the company's "Trojan horses." *See October 4 Government Memo*
16   (citing "Email dated February 08, 2008 reporting that a healthcare payer's medical
17   director "would not talk to Allergan but they respected this advocate so [Allergan] used
18   him as a trojan horse.")). The *DOJ Facts* reveal that Allergan's reimbursement team
19   created a package of materials for the advocate to submit to the payer, which included
20   a cover letter requesting the policy expansion for headache, a consensus statement
21   signed by "headache experts" (doctors with whom the *DOJ Facts* state that Allergan
22   had financial ties) stating that Botox was an effective treatment for headache, selected
23   medical literature about the use of Botox for headache, and an annotated literature
24   review. Allergan's involvement in the submission was not disclosed according to the
25   DOJ. The *DOJ Facts* state that the Allergan reimbursement team went to great lengths
26   to ensure that the "ghostwritten" materials that were submitted to different healthcare
27   payers did not look too much alike if anyone were to compare them. The *DOJ Facts*
28   further state that two Allergan employees went so far as to request an in-person

1   meeting with a Medicare Part B Carrier Medical Director to find out why he expanded

2   the policy to cover headache "even though [they] kn[e]w the process that took place,"

3   because it would be a "[g]ood opportunity to learn more on process side using naïve

4   approach on HA [headache] situation. (Or to learn what he may know/perceive as to

5   what our involvement was)."

### 3.  Allergan Directed Physician Training, Workshops, and Dinners

96.   Allergan also funded and controlled the content of hundreds of continuing medical education (CME) seminars, injection workshops, and promotional dinner programs at which paid speakers identified by the company as "Key Opinion Leaders" ("KOLs") advocated Botox for off-label indications. For example, in 2004, a CME provider worked with Allergan to develop purported CME programs to address pain and spasticity. Allergan also created the Centers of Excellence as an "independent" CME to drive headache growth. According to the *DOJ Facts*, it was a "Management Business Objective" for Allergan's scientific services group to create, edit and control the substance of off-label CMEs, including headache.

### 4.  Allergan Paid Doctors to Attend "Advisory Boards"

97.   Allergan hosted numerous "Advisory Boards," purportedly designed to elicit feedback from doctors about their experience with Botox. The "Advisory Boards" were used by the Defendants to promote Botox for off-label indications. According to the *DOJ Facts*, in 2005 and 2006, over 200 top-prescribing doctors attended the "Allergan Institute of Distinction" ("AIOD"), a two-day, invitation-only Botox marketing program held at Allergan's corporate headquarters and the Balboa Bay Club and Resort in Newport Beach. Doctors attending the AIOD provided no consulting services, but were paid $1,500 to listen to the presentations that included off-label topics. Rather, these "Engagement Plans" reveal Allergan's intent to reward hundreds of its top injectors with consulting fees and corporate attention in an effort to further develop these doctors' use of Botox.

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

### 5. Allergan Created and Funded Organizations to Promote Botox for Off-Label Uses

98. The Defendants also caused Allergan to create and fund an on-line neurotoxin education organization to "stimulate increased use of Botox." The *DOJ Facts* reveal that, in 2003, Allergan had a website designed to appear as the educational arm of an independent public interest entity. Allergan had an on-line neurotoxin institute created and directed its operations in order to distribute off-label promotional material about Botox to the medical and scientific community. The Mission Statement for the on-line neurotoxin education organization was to "validate and disseminate consistent information regarding the expanding uses of Botox." The *DOJ Facts* state that an Allergan executive admitted its control over the organization, revealing that "they act under our direction in creating the content and setting direction." From 1999 to 2007, Allergan gave approximately $10 million in "unrestricted" grants to the on-line neurotoxin education organization. The on-line neurotoxin education maintained a web site to disseminate information about off-label uses, including videos of CME programs sponsored by Allergan and other written materials prepared by Allergan. According to the DOJ, Allergan's sales representatives were to refer doctors to the on-line neurotoxin education organization website, and to distribute "Awareness Cards," with the website's information on them, to all doctors during sales calls.

### 6. Allergan Offered Discounts and Other Services to Doctors to Cause the Doctors to Use Botox Off-Label

99. In addition to the above, the Individual Defendants caused Allergan to employ other tactics to cause doctors to prescribe more Botox for off-label purposes. According to the *DOJ Facts*, these tactics included paying "honoraria" to high-volume injectors, paying money to doctors through the Speaker's Bureau, CMEs, and one-on-one training. Allergan also used its medical grants, in part, as an extension of sales and marketing, to reward top purchasers and grow sales of Botox. According to the *DOJ Facts*, an Allergan executive recognized the leverage provided by medical grants, saying that "[b]efore we give [this grant request] further thought, would you check

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

whether [the requesters] are significant users of Botox . . . . Upon receiving your reply, I will decide how to handle." The DOJ also asserts that the Vice-President of Medical Affairs understood marketing's importance to the grant making process, quoting the executive as stating that "[o]bviously, [grant] proposals that would negatively impact the goals of Marketing should not be funded and studies that would support Marketing goals should be given careful consideration."

100.   According to the *DOJ Facts*, in 2005 alone, Allergan paid hundreds of thousands of dollars to doctors for Speaker's Bureau and "Practice with the Experts" dinner programs.  In 2004 and 2005, Allergan paid approximately $2.5 million in grants to individual doctors. These so-called grants were a priority for the marketing and sales teams, and paid great dividends to Allergan, allowing its off-label sales of Botox to climb dramatically through the decade. In 2006, Allergan sponsored over 1,200 programs, with each program having at least one paid physician.

**E.   Allergan's Unlawful Marketing Campaign Drove the Tremendous Growth of Off-Label Uses of Botox**

101.   According to the *October 4 Government Memo*, which summarizes internal documents produced by Allergan to the DOJ, the tremendous growth in off-label Botox sales were caused by Allergan's sales and marketing organization, demonstrating that the Individual Defendants' efforts drove the majority of Allergan's increased off-label sales of Botox. First, Allergan recognized that doctors "that are naïve to Botox demonstrate limited interest in picking up the needle," and that "[t]he barrier to entry into the [Botox] world is still relatively high for clinicians [with i]ssues of interventional invasive treatments and lack of prior training." Studies commissioned by Allergan found that doctors had a "Limited Interest in Learning How to Inject" Botox, and that "Non-Users of Botox for HA still 'on the fence'" in part because "Non-users perceive the published data supporting use of Botox in chronic HA to be . . . unimpressive." Allergan concluded that a threat to increased sales of Botox was the "[l]imited perception of need; apathy" of potential injectors.

102.   Second, Allergan dramatically expanded its therapeutic Botox field sales force far beyond levels justified by the drug's approved indications. Between February 2003 and February 2008, Allergan almost tripled its payroll of sales personnel, while obtaining only one very narrow label extension (severe primary axillary hyperhydrosis). According to the *DOJ Facts*, the "clearest connection" between the number of sales representatives and off-label sales growth was made in Allergan's 2007-2011 Strategic Plan, which stated that in "2006 [Allergan] Added 45 New NMCs [sales representatives] & Spasticity grew 25% [and in] 2007 [it] Added 19 New NMCs & Spasticity Est[timated] 18%." In its 2005 Strategic Planning process, Allergan concluded that sales for pain, headache and spasticity were negatively affected by a "decrease in calls to Pain [doctors]/Ped[iatricians]." Allergan also projected further sales declines for pain in its 2006-2010 Strategic Plan because there would be "no promotion" for that indication (and at the same time projecting increases for other indications, presumably because Allergan's promotion would continue). The 2006 Marketing Plan recognized that "Growth is Detail Sensitive" and that "BMCs [sales representatives] Have Impact on Sales." Allergan's studies supported the conclusion that Allergan's sales and marketing efforts drove higher sales. In particular, Allergan found that "Across all specialties, Botox sales/MD increase with higher call frequency" and that expanding sales calls to rehabilitation doctors would increase sales by $14.3 million over three years. In short, the DOJ found "overwhelming" evidence that Allergan's sales and marketing efforts drove the substantial increases in off-label sales of Botox from 2001-2008.

## THE INDIVIDUAL DEFENDANTS KNEW OR WERE RECKLESSLY UNAWARE OF THE WRONGDOING AT THE COMPANY

103.   The Individual Defendants could not help but know about the illegal marketing activity at the Company due to its scope and pervasiveness at Allergan. From 2000 to the present, Botox (in its therapeutic and cosmetic form) has accounted for approximately 30% of the Company's sales. Botox's therapeutic sales accounted

- 39 -

1  for over half that amount, worth hundreds of millions of dollars.  For example, in the

2  year ending December 31, 2006, the Company had $510 million worth of Botox

3  (therapeutic) sales.  Considering that Botox had only four FDA approved indications

4  during this timeframe, all of which are rare or rarely require Botox treatment, it was

5  impossible for the Company to hit these numbers without significant off-label sales.

6      104.  For instance, cervical dystonia, only occurs in nine out of every 100,000

7  people, or roughly 0.0009%.  Assuming there are 300 million Americans, this ratio

8  would correlate to 27,000 people with cervical dystonia.  Even assuming that every

9  single person with cervical dystonia used Botox at normal levels (300 units, four times

10  a year) and normal reimbursement rates ($5.102/unit), the Company's sales would

11  reach only approximately $165 million, less than 33% of the amount that the Company

12  actually sold in 2006.

13      105.  The numbers are not any better for Botox's other approved indications.

14  According to Civil Action I, patients with strabismus and severe primary hyperhidrosis

15  rarely resort to Botox treatment.  For patients that suffer from hyperhidrosis, the FDA

16  had approved the use of Botox only when topical agents fail to work.  Similarly,

17  strabismus patients only use Botox after less invasive and cheaper treatments (i.e.,

18  glasses) fail to correct the problem.  Further, the amount of Botox used to treat

19  strabismus (7.5 to 15 units per eye) is significantly lower than the amount used to treat

20  patients for off-label uses such as headaches (100 to 200 units) and myofascial pain

21  (200 to 400 units).

22      106.  In addition to the Company's financial results, the FDA's repeated

23  warnings also put the Individual Defendants on notice of the wrongdoing at the

24  Company.  From at least 2001 through 2009, Allergan received at least two FDA

25  warning letters informing the Company of misbranding and other potential violations

26  of the FDCA.  For instance, these warnings were:

27      •  **September 6, 2005 Lumigan® (bimatoprost ophthalmic solution)**

28  **0.03% Warning Letter:** sent to defendant Pyott, who at the time was the President

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1 and CEO of the Company and Chairman of the Board, to inform Allergan of

2 misbranding Lumigan®, by distributing sales aids that are misleading because they

3 present unsubstantiated superiority claims in violation of the FDCA.

4 • **August 17, 2009 ACZONE® (dapsone) Gel, 5% Warning Letter**: sent

5 to the attention of defendant Pyott, CEO and Chairman of the Board, to inform

6 Allergan of violations of the FDCA and FDA implementing regulations regarding

7 ACZONE® by: (1) false or misleading advertising overstating the efficacy of

8 ACZONE®; and (2) omitting material facts and important risk information associated

9 with the use of the product.

10 107.   Also, beginning in 2005, Allergan became aware of European reports of

11 toxin spread that led to aspiration and death, and the Company accumulated its own

12 safety database, at least some of which it shared with the FDA.   Specifically, the

13 French government, on behalf of the European Medicines Agenecy sent a letter to

14 Allergan alerting the Company of reports that botulinum toxin had spread beyond the

15 injection site among patients who sought cosmetic treatment.   In a confidential

16 response dated Sept. 16, 2005, Allergan said its internal database contained 436

17 "serious adverse event" reports related to Botox.   Of those, 201 were "serious,

18 healthcare professional-confirmed cases with events possibly due to remote spread of

19 the toxin."

20 108.   Notwithstanding these prior warnings, the Civil Qui Tam Actions allege

21 that the Defendants had yet again "illegally, vigorously, and without any thought to the

22 possible negative health effects to which [they] subjected patients, promoted" Botox®

23 for uses that had not been deemed safe by the FDA.   Federal prosecutors specifically

24 accused defendants of teaching doctors how to obtain reimbursement from Medicare

25 and Medicaid for off-label uses by putting in the codes for an approved treatment.

26 Also according to the Civil Qui Tam Actions, from 2002 through 2006, Medicaid paid

27 approximately $77 million for Botox® treatments, much for unapproved sues.   Included

28 was a citation to a 2004 Allergan presentation indicating that 86% of Botox®

- 41 -

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1    treatments reimbursed by Medicaid were for children, primarily for cerebral palsy, an

2    off-label use.

3        109.    Allergan has entered its Guilty Plea, agreeing to plead guilty to a criminal

4    misdemeanor for misbranding Botox® in violation of the FDCA.    Pursuant to the

5    Guilty Plea, the Company will pay a criminal fine of $375 million, which includes

6    forfeiting assets of $25 million.[4]

7        110.    Allergan currently estimates that it will record total non-recurring pre-tax

8    charges of between approximately $610 million and $615 million in its third fiscal

9    quarter in connection with the global settlement with the DOJ.    This amount includes

10    estimated interest and certain attorneys' fees that Allergan is obligated to pay in

11    connection with the global settlement, but does not include ongoing administrative

12    legal fees and other costs. The Company expects to pay the global settlement costs in

13    its fourth fiscal quarter of 2010.

14        111.    Allergan's U.S. Securities and Exchange Commission ("SEC") Form 10-

15    K annual report to shareholders for the calendar year ending December 31, 2004,

16    acknowledged that:

17        Physicians may prescribe pharmaceutical or biologic products for uses

18        that are not described in a product's labeling or differ from those tested by

19        us and approved by the FDA.    While such "off-label" uses are common

20        and the FDA does not regulate a physician's choice of treatment, the FDA

21        does not restrict a manufacturer's communications on the subject of off-

22        label use.    Companies cannot actively promote FDA-approved

23        pharmaceutical or biologic products for off-label uses, but they may

24        disseminate to physicians articles published in peer reviewed journals....

25

---

[4] This figure does not include $225 million payment to various states also involved in this litigation.

26    The total figure for the Civil and Criminal Settlements is approximately $600 million, excluding any
applicable interest.  The $600 million also does not include the damages incurred by the Company in

27    the form of legal fees and costs for litigating and/or defending the Civil Qui Tam Actions and
Criminal Information.

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1    If, however, our promotion activities fail to comply with the FDA's

2    regulations or guidelines, we may be subject to warning from, or

3    enforcement action by, the FDA or another enforcement agency.

4    112.   The Federal Bureau of Investigation ("FBI") also began investigating

5    Allergan in 2007 when the first of the Civil Qui Tam Actions (i.e. Civil Action I) was

6    filed against Allergan.  In light of the above, the Individual Defendants knew, or in

7    reckless disregard were unaware, of the illegal scheme they were carrying out at the

8    Company.

9                    **THE MATERIALLY MISLEADING PROXY STATEMENTS**

10   113.   Allergan's Annual Proxy Statements filed with the U.S. Securities and

11   Exchange Commission ("SEC") on Form DEF 14A on or about March 20, 2008 (the

12   "2008 Proxy Statement"), March 19, 2009 (the "2009 Proxy Statement"), and March

13   12, 2010 (the "2010 Proxy Statement") (collectively, the "Proxy Statements") were

14   materially inaccurate in that they failed to disclose numerous highly material facts and

15   circumstances.   The materially inaccurate Proxy Statements caused direct harm to the

16   Company in that, among other things, the Defendants' omissions perpetuated the

17   systematic legal violations within the Company, which brought about the severe fines,

18   penalties, and other liabilities to which the Company was ultimately subjected, as well

19   as through the creation of compensation obligations by the Company that would not

20   have existed but for the materially inaccurate and incomplete Proxy Statements.

21   114.   Each of the Proxy Statements was intended to, and did, procure Allergan's

22   shareholders' votes with respect to matters materially affecting the Company that

23   legally required shareholder approval. All three Proxy Statements sought and obtained

24   election of the Director Defendants by shareholder vote, in each case upon the Board's

25   explicit recommendation as to which directors should be elected. In addition, the 2008

26   Proxy Statement, sought and obtained shareholder approval for the 2008 Incentive

27   Award Plan, which authorized a twenty million share increase in the stock available for

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1  grants to the Company's employees, executives, and directors for as little as one year of
2  positive performance.  The 2008 Incentive Award Plan is particularly lucrative to the
3  Company's directors since it *automatically* provides them with 11,400 stock options
4  and 14,400 shares of restricted stock yearly.  The Board portrayed the 2008 Incentive
5  Award Plan as a necessary increase in potential compensation to reward high-
6  performing employees, officers, and outside directors.

7       115.   Each of the Director Defendants was duty-bound pursuant to his or her
8  general fiduciary duties under Delaware law and by the provisions of federal securities
9  laws to fully disclose all information material to shareholders' decision concerning how
10  to cast their votes in connection with the election of Board members in 2008, 2009, and
11  2010 and with respect to their decision whether to vote to approve the massive
12  potential compensation increases embodied in the 2008 Incentive Award Plan.

13       116.   The 2008 Incentive Award Plan, which Defendants included in the 2008
14  Proxy Statement and for which Defendants sought and obtained shareholder approval,
15  authorized a twenty million share increase in the stock available for grants to the
16  Company's employees, executives, and directors for as little as one year of positive
17  performance.  The 2008 Inventive Award Plan was particularly lucrative to the
18  Company's directors since it *automatically* provides them with 11,400 stock options
19  and 14,400 shares of restricted stock yearly.  Defendants portrayed the 2008 Incentive
20  Award Plan as a necessary increase in potential compensation to reward high-
21  performing employees, officers, and outside directors.

22            (a)    As a result of the false and misleading 2008 Proxy Statement
23  and their reelection to the Board in 2008, the Individual Defendants entered into
24  compensation contracts with the Company and afforded themselves a generous
25  compensation program via a shareholder vote on the false and misleading 2008 Proxy
26  Statement.

27            (b)    As a result of the false and misleading 2008 Proxy Statement
28  and 2009 Proxy Statement, the Director Defendants were reelected to the Board in

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

2009 and entered into compensation contracts with the Company, affording themselves a generous compensation program via a shareholder vote on the false and misleading 2009 Proxy Statement.

117.   Despite its obligations under fiduciary duty and the federal securities laws, the Board caused the Company to file and disseminate the materially inaccurate Proxy Statements.  Specifically, in Allergan's definitive Proxy Statements, defendants provided materially misleading information and disclosures concerning the Company, the general responsibilities of the Board and its committees, and the basis upon which the members of the Board (or prospective members of the Board) were seeking election to another (or initial) term of office.  In the Proxy Statements, defendants uniformly failed to disclose material information to shareholders concerning critical aspects of the Board's responsibilities and activities – such as the Board's obligation to assure compliance with applicable drug marketing laws and regulations, or the fact that the financial and operating metrics disclosed in the Proxy Statements were the result of widespread criminal misconduct within Allergan that the Board was duty-bound to prevent.

118.   The Proxy Statements were materially inaccurate and incomplete because, among other things, defendants failed to disclose:

(i)     The extent to which the Company's financial performance depended on the Company's off-label marketing of Allergan drugs—including Allergan's most important drug, Botox—which exposed the Company and its shareholders to tremendous regulatory, reputational, and financial risk;

(ii)    The circumstances surrounding the Board's waiver or constructive waiver of explicit provisions of the Code of Business Conduct and Ethics—including with respect to defendants' duties to ensure legal compliance, to ensure the reporting of legal violations, and to themselves report suspected non-compliance—even though the Board had waived or otherwise determined to deviate from these clear requirements;

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

    (iii) The nature of the Board's performance of their duties under the charters of the Board's various committees, including the reason for the then-current directors' decision to allow continued off-label and otherwise improper marketing despite the risks to the Company, its shareholders, or its patients; and

    (iv) The numerous instances in which the Board was informed of legal compliance violations concerning the unlawful marketing of Allergan drugs.

 119. In light of Defendants' highly material omissions from the Proxy Statements, the votes and the consequent election of directors to the Board were obtained on the basis of inaccurate disclosures. Had shareholders been provided with complete and accurate information concerning the Board's performance of its duties – including with respect to presiding over the Company's extensive criminal violations – the members of the Board would not have been elected (or reelected).

 120. The election (or reelection) of the Director Defendants inflicted significant harm on the Company. This reliance on the Board's assumption of duty caused the direct detriment of the Company, which, in the absence of the Board's fulfillment of its obligations, was left helpless to prevent the misconduct occurring in its name. The consequent penalties levied upon the Company, as well as the numerous other liabilities to patients and other third parties, were a direct result of the Board's perpetuation of the Company's misconduct, which was only made possible by the materially inaccurate and incomplete statements that caused defendants' election to the Board. But for the Board's refusal to carry out its duties, the harm that befell the Company would not have occurred.

 121. Further, shareholders would not have voted in favor of the 2008 Incentive Award Plan but for the materially misleading 2008 Proxy Statement. Had they been provided with complete and accurate disclosures, Allergan shareholders would have chosen not to increase the compensation of employees, officers, and directors who participated in illegal marketing misconduct, and thereby reward them for their illegal activity. Rather, Allergan's shareholders would have instead demanded that

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT

1  appropriate legal action be taken against those employees, officers, and outside
2  directors who participated in this widespread misconduct.  Shareholders' approval of
3  the 2008 Incentive Award Plan likewise harmed the Company by drawing off twenty
4  million shares of stock directly from the Company in order to offer lavish
5  compensation to senior executives and others at Allergan—including the outside
6  directors—in return for engaging in extensive criminal misconduct in Allergan's name.

7      122.   Accordingly, Allergan has been damaged by the materially inaccurate
8  statements and omissions in the Proxy Statements that procured the reelection of
9  defendants to the Board, thus perpetuating their misconduct, as well as shareholders'
10  approval for an increase in compensation for employees, officers, and outside directors
11  who had been involved in wide-ranging criminal conduct – a proposal that would have
12  been rejected had the true facts been disclosed to shareholders.

## UNLAWFUL INSIDER TRADING

14      123.   While defendants were engaging in their unlawful and illegal sales and
15  marketing scheme, certain defendants sold almost 1.5 shares of Allergan stock for
16  insider trading proceeds of $93 million, based upon their knowledge of material
17  nonpublic information regarding the illegal sales and marketing scheme:

| DEFENDANT/ INSIDER | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| DAVID E.I. PYOTT | 8/14/06 – 12/7/07 | 1,344,866 | $84,941,181 |
| GAVIN S. HERBERT | 4/3/06 – 12/29/09 | 147,106 | $8,532,114 |

## DAMAGES TO ALLERGAN CAUSED BY THE INDIVIDUAL DEFENDANTS

24      124.   As a result of the Individual Defendants' improprieties, Allergan has
26  expended and will continue to expend significant sums of money. Such expenditures
27  include, but are not limited to:

- 47 -

1          (a)     the *$600 million* in Civil and Criminal Settlements due to the

2 admitted illegal promotion of Allergan's pharmaceutical products;

3          (b)     costs incurred in investigating the Civil Qui Tam Actions, the

4 Criminal Action, other complaints of wrongdoing made by whistleblowers and

5 governmental agencies, including investigations conducted by governmental agencies;

6          (c)     costs incurred in defending Allergan in the Civil Qui Tam

7 Actions, the Criminal Action, and in connection with other complaints of wrongdoing

8 by whistleblowers and governmental agencies, including investigations conducted by

9 governmental agencies; and

10          (d)     costs incurred from compensation and benefits paid to the

11 Individual Defendants who have breached their duties to Allergan.

12      125.    These actions have irreparably damaged Allergan's corporate image and

13 goodwill. Further, the Company now faces increased scrutiny, as evidenced by the

14 CIA. It is likely that the DOJ and FDA will not be as forgiving for any future

15 violations, increasing the risk that the Company will be barred from participating in

16 Medicare and Medicaid.

17 ## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

18      126.    Plaintiffs incorporate by reference and reallege each and every allegation

19 set forth herein.

20      127.    Plaintiffs bring this action derivatively in the right and for the benefit of

21 Allergan to redress injuries suffered, and to be suffered, by Allergan as a direct result

22 of defendants' violations of federal law, breaches of fiduciary duty, waste of corporate

23 assets, and unjust enrichment, as well as the aiding and abetting thereof. Allergan is

24 named as a nominal defendant solely in a derivative capacity. This is not a collusive

25 action to confer jurisdiction on this Court that it would not otherwise have.

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT