1  | IRELL & MANELLA LLP
   | John C. Hueston (164921)
2  | jhueston@irell.com
   | Daniel P. Lefler (151253)
3  | dlefler@irell.com
   | Lillie A. Werner (261250)
4  | lwerner@irell.com
   | 1800 Avenue of the Stars, Suite 900
5  | Los Angeles, California 90067-4276
   | Telephone:   (310) 277-1010
6  | Facsimile:    (310) 203-7199

7  | Attorneys for Nominal Defendant Allergan, Inc.

8  | UNITED STATES DISTRICT COURT

9  | CENTRAL DISTRICT OF CALIFORNIA

10 | SOUTHERN DIVISION

11 | In re ALLERGAN, INC.                ) Master File No. SACV10-01352-DOC
   | SHAREHOLDER DERIVATIVE              ) (MLGx)
12 | LITIGATION                          )
   |                                      ) **DECLARATION OF LILLIE A.**
13 | _____ ) **WERNER AND EXHIBITS IN**
   |                                      ) **SUPPORT OF NOMINAL**
14 | This Document Relates To:            ) **DEFENDANT ALLERGAN, INC.'S**
   |                                      ) **MOTION TO STAY, MOTION TO**
15 | ALL ACTIONS                          ) **DISMISS, AND REQUEST FOR**
   |                                      ) **JUDICIAL NOTICE**
16 |                                      )
   |                                      ) Date:    February 28, 2011
17 |                                      ) Time:    8:30 a.m.
   |                                      ) Ctrm:    9D
18 |                                      ) Judge:   Hon. David O. Carter
   |                                      )
19 | _____ )

20
21
22
23
24
25
26
27
28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2349098

DECLARATION OF LILLIE A. WERNER
AND EXHIBITS

## DECLARATION OF LILLIE A. WERNER

I, Lillie A. Werner, declare as follows:

1.     I am an attorney admitted to practice in the Central District of California.  I am an associate at Irell & Manella LLP, counsel of record for nominal defendant Allergan, Inc. ("Allergan") in this action. This declaration is submitted in support of Allergan's Motion to Stay, Motion to Dismiss, and Request for Judicial Notice.  I have personal knowledge of the facts set forth herein and, if called to testify, I could and would testify competently thereto.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of the Settlement Agreement between Allergan and the United States Department of Justice & United States Attorney's Office for the Northern District of Georgia, executed August 31, 2010, and attached as Exhibit 10.1 to Allergan's Securities and Exchange Commission ("SEC") Form 8-K, filed with the SEC on or about September 1, 2010, and currently available on the SEC's EDGAR website, at http://www.sec.gov/Archives/edgar/data/850693/00011 9312510202820/d8k.htm.

3.     Attached hereto as **Exhibit 2** is a true and correct copy of the Department of Justice Criminal Information against Allergan, filed September 1, 2010, in the United States District Court for the Northern District of Georgia.

4.     Attached hereto as **Exhibit 3** is a true and correct copy of the United States Attorney's Office Government Memorandum in Support of Binding Plea and Sentencing Memorandum, filed October 4, 2010, in the United States District Court for the Northern District of Georgia.

5.     Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from Allergan's 2004 SEC Form 10-K, filed with the SEC on or about March 9, 2005, and currently available on the SEC's EDGAR website, at http://www.sec.gov/Archives/edgar/data/850693/000095013705002808/a05924e10vk.htm.

6.     Attached hereto as **Exhibit 5** is a true and correct copy of Allergan's Amended and Restated Certificate of Incorporation, filed April 30, 2010 and

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2349098

- 1 -

DECLARATION OF LILLIE A. WERNER
AND EXHIBITS

attached as Exhibit 3.1 to Allergan's SEC Form 10-Q for the First Quarter of 2010, filed with the SEC on or about May 7, 2010, and currently available on the SEC's EDGAR website, at http://www.sec.gov/Archives/edgar/data/850693/000119312510 112943/d10q.htm.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of excerpts from Allergan's SEC Form 8-K & Attached Exhibit 99.1, Allergan November 1, 2010, News Release, filed with the SEC on or about November 1, 2010, and currently available on the SEC's EDGAR website, at http://www.sec.gov/Archives/edgar/data/ 850693/0 00119312510242032/d8k.htm.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of the First Amended Derivative Complaint in *Louisiana Municipal Police Employees' Retirement System v. Pyott et al.*, Civil Action No. 5795-VCL, filed in Delaware Chancery Court on October 11, 2010, alleging demand futility and breaches of fiduciary duty.

9.      The above Delaware Chancery court action, *Louisiana Municipal Police Employees' Retirement System v. Pyott et al.*, Civil Action No. 5795-VCL, was originally filed on September 3, 2010, and the First Amended Complaint (Exhibit 7) was filed on October 11, 2010.  Defendants in that action responded to the amended Complaint on October 25, 2010, and a hearing on the motions to dismiss the action is scheduled for December 17, 2010.

10.     A separate shareholder, UFCW Fund, issued a Section 220 books-and-records demand upon the Board of Directors on November 3, 2010.  Allergan issued a response to the request on November 15, 2010.  On November 30, 2010, UFCW Fund moved to intervene in *Louisiana Municipal Police Employees' Retirement System v. Pyott et al.*

11.     On November 22, 2010, I contacted Brian O'Mara of Robbins Geller Rudman & Dowd LLP to conduct a conference of counsel pursuant to L.R. 7-3.  The

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2349098

- 2 -

DECLARATION OF LILLIE A. WERNER
AND EXHIBITS

1  parties conferred in good faith about the Motion to Stay and Motion to Dismiss, and
2  we were unable to resolve any substantive issues.

3       I declare under penalty of perjury of the laws of the United States of America
4  that the foregoing is true and correct.

5       Executed on December 8, 2010, in Los Angeles, California.

6  DATED:  December 8, 2010          IRELL & MANELLA LLP
7                                       LILLIE A. WERNER

8
9                               By:  /s/  Lillie A. Werner
                                     LILLIE A. WERNER
10                              1800 Avenue of the Stars, Suite 900
                             Los Angeles, CA  90067
11                              Telephone:  (310) 277-1010
                             Facsimile:  (310) 203-7199
12                              lwerner@irell.com

13                              Counsel for Nominal Defendant
                             Allergan, Inc.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

2349098                  - 3 -

DECLARATION OF LILLIE A. WERNER
AND EXHIBITS

# Exhibit 1

# ALLERGAN INC (AGN)

2525 DUPONT DRIVE
IRVINE, CA 92612
714. 246.4500

# 8−K

**FORM 8−K**
**Filed on 09/01/2010 − Period: 08/30/2010**
File Number 001−10269



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 1
Page 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8−K

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**August 30, 2010**
**Date of Report (Date of Earliest Event Reported)**

# ALLERGAN, INC.
**(Exact Name of Registrant as Specified in its Charter)**

| Delaware | 1−10269 | 95−1622442 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**2525 Dupont Drive**
**Irvine, California 92612**
**(Address of Principal Executive Offices) (Zip Code)**

**(714) 246−4500**
**(Registrant's Telephone Number, Including Area Code)**

**N/A**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8−K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a−12 under the Exchange Act (17 CFR 240.14a−12)

☐ Pre−commencement communications pursuant to Rule 14d−2(b) under the Exchange Act (17 CFR 240.14d−2(b))

☐ Pre−commencement communications pursuant to Rule 13e−4(c) under the Exchange Act (17 CFR 240.13e−4(c))

Exhibit 1
Page 5

**Exhibit 10.1**

## <u>SETTLEMENT AGREEMENT</u>

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and the United States Attorney's Office for the Northern District of Georgia and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG−HHS"), the TRICARE Management Activity ("TMA"), the United States Office of Personnel Management ("OPM"), the United States Department of Veterans Affairs ("VA"), and Office of Workers' Compensation Programs of the United States Department of Labor ("DOL−OWCP") (collectively "the United States"); Dr. Amy M. Lang, Charles J. Rushin, Cher Beilfuss, Kathleen O'Connor−Masse, and Albert Edward Hallivis (collectively, "Relators"); Allergan, Inc. and Allergan USA, Inc. (referred to individually and collectively as "Allergan"), through their authorized representatives. Collectively, all of the above will be referred to as "the Parties."

### <u>PREAMBLE</u>

As a preamble to this Agreement, the Parties agree to the following:

A.      Allergan, Inc. and Allergan USA, Inc. are Delaware corporations headquartered in Irvine, California. At all relevant times herein, Allergan developed, manufactured, distributed, marketed, and sold pharmaceutical products in the United States, including a drug sold under the trade name of Botox® Therapeutic ("Botox®"), which is billed to federal health care programs under HCPCS code J0585.

B.      Relators have filed the following <u>qui</u> <u>tam</u> actions against Allergan captioned as follows (collectively the "Civil Actions"):

(i)      <u>United States ex rel. Amy M. Lang and Charles J. Rushin v. Allergan, Inc.</u>, Civ. No. 1:07−cv−1288−WSD (N.D. Ga.) (hereinafter "Civil Action I");

Exhibit 1
Page 6

(ii)    <u>United States ex rel. Cher Beilfuss and Kathleen O'Connor−Masse v. Allergan, Inc.</u>, Civ. No. 1:08−cv−1883−WSD (N.D. Ga.) (hereinafter "Civil Action II"); and

(iii)   <u>United States ex rel. Albert Edward Hallivis v. Allergan, Inc. a/k/a Allergan USA, Inc.</u>, Civ. No. 1:09−cv−3434−WSD (N.D. Ga.) (hereinafter "Civil Action III").

The United States intervened in Civil Action I and Civil Action II on April 2, 2010.

C.    On such date as may be determined by the Court, Allergan, Inc. will enter into a plea of guilty pursuant to Fed. R. Crim. P. 11(c)(1)(C) (the "Plea Agreement") to an information to be filed in <u>United States v. Allergan, Inc.</u>, Criminal Action No. [to be assigned] (Northern District of Georgia) (the "Criminal Action") that will allege a violation of Title 21, United States Code, Sections 331(a) and 333(a)(1), a misdemeanor, namely, the introduction into interstate commerce of a misbranded drug, Botox$^{®}$, in violation of the Food, Drug and Cosmetic Act.

D.    Allergan has filed a declaratory judgment action pending in the United States District Court for the District of Columbia, captioned <u>Allergan, Inc. v. United States, et al.</u>, 1:09−cv−01879 (D.D.C.) (hereinafter, the "D.C. Litigation"). The D.C. Litigation is currently stayed at the joint request of Allergan and the United States.

E.    Allergan has entered or will be entering into separate settlement agreements, described in Paragraph 1.b., below (hereinafter referred to as the "Medicaid State Settlement Agreements") with certain states and the District of Columbia in settlement of the Covered Conduct. States with which Allergan executes a Medicaid State Settlement Agreement in the form to which Allergan and the National Association of Medicaid Fraud Control Units ("NAMFCU") Negotiating Team have agreed, or in a form otherwise agreed to by Allergan and an individual State, shall be defined as "Medicaid Participating States."

−2−

Exhibit 1
Page 7

F.      The United States alleges that Allergan caused claims for payment for Botox® to be submitted to the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395−1395hhh. The United States further alleges that Allergan caused claims for payment for Botox® to be submitted to the Medicaid Program ("Medicaid"), Title XIX of the Social Security Act, 42 U.S.C. §§ 1396−1396v. The United States further alleges that Allergan caused claims for payment of Botox® to be submitted to the TRICARE program, 10 U.S.C. §§ 1071−1109; the Federal Employees Health Benefits Program ("FEHBP"), 5 U.S.C. §§ 8901−8914; the following DOL−OWCP programs: the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101 et seq.; the Energy Employees Occupational Illness Compensation Program Act ("EEOICPA"), 42 U.S.C. § 7384 et seq.; and the Black Lung Benefits Act ("BLBA"), 30 U.S.C. § 901 et seq.; and caused purchases of Botox® by the VA, 38 U.S.C. §§ 1701−1743 (collectively, the "Other Federal Health Care Programs").

G.      The United States contends that it and the Medicaid Participating States have certain civil claims, as specified in Paragraph 2, below, against Allergan for engaging in the following conduct during the period January 1, 2001 through December 31, 2008 (hereinafter referred to as the "Covered Conduct"):

(i)      Allergan promoted the sale and use of Botox® for uses that were not approved by the Food and Drug Administration as safe and effective (including but not limited to headache, pain, spasticity, and overactive bladder) ("unapproved uses") and promoting the drug for unapproved uses renders the drug misbranded in violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331, et seq. Some of these unapproved uses were not medically accepted indications for which the United States and state Medicaid programs provided coverage for Botox®;

(ii)     Allergan made and/or disseminated unsubstantiated and/or misleading representations or statements that Botox® was safe and effective for some of these unapproved uses;

−3−

Exhibit 1
Page 8

(iii)   Allergan instructed health care professionals to miscode claims for the treatment of headache and pain using inapplicable diagnosis codes (including but not limited to codes for spasm of muscle (ICD−9−CM 728.5), other facial nerve disorders (ICD−9−CM 351.8), spasmodic torticollis (ICD−9−CM 333.83), and torticollis unspecified (ICD−9−CM 723.5)) to ensure payment by Medicare, Medicaid and the Other Federal Health Care Programs; and

(iv)    Allergan offered and paid illegal remuneration to health care professionals that was intended to induce them to promote and/or prescribe Botox .

As a result of the foregoing conduct, the Government alleges that Allergan caused false or fraudulent claims for Botox® to be submitted to, or caused purchases by, Medicare, Medicaid and the Other Federal Health Care Programs.

With respect only to claims for Botox® submitted to Medicaid, Medicare and the Other Federal Health Care Programs with diagnosis codes for overactive bladder and neurogenic bladder conditions (ICD−9−CM 788.30, 788.31, 788.32, 788.33, 788.34, and 599.82), the Covered Conduct extends from January 1, 2001 through December 31, 2009.

Notwithstanding Preamble Paragraph G(iii), the Covered Conduct does not include conduct relating to claims for Botox® submitted to Medicaid, Medicare and the Other Federal Health Care Programs with the diagnosis codes ICD−9−CM 333.81 (blepharospasm) and ICD−9− CM 705.21, 705.22, and 780.8 (hyperhidrosis).

H.      The United States also contends that it has certain administrative claims against Allergan, as set forth in Paragraphs 4 through 7, below, for engaging in the Covered Conduct.

I.      This Agreement is made in compromise of disputed claims. This Agreement is not an admission of facts or liability by Allergan. With the exception of such admissions that are made in connection with any guilty plea by Allergan in connection with the Criminal Action, Allergan expressly denies the allegations of the United States and the Relators as set forth herein

−4−

Exhibit 1
Page 9

and in the Civil Actions and denies that it engaged in any wrongful conduct in connection with the Covered Conduct. This Agreement is not a concession by the United States that its claims are not well founded. Neither this Agreement, its execution, nor the performance of any obligation under it, including any payment, nor the fact of any settlement, is intended to be, or shall be understood as, an admission of liability or wrongdoing, or other expression reflecting on the merits of the dispute by Allergan.

J.    To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, the Parties reach a full and final settlement pursuant to the Terms and Conditions below.

–5–

Exhibit 1
Page 10

## TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.    Allergan agrees to pay to the United States and the Medicaid Participating States, collectively, the sum of Two Hundred and Twenty Five Million Dollars ($225,000,000), plus accrued interest at the rate of 3.5% per annum from January 25, 2010, and continuing until and including the day of payment (the "Settlement Amount"). The Settlement Amount shall constitute a debt immediately due and owing to the United States and the Medicaid Participating States on the Effective Date of this Agreement. This debt shall be discharged by payments to the United States and the Medicaid Participating States, under the following terms and conditions:

(a)    Allergan shall pay to the United States the sum of $210,150,000 plus accrued interest as set forth above ("Federal Settlement Amount"). The Federal Settlement Amount shall be paid by electronic funds transfer pursuant to written instructions from the United States no later than seven (7) business days after (i) this Agreement is fully executed by the Parties and delivered to Allergan's attorneys; or (ii) the Court accepts a Fed. R. Crim. P. 11(c)(1)(C) guilty plea as described in Preamble Paragraph C in connection with the Criminal Action and imposes the agreed upon sentence, whichever occurs later.

(b)    Allergan shall deposit the sum of $14,850,000, plus accrued interest as set forth above ("Medicaid State Settlement Amount") into one or more interest−bearing money market or bank accounts (the "State Settlement Accounts") that are held in the name of Allergan but segregated from other Allergan accounts, and shall pay the Medicaid Participating States

−6−

Exhibit 1
Page 11

from the State Settlement Accounts pursuant to written instructions from the NAMFCU Negotiating Team and under the terms and conditions of the Medicaid State Settlement Agreements that Allergan will enter into with the Medicaid Participating States.

       (c)      Contingent upon the United States receiving the Federal Settlement Amount from Allergan, the United States agrees to pay, as soon as feasible upon receipt, Amy M. Lang and Charles J. Rushin $37,827,000, plus a proportionate share of the actual accrued interest paid to the United States by Allergan, as set forth in Paragraph 1.a., above, ("Relators' Share") as Relators' share of the proceeds pursuant to 31 U.S.C. § 3730(d). No other relator payments shall be made by the United States with respect to the matters covered by this Agreement. All Relators represent that they will abide by the terms of any written and executed separate agreements that they may have entered into with one or more of the other Relators concerning the allocation of the Relators' Share among themselves.

       (d)      If Allergan's agreed−upon guilty plea pursuant to Fed. R. Crim. P. 11(c)(1)(C) in the Criminal Action described in Preamble Paragraph C is not accepted by the Court or the Court does not impose the agreed−upon sentence for whatever reason, this Agreement shall be null and void at the option of either the United States or Allergan. If either the United States or Allergan exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within five (5) business days of the Court's decision, the Parties will not object and this Agreement will be rescinded. If this Agreement is rescinded, Allergan will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims, actions or proceedings arising from the Covered Conduct that are brought by the United States within 90

−7−

Exhibit 1
Page 12

calendar days of rescission, except to the extent such defenses were available on the day on which the <u>qui</u> <u>tam</u> complaints listed in Preamble Paragraph B, above, were filed.

(e)     If the stay of the D.C. Litigation described in Preamble Paragraph D is lifted before Allergan dismisses with prejudice the D.C. Litigation pursuant to Paragraph 19, below, this Agreement shall be null and void at the option of either the United States or Allergan. If either the United States or Allergan exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within five (5) business days of the Court's decision to lift the stay, the Parties will not object and this Agreement will be rescinded. If this Agreement is rescinded, Allergan will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims, actions or proceedings arising from the Covered Conduct that are brought by the United States within 90 calendar days of rescission, except to the extent such defenses were available on the day on which the <u>qui</u> <u>tam</u> complaints listed in Preamble Paragraph B, above, were filed.

2.     Subject to the exceptions in Paragraph 8 (concerning excluded claims), below, in consideration of the obligations of Allergan set forth in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, the United States (on behalf of itself, its officers, agents, agencies, and departments) agrees to release Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees from any civil or administrative monetary claim the United States has or may have for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729−3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a−7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801−3812; any statutory provision for which the Civil

−8−

Exhibit 1
Page 13

Division of the Department of Justice has actual and present authority to assert and compromise pursuant to 28 C.F.R. Part 0, Subpart I, Section 0.45(d); or the common law theories of payment by mistake, fraud, disgorgement, unjust enrichment, and, if applicable, breach of contract.

3.     Subject to the exceptions in Paragraph 8 (concerning excluded claims), below, in consideration of the obligations of Allergan in this Agreement, conditioned upon Allergan's full payment of the Settlement Amount, Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns, agree to release Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees from any liability to Relators arising from any claim the United States has, may have, or could have asserted relating to the Covered Conduct, and from all liability, claims, demands, actions or causes of action whatsoever existing as of the Effective Date of this Agreement, whether known or unknown, fixed or contingent, in law or in equity, in contract or in tort, under any federal or state statute or regulation or that they or their heirs, successors, attorneys, agents and assigns otherwise would have standing to bring, including any liability arising from the filing of the Civil Actions, except for: (1) claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d); (2) claims for a Relator's Share under the Medicaid State Settlement Agreements; and (3) any employment discrimination claims Albert Edward Hallivis may have against Allergan.

4.     In consideration of the obligations of Allergan in this Agreement and the Corporate Integrity Agreement (CIA) entered into between OIG−HHS and Allergan, Inc., and conditioned upon Allergan's full payment of the Settlement Amount, OIG−HHS agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from Medicare, Medicaid, and other Federal health care programs (as defined in 42 U.S.C. §

−9−

Exhibit 1
Page 14

1320a−7b(f)) against Allergan under 42 U.S.C. § 1320a−7a (Civil Monetary Penalties Law), or 42 U.S.C. § 1320a−7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities) for the Covered Conduct, or against Allergan, Inc. under 42 U.S.C. § 1320a−7(b)(1) based on Allergan, Inc.'s agreement to plead guilty to the charge in the Allergan Criminal Action referenced above in Preamble Paragraph C, except as reserved in Paragraph 8 (concerning excluded claims), below, and as reserved in this Paragraph. The OIG−HHS expressly reserves all rights to comply with any statutory obligations to exclude Allergan from Medicare, Medicaid, and other Federal health care programs under 42 U.S.C. § 1320a−7(a) (mandatory exclusion) based upon the Covered Conduct. Nothing in this Paragraph precludes the OIG−HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

5.      In consideration of the obligations of Allergan in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, TMA agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion or suspension from the TRICARE Program against Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees under 32 C.F.R. § 199.9 for the Covered Conduct, except as reserved in Paragraph 8 (concerning excluded claims), below, and as reserved in this Paragraph. TMA expressly reserves authority to exclude Allergan from the TRICARE Program under 32 C.F.R. §§ 199.9 (f)(1)(i)(A), (f)(1)(i)(B), and (f)(1)(iii), based upon the Covered Conduct. Nothing in this Paragraph precludes TMA or the TRICARE Program from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

−10−

Exhibit 1
Page 15

6.     In consideration of the obligations of Allergan in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, OPM agrees to release and refrain from instituting, directing, or maintaining any administrative action against Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees under 5 U.S.C. § 8902a or 5 C.F.R. Part 919 for the Covered Conduct, except as reserved in Paragraph 8 (concerning excluded claims), below, and except if excluded by the OIG−HHS pursuant to 42 U.S.C. § 1320a−7(a). Nothing in this Paragraph precludes OPM from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

7.     In consideration of the obligations of Allergan in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, DOL−OWCP agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion and debarment from the FECA, EEOICPA and BLBA programs against Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees under 20 C.F.R. §§ 10.815, 30.715 and 702.431 for the Covered Conduct, except as reserved in Paragraph 8 (concerning excluded claims), below and except if excluded by the OIG−HHS pursuant to 42 U.S.C. § 1320a−7(a). Nothing in this Paragraph precludes the OWCP of the DOL from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

8.     Notwithstanding any term of this Agreement, the following claims of the United States are specifically reserved and excluded from the scope and terms of the Agreement as to any entity or person (including Allergan and the Relators):

−11−

Exhibit 1
Page 16

(a)     Any civil, criminal, or administrative liability arising under Title 26, U.S. Code (Internal Revenue Code);

(b)     Any criminal liability;

(c)     Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs;

(d)     Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

(e)     Any liability based upon such obligations as are created by this Agreement;

(f)     Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

(g)     Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct;

(h)     Any liability for failure to deliver goods or services due; and

(i)     Any liability of individuals (including current or former directors, officers, employees, or agents of Allergan) who receive written notification that they are the target of a criminal investigation, are criminally indicted or charged, or are convicted, or who enter into a criminal plea agreement.

9.     Relators and their heirs, successors, attorneys, agents, and assigns agree not to object to this Agreement and agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B), and expressly waive the opportunity for a hearing on any objection to this Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon the United States' payment of the Relators' Share, as

−12−

Exhibit 1
Page 17

set forth in Paragraph 1.c., above, Relators for themselves individually, and for their heirs, successors, agents, and assigns, fully and finally release, waive, and forever discharge the United States, and its officers, agents, and employees, from any claims arising from or relating to 31 U.S.C. § 3730; from any claims arising from the filing of the Civil Actions; and from any other claims for a share of the Settlement Amount or payment of any sort from the United States relating to the Agreement or the filing of the Civil Actions; and in full settlement of any claims Relators may have under this Agreement. This Agreement does not resolve or in any manner affect any claims the United States has or may have against the Relators arising under Title 26, U.S. Code (Internal Revenue Code), or any claims arising under this Agreement.

    10.    Conditioned upon the United States' payment of the Relators' Share, as set forth in Paragraph 1.c., above, the Relators, for themselves, and for their respective heirs, successors, attorneys, agents, and assigns:

        (a)        hereby fully and finally release and forever discharge Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors, and assigns, and their current and former officers, directors, trustees, agents, servants, employees, representatives, attorneys, consultants, executors, and administrators (collectively, "Allergan Releasees") from any and all claims for relief, actions, rights, causes of action, suits, debts, obligations, liabilities, demands, losses, damages (including treble damages and any civil penalties), punitive damages, costs, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, in law or in equity, in contract or in tort, or under any federal or state statute or regulation or otherwise that Relators or their heirs, successors, attorneys, agents or assigns would have standing to bring, and which Relators or their heirs, successors, attorneys, agents, or assigns may now have or claim to have against the Allergan

−13−

Exhibit 1
Page 18

Releasees, arising in any way out of or connected in any way with the facts, claims, and circumstances alleged in, arising under, or arising from the filing of the Civil Actions, or from any other past activities and actions of the Allergan Releasees, except for: (1) claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d); (2) claims for a Relators' Share under the Medicaid State Settlement Agreements; and (3) any employment discrimination claims that Albert Edward Hallivis may have against Allergan; and

        (b)     agree not to disseminate any documents or communications in their possession or control, or information from such documents or communications, that can be readily identified as having been created in whole or in part by, or at the direction of, Allergan. In this regard, Relators and their counsel will make a good faith effort to identify all such materials. The obligations in this subparagraph do not apply: (1) to documents or information in the public record or domain; (2) to the extent that compliance with the obligation would conflict with a statute or regulation; (3) if disclosure is required by a subpoena or court order; or (4) in the case of employee Albert Edward Hallivis, to the degree he is authorized by Allergan to utilize business records as necessary within the scope of his current employment.

       11.   Allergan waives and shall not assert any defenses Allergan may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

−14−

Exhibit 1
Page 19

12.    Allergan fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Allergan has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the Covered Conduct or arising from the United States' investigation and prosecution of the Civil Actions and the Criminal Action.

13.    Conditioned upon Relators' compliance with their obligations under this Agreement, Allergan, for itself, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors, and assigns, and their current and former officers, directors, trustees, agents, servants, employees, representatives, attorneys, consultants, executors, and administrators, when acting on behalf of Allergan or any of its affiliated companies, fully and finally releases and forever discharges Relators and their heirs, successors, attorneys, agents, and assigns (collectively, "Relator Releasees") from any and all claims for relief, actions, rights, causes of action, suits, debts, obligations, liabilities, demands, losses, damages (including treble damages and any civil penalties), punitive damages, costs, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, in law or in equity, in contract or in tort, or under any federal or state statute or regulation or otherwise that Allergan, its predecessors, or its current and former divisions, parents, affiliates, subsidiaries, successors, or assigns may now have or claim to have against the Relator Releasees, arising in any way out of or connected in any way with the facts, claims, and circumstances alleged in, arising under, or arising from the Civil Actions, or from any other past activities and actions of the Relator Releasees, except to the extent related to: (1) claims Relators may have under 31 U.S.C. § 3730(d); (2) claims for a Relators' Share under the Medicaid State Settlement Agreements; or (3)

−15−

Exhibit 1
Page 20

any employment discrimination claim that Albert Edward Hallivis may have against Allergan, or rights Allergan may have arising out of any violation by him of the terms and conditions of his employment. Allergan attests that, upon inquiry of its Legal Department, it is not presently aware of any claims its officers, directors, employees, or agents may have against Relator Releasees.

14.   The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare carrier or intermediary or any other state or Federal payer, related to the Covered Conduct; and Allergan agrees not to resubmit to any Medicare carrier or intermediary or any other state or Federal payer any previously denied claims related to the Covered Conduct, and agrees not to appeal any such denials of claims.

15.   Allergan agrees to the following:

(a)   <u>Unallowable Costs Defined:</u> that all costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205−47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395−1395hhh and 1396−1396v; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Allergan, its present or former officers, directors, employees, shareholders, and agents in connection with the following shall be "Unallowable Costs" on government contracts and under the Medicare Program, Medicaid Program, TRICARE Program, and FEHBP:

(i)      the matters covered by this Agreement and any related plea agreement;

(ii)     the United States' audit(s) and civil and criminal investigation(s) of the matters covered by this Agreement;

(iii)    Allergan's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and criminal

−16−

Exhibit 1
Page 21

investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(iv)    the negotiation and performance of this Agreement, the Plea Agreement, and the Medicaid State Settlement Agreements;

(v)    the payments Allergan makes to the United States pursuant to this Agreement, the Plea Agreement, or the Medicaid State Settlement Agreements, and any payments that Allergan may make to Relators (including costs and attorneys' fees); and

(vi)    the negotiation of, and obligations undertaken pursuant to the CIA to:

(a)    retain an independent review organization to perform annual reviews as described in Section III of the CIA; and

(b)    prepare and submit reports to the OIG−HHS.

However, nothing in this Paragraph 15.a.vi. that may apply to the obligations undertaken pursuant to the CIA affects the status of costs that are not allowable based on any other authority applicable to Allergan. (All costs described or set forth in this Paragraph 15.a. are hereafter "Unallowable Costs.")

(b)    <u>Future Treatment of Unallowable Costs</u>: These Unallowable Costs shall be separately determined and accounted for by Allergan, and Allergan shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Allergan or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

(c)    <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: Allergan

−17−

Exhibit 1
Page 22

further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Allergan or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. Allergan agrees that the United States, at a minimum, shall be entitled to recoup from Allergan any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously−submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Allergan or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on Allergan or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

(d)     Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re−examine Allergan's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

16.     This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except as explicitly stated in this

−18−

Exhibit 1
Page 23

Agreement, including in Paragraph 17 (waiver for beneficiaries paragraph), below.

17.     Allergan agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

18.     Allergan warrants that it has reviewed its financial situation and that it currently is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and shall remain solvent following payment to the United States of the Settlement Amount. Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to Allergan, within the meaning of 11 U.S.C. § 547(c)(1); and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Allergan was or became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

19.     Within seven (7) days of making the payments described in Paragraph 1, above, Allergan shall file a stipulation of dismissal with prejudice in the D.C. Litigation.

20.     Upon the Effective Date of this Agreement, the United States shall file in Civil Action III a Notice of Intervention as to the Covered Conduct. Upon receipt of the payments described in Paragraph 1, above, and entry of an order dismissing the D.C. Litigation with prejudice, the United States and Relators shall file a Joint Stipulation of Dismissal in each of the

−19−

Exhibit 1
Page 24

Civil Actions as follows:

(a)     each stipulation of dismissal shall be with prejudice as to the United States' and Relators' claims as to Allergan as to the Covered Conduct in each Civil Action pursuant to and consistent with the terms and conditions of this Agreement;

(b)     each stipulation of dismissal shall be without prejudice to the United States and with prejudice as to Relators as to all other claims; and

(c)     provided, however, that the following claims against Allergan shall not be dismissed until they are settled, adjudicated, or otherwise resolved, and the Court is so informed: (a) Relators' claims for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); (b) Relators' claims for a Relators' Share under the Medicaid State Settlement Agreements; and (c) any employment discrimination claims that Albert Edward Hallivis may have against Allergan.

21.     Except as expressly provided to the contrary in this Agreement, each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

22.     Allergan represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

23.     Relators represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

24.     This Agreement is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement is the United States District Court for the Northern District of Georgia, except that disputes arising under the CIA shall be resolved exclusively under the dispute

−20−

Exhibit 1
Page 25

resolution provisions in the CIA.

25.     For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

26.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

27.     The individuals signing this Agreement on behalf of Allergan represent and warrant that they are authorized by Allergan to execute this Agreement. The individuals signing this Agreement on behalf of Relators represent and warrant that they are authorized by Relators to execute this Agreement. The United States signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

28.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

29.     This Agreement is binding on Allergan's successors, transferees, heirs, attorneys, agents, and assigns.

30.     This Agreement is binding on Relators' successors, transferees, heirs, attorneys, agents, and assigns.

31.     All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

32.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

−21−

Exhibit 1
Page 26

## THE UNITED STATES OF AMERICA

DATED:   8/31/10          BY:   /s/ Sally Quillian Yates
                                SALLY QUILLIAN YATES
                                United States Attorney
                                United States Attorney's Office
                                Northern District of Georgia

DATED:   8/31/10          BY:   /s/ Amy Berne
                                AMY BERNE
                                Chief, Civil Division
                                United States Attorney's Office
                                Northern District of Georgia

DATED:   8/31/10          BY:   /s/ Sally B. Molloy
                                SALLY B. MOLLOY
                                Assistant U.S. Attorney
                                United States Attorney's Office
                                Northern District of Georgia

DATED:   8/31/2010        BY:   /s/ Christopher J. Huber
                                CHRISTOPHER J. HUBER
                                Assistant U.S. Attorney
                                United States Attorney's Office
                                Northern District of Georgia

DATED:   8/31/10          BY:   /s/ Edward C. Crooke
                                EDWARD C. CROOKE
                                Trial Attorney
                                Commercial Litigation Branch
                                Civil Division
                                United States Department of Justice

–22–

Exhibit 1
Page 27

DATED:    8/20/10                BY:    /s/ Gregory E. Demske
                                       GREGORY E. DEMSKE
                                       Assistant Inspector General for Legal Affairs
                                       Office of Counsel to the Inspector General
                                       Office of Inspector General
                                       United States Department of Health and Human Services

DATED:    18 Aug 2010           BY:    /s/ Laurel C. Gillespie
                                       LAUREL C. GILLESPIE
                                       Deputy General Counsel
                                       TRICARE Management Activity
                                       United States Department of Defense

DATED:    8/18/10                BY:    /s/ Shirley R. Patterson
                                       SHIRLEY R. PATTERSON
                                       Acting Deputy Associate Director Insurance Operations
                                       United States Office of Personnel Management

DATED:    8/19/2010             BY:    /s/ J. David Cope
                                       J. DAVID COPE
                                       Assistant Inspector General for Legal Affairs
                                       United States Office of Personnel Management

DATED:    8/18/2010             BY:    /s/ Cecily A. Rayburn
                                       CECILY A. RAYBURN
                                       Acting Deputy Director
                                       Office of Workers' Compensation Programs
                                       United States Department of Labor

−23−

Exhibit 1
Page 28

### **ALLERGAN**

DATED:    8/30/10          BY:    /s/ Samuel J. Gesten
                                                 SAMUEL J. GESTEN, ESQ.
                                                 Executive Vice President and General Counsel
                                                 Allergan, Inc.

                                                 Vice President and Assistant Secretary
                                                 Allergan USA, Inc.

DATED:    8/31/10          BY:    /s/ Stephen S. Cowen
                                                 STEPHEN S. COWEN, ESQ.
                                                 King & Spalding, LLP

DATED:    8/31/10          BY:    /s/ Matthew H. Baughman
                                                 MATTHEW H. BAUGHMAN, ESQ.
                                                 King & Spalding, LLP

DATED:    8/31/10          BY:    /s/ John T. Bentivoglio
                                                 JOHN T. BENTIVOGLIO, ESQ.
                                                 Skadden, Arps, Slate, Meagher & Flom, LLP

−24−

Exhibit 1
Page 29

### RELATOR AMY M. LANG, M.D.

DATED: ___8/18/2010_____  BY: ___/s/ Amy M. Lang, M.D._____
                                     AMY M. LANG, M.D.

DATED: ___08/18/10_____  BY: ___/s/ John E. Floyd_____
                                   JOHN E. FLOYD, ESQ.
                                   Bondurant, Mixson, & Elmore, LLP

DATED: ___08/18/10_____  BY: ___/s/ Ben E. Fox_____
                                   BEN E. FOX, ESQ.
                                   Bondurant, Mixson, & Elmore, LLP

DATED: ___8/18/2010_____  BY: ___/s/ Lance D. Lourie_____
                                    LANCE D. LOURIE, ESQ.
                                    Watkins, Lourie, Roll & Chance, P.C.

−25−

Exhibit 1
Page 30

## **RELATOR CHARLES J. RUSHIN**

DATED:   8/18/2010         BY:   /s/ Charles J. Rushin
                                             CHARLES J. RUSHIN

DATED:   08/18/2010        BY:   /s/ John E. Floyd
                                             JOHN E. FLOYD, ESQ.
                                           Bondurant, Mixson, & Elmore, LLP

DATED:   08/18/10           BY:   /s/ Ben E. Fox
                                           BEN E. FOX, ESQ.
                                         Bondurant, Mixson, & Elmore, LLP

DATED:   8/18/10            BY:   /s/ Lance D. Lourie
                                           LANCE D. LOURIE, ESQ.
                                         Watkins, Lourie, Roll & Chance, P.C.

−26−

Exhibit 1
Page 31

**RELATOR CHER BEILFUSS**

DATED:   Aug 22, 2010     BY:    /s/ Cher Beilfuss
CHER BEILFUSS

DATED:   8/23/10     BY:    /s/ Marcella Auerbach
MARCELLA AUERBACH, ESQ.
Nolan & Auerbach, P.A.

DATED:   8/23/10     BY:    /s/ Ken Nolan
KEN NOLAN, ESQ.
Nolan & Auerbach, P.A.

−27−

Exhibit 1
Page 32

**RELATOR KATHLEEN O'CONNOR−MASSE**

DATED:   8/18/10                          BY:   /s/ Kathleen O'Connor−Masse
                                                KATHLEEN O'CONNOR−MASSE


DATED:   8/23/10                          BY:   /s/ Marcella Auerbach
                                                MARCELLA AUERBACH, ESQ.
                                                Nolan & Auerbach, P.A.


DATED:   8/23/10                          BY:   /s/ Ken Nolan
                                                KEN NOLAN, ESQ.
                                                Nolan & Auerbach, P.A.

−28−

Exhibit 1
Page 33

## RELATOR ALBERT EDWARD HALLIVIS

DATED:    8/18/10            BY:    /s/ Albert Edward Hallivis

ALBERT EDWARD HALLIVIS

DATED:    8/18/10            BY:    /s/ Jay P. Holland

JAY P. HOLLAND, ESQ.
Joseph, Greenwald & Laake, P.A.

DATED:    8/18/10            BY:    /s/ Brian J. Markowitz

BRIAN J. MARKOWITZ, ESQ.
Joseph, Greenwald & Laake, P.A.

–29–

Exhibit 1
Page 34

# Exhibit 2

# ORIGINAL

FILED IN CHAMBERS
U.S.D.C. Atlanta

SEP  1 2010

JAMES N. HATTEN, Clerk
By: L. Wade-Child
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | : |
| | : |
| | :  CRIMINAL ACTION NO. |
| v. | : |
| | :  1:10-CR-375 |
| | : |
| | : |
| | : |
| ALLERGAN, INC., | : |
| | : |
| Defendant. | : |

**INFORMATION**

Exhibit 2
Page 35

**THE UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF GEORGIA
CHARGES THAT:**

At all times relevant to this Criminal Information:

### COUNT ONE

(Distribution of a Misbranded Drug/Biologic)
21 U.S.C. §§ 331(a) and 352(f)(1)

    1.   From on or about January 01, 2000, through on or about December 31, 2005, in the Northern District of Georgia and elsewhere, defendant,

### ALLERGAN, INC.,

the producer and manufacturer of BOTOX, a prescription biological product containing botulinum toxin type A, a purified neurotoxin, introduced into interstate commerce, and caused to be introduced into interstate commerce, quantities of BOTOX, a drug and biologic within the meaning of 21 U.S.C. § 321(g)(1) and 42 U.S.C. § 262(i), which was misbranded under 21 U.S.C. § 352(f)(1), in that this drug and biologic lacked adequate directions for its use, because the defendant **ALLERGAN, INC.,** marketed and promoted the drug and biologic for uses that were outside its labeling, to wit, off-label uses specifically for the treatment of headache, pain, spasticity, and juvenile cerebral palsy, and these off-label uses had not been approved by the Food and Drug Administration.

-2-

Exhibit 2
Page 36

## The Defendant

2.    Defendant **ALLERGAN, INC.** (hereinafter referred to as "**ALLERGAN**"), is a global corporation formed under the laws of the state of Delaware, with its principal executive offices at 2525 Dupont Drive, Irvine, California 92612. **ALLERGAN** specializes in manufacturing and marketing specialty pharmaceuticals (primarily eye care, skin care, and neuromodulators) and medical devices (primarily breast implants, gastric bands for obesity surgery, and injectable dermal fillers used on facial wrinkles).

### BOTOX

3.    **ALLERGAN** and its wholly-owned subsidiaries produce and manufacture a prescription pharmaceutical formulation of botulinum toxin type A, a purified neurotoxin to which it received the rights in 1991 from Oculinum, Inc., the drug's developer. **ALLERGAN** markets and sells the toxin in the United States for therapeutic use under the brand name: "BOTOX".

4.    During the relevant time period, one vial of BOTOX cost approximately $400 to $500 for 100 units, and treatment of most off-label uses of BOTOX required injections of anywhere between 100 to 400 units or more. Since BOTOX's effect on a muscle wears off over time, patients get re-injected at periodic intervals, generally every three months. BOTOX is a "buy and bill" drug, meaning that doctors purchase BOTOX directly from **ALLERGAN** and assume the risk that they will get reimbursed on the back end by a

-3-

Exhibit 2
Page 37

healthcare payer after submitting the claim.  Consequently, doctors would not inject BOTOX for off-label uses if they could not get reimbursed.

### BOTOX's Limited FDA Approval

5.   BOTOX has limited approval and licensing by the Food and Drug Administration ("FDA") as a biological product and drug. Although perhaps best known for its use in connection with cosmetic facial aesthetics, the FDA first approved BOTOX for the treatment of certain neuromuscular disorders.

6.   In 1989, the FDA approved **ALLERGAN**'s Biological License Application ("BLA") to distribute and market BOTOX (botulinum toxin type A) in interstate commerce for the treatment of strabismus (crossed-eyes) and blepharospasm (involuntary eyelid muscle contractions) associated with dystonia. Thereafter, in December 2000, FDA approved **ALLERGAN**'s supplemental BLAs ("sBLAs") to distribute and market BOTOX in interstate commerce for the treatment of cervical dystonia (involuntary neck muscle contractions) in adults, to decrease the severity of abnormal head position and neck pain associated with cervical dystonia, and in July 2004, to treat severe primary axillary hyperhidrosis (excess sweating) that is inadequately managed with topical agents.

-4-

Exhibit 2
Page 38

**THE FOOD DRUG AND COSMETICS ACT
(21 U.S.C. §§ 301 - 397) &
PUBLIC HEALTH SERVICE ACT
(42 U.S.C. §§ 262 et seq.)**

7.  Under the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-397, and the Public Health Services Act ("PHSA"), 42 U.S.C. § 262 et seq., the FDA is charged with, *inter alia*, ensuring that drugs and biological products are reasonably safe and effective as well as properly labeled.

8.  BOTOX qualifies as a "drug" under the FDCA because it is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man" and "intended to affect the structure or function of the body of man." 21 U.S.C. § 321(g)(1). In addition, BOTOX qualifies as a "biological product" under the PHSA because it is a "toxin...applicable to the prevention, treatment or cure of a disease or condition of human beings." 42 U.S.C. § 262(i); *see also* 21 C.F.R. § 600.3(h) (defining "[b]iological product" as "any ... toxin ... or analogous product applicable to the prevention, treatment or cure of disease or injuries of man"). As a biologic that was shipped in interstate commerce, defendant **ALLERGAN** was required to obtain a biological license for each of intended uses of BOTOX, *see* 42 U.S.C. § 262, and otherwise must comply with all other federal prescription drug regulations, *see* 42 U.S.C. § 262.

-5-

Exhibit 2
Page 39

9.    Biological products ("biologics"), such as BOTOX, are drugs derived from living material, rather than chemical synthesis. In light of additional manufacturing, storage, and safety issues raised by biologics, they undergo a different FDA approval process than other drugs and are issued a "biologics license," when they are approved. Other than the initial licensing process, all drug regulations in the FDCA apply to biologics with equal force and effect. *See* 42 U.S.C. § 262.

10.    No biological products may be introduced into, or distributed through, interstate commerce unless the sponsor of the product obtains a biologics license and properly labels the product. 42 U.S.C. § 262(a)(1). To obtain a biologics license, the sponsor must submit a BLA to the FDA, 21 C.F.R. §601.2, providing evidence that the biologic is "safe, pure, and potent," 42 U.S.C. § 262(a)(2)(C)(i)(I), which means that the product has been proven effective for a specific use "by appropriate laboratory tests or by adequately controlled clinical data." 21 C.F.R. § 600.3(s). The FDA approves new biologics based on an evaluation of the products' safety and efficacy demonstrated by randomized, prospective, and double-blind clinical trials. 21 C.F.R. § 601; FDA Release "Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products," May 1998.

11.    The indication and dosages approved by the FDA are set forth in the biologics' labeling, the content of which is also

-6-

Exhibit 2
Page 40

reviewed by the FDA as part of the BLA process. *See, e.g.*, 21 C.F.R. §§ 600.3(dd); 601.2(b); 601.12. The label must also reveal all medically relevant information regarding the appropriate use of the biologic, such as dosage, directions for administration, known precautions, warnings, and contraindications. *Id.*

### FDA Prohibition on Off-Label Marketing

12. Once a drug is approved for a particular use the FDA does not prevent doctors from prescribing the drug for uses that are different than those approved by the FDA. Allowing off-label prescriptions coincides with the FDA's mission to regulate the pharmaceutical industry without directly regulating the practice of medicine.

13. The FDCA, at 21 U.S.C. § 352(f)(1), provides that a drug is misbranded if, among other things, the labeling does not contain "adequate directions for use." As the phrase is used in the FDCA, "adequate directions for use" cannot be written for medical indications or uses for which the drug had not been proven to be safe and effective, through well-controlled clinical studies. Any uses for a drug that are not approved by FDA as safe and effective, and thus that are not included in the drug's approved labeling, are known as "off-label" indications or uses. A drug that does not contain adequate directions for all intended uses because such uses are not included in the FDA-approved labeling for the drug is, therefore, misbranded under section 352(f)(1).

-7-

Exhibit 2
Page 41

## ALLERGAN Was Prohibited from
## Marketing BOTOX for Off-Label Uses

14.   **ALLERGAN** was aware of the prohibitions on promoting and marketing a drug or biologic in interstate commerce for off-label uses. On June 21, 2002, **ALLERGAN** distributed to all sales and marketing personnel the PhRMA Code on Interaction with Healthcare Professionals and the "ALLERGAN Field Reference Guide." The ALLERGAN Field Reference Guide emphasized that

> you may not promote any Company product for uses that are not addressed in the approved product labeling or insert.... This promotional ban applies not only to sales calls, but to all marketing efforts such as product launches, sales meetings and activities of third-parties controlled by ALLERGAN.

15.   **ALLERGAN's** SEC Form 10-K annual report to shareholders for the calendar year ending December 31, 2004, acknowledges that:

> Physicians may prescribe pharmaceutical and biologic products, and utilize medical device products for uses that are not described in a product's labeling or differ from those tested by us and approved by the FDA. While such "off-label" uses are common and the FDA does not regulate a physician's choice of treatment, the FDA does restrict a manufacturer's communications on the subject of off-label use. Companies cannot actively promote FDA-approved pharmaceutical, biologic or medical device products for off-label uses, but they may disseminate to physicians articles published in peer reviewed journals.... If, however, our promotional activities fail to comply with the FDA's ... regulations or guidelines, we may be subject to warnings from, or enforcement action by, the FDA or another enforcement agency.

-8-

Exhibit 2
Page 42

16. At all times relevant to this Information, the four conditions that BOTOX had been approved to treat were relatively rare in comparison to the off-label conditions that **ALLERGAN** actively promoted it to treat (*e.g.*, headache, pain, spasticity including juvenile cerebral palsy). For example, with respect to cervical dystonia ("CD"), **ALLERGAN's** 2003 BOTOX Foundation Training Materials estimated that in the United States the prevalence of CD was slightly less than 9 people out of 100,000 (0.0009%), which would correlate to approximately 27,000 Americans who had the condition in a population of approximately 300 million.

## ALLERGAN'S OFF-LABEL
## MARKETING PRACTICES

17. Since as early as its 1997-2001 Strategic Plan, **ALLERGAN** made it a top corporate priority to maximize sales of BOTOX for spasticity, migraine headache and pain, none of which were approved by the FDA. Many of **ALLERGAN's** yearly Strategic Plans forecast that BOTOX's on-label sales would shrink and that all incremental growth would come from off-label sales.

18. **ALLERGAN's** off-label marketing efforts included sales calls by **ALLERGAN** sales representatives ("BMCs," or BOTOX Medical Consultants, then later called "NMCs," Neurotoxin Medical Consultants) on physicians who would not typically treat patients who had any of the four FDA-approved conditions.

-9-

Exhibit 2
Page 43

19.   **ALLERGAN** instructed its sales representatives to promote BOTOX for pain and headache - even when its own clinical studies showed limited support for these uses.

20.   **ALLERGAN** exploited its Cervical Dystonia ("CD") indication to grow headache and pain sales.   In 2003, **ALLERGAN** developed the "CD/HA Initiative" as a "rescue strategy" in the event of negative results of clinical trials, and a backup strategy to ensure continued expansion into the headache market.

21.   As part of this initiative, **ALLERGAN** asked the FDA to expand the BOTOX label to include treatment of headache associated with CD and the treatment of "pain" - not merely "neck pain" - associated with CD.   The FDA refused the headache request, and, during the relevant time period of this Criminal Information, the FDA had not yet denied the pain request.   Undeterred by the poor clinical trial results and FDA's unwillingness to expand the BOTOX label to include headache associated with CD without further evidence of efficacy, **ALLERGAN** continued to market and promote BOTOX for headache and pain by claiming that CD was misdiagnosed or underdiagnosed.   In an email, an **ALLERGAN** executive states:   "It's too bad that there is no easy way to obtain 'headache' in our label (even as part of CD). . . . Has the US Marketing group exploited the notion of much higher prevalence of CD in the population?"

22.   Soon thereafter, **ALLERGAN** launched a new BOTOX marketing campaign premised on the idea that CD is "underdiagnosed" and

-10-

Exhibit 2
Page 44

"misdiagnosed" and to move toward emphasizing symptoms of mild/moderate CD (*i.e.*, Headache, Pain instead of severe CD). **ALLERGAN's** "key messages" for the campaign emphasized that doctors could diagnose CD based on headache and pain symptoms, even when a doctor "doesn't see any cervical dystonia."

23. **ALLERGAN's** new CD campaign marketing worked. **ALLERGAN** listed the "CD expansion campaign" as one of the "key drivers" for BOTOX sales.

24. **ALLERGAN** also leveraged other companies' relationships with doctors in off-label specialties by entering into "co-promotion" agreements. In 2002, **ALLERGAN** agreed to sell a medical device manufacturer's device to doctors who treated spasticity, thereby giving **ALLERGAN** sales people opportunities to discuss BOTOX as an adjunctive therapy for spasticity and pain, uses which were not approved by FDA.

### ALLERGAN's Used a Variety of Tactics to Carry Out Its Unlawful, Off-Label Marketing Strategy

25. **ALLERGAN** used a variety of tactics to carry out its illegal off-label marketing strategy including providing "value-added" reimbursement support services, lobbying healthcare payers to expand coverage for off-label uses, funding and controlling continuing medical education programs on off-label uses, paying doctors to attend Advisory Boards on off-label uses, promotional dinners to tout BOTOX's efficacy for off-label uses,

-11-

Exhibit 2
Page 45

and creating and funding organizations to promote off-label uses of BOTOX. For most of the relevant time period, BOTOX "Customer Team Units," or "CTUs," coordinated sales initiatives among numerous different departments, including its sales/marketing, medical affairs (purportedly independent scientific advisors), and reimbursement divisions which permitted more focused communication of its off-label marketing messages.

### A. ALLERGAN Provided "Value-Added" Reimbursement Support Services to Grow Off-Label Sales.

26. **ALLERGAN** recognized that the "biggest obstacle" to growing BOTOX sales was the lack of reimbursement for off-label uses. Even though government and private healthcare payers covered BOTOX for every FDA-approved indication, **ALLERGAN** doubled the size of its reimbursement support team in 2003 to "minimize customer barriers" for the use of BOTOX for headache, pain and spasticity.

27. The BOTOX reimbursement team was an extension of the sales force, and its express goal was to improve injector economics by selling more BOTOX. The pitch for the BOTOX reimbursement programs - collectively referred to as the "BOTOX Advantage Program" - was: "Improving the Reimbursement Environment for Today and For the Future by Providing Comprehensive Reimbursement Assistance, Reducing Reimbursement Issues, Saving You Time and Effort!"

-12-

Exhibit 2
Page 46

28.  **ALLERGAN** cited "reimbursement" as the "#1 reason limiting M.D. BOTOX use." **ALLERGAN** increased its reimbursement services to drive off-label sales.

### B.  ALLERGAN Lobbied Healthcare Payers to Expand Coverage for Off-Label Uses.

29.  Notwithstanding the lack of scientific support for headache or pain, **ALLERGAN** initiated a carefully orchestrated campaign to: (1) expand BOTOX coverage for off-label uses, and (2) eliminate any payer-imposed limitation on the amount of BOTOX injected into patients (i.e., "dosing caps"). **ALLERGAN** recruited and used physician "advocates" to lobby Medicare and Medicaid decision-makers to expand coverage for off-label uses.

30. **ALLERGAN** also funded and controlled a patient advocacy group, an organization whose mission is to expand patient access to BOTOX.  Doctors were paid $1,000 each to attend the patient advocacy group's regional workshops where **ALLERGAN** reimbursement personnel coached them how to successfully lobby healthcare payers to cover off-label uses of BOTOX.

### C.  ALLERGAN Directed Physician Training, Workshops, and Dinners.

31.  **ALLERGAN** funded and controlled the content of hundreds of continuing medical education ("CME") seminars, injection workshops, and promotional dinner programs at which paid speakers identified by the Company as "Key Opinion Leaders" ("KOLs") advocated BOTOX for off-label indications.  For example, in 2004, a CME provider

-13-

Exhibit 2
Page 47

worked with **ALLERGAN** to develop purported CME programs to address the use of BOTOX to treat pain and spasticity. **ALLERGAN** also created the Centers of Excellence as an "independent" CME to drive the use of BOTOX for headache growth. It was also a "Management Business Objective" for **ALLERGAN's** scientific services group to create, edit and control the substance of off-label CMEs, including headache.

> **D.  ALLERGAN Paid Doctors to Attend "Advisory Boards."**

32.  **ALLERGAN** hosted numerous "Advisory Boards," purportedly designed to elicit feedback from doctors about their experience with BOTOX.  These "Advisory Boards" represented another opportunity for **ALLERGAN** to promote BOTOX for off-label indications and "build loyalty and solidify important relationships."  For example, in 2005, approximately 100 top-prescribing doctors attended the "**ALLERGAN** Institute of Distinction ("AIOD")," an invitation-only BOTOX marketing program held at **ALLERGAN's** corporate headquarters and the Balboa Bay Club and Resort in Newport Beach.  Doctors attending the AIOD provided no consulting services, but were paid $1,500 to listen to off-label marketing presentations.

> **E.  ALLERGAN Created and Funded Organizations to Promote BOTOX for Off-Label Uses.**

33.  In addition to the patient advocacy organization, **ALLERGAN** created and funded a purportedly independent organization,

-14-

Exhibit 2
Page 48

an on-line neurotoxin education organization to "stimulate increased use of BOTOX." The Mission Statement for this on-line neurotoxin education organization was to "validate and disseminate consistent information regarding the expanding uses of BOTOX." While this on-line neurotoxin education organization purported to be an independent, third-party organization, **ALLERGAN** admitted its control over the organization, stating that "they act under our direction in creating the content and setting direction." From 1999 to 2005, **ALLERGAN** gave approximately $8 million in "unrestricted" grants to this on-line neurotoxin education organization. This on-line neurotoxin education organization maintained a web site to disseminate information about off-label uses, including videos of CME programs sponsored by **ALLERGAN** and other written materials prepared by **ALLERGAN**. **ALLERGAN**'s sales representatives were specifically trained to refer doctors to the on-line neurotoxin education organization website during sales calls.

### FORFEITURE

THE UNITED STATES FURTHER CHARGES THAT:

1. As a result of the violations of Title 21, United States Code, Sections 331 (a), 333(a)(1), and 352(f)(1) set forth in this information, defendant **ALLERGAN, INC.**, shall forfeit to the United States of America any quantities of BOTOX which between January 2000 and December 31, 2005 were misbranded when introduced into or

-15-

Exhibit 2
Page 49

while in interstate commerce, or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of Title 21, United States Code, Section 331, be introduced into interstate commerce.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant **ALLERGAN**:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture, that is $25,000,000.

All pursuant to Title 21, United States Code, Sections 331, 334, and Title 28, United States Code, Section 2461(c).

-16-

Exhibit 2
Page 50

All in violation of Title 21, United States Code, Sections 331(a), 333(a)(1), and 352(f)(1).

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

RANDY S. CHARTASH
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 121760

DOUGLAS W. GILFILLAN
ASSISTANT UNITED STATE ATTORNEY
Georgia Bar No. 294713

600 RICHARD B. RUSSELL BUILDING
75 SPRING STREET, S.W.
ATLANTA, GEORGIA 30303
404.581.6009
404.581.6181

JOHN W. BURKE
Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
(202) 353-2001

-17-

Exhibit 2
Page 51

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| | : | |
| | : | CRIMINAL ACTION NO. |
| v. | : | 1:10-CR-375-ODE |
| | : | |
| | : | |
| | : | |
| | : | |
| ALLERGAN, INC., | : | |
| | : | |
| | : | |
| Defendant. | : | |

_____

**GOVERNMENT MEMORANDUM IN SUPPORT OF BINDING PLEA AND SENTENCING MEMORANDUM**

Exhibit 3
Page 52

The United States of America submits this memorandum in support of the proposed Rule 11(c)(1)(C) plea agreement and sentence in this case. The defendant, Allergan, Inc. ("Allergan" or "the Company"), is prepared to plead guilty to a one count Criminal Information of introducing into interstate commerce a misbranded drug by reason of the drug being inadequately labeled for its intended uses in violation of Title 21, United States Code, Sections 331(a), 333(a)(1) and 352(f). For the reasons set forth below, the Government submits that this Court should accept the guilty plea and sentence Allergan in accordance with the terms of the negotiated plea agreement.

## I. THE PROPOSED GLOBAL RESOLUTION

The proposed global resolution in this case represents the culmination of a complex investigation regarding the sales, promotion and marketing practices of Allergan for its flagship drug, Botox. The components of the resolution are as follows:

1. Allergan agrees to plead guilty to one count of introducing into interstate commerce a misbranded drug by reason of the drug being inadequately labeled for its intended uses in violation of Title 21, United States Code, Sections 331(a), 333(a)(1) and 352(f) and to pay a criminal fine in the amount of three hundred and fifty million dollars ($350,000,000) and a forfeiture of twenty-five million dollars ($25,000,000);

2. Allergan agrees to settle its Federal False Claims Act

-2-

Exhibit 3
Page 53

civil liability for a total amount of two hundred and twenty-five million dollars ($225,000,000);

3. Allergan agrees to dismiss with prejudice its lawsuit, *Allergan, Inc. v. United States of America, et al.*, Civil Action No. 09-1879 (JDB), filed in the United States District Court for the District of Columbia;

4. The United States agrees not to prosecute Allergan for conduct described in the plea agreement paragraph 5;

5. Allergan agrees to comply with the terms of a new corporate integrity agreement; and

All aspects of the global agreement, including the civil and administrative remedies and the dismissal with prejudice, are contingent upon the Court's acceptance of the plea and sentence as proposed by the parties.

## II.  THE FOOD, DRUG AND COSMETIC ACT CHARGE

The Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq, sets out the authority and framework for the regulation of prescription drugs by the FDA.  The purpose of the FDCA is to protect the public health and a "violation of the FDCA is presumed to harm the public." *United States v. Kasz Enterprises*, 855 F. Supp. 534, 543 (D.R.I. 1994).  Botox is a "drug" under the FDCA because it is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man" and "intended to affect the structure or function of the body of man." 21 U.S.C.

-3-

Exhibit 3
Page 54

§321(g)(l).  In addition, Botox is a "biological product" under the Public Health Services Act, ("PHSA"), 42 U.S.C. §§ 262 et seq., because it is a "toxin . . . applicable to the prevention, treatment or cure of a disease or condition of human beings."  42 U.S.C. § 262(I); *see also* 21 C.F.R. § 600.3(h) (defining "[b]iological product" as "any . . . toxin . . . or analogous product applicable to the prevention, treatment or cure of disease or injuries of man").  As a biological product, Allergan was required to obtain a Biologic License Application ("BLA") for each of the intended uses of Botox.  *See* 42 U.S.C. § 262.  A product that has a BLA under the PHSA is not required to also have an approved New Drug Application ("NDA") under the FDCA; in every other respect, however, the FDCA applies, including the provisions applicable to adulteration and misbranding of drugs.  42 U.S.C. § 262(j).  Botox is also a "prescription drug" because it is one that is not safe for use except under the supervision of a licensed practitioner.  21 U.S.C. § 353(b)(1)(A).

### A.  Misbranding:  21 U.S.C. § 331(a)

The FDCA prohibits the "introduction or delivery for introduction into interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded."  21 U.S.C. § 331(a).  Under this statute, a product's labeling, which has a broad definition under the FDCA, must provide adequate directions for its use.  21 U.S.C. § 352(f).  According to the regulations, this means

-4-

Exhibit 3
Page 55

"directions under which the layman can use a drug safely and for the purposes for which it is intended," and "[d]irections for use may be inadequate because, among other reasons, of omission, in whole or in part, or incorrect specification of (a) Statements of all conditions, purposes, or uses for which such drug is intended, [ . . . and] (b) Quantity of dose, including usual quantities for each of the uses for which it is intended and usual quantities for persons of different ages and different physical conditions." 21 C.F.R. § 201.5.

In addition, "intended uses" are defined in 21 C.F.R. § 201.128 as follows:

> The words intended uses or words of similar import . . . refer to the objective intent of the persons legally responsible for the labeling of drugs. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. It may shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised. The intended use of an article may change after it has been introduced into interstate commerce by its manufacturer. . . . But if a manufacturer knows, or has knowledge of facts that would give him notice, that a drug introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a drug which accords with such uses to which the article is to be put.

Under this definition, the off-label uses of Botox to treat pain, headache, spasticity, and juvenile cerebral palsy were

-5-

Exhibit 3
Page 56

"intended," and thus required proper labeling.  Since the labeling cannot provide directions for an unapproved use, it is presumptively inadequate if the manufacturer intended, as Allergan did, that the drugs be used off-label.

Introduction of a misbranded or unapproved new drug into interstate commerce is a misdemeanor violation without regard to the defendant's scienter.  *United States v. Dotterweich*, 320 U.S. 277, 281 (1947).  *See also United States v. Hiland*, 909 F.2d 1114, 1127-1128 (8th Cir. 1990); *United States v. Mitcheltree*, 940 F.2d 1329, 1350 (10th Cir. 1991) ("Misdemeanor criminal responsibility does not require consciousness of wrongdoing").

## B. The essential elements of the offense

The Criminal Information charges one count of misbranding under the FDCA, in violation of 21 U.S.C. §§ 331(a), 333(a)(1), and 352(f)(1).  Section 331 lists prohibited acts, including:

> (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded.

21 U.S.C. § 331(a).

Under section 352 of the FDCA, 21 U.S.C. 352, a drug is "misbranded" under several circumstances, including (as relevant here):

A drug or device shall be deemed to be misbranded –

\*    \*    \*    \*    \*

-6-

Exhibit 3
Page 57

> (f)  Unless its labeling bears (1) adequate directions for use . . . .

21 U.S.C. § 352(f).

Section 333 sets forth penalties, 21 U.S.C. 333, including:

> (1) Any person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both.
>
> (2) Notwithstanding the provisions of paragraph (1) of this section, if any person commits such a violation after a conviction of him under this section has become final, or commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000, or both.

The Criminal Information in this case charges a misdemeanor under this statute. 21 U.S.C. § 331(a)(1). Thus, to prove the crime of misdemeanor misbranding, the government must establish the following elements beyond a reasonable doubt:

- that Botox is a drug and/or a biologic
- that Botox as misbranded, in that it lacked adequate directions for the uses intended by Allergan, and
- that it was introduced into interstate commerce.

It is not illegal for a doctor to prescribe off-label, using his or her best medical judgment. However, it constitutes misbranding for a drug manufacturer who promotes an off-label use to a doctor, such as Allergan, to distribute the drug without adequate directions for the off-label use.

-7-

Exhibit 3
Page 58

### III. THE FACTS AT TRIAL

If this case were to proceed to trial, the Government would prove these facts beyond a reasonable doubt, as well as other allegations set forth in the Criminal Information.

### INTRODUCTION

#### A. Botox's Limited FDA Approval

Allergan manufactures Botox[1], a prescription biological product containing purified botulinum toxin protein. Botox is injected into the muscles or the skin to block overactive nerve impulses that trigger excessive muscular contractions or glandular activity. The effect of Botox are temporary and last from one to six months, depending on the patient and the indication. Until very recently, Botox was approved by the Food and Drug Administration ("FDA") to treat only four rare conditions: (1) strabismus (misalignment of the eyes); (2) blepharospasm (involuntary eye muscle contraction); (3) cervical dystonia (involuntary neck muscle contraction); and (4) hyperhidrosis (excessive sweating) (hereinafter collectively referred to as "on-label uses").

Earlier this year, in March 2010, FDA approved the use of

---

[1]Allergan markets and sells botulinum toxin in the United States under the trade names "Botox" for therapeutic use and "Botox Cosmetic" for cosmetic use, but the toxin found in each is exactly the same. This case concerns only Botox for therapeutic use, and all references to "Botox" in this Memorandum relate solely to Botox Therapeutic, unless otherwise noted.

-8-

Exhibit 3
Page 59

Botox for the treatment of increased muscle stiffness in the elbow, wrist and finger muscles in adults with upper limb spasticity.[2] For many years, Botox is and has been the standard of care for the treatment of various forms of spasticity. In fact, Botox has also been approved for a number of years in a number of countries outside of the United States to treat spasticity. Physicians are likely to continue to use Botox for other off-label conditions, including lower limb spasticity and spasticity in juveniles suffering from cerebral palsy.

There is a risk of adverse "distant spread of toxin" associated with the injection of botulinum toxin generally, including Botox. In connection with this risk, the FDA ordered all manufacturers of botulinum toxin, including Allergan, to add a special "boxed warning" to the existing label and package insert, and to adopt a Risk Evaluation and Mitigation Strategy ("REMS"). In connection with its decision, however, the FDA noted that its intention was not to discourage the use of botulinum toxins for spasticity, as they remain "very effective" and "commonly used."[3]

---

[2]The FDA has not approved Botox to treat spasticity in other parts of the body or to treat children with any form of spasticity. This new FDA approval comes after close to a decade of off-label marketing and promoting of Botox for spasticity by Allergan.

[3]Ellis Unger, Office of New Drugs, Ctr. For Drug Evaluation and Research, Food & Drug Admin., Remarks at the FDA Media Briefing on Botulinum Toxin Products (April 30, 2009) http://www.fda.gov/downloads/NewsEvents/Newsroom/MediaTranscripts/ucm169170).

-9-

Exhibit 3
Page 60

Medicare and Medicaid pay, or provide coverage for, drugs prescribed for off-label uses if those uses are "medically accepted indications." Although "medically accepted indications" is defined slightly differently for various federal programs, the term generally refers to uses supported by citations in certain published drug compendia specified by statute. The three statutory compendia are the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information and the Drugdex Information System. Some of the off-label indications illegally promoted by Allergan were "medically accepted indications" covered by federal healthcare programs. For example, from 2001 to 2008, Medicare and Medicaid paid $232 million for claims with a primary diagnosis of spasticity. However, other off-label indications promoted by Allergan were not medically accepted indications, and were not covered by federal healthcare programs.

Allergan has also recently sought FDA approval of Botox for the treatment of "chronic migraine" (specifically, individuals who suffer from fifteen or more headaches per month, at least half of which are attributable to migraines). That application is still pending with the FDA. However, during the relevant time period, Botox was not approved to treat headache, Allergan lacked clinical support for its headache claims, and only a handful of federal healthcare programs covered Botox injections for headaches. Morever, even if the FDA approves Botox as a preventative treatment

-10-

Exhibit 3
Page 61

for chronic migraine, the product will still not have approval for the other headache types that Allergan was marketing and promoting, such as tension type headache, episodic migraine, and post-whiplash headache.

### B.   Allergan Was Prohibited from Marketing Botox for Off-Label Uses.

In its 1997 Strategic Plan, long before getting FDA approval for the off-label indications, Allergan made it a top corporate priority to maximize Botox sales for the treatment of off-label uses, including spasticity, migraine, and pain, and highlighted migraine and pain as two of Allergan's top three future growth opportunities. Even though Botox's on-label uses were very limited at the time, the 1997 Strategic Plan identified the brand as Allergan's fastest growing business, with the greatest peak year sales, and highest margins. In fact, several of Allergan's Strategic Plans forecast that Botox's on-label sales would shrink and that all growth from Botox Therapeutic would come from off-label sales. In order to meet the ambitious Botox sales goals demanded by its Strategic Plans, Allergan had to expand sales beyond the four narrow FDA-approved indications.

As a result of this unlawful off-label marketing scheme, Botox sales skyrocketed. Between 1999 and 2006, spasticity sales grew by 332 percent, headache sales grew by 1,407 percent, and pain sales grew by 504 percent. By 2007, Allergan had over $500 million in annual Botox sales for therapeutic uses, and 70 to 80 percent of

-11-

Exhibit 3
Page 62

those sales were attributable to off-label indications, primarily for spasticity, headache and pain.

Allergan knew that marketing and promoting Botox for off-label uses was unlawful. On June 21, 2002, Allergan distributed to all sales and marketing personnel the PhRMA Code on Interaction with Healthcare Professionals and the "Allergan Field Reference Guide." The Allergan Field Reference Guide emphasized that "you may not promote any Company product for uses that are not addressed in the approved product labeling or insert . . . This promotional ban applies not only to sales calls, but to all marketing efforts such as product launches, sales meetings and activities of third-parties controlled by Allergan."

Allergan's SEC Form 10-K annual report to shareholders for the calendar year ending December 31, 2004, acknowledges this promotional ban as well:

> Physicians may prescribe pharmaceutical and biologic products, and utilize medical device products for uses that are not described in a product's labeling or differ from those tested by us and approved by the FDA. While such "off-label" uses are common and the FDA does not regulate a physician's choice of treatment, the FDA does restrict a manufacturer's communications on the subject of off-label use. Companies cannot actively promote FDA-approved pharmaceutical, biologic or medical device products for off-label uses, but they may disseminate to physicians articles published in peer reviewed journals.... If, however, our promotional activities fail to comply with the FDA's...regulations or guidelines, we may be subject to warnings from, or enforcement action by, the FDA or another enforcement agency.

-12-

Exhibit 3
Page 63

Essentially the same language appeared in Allergan's 10-K filings for 2005 and 2006.

In this case, the four FDA-approved indications for Botox - strabismus, blepharospasm, cervical dystonia ("CD"), and hyperhidrosis - are extremely rare. Studies reflect that the prevalence rate of CD in the population of the United States is only 27,000 people.[4]  As a practical matter, patients with strabismus and hyperhidrosis rarely resort to Botox treatment. Botox treatments for hyperhidrosis are indicated only after prescription antiperspirants fail to adequately manage the condition, and strabismus patients almost always choose alternative treatments such as eye surgery, corrective lenses, or eye exercises. Yet, Allergan has made it a top corporate priority to maximize sales of Botox for off-label indications. *See also* 2003 Strategy Review that "Adult Spasticity, Headache, and Pain will account for 85% of incremental sales in 2003".[5]  Indeed, Allergan

---

[4] With respect to cervical dystonia ("CD"), Allergan's 2003 Botox Foundation Training Materials estimated that in the United States the prevalence of the condition is slightly less than 9 people out of 100,000, which would correlate to approximately 27,000 Americans who have the condition in a population of approximately 300 million. *See also* "Overview of the Epidemiology of Botox Indications: Risk Management and Epidemiology Allergan, Inc." at 39 (September 2007)("With a current US population of 281,421,906 (U.S.Census Bureau, 2000) and given a CD prevalence of 8.9/100,000 (Nutt et al., 1988), the estimated number of people affected in the US is 25,047.").

[5] The references made throughout this Memorandum are to Allergan documents which the Government is prepared to provide to the Court should the Court be interested.

-13-

Exhibit 3
Page 64

instructed its sales representatives to promote Botox for pain, spasticity and headache - even when at the time it had no clinical support for these indications.

In pharmacology, the term "mechanism of action" ("MOA") refers to the specific biochemical interaction through which a drug substance produces its pharmacological effect. Allergan also employed a "mechanism of action" for its promotional and marketing activities related to off-label sales of Botox. Allergan had a well-developed MOA for its off-label sales and marketing efforts. Allergan's MOA is reflected in strategic plans, marketing initiatives, employee training, internal communications, staffing decisions, and even corporate structure. Allergan's MOA included providing "value-added" reimbursement support services; lobbying healthcare payers to expand coverage for off-label uses; funding and controlling continuing medical education programs; paying doctors to attend Advisory Boards, promotional dinners, or to tout Botox's efficacy for off-label uses; creating and funding organizations to promote off-label uses of Botox; and providing selective discounts to doctors who predominantly treated off-label conditions. For example, in January 2002, at an annual sales meeting in Whistler, British Columbia, Canada, Allergan unveiled its "MOA" for increasing sales of Botox for spasticity, headache,

-14-

Exhibit 3
Page 65

and pain.[6]  This is a blueprint for the illegal promotional and marketing activity of Allergan.

Allergan developed Botox "Customer Team Units," or "CTUs," which in effect coordinated these sales initiatives and off-label marketing messages.  CTU's included representatives from sales, medical affairs, reimbursement, marketing and management.  The CTU became or evolved into a mechanism for coordinating the promotional activities among the numerous different departments participating in the CTU.  Specifically, until January 2007, CTU teams met on a quarterly basis to exchange detailed information about each physician's off-label use in a given territory and plan future sales calls on physicians to be made by the different areas.  Through the CTU mechanism, the formal organizational separations

---

[6]In these various slide decks, Allergan acknowledges that it is pursuing future approval for these off-label indications but such approvals are years away.  Yet notwithstanding the trajectory for the future approvals, Allergan heavily marketed and promoted these off-label uses. In fact, Allergan's projected target date for approval by FDA for these off-label indications constantly gets moved backed in time.  *See, e.g.*, Therapeutic Marketing Plan - 2002, "Development Assumptions for Strategic Plan Period" (September 24, 2001)(Allergan's assumption about likely FDA-approval for  Adult Spasticity is projected for the second quarter of 2005; pediatric spasticity, headache, and pain have no specific projected FDA-approval date, as the development assumption for these indications goes into the future beyond the 2005 date on the power point slide).  In Allergan's 2004 Marketing Plan for U.S. Botox, approval for spasticity is now projected to be in the second quarter of 2007, headache approval is projected for 2009 and there is no approval projections for either juvenile spasticity or pain. "US Botox Therapeutic Team, 2004 Marketing Plan, 'Claim Real Estate,' Recruit More Injectors; Escalate Productivity."

Exhibit 3
Page 66

between the sales, medical affairs, and reimbursement divisions were effectively circumvented, resulting in a de facto exchange of sales and marketing information between CTU participants.

Doctors got the message. In a 2003 survey commissioned by Allergan, doctors reported that Allergan sales representatives routinely discussed "migraine treatment and spasticity" and communicated that "Botox is effective in managing migraine headaches and regional myofascial pain." Off-label sales grew exponentially, and by 2007, Allergan identified Botox as its "#1 growth driver." Thus, Allergan succeeded in making Botox its flagship brand.

### C. Allergan Targeted Off-Label Specialties.

Allergan aggressively promoted Botox to medical specialists who did not customarily treat patients with any of the conditions that Botox was approved to treat, including headache clinics, anesthesiologists, pain specialists, and pediatricians. For example, in 2001, Allergan sought to establish Botox in the "back pain market" by calling on "1,000 pain specialists." *See, e.g.*, Botox Therapeutic Team 2004 Marketing Plan (identifying Allergan's 2003 goals for new injectors by medical practice category, including a target of 110 new pediatrician injectors and 230 new pain specialty injectors).[7] More recently, in its 2007 Call Plan,

---

[7]It is not surprising that Allergan targeted off-label specialists given the training its sales people received. For example, in February 2003, Allergan's Foundation Training

-16-

Exhibit 3
Page 67

Allergan sought to target 20 percent more pain and headache specialists and pediatricians than it had in 2006.

Allergan also leveraged other companies' relationships with doctors in off-label specialties by entering into "co-promotion" agreements. In 2002, Allergan agreed to sell another manufacturer's medical device to doctors who treated spasticity, thereby giving Allergan representatives an opportunity to discuss Botox as an adjunctive therapy for spasticity and pain. Similarly, in 2006, Allergan entered into a co-promotion agreement with a top-tier pharmaceutical company to gain an audience with neurologists who treated headache. Allergan had no drug approved for the treatment of headache, but agreed to double its sales force to sell the top-tier pharmaceutical company's headache drugs to the top-tier pharmaceutical company's neurologists. Although Allergan was eligible to receive a $10 million "performance payout" from this top-tier pharmaceutical company if it met certain sales targets, internal documents reflect that a significant motivation for the deal was to "Allow us to Sell More Botox!!!" In fact, when Allergan was not on track to meet either the 2006 or 2007 sales

---

materials, which are the training materials provided to all new sales and marketing employees in the Botox Division, contained approximately 6 pages of boilerplate compliance admonitions on off-label promotion and 48 pages addressing off-label use of Botox as a treatment of headache, including sections on the history of Botox treatment for headaches. Allergan provided extensive training to its sales force on promoting and selling Botox off-label years before the Company was in any position to file a new application to legitimate those unapproved uses.

-17-

Exhibit 3
Page 68

targets of the top-tier pharmaceutical company, Allergan's Senior Director of Marketing reported that "there was no concern expressed" by Allergan executives because "we've seen the positive impact the deal has had on Botox." Allergan was successful in converting the top-tier pharmaceutical company's neurologists to Botox, and about half of its new Botox injectors in 2007 were the top-tier pharmaceutical company's targets. Indeed, based on the "success in Neurology following the [top-tier pharmaceutical] expansion," Botox Marketing Department executives requested additional funding to expand its sales force to call on more physical medicine and rehabilitation doctors ("PM&Rs").

     **D.**     **Allergan Promoted Botox at a Time When The Efficacy of the Drug had Not Been Demonstrated.**

Allergan aggressively promoted Botox for unapproved uses such as headache and pain at a time when the efficacy of the drug to treat those conditions had not been demonstrated by clinical trials. For example, while Allergan vigorously promoted Botox for pain management and instructed its sales representatives to promote the message that "it works!," it recognized in the same internal document that there was no clinical support and "a lack of successful [Double-Blind, Placebo-Controlled] trial(s)" for using Botox injections to relieve pain. *See* ("Key Pain Messages - Neurology - It works");("Clinical Data Support is Modest");("Teach [sales representatives] how to discuss the role of Botox in pain management"; "Lack of peer reviewed, credible data to support this

-18-

Exhibit 3
Page 69

use").  Indeed, after years of clinical trials involving the treatment of back pain, Allergan placed its FDA application in inactive status in 2003 after its Phase 3 studies were "[n]ot successful."  Despite these negative results, Allergan sought to "drive market development of back pain" by "focus[ing] on areas where there is the path of least resistance 'upper back' lower back."  Looking back in 2007, Allergan itself recognized that for more than a decade, it had marketed Botox in "areas where there was not even supportive clinical literature, such as 'pain.'"

Likewise, Allergan aggressively promoted Botox to treat several different types of headache conditions, in addition to chronic headache, and caused sales for that indication to increase over 1,400 percent.  At the same time, Allergan recognized that it lacked scientific evidence that Botox was more effective in treating headache than a placebo.  Allergan's phase 2 FDA headache trials were not successful.  In fact, nine out of ten trials failed to meet their primary endpoint and Allergan concluded that these trials were "negative."  In December 2004, the FDA agreed, finding that the "Botox headache primary efficacy results for the extensive phase 2 development plan have been largely negative."  The FDA also expressed its concern about the existing public perception about the "broad utility" of Botox, and required Allergan to refrain from funding any medical education programs for headache until it had published all of the phase 2 headache studies.  Although Allergan

-19-

Exhibit 3
Page 70

ultimately published the studies, it directed its employees to refer to the trials as "inconclusive" - not "negative." Although at the time its employees candidly recognized that the "data just isn't there for headache," Allergan continued to promote Botox as an effective treatment for headache.[8]

### E. Allergan Used a Variety of Tactics to Carry Out Its Unlawful, Off-Label Marketing Scheme.

In addition to its sales representatives' pitches to doctors that Botox was a safe and effective treatment for headache, pain and spasticity, Allergan used a variety of tactics to carry out its illegal off-label marketing campaign. As stated earlier, Allergan laundered its off-label message through a variety of mechanisms including: providing "value-added" reimbursement support services; lobbying healthcare payers to expand coverage for off-label uses; funding and controlling continuing medical education programs; paying doctors to attend Advisory Boards, promotional dinners, or to tout Botox's efficacy for off-label uses; and creating and funding organizations to promote off-label uses of Botox.

---

[8]Numerous documents reflect that marketing guided Allergan's headache development program. For example, an e-mail from the lead scientist for Allergan's headache development program to the Marketing Department inquired, "if both trial[s] failed to meet the primary [endpoint], would marketing want to give up pursuit of the indication?" Likewise, an Allergan executive reported that Allergan reimbursement personnel planned to develop a "Headache Contingency Plan," which she described as "critical communication and key activities for payers to maintain current coverage and continue to gain coverage for headache," even if "phase II data [is] not positive."

-20-

Exhibit 3
Page 71

###### 1. Allergan Provided "Value-Added" Reimbursement Support Services to Grow Off-Label Sales.

The commercial success of Botox heavily depended on the ability of doctors to obtain reimbursement from federal healthcare programs. Botox is an expensive treatment considering the high drug and administration costs and the fact that its effects are temporary and palliative (not curative). During the relevant time period, one vial of Botox cost approximately $400-$500 for 100 units, and treatment of most off-label uses of Botox required injections of anywhere between 100 to 400 units or more. Since Botox's effect on a muscle wears off over time, patients have to get re-injected at periodic intervals, generally every three months. Doctors can also bill a healthcare payer for the cost of performing the Botox injection procedure, and any associated diagnostic tests, which provide a source of revenue for a doctor's practice. However, unlike most drugs where the doctor writes a prescription and the patient purchases the drug from a pharmacy, Botox is a "buy and bill" drug, meaning that doctors purchase Botox directly from Allergan and assume the risk of reimbursemen on the back-end by a healthcare payer after submitting the claim. Consequently, doctors were not going to inject Botox for off-label uses if they could not get reimbursed.

Indeed, Allergan recognized that the "biggest obstacle" to growing Botox sales was the lack of reimbursement for off-label uses. Even though Government and private healthcare payers covered

-21-

Exhibit 3
Page 72

Botox for every FDA-approved indication, Allergan doubled the size of its reimbursement support team in 2003 to "minimize customer barriers" for headache, pain and spasticity. The Botox reimbursement team was an extension of the sales force, and its express goal was to "Improve Injector Economics = (Sell More Botox)." The pitch for the Botox reimbursement programs - collectively referred to as the "Botox Advantage Program" - was: "Improving the Reimbursement Environment for Today and For the Future by Providing Comprehensive Reimbursement Assistance, Reducing Reimbursement Issues, Saving You Time and Effort!"

Through the Botox Advantage Program, Allergan provided customized reimbursement support services to doctors and their office practice managers, expended millions of dollars each year to operate the Botox Reimbursement Hotline, and performed detailed audits (or "interventions") of physician billing records to demonstrate "the value of Botox to their practice" (*i.e.*, you can make money injecting Botox). Allergan cited "high value [reimbursement] services" as a key driver of Botox sales, and touted their reimbursement support as one of the "most valued services Allergan provides." Indeed, Allergan was able to quantify the success of its reimbursement services, noting that on average, accounts with an intervention grew by $6,000 versus $1,000 at accounts without an intervention.

-22-

Exhibit 3
Page 73

### 2. Allergan Lobbied Healthcare Payers to Expand Coverage for Off-Label Uses.

Notwithstanding the lack of scientific support for headache or pain, Allergan initiated a carefully orchestrated campaign to (1) expand Botox coverage for off-label uses, and (2) eliminate any payer-imposed limitation on the amount of Botox injected into patients (*i.e.*, "dosing caps"). *See* "Reimbursement Operations, Deployment 2006," September 12, 2005(observing that "[w]ithout indications or significant Double-Blind/Placebo-Controlled data, challenging to block competitors and grow coverage at the same time"). Allergan recruited and used physician "advocates" to lobby Medicare and Medicaid decision-makers to expand coverage for off-label uses. Allergan also funded and controlled a patient advocacy group, which is an organization whose mission is to "expand patient access to Botox." Doctors were paid $1,000 each to attend regional physician advocacy workshops where Allergan reimbursement personnel coached them how to successfully lobby healthcare payers to cover off-label uses of Botox.

Allergan viewed physician advocates as the ultimate "critical success factor" for gaining policy expansions for pain and headache and referred to the advocates as the company's "Trojan horses." *See* Email dated February 08, 2008, (reporting that a healthcare payer's medical director "would not talk to Allergan but they respected this advocate so [Allergan] used him as a trojan horse."). With respect to headache, Allergan's reimbursement team

-23-

Exhibit 3
Page 74

created the package of materials for the advocate to submit to the payer, which included a cover letter requesting the policy expansion, a consensus statement signed by "headache experts" (doctors with whom Allergan had financial ties) stating that Botox was an effective treatment for headache, selected medical literature about the use of Botox for headache, and an annotated literature review. Allergan did not disclose its role in this process, and none of the documentation that the advocate submitted to Medicare disclosed Allergan's involvement. Indeed, the reimbursement team went to great lengths to ensure that the "ghostwritten" materials that were submitted to different healthcare payers did not look too much alike if anyone were to compare them. Two Allergan employees went so far as to request an in-person meeting with a Medicare Part B Carrier Medical Director to find out why he expanded the policy to cover headache "even though [they] kn[e]w the process that took place," because it would be a "[g]ood opportunity to learn more on process side using naïve approach on HA [headache] situation. (Or to learn what he may know/perceive as to what our involvement was)."

### 3. Allergan Directed Physician Training, Workshops, and Dinners.

Allergan also funded and controlled the content of hundreds of continuing medical education (CME) seminars, injection workshops, and promotional dinner programs at which paid speakers identified by the company as "Key Opinion Leaders" ("KOLs") advocated Botox

-24-

Exhibit 3
Page 75

for off-label indications. For example, in 2004 a CME provider worked with Allergan to develop purported CME programs to address pain and spasticity. And Allergan created the Centers of Excellence as an "independent" CME to drive headache growth. Indeed, it was a "Management Business Objective" for Allergan's scientific services group to create, edit and control the substance of off-label CMEs, including headache.

### 4. Allergan Paid Doctors to Attend "Advisory Boards."

Allergan hosted numerous "Advisory Boards," purportedly designed to elicit feedback from doctors about their experience with Botox. However, the frequency, context, and content of these "Advisory Boards" demonstrate that they were merely another opportunity for Allergan to promote Botox for off-label indications and "build loyalty and solidify important relationships." For example, in 2005 and 2006, over 200 top-prescribing doctors attended the "Allergan Institute of Distinction" ("AIOD"), a two-day, invitation-only Botox marketing program held at Allergan's corporate headquarters and the Balboa Bay Club and Resort in Newport Beach. Doctors attending the AIOD provided no consulting services, but were paid $1,500 to listen to the presentations that included off-label topics. Rather, these "Engagement Plans" reveal Allergan's intent to reward hundreds of its top injectors with consulting fees and corporate attention in an effort to further develop these doctors' use of Botox.

-25-

Exhibit 3
Page 76

### 5.   Allergan Created and Funded Organizations to Promote Botox for Off-Label Uses

In addition to the patient advocacy group, Allergan created and funded a purportedly independent on-line neurotoxin education organization to "stimulate increased use of Botox."  In 2003, Allergan had a website designed by a large health care marketing corporation to appear as the educational arm of an independent public interest entity. Allergan had an on-line neurotoxin institute created and directed its operation with the intent to seed the medical and scientific community with off-label promotional material about its unapproved uses of Botox.   T h e Mission Statement for the on-line neurotoxin education organization was to "validate and disseminate consistent information regarding the expanding uses of Botox."  However, an Allergan executive admitted its control over the organization, stating that "they act under our direction in creating the content and setting direction." From 1999 to 2007, Allergan gave approximately $10 million in "unrestricted" grants to the on-line neurotoxin education organization.  The on-line neurotoxin education maintained a web site to disseminate information about off-label uses, including videos of CME programs sponsored by Allergan and other written materials prepared by Allergan.  Allergan's sales representatives were specifically trained to refer doctors to the on-line neurotoxin education organization website, and to distribute "Awareness Cards," with the website's information on them, to all

-26-

Exhibit 3
Page 77

doctors during sales calls.

    **F.    Allergan's Unlawful Marketing Campaign Drove the Tremendous Growth of Off-Label Uses of Botox.**

The tremendous growth in off-label Botox sales were caused by Allergan's sales and marketing organization, as the contemporaneous documents produced by Allergan demonstrate that Allergan's efforts drove the majority of increased off-label sales. First, Allergan recognized that doctors "that are naïve to Botox demonstrate limited interest in picking up the needle," and that "[t]he barrier to entry into the [Botox] world is still relatively high for clinicians [with i]ssues of interventional invasive treatments and lack of prior training." Studies commissioned by Allergan found that doctors had a "Limited Interest in Learning How to Inject" Botox, and that "Non-Users of Botox for HA still 'on the fence'" in part because "Non-users perceive the published data supporting use of Botox in chronic HA to be . . . unimpressive." Allergan concluded that a threat to increased sales of Botox was the "[l]imited perception of need; apathy" of potential injectors.

Second, Allergan dramatically expanded its therapeutic Botox field sales force far beyond levels justified by the drug's approved indications. Between February 2003 and February 2008, Allergan almost tripled its payroll of sales personnel, while obtaining only one very narrow label extension (severe primary axillary hyperhydrosis. The clearest connection between the number of sales representatives and off-label sales growth was made in

Exhibit 3
Page 78

Allergan's 2007-2011 Strategic Plan, which stated that in "2006 [Allergan] Added 45 New NMCs [sales representatives] & Spasticity grew 25% [and in] 2007 [it] Added 19 New NMCs & Spasticity Est[timated] 18%." In its 2005 Strategic Planning process, Allergan concluded that sales for pain, headache and spasticity were negatively affected by a "decrease in calls to Pain [doctors]/Ped[iatricians]." Allergan also projected further sales declines for pain in its 2006-2010 Strategic Plan because there would be "no promotion" for that indication (and at the same time projecting increases for other indications, presumably because Allergan's promotion would continue). The 2006 Marketing Plan recognized that "Growth is Detail Sensitive" and that "BMCs [sales representatives] Have Impact on Sales." Allergan's studies supported the conclusion that Allergan's sales and marketing efforts drove higher sales. In particular, Allergan found that "Across all specialties, Botox sales/MD increase with higher call frequency" and that expanding sales calls to rehabilitation doctors would increase sales by $14.3 million over three years. As stated above, the evidence is overwhelming that Allergan's sales and marketing efforts drove the substantial increases in off-label sales of Botox from 2001-2008.

> **G. Allergan Coached and Encouraged Doctors to Diagnose Headache and Pain as "Symptoms" of Cervical Dystonia**

Allergan encouraged doctors to diagnose headache and pain as symptoms of its on-label cervical dystonia indication. CD, also

-28-

Exhibit 3
Page 79

known as "spasmodic torticollis," is a rare movement disorder, the number of people in the United States that currently have the condition is approximately 27,000 individuals. However, with its headache development program in jeopardy and no prospect of obtaining a pain indication, Allergan exploited its approved CD indication to grow headache and pain sales. In 2003, Allergan developed the "CD/HA Initiative" as a "rescue strategy in the event of negative phase II data" and a "backup strategy to ensure continued expansion into the headache market" with the goal of establishing a connectivity between CD and headache to "augment existing use of Botox in the treatment of headache and give an entry point for use of Botox in headache for skeptical markets." As part of this initiative, Allergan asked the FDA to expand the Botox label to include treatment of headache associated with CD and the treatment of "pain" - not merely "neck pain" - associated with CD. The FDA rejected both requests, and an Allergan executive pondered how to proceed: "It's too bad that there is no easy way to obtain 'headache' in our label (even as part of CD). . . . Has the US Marketing group exploited the notion of much higher prevalence of CD in the population?"

Soon thereafter, Allergan launched a new Botox marketing campaign premised on the idea that CD is "underdiagnosed" and "misdiagnosed" and to "strategically move toward emphasizing symptoms of mild/moderate CD (i.e., HA, Pain, Tremors) instead of

-29-

Exhibit 3
Page 80

severe CD." The company's "key messages" for the campaign emphasized that doctors could diagnose CD based on headache and pain symptoms, even when a doctor "doesn't see any cervical dystonia."

Allergan's new CD campaign worked. Allergan acknowledged that the sales and reimbursement teams had successfully convinced doctors to change patients' diagnoses from headache to cervical dystonia. Specifically, upon learning that one doctor was audited by Medicare and asked to pay back over $120,000 for purported "CD claims," Allergan sales and marketing management called for the field to "be more aggressive during their consults" with doctors. Management emphasized that sales representatives should stress "the need for more thorough chart documentation in order to justify a CD diagnosis, especially in those situations where a patient may have been diagnosed with headache previously, but the doctor is changing the diagnosis based upon a better understanding of CD and how a patient may present with CD (we are routinely reviewing with a physician the symptoms of CD - HA, muscle contractions, abnormal posture, pain, etc.)" Allergan's VP of Neurosciences listed the "CD expansion campaign" as one of the "key drivers" for Botox sales, but at the same time worried whether Allergan could "actually defend [723.5] 'unspecified torticollis' as a labeled indication?"

Exhibit 3
Page 81

### III. Allergan Offered Discounts and Other Services to Doctors to Cause the Doctors to Use Botox Off-Label.

Allergan used a wide array of tactics to cause doctors to prescribe more Botox. Those tactics ranged from the blatant - paying substantial honoraria to high-volume injectors - to the more nuanced - providing significant "value-added" reimbursement support. Allergan recognized the strategic imperative of keeping its most valuable customers happy, particularly considering that Botox's most lucrative uses were off-label. As recently as its 2007 Business Plan, Allergan recognized as "imperative," "employ[ing] . . . reimbursement support to retain 'buy and bill' physicians." Similarly, it saw honoraria and speakers bureau engagements as methods of buying "loyalty" and "solidifying relationships" with large customers. Its sales representatives' tactics to increase Botox use included paying money to doctors through the Speaker's Bureau, CMEs, and one-on-one training. Allergan also used its medical grants, in part, as an extension of sales and marketing, to reward top purchasers and grow sales of Botox. An Allergan executive recognized the leverage provided by medical grants, saying that "[b]efore we give [this grant request] further thought, would you check whether [the requesters] are significant users of Botox . . . . Upon receiving your reply, I will decide how to handle." And the Vice-President of Medical Affairs understood marketing's importance to the grant making

-31-

Exhibit 3
Page 82

process, deciding that "[o]bviously, [grant] proposals that would negatively impact the goals of Marketing should not be funded and studies that would support Marketing goals should be given careful consideration."

These programs were widespread. For example, in 2005, Allergan paid hundreds of thousands of dollars to doctors for Speaker's Bureau and "Practice with the Experts" dinner programs. In 2004 and 2005, Allergan paid approximately $2.5 million in grants to individual doctors. These so-called grants were a priority for the marketing and sales teams, and paid great dividends to Allergan, allowing its off-label sales of Botox to climb dramatically through the decade. In 2006, Allergan sponsored over 1,200 programs, with each program having at least one paid physician.

Perhaps Allergan's most innovative mechanism of action relates to the extensive value-added reimbursement support services Allergan provided doctors. Allergan recognized that reimbursement issues were the "biggest obstacle" to increasing Botox sales. It realized that providing doctors with valuable reimbursement services would allow it to sell more Botox. Beginning as early as 2003, Allergan doubled the size of its reimbursement support team to "minimize customer barriers" for headache, pain and spasticity and grow off-label uses. Allergan cited "high value [reimbursement] services" as a key driver of Botox sales, and

-32-

Exhibit 3
Page 83

touted their reimbursement support as one of the "most valued services Allergan provides." This reimbursement support included a wide-range of services, including individual patient record audits to maximize payments to the doctors.

In its analysis of these services, Allergan concluded that doctors who received these services would increase their purchases of Botox by six times as much as doctors who did not. It is no surprise that Allergan taught its sales force to aggressively tout the reimbursement services to induce additional off-label use of Botox.

### IV. COMPLIANCE

An effective compliance and ethics program must promote and instill an organizational culture that encourages ethical conduct and a commitment to compliance with the law. On June 21, 2002, Allergan distributed to all sales and marketing personnel the PhRMA Code on Interaction with Healthcare Professionals and the Allergan Field Guide. The "Allergan Field Reference Guide" emphasized that "you may not promote any Company product for uses that are not addressed in the approved product labeling or insert . . . This promotional ban applies not only to sales calls, but to all marketing efforts such as product launches, sales meetings and activities of third-parties controlled by ALLERGAN." Generally with regard to promotional activity, the Field Guide states that no Allergan employee or representative may promote a drug in a manner

-33-

Exhibit 3
Page 84

that is inconsistent with FDA-approved labeling.

The investigation revealed that Allergan had been working (and at times succeeding) to improve its compliance culture and compliance plan. No compliance plan is perfect, however. For example, on Wednesday, August 9, 2006, an Allergan-sponsored dinner program was presented by a physician-speaker at the Capital Grille in Baltimore, MD. When a speaker such as this doctor makes such a presentation, Allergan correctly views the speaker as a representative of Allergan and his presentation is considered a "promotional" Allergan activity, regardless of the credentials of the speaker or the audience. At the dinner program the Allergan physician-speaker illegally promoted Botox for the treatment of headache. The Allergan physician-speaker made other similar presentations across the country about the off-label use of Botox for headache. After a complaint was lodged by a doctor-attendee of one of these dinners, FDA investigated the incident and required Allergan to send out "Dear Doctor" letters apologizing for the misconduct. Allergan reprimanded the manager of the sales representative by removing him to a different division of Allergan and placed letters of reprimand in the personnel file of several employees in the chain of command of the sales manager.

As a result in part of this incident, on November 7, 2006, the then-Chief Administrative Officer, Executive Vice President, General Counsel and Secretary, issued a cover letter accompanying

-34-

Exhibit 3
Page 85

Allergan's new Healthcare Law Compliance, Policies and Procedures Manual (the "Manual"). The cover letter specifically states that "Allergan expects you to understand the laws and Allergan policies that apply to your job responsibilities and will hold you personally responsible for compliance with the Manual."

The Manual itself is dated January 1, 2007, and begins with a "Message From the Chief Executive Officer," Chairman of the Board and Chief Executive Officer of Allergan. That message states:

> There are laws, regulations, and industry guidance that govern the way we do business, including our interactions with customers, healthcare professionals and the Government. Allergan expects you to understand and comply with these standards in order toinsure your actions remain ethical and appropriate in all circumstances.

The message closes with the statement "Remember . . . THERE IS NO RIGHT WAY TO DO THE WRONG THING." The Manual goes on to summarize the extant body of law, industry guidance and federal regulations in this area.

A good compliance program has and publicizes a system which typically includes mechanisms that allow for anonymity or confidentiality, whereby the organization's employees and agents may report or seek guidance regarding potential or actual misconduct without fear of retaliation. The government's investigation revealed, however, a corporate culture that did not encourage such type of conduct with regard to significant questions or concerns about the company's promotion of Botox.

-35-

Exhibit 3
Page 86

As indicated, Allergan did ramp-up its compliance efforts after the distribution of this manual. Allergan continued to experience noncompliance, however. The government investigation uncovered instances supporting a conclusion that Allergan's efforts at off-label marketing overwhelmed its compliance efforts from time to time. Notwithstanding this, the Government's investigation revealed that Allergan made strides to increase its compliance efforts, which have paid off. The Government anticipates that Allergan will address in greater detail its compliance efforts.

Exhibit 3
Page 87

## V. THE SENTENCING CONSIDERATION

### A. The Fine[9]

The stipulated criminal fine of $350 million is the result of

---

[9]Although Chapter 8 of the United States Sentencing Guidelines ("U.S.S.G.") applies generally, the fine guidelines in Chapter 8, U.S.S.G. §§ 8C2.2 through 8C2.9, apply only to specified types of offenses.  *See* U.S.S.G. §§ 8A1.1, app. n. 2; 8C2.1.  To determine whether the fine guidelines apply to this FDCA violation, the Court must look at U.S.S.G. § 8C2.1 (Applicability of Fine Guidelines).  This section states that the fine guidelines apply to "each count for which the applicable guideline offense level is determined under" one of those listed in subsections (a) and (b).

The applicable guideline offense level for a misdemeanor violation of 21 U.S.C. § 333(a)(1) is determined under U.S.S.G. § 2N2.1.  *See* U.S.S.G. Appendix A.  Section 2N2.1 is not listed under § 8C2.1(a) or (b).  Accordingly, the fine guidelines of Chapter 8 do not directly apply to Allergan's FDCA violation.

In the absence of an applicable fine guideline, U.S.S.G. § 8C2.1 instructs the Court to apply U.S.S.G. § 8C2.10 (Determining the Fine for Other Counts).  Section 8C2.10 states:  "For any count or counts not covered under § 8C2.1 ("Applicability of Fine Guidelines"), the Court should determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572."

Determining an appropriate fine for Allergan's FDCA offense, therefore, requires evaluating the general factors to be considered in imposing a sentence under 18 U.S.C. § 3553(a) and to the factors specific to fines set forth in 18 U.S.C. § 3572, including, "the need to deprive the defendant of illegally obtained gains from the offense."  18 U.S.C. § 3572(a)(5).  Among the 3553(a) factors are:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct.  Many of the same considerations before the Court in a statutory analysis are considerations under a guidelines analysis.  Where there is no applicable sentencing guideline the Court must "have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders."  18 U.S.C. § 3553(b).

-37-

Exhibit 3
Page 88

intensive negotiations between the parties over the appropriate factual drivers and other considerations.[10]  It represents a just and reasonable resolution of the charge against Allergan, the parent-operating company, for its off-label marketing, particularly when coupled with the significant civil settlement and the obligations imposed by the Corporate Integrity Agreement. The total package is the largest resolution in this district's history. The proposed criminal resolution accomplishes the goals of sentencing without being overly harsh. The statute and regulations that prohibit off-label marketing do so because the practice undermines FDA's process for ensuring that drugs are safe and effective, and in certain cases can interfere with doctor-patient relationship, may be misleading to doctors, and can even result in harm to patients.  The agreed-upon plea and sentence also properly takes into account Allergan's conduct. It reflects the fact that the

---

[10]For example, the criminal fine amount takes into account that there is some percentage of the off-label growth of Botox that resulted from factors independent of Allergan's illegal marketing and promotional activities (so-called "organic growth"), including that Botox was the standard of care for certain types of spasticities, experimentation by physicians, FDA trials, and legitimate continuing medical education.

The fine amount also takes into account that Medicare and Medicaid pay, or provide coverage for, drugs prescribed for off-label uses if those uses are "medically accepted indications." Some of the off-label indications illegally promoted by Allergan were "medically accepted indications" covered by federal healthcare programs.  However, other off-label indications promoted by Allergan were not medically accepted indications, and were not covered by federal healthcare programs.

-38-

Exhibit 3
Page 89

Company has no prior conviction, balanced against the breadth and
length of the illegal conduct. The Government believes that the
global resolution will deter the Company from further unlawful
promotions, particularly in light of the fact that the parent-
operating company, Allergan, Inc., is pleading guilty. According
to the statutory framework of the FDCA, a second misdemeanor
violation, which requires no proof of mens rea, results in a felony
conviction. Thus, a plea by the parent-operating company, coupled
with a fine of this nature, together with all of the other aspects
of this global resolution, will also be just punishment for the
offense, and serve as general deterrence to others who might be
tempted to go down the road of off-label marketing. All of these
factors are difficult to quantify, but the parties have engaged in
lengthy discussions aimed at reaching a fair resolution of this
matter.

The Government also considered other similar cases. Over the
last 5 years or so, in similar off-label marketing cases, the
pharmaceutical industry has paid more than $3 billion to the United
States to resolve Food, Drug, and Cosmetic Act ("FDCA") charges and
False Claims Act (FCA) claims. The resolution proposed in this case
fits within the range of criminal fines and civil settlements for
the type of conduct alleged in the Criminal Information and
described more fully in this Memorandum. Specifically, in other
cases where the parent-operating company has pleaded guilty to off-

-39-

Exhibit 3
Page 90

label marketing, they have pleaded to a misdemeanor FDCA charge and paid large fines.

The Government therefore asks the Court to accept the plea and impose the agreed-upon sentence.[11]

## B. Probation

The Government did not seek a period of probation because of the comprehensive five year Corporate Integrity Agreement ("CIA") that was executed between Allergan and the Office of the Inspector General of the Department of Health and Human Services ("OIG"). As part of the CIA, Allergan is obligated to conduct extensive internal and external monitoring, train its employees, report regularly to OIG, and fulfill other obligations as set forth in the

---

[11]Although Allergan states in its Sentencing Memo that there is "much controversy" about the application of the First Amendment to off-label promotion by a drug manufacturer, the Government does not understand that Allergan asserts a First Amendment challenge in this case. The primary (although not the only) way that the FDCA and regulations affect promotional speech about unapproved uses is by treating such speech as evidence of intended use, which in turn triggers various obligations under the misbranding and new drug approval provisions. The Supreme Court has held that evidentiary use of speech to prove intent or other elements of an offense is permissible under the First Amendment. *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)((First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."). *See also Whitaker v. Thompson*, 353 F.3d 947 (D.C. Cir. 2004). Thus, to the extent that Allergan is complaining about restrictions that ultimately rest on the use of promotional speech as evidence of intended use, its claims are without merit. Generally speaking, the FDCA and regulations do *not* prohibit Allergan from discussing health risks associated with unapproved uses of its products. The labeling and advertising provisions of the Act and regulations are directed at speech that promotes particular uses of a drug.

-40-

Exhibit 3
Page 91

agreement.[12]   The OIG has entered CIAs with hundreds of other providers and has a well-established CIA monitoring process. Accordingly, the Government submits that OIG is in the best position to effectively monitor the conduct of Allergan going forward.

### C. Victims and Restitution

Allergan has pled guilty to distributing a misbranded drug into interstate commerce, a violation of the Food, Drug, and

---

[12]The CIA requires enhanced accountability, increased transparency, and wide-ranging monitoring activities conducted by both internal and independent external reviewers.  The agreement requires, among other things, that:

- the Audit Committee of Allergan's Board of Directors annually review the Company's compliance program and certify as to its effectiveness; that Allergan's Board of Directors (or a Committee of the Board) annually review the company's compliance program and certify as to its effectiveness;

- senior executives from certain key areas (including sales and marketing) annually certify about compliance;

- Allergan notify doctors about the settlement and establish a mechanism doctors can use to report questionable conduct by an Allergan representative; and

- Allergan post on its web site information about payments to doctors, such as honoraria for speaking, payments for other consulting services, and reimbursement for travel and lodging.

If Allergan fails to comply with its obligations, it risks exclusion from Federal health care programs (for a material breach) and monetary penalties (for other breaches).

-41-

Exhibit 3
Page 92

Cosmetic Act. 21 U.S.C. §§ 331(a), 333(a)(1), and 352(f). The Victim and Witness Protection Act, 18 U.S.C. § 3663 ("VWPA") and the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, are not directly applicable in this case because the misbranding offense to which Allergan pleaded guilty is not covered by these statutes. *See* 18 U.S.C. § 3663(a) (covering restitution only for offenses under Title 18; 21 U.S.C. §§ 841, 848(a), 849, 856, 861 & 863; and 49 U.S.C. §§ 5124, 46312, 46502 & 46504 except when the MVRA applies); 18 U.S.C. § 3663A(c)(1) (covering restitution only for crimes of violence under 18 U.S.C. § 16; offenses against property under Title 18 or 21 U.S.C. § 956(a); and offenses described in 18 U.S.C. § 1365). Although the Court has the authority to order restitution as a condition of probation, 18 U.S.C. § 3563(b)(2), or supervised release, 18 U.S.C. § 3583(d), and pursuant to U.S.S.G. § 5E1.1(a)(2), as mentioned above, the Government does not seek a period of probation or supervised release in this case because of the existence of a comprehensive CIA between Allergan and the Department of Health and Human Services ("HHS"). More importantly, however, under any of these provisions, even if they were to apply, the Court may decline to make an order of restitution if it determines that the complication and prolongation of the sentencing process outweighs the need for restitution. 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B). *See also* U.S.S.G. § 5E1.1(b)(2). Determining actual victims from the

-42-

Exhibit 3
Page 93

conduct, and the harm resulting therefrom, is a complicated process. Indeed, should even a single entity or individual make a claim for restitution in this matter, the Court would likely be required to hold a mini-trial to determine whether the claimant is a victim at all, and, if so, whether the claimant suffered any losses. The Government contend that determining complex issues of fact related to the cause or amount of any victim's losses would complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

Furthermore, the Government contend that the Court should decline to issue a restitution order in this matter in light of the pending civil settlements. As part of this proposed settlement, Allergan and the United States have reached an agreement as to civil claims, which requires the payment of two hundred and twenty-five million dollars ($225,000,000). Accordingly, the Court should decline to issue a restitution order.

### D. Forfeiture

The forfeiture component of the plea agreement and Information arises from the FDCA's provision for seizing misbranded drugs. 21 U.S.C. § 334 (allowing proceedings on libel of information, for condemnation, against drugs that are misbranded or adulterated so that the Government can seize, destroy or sell them). These proceedings are by their nature classic civil forfeiture

-43-

Exhibit 3
Page 94

proceedings. Under federal forfeiture law, the Government can pursue criminal forfeiture in any case where the defendant is charged with a violation of an Act of Congress which contains a civil forfeiture remedy. *See* 28 U.S.C. § 2461(c)(allowing criminal forfeiture where the defendant is charged "in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized . . . ."). Thus, if civil forfeiture is authorized in a statute such as the FDCA, then criminal forfeiture is as well. As the misbranded drugs are no longer available for seizure or destruction, the Government can seek substitute assets as it has done here. *See* 28 U.S.C. § 2461(c) (the procedures set forth in 21 U.S.C. §853 apply to this criminal forfeiture); 21 U.S.C. § 853(p) (allowing the forfeiture of substitute assets if the items subject to forfeiture are no longer available).

–44–

Exhibit 3
Page 95

**V. CONCLUSION**

The United States therefore respectfully recommends and requests that the Court accept Allergan's plea of guilty and enter the agreed-upon sentence set forth in the Negotiated Plea Agreement and herein.

Dated this 4th day of October, 2010.

Respectfully submitted,

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

/s/ Randy S. Chartash
RANDY S. CHARTASH
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 121760

/s/ Douglas W. Gilfillan
DOUGLAS W. GILFILLAN
ASSISTANT UNITED STATE ATTORNEY
Georgia Bar No. 294713

600 RICHARD B. RUSSELL BUILDING
75 SPRING STREET, S.W.
ATLANTA, GEORGIA 30303
404.581.6009
404.581.6181

-45-

Exhibit 3
Page 96

# Exhibit 4

# ALLERGAN INC (AGN)

2525 DUPONT DRIVE
IRVINE, CA 92612
714. 246.4500

# 10−K

**FORM 10−K**
**Filed on 03/09/2005 − Period: 12/31/2004**
File Number 001−10269



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 4
Page 97

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10−K
### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934
#### For The Fiscal Year Ended December 31, 2004
#### Commission File No. 1−10269

# Allergan, Inc.
*(Exact name of Registrant as Specified in its Charter)*

| | |
|---|---|
| **Delaware** | **95−1622442** |
| *(State of Incorporation)* | *(I.R.S. Employer Identification No.)* |
| **2525 Dupont Drive** | **92612** |
| **Irvine, California** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

### (714) 246−4500
*(Registrant's telephone number)*

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which each class registered** |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange |
| Preferred Share Purchase Rights | |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S−K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10−K or any amendment to this Form 10−K.   ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b−2).
Yes ☑   No ☐.

The aggregate market value of the registrant's common equity held by non−affiliates was approximately $11,819 million on June 25, 2004, based upon the closing price on the New York Stock Exchange on such date.

Common Stock outstanding as of February 25, 2005 — 134,254,772 shares (including 2,649,633 shares held in treasury).

**DOCUMENTS INCORPORATED BY REFERENCE**

Part III incorporates certain information by reference from the registrant's proxy statement for the annual meeting of stockholders to be held on April 26, 2005, which proxy statement will be filed no later than 120 days after the close of the registrant's fiscal year ended December 31, 2004.

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| **PART I** | | | 1 |
| | Item 1. | Business | 1 |
| | Item 2. | Properties | 21 |
| | Item 3. | Legal Proceedings | 21 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | 23 |
| **PART II** | | | 23 |
| | Item 5. | Market For Registrant's Common Equity, and Related Stockholder Matters and Issuer Purchases of Equity Securities | 23 |
| | Item 6. | Selected Financial Data | 25 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 46 |
| | Item 8. | Financial Statements and Supplementary Data | 53 |
| | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 53 |
| | Item 9A. | Controls and Procedures | 53 |
| | Item 9B. | Other Information | 54 |
| **PART III** | | | 54 |
| | Item 10. | Directors and Executive Officers of Allergan, Inc. | 54 |
| | Item 11. | Executive Compensation | 56 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 56 |
| | Item 13. | Certain Relationships and Related Transactions | 57 |
| | Item 14. | Principal Accountant Fees and Services | 57 |
| **PART IV** | | | 58 |
| | Item 15. | Exhibits and Financial Statement Schedules | 58 |
| **SIGNATURES** | | | 63 |
| **EXHIBIT 10.7** | | | |
| **EXHIBIT 10.8** | | | |

Exhibit 4
Page 98

Table of Contents

PART I

Item 1.    *Business*

**General Development of Our Business**

Allergan, Inc. is a technology−driven, global health care company that develops and commercializes specialty pharmaceutical products for the ophthalmic, neurological, dermatological and other specialty markets. We are a pioneer in specialty pharmaceutical research, targeting products and technologies related to specific disease areas such as glaucoma, retinal disease, dry eye, psoriasis, acne and movement disorders. Additionally, we develop and market aesthetic−related pharmaceuticals and over−the−counter products. Within these areas, we are an innovative leader in therapeutic and other prescription products, and to a limited degree, over−the−counter products that are sold in more than 100 countries around the world. We are also focusing research and development efforts on new therapeutic areas, including gastroenterology, neuropathic pain and genitourinary diseases.

We were originally incorporated in California in 1948 and became known as Allergan Corporation in 1950. In 1977, we reincorporated in Delaware. In 1980, we were acquired by SmithKline Beecham plc (then known as SmithKline Corporation). From 1980 through 1989, we operated as a wholly−owned subsidiary of SmithKline and in 1989 we again became a stand−alone public company through a spin−off distribution by SmithKline.

Our Internet website address is www.allergan.com. We make our periodic and current reports, together with amendments to these reports, available on our Internet website, free of charge, as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission. The information on our Internet website is not incorporated by reference in this Annual Report on Form 10−K.

In June 2002, we completed the spin−off of our optical medical device business to our stockholders. The optical medical device business consisted of two businesses: our ophthalmic surgical products business and our contact lens care products business. The spin−off was effected by contributing our optical medical device business to a newly formed subsidiary, Advanced Medical Optics, Inc., or AMO, and issuing a dividend of AMO's common stock to our stockholders. Our consolidated financial statements and related notes reflect the financial position, results of operations and cash flows of the optical medical device business as a discontinued operation.

In October 2004, our board of directors approved certain restructuring activities related to the scheduled termination of our manufacturing and supply agreement with AMO. Under the manufacturing and supply agreement, which was entered into in connection with the AMO spin−off, we agreed to manufacture certain products for AMO for a period of up to three years ending in June 2005. As part of the termination of the manufacturing and supply agreement, we will eliminate certain manufacturing positions at our Westport, Ireland; Waco, Texas; and Guarulhos, Brazil manufacturing facilities. We anticipate that the pre−tax restructuring charges to be incurred in connection with the termination of the manufacturing and supply agreement will total between $24 million and $28 million and that there will be a reduction in our workforce of approximately 350 individuals.

In January 2005, our board of directors approved the initiation and implementation of a restructuring of certain activities related to our European operations. The restructuring seeks to optimize operations, improve resource allocation and create a scalable, lower cost and more efficient operating model for our European research and development and commercial activities. Specifically, the restructuring anticipates moving key European research and development and select commercial functions from our Mougins, France and other European locations to our Irvine, California, High Wycombe, U.K. and Dublin, Ireland facilities and streamlining our European commercial back office functions. Under applicable law, the proposed restructuring requires consultations and, in certain cases, negotiations with European and national works councils, other management/ labor organizations and local authorities. The restructuring steps to be implemented and their ultimate cost will depend in part on the outcome of such consultations and negotiations. We anticipate

1

Exhibit 4
Page 99

**Table of Contents**

incurring restructuring charges and charges relating to severance, relocation and one−time termination benefits, payments to public employment and training programs, implementation, transition, capital and other asset−related expenses, duplicate operating expenses and contract termination costs in connection with the restructuring. We currently estimate that the pre−tax charges and capital expenditures resulting from the restructuring will be between $50 million and $60 million. We also estimate that the restructuring will yield annual operating cost reductions of between $6 million and $9 million.

**Our Business**

The following table sets forth, for the periods indicated, net sales from continuing operations for each of our specialty pharmaceutical product lines, earnings (loss) from continuing operations, domestic and international sales as a percentage of total net sales and domestic and international long−lived assets:

|  | Year Ended December 31, | | |
|  | **2004** | **2003** | **2002** |
|  | (in millions) | | |
| Net Sales by Product Line |  |  |  |
|    Eye Care Pharmaceuticals | $1,137.1 | $  999.5 | $  827.3 |
|    *Botox*®/ Neuromodulator | 705.1 | 563.9 | 439.7 |
|    Skin Care Products | 103.4 | 109.3 | 90.2 |
|    Other(1) | 100.0 | 82.7 | 27.8 |
| Total | $2,045.6 | $1,755.4 | $1,385.0 |
| Earnings (loss) from continuing operations | $  377.1 | $  (52.5) | $  64.0 |
| Sales |  |  |  |
|    Domestic | 69.1% | 70.4% | 70.6% |
|    International | 30.9% | 29.6% | 29.4% |
| Long−Lived Assets |  |  |  |
|    Domestic | $  593.9 | $  573.8 | $  381.2 |
|    International | $  287.1 | $  252.9 | $  225.2 |

(1)   Other sales primarily consist of sales to AMO pursuant to a manufacturing and supply agreement entered into as part of the AMO spin−off that is scheduled to terminate in June 2005.

See Note 15, "Business Segment Information," in the notes to the consolidated financial statements listed under Item 15(a) of Part IV of this report for further information concerning our foreign and domestic operations.

### Eye Care Pharmaceutical Product Line

We develop, manufacture and market a broad range of prescription and non−prescription products designed to treat diseases and disorders of the eye, including glaucoma, dry eye, inflammation, infection and allergy.

*Glaucoma.* The largest segment of the market for ophthalmic prescription drugs is for the treatment of glaucoma, a sight−threatening disease typically characterized by elevated intraocular pressure leading to optic nerve damage. Glaucoma is currently the world's second leading cause of blindness, and we estimate that over 60 million people worldwide have glaucoma. According to IMS Health Inc., an independent research firm, our products for the treatment of glaucoma, including *Alphagan*®, *Alphagan*® *P* and *Lumigan*®, captured approximately 17% of the worldwide glaucoma market for the first nine months of 2004.

Our largest selling eye care pharmaceutical products are the ophthalmic solutions *Alphagan*® (brimonidine tartrate ophthalmic solution) 0.2% and *Alphagan*® *P* (brimonidine tartrate ophthalmic solution)

2

Exhibit 4
Page 100

Table of Contents

Any of these factors, or any other international factors, could have a material adverse effect on our business, financial condition and results of operations. We cannot assure you that we can successfully manage these risks or avoid their effects.

***We may be subject to intellectual property litigation and infringement claims, which could cause us to incur significant expenses and losses or prevent us from selling our products.***

Although we have a corporate policy not to infringe the valid and enforceable patents of others, we cannot assure you that our products will not infringe patents held by third parties. In the event we discover that we may be infringing third party patents, licenses from those third parties may not be available on commercially attractive terms or at all. We may have to defend, and have recently defended, against charges that we violated patents or the proprietary rights of third parties. Litigation is costly and time−consuming, and diverts the attention of our management and technical personnel. In addition, if we infringe the intellectual property rights of others, we could lose our right to develop, manufacture or sell products or could be required to pay monetary damages or royalties to license proprietary rights from third parties. An adverse determination in a judicial or administrative proceeding or a failure to obtain necessary licenses could prevent us from manufacturing or selling our products, which could harm our business, financial condition, prospects, results of operations and cash flows. See Item 3 of Part I of this report, "Legal Proceedings" and Note 13, "Commitments and Contingencies," in the notes to the consolidated financial statements listed under Item 15(a) of Part IV of this report for information concerning our current intellectual property litigation.

***The consolidation of drug wholesalers could increase competitive and pricing pressures on pharmaceutical manufacturers, including us.***

We sell our pharmaceutical products primarily through wholesalers. These customers comprise a significant part of the distribution network for pharmaceutical products in the United States. This distribution network is continuing to undergo significant consolidation marked by mergers and acquisitions. As a result, a smaller number of large wholesale distributors control a significant share of the market. We expect that consolidation of drug wholesalers will increase competitive and pricing pressures on pharmaceutical manufacturers, including us. In addition, wholesalers may apply pricing pressure through the implementation of fee−for−service arrangements, and their purchases may exceed customer demand, resulting in reduced wholesaler purchases in later quarters. We cannot assure you that we can manage these pressures or that wholesaler purchases will not decrease as a result of this potential excess buying.

***We may acquire companies in the future and these acquisitions could disrupt our business.***

As part of our business strategy, we regularly consider and, as appropriate, make acquisitions of technologies, products and businesses that we believe are complementary to our business. Acquisitions typically entail many risks and could result in difficulties in integrating the operations, personnel, technologies and products of the companies acquired, some of which may result in significant charges to earnings. If we are unable to successfully integrate our acquisitions with our existing business, we may not obtain the advantages that the acquisitions were intended to create, which may materially adversely affect our business, results of operations, financial condition and cash flows, our ability to develop and introduce new products and the market price of our stock. In connection with acquisitions, we could experience disruption in our business or employee base, or key employees of companies that we acquire may seek employment elsewhere, including with our competitors. Furthermore, the products of companies we acquire may overlap with our products or those of our customers, creating conflicts with existing relationships or with other commitments that are detrimental to the integrated businesses.

***Compliance with the extensive government regulations to which we are subject is expensive and time consuming, and may result in the delay or cancellation of product sales, introductions or modifications.***

Extensive industry regulation has had, and will continue to have, a significant impact on our business, especially our product development and manufacturing capabilities. All pharmaceutical companies, including

19

Exhibit 4
Page 101

Table of Contents

Allergan, are subject to extensive, complex, costly and evolving regulation by federal governmental authorities, principally by the FDA and the U.S. Drug Enforcement Administration, or DEA, and similar foreign and state government agencies. Failure to comply with the regulatory requirements of the FDA, DEA and other U.S. and foreign regulatory requirements may subject a company to administrative or judicially imposed sanctions, including, among others, a refusal to approve a pending application to market a new product or a new indication for an existing product. The Federal Food, Drug, and Cosmetic Act, the Controlled Substances Act and other domestic and foreign statutes and regulations govern or influence the research, testing, manufacturing, packing, labeling, storing, record keeping, safety, effectiveness, approval, advertising, promotion, sale and distribution of our products. Under certain of these regulations, we are subject to periodic inspection of our facilities, production processes and control operations and/or the testing of our products by the FDA, the DEA and other authorities, to confirm that we are in compliance with all applicable regulations, including the FDA's cGMP regulations. The FDA conducts pre−approval and post−approval reviews and plant inspections of us and our suppliers to determine whether our record keeping, production processes and controls, personnel and quality control are in compliance with the cGMPs and other FDA regulations. We also need to perform extensive audits of our vendors, contract laboratories and suppliers to ensure that they are compliant with these requirements. In addition, in order to commercialize our products or new indications for an existing product, we must demonstrate that the product or new indication is safe and effective, and that our and our suppliers' manufacturing facilities are compliant with applicable regulations, to the satisfaction of the FDA and other regulatory agencies.

The process for obtaining governmental approval to manufacture pharmaceutical products is rigorous, typically takes many years and is costly, and we cannot predict the extent to which we may be affected by legislative and regulatory developments. We are dependent on receiving FDA and other governmental approvals prior to manufacturing, marketing and shipping our products. We may fail to obtain approval from FDA or other governmental authorities for our product candidates, or experience delays in obtaining such approvals, due to varying interpretations of data or failure to satisfy rigorous efficacy, safety and manufacturing quality standards. Consequently, there is always a risk that the FDA or other applicable governmental authorities will not approve our products, or will take post−approval action limiting or revoking our ability to sell our products, or that the rate, timing and cost of such approvals will adversely affect our product introduction plans, results of operations and stock price. Despite the time and expense exerted, regulatory approval is never guaranteed.

Even after we obtain regulatory approval for a product candidate or new indication, we are subject to extensive regulation, including ongoing compliance with the FDA's cGMP regulations, post−marketing clinical studies mandated by the FDA, adverse event reporting, labeling, advertising, marketing and promotion. If we or any third party that we involve in the testing, packing, manufacture, labeling, marketing and distribution of our products fail to comply with any such regulations, we may be subject to, among other things, warning letters, product seizures, recalls, fines or other civil penalties, injunctions, suspension or revocation of approvals, operating restrictions and criminal prosecution. Physicians may prescribe pharmaceutical or biologic products for uses that are not described in a product's labeling or differ from those tested by us and approved by the FDA. While such "off−label" uses are common and the FDA does not regulate a physician's choice of treatment, the FDA does restrict a manufacturer's communications on the subject of off−label use. Companies cannot actively promote FDA−approved pharmaceutical or biologic products for off−label uses, but they may disseminate to physicians articles published in peer−reviewed journals. To the extent allowed by law, we disseminate peer−reviewed articles on our products to targeted physicians. If, however, our promotional activities fail to comply with the FDA's regulations or guidelines, we may be subject to warnings from, or enforcement action by, the FDA or another enforcement agency.

***If we market products in a manner that violates health care fraud and abuse laws, we may be subject to civil or criminal penalties.***

Federal health care program anti−kickback statutes prohibit, among other things, knowingly and willfully offering, paying, soliciting, or receiving remuneration to induce or in return for purchasing, leasing, ordering, or arranging for the purchase, lease or order of any health care item or service reimbursable under Medicare,

20

Exhibit 4
Page 102

# Exhibit 5

# ALLERGAN INC (AGN)

2525 DUPONT DRIVE
IRVINE, CA 92612
714. 246.4500

# 10−Q

**FORM 10−Q**
**Filed on 05/07/2010 − Period: 03/31/2010**
File Number 001−10269



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 5
Page 103

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10−Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the quarterly period ended March 31, 2010**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File Number 1−10269**

# Allergan, Inc.
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **95−1622442** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **2525 Dupont Drive** | **92612** |
| Irvine, California | (Zip Code) |
| (Address of Principal Executive Offices) | |

**(714) 246−4500**
(Registrant's Telephone Number, Including Area Code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S−T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non−accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b−2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non−accelerated filer | ☐ (Do not check if a smaller reporting company) | | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b−2 of the Exchange Act). Yes ☐ No ☒

As of April 30, 2010, there were 307,511,888 shares of common stock outstanding (including 3,427,546 shares held in treasury).

Exhibit 5
Page 104

# ALLERGAN INC (AGN)

2525 DUPONT DRIVE
IRVINE, CA 92612
714. 246.4500

# EX−3.1

**EXHIBIT 3.1**
**10−Q Filed on 05/07/2010 − Period: 03/31/2010**
File Number 001−10269



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 5
Page 105

EXHIBIT 3.1

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

### OF

### ALLERGAN, INC.

\* \* \* \* \*

ALLERGAN, INC. (the "Corporation"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

1. The Corporation was originally incorporated on April 14, 1977, under the name of ALLERGAN PHARMACEUTICALS, INC. Pursuant to a Certificate of Amendment filed on September 26, 1986, the name of the Corporation was changed and now is ALLERGAN, INC.

2. Pursuant to Sections 242 and 245 of the General Corporation Law of the State of Delaware, this Amended and Restated Certificate of Incorporation (this "Certificate of Incorporation") restates and integrates and further amends the provisions of the Restated Certificate of Incorporation of the Corporation.

3. This Certificate of Incorporation amends and restates in its entirety the Corporation's Restated Certificate of Incorporation filed on May 22, 1989, as heretofore amended, to read as follows:

**ARTICLE 1. Name**

The name of the Corporation is Allergan, Inc.

**ARTICLE 2. Registered Office**

The address of the registered office of the Corporation in the State of Delaware is The Prentice−Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Prentice−Hall Corporation System, Inc.

**ARTICLE 3. Purpose**

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware, as may be amended from time to time. The Corporation shall have perpetual existence.

Exhibit 5
Page 106

**ARTICLE 4. Authorized Capital Stock**

The aggregate number of shares which the Corporation shall have authority to issue is 505,000,000, to be divided into (a) 500,000,000 shares of Common Stock, par value $.01 per share and (b) 5,000,000 shares of Preferred Stock, par value $.01 per share.

The Board of Directors is hereby empowered to cause the Preferred Stock to be issued from time to time for such consideration as it may from time to time fix, and to cause such Preferred Stock to be issued in series with such voting powers and such designations, preferences and relative, participating, optional or other special rights as designated by the Board of Directors in the resolution providing for the issue of such series. Shares of Preferred Stock of any one series shall be identical in all respects.

**ARTICLE 5. Bylaws**

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind the bylaws of the Corporation.

**ARTICLE 6. Classified Board of Directors**

The number of directors that shall constitute the whole Board of Directors shall be fixed by, or in the manner provided in, the bylaws of the Corporation. The directors of the Corporation shall be divided into three classes, as nearly equal in number as reasonably possible, with the directors in each class to hold office until their successors are elected and qualified. Each member of the Board of Directors in the first class of directors shall hold office until the annual meeting of stockholders in 2011, each member of the Board of Directors in the second class of directors shall hold office until the annual meeting of stockholders in 2012 and each member of the Board of Directors in the third class of directors shall hold office until the annual meeting of stockholders in 2013. At each annual meeting of stockholders of the Corporation, the successors to the class of directors whose term shall then expire shall be elected to hold office for a three–year term. If the number of directors is changed, any increase or decrease shall be apportioned among the classes so as to maintain the number of directors in each class as nearly equal as possible, and any additional directors of any class elected to fill a vacancy resulting from an increase in such class shall hold office for a term that shall coincide with the remaining term of that class, but in no case will a decrease in the number of directors shorten the term of any incumbent director. A director shall hold office until the annual meeting for the year in which his term expires and until his successor shall be elected and shall qualify, subject, however, to prior death, resignation, retirement, disqualification or removal from office.

Notwithstanding the foregoing, whenever the holders of any one or more classes or series of Preferred Stock issued by the Corporation shall have the right, voting separately by class or series, to elect directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by the terms of this Restated Certificate of Incorporation or the resolution or resolutions adopted by the Board of Directors pursuant to Article 4 hereof, and such directors so elected shall not be divided into classes pursuant to this unless expressly provided by such terms.

2

Exhibit 5
Page 107

Elections of directors need not be by written ballot unless the bylaws of the Corporation shall so provide.

**ARTICLE 7. Removal of Directors**

Subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, any or all of the directors of the Corporation may be removed from office by the stockholders at any annual or special meeting of stockholders of the Corporation, the notice of which shall state that the removal of a director or directors is among the purposes of the meeting, but only for cause, by the affirmative vote of at least a majority of the outstanding shares of stock of the Corporation entitled to vote generally in the election of directors of the Corporation.

**ARTICLE 8. Board of Directors Vacancies**

Subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, newly created directorships resulting from any increase in the number of directors or any vacancy on the Board of Directors resulting from death, resignation, disqualification, removal or other cause shall be filled solely by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum, or by a sole remaining director. Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor shall have been elected and qualified. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

**ARTICLE 9. No Stockholder Action by Written Consent**

Any action required or permitted to be taken at any annual or special meeting of stockholders may be taken only upon the vote of the stockholders at an annual or special meeting duly called and may not be taken by written consent of the stockholders.

**ARTICLE 10. Special Meetings of the Stockholders**

Special meetings of the stockholders of the Corporation for any purpose or purposes may be called at any time by the Board of Directors, the Chairman of the Board of Directors or the Chief Executive Officer of the Corporation. Subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, special meetings of the stockholders of the Corporation may not be called by any other person or persons.

**ARTICLE 11. Annual Meetings of Stockholders**

At an annual meeting of stockholders, only such business shall be conducted, and only such proposals shall be acted upon, as shall have been brought before the annual meeting (a) by, or at the direction of, a majority of the directors, or (b) by any stockholder of the Corporation who complies with the notice procedures set forth in this Article 11. For a proposal to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive

3

Exhibit 5
Page 108

offices of the corporation not less than 30 days nor more than 60 days prior to the scheduled annual meeting, regardless of any postponements, deferrals or adjournments of that meeting to a later date; *provided, however*, that if less than 40 days' notice or prior public disclosure of the date of the scheduled annual meeting is given or made, notice by the stockholder, to be timely, must be so delivered or received not later than the close of business on the tenth day following the earlier of the day on which such notice of the date of the scheduled annual meeting was mailed or the day on which such public disclosure was made. A stockholder's notice to the Secretary shall set forth as to each matter the stockholder proposes to bring before the annual meeting (a) a brief description of the proposal desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (b) the name and address, as they appear on the Corporation's books, of the stockholder proposing such business and any other stockholders known by such stockholder to be supporting such proposal, (c) the class and number of shares of the Corporation's stock which are beneficially owned by the stockholder on the date of such stockholder notice and by any other stockholders known by such stockholder to be supporting such proposal on the date of such stockholder notice, and (d) any financial interest of the stockholder in such proposal.

The presiding officer of the annual meeting shall determine and declare at the annual meeting whether the stockholder proposal was made in accordance with the terms of this Article 11. If the presiding officer determines that a stockholder proposal was not made in accordance with the terms of this Article 11, he shall so declare at the annual meeting and any such proposal shall not be acted upon at the annual meeting.

This provision shall not prevent the consideration and approval or disapproval at the annual meeting of reports of officers, directors and committees of the Board of Directors, but, in connection with such reports, no new business shall be acted upon at such annual meeting unless stated, filed and received as herein provided.

**ARTICLE 12. Stockholder Nomination of Directors**

Subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, only persons who are nominated in accordance with the following procedures shall be eligible for election as directors. Nominations of persons for election to the Board of Directors of the Corporation may be made at a meeting of stockholders by or at the direction of the Board of Directors by any nominating committee or person appointed by the Board of Directors or by any stockholder of the Corporation entitled to vote for the election of directors at the meeting who complies with the notice procedures set forth in this Article 12. Such nominations, other than those made by or at the direction of the Board of Directors, shall be made pursuant to timely notice in writing to the Secretary of the Corporation. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not less than 30 days nor more than 60 days prior to the scheduled annual meeting, regardless of any postponements, deferrals or adjournments of that meeting to a later date; *provided, however*, that if less than 40 days' notice or prior public disclosure of the date of the scheduled annual meeting is given or made, notice by the stockholder, to be timely, must be so delivered or received not later than the close of business on the tenth day following the earlier of the day on which such notice of the date of the scheduled annual meeting was mailed or the day on which such public disclosure was made. A stockholder's notice to the

4

Exhibit 5
Page 109

Secretary shall set forth (a) as to each person whom the stockholder proposes to nominate for election or re−election as a director, (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) the class and number of shares of capital stock of the Corporation which are beneficially owned by the person and (iv) any other information relating to the person that is required to be disclosed in solicitations for proxies for election of directors pursuant to Rule 14a under the Securities Exchange Act of 1934, as amended; and (b) as to the stockholder giving the notice (i) the name and address, as they appear on the Corporation's books, of the stockholder and (ii) the class and number of shares of the Corporation's stock which are beneficially owned by the stockholder on the date of such stockholder notice. The Corporation may require any proposed nominee to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as director of the Corporation.

The presiding officer of the annual meeting shall determine and declare at the annual meeting whether the nomination was made in accordance with the terms of this Article 12. If the presiding officer determines that a nomination was not made in accordance with the terms of this Article 12, he shall so declare at the annual meeting and any such defective nomination shall be disregarded.

**ARTICLE 13. Limitation of Director Liability**

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended after the date hereof to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.

**ARTICLE 14. Indemnification**

(a) Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such

5

Exhibit 5
Page 110

amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith. Such indemnification shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators; *provided, however,* that, except as provided in subparagraph (b) hereof, the Corporation shall indemnify any such indemnitee seeking indemnification in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. The right to indemnification conferred in this Article 14 shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition (an "expense advancement"); *provided, however,* that, if the Delaware General Corporation Law so requires, the payment of such expenses incurred by an indemnitee in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such indemnitee while a director or officer, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made upon delivery to the Corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified under this Article 14 or otherwise; and *provided, further,* that no expense advancement shall be paid by the Corporation if independent legal counsel shall advise the Board of Directors in a written opinion that, based upon the facts known to such counsel at the time, (a) the indemnitee acted in bad faith or deliberately breached his or her duty to the Corporation or its stockholders, and (b) as a result of such conduct by the indemnitee, it is more likely than not that it will ultimately be determined that such indemnitee has not met the standards of conduct which make it permissible under the Delaware General Corporation Law for the Corporation to indemnify such indemnitee. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of directors and officers.

(b) If a claim under subparagraph (a) of this Article 14 is not paid in full by the Corporation within 30 days after a written claim has been received by the Corporation, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an expense advancement, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. It shall be a defense to any such action that the indemnitee has not met the standards of conduct which make it permissible under the Delaware General Corporation Law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the indemnitee is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) that the indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the indemnitee has not met the applicable standard of conduct; *provided, however,* that a determination by the board of directors denying

6

Exhibit 5
Page 111

an expense advancement based upon the written opinion of independent legal counsel as provided for in subparagraph (a) above shall be a complete defense to any action seeking an expense advancement, but such determination shall not be a defense or create a presumption that the indemnitee is not entitled to be indemnified hereunder upon the final disposition of the proceeding.

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article 14 shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of this Certificate of Incorporation, bylaw, agreement, vote of stockholders or disinterested directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any such expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

**ARTICLE 15. Business Combinations**

(a) For purposes of this Article 15, the following terms shall have the meanings indicated, and all capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Section 203(c) of the Delaware General Corporation Law, as in effect on the date of filing of this Certificate of Incorporation:

(i) "Business Combination" shall have the meaning ascribed to it in Section 203(c)(3) of the Delaware General Corporation Law; *provided, however*, that the term "interested stockholder," as used therein, shall have the meaning ascribed to it in subparagraph (a)(iv) below.

(ii) "Disinterested Shares" shall mean the shares of Voting Stock of the Corporation held by Persons other than an Interested Stockholder, and each reference herein to a percentage or portion of the Disinterested Shares shall refer to such percentage or portion of the votes entitled to be cast by the holders of such Disinterested Shares.

(iii) "Independent Directors" shall mean the members of the Board of Directors who were directors of the Corporation prior to any Person becoming an Interested Stockholder or were recommended for election or elected to succeed such directors by a majority of such directors.

(iv) "Interested Stockholder" shall mean any Person (other than the Corporation and any direct or indirect majority−owned subsidiary of the Corporation) that (1) is the owner of 5% or more of the outstanding Voting Stock or (2) is an Affiliate or Associate of the Corporation and was the owner of 5% or more of the outstanding Voting Stock at any time within the three−year period immediately prior to the date on which it is sought to be determined whether such Person is an Interested Stockholder; and the Affiliates and Associates of such Person. For the purpose of determining whether a Person is an Interested Stockholder, the Voting Stock deemed to be outstanding shall

7

Exhibit 5
Page 112

include stock deemed to be owned by the Person through application of Section 203(c)(8) of the Delaware General Corporation Law, but shall not include any other unissued stock of the Corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

(v) "Voting Stock" shall mean stock of the Corporation of any class or series entitled to vote generally in the election of directors of the Corporation, and each reference herein to a percentage or portion of shares of Voting Stock shall refer to such percentage or portion of the votes entitled to be cast by the holders of such shares.

(b) In addition to any affirmative vote required by applicable law or any other provision of this Certificate of Incorporation or specified in any agreement, and in addition to any voting rights granted to or held by the holders of any series of Preferred Stock, the approval or authorization of any Business Combination with an Interested Stockholder that has not been approved by a majority of the Independent Directors prior to the date that such stockholder became an Interested Stockholder, shall require the affirmative vote of the holders of not less than a majority of the Disinterested Shares then outstanding.

(c) A majority of the Independent Directors shall have the power and duty to determine, on the basis of information known to them after reasonable inquiry, all facts necessary to determine compliance with this Article 15, including without limitation, (i) whether a Person is an Interested Stockholder; (ii) the number of shares of Voting Stock Owned by any Person, (iii) whether a Person is an Affiliate or Associate of another Person, (iv) whether a proposed transaction is a Business Combination and (v) whether a Business Combination shall have been approved by a majority of the Independent Directors prior to the date that a stockholder became an Interested Stockholder; and any such determination made in good faith by a majority of the Independent Directors shall be conclusive and binding for all purposes of this Article 15.

### ARTICLE 16. Board Considerations

The Board of Directors, each committee of the Board and each individual director, in discharging their respective duties under applicable law and this Certificate of Incorporation and in determining what they each believe to be in the best interests of the Corporation and its stockholders, may consider the effects, both short−term and long−term, of any action or proposed action taken or to be taken by the Corporation, the Board of Directors or any committee of the Board on the interests of (i) the employees, distributors, customers, suppliers and/or creditors of the Corporation and its subsidiaries and (ii) the communities in which the Corporation and its subsidiaries own or lease property or conduct business, all to the extent that the Board, any committee of the Board or any individual director deems pertinent under the circumstances; *provided, however,* that the provisions of this Article 16 shall not limit in any way the right of the Board to consider any other lawful factors in making its determinations, including, without limitation, the effects, both short−term and long−term, of any action or proposed action on the Corporation or its stockholders directly; and *provided further* that this Article 16 shall be deemed solely to grant discretionary authority to the Board, each committee of the Board and each individual director and shall not be deemed to provide to any specific constituency any right to be considered.

8

Exhibit 5
Page 113

**ARTICLE 17. Amendment of Certificate of Incorporation**

The Corporation reserves this right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation. In addition to any affirmative vote required by applicable law or any other provision of this Certificate of Incorporation, and in addition to any voting rights granted to or held by the holders of any series of Preferred Stock, the affirmative vote of the holders of not less than a majority of the outstanding shares of stock of the Corporation entitled to vote generally in the election of directors of the Corporation shall be required to amend or repeal, or adopt any provisions inconsistent with, the provisions of this Certificate of Incorporation.

IN WITNESS WHEREOF, this Certificate of Incorporation has been signed by David E.I. Pyott, the Corporation's Chief Executive Officer, and attested by Douglas S. Ingram, the Corporation's Secretary, this 30th day of April, 2010.

/s/ David E.I. Pyott
David E.I. Pyott, Chief Executive Officer


/s/ Douglas S. Ingram
Douglas S. Ingram, Secretary

9

Exhibit 5
Page 114

# Exhibit 6

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8−K

## CURRENT REPORT
## Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**November 1, 2010**
**Date of Report (Date of Earliest Event Reported)**

# ALLERGAN, INC.
**(Exact Name of Registrant as Specified in its Charter)**

| | | |
|---|---|---|
| **Delaware** | **1−10269** | **95−1622442** |
| **(State of Incorporation)** | **(Commission File Number)** | **(IRS Employer Identification Number)** |

**2525 Dupont Drive**
**Irvine, California 92612**
**(Address of Principal Executive Offices) (Zip Code)**

**(714) 246−4500**
**(Registrant's Telephone Number, Including Area Code)**

**N/A**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8−K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a−12 under the Exchange Act (17 CFR 240.14a−12)

☐ Pre−commencement communications pursuant to Rule 14d−2(b) under the Exchange Act (17 CFR 240.14d−2(b))

☐ Pre−commencement communications pursuant to Rule 13e−4(c) under the Exchange Act (17 CFR 240.13e−4(c))

Exhibit 6
Page 115

**Exhibit Index**

| Exhibit | Description of Exhibit |
|---|---|
| 99.1 | Allergan, Inc. press release dated November 1, 2010 |

Exhibit 6
Page 116

Exhibit 99.1

# News Release



2525 Dupont Drive
Irvine, CA 92612-1599
(714) 246-4500
www.allergan.com

**ALLERGAN REPORTS THIRD QUARTER 2010 OPERATING RESULTS**

○      Board of Directors Declares Third Quarter Dividend

(IRVINE, Calif., November 1, 2010) — Allergan, Inc. (NYSE: AGN) today announced operating results for the quarter ended September 30, 2010. Allergan also announced that its Board of Directors has declared a third quarter dividend of $0.05 per share, payable on December 1, 2010 to stockholders of record on November 10, 2010.

**Operating Results Attributable to Stockholders**
For the quarter ended September 30, 2010:

- Allergan reported $2.21 diluted loss per share attributable to stockholders compared to $0.58 diluted earnings per share attributable to stockholders for the third quarter of 2009.

- Allergan reported $0.78 non−GAAP diluted earnings per share attributable to stockholders compared to $0.70 non−GAAP diluted earnings per share attributable to stockholders for the third quarter of 2009, an 11.4 percent increase.

**Product Sales**
For the quarter ended September 30, 2010:

- Allergan reported $1,192.0 million total product net sales. Total product net sales increased 5.7 percent compared to total product net sales in the third quarter of 2009. On a constant currency basis, total product net sales increased 6.3 percent compared to total product net sales in the third quarter of 2009.

    - Total specialty pharmaceuticals net sales increased 5.2 percent, or 5.7 percent on a constant currency basis, compared to total specialty pharmaceuticals net sales in the third quarter of 2009.

    - Total medical devices net sales increased 8.3 percent, or 9.0 percent on a constant currency basis, compared to total medical devices net sales in the third quarter of 2009.

"We are very pleased with our third quarter results," said David E.I. Pyott, Allergan's Chairman of the Board and Chief Executive Officer. "Strong R&D performance led to a series of several important product approvals, including FDA approval of LUMIGAN® 0.01%, OZURDEX® for uveitis, and BOTOX® for the prophylactic treatment of headaches in adults with chronic migraine, as well as approvals in Europe and Canada."

−**more**−

Exhibit 6
Page 117

2−2−2

**Product and Pipeline Update**
During the third quarter of 2010:

- Effective July 1, 2010, Allergan established direct operations in Poland and Turkey.

- On July 9, 2010, Allergan announced that BOTOX® (botulinum toxin type A) was licensed by the Medicines and Healthcare Products Regulatory Agency in the United Kingdom for the prophylaxis of headaches in adults who have chronic migraine (headaches on at least 15 days per month of which at least 8 days are with migraine).

- On July 27, 2010, the European Medicines Agency granted marketing authorization for OZURDEX® (dexamethasone 700mcg intravitreal implant in applicator) in the 27 member states of the European Union, making OZURDEX the first licensed treatment in Europe for macular edema in patients with retinal vein occlusion.

- On August 31, 2010, Allergan announced that the United States Food and Drug Administration (FDA) approved LUMIGAN® (bimatoprost ophthalmic solution) 0.01% as a first−line therapy indicated for the reduction of elevated intraocular pressure in patients with open−angle glaucoma or ocular hypertension.

- On September 24, 2010, Allergan announced that the FDA approved OZURDEX® (dexamethasone intravitreal implant) 0.7 mg for the treatment of non−infectious ocular inflammation, or uveitis, affecting the posterior segment of the eye.

- Health Canada approved RESTASIS® (cyclosporine ophthalmic emulsion) 0.05% for the treatment of moderate to moderately severe aqueous deficient dry eye disease.

- Allergan acquired from Vistakon Pharmaceuticals, LLC, Janssen Pharmaceutica N.V., Beerse and Johnson & Johnson Vision Care Inc. the global license to manufacture and commercialize alacafadine 0.25%, a topical allergy medication for the prevention and treatment of itching associated with allergic conjunctivitis. Alcaftadine is FDA−approved in the United States under the brand name LASTACAFT™ (alcaftadine ophthalmic solution).

Following the end of the third quarter of 2010:

- On October 15, 2010, Allergan announced that the FDA approved BOTOX® (onabotulinumtoxinA) for the prophylactic treatment of headaches in adults with chronic migraine, a distinct and severe neurological disorder characterized by patients who have a history of migraine and suffer from headaches on 15 or more days per month with headaches lasting four hours a day or longer.

- Allergan filed a supplemental Biologics License Application (sBLA) with the FDA for the use of BOTOX® in the treatment of urinary incontinence due to neurogenic detrusor overactivity resulting from neurogenic bladder.

−**more**−

Exhibit 6
Page 118

# Exhibit 7

EFiled:  Oct 11 2010  4:18PM EDT
Transaction ID 33739571
Case No. 5795-VCL

# EXHIBIT A

Exhibit 7
Page 119

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

LOUISIANA MUNICIPAL POLICE
EMPLOYEES' RETIREMENT SYSTEM,      :

      Plaintiff,      :

      -against-      :

DAVID PYOTT, HERBERT W. BOYER,      :
LOUIS J. LAVIGNE, GAVIN S.
HERBERT, STEPHEN J. RYAN,      :
LEONARD D. SCHAEFFER, MICHAEL      :      Civil Action No. 5795-VCL
R. GALLAGHER, ROBERT
ALEXANDER INGRAM, TREVOR M.      :
JONES, DAWN E. HUDSON, RUSSELL      :
T. RAY, and DEBORAH DUNSIRE,      :

      Defendants,      :

and      :

ALLERGAN, INC.,      :

      Nominal Defendant.      :

## VERIFIED AMENDED DERIVATIVE COMPLAINT

Plaintiff, Louisiana Municipal Police Employees' Retirement System ("LAMPERS"), based upon personal knowledge as to its own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation made by and through its attorneys, alleges as follows:

## SUMMARY OF THE ACTION

1.     This is a derivative action brought on behalf of nominal defendant Allergan, Inc. ("Allergan" or the "Company") against the Company's Board of Directors ("Board") for breaches of their fiduciary duty of loyalty and for the commission of waste. In breach of their duties to Allergan, the Board allowed the Company to aggressively and illegally promote its flagship drug, BOTOX®,

- 1 -

Exhibit 7
Page 120

for uses not approved by the United States Food and Drug Administration ("FDA"), pay kickbacks to

doctors in violation of the federal anti-kickback laws, make false and misleading statements in

Allergan's annual proxy statements, and commit other violations of the Civil False Claims Act, 31

U.S.C. § 3729, *et seq.*, resulting in significant harm to the Company.

    2.    On September 1, 2010, Allergan announced that it reached an agreement with the

United States Department of Justice ("DOJ") to resolve criminal and civil allegations that the

Company illegally promoted and sold its top-selling product, BOTOX®, for unapproved medical

uses, which was a key corporate priority for the Company.  Indeed, as stated in the *qui tam* complaint

filed by Amy M. Lang and Charles J. Rushin,[i] Allergan employed a "multi-pronged and centrally

coordinated strategy to maintain Botox's sales growth by promoting Botox for a myriad of *off-label*

uses, regardless of its lack of efficiency for many, and potentially all, of these uses."

    3.    In its September 1, 2010 press release announcing the guilty plea and civil settlement,

the DOJ described certain of the Company's illegal off-label marketing tactics as follows:

> Allergan exploited its on-label cervical dystonia (CD) indication to grow off-label
> pain and headache (HA) sales by claim[ing] that cervical dystonia was
> 'underdiagnosed' and that doctors could diagnose cervical dystonia based on
> headache and pain symptoms, even when the doctor 'doesn't see any cervical
> dystonia.'

> Allergan's off-label marketing tactics also included calling on doctors who typically
> treat patients with off-label conditions.  In 2003, Allergan doubled the size of its
> reimbursement team to assist doctors in obtaining payment for off-label Botox®
> injections.  Allergan held workshops to teach doctors and their office staffs how to
> bill for off-label uses, conducted detailed audits of doctors' billing records to

---

[i] From 2007 to 2009, three whistleblower *qui tam* actions were filed against Allergan in connection with its off-label
marketing of BOTOX®. These include: *United States ex rel. Amy M. Lang &Charles Rushin v. Allergan, Inc.*, Civ. No.
1:07-1288-WSD (N.D. Ga.); *United States ex rel. CherBeilfuss & Kathleen O'Connor-Masse v. Allergan, Inc.*, Civ. No.
1:08-1883-WSD (N.D. Ga.); and *United States ex rel. Albert E. Hallivis v. Allergan, Inc.*, Civ. No. 1:09-3434-WSD
(N.D. Ga.).  Among other things, these complaints alleged that Allergan "developed and successfully executed a
sophisticated marketing plan with the purpose of inducing physicians to prescribe the prescription drug Botox® for
particular off-label uses (and off-label dosages) which are neither FDA approved or demonstrated to be safe and
effective," and that Allergan had promoted BOTOX® for such uses "illegally, vigorously and, without any thought to the
possible negative health effects to which it subjected patients."

Exhibit 7
Page 121

demonstrate how they could make money by injecting Botox®, and operated the Botox® Reimbursement Hotline, which provided a wide array of free on-demand services to doctors for off-label uses. Allergan also lobbied government health care programs to expand coverage for off-label uses, directed physician workshops and dinners focused on off-label uses, paid doctors to attend "advisory boards" promoting off-label uses, and created a purportedly independent online neurotoxin education organization to stimulate increased use of Botox® for off-label indications.

4.      The Company agreed to plead guilty and pay $600 million in criminal and civil penalties for its sales and marketing practices. It is also the subject of at least a dozen lawsuits alleging that it illegally promoted BOTOX® for non-approved uses and failed to adequately warn about the risk of severe and potentially life-threatening injuries. The conduct described herein, which was known to and approved by the defendants, has therefore resulted in substantial injury to the Company.

5.      Plaintiff brings this action as a stockholder's derivative action in the right of and for the benefit of nominal defendant Allergan. Plaintiff seeks to shift the burden of the $600 million, plus other costs and expenses, from Allergan to the Board, who caused the Company to incur these payments.

## PARTIES

6.      Plaintiff LAMPERS is a stockholder of the Company and was a stockholder during the misconduct alleged herein and has been such continuously since then. Plaintiff will continue to hold Allergan shares at least through the resolution of this action.

7.      Nominal Defendant Allergan is incorporated under the laws of the State of Delaware and maintains its principal executive office at 2525 Dupont, Irvine, CA 92612. Allergan is a global, multi-specialty health care company focused on discovering, developing and commercializing innovative pharmaceuticals, biologics and medical devices. The Company specializes in specialty pharmaceuticals (primarily eye care, skin care and neuromodulators) and medical devices (primarily

Exhibit 7
Page 122

breast implants, gastric bands for obesity surgery, and injectable dermal fillers used on facial wrinkles).   The Company offers a number of specialty products, including:   BOTOX® (onabotulinumtoxinA); RESTASIS® (cyclosporine ophthalmic emulsion); LUMIGAN® (bimatoprost ophthalmic solution); BOTOX® Cosmetic (onabotulinumtoxinA); the JUVÉDERM® family of dermal fillers; and the LAP-BAND® Adjustable Gastric Banding System.

8.      Defendant David Pyott ("Pyott") is the Chief Executive Officer of the Company and the Chairman of the Board.   Defendant Pyott has been Chief Executive Officer of Allergan since January 1998 and in 2001 became Chairman of the Board.  Defendant Pyott also served as President of Allergan from January 1998 until February 2006.

9.      Defendant Herbert W. Boyer, Ph.D. ("Boyer") has served as a member of the Board since 1994 and as Vice Chairman of the Board since 2001.  Defendant Boyer served as Chairman from 1998 to 2001.  He is also a member of the Corporate Governance Committee and a member of the Science & Technology Committee.  In 2009, defendant Boyer received $963,829 in cash and stock awards for his service as an Allergan director.  According to the Company's 2010 proxy statement, "Boyer played a critical role in assuring effective corporate governance and in managing the affairs of [the] board."

10.      Defendant Deborah Dunsire, M.D. ("Dunsire") has been a member of the Board since 2006.  She is a member of the Corporate Governance Committee and a member of the Science & Technology Committee.  In 2009, defendant Dunsire received $227,694 in cash and stock awards for her service as an Allergan director.

11.      Defendant Michael H. Gallagher ("Gallagher") has been a member of the Board since 1998. Defendant Gallagher is a member of the Audit & Finance Committee and a member of the

Exhibit 7
Page 123

Organization & Compensation Committee. In 2009, defendant Gallagher received $238,021 in cash and stock awards for his service as an Allergan director.

12.     Defendant Gavin S. Herbert ("Herbert") is the founder of Allergan and has been the Chairman Emeritus since 1996. Defendant Herbert was elected to the Board in 1950. He served as Chief Executive Officer for 30 years and as Chairman from 1977 to 1996. In 2009, defendant Herbert received $224,087 in cash and stock awards for his service as an Allergan director.

13.     Defendant Dawn Hudson ("Hudson") has served as a member of the Board since 2008. She is a member of the Audit & Finance Committee and a member of the Organization & Compensation Committee. In 2009, defendant Hudson received $233,087 in cash and stock awards for her service as an Allergan director.

14.     Defendant Robert A. Ingram ("Ingram") has served as a member of the Board since 2005. Defendant Ingram is the Chairman of the Corporate Governance Committee and a member of the Organization & Compensation Committee. In 2009, defendant Ingram received $910,884 in cash and stock awards for his service as an Allergan director.

15.     Defendant Trevor M. Jones, Ph.D. ("Jones") has served as a member of the Board since 2004. Defendant Jones is a member of the Corporate Governance Committee and a member of the Science & Technology Committee. In 2009, defendant Jones received $227,905 in cash and stock awards for his service as an Allergan director.

16.     Defendant Louis J. Lavigne ("Lavigne") has served as a member of the Board since 2005. Defendant Lavigne is a member of the Audit & Finance Committee and a member of the Science & Technology Committee. In 2009, defendant Lavigne received $234,087 in cash and stock awards for his service as an Allergan director.

Exhibit 7
Page 124

17.     Defendant Russell T. Ray ("Ray") has served as a member of the Board since 2003. Defendant Ray is Chairman of the Audit & Finance Committee and a member of the Organization & Compensation Committee. In 2009, defendant Ray received $926,991 in cash and stock awards for his service as an Allergan director.

18.     Defendant Stephen J. Ryan, M.D. ("Ryan") has served as a member of the Board since 2002. Defendant Ryan is the Chairman of the Science & Technology Committee and serves as a member of the Audit & Finance Committee. In 2009, defendant Ryan received $243,934 in cash and stock awards for his service as an Allergan director.

19.     Defendant Leonard D. Schaeffer ("Schaeffer") has served as a member of the Board since 1993. Defendant Schaeffer is the Chairman of the Organization & Compensation Committee and a member of the Corporate Governance Committee. In 2009, defendant Schaeffer received $243,230 in cash and stock awards for his service as an Allergan director.

## SUBSTANTIVE ALLEGATIONS

20.     The Company has over 307 million shares of common stock outstanding, traded on the New York Stock Exchange under the symbol "AGN."

21.     Defendants, as the Company's directors, owe fiduciary duties of care, good faith, loyalty, and candor to Allergan and its stockholders. The fiduciary duty of loyalty prohibits a director from using his position to do anything that would cause injury to the corporation.

**Regulation of Prescription Drug Sales and Marketing**

22.     The FDA, as the agency in charge of the Federal Food, Drug, and Cosmetic Act ("FDCA"), subjects Allergan's business to extensive regulations and oversight. The FDCA requires Allergan to establish the efficacy and safety of its drug products before they can be sold.

Exhibit 7
Page 125

23.     Under the FDCA, a company must specify each intended use of a biological product
in its application to the FDA.  The FDA then approves the drug as safe and effective for specific uses
and dosages.  Any marketing or promotion of that drug for other uses that are outside the scope of
the FDA's approval – known as "off-label uses" – is illegal.  21 U.S.C. § 331(d), 355(a).  The
dissemination of information or materials by a drug manufacturer regarding such unapproved or off-
label uses - known as "misbranding" - constitutes unlawful promotional advertising in violation of
the FDCA.

24.     There are severe penalties for misbranding, including criminal prosecution,
injunctions, and seizure of misbranded or unapproved new drugs.  Drug companies may also be
subject to liability under the False Claims Act[2] and the federal anti-kickback statute for misbranding.

25.     Drug manufacturers are also prohibited from employing indirect methods to promote
a drug for unapproved uses.  For instance, the FDA regulates the dissemination of medical and
scientific publications concerning off-label uses of a manufacturer's products.  It also regulates
manufacturer support for Continuing Medical Education ("CME") programs.

26.     The regulatory scheme created by the FDA protects consumers and patients by
ensuring that drug manufacturers do not promote their products for off-label uses that the FDA has
not deemed to be safe and effective.

## BOTOX®

27.     BOTOX® is a prescription-only medical product that contains tiny amounts of highly
purified botulinum toxin protein refined from the bacterium, *Clostridium botulinum*.  When injected

---

[2]  The False Claims Act provides, in pertinent part:
      [A] any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for
      payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement
      material to a false or fraudulent claim; [or] (C) conspires to commit a violation of [subparagraphs A or B]
      … is liable to the United States Government for a civil penalty.

Exhibit 7
Page 126

at approved and labeled doses into a specific muscle or gland, BOTOX® neurotoxin is expected to diffuse locally and expected to produce a safe and effective result by producing a localized and temporary reduction in the overacting muscle or gland, usually lasting up to approximately 3 to 6.7 months depending on the individual patient and indication.

28.   BOTOX® Therapeutic was first approved by the FDA 20 years ago for the treatment of strabismus and blepharospasm, two eye muscle disorders associated with dystonia. In 2000 and 2004, respectively, the FDA approved BOTOX® to treat the abnormal head position and neck pain that happens with cervical dystonia ("CD") in adults, as well as symptoms of severe underarm sweating (severe primary axillary hyperhidrosis) that is inadequately managed with topical agents. In 2010, the FDA approved BOTOX® to treat increased muscle stiffness in elbow, wrist, and finger muscles in adults with upper limb spasticity. Allergan has also filed for FDA approval of BOTOX® for the treatment of chronic migraines but the FDA has not yet ruled on the application.

29.   In addition to its therapeutic uses, the same formulation of BOTOX® with dosing specific to glabellar lines was approved by the FDA in 2002 under the trade name BOTOX® Cosmetic (onabotulinumtoxinA).

30.   Allergan is a worldwide leader in the neuromodular field (which includes BOTOX®). As of 2007, BOTOX® led in neuromodular therapy with 85% market share worldwide. As of 2008, Allergan's market share in the top-10 neuromodulator markets (which then totaled $1.3 billion) was approximately 91%.

31.   The significance of the BOTOX® product line to the Company is indisputable and was well-known to defendants. BOTOX® has been one of Allergan's top-selling, if not the top-selling, specialty pharmaceutical products for nearly a decade, and has constituted a major source of

31 U.S.C. § 3729.

Exhibit 7
Page 127

revenue for the Company. During the years 2000-2009, Allergan's total net sales of BOTOX® were $240 million, $310 million, $440 million, $564 million, $705 million, $831 million, $1.21 billion, $1.31 billion, and $1.31 billion, respectively. Expressed as a percentage of the Company's total net sales across all product lines during those years, this equates to 24%, 27%, 32%, 32%, 35%, 36%, 33% (37% of total specialty pharmaceutical sales), 32% (39% of total specialty pharmaceutical sales), 30% (37% of total specialty pharmaceutical sales), and 29% (36% of total specialty pharmaceutical sales).

32.     While defendants were certainly aware of the importance of the BOTOX® product line to the Company's overall financial health, these defendants were also aware that *the Company's therapeutic BOTOX® sales figures and growth targets required massive marketing and sales of BOTOX® for off-label uses.*

33.     Sales of BOTOX® therapeutic have historically constituted a significant portion of Allergan's total BOTOX® sales. For instance, in 2006, sales of BOTOX® therapeutic were approximately $330 million. Further, Allergan established a 2007 sales target for therapeutic BOTOX® of $370 million.

34.     Further, according to the *qui tam* complaints, the majority of Allergan's sales of BOTOX® therapeutic have been for off-label uses, and over 80% of the Government or insurance company reimbursements for BOTOX® have generally been for off-label prescriptions. Indeed, Medicaid paid about $76.5 million for BOTOX® treatments from 2002 to 2006, much of it for unapproved uses of the drug. The most-common off-label uses/prescriptions paid for by Government healthcare programs have been adult spasticity, spasticity in cerebral palsy patients, and headaches.

Exhibit 7
Page 128

35.     Allergan tracked its off-label sales of BOTOX® internally in annual "Customer
Surveys."   These Customer Surveys listed, among other things, total sales of BOTOX® for
therapeutic uses, including spasticity, pediatric spasticity, headache, and pain.   According to the
Customer Survey for 2007, spasticity was one of the most profitable off-label therapeutic indications
for Allergan that year, accounting for about $175 million in sales.   The Customer Survey indicated
that over two-thirds of Allergan's sales of BOTOX® in 2007 alone were for off label uses.

36.     Moreover, as was well known to defendants and as alleged in a *qui tam* complaint, the
four FDA-approved therapeutic indications for BOTOX® during the relevant period are relatively
rare, and *can only generate a small minority of the total revenues achieved through the Company's
total sales of BOTOX® therapeutic*.   With respect to CD (the FDA-approved indication that likely
accounts for most of Allergan's on-label BOTOX® sales), Allergan's own training materials estimate
that the condition likely occurs in only 9 out of 100,000 people.   Thus, even if each and every
individual who has CD based on these figures is treated with BOTOX® at the maximum dose and at
the most frequent intervals, this would only account for about 52% of total BOTOX® therapeutic
sales for 2006.

37.     Patients with two of the other on-label conditions, strabismus and severe primary
axillary hyperhidrosis, are rarely treated with BOTOX®.   Strabismus patients generally employ less
expensive and invasive treatments, such as corrective lenses or eye patches, instead of BOTOX®, and
the FDA has only approved BOTOX® for hyperhidrosis patients after topical agents, such as
prescription strength antiperspirants, have failed to adequately manage the condition.   Furthermore,
the amount of BOTOX® used to treat strabismus and blepharospasm are relatively small, especially
as compared with the amounts suggested for BOTOX®'s off-label uses, such as headaches and
myofascial pain.

Exhibit 7
Page 129

**Defendants' Off-Label Marketing Scheme**

38.     For nearly a decade, Allergan and its Board have executed a strategic plan to promote

and sell BOTOX® in the lucrative off-label market.  According to Sally Yates ("Yates"), U.S.

Attorney for the Northern District of Georgia:

> The FDA had approved therapeutic uses of Botox for only four rare conditions, yet
> Allergan made it a *top corporate priority to maximize sales of far more lucrative*
> *off-label uses that were not approved by FDA*.  Allergan further demanded
> tremendous growth in these off-label sales year after year, even when there was little
> clinical evidence that these uses were effective. (Emphasis added.)

39.     Consistent with its "top corporate priority" to maximize BOTOX® sales for

unapproved uses, Allergan undertook a vigorous Company-wide marketing campaign.  As set forth

in the criminal information filed by the Government on September 1, 2010, "Since as early as its

1997-2001 Strategic Plan, Allergan made it a top corporate priority to maximize sales of BOTOX for

spasticity, migraine headache and pain, none of which were approved by the FDA.  Many of

Allergan's yearly Strategic Plans forecast that BOTOX's on-label sales would shrink and that all

incremental growth would come from off-label sales."

40.     In 2003, the Company developed the "CD/HA Initiative" as a "'recue strategy' in the

event of negative results from its clinical trials to ensure continued expansion into the pain and

headache markets."  Pursuant to this initiative, Allergan "exploited its on-label [CD] indication to

grow off-label pain and headache" sales by claiming that CD was underdiagnosed and, even when

doctors did not "see" any CD, those doctors could diagnose CD based on headache and pain

symptoms.

41.     The corporate strategy to artificially expand the diagnosis of CD into the province of

myofascial pain and headache involved efforts by Allergan personnel, including Neuroscience

Medical Consultants ("NMCs") and Regional Scientific Specialists ("RSSs"), "to convince treating

Exhibit 7
Page 130

physicians that any headache or myofascial pain 'could' or 'probably does' have its origins in some form of cervical dystonia," according to the *qui tam* complaint filed by whistleblowers Lang and Rushin. Allergan personnel also met with doctors to convince them that mischaracterizing patients' actual diagnoses and recording inaccurate and fraudulent diagnoses could help these doctors obtain reimbursement from the Government for BOTOX® used to treat myofascial pain, even though myofascial pain is an off-label use that is not covered by Medicare.

42.     In one particular instance, Rushin and Allergan's former Southeastern Regional Director of Medical Affairs visited Dr. Lang's medical office to explain "how Botox injections for myofascial pain could be coded as medically reimbursable injections" if the doctor were to use two particular diagnosis codes covered by Medicare on claim forms for myofascial pain. In other instances, Allergan personnel attempted to encourage doctors to misdiagnose headaches for CD by fabricating a medical link between the two conditions.

43.     Allergan listed the "CD expansion campaign" as one of the "key drivers" for BOTOX® sales.

44.     Pursuant to the Company's strategic plan to maximize sales of BOTOX® for off-label uses, Allergan also held off-label seminars and presentations – sometimes with the assistance of a third party vendor - where, among other things, physicians (who were paid by Allergan for their attendance) were instructed (often by other physicians speakers paid by Allergan) on the various off-label uses of BOTOX® and how to bill Medicare for such off-label procedures.

45.     For example, according to the *qui tam* complaint filed by Albert Hallivis, an Allergan employee, Hallivis observed, on numerous occasions, Dr. David A. Gordon – a urologist and frequent speaker at these events who was being compensated by Allergan to speak – promoting the use of BOTOX® for off-label uses, including overactive bladder and neurogenic bladder. The slides

Exhibit 7
Page 131

that Dr. Gordon used in these presentations – which, among other things, described the advantages of using BOTOX® to treat these conditions - were provided to him by Allergan and paid for by a publishing company hired by Allergan. According to Hallivis, the illegal promotion of BOTOX® for off-label uses was well known and encouraged by Company management.

46.    As part of its strategic plan, the Company frequently had Allergan-paid injectors available at these seminars and also conducted other off-label injection training sessions and workshops that the Company funded, scheduled, and coordinated to train other doctors.   The Company used its sales force as a network to facilitate such "injector training" for physicians.

47.    In furtherance of its strategic plan to maximize off-label sales, Allergan also provided its sales representatives and field personnel with free vials of BOTOX® every quarter so that they could distribute them to physicians at no cost.   According to the DOJ, Allergan sent its sales representatives to visit specialists who would not ordinarily administer BOTOX® for any of the approved applications.    Allergan also hired RSSs or "medical liaisons" (typically PhD's, pharmacists, or physicians) to work closely with the sales force to target physicians for off-label uses, and Payor Reimbursement Account Managers to work with the sales force to identify physician advocates, who would assist Allergan in advancing its policy goals of expanding approved uses for BOTOX® and eliminating dose restrictions/maximums.

48.    In addition, Allergan employed Provider Reimbursement Account Managers to provide in-kind consultation services to physicians the Company targeted regarding how to maximize reimbursements associated with prescribing BOTOX® for off-label uses.  These consulting services included reviewing physician claims payments, preparing excel spreadsheets on how to maximize reimbursement, conducting detailed audits of doctors' billing records to demonstrate how they could make more money by injecting BOTOX® for off-label uses, and operating the BOTOX®

- 13 -

Exhibit 7
Page 132

Reimbursement Hotline, which, according to the Government, provided a wide array of free services to physicians and their office staff regarding billing and reimbursement for BOTOX®.

49.     Allergan also taught and encouraged physicians, hospitals, and their staff how to use false or improper codes or otherwise falsely or improperly document patient conditions and treatments on claim forms and in electronic or paper records or submissions provided to physician billing services or Medicare contractors.

50.     Allergan also developed and instituted various corporate programs to further its strategic plan of maximizing sales of BOTOX® for off-label uses.  Pursuant to the BOTOX® Advantage Program™, Allergan sponsored a third party hotline, which it funded it with *$10-$15 million* annually, for physicians to call and obtain off-label billing assistance including pre-drafted letters to insurance companies or government healthcare programs to obtain reimbursement for BOTOX® when prescribed for off-label uses.  Another program that the Company developed, the Temporary Price Allowance Program, guaranteed physicians targeted by the Company an off-invoice discount equal to the annual price increase for that year.  Allergan devised this program so as to create a spread between the physician acquisition cost of BOTOX® and the Medicare reimbursement amount.  The Physician Partnership Program allowed Allergan to use and pay physicians to be "travelling mentors" to promote off-label uses and doses for BOTOX®.

51.     Off-label marketing for BOTOX® has been a major component of Allergan's employee training and a key piece of the Company's strategic plan to maximize sales of BOTOX® for off-label uses.  For instance, the Company developed and implemented a formalized Foundation Training course for its NMCs, who were responsible for making sales calls on physicians (including those who would not typically treat patients who had any of the four FDA-approved conditions) with the objective of increasing these doctors' BOTOX® use in their practices.  According to the *qui tam*

Exhibit 7
Page 133

complaint filed by Lang and Rushin, this training included "specific and repeated discussions of *off-label* uses of Botox, including the use to treat headache and pain," and employees were trained specifically to promote such off-label uses. Allergan also conducted Acceleration Training for its NMCs, including role playing in which the consultants "practice and perfect their attempts to market Botox for *off-label* uses, including headache and pain."

52.     As part of the scheme, Allergan also established a "Customer Team Unit" ("CTU"), which was comprised of Allergan employees involved in all three components of Allergan's sales and marketing efforts for BOTOX®: Sales (neuroscience medical consultants), Reimbursement (reimbursement account managers), and Medical (regional scientific specialists). According to the *qui tam* complaint filed by Lang and Rushin, the Company held CTU meetings quarterly, during which the participants would exchange materials and information "to analyze and direct the CTU's coordinated efforts to increase Botox sales through *off-label* promotion and maximizing reimbursement to physicians for Botox use." Among other things, the CTU meetings were used to track physician attendance at Allergan-sponsored off-label CME programs, target specific physicians for invitations to off-label CME programs, and identify physicians who utilized high volumes of BOTOX® for invitations to become "preceptors" or "key opinion leaders" who would be paid to train and lecture other physicians. Members of the CTU would also share information gained from physicians regarding, among other things, what diagnosis codes a particular physician was using on Medicare and private insurance claims and whether those codes were being accepted.

53.     According to the *qui tam* complaint filed by Lang and Rushin, "Allergan's *off-label* marketing efforts are ***so aggressive that NMCs are encouraged to make sales calls to physicians whose practices do not even treat patients with any of the four conditions for which the FDA has approved the use of Botox.***"

Exhibit 7
Page 134

54.     Allergan also used Company-controlled organizations and websites to market
BOTOX® for off-label uses.  Alliance for Patient Access ("AFPA"), an organization that is fully-
funded by Allergan, assists with lowering coverage barriers by payors for-off label uses.

55.     WE MOVE is an educational organization founded by Mitchell Bren, who is the chief
scientific officer for BOTOX® at Allergan, and funded by Allergan.  WE MOVE creates off-label
dosing guidelines for spasticity, which Allergan then distributes to physicians as "medical literature."
WE MOVE's dosing guidelines, however, are much higher than even Allergan's own internal
guidelines.    For example, WE MOVE's "Suggested Pediatric BOTOX® Dosing" manual
recommended a maximum dose of 16 units per kilogram, whereas Allergan's internal guidelines, as
set forth in internal Company Core Data Sheets (which contain all the vital product information),
recommended a maximum dosage of 8 units per kilogram.  Allergan and the Board knew that WE
MOVE's guidelines were exceptionally high.   For instance, in animal studies the Company
conducted in the 1990s, monkeys were injected with 16 units per kilogram and half of those monkeys
injected died, two of them from aspiration pneumonia caused by the BOTOX®.

56.     Allergan also funds The Neurotoxin Institute ("NTI") and NTI's website, found at the
web address, *www.neurotoxininstitute.com*.  Allergan trained its employees, including its NMCs, to
refer physicians to the NTI website.  Although the website states that NTI "is a multidisciplinary
organization created to serve as a comprehensive independent source of information related to the
basic science and the clinical applications of neurotoxins," its actual purpose is to promote off-label
uses of BOTOX® and provide doctors with off-label information regarding those uses.  During the
relevant time period, that website contained, among other things, videos of CME programs that were
typically designed, scripted, and sponsored by Allergan regarding the off-label use of neurotoxins

Exhibit 7
Page 135

(including BOTOX®) and other written materials prepared by Allergan for use in the CME programs and otherwise.  NTI is supported by an unrestricted educational grant from Allergan.

57.     As a further part of its corporate strategic plan to promote BOTOX® for off-label uses, Allergan also produced videos promoting the use of BOTOX® to treat headaches.  In one particular DVD, titled "Focus on Headache," Stephen D. Silberstein, M.D., who has (i) conducted various studies funded by Allergan, (ii) acted as paid lecturer at Allergan-sponsored CME programs, and (iii) been paid by Allergan to instruct other physicians about the use of BOTOX® to treat headaches, makes false and misleading statements regarding supposed "scientific evidence" suggesting BOTOX® improves headache and pain and other false statements safety and effectiveness as a headache treatment.  There was an intra-Company effort to distribute this DVD to as many physicians as possible who might treat headache patients with BOTOX®.  The DVD was also posted on the NTI website.

58.     Allergan also undertook an extensive campaign to lobby government healthcare programs to expand coverage for off-label uses of BOTOX® and eliminate any payer-imposed limitation on the amount of BOTOX® injected into patients.  Allergan executed this part of the scheme by recruiting and using physician "advocates" to lobby Medicare and Medicaid to expand coverage.

## Allergan Made False Statements Regarding the Efficacy of BOTOX® For Off-Label Uses

59.     As part of its strategic plan to maximize sales of BOTOX® for off-label uses, Allergan also made false and fraudulent statements to the public, the physicians it targeted, its employees, Medicare contractors, and others regarding BOTOX®'s efficacy (as well as scientific and clinical evidence in support thereof) for the treatment of headaches and other off-label conditions "even

Exhibit 7
Page 136

when there was little clinical evidence that these uses were effective." This was part of the Company's comprehensive effort to promote BOTOX® for off-label use.

60.     These false statements were known to the Board – many of whom are either executives or former executives of the Company or have significant experience in the pharmaceutical industry – and, as alleged in the *qui tam* complaint filed by Lang and Rushin, "were made through concerted and coordinated efforts of Allergan management and employees in different divisions of the [C]ompany to aggressively promote Botox for unapproved indications."

61.     The false statements were made, for example, during Allergan's CME programs and off-label injection training sessions, and on websites that were funded and controlled by the Company. Allergan also made false statements in articles and abstracts published in journals and magazines that were ghost-written by Allergan employees, but submitted to professional journals under the names of practicing physicians. For example, in 2005, the *Journal of Managed Care Medicine* published a supplement entitled, "Acute and Prophylactic Treatment of Chronic Headache Disorders" that it attributes to two physicians, but which was actually written and edited by two Allergan employees. Various other abstracts and/or articles regarding the use of BOTOX® for such off-label conditions as headaches and myofascial pain have been written by Allergan employees, but the Company has concealed their participation.

62.     As further set forth in the *qui tam* complaints, Allergan also made misrepresentations to the public and directly to its sales force regarding the Company's intention to undertake Phase III trials to investigate the safety and efficacy of, and obtain FDA-approval for, BOTOX® as a treatment for spasticity and headaches, including as a prophylactic therapy in a subset of migraine patients with chronic daily headaches.

Exhibit 7
Page 137

63.     Defendants knew that the results of the Company's Phase II trials did not support BOTOX® as prophylactic therapy for various forms of headache, including tension type headache, episodic migraine, and chronic daily headache, but continued to allow the Company to promote the product as a headache preventative.  As alleged in the *qui tam* complaint filed by Lang and Rushin, Chandra Coleman, an Allergan RSS Manager, stated in February 2007: "The data just isn't there for headache."  Coleman's statement was based on her review of all the clinical trials that Allergan had conducted since the late-1990s, studies that were undoubtedly familiar to the defendants, as Company directors, and industry insiders.

64.     As part of its comprehensive scheme, Allergan also made false statements regarding the efficacy of BOTOX® for off-label uses, including contrived or exaggerated claims of positive study results, to Medicare contractors in an attempt to convince them to enact coverage determinations reimbursing physicians for the use of BOTOX® to treat migraine headaches.  For example, in an August 2004 letter written to the Medical Director of the Medicare Contractor for Part B claims from certain states, Allergan attempted to convince the Medicare Contractor to enact a Local Coverage Determination expanding Medicare coverage to include BOTOX® treatments for two types of headaches by making numerous false statements regarding the proven efficacy of BOTOX® as a headache treatment.  Although the letter states that clinical evidence has emerged to support the use of BOTOX® for such headaches, in reality, as defendants knew, no scientifically-reliable studies supported such a conclusion.

65.     Allergan drafted similar letters for physicians to submit to Medicare contractors. In one particular letter Allergan drafted on behalf of *qui tam* plaintiff Lang, it wrote that, among other things, BOTOX® provides meaningful relief from migraines and daily tension headaches, when in fact BOTOX® was not proven to provide any such relief.

- 19 -

Exhibit 7
Page 138

**Allergan Illegally Provided Kickbacks to Physicians**

66.     Pursuant to the Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration in exchange for the referral of any product for which payment is sought from any federally-funded health care program, such as Medicare or Medicaid. This law prohibits drug manufacturers from compensating, in cash or in kind, a health care provider when a purpose of the payment is to influence the provider's prescribing habits or to gain favor for its product. Every federally funded health-care program requires every provider or supplier to ensure compliance with the Anti-Kickback Act.

67.     As part of its strategic plan to maximize sales of BOTOX® for off-label uses, Allergan intentionally and purposefully offered and paid illegal kickbacks to physicians and other health care providers to induce them to purchase, order, or arrange for the purchasing or ordering of BOTOX® or to order a service, consisting of the injection of BOTOX®, where payment would be made under a federal health care program. According to the Government, Allergan provided kickbacks in the form of cash, travel, lodging, and meals. Allergan paid doctors for such things as consulting services, training sessions, clinical trials, studies, unrestricted educational grants, promotional programs, and speaking fees to entice them to prescribe BOTOX® for off-label uses and provide corresponding injection services.

68.     According to the DOJ and *qui tam* complaints, one of the ways Allergan compensated physicians pursuant to this kickback scheme was through a series of invitation-only BOTOX® marketing programs organized by the Allergan Institute of Distinction. The Company would pay physicians approximately $1,500 to attend these programs and provide them with a free-of-charge stay in a full-service resort in Newport Beach, California. Allergan sales and marketing personnel were required to recommend physicians for invitation to these programs. Physicians were chosen

Exhibit 7
Page 139

based on their history of BOTOX® prescriptions for off-label uses and the number of Medicare

patients they saw.  A major focus of these presentations was off-label uses of BOTOX®.

69.     Allergan also paid doctors and other healthcare providers for their participation in

"preceptorships," pursuant to which Allergan sales representatives, reimbursement business

managers, and regional healthcare policy managers would "shadow" a physician in order to promote

BOTOX® for off-label uses.  *Qui tam* plaintiffs Beilfuss and O'Connor Masse have alleged that the

"preceptorships" were a "sales tactic driven from [Allergan's] corporate offices in order to develop

personal relationships between sales representatives and physicians."

70.     Allergan's remuneration payments to physicians were determined in a manner that

accounted for the volume or value of business generated by the physician's prescriptions of

BOTOX® for off-label uses.  *Qui tam* plaintiffs Beilfuss and O'Connor Masse have alleged that

Allergan spent $9.2 million in 2006 alone for CME programs and other professional development

and residency programs and grants.

71.     As stated in the Government's September 1, 2010 press release, "when a

pharmaceutical manufacturer violates the integrity of the drug approval process established by

Congress and the FDA by paying kickbacks to encourage the off-label use of an unapproved drug,

that not only undermines the judgments of health care professionals, it also threatens to put patients'

health and safety at risk."

**Defendants Allowed Allergan to Make False Statements in Its Annual Proxy Statements**

72.     Pursuant to their fiduciary duties under Delaware law, the defendant directors were

required to accurately, fully, and fairly disclose all material facts when seeking stockholder votes in

connection with their annual election as directors.  However, Allergan's annual proxy statements

failed to disclose material facts and circumstances regarding, among other things, critical aspects of

Exhibit 7
Page 140

the Board's performance (or non-performance) relating to the Company's off-label marketing of BOTOX®. These omissions constituted a breach of the defendants' fiduciary duties and directly caused and/or perpetuated the Company's systematic legal and regulatory violations, which subjected the Company to substantial criminal and civil fines and penalties and other liabilities and potential liabilities to patients and other third parties.

73.     The proxy statements failed to disclose the extent to which the Company's financial performance depended on the off-label marketing of BOTOX®, which exposed the Company to significant regulatory, reputational, and financial risk. As set forth above, off-label sales historically accounted for over 80% of Allergan's total sales of BOTOX® therapeutic. Thus, the Board failed in its obligation to assure the Company's compliance with applicable drug marketing laws and regulations. Yet the proxy statements failed to disclose any of this information.

74.     The proxy statements further failed to disclose the circumstances surrounding the Board's waiver of the Company's Code of Business Conduct and Ethics (the "Code"), which articulates Allergan's "fundamental principles, values and framework for action within" the Company. The Code states that all directors, officers, employees, and independent consultants "are required to comply with all applicable laws and regulations." It further states that "know[ing] and observ[ing] applicable laws and regulations and Allergan policies" is a "condition of employment" and that "failure to do so could subject an [officer, director, employee or independent consultant] and Allergan to sanctions, could harm Allergan's reputation and competitive position, and could result in disciplinary measures up to and including the termination of employment." The Code also requires directors and officers to "ensur[e] compliance with worldwide clinical and regulatory standards, including conduct of clinical studies, marketing approvals, good manufacturing practice requirements, labeling and advertising controls, and other mandated product regulations." *The Code*

- 22 -

Exhibit 7
Page 141

*further obliged the Board to disclose to shareholders any waiver or deviation from the terms*
*thereof.   However, the Company's proxy statements did not disclose the circumstances*
*surrounding the Board's waiver or constructive waiver of these explicit provisions of the Code,*
*even though the Board had waived, or otherwise determined to deviate from, these specific terms.*

75.    The proxy statements further failed to disclose the nature of the Board's performance
of their duties under the Charters of the Board's various committees.  Pursuant to Allergan's Audit
and Finance Committee Charter, members of the committee are specifically required to, among other
things, (a) review the integrity of the Company's financial statements, financial reporting process and
systems of internal controls regarding finance, accounting and legal compliance; (b) assist the Board
in its oversight of the Company's compliance with legal and regulatory requirements; and (c)
establish, review and update periodically the Code and ensure that management has established a
system to enforce the Code.  Pursuant to the Company's Corporate Governance Charter, members of
the Committee are specifically required to review comprehensive reports from management
regarding compliance-related matters affecting Allergan and provide general compliance oversight to
the Company.   However, the proxy statements failed to disclose the nature of the Board's
performance of their duties under these Charters, including the directors' decision to allow the
continued off-label and illegal marketing of BOTOX® despite the significance risks to the Company,
its shareholders, and the patients who were ultimately prescribed the drug for off-label treatments.

76.    The proxy statements also failed to disclose the numerous instances in which the
Board was informed of legal compliance violations and/or criminal violations concerning the
Company's unlawful marketing of BOTOX®, as set forth herein.

77.    The failure to make these required disclosures directly served the personal interests of
the members of the Allergan Board, the defendants herein.  Had shareholders been provided with

Exhibit 7
Page 142

complete and accurate information, the members of the Board likely would not have been elected (or re-elected).   Moreover, the election and re-election of the defendant directors resulted in a perpetuation of the Company's continued violations of the drug marketing rules and caused significant harm to the Company by way of criminal and civil penalties and numerous other liabilities to patients and others.

## Allergan Knew About the Safety Issues as Well as the Off-Label Marketing And Misbranding Practices Of Botox

78.   Defendants knew that the off-label marketing and misbranding practices detailed herein were widespread at the Company.  By at least 2000, Allergan knew about the spread of toxin ("SOT"), also known as "botulism" or "systemic effects" and defendants made a conscious decision not to warn the investors or the public.  Even worse, in the U.S., Allergan was actually telling doctors the opposite - that BOTOX$^®$ couldn't go systemic.

79.   By the year 2000, Allergan was aware of patient deaths from BOTOX$^®$.  This is evidenced in, among other places, an email to Beta Bowen ("Bowen"), a 20 year Allergan employee who currently works in the medical affairs department, or SIMCOM (Scientific Information and Medical Compliance), which was the department responsible for providing physicians with medical information and approving promotional literature that was used by the sales force.

80.   In a 2002 email to herself, Bowen describes Allergan's safety training on BOTOX$^®$ and mentions systemic effects and the possibility of botulism poisoning.

81.   Starting in February 2004 and continuing throughout year, there were various internal communications about botulism.  For instance, in a November 2004 email from Bowen, Allergan ran searches of their adverse event databases for the key terms "botulism" and "ventil" (as in ventilate or

- 24 -

Exhibit 7
Page 143

ventilator, since– many people with severe botulism end up on a ventilator).  There were a total of 27 cases with the keyword botulism found in the AE database.

82.     On September 16, 2005, Allergan prepared its first internal "Report on Risk of Adverse Events Due to Spread of Toxin," compiling all reported cases of SOT around the world.

83.     Also in 2005, the French government, on behalf of the European Medicines Agency ("EMEA"), sent Allergan a letter, stating that it was concerned about death and adverse events caused by potential spread of toxin.

84.     In 2006, according to employee Haley Kaplowitz, Allergan considered sending a dear doctor letter in the United States regarding the risks of BOTOX® but decided against it.

85.     In February 2007, researchers working within Allergan also specifically warned the Company and its management that the corporate push to market BOTOX® as a safe and effective treatment for headache – by, for instance, reviewing and repackaging study data to create the impression that BOTOX® was effective for headaches – was deceitful and mischaracterized the clinical research.  For example, in a February 28, 2007 email from David W. Dodick, the lead investigator of Allergan's Phase III headache studies, to an Allergan "key opinion leader" discussing a portion of an Allergan-sponsored CME program under review, Dodick stated: "The post-hoc and subgroup analyses *makes it look like the data has been sliced and diced to create positive spin from negative studies."*  Dodick refused any further involvement in the CME presentation.

86.     In April 2007, Allergan updated its Company Core Data Sheet to include warnings on SOT.  Despite the fact that the SOT warning is a "mandatory safety concept" that must be included in all product labels, Allergan and/or the Board decided not to include this warning in the U.S. label.

87.    In June 2007, the EMEA required Allergan to include a black-box warning on its

Botox label and sent a dear doctor letter in Europe regarding SOT.  Allergan did not warn U.S.

physicians at that time, but instead keeps telling them that BOTOX® cannot cause botulism.

88.    On July 16, 2007, Allergan hired an outside safety company, Biosoteria, to conduct an

independent review of SOT cases.  The company found 207 cases of SOT.  This is later revised by

Allergan and only 26 cases are reported to the regulatory authorities.

89.    In November 2007, the FDA held a teleconference regarding the number of botulism

cases that had been reported.  The FDA also questioned whether any other regulatory authorities had

called these issues to Allergan's attention.

90.    In February 2008, the FDA announced it was reviewing cases of SOT and issued a

warning about the risks associated with use of BOTOX® to treat cerebral palsy after receiving a

number of adverse event reports involving sudden death, breathing problems, and other potentially

life-threatening injuries.  In a document entitled "Early Communication about Ongoing Safety

Review Botox and Botox Cosmetic (Botulinum toxin Type A) and Myobloc (Botulinum toxin Type

B)," the FDA stated:

> FDA has received reports of systemic adverse reactions including respiratory
> compromise and death following the use of botulinum toxins types A and B for both
> FDA-approved and unapproved uses.  The reactions reported are suggestive of
> botulism, which occurs when botulinum toxin spreads in the body beyond the site
> where it was injected.  The most serious cases had outcomes that included
> hospitalization and death, and occurred mostly in ***children treated for cerebral palsy-
> associated limb spasticity.  Use of botulinum toxins for treatment of limb spasticity
> (severe arm and leg muscle spasms) in children or adults is not an approved use in
> the U.S.***
>
> ***
>
> FDA is aware of the body of literature describing the use of botulinum toxins to treat
> limb spasticity in children and adults.  The safety, efficacy and dosage of botulinum
> toxins ***have not been established for the treatment of limb spasticity of cerebral***

Exhibit 7
Page 145

*palsy or for use in any condition in children less than 12 years of age.* (emphasis
added.)

91.     Following this, and as known to the Board, Allergan went into crisis control mode.

For example, in a chain of emails between Mitchell Brin (the chief scientific officer) and the heads of

marketing and sales, the Allergan staff expressed deep concerns over the possibility of getting a

black box warning. In another email from Sharon Tonetta to Mitchell Brin, Tonetta states: "now that

spread of toxin is out in the public domain and everyone is aware of it, the real message is that Botox

is a drug with AEs and is not completely safe at high doses. My guess is regulators will be watching

for off-label use. Also, the safety profile for our drug is now under the microscope for our

submission."

92.     Shortly thereafter, Allergan hired an outside toxicologist to review its animal studies

(which were primarily done in the 1990s). The toxicologist concluded that the animal studies

showed a risk of botulism.

93.     Then, in August 2009, the FDA added a "black box" warning to BOTOX® with

respect to the risk of botulism-like side effects, such as swallowing and breathing difficulties, that

can occur if the injection spreads to other areas of the body. Up until this point, there was no

warning in the United States (the European label was actually changed 2 years earlier although

Allergan did not inform U.S. doctors). However, even after the Company was required to issue a

black-box warning for one known off-label use, the Board failed to take sufficient actions to reign in

other off-label uses that the Company continued to promote.

94.     From at least 2003 through 2009, Allergan received several FDA Warning Letters

informing the Company of misbranding and other potential violations of the FDCA:

- **June 23, 2003 BOTOX® COSMETIC Botulinum Toxin Type A Warning
  Letter**: directly sent to Peter A. Kresel, former Senior Vice President of Global

Regulatory Affairs at Allergan to inform the Company of violations of the FDCA
regarding BOTOX® COSMETIC Botulinum Toxin Type A by: (1) disseminating
false or misleading advertisement that falsely identify the product as a cosmetic
treatment, (2) failing to reveal material facts about the product's use, and (3)
minimizing the risk information presented.

- **September 6, 2005 Lumigan® (bimatoprost ophthalmic solution) 0.03%
  Warning Letter:** directly sent to Defendant Pyott, who at the time was the
  President and Chief Executive Officer of the Company and Chairman of the
  Board, to inform Allergan of misbranding Lumigan® by distributing sales aids
  that are misleading because they present unsubstantiated superiority claims in
  violation of the FDCA.

- **August 17, 2009 ACZONE® (dapsone) Gel, 5% Warning Letter:** directly sent
  to the attention of Defendant Pyott, Chief Executive Officer and Chairman of the
  Board, to inform Allergan of violations of the FDCA and FDA implementing
  regulations regarding ACZONE® by: (1) false or misleading advertising
  overstating the efficacy of ACZONE®; and (2) omitting material facts and
  important risk information associated with the use of the product.

## Allergan's Civil and Criminal Liability

95.     The Federal Bureau of Investigation ("FBI") began investigating Allergan in 2007

when a doctor and an Allergan employee came forward to complain about Allergan's off-label

marketing practices. Over the next few years, the FBI, the FDA's Office of Criminal Investigation,

and the Department of Health and Human Services, Office of Inspector General ("HHS-OIG"),

undertook an extensive investigation of Allergan's marketing practices.

96.     The Government's multi-year investigation culminated in Allergan's agreement to

plead guilty and pay $600 million to resolve civil and criminal charges that it promoted BOTOX® for

uses not approved as safe and effective by the FDA. The investigation revealed that the Company's

off-label marketing practices were widespread. Based on the Government's public statements to

date, the allegations in the various *qui tam* complaints that will be settled as part of the $600 million

payment, and other information known to plaintiff, it is clear that the defendants' scheme of

Exhibit 7
Page 147

promoting off-label uses of BOTOX® for uses not approved as safe and effective by the FDA covered a period from January 2000 through at least 2009.

97.     This resolution includes a civil settlement of $225 million – $210 million to be paid to the federal government and the rest to several states – to resolve claims from 2001 through at least 2008 that Allergan "promoted Botox® for off-label indications that were not medically accepted and therefore not covered by federal health care programs, made unsubstantiated and misleading statements about the safety and efficacy of Botox® for off-label indications, instructed doctors to miscode Botox® claims for uncovered indications using inappropriate diagnosis codes to ensure payment by government health care programs, and provided inducements to doctors to inject more Botox®." The civil settlement resolves the three *qui tam* actions, one of which alleges that the illegal promotion scheme extended into 2009. The five whistle-blowers will be awarded a total of $38.7 million out of the settlement.

98.     Allergan also has agreed to plead guilty to a criminal misdemeanor "misbranding" charge covering the period 2000 through 2005. The Company will pay a $375 million criminal fine, which includes the forfeiture of $25 million in assets as part of its plea. According to the criminal information filed by federal prosecutors and the DOJ against on September 1, 2010, Allergan promoted BOTOX® for headache, pain spasticity, and juvenile cerebral palsy, none of which were approved by the FDA, and in fact made it a top corporate priority to maximize sales for such off-label uses.

99.     The Company has also agreed, as part of its plea, to dismiss a legal action that the Company had filed, based on alleged violations of its First Amendment rights, against the U.S. Government. The Company's complaint had alleged that the Government's legal position – that it is

Exhibit 7
Page 148

a crime for a drug company to communicate truthful information to physicians about off-label uses of its products – violates the First Amendment and is inconsistent with the FDCA.

100.    Allergan currently estimates that it will record total non-recurring pre-tax charges of between approximately $610 million and $615 million in its 2010 third fiscal quarter in connection with the global settlement with the DOJ.  This amount includes estimated interest and certain attorneys' fees that Allergan is obligated to pay in connection with the global settlement, but does not include ongoing administrative legal fees and other costs.  Nor does it include payments the Company has made, and may make in the future, as a result of wrongful death and other personal injury cases brought by persons who claim to have been injured by medical procedures using Botox® for off-label indications, as more fully described below.  The Company expects to pay the global settlement costs in its fourth fiscal quarter of 2010.

101.    Additionally, as part of the resolution, Allergan entered into a corporate integrity agreement ("CIA") with the HHS-OIG that requires the Company to submit compliance reports, and to post on its website any payments to doctors, such as honoraria, travel or lodging.  Specifically, the CIA will require Allergan to maintain its current compliance program and undertake a series of compliance-related obligations, including additional monitoring, maintenance of specific written standards, auditing, training, education, reporting and disclosure, for five years.  The CIA also provides for an independent third-party review organization to assess and report on Allergan's compliance program.

**Products Liability and Wrongful Death Suits Filed Against Allergan**

102.    More than a dozen people have filed lawsuits against Allergan, alleging that the Company illegally promoted BOTOX® for non-approved uses and failed to adequately warn about the risk of the severe and potentially life-threatening BOTOX® injuries they or their family members

Exhibit 7
Page 149

suffered.  Various of the suits have resulted in jury awards or settlements requiring Allergan to pay millions of dollars to the victims.

103.    For instance, in September 2010, Allergan agreed to settle a wrongful death lawsuit filed by the family of a nurse who died after being injected with large amounts of BOTOX® to combat shoulder pain.  The plaintiffs argued that the woman, who was injected with 100 units of BOTOX® (or about five times as much as one receives during plastic surgery), would have never allowed herself to be injected if she had known about the potential risk of life-threatening problems from BOTOX® side effects.

104.    Products liability and wrongful death lawsuits constitute yet another source of damages the Company has faced and will continue to face from the scheme, in addition to the $600 million penalty it is required to pay the Government.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

105.    This action is brought derivatively on behalf of the Company.  Plaintiff is currently a stockholder of the Company and was a stockholder of the Company at the time of the actions complained of herein and has been a stockholder continuously to date.

106.    Plaintiff has not made any demand on the Board to institute this action against the individual defendants.  Under Delaware law, pre-suit demand on the board is excused where the allegations of the complaint create a reasonable doubt that (1) a majority of the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.  In an "interested" director transaction, the business judgment rule is inapplicable to the board majority approving the transaction, and the inquiry ceases.  In that event, futility of demand has been established by any objective standard.

Exhibit 7
Page 150

**The Directors Are Not Disinterested and Independent**

107.    At the time this action was initiated, the Board was comprised of twelve members: Pyott, Lavigne, Boyer, Dunsire, Gallagher, Herbert, Hudson, Ingram, Jones, Ray, Ryan, and Schaeffer. Each of these twelve defendants was a member of the Allergan Board at some point during the time of the misconduct which, as alleged herein, occurred from 2000 into 2009. For this reason, each of the defendants is interested and approved strategic plans that sought to promote and take advantage of the off-label marketing scheme. This element alone compels a finding of demand futility.

108.    Indeed, the Company *admitted* as part of the plea with the Government that the wrongful scheme took place at least during the period from 2000 to 2005. Based on this admission alone, ten of the twelve director defendants were part of the Board during that period of time, and thus, approved the strategic plan(s) that made off-label promotion of BOTOX® a number one priority of the Company. Eight of the directors (Pyott, Boyer, Gallagher, Herbert, Jones, Ray, Ryan, and Schaeffer) were Board members in and prior to 2004, and two others (Ingram and Lavigne) joined the Board in 2005. Thus, by the Company's own admission, each of these ten directors must be found to be not disinterested or independent, and because they constitute an overwhelming majority of the current Board, this also compels a finding of demand futility.

109.    In addition, defendants Pyott, Herbert and Ingram, as Company insiders, are not independent and are therefore incapable of impartially considering a demand to prosecute this action. Pyott is Allergan's CEO; Herbert is the founder of Allergan, served as its CEO for thirty years, and currently serves as Chairman Emeritus of the Company; and Ingram is a past Executive Vice President, Chief Administrative Officer, General Counsel, and Secretary of Allergan.

Exhibit 7
Page 151

110.    Moreover, the revenues derived from the off-label marketing of BOTOX® increased the total revenues and thereby increased the compensation of defendant Pyott, the Chief Executive Officer and Chairman of the Board.  Because of the increased revenue and Pyott's resulting increased compensation, it is unlikely that Pyott would have reported or stopped the off-label promotion of this product, and this further presents a conflict for the remaining members of the Board.

**Defendants' Conduct Was Not a Valid Exercise of Business Judgment and the Board Members Face a Substantial Likelihood of Liability Arising From the Misconduct**

111.    Even in the absence of a traditionally interested (or non-independent) board, demand is excused under the facts at bar.  The demand requirement and its exceptions serve to encourage intra-corporate resolution of disputes and to obtain the business judgment of the board as to whether the litigation is in the best interest of the corporation and its shareholders.  However, where, as here, a shareholder sues the board of directors over an act that is not the product of a valid exercise of business judgment, such as waste and blatant violations of FDA rules and regulations, Delaware law excuses demand, regardless of whether a majority of the board is disinterested and independent.

112.    As alleged herein, the off-label marketing BOTOX® (which is one of the Company's biggest products, accounting for sales of approximately $1.31 billion in 2009 alone), was part of the Company's strategic plan and was a top corporate priority.  Therefore, as with strategic plans generally enacted by boards of public companies, and based on the allegations contained in the Government's complaint, the three *qui* tam complaints, and otherwise in the public record, the off-label marketing of BOTOX®, which accounted for "hundreds of millions of dollars" to Allergan, was a Board-approved decision, and its implementation was a significant piece of the Company's strategic plan.

Exhibit 7
Page 152

113.    Moreover, the Board was aware of other repeated violations of the FDCA, as the Company received several FDA Warning Letters from 2003 through 2009. The misconduct occurred over a long period of time; it was not an isolated conduct. As such, the Board failed to prevent violations of federal statutes, rules and regulations concerning the sales and marketing of drug products. Accordingly, (a) the Board is conflicted because there is an extremely high risk of directors' personal liability were they to institute this action; (b) the Board members failed to perform duties they knew were required, including monitoring the Company's marketing practices, and they knew that such failure would cause serious injury to the Company; and (c) the failure of the Board to prevent civil and criminal acts in this case was an egregious wrong in violation of the law, and it cannot be the product of business judgment, *i.e.*, directors are forbidden to cause a company to break the law in order to make a profit.

114.    Many of the members of the Board, by their education and experience, were or certainly should have been aware of the problems posed by off-label marketing and promotion, and of violating FDA rules and regulations through the strategic plan that made off-label marketing and promotion of therapeutic BOTOX® a primary corporate priority. These include defendants:

(a)    Pyott, who is employed by the Company as its CEO and Chairman;

(b)    Boyer, who has served as the Vice Chair of the Allergan Board since 2001, had previously served as the Board's Chairman from 1998 to 2001, and is a founder of Genentech, Inc. and served as a director of Genentech from 1976 to 2009;

(c)    Dunsire, who has also served as the President and Chief Executive Officer of Millennium Pharmaceuticals, Inc. (now Millennium: The Takeda Oncology Company), since July 2005;

(d)    Herbert, who is a founder of Allergan and has been its CEO for 30 years;

Exhibit 7
Page 153

(e)     Ingram, who is also a General Partner of Hatteras Venture Partners, a venture capital firm focused on early stage life science companies, and who previously held major executive and advisory positions with GlaxoSmithKline plc and its predecessor companies;

(f)     Jones, who, from 1994 to 2004, served as the Director General of the Association of the British Pharmaceutical Industry;

(g)     Lavigne, who was previously the Executive Vice President and Chief Financial Officer of Genentech;

(h)     Ray, who is also a Partner of HLM Venture Partners, a private equity firm that provides venture capital to health care information technology, health care services, and medical technology companies, and who earlier served as the Global Co-Head of the Credit Suisse First Boston Health Care Investment Banking Group, where he focused on providing strategic and financial advice to life sciences, health care services and medical device companies; and

(i)     Ryan, who is the President of the Doheny Eye Institute and a professor of ophthalmology at the Keck School of Medicine of the University of Southern California.

115.    The repeated failure of the Board and its committees to follow requirements of its procedures and codes of conduct for supervising the officers and employees to prevent illegal activity is not protected by the business judgment rule. The Board failed to follow the requirements of the Code, which contains general requirements for conducting Allergan's business and explicitly requires all business conducted by Allergan employees be in compliance with all applicable laws.

116.    The Board further failed to follow the requirements of the Audit and Finance Committee Charter and the Corporate Governance Charter with respect to ensuring the Company's compliance with applicable laws and regulations. Thus, at a minimum, Defendants Boyer, Dunsire,

Exhibit 7
Page 154

Ingram, Jones, and Schaeffer, as members of the Corporate Governance Committee, and Gallagher, Hudson, Lavigne, Ray and Ryan, as members of the Audit & Finance Committee, should have supervised and prevented officers and employees from conducting the illegal activity alleged herein.

117.    These failures to follow procedures and codes excuse demand.

118.    The off-label marketing practices have already caused injury to the Company and will continue to cause harm to the Company by virtue of the fines it has agreed to pay in connection with these illegal sales and marketing practices, as well as all other costs and expenses incurred in connection with the Government's investigation, the *qui tam* complaints, and personal injury cases brought by persons who received medical procedures with off-label uses.

## COUNT I

### (Derivative Claim Against All Defendants)

119.    Plaintiff repeats and realleges each of the foregoing paragraphs of this complaint.

120.    This count is brought derivatively on behalf of the Company against all defendants for violations of their fiduciary duty of loyalty they each owed to the Company, and for the commission of waste under Delaware law.

121.    As Company directors, each of the defendants owed and owe fiduciary duties to Allergan and its shareholders.  Pursuant to this fiduciary relationship, defendants owed the Company the highest obligation of loyalty in the administration of the affairs of Allergan, including with respect to the oversight of Allergan's compliance with federal laws governing the marketing of pharmaceuticals and the specific fiduciary duties as defined by the Code and various Board committee Charters. Moreover, defendants were all aware of and educated about the relevant laws and regulations concerning pharmaceutical marketing and were duty-bound to abide by the laws and regulations and to enforce compliance therewith.

Exhibit 7
Page 155

122.   Defendants violated their fiduciary duties by, among other things, (a) knowingly and repeatedly failing to stop or prevent the illegal off-label marketing and promotion of BOTOX®; (b) knowingly and repeatedly failing to stop or prevent the illegal kickbacks Allergan was paying to health professionals for prescribing for off-label uses, and/or consciously disregarding such reports and activity; (c) approving and/or consciously disregarding Allergan's top strategic plan to maximize sales of BOTOX® for off-label uses through a Company-wide illegal marketing scheme and the payment of illegal kickbacks; and (d) causing or allowing the Company to disseminate to Allergan shareholders materially misleading and inaccurate information through proxy statements and other Company filings.

123.   Defendants further breached their fiduciary duty of loyalty by causing Allergan to employ a deliberate and systematic business plan of artificially increasing sales by engaging in unlawful sales and promotional practices in violation of FDA requirements, federal healthcare program requirements, and/or the anti-kickback statute. Defendants authorized and implemented Company policies and practices designed to perpetuate the illegal marketing and promotion of off-label uses and dosages of BOTOX®, as well as the payment of illegal kickbacks to healthcare professionals to induce the prescription of BOTOX®.

124.   The defendants, as directors, have breached their fiduciary duty of loyalty to the Company and have committed waste by the actions complained of herein. As a result, the Company has been and will be irreparably harmed. Allergan has sustained significant damages, both monetary and to its corporate image and goodwill. Such damage includes, among other things, significant fines, penalties, liabilities, and expenses as set forth above. These sums currently exceed $600 million.

125.   As a result of the misconduct alleged herein, defendants are liable to the Company.

Exhibit 7
Page 156

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for the following relief:

A.     Determining that Count I may proceed derivatively on behalf of the Company;

B.     An equitable accounting, including disgorgement, in favor of the Company against the defendants, for the losses that it has and will sustain by virtue of the misconduct alleged herein;

C.     Directing Allergan to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the events at issue in this action;

D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and expenses;

E.     Directing the defendants to pay damages to the Company, including both pre- and post-judgment interest at the highest rate allowed by law; and

F.     Granting such other and further relief whether similar or different, as the Court deems appropriate and just.

Dated: October 11, 2010

CHIMICLES & TIKELLIS LLP

Pamela S. Tikellis (Del. ID No. 2172)
Robert J. Kriner, Jr. (Del. ID No. 2546)
Meghan A. Adams (Del. ID No. 4981)
222 Delaware Ave.
P.O. Box 1035
Wilmington, DE 19899
(302) 656-2500

*Attorneys for Plaintiff*

*Of Counsel:*

BARRACK, RODOS & BACINE

Exhibit 7
Page 157

Daniel E. Bacine
Jeffrey W. Golan
Lisa M. Lamb
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19130
(215) 963-0600

Exhibit 7
Page 158