WAYNE W. SMITH, SBN 54593
   WSmith@gibsondunn.com
JEFFREY H. REEVES, SBN 156648
   JReeves@gibsondunn.com
KRISTOPHER P. DIULIO, SBN 229399
   KDiulio@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, California 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220

Attorneys for Defendants,
David E. I. Pyott; Herbert W. Boyer,
Ph.D.; Louis J. Lavigne, Jr.; Gavin S.
Herbert; Stephen J. Ryan, M.D.; Leonard
D. Schaeffer; Michael R. Gallagher;
Robert A. Ingram; Trevor M. Jones,
Ph.D.; Dawn E. Hudson; Russell T. Ray;
Deborah Dunsire, M.D.; Handel E.
Evans; Ronald M. Cresswell, Ph.D.;
Louis T. Rosso; Karen R. Osar; and
Anthony H. Wild, Ph.D.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| In re ALLERGAN, INC. SHAREHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | CASE NO. SACV10-1352 DOC (MLGx)<br><br>**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[*Request for Judicial Notice and Declaration of Kristopher P. Diulio filed concurrently*]<br><br>**Hearing:**<br><br>Date:   February 28, 2011<br>Time:   8:30 a.m.<br>Place:   Courtroom 9D |

Gibson, Dunn &
Crutcher LLP

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 28, 2011, at 8:30 a.m., in Courtroom 9D of the above-entitled Court, located at 411 West Fourth Street, Santa Ana, California, before the Honorable David O. Carter, Defendants David E. I. Pyott; Herbert W. Boyer, Ph.D.; Deborah Dunsire, M.D.; Gavin S. Herbert; Leonard D. Schaeffer; Michael R. Gallagher; Stephen J. Ryan, M.D.; Russell T. Ray; Trevor M. Jones, Ph.D.; Robert A. Ingram; Louis J. Lavigne, Jr.; Dawn E. Hudson; Handel E. Evans; Ronald M. Cresswell, Ph.D.; Louis T. Rosso; Karen R. Osar; and Anthony H. Wild, Ph.D. (collectively the "Individual Defendants" or "Directors"), by and through their attorneys of record, will and hereby do move this Court for an order dismissing Plaintiffs' Consolidated Complaint for failure to state a claim upon which relief can be granted pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

Nominal Defendant Allergan, Inc. ("Allergan" or the "Company") is concurrently filing a Motion to Dismiss on the grounds that the Complaint is legally deficient because Plaintiffs failed to make a pre-suit demand on Allergan's Board and have not pled with particularity why demand should be excused, as required by Rule 23.1 and governing Delaware law. The Individual Defendants hereby join in the Motion to Dismiss filed by Allergan. If the Court grants Allergan's Motion and dismisses the Consolidated Complaint, then the Court need not rule on this Motion, which will be moot.

If the Court does not grant Allergan's Motion to Dismiss for failure to properly plead demand futility, the Individual Defendants believe the Court should next address the purported federal law claims alleged to exist under Sections 14 and 29 of the Securities Exchange Act. It will be readily apparent that these claims are wholly without merit, and upon their dismissal, no federal question will remain as a basis for jurisdiction. Furthermore, diversity jurisdiction is unavailable because one of the Plaintiffs and one of the Individual Defendants are citizens of the same state.

Whether or not the Court dismisses the federal claims, the Individual Defendants urge the Court to decline to exercise supplemental jurisdiction over the state law claims,

1 which were previously filed in Delaware and which have also been filed in California

2 state court.  Alternatively, the Court should grant Allergan's motion to stay the state law

3 claims in favor of the pending Delaware action.  The Individual Defendants believe

4 these state law claims should be litigated in Delaware both because they were first filed

5 there and because the law of Delaware applies under the internal affairs doctrine.

6 Furthermore, these claims are brought on behalf of the Company and can only exist

7 once, so they should not under any circumstances be litigated in two (or three) different

8 courts.

9      This Motion is based on this Notice of Motion and Motion, the following

10 Memorandum of Points and Authorities, the concurrently filed Declaration of Kristopher

11 P. Diulio, the accompanying Request for Judicial Notice and any other matters of which

12 the Court may take judicial notice, other documents on file in this action, and any oral

13 argument of counsel.

14      This Motion is made following the conference of counsel pursuant to L.R. 7-3

15 that took place on November 22, 2010.

16                       Respectfully submitted,

17 Dated:  December 8, 2010       GIBSON, DUNN & CRUTCHER LLP

18                      WAYNE W. SMITH
JEFFREY H. REEVES

19                      KRISTOPHER P. DIULIO

20                By:/s/ Wayne W. Smith
                     Wayne W. Smith

21        Attorneys for David E. I. Pyott; Herbert W.

22        Boyer, Ph.D.; Louis J. Lavigne, Jr.; Gavin S.
Herbert; Stephen J. Ryan, M.D.; Leonard D.

23        Schaeffer; Michael R. Gallagher; Robert A.
Ingram; Trevor M. Jones, Ph.D.; Dawn E.

24        Hudson; Russell T. Ray; Deborah Dunsire,
M.D.; Handel E. Evans; Ronald M. Cresswell,

25        Ph.D.; Louis T. Rosso; Karen R. Osar; and
Anthony H. Wild, Ph.D.

26

27

28

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

Gibson, Dunn &
Crutcher LLP

1

2

# TABLE OF CONTENTS

3
<u>Page</u>

4

I. INTRODUCTION ................................................................................................1

5

II. BACKGROUND...............................................................................................3

6

     A.     BOTOX® And Off-Label Uses ................................................4

7

     B.     The Government Settlement .....................................................6

8

     C.     The Board Of Directors.............................................................7

9

     D.     Plaintiffs' Allegations And Procedural Posture .......................8

10

III. PLAINTIFFS' FEDERAL CLAIMS FAIL AS A MATTER OF LAW .................9

11

     A.     Plaintiffs' Section 14(a) Claim Must Be Dismissed.................9

12

13

          1.     The Section 14(a) Claim Is A Direct Claim Improperly Cast As A Derivative Claim To Mask Plaintiffs' Pleading Deficiencies ...................................................9

14

15

16

          2.     The Statute Of Limitations Bars Plaintiffs' Section 14(a) Claim .........................................................11

17

18

          3.     The Complaint Fails To State A Section 14(a) Claim....................12

19

20

               a.     Plaintiffs Failed To Plead With Particularity The Existence Of Any Material Misrepresentation Or Omission ...................................................13

21

22

               b.     Plaintiffs Do Not Adequately Allege Any Injury................15

23

24

               c.     Plaintiffs Have Failed To Plead An "Essential Link" Between The Proxy Statements And Alleged Illegal Activity...................................................16

25

26

               d.     The Section 14(a) Claim Fails To Adequately Plead The Required State Of Mind...................................17

27

28

     B.     Plaintiffs' Section 29(b) Claim Fails .....................................17

Gibson, Dunn & Crutcher LLP

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Page

      1.     No Underlying Securities Violation ................................................18

      2.     No Relationship Between Violation And Contract ........................19

IV. THE COURT SHOULD REFUSE SUPPLEMENTAL JURISDICTION .............19

V. PLAINTIFFS' STATE LAW CLAIMS FAIL ........................................................21

  A.    Failure To State Claim For Breach Of Fiduciary Duty ............................21

  B.    Plaintiffs Attempt To State A Claim For Inaction...................................22

  C.    The Complaint Does Not Adequately Allege Any Bad Faith..................25

      1.     Allegations Regarding Strategic Plans Do Not Establish
           The Directors' Bad Faith ...............................................................26

      2.     FDA Warning Letters Do Not Show Bad Faith By The
           Directors ........................................................................................27

      3.     The Criminal Guilty Plea Does Not Establish Bad Faith
           By The Directors............................................................................30

  D.    Section 309 Does Not Apply To A Delaware Corporation......................31

  E.    The Complaint Does Not State A Claim For Aiding And
      Abetting ...................................................................................................31

  F.    Plaintiffs Have Not Stated A Claim For Waste Of Corporate
      Assets .....................................................................................................32

  G.    The Complaint Does Not State A Claim For Unjust Enrichment.............33

  H.    The Insider Trading Allegations Are Specious........................................33

VI. CONCLUSION.........................................................................................................34

Gibson, Dunn &
Crutcher LLP

Page

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aronson v. Lewis*
  473 A.2d 805 (Del. 1984)..........................................................................21, 27

*Ashcroft v. Iqbal*
  129 S. Ct. 1937 (2009)..............................................................................22, 23

*Atherton v. FDIC*
  519 U.S. 213 (1997).........................................................................................20

*Bell Atlantic Corp. v. Twombly*
  550 U.S. 544 (2007).........................................................................................22

*Benihana of Tokyo, Inc. v. Benihana, Inc.*
  891 A.2d 150 (Del. Ch. 2005) ........................................................................23

*Boeing By Levit v. Shrontz*
  1992 WL 81228 (Del. Ch. Apr. 20, 1992) ......................................................33

*Brehm v. Eisner*
  746 A.2d 244 (Del. 2000)..........................................................................27, 32

*Bronstein v. Austin*
  2008 U.S. Dist. LEXIS 42881 (N.D. Ill. May 30, 2008) ...............................30

*Buckman Co. v. Plaintiffs' Legal Comm.*
  531 U.S. 341 (2001)...........................................................................................4

*Calamore v. Juniper Networks Inc.*
  364 F. App'x 370 (9th Cir. Feb. 5, 2010) .......................................................11

*Cede & Co. v. Technicolor, Inc.*
  634 A.2d 345 (Del. 1993).................................................................................22

*Chambers v. Gen. Motors Corp.*
  2007 WL 4181264 (S.D. Cal. Nov. 21, 2007) ................................................21

*Comm. Concerning Cmty. Improvement v. Modesto*
  583 F.3d 690 (9th Cir. 2009) ...........................................................................20

*Desaigoudar v. Meyercord*
  223 F.3d 1020 (9th Cir. 2000) ...................................................................12, 13

*Desimone v. Barrows*
  924 A.2d 908 (Del. Ch. 2007) ..............................................................3, 25, 30

*Dura Pharms., Inc. v. Broudo*
  544 U.S. 336 (2005).........................................................................................19

*Fleer Corp. v. Topps Chewing Gum, Inc.*
  539 A.2d 1060 (Del. 1988)...............................................................................33

*Gaines v. Haughton*
  645 F.2d 761 (9th Cir. 1981) .............................................................13, 14, 16

iii

Page

*GFL Advantage Fund, Ltd. v. Colkitt*
272 F.3d 189 (3d Cir. 2001) .......................................................................19

*Gompper v. VISX, Inc.*
298 F.3d 893 (9th Cir. 2002) .......................................................................14

*Greenspun v. Del E. Webb Corp.*
634 F.2d 1204 (9th Cir. 1980) .....................................................................22

*Guttman v. Huang*
823 A.2d 492 (Del. Ch. 2003) .....................................................................26

*Hulliung v. Bolen*
548 F. Supp. 2d 336 (N.D. Tex. 2008) ........................................................16

*In re 3COM Corp. S'holders Litig.*
1999 WL 1009210 (Del. Ch. Oct. 25, 1999)................................................32

*In re Caremark Int'l Inc. Deriv. Litig.*
698 A.2d 959 (Del. Ch. 1996) .............................................................passim

*In re Citigroup Shareholder Derivative Litig.*
964 A.2d 106 (Del. Ch. 2009) .........................................................25, 27, 31

*In re Intel Corp. Deriv. Litig.*
621 F. Supp. 2d 165 (D. Del. 2009).............................................................28

*In re J.P. Morgan Chase & Co. S'holder Litig.*
906 A.2d 766 (Del. 2006)............................................................................10

*In re McKesson HBOC, Inc. Sec. Litig.*
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................17

*In re Mutual Funds Inv. Litig.*
384 F. Supp. 2d 873 (D. Md. 2005).............................................................19

*In re Silicon Graphics*
183 F.3d 970 ...........................................................................................13, 22

*In re Syntex Corp. Sec. Litig.*
855 F. Supp. 1086 (N.D. Cal. 1994)............................................................11

*In re Teledyne Defense Contracting Derivative Litig.*
849 F. Supp. 1369 (C.D. Cal. 1993).......................................................14, 15

*In re Textainer P'ship Sec. Litig.*
2005 WL 3801596 (N.D. Cal. Mar. 8, 2005)...........................................17, 31

*In re U.S. Grant Hotel Assocs., Ltd. Sec. Litig.*
740 F. Supp. 1460 (S.D. Cal. 1990).............................................................18

*In re VeriSign, Inc., Derivative Litig.*
531 F. Supp. 2d 1173 (N.D. Cal. 2007) ..................................................11, 17

*In re Walt Disney Co. Derivative Litig.*
906 A.2d 27 (Del. 2006) .........................................................................24, 25, 33

*J.I. Case Co. v. Borak*
377 U.S. 426 (1964).................................................................................10, 16

*Jackson Nat. Life Ins. Co. v. Kennedy*
741 A.2d 377 (Del. Ch. 1999) ................................................................32, 33

Gibson, Dunn &
Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

Page

*Kelley v. Rambus, Inc.*
   2008 WL 5170598 (N.D. Cal. Dec. 9, 2008)............................................16, 17

*King v. Baldino*
   648 F. Supp. 2d 609 (D. Del. 2009)................................................27, 29, 31

*Lapidus v. Hecht*
   232 F.3d 679 (9th Cir. 2000) .............................................................10

*Lewis v. Vogelstein*
   699 A.2d 327 (Del. Ch. 1997) ...................................................21, 27, 33

*Log On America, Inc. v. Promethean Asset Mgmt. LLC*
   223 F. Supp. 2d 435 (S.D.N.Y. 2001) ..................................................18

*Lyondell Chemical Co. v. Ryan*
   970 A.2d 235 (Del. 2009)............................................................22, 26

*Malpiede v. Townson*
   780 A.2d 1075 (Del. 2001) ...............................................................32

*Matter of McLinn*
   739 F.2d 1395 (9th Cir. 1984) ...........................................................13

*McMichael v. U.S. Filter Corp.*
   2001 WL 418981 (C.D. Cal. Feb. 23, 2001)..............................................22

*Midland Grange No. 27 Patrons of Husbandry v. Walls*
   2008 Del. Ch. LEXIS 28 (Del. Ch. 2008)................................................23

*Mills v. Electric Auto-Lite Co.*
   396 U.S. 375 (1970)................................................................16, 18

*National Union Fire Ins. Co. v. Turtur*
   892 F.2d 199 (3d Cir.1989) .............................................................18

*New York City Employees' Ret. Sys. v. Jobs*
   593 F.3d 1018 (9th Cir. 2010) ......................................................10, 11

*Pfeffer v. Redstone*
   965 A.2d 676 (Del. 2009)................................................................23

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*
   794 F. Supp. 1265 (S.D.N.Y. 1992) .....................................................18

*Potter v. Hughes*
   546 F.3d 1051 (9th Cir. 2008).......................................................21, 22

*Robotti & Co., LLC v. Liddell*
   2010 WL 157474 (Del. Ch. 2010).......................................................24

*Ruggiero v. Am. Bioculture, Inc.*
   56 F.R.D. 93 (S.D.N.Y. 1972)...........................................................10

*RWP Consolidated, L.P. v. Salvatore*
   534 F. Supp. 2d 364 (D. Conn. 2008)....................................................18

*Sanford v. Memberworks, Inc.*
   2010 WL 4158602 (9th Cir. Oct. 25, 2010)..............................................20

*Schuster v. Gardner*
   127 Cal. App. 4th 305 (2005)...........................................................10

v

Gibson, Dunn &
Crutcher LLP

Page

*Siler v. Dillingham Ship Repair*
  288 F.App'x 400 (9th Cir. 2008) ......................................................... 20

*Stone v. Ritter*
  911 A.2d 362 (Del. 2006) ........................................................ 25, 30, 31

*Thorpe v. CERBCO, Inc.*
  1993 WL 35967 (Del. Ch. Jan. 26, 1993) .......................................... 11

*TSC Indus., Inc. v. Northway, Inc.*
  426 U.S. 438 (1976) ............................................................................ 12

*United States v. Caronia*
  576 F. Supp. 2d 385 (E.D.N.Y. 2008) ................................................. 4

*United States v. Dotterweich*
  320 U.S. 277 (1943) ........................................................................... 30

*Vess v. Ciba-Geigy Corp. USA*
  317 F.3d 1097 (9th Cir. 2003) ........................................................... 12

*Washington Legal Found. v. Friedman*
  13 F. Supp. 2d 51 (D.D.C. 1998) ........................................................ 5

*Washington Legal Found. v. Henney*
  202 F.3d 331 (D.C. Cir. 2000) ......................................................... 5, 6

*White v. Panic*
  783 A.2d 543 (Del. 2001) .................................................................. 32

*Wren v. Sletten Constr. Co.*
  654 F.2d 529 (9th Cir. 1981) ............................................................. 21

**Statutes**

15 U.S.C. 78 ..................................................................................... 2, 13

21 U.S.C. 321(p) ................................................................................... 6

21 U.S.C. 355(a) ................................................................................... 6

28 U.S.C. 1332(a)(2) ........................................................................... 20

28 U.S.C. 1367(c)(3) ........................................................................... 20

42 U.S.C. 1396b(i)(10) .......................................................................... 5

42 U.S.C. 1396r-8(k)(2) ......................................................................... 5

8 *Del. C.* 102(b)(7) ......................................................................... 7, 22

Cal. Corp. Code § 25502.5 ................................................................. 34

Cal. Corp. Code 2116 .................................................................... 20, 31

**Regulations**

21 C.F.R. 201.100(c)(1) ......................................................................... 6

21 C.F.R. 201.128 ................................................................................. 6

*Legal Status of Approved Labeling for Prescription Drugs*
  37 Fed. Reg. 16503 (Aug. 15, 1972) ................................................... 5

Gibson, Dunn &
Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

# I.  INTRODUCTION

Two days after Allergan announced that it had agreed to plead guilty to a single strict liability misdemeanor offense of misbranding, a shareholder derivative action was filed in Delaware Chancery Court—because Allergan is incorporated in Delaware—claiming that because of that plea agreement, *ipso facto*, the members of Allergan's board of directors (the "Board") must have breached their fiduciary duties.[1]  Five days later, the first of three lawsuits was filed in this Court premised on the same underlying conduct as the Delaware state-law action.  In a transparent effort to secure federal court jurisdiction, Plaintiffs miscast their state law breach of fiduciary duty claims as violations of federal securities laws.  However, they have failed to adequately plead any federal claim.  Plaintiffs' gloss of federal law does not mask the reality that they are pursuing state law fiduciary duty claims that are already pending in Delaware.

As an initial matter, the Consolidated Complaint is legally deficient because Plaintiffs did not make a pre-suit demand on the Board.  As set forth in Allergan's brief in support of Defendants' motion to dismiss, the Complaint does not meet the pleading requirements for demonstrating that such a demand would be futile.  In fact, another Allergan shareholder has made a demand on the Board.  (Ex. A.)[2]  Pursuant to Rule 23.1 and for the reasons stated in Allergan's brief, the Complaint should be dismissed for failure to plead demand futility.

In addition to failing to adequately allege demand futility, the Complaint also fails to state a claim for violation of the federal securities laws, breach of fiduciary duty, or corporate waste against the Individual Defendants.  Plaintiffs' Complaint does not contain any particularized allegations establishing that the Directors acted in bad faith or

---

[1]  These state law fiduciary duty claims fail because, without specific allegations showing bad faith, "a violation of criminal law alone does not create a breach of fiduciary duty by directors."  *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 972 (Del. Ch. 1996).

[2]  The documents cited in this brief are attached as exhibits to the accompanying Request for Judicial Notice.

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

1   otherwise breached their fiduciary duties, wasted corporate assets, unjustly enriched

2   themselves, improperly traded Allergan's stock or otherwise violated federal securities

3   laws.

4        One week before Plaintiffs initiated this lawsuit, Allergan announced its

5   agreement to settle previously disclosed claims regarding past marketing practices with

6   respect to BOTOX® (onabotulinumtoxinA) ("BOTOX®") for therapeutic (non-

7   cosmetic) uses.  As part of that settlement, Allergan agreed to plead guilty to a single

8   strict liability misdemeanor charge of misbranding relating to conduct that allegedly

9   occurred between 2000 and 2005, and to pay the United States Government $375

10  million.  Allergan also agreed to pay $225 million to settle civil actions under the False

11  Claims Act, although Allergan denies liability associated with those civil allegations and

12  contends that they have no factual or legal merit (collectively, the guilty plea and

13  payments will be referred to as the "Government Settlement").

14       In an effort to create a federal question for the transparent purpose of bypassing

15  the first-filed Delaware action, Plaintiffs attempt to allege claims under Section 14(a)

16  and Section 29(b) of the Securities Exchange Act of 1934.  However, these claims are

17  patently defective.  The Section 14(a) claim fails because:  (i) Plaintiffs' claim is a direct

18  claim, not derivative; (ii) it is barred by the statute of limitations; and (iii) Plaintiffs have

19  not adequately alleged all elements necessary to state such a claim.  The Section 29

20  claim fails because:  (i) Plaintiffs have failed to allege a predicate securities law

21  violation; and (ii) there is no relationship between the alleged conduct and the contracts

22  Plaintiffs seek to rescind.

23       Upon dismissal of the purported securities law claims, the Court is urged to

24  decline to exercise supplemental jurisdiction over the state law claims.  Should the

25  Court retain supplemental jurisdiction, the state law claims should nonetheless be

26  dismissed because the Complaint does not state with particularity any improper action

27  by the Board.  Plaintiffs' conclusory, highly generalized allegations do not show that the

28  Individual Defendants knew of, participated in, or should have known of the alleged

2

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT

1  wrongdoing that ultimately resulted in the Government Settlement.  This fails to meet
2  the standard imposed by applicable Delaware law.

3       Without adequate allegations of any specific action by the Board, the gravamen
4  of the Complaint is that the Board failed to properly oversee the Company.  (*See, e.g.*,
5  Compl. ¶¶ 1 ("[T]he Board permitted the Defendants to cause the Company to engage
6  in a decade long scheme to misbrand Botox®."), 120.)  This theory of liability requires
7  Plaintiffs to allege facts showing that the Individual Defendants acted in ***bad faith***.  To
8  meet this high burden, Plaintiffs must plead facts that show either the absence of
9  controls or that the Board made a conscious decision to do nothing about controls it
10  knew were inadequate.  *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007).
11  The Complaint fails in this respect because no facts alleged show any failure by the
12  Directors, Plaintiffs concede that the Company had an oversight process in place, and
13  Plaintiffs do not include any facts to support the conclusion that the Directors neglected
14  that process.

15       Plaintiffs also allege that the Directors wasted corporate assets and unjustly
16  enriched themselves, and that two Directors improperly traded Allergan stock; but
17  Plaintiffs plead no facts to support these claims.  Specifically, Plaintiffs do not allege
18  facts that would demonstrate that any consideration received by the Company was so
19  inadequate that no person of ordinary business judgment would deem it worth what the
20  Company paid.  Nor do Plaintiffs identify any material, inside information that
21  Defendants Pyott and Herbert supposedly traded on, or explain how there can be any
22  damages from insider trading when Allergan's stock did not negatively react to news of
23  the Government Settlement.

## II.  BACKGROUND

25       Allergan is a Delaware corporation that concentrates on developing and
26  commercializing innovative pharmaceuticals, biologics, and medical devices.  (Compl. ¶
27  61.)  One of the numerous specialty products offered by Allergan is BOTOX®, a
28  prescription neurotoxin that is intended to safely and effectively produce a localized and

Gibson, Dunn &
Crutcher LLP

3

temporary reduction in an overactive muscle or gland. (*Id.* ¶ 62.) More than twenty years ago, the Food and Drug Administration (the "FDA") approved BOTOX® for two eye muscle disorders: crossed-eyes and involuntary eyelid muscle contractions. (*Id.* ¶ 63.) Since then, BOTOX® has been approved for the treatment of involuntary neck muscle contractions (cervical dystonia, or "CD"), excessive sweating, increased muscle stiffness in the elbow, wrist, and fingers due to upper limb spasticity, and most recently, migraine headaches. (*Id.*; *see also* Ex. B.) Although widely known for its cosmetic use ("BOTOX® Cosmetic"), the subject of this litigation is related to the therapeutic uses for BOTOX®. (Compl. ¶ 63.)

## A.   BOTOX® And Off-Label Uses

Underlying Plaintiffs' Complaint is the assertion that because Allergan pleaded guilty to a misbranding charge, the Board must have known that alleged illegal conduct was occurring. Ignoring Plaintiffs' hyperbole and focusing on the complex and inconsistent FDA regulatory scheme makes clear that Plaintiffs have not pleaded any facts that tie the Directors to any illegal conduct.

Although BOTOX® is approved by the FDA for several therapeutic uses, there are also a number of medically accepted uses of BOTOX® that have not yet been approved by the FDA. (*Id.* ¶ 68.) A physician in the United States may prescribe an approved pharmaceutical product for ***any*** use—including uses not approved by the FDA. These are commonly referred to as "off-label" uses, which are not only legal but can be the standard of care for treatment of many conditions. "Off-label use is widespread in the medical community and often is essential to giving patients optimal medical care, both of which medical ethics, FDA, and most courts recognize." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 n.5 (2001) (citation omitted); *see also United States v. Caronia*, 576 F. Supp. 2d 385, 393 (E.D.N.Y. 2008) ("It is generally recognized (even by the FDA) that off-label prescriptions can constitute a medically recognized standard of care and, therefore, that it is important for physicians to have access to accurate information about off-label uses.").

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

1    The absolute right of physicians to prescribe a drug for off-label uses is consistent

2    with the FDA's role of regulating the pharmaceutical industry, but not the practice of

3    medicine.[3]  Accordingly, BOTOX® has been regularly prescribed by physicians for the

4    therapeutic treatment of headaches, pain, and juvenile cerebral palsy—even at times

5    when those uses had not been approved by the FDA.  (Compl. ¶ 68.)  For example,

6    more than 80% of historical BOTOX® treatments reimbursed by Medicaid or insurance

7    companies have been for off-label prescriptions.[4]  (*Id.*)

8    The Food, Drug, and Cosmetic Act ("FDCA") does not prohibit truthful, non-

9    misleading communications to physicians that educate about off-label use.  Nonetheless,

10   FDA regulations and guidance have at times been overly restrictive or vague.  One

11   district court permanently enjoined the FDA from enforcing guidance that attempted to

12   prohibit the dissemination of journal articles, reference texts, and manufacturer support

13   of Continuing Medical Education ("CME") regarding off-label uses.  *See Washington*

14   *Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 74-75 (D.D.C. 1998) ("*WLF*"), *vacated*

15   *as moot on other grounds by Washington Legal Found. v. Henney*, 202 F.3d 331, 336-

16   37 (D.C. Cir. 2000).  The *WLF* court explained that:

17           [O]ff-label prescriptions, presently legal, do constitute the most effective
             treatment available for some conditions.  Through the government's well-
18           intentioned efforts to prevent misleading information from being
             communicated, a great deal of truthful information will also be embargoed.
19           In this case, the truthful information may be life saving information, or
             information that makes a life with a debilitating condition more
20           comfortable."

21

22   _____

23   [3]  Physicians may only prescribe drugs once they have been approved by the FDA for
     some particular use.  However, once the FDA has determined a drug is sufficiently safe
     for a particular use, physicians may prescribe it for other uses even though the FDA has
24   not yet determined the drug's efficacy for such uses.  "[T]he physician may, as part of
     the practice of medicine, lawfully prescribe a different dosage for his patient, or may
25   otherwise vary the conditions of use from those approved in the package insert, without
     informing or obtaining the approval of the [FDA]."  *Legal Status of Approved Labeling*
26   *for Prescription Drugs*, 37 Fed. Reg. 16503, 16503-16504 (Aug. 15, 1972).

27   [4]  Federal law recognizes the importance and legitimacy of off-label use by reimbursing
     off-label prescriptions for drugs, like BOTOX, when the off-label use is "medically
28   accepted."  42 U.S.C. §§ 1396b(i)(10), 1396r-8(k)(2).

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

1  *WLF*, 13 F. Supp. 2d at 73; *see also Washington Legal Found. v. Henney*, 56 F. Supp.

2  2d 81, 86 (D.D.C. 1999) ("The government, however benign its motivations, simply

3  cannot justify a restriction of truthful nonmisleading speech on the paternalistic

4  assumption that such restriction is necessary to protect the listener from ignorantly or

5  inadvertently misusing the information.").

6  **B.     The Government Settlement**

7       Plaintiffs' Complaint alleges that the Government first began investigating

8  Allergan's marketing of BOTOX® (the "Government Investigation") in 2007, when the

9  first of three False Claims Act *qui tam* actions was filed.  (Compl. at ¶ 9.)  Allergan

10  disclosed the investigation by the Department of Justice ("DOJ") on March 3, 2008,

11  after the Company received a subpoena.  (Ex. C.)

12       The Government contends that manufacturers must provide "adequate

13  information" for all intended uses of a drug.  21 C.F.R. § 201.100(c)(1).  If a

14  manufacturer sells the drug to a physician knowing the physician will lawfully prescribe

15  it for an off–label use, the Government contends that use becomes an intended use, and

16  the label must include adequate information for all intended uses.  21 C.F.R. §§

17  201.100(c)(1), 201.128.  However, the Government prohibits manufacturers from

18  including instructions for off-label uses.  21 U.S.C. §§ 321(p), 355(a).  Thus, the legal

19  off-label prescriptions by physicians place a manufacturer in a catch-22 because the

20  manufacturer that is aware of the off-label uses either includes instructions—which the

21  Government considers improper labeling—or does not include instructions for off-label

22  uses—which the Government considers misbranding.

23       Allergan ultimately resolved the Government Investigation on September 1, 2010,

24  by agreeing to plead guilty to a single misdemeanor "misbranding" charge, which is a

25  strict liability offense, covering the period of 2000 through 2005.  (Compl. ¶ 109.)  On

26  October 5, 2010, Allergan pleaded guilty to the misbranding charge, which did not

27  involve any admission that Allergan took part in any false or deceptive conduct.  (*Id.* ¶

28  14.)  Nor does the guilty plea implicate any action or inaction by the Board.  Instead,

Gibson, Dunn &
Crutcher LLP

6

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED COMPLAINT**

1  Allergan agreed that between 2000 and 2005, certain of its BOTOX® marketing

2  resulted in the use of BOTOX® for the therapeutic treatment of headaches, pain,

3  spasticity and juvenile cerebral palsy.  (Ex. D.)  During that time, because the FDA had

4  not approved BOTOX® for these uses, the labeling for BOTOX® could not and did not

5  include directions for those uses.  (*Id.*)

6       Plaintiffs' effort to taint this case with spurious allegations of drug safety is

7  misguided.  Since 2005, the FDA has approved BOTOX® for the treatment of increased

8  muscle stiffness in adults with upper limb spasticity, which was the most substantial use

9  during the period relevant to the guilty plea.  (Ex. E.)  Recently, the FDA also approved

10  BOTOX® for the treatment of chronic migraines.  (Ex. B.)  Currently, Allergan is

11  conducting Phase III clinical trials investigating the use of BOTOX® to treat neurogenic

12  and idiopathic overactive bladder.  (Ex. E.)  Furthermore, Allergan also is in discussions

13  with the FDA regarding the use of BOTOX® to treat juvenile cerebral palsy, which has

14  already been approved in 70 countries, including the United Kingdom, Canada, Brazil,

15  Hong Kong, and Japan.  (*Id.*)  These approvals do not avoid the misbranding charge as

16  they came after the 2000 through 2005 period covered by the guilty plea, but they do

17  discredit Plaintiffs' specious allegations that there is "no clinical support" for the safety

18  and efficacy of BOTOX® for these uses.  (Compl. ¶ 84.)

19  **C.    The Board Of Directors**

20       The Individual Defendants are the 12 current and five former members of

21  Allergan's Board.  (*Id.* ¶¶ 27-43.)  Allergan's Amended and Restated Certificate of

22  Incorporation contains an exculpatory provision consistent with 8 *Del. C.* § 102(b)(7):

23       A director of the Corporation shall not be personally liable to the
     Corporation or its stockholders for monetary damages for breach of
24       fiduciary duty as a director, except for liability (i) for any breach of the
     director's duty of loyalty to the Corporation or its stockholders, (ii) for acts
25       or omissions not in good faith or which involve intentional misconduct or a
     knowing violation of law, (iii) under Section 174 of the Delaware General
26       Corporation Law, or (iv) for any transaction from which the director
     derived an improper personal benefit.  If the Delaware General
27       Corporation Law is amended after the date hereof to authorize corporate
     action further eliminating or limiting the personal liability of directors, then
28       the liability of a director of the Corporation shall be eliminated or limited to

Gibson, Dunn &
Crutcher LLP

7

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

1    the fullest extent permitted by the Delaware General Corporation Law, as so amended.

2    (Ex. F at 5.)

### D.    Plaintiffs' Allegations And Procedural Posture

An Allergan stockholder filed a derivative action in Delaware against the Directors two days after the Government Settlement was announced. *Louisiana Municipal Police Empl. Retirement Sys. v. Allergan, Inc.*, No. 5795-VCL (filed September 3, 2010) ("*LMPERS*"). Afterwards, three additional derivative suits were filed in this Court: *Rosenbloom v. Pyott,* No. SACV10-01352-DOC (MLGx) (filed September 9, 2010), *Himmel v. Pyott,* No. SACV10-1417-JVS (MLGx) (filed September 17, 2010), and *Pompano Beach Police & Firefighters' v. Pyott,* No. SACV10-01449 DOC (JEMx) (filed September 24, 2010). Yet another stockholder filed a derivative action in California Superior Court on October 21, 2010. *Rosenberg v. Pyott,* No. 30-2010-00418912-CU-SL-CXC.

On October 25, 2010, this Court consolidated the three federal actions, and Plaintiffs filed a Consolidated Complaint on November 1, 2010. In their Complaint, Plaintiffs allege that the Directors violated Sections 14(a) and 29(b) of the Securities Exchange Act of 1934, breached their fiduciary duties, committed waste, and unjustly enriched themselves when they "illegally promot[ed] Allergan's flagship product Botox® for uses not approved by the [FDA]," "severely damaging Allergan's once valuable corporate franchise." (Compl. ¶ 1.) The Complaint concludes that the Board "approved" an "off-label marketing scheme" for BOTOX®, which the Defendants allegedly had made "a top corporate priority." (*Id.* ¶¶ 78, 136-37.) Plaintiffs allege that the failure to disclose this "scheme" in proxy statements was a material omission that affected shareholders' voting decisions and that it rendered improper the sales of Allergan's stock by Directors Pyott and Herbert. (*Id.* ¶¶ 123, 198.)

All of Plaintiffs' claims rely on an alleged "off-label marketing scheme," but Plaintiffs fail to allege any facts suggesting that such a scheme was part of any strategic

Gibson, Dunn & Crutcher LLP

1   plan or policy approved by the Board.  Plaintiffs allege conclusorily that Defendants

2   "devised, implemented, and allowed" an off-label marketing scheme, but do not allege

3   any specific facts about how they acted wrongfully, assisted in implementing any such

4   scheme, or contributed to any wrongful conduct.  (*Id.* ¶ 6.)  Similarly, the Complaint

5   alleges no facts to support its conclusion that the Board should have known about the

6   violations.  (*Id.* ¶ 140.)

7        The few specific facts that appear in the Complaint actually lead to the opposite

8   inference.  For example, Plaintiffs note the Board's significant emphasis on producing

9   safe, high-quality products, engaging in ethical practices, and complying with the law.

10  (*Id.* ¶ 50.)  Not only did the Board emphasize that being ethical was "the right thing to

11  do," the Board recognized that it was necessary for Allergan's "continued success as a

12  company." (*Id.*)  As the CEO noted, "[i]n the health care business, any legal or ethical

13  violation has the potential to harm patients and damage our reputation." (*Id.*)  These

14  statements suggest that the Board never "affirmatively adopted, implemented, [or]

15  condoned a business strategy based on deliberate and widespread violations of

16  applicable law." (*Id.* ¶ 132.)

17  **III.  PLAINTIFFS' FEDERAL CLAIMS FAIL AS A MATTER OF LAW**

18       Plaintiffs' attempt to disguise their state law derivative claims as federal claims

19  fails to withstand the scrutiny of Rule 12(b)(6).

20  **A.    Plaintiffs' Section 14(a) Claim Must Be Dismissed**

21  **1.    The Section 14(a) Claim Is A Direct Claim Improperly Cast As A
        Derivative Claim To Mask Plaintiffs' Pleading Deficiencies**

22

23       Plaintiffs' Section 14(a) claim is a direct claim that cannot be asserted in this

     derivative action.  Although a Section 14(a) claim is a federal claim, whether it can be
24
     brought as a direct or derivative claim "is governed by the law of the state of
25
     incorporation." *New York City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th
26
     Cir. 2010) (citing *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) and *Lapidus v.*
27
     *Hecht*, 232 F.3d 679, 682 (9th Cir. 2000)).  Plaintiffs' classification of the lawsuit as
28

1   either direct or derivative "is not binding" and does not control the nature of the

2   underlying claim.  *Id.*  Thus, Delaware law—which applies to Allergan as a Delaware

3   corporation—determines the nature of the claim.[5]

4        Plaintiffs allege that "[e]ach of the Director Defendants was duty-bound pursuant

5   to his or her general fiduciary duties under Delaware law and by the provisions of

6   federal securities laws to fully disclose all information material to shareholders' decision

7   concerning ***how to cast their votes*****.**"  (Compl. ¶ 115 (emphasis added).)  The Complaint

8   further alleges that as a result of Defendants' omissions "the ***votes*** and the consequent

9   election of directors to the Board were ***obtained on the basis of inaccurate***

10   ***disclosures***."  (*Id.* ¶ 119 (emphasis added).)  According to Plaintiffs, "[h]ad

11   shareholders been provided with complete and accurate information . . . the members of

12   the Board would not have been elected (or reelected)."  (*Id.*)  The Complaint further

13   states that "[h]ad they been provided with complete and accurate disclosures, Allergan

14   shareholders would have chosen not to increase the compensation . . . ."  (*Id.* ¶ 121.)

15        These allegations do not create a derivative claim under Delaware law:  "Where

16   it is claimed that a duty of disclosure violation impaired the stockholders' right to cast

17   an informed vote, that claim is direct."  *In re J.P. Morgan Chase & Co. S'holder Litig.*,

18   906 A.2d 766, 772 (Del. 2006).  This is because "[t]he right to vote stock is the

19   individual right of the legal owner of stock."  *Thorpe v. CERBCO, Inc.*, Civ. A. No.

20   11713, 1993 WL 35967 (Del. Ch. Jan. 26, 1993).  When a plaintiff alleges that a "board

21   of directors wrongfully interferes with or wrongfully impairs that right it violates

22   individual rights of stockholders."  *Id.* ("The wrong is one suffered by all those who

23   vote, but it is not a derivative wrong for that reason, but a direct one.")  Plaintiffs'

24

---

25   [5]  One reason for Plaintiffs to miscast their claim as derivative is to avoid the actual

26   conflict of interest that exists when a plaintiff asserts both direct claims against a
company and derivative claims on behalf of the company.  *See Ruggiero v. Am.*

27   *Bioculture, Inc.*, 56 F.R.D. 93, 95 (S.D.N.Y. 1972) (holding that the plaintiff could not
bring both a class action against the corporation and a derivative action on behalf of the

28   corporation); *Schuster v. Gardner*, 127 Cal. App. 4th 305 (2005) (noting that derivative
and direct actions are mutually exclusive).

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

1    claim that inadequate disclosures impacted the stockholders' ability to exercise their

2    voting rights is a direct claim under Delaware law.  *See New York City Employees' Ret.*

3    *Sys.*, 593 F.3d at 1018 (applying Delaware law holding that Section 14(a) claim is a

4    direct claim); *Calamore v. Juniper Networks Inc.*, No. 08-17052, 364 F. App'x 370,

5    371 (9th Cir. Feb. 5, 2010) (same).  Because Plaintiffs' Section 14(a) claim may not be

6    brought in a derivative action, it must be dismissed.

7    ### 2.    The Statute Of Limitations Bars Plaintiffs' Section 14(a) Claim

8          Plaintiffs' Section 14(a) claim is untimely because Allergan disclosed the

9    existence of the DOJ investigation on March 3, 2008.  (Ex. C.)  "The limitations period

10   for a § 14(a) claim is one year after the plaintiff discovers the facts constituting the

11   violation."  *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1212 (N.D.

12   Cal. 2007) (internal quotations omitted).  Plaintiffs assert that "investors had no reason

13   to know of the Individual Defendants' breaches of their fiduciary duties until at least

14   September 1, 2010, when the DOJ announced the Civil and Criminal Settlements."

15   (Compl. ¶ 153.)  But this claim is contradicted by Allergan's March 3, 2008 disclosure

16   that it received a subpoena from the DOJ and that "the [DOJ] inquiry involved questions

17   regarding alleged off label promotion relating to the use of Botox® for the treatment of

18   headaches." (Ex. C.)  And Allergan continued to disclose the investigation in its SEC

19   filings and investors conference calls.  (Exs. G–I.)

20         The statute of limitations for federal securities claims "is triggered when the

21   plaintiff has actual knowledge of the fraud ***or knowledge of facts sufficient to put a***

22   ***reasonable person on notice***."  *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1099

23   (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996) (emphasis added) (internal

24   quotations omitted).  The broad and repeated disclosures by Allergan of the DOJ

25   investigation during the two years prior to the settlement placed investors on notice of

26   the possibility that the Company was improperly promoting BOTOX®.  These

27   disclosures also triggered the running of the statute of limitations.  The Section 14(a)

28   claim must be dismissed as untimely because investors were on inquiry notice of alleged

Gibson, Dunn &
Crutcher LLP

11

1  breaches of fiduciary duty over two years before the first lawsuit was filed in this Court
2  on September 9, 2010.

### 3. The Complaint Fails To State A Section 14(a) Claim

4  Even were the Section 14(a) claim derivative in nature and the statute of
5  limitations ignored, the Complaint nonetheless fails to adequately allege necessary
6  elements.  To state a claim under Section 14(a), Plaintiffs "must establish that (1) a
7  proxy statement contained a material misrepresentation or omission which (2) caused
8  the plaintiff injury and (3) that the proxy solicitation itself . . . was an essential link in
9  the accomplishment of the transaction." *Jobs*, 593 F. 3d at 1022 (citation and internal
10  quotation marks omitted).  "In addition, a Section 14(a) . . . plaintiff must demonstrate
11  that the misstatement or omission was made with the requisite level of culpability."
12  *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000) (citing *TSC Indus.,*
13  *Inc. v. Northway, Inc.*, 426 U.S. 438, 444 & n.7 (1976)).  Here, Plaintiffs' Section 14(a)
14  claim fails to meet any of these elements.

15  Moreover, Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA")
16  require Plaintiffs to plead their case with "a high degree of meticulousness."[6]  *Id.* at
17  1022 (noting applicability of Rule 9(b) to securities fraud claims)).  Rule 9(b) requires
18  that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or
19  mistake shall be stated with particularity."  The PSLRA strengthens Rule 9(b),
20  providing that "a securities fraud plaintiff shall identify: (1) each statement alleged to
21  have been misleading; (2) the reason or reasons why the statement is misleading; and
22  (3) all facts on which that belief is formed."  *Desaigoudar*, 223 F.3d at 1023 (citing *In*
23  *re Silicon Graphics*, 183 F.3d 970, 996 (9th Cir. 1999)); 15 U.S.C. § 78u-4(b)(1).
24  Plaintiffs have failed to comply with this standard.

---

25
26  [6]  Plaintiffs' Section 14(a) claim is subject to Rule 9(b) because the underlying allegations sound in fraud.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003); *see also McKesson HBOC*, 126 F. Supp. 2d at 1266 (applying Rule 9(b) to a Section 14(a) claim).
27
28

Gibson, Dunn & Crutcher LLP

12

a.      **Plaintiffs Failed To Plead With Particularity The Existence Of Any Material Misrepresentation Or Omission**

Plaintiffs have not alleged with the requisite particularity any material misrepresentation or omission; rather, Plaintiffs summarily claim that the proxy statements were materially inaccurate and incomplete because "the financial and operating metrics disclosed in the Proxy Statements were the result of widespread criminal misconduct within Allergan that the Board was duty-bound to prevent." (Compl. ¶ 117). Plaintiffs further allege that the proxy statements failed to disclose "critical aspects of the Board's responsibilities and activities—such as the Board's obligation to assure compliance with applicable drug marketing laws and regulations," and the alleged failure by the Board to do so. (Compl. ¶¶ 117-18.)

Such allegations cannot form the basis of a viable Section 14(a) claim. *See Gaines v. Haughton*, 645 F.2d 761 (9th Cir. 1981), *overruled on other grounds by*, *Matter of McLinn*, 739 F.2d 1395 (9th Cir. 1984). In *Gaines*, the plaintiff's Section 14(a) claims were based on the defendants' previously undisclosed practice of hiring consultants and foreign sales agents and paying them large fees and commissions, including approximately $30−38 million paid directly to foreign governments and officials in "off the books," questionable payments later revealed by a government investigation. *Id.* at 765. The plaintiff claimed that the defendants violated Section 14(a) by failing to disclose the existence and details of the questionable foreign payments in proxy solicitation materials each year from 1961−1974. *Id.* at 766. The court rejected that claim and explained that "[a]bsent credible allegations of self-dealing by the directors or dishonesty or deceit which inures to the direct, personal benefit of the directors a fact that demonstrates a betrayal of trust to the corporation and shareholders and the director's essential unfitness for corporate stewardship we hold that director misconduct of the type traditionally regulated by state corporate law ***need not be disclosed in proxy solicitations*** for director elections." *Id.* at 779 (emphasis added). This is because an allegation of mismanagement "unadorned by self-dealing, is

Gibson, Dunn & Crutcher LLP

13

1    simply not material or otherwise within the ambit of the federal securities laws." *Id.*

2    ("A contrary holding . . . would represent a move toward the federalization of corporate

3    law that the Supreme Court has repeatedly and emphatically rejected.").

4            There is simply no evidence to suggest that the Directors were acting for their

5    own benefit.  The Ninth Circuit has held that under the PSLRA, all reasonable

6    inferences must be considered in determining whether plaintiffs have met their pleading

7    burden.  *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).  Plaintiffs have

8    utterly failed to provide any evidence from which it can be inferred that the Directors

9    were acting in their own self-interest.  *See In re Teledyne Defense Contracting*

10   *Derivative Litig.*, 849 F. Supp. 1369 (C.D. Cal. 1993).

11          In *Teledyne*, the plaintiffs alleged that the proxy materials at issue were false and

12   misleading in seeking and obtaining the election of the company's directors without

13   disclosing the defendants' repeated illegal acts and violations of law.  *Id.* at 1379.  The

14   court noted that although the plaintiffs misleadingly referred to "Defendants' repeated

15   illegal acts," it was only to the extent that the individual defendants were "personally

16   involved in or guilty of illegal conduct that a claim of an omission material to their

17   election may be stated."  *Id.*  The court held that in the Ninth Circuit, "'credible

18   allegations of self-dealing . . . or dishonesty or deceit which inures to the direct,

19   personal benefit of the directors' are ***absolute prerequisites*** to § 14(b) claims of

20   material omissions in election proxies."  *Id.* at 1382 (emphasis added) (quoting *Gaines*,

21   645 F.2d 761, 779).  The court further noted that the remedy that the plaintiffs sought,

22   annulment of the most recent election or removal of the directors, was "readily

23   attainable through more traditional state law corporate remedies."  *Id.* at 1381 (citations

24   omitted).

25          The *Teledyne* court also explained that regarding alleged illegal conduct, the duty

26   of disclosure is limited to:

27          (1) pending litigation in which a nominee for the board has an interest
            adverse to that of the corporation,

28

Gibson, Dunn &
Crutcher LLP

(2) litigation filed against a nominee under federal bankruptcy or state insolvency law,

(3) litigation that has resulted in a criminal conviction of the nominee or involves pending criminal charges,

(4) litigation which resulted in the suspension of the nominee from participating in certain specified securities related professional activities, or

(5) litigation in which the nominee was found to have violated state or federal securities law.

*Id.* at 1381–82.  Furthermore, "§ 14(b) requires disclosure of material facts, and the Defendants' culpability–under the case law and the SEC regulations . . . does not become a fact that must be disclosed until it is at least charged (in which case the charge is material) or proven (in which case the proven conduct is material)." *Id.* at 1383. None of Plaintiffs' allegations fall within these categories.

Here, as in *Teledyne*, Plaintiffs rely on a deficient theory of liability that would have required the Board to engage in self-flagellation and disclose allegations of wrongdoing before being charged by the government.  In fact, the Directors have never been charged with any wrongdoing.  The proxy rules and applicable case law simply do not require additional disclosure.  The court emphasized in *Teledyne* the wisdom of limiting disclosure to pending or adjudicated actions, where "neither Plaintiffs nor anyone else has yet proven, that the Defendants had any culpable involvement which they might have been obligated to disclose." *Id.* at 1383; *see also Cathcart*, 980 F.2d at 935 ("[S]peculative disclosure is not required under Section 14(a).**Error! Bookmark not defined.**").  Here, Allergan timely disclosed the Government Investigation and the fact that it resulted in a settlement—which did not implicate any action or inaction by the Directors—does not render any prior proxy statement misleading.

### b.     Plaintiffs Do Not Adequately Allege Any Injury

Here, as in *Gaines*, the misconduct alleged by Plaintiffs was not the subject of shareholder vote and cannot be considered the legal cause of damages resulting from the Government Settlement.  Plaintiffs' requests for equitable relief (including an order invalidating the director elections and authorization of the 2008 Incentive Award Plan

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

based on the allegedly misleading proxy statements) must also be denied because they have failed to plead with particularity any credible allegations of self-dealing by the Directors or deceit that inured to the direct benefit of the Directors.  Indeed, Plaintiffs allege that "[p]rior to [the September 1, 2010 announcement of the Settlement], Allergan **suffered no damage** from the unlawful off-label marketing of Botox® because it enjoyed the benefits of the unlawful sales."  (Compl. ¶ 153.)

### c.      Plaintiffs Have Failed To Plead An "Essential Link" Between The Proxy Statements And Alleged Illegal Activity

The Section 14(a)**Error! Bookmark not defined.** claim also fails because Plaintiffs do not—and cannot—plead that Allergan's proxy statements were an "essential link in the accomplishment" of any contested action by the Company.  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970).  In the context of a Section 14(a) claim, "[t]he essential link requirement can 'only be established when the proxy statement at issue **directly authorizes** the loss-generating corporate action.'"  *Kelley v. Rambus, Inc.*, No. C 07-1238 JF (HRL), 2008 WL 5170598, *7 (N.D. Cal. Dec. 9, 2008) (quoting *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 341 (N.D. Tex. 2008) (emphasis added)).  This requirement flows from the purpose of Section 14(a)**Error! Bookmark not defined.**, which "'is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.'"  *Gaines*, 645 F.2d at 773 (quoting *J.I. Case Co.*, 377 U.S. at 431).

Plaintiffs' own allegations confirm that the vast majority of the alleged conduct predated the earliest proxy on which Plaintiffs base their Section 14(a)**Error! Bookmark not defined.** claim and thus the proxies could not have been an essential link in the alleged conduct.  *See, e.g., Kelley*, 2008 WL 5170598, at *7 (dismissing Section 14(a) claim for failure to state a claim and finding that it is "'simply illogical to suggest that Proxies could be an "essential link" to—i.e., directly authorize—corporate actions that were taken . . . before any of the proxies were distributed.'")  Thus, Plaintiffs' Section 14(a)**Error! Bookmark not defined.** claim must fail because the

Gibson, Dunn &
Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

proxy statements were not used to obtain shareholder approval for any alleged illegal action.  Plaintiffs' Section 14(a) claim is based on Allergan's proxy statements filed on March 20, 2008, March 19, 2009, and March 12, 2010.  (Compl. ¶ 113.)  The Complaint alleges that prior to the September 1, 2010 announcement of the Settlement, "Allergan *suffered no damage* from the unlawful off-label marketing of Botox® . . . ." (*Id.* ¶ 153.)  Plaintiffs further allege that the harm to the Company included the $600 million paid in connection with the Settlement, damages and costs of legal expenses related to "the conduct giving rise to the Civil Qui Tam Actions, the Criminal Action, and other suits relating to the Covered Conduct and Criminal Conduct."  (*Id.* ¶ 200.) The Complaint alleges that "Criminal Conduct" occurred from 2000 through 2005. There is no possible "essential link" authorizing this conduct in proxies filed years later.

> **d.**    **The Section 14(a) Claim Fails To Adequately Plead The Required State Of Mind**

Plaintiffs must plead facts creating a "strong inference" of the required state of mind in the release of materially false proxy statements.  *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000); *In re Textainer P'ship Sec. Litig.*, No. C-05-0969 MMC, 2005 WL 3801596, at *4–5 & n.3 (N.D. Cal. Mar. 8, 2005); *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d at 1213 (dismissing Section 14(a)**Error! Bookmark not defined.** claim where "plaintiffs fail[ed] to plead the required state of mind with particularity as to each defendant, as required by the PSLRA.").  Plaintiffs failed to include *any* particularized allegations about the role of each Individual Defendant in the alleged wrongdoing.  Because Plaintiffs have failed to plead facts supporting an inference that *each* Defendant knew of or recklessly disregarded any material misrepresentation or omission, Plaintiffs' Section 14(a) claim must be dismissed.

**B.**    **Plaintiffs' Section 29(b) Claim Fails**

Plaintiffs' Section 29(b) claim fails because the Complaint does not allege any unlawful transactions that are subject to rescission.  "[R]escission of a contract pursuant

1  to Section 29(b) is not available without an underlying violation of the substantive

2  provisions of the securities laws." *Pompano-Windy City Partners, Ltd. v. Bear Stearns*

3  *& Co.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992) (citing *National Union Fire Ins. Co.*

4  *v. Turtur*, 892 F.2d 199, 206 n.4 (3d Cir.1989)).  To void an agreement under Section

5  29(b), a party must establish that: (1) the contract involved a prohibited transaction, (2)

6  he is in contractual privity with the defendant, and (3) he is in the class of persons that

7  the Act was designed to protect.  *Id.*  Plaintiffs seek rescission of unspecified

8  employment and compensation contracts pursuant to Section 29(b) of the Exchange Act.

9  **1.**    **No Underlying Securities Violation**

10  Plaintiffs' Section 29(b) claim must be dismissed because they have failed to

11  adequately plead an underlying securities violation.[7]  *See Log On America, Inc. v.*

12  *Promethean Asset Mgmt. LLC*, 223 F. Supp. 2d 435, 452 (S.D.N.Y. 2001) (dismissing

13  plaintiff's claim for rescission and finding that plaintiff had not adequately pled

14  "prohibited transaction" element); *RWP Consolidated, L.P. v. Salvatore*, 534 F. Supp.

15  2d 364, 368 (D. Conn. 2008) ("[B]efore reaching the voiding remedy of § 29(b), there

16  must first be an underlying securities violation."); *In re U.S. Grant Hotel Assocs., Ltd.*

17  *Sec. Litig.*, 740 F. Supp. 1460, 1466 (S.D. Cal. 1990) (dismissing Section 29(b) claim

18  where Section 10(b) claim was dismissed).  Here, Plaintiffs' Section 14(a)**Error!**

19  **Bookmark not defined.** claim must be dismissed and thus is not a predicate for the

20  Section 29(b) remedy.[8]

21

22  _____

23  [7]  In addition, because Plaintiffs' Section 14(a) claim is properly characterized as a
direct claim, Plaintiffs (as individual shareholders) fail to satisfy the contractual privity
element for Section 29(b).  The relief Plaintiffs could seek under Section 29(b) would be
24  limited to rescission of their individual proxies.  *See Mills v. Electric Auto-Lite Co.*, 396
U.S. 375, 388 n.11 (1970).

25  [8]  While Plaintiffs refer to Rule 10b-5 in Count I of the Complaint, they have not
brought such a claim and have not alleged with the requisite particularity facts sufficient
26  to establish a violation of that provision or Section 10(b), which requires:  (1) a material
misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of
27  a security; (4) reliance or transaction causation; (5) economic loss; and (6) loss
causation.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).

28

Gibson, Dunn &
Crutcher LLP

18

1

## 2.    No Relationship Between Violation And Contract

Even if Plaintiffs could establish a violation of the Exchange Act—which they cannot—they must also demonstrate a direct relationship between that violation and the performance of a contract (*i.e.*, the violation must be "inseparable from the performance of the contract" rather than "collateral or tangential to the contract").  *See GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 201 (3d Cir. 2001); *see also In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d 873, 880–81 (D. Md. 2005) (applying Section 29(b) to dismiss claim because performance of the contracts was not necessarily unlawful and the activities of which plaintiffs complained were "collateral and tangential to" the contracts).  Here, Plaintiffs refer generally to employment and compensation contracts, including the 2008 Incentive Award Plan, and "all stock and options contracts entered by the Company," but do not provide any facts related to the alleged agreements (including the dates on which they were executed and by whom).  Plaintiffs do not allege that the contracts themselves are unlawful, and Defendants can and have performed their employment contracts without committing any violation of the Exchange Act.  Even if Plaintiffs could establish such violations—which they cannot— the violations would be collateral or tangential to the lawful agreements between the parties and separable from the performance of the contracts.  Plaintiffs have failed to adequately allege Section 29(b)'s prohibited transaction element, and the claim must be dismissed.

## IV.  THE COURT SHOULD REFUSE SUPPLEMENTAL JURISDICTION

Plaintiffs have applied a veneer of federal claims in an attempt to circumvent the derivative action already pending in Delaware state court.  The federal claims do not withstand the scrutiny of Rule 12(b)(6), and the Court should decline to exercise supplemental jurisdiction over any remaining state law claims.  Under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original

jurisdiction."  While the decision is discretionary, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point to declining to exercise jurisdiction over the remaining state-law claims." *Sanford v. Memberworks, Inc.*, No. 09-55502, 2010 WL 4158602, at *6 (9th Cir. Oct. 25, 2010).  This is the "usual case" and there is no reason to retain jurisdiction over any state law claims, particularly because the claims are already pending in Delaware state court.[9]

Delaware law applies to Plaintiffs' fiduciary duty claims under the "internal affairs doctrine" because Allergan is a Delaware corporation.  *See* Cal. Corp. Code § 2116; *Atherton v. FDIC*, 519 U.S. 213, 224 (1997) ("States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care.").  Because Delaware law applies, Delaware courts are in the best position to interpret and apply that law.  *See Comm. Concerning Cmty. Improvement v. Modesto*, 583 F.3d 690, 715 (9th Cir. 2009) (declining supplemental jurisdiction over state law claims where claims involved statutory interpretation and state law analysis); *Chambers v. Gen. Motors Corp.*, No. 07cv1224-L (WMc), 2007 WL 4181264, at *3 (S.D. Cal. Nov. 21, 2007) (declining supplemental jurisdiction over state law claims because state court was in best position to apply and interpret that law).

Judicial economy further favors Delaware courts.  In light of the procedural posture, very few resources have yet been spent litigating the state law claims before this Court.  *See Wren v. Sletten Constr. Co.*, 654 F.2d 529, 536 (9th Cir. 1981) (reversing district court decision to exercise pendent jurisdiction over remaining state

---

[9]  Although Plaintiffs also allege diversity as a basis for federal jurisdiction (Compl. ¶ 20), there is no complete diversity because both Plaintiff Rosenbloom and Defendant Evans are citizens of Pennsylvania.  (*Id.*  ¶¶ 22, 39); 28 U.S.C. § 1332(a)(2); *Siler v. Dillingham Ship Repair*, 288 F.App'x 400, 401 (9th Cir. 2008) (affirming dismissal for lack of jurisdiction where complaint failed to allege complete diversity).

---

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

Gibson, Dunn &
Crutcher LLP

1   law claims where the state law issues had not been briefed or illuminated in oral

2   argument).  In fact, the state law claims are currently pending before Delaware

3   Chancery Court in a lawsuit that was filed before the action pending before this Court.

4   (*See LMPERS*, No. 5795-VCL.)  It would be duplicative and cause the parties to incur

5   needless expense if this Court were to invoke supplemental jurisdiction and require the

6   litigation of state law claims in Delaware state court and before this Court.

## V.  PLAINTIFFS' STATE LAW CLAIMS FAIL

8   The Court need not address Plaintiffs' state law claims if it either grants

9   Allergan's motion for failure to plead demand futility or dismisses the federal claims and

10  does not exercise supplemental jurisdiction.  Even if the Court were to address the state

11  law claims, however, they must be dismissed for failure to state a claim.  Plaintiffs

12  assert three claims under Delaware law, for breach of fiduciary duty, corporate waste

13  and unjust enrichment (Counts II, III and IV).  In addition, Plaintiffs assert a claim

14  against two Directors for insider trading under California law (Count VI).  Each of these

15  claims is addressed below.

16  **A.      Failure To State Claim For Breach Of Fiduciary Duty**

17  Corporate directors are presumed to have acted on an informed basis with the

18  good faith belief that their actions were taken in the company's best interests.  *Potter v.*

19  *Hughes*, 546 F.3d 1051, 1059 n.3 (9th Cir. 2008) (quoting *Aronson v. Lewis*, 473 A.2d

20  805, 812 (Del. 1984)).  This "powerful presumption" protects a director's decisions

21  "unless it cannot be 'attributed to any rational business purpose.'"  *McMichael v. U.S.*

22  *Filter Corp.*, No. EDCV 99-182VAP (MCX), 2001 WL 418981, at *9 (C.D. Cal. Feb.

23  23, 2001) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993)).

24  A complaint that alleges mere approval of a particular corporate action, therefore,

25  ordinarily requires dismissal.  *See Potter*, 546 F.3d at 1059; *Greenspun v. Del E. Webb*

26  *Corp.*, 634 F.2d 1204, 1210 (9th Cir. 1980).

27  To survive a motion to dismiss, Plaintiffs must rebut this presumption by alleging

28  sufficient, well-pleaded *facts* to show that the Directors failed to comply with their

21

1   duties of due care or loyalty.  *In re Silicon Graphics*, 183 F.3d at 990 (dismissing

2   complaint where plaintiff had "not pleaded with particularity facts showing that the

3   Board approved, acquiesced in, or otherwise supported" the alleged wrongdoing);

4   *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50 (2009) ("Although for the purposes of a

5   motion to dismiss we must take all of the factual allegations in the complaint as true, we

6   'are not bound to accept as true a legal conclusion couched as a factual allegation.'"

7   (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A plaintiff must

8   plead facts that are more than "merely consistent with a defendant's liability."  *Iqbal*,

9   129 S. Ct. 1937, 1949 (internal quotations omitted).

10       Moreover, Delaware law allows a corporation—as Allergan has done—to limit

11   directors' personal liability to intentional breaches of their fiduciary duties.  *See* 8 *Del.*

12   *C.* § 102(b)(7); *Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 243–44 (Del. 2009)

13   (where corporate governance documents contain an exculpatory provision, directors are

14   only liable for "knowingly and completely fail[ing] to undertake their responsibilities").

15   In order to state a claim for monetary damages, Plaintiffs must therefore allege facts to

16   show that the Directors ***intentionally*** breached their fiduciary duties.  Therefore, to state

17   a claim for violations of the duty of loyalty, a plaintiff must adequately allege either that

18   (1) the board members affirmatively committed acts that violated their duty of loyalty to

19   the company, or (2) the board members failed, by acting in bad faith, to adequately

20   monitor corporate operations.  *Id.* [10]

21   **B.    Plaintiffs Attempt To State A Claim For Inaction**

22       Plaintiffs have not alleged facts demonstrating a wrongful action by the Directors.

23   Instead, the Complaint generally alleges that the Board "approved" the an off-label

24

25   [10]  Although one Board member—Defendant Pyott—is also an officer of the Company,
    the same standard of "bad faith" applies to each of the Directors.  *See Benihana of*
26   *Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 191 (Del. Ch. 2005) (applying the same
    duty of loyalty to both officers and directors); *see also Midland Grange No. 27 Patrons*
27   *of Husbandry v. Walls*, No. 2155-VCN, 2008 Del. Ch. LEXIS 28, at *43–44 (Del. Ch.
    2008) (applying the bad faith standard to corporate officers).

28

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

marketing scheme.  (Compl. ¶¶ 136, 137.)  But Plaintiffs provide no detail as to which Board members approved the alleged scheme, when any plans were approved, what the content of those plans was, or any other particularized facts concerning the alleged strategic plans.  Merely alleging that the Board approved a corporate policy is insufficient to state a claim for breach of the duty of loyalty.  *Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (holding that dismissal is appropriate where a complaint "alleges conclusorily that 'each of the [directors] breached their fiduciary duties of loyalty and care in approving and/or acquiescing in'" actions that unfairly hurt shareholders).[11]

In their Complaint, Plaintiffs allege that Allergan maximized sales of BOTOX® for off-label use through its implementation of several tactics, such as: attempting to expand the definition of the approved use to treat cervical dystonia (Am. Compl. ¶ 86-88); sponsoring CME seminars regarding off-label usage (*id.* ¶ 96); assisting with patient and physician reimbursement from health care plans (*id.* ¶¶ 91-93); funding educational organizations that provide scientific and clinical information on neurotoxins to physicians (*id.* ¶ 96); and recruiting advocates to lobby Medicare and Medicaid to expand their coverage of BOTOX® (*id.* ¶ 94).  Even if these actions occurred or amounted to prohibited marketing—which Allergan disputes—these conclusory allegations do not establish that the ***Board*** intentionally breached their fiduciary duties by undertaking any illegal action.  *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006).

In fact, Plaintiffs' allegations give rise to the opposite inference; that is, that there is no reason that the Board would have known of the specific tactics purportedly engaged in by various Allergan employees.  Allergan is a global company, publicly

---

[11]  Rather than alleging particularized facts, Plaintiff merely parrots allegations from the *qui tam* complaints, the criminal Information filed in the Government Investigation (the "Information") (Ex. J), and the DOJ's press release (Ex. K).  This repetition of *conclusions* from others does not satisfy Plaintiffs' obligation to plead *facts* with particularity.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

1   traded with more than 307 million shares of common stock outstanding.  (Compl. ¶

2   152.)  The Company has commercialized many successful products in addition to

3   BOTOX®, including RESTASIS® (cyclosporine ophthalmic emulsion), LUMIGAN®

4   (bimatoprost ophthalmic solution), JUVEDERM® (a family of dermal fillers), and LAP-

5   BAND® (a gastric banding system used in obesity surgeries).  (*Id.* ¶ 26.)  The Company

6   is continually working to discover and develop new and innovative pharmaceuticals,

7   biologics, and medical devices.  (*Id.*)  Plaintiffs cannot simply assume that the Board

8   breached their fiduciary duties without alleging any specific facts that, if proven, show

9   that the Board approved a specific strategic plan to promote the off-label use of

10  BOTOX®.  *Robotti & Co., LLC v. Liddell*, No. 3128-VCN, 2010 WL 157474, at *11

11  (Del. Ch. 2010) ("There is a presumption that directors have acted in accordance with

12  [their duties], and this presumption cannot be overcome unless the complaint pleads

13  specific facts demonstrating otherwise.").

14          Without specific allegations of Director action, Plaintiffs' Complaint thus rests on

15  the theory that the Board should be liable for corporate losses because the Directors

16  failed to adequately monitor operations.  But liability for failing to adequately monitor

17  corporate operations is "possibly the most difficult theory in corporation law upon

18  which a plaintiff might hope to win a judgment." *Caremark*, 698 A.2d at 967.  A

19  plaintiff only states a claim for failure to monitor corporate operations if it establishes

20  that the directors either knew or should have known that the company was violating the

21  law; and then made no good faith effort to prevent or remedy the situation which, in

22  turn, proximately resulted in the alleged losses.  *Id.* at 971.  Where such inattention or

23  ignorance is the basis for liability, a plaintiff must allege a "sustained or systematic

24  failure of the board to exercise oversight." *Id.*; *see also Desimone*, 924 A.2d at 935

25  ("[T]o hold directors liable for a failure in monitoring, the directors have to have acted

26  with a state of mind consistent with a conscious decision to breach their duty of care.").

27  In short, a plaintiff must show that the directors' failure to monitor corporate operations

28  was the product of ***bad faith***. *Desimone*, 924 A.2d at 935.

Gibson, Dunn &
Crutcher LLP

24

## C.     The Complaint Does Not Adequately Allege Any Bad Faith

While the Complaint makes the conclusory allegation that the Directors breached their duties of loyalty to the Company, Plaintiffs do not adequately allege what the Directors did or failed to do that would constitute such a violation.  To allege bad faith, Plaintiffs must plead that "the directors ***knew*** they were not discharging their fiduciary obligations or that the directors demonstrated a ***conscious*** disregard for their responsibilities."  *In re Citigroup Shareholder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009) (first emphasis added).  A director acts with bad faith only when he or she "intentionally acts with a purpose other than that of advancing the best interests of the corporation, . . . acts with the intent to violate applicable positive law, or . . . intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his [or her] duties."  *In re Walt Disney Co.*, 906 A.2d at 67 (internal quotation marks omitted).

Plaintiffs fail to allege with particularity any facts demonstrating that any of the Individual Defendants consciously disregarded his or her responsibilities such as by failing to act in the face of a known duty to act or by utterly failing to discharge his or her responsibilities.  *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (director oversight liability requires that the directors utterly failed to implement any reporting or information system or controls, or having implemented such system or controls consciously failed to monitor operations); *Caremark*, 698 A.2d at 971 (plaintiff must show that directors knew or should have known that violations of law were occurring, and that the directors took no steps in a good faith effort to prevent or remedy that situation, and that such failure resulted in the complained of losses).  This is because "neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf."  *Caremark*, 698 A.2d at 969.

Gibson, Dunn & Crutcher LLP

25

Rather than alleging any facts showing that the Individual Defendants consciously disregarded their duties, Plaintiffs point to (1) unspecified strategic plans, (2) FDA warning letters addressing topics unrelated to the Government Settlement, and (3) the Government Settlement.  Nowhere in the Complaint do Plaintiffs connect these facts to the Board's knowledge or involvement in the alleged off-label marketing that triggered Plaintiffs' lawsuit.  *See Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003) (finding no liability where a "complaint does not plead a single fact suggesting red—or even yellow—flags were waved").  Without any showing that the Individual Defendants consciously disregarded their responsibilities by acting in bad faith, the Complaint fails to state a claim.

### 1.    Allegations Regarding Strategic Plans Do Not Establish The Directors' Bad Faith

Plaintiffs' allegations regarding the Company's strategic plans fall far short of pleading with the requisite particularity that the Board approved the plans or that the approval as alleged amounted to bad faith.  "[I]mportantly, there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."  *Lyondell Chem. Co.*, 970 A.2d at 243.  The Complaint does not allege what was contained in the plans, how they were approved, or which (if any) Board members approved them.

General allegations regarding other public companies simply do not satisfy Plaintiffs' obligation to provide particularized facts demonstrating that the Board members here "knowingly and completely failed to undertake their responsibilities" and thus breached their duties of loyalty.  *Id.* at 243-44; *King v. Baldino*, 648 F. Supp. 2d 609, 623–24 (D. Del. 2009) (finding that complaint did not set forth particularized allegations that board authorized implementation of marketing scheme where plaintiff provided no facts supporting the allegation).  While the Complaint suggests that the *qui tam* complaints or Information support Plaintiffs' allegation that the Board approved strategic plans that sought to take advantage of off-label marketing, the Information and

Gibson, Dunn & Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

1    *qui tam* complaints do not contain any allegation that the ***Board*** approved or

2    implemented any improper scheme.  (Exs. J, L–N).

3      Even if the Board had approved a plan that led to the misbranding of

4    BOTOX®—which it did not—Plaintiffs fail to adequately allege that those decisions

5    violated the business judgment rule.  Delaware law presumes that in taking corporate

6    action, disinterested directors "act[] on an informed basis, in good faith and in the

7    honest belief that the action[s] taken [are] in the best interests of the company,"

8    *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) *overruled on other grounds by*

9    *Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000), and it is Plaintiffs' burden to rebut

10   that presumption.  It is the decision-making *process* rather than the content of corporate

11   decisions that determines whether the business judgment rule affords directors

12   protection.  *See Caremark*, 698 A.2d at 967.  "Whether a judge or jury considering the

13   matter after the fact, believes a decision substantively wrong, or degrees of wrong

14   extending through stupid to egregious or irrational, ***provides no ground for director***

15   ***liability***, so long as the court determines that the process employed was either rational

16   or employed in a good faith effort to advance corporate interests."  *Citigroup*, 964 A.2d

17   at 122 (emphasis added) (internal quotations omitted).  Critically, Plaintiffs have alleged

18   no facts regarding any decision-making processes by the Board.  *See id.* (explaining that

19   the business judgment rule "prevents judicial second guessing" of a decision if

20   shareholders fail to establish that directors employed an irrational decision-making

21   process).

22     **2.  FDA Warning Letters Do Not Show Bad Faith By The Directors**

23     Plaintiffs next suggest that the Board had knowledge of various violations when it

24   received FDA warning letters.  (Compl. ¶ 106.)  None of the letters relates to the

25   therapeutic use of BOTOX® or the marketing practices that were the focus of the

26

27

28

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

Government Settlement that triggered Plaintiffs' Complaint.[12]  The letter dated September 6, 2005, addresses superiority claims regarding LUMIGAN®, which is an ophthalmic pharmaceutical used for the reduction of elevated intraocular pressure and is not related to BOTOX®.  (Ex. Q.)  The letter dated August 17, 2009, concerns a medical journal advertisement for ACZONE®, which is indicated for the topical treatment of acne vulgaris and is not related to BOTOX®.  (Ex. R.)

Both of the letters explicitly requested a written response, and yet Plaintiffs fail to plead any facts regarding Allergan's responses.  Plaintiffs do not allege that Allergan failed to carry out the actions requested in the letters or that the Company did not take appropriate responsive measures.  *See In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 174 (D. Del. 2009) (plaintiff failed to allege particularized facts sufficient to show a substantial likelihood of liability under *Caremark* where plaintiff "identifie[d] a number of so-called 'red flags,'" but "fail[ed] to identify what the Directors actually knew about the 'red flags' and how they responded to them").  An allegation of the existence of two disparate FDA warning letters during an eight-year period, without particularized allegations as to the Directors' knowledge regarding the letters, the resolutions of the issues raised by the letters, or any connection to the Government Settlement, is insufficient to allege that the Directors "consciously disregarded their duties or otherwise acted in bad faith."  *King*, 648 F. Supp. 2d at 623 (granting

---

[12]  The Complaint alleges in paragraph 106 that the Directors were put on notice by "two FDA warning letters," citing the September 5, 2005 LUMIGAN® letter and the August 17, 2009 ACZEON® letter.  (Compl. ¶ 106).  Although not cited in paragraph 106, the Complaint also references at other points two additional letters, which likewise do not involve the conduct underlying the Government Settlement.  (Compl. ¶¶ 79, 80.) The first is an August 22, 2001 letter, which addressed promotional activities and materials related to BOTOX but not alleged misbranding or off-label usage, which were the activities that were the subject of the Government Settlement.  (Ex. O.; Compl. ¶ 79.)  The second letter, dated June 23, 2003, related to BOTOX Cosmetic and not the therapeutic use of BOTOX, which is the use that is at issue here.  (Exs P, K.)  In that letter, the FDA alleged that the Company falsely identified the product as a cosmetic treatment, failed to provide material facts about its use, and minimized risk information.  (Ex. P.)  Neither the August 22, 2001 nor the June 23, 2003 letter concern the misbranding or off-label promotion activities alleged in the Complaint.

---

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

1    judgment on claim that relied on purported red flags to show that board consciously

2    failed to monitor or oversee its operations because plaintiff failed to plead the existence

3    of "facts showing that the board . . . was aware that [the company's] internal controls

4    were inadequate, that these inadequacies would result in illegal activity, and that the

5    board chose to do nothing about problems it allegedly knew existed." (internal quotation

6    marks omitted)).

7         In *King v. Baldino*, 648 F. Supp. 2d at 623, the court addressed allegations

8    similar to those found in Plaintiffs' Complaint.  There, the plaintiff alleged that the

9    defendants—members of the board of a pharmaceutical company—through their

10   inaction, allowed FDA regulatory violations to occur over a six-year period, which

11   ultimately resulted in a criminal guilty plea by the company and financial settlements.

12   Specifically, the plaintiff's complaint alleged that the defendants allowed illegal drug

13   marketing practices to continue despite "red flags" that included: allegations that sales

14   of one drug increased in one year by 92%; an intra-company audit concluded that

15   violations of FDA mandates had taken place; and several regulators had launched

16   investigations regarding the alleged illegal marketing.  *Id.* at 623.  The court addressed

17   each of the alleged red flags and noted that "[a] significant problem with plaintiff's

18   complaint is the failure to identify which individual director defendants breached his or

19   her fiduciary duties, and when those duties were breached."  *Id.* at 623.  The court held

20   that the "plaintiff fail[ed] to plead particularized facts demonstrating that the Board was

21   aware of the actions of the alleged 'principal wrongdoers' and consciously failed to act

22   in light of that knowledge."  *Id.* at 626; *Caremark*, 698 A.2d at 971–72 ("If the

23   directors did not know the specifics of the activities that lead to the indictments, they

24   cannot be faulted."); *Bronstein v. Austin*, No. 07 C 3984, 2008 U.S. Dist. LEXIS

25   42881, at *16-17 (N.D. Ill. May 30, 2008) (finding that complaint fell short of pleading

26   particularized facts establishing bad faith where plaintiff did not allege that directors

27   failed to ensure that management responded to FDA warning letter).

28

### 3.     The Criminal Guilty Plea Does Not Establish Bad Faith By The Directors

Plaintiffs also point to Allergan's agreement to plead guilty to a single strict liability misdemeanor misbranding charge as support for the claim that the Directors knowingly failed to undertake their responsibilities and breached their duties of loyalty. (Compl. ¶ 109.)  Notably, the plea agreement, as part of the Government Settlement, concerns a strict liability offense that removes intent as an element of the offense. *United States v. Dotterweich*, 320 U.S. 277, 281 (1943) (holding that strict liability "dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing").  Even if it is assumed that the Company—as alleged in the Information— "promoted BOTOX® for unapproved uses such as headache and pain at a time when the efficacy of the drug to treat those conditions had not been demonstrated by clinical trials" (Compl. ¶ 84), the resulting guilty plea for misdemeanor misbranding does not speak to the ***Board's*** intent with respect to allegedly "widespread" off-label marketing practices.  (*Id.* at ¶ 117.)  Simply put, without any indication of intent by the Company, let alone the Directors, the fact that Allergan pleaded guilty to a strict liability regulatory offense does not contradict that the Directors acted honestly and in good faith.

Furthermore, "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Desimone*, 924 A.2d at 940 (citing *Stone*, 911 A.2d at 373 (recognizing that a good faith exercise of oversight responsibility may not invariably prevent employees from causing harm)).  There are absolutely no allegations by the Government about Directors.  (Compl. ¶ 106.)  To the contrary, the most reasonable and logical inference to be drawn from Plaintiffs' allegations is that the Board acted in good faith and was reasonably informed, based on Plaintiffs' concessions that the Company denies liability for the Government's civil claims (Compl. ¶ 151.) and Allergan already had in place a compliance program that, as part of the Government Settlement, the Company agreed to keep in place and supplement.  (Compl. ¶ 76; Ex. S.)

1       Courts routinely reject claims, such as those made in Plaintiffs' Complaint, that

2    "[w]ith the benefit of hindsight, . . . seek[] to equate a bad outcome with bad faith."

3    *Stone*, 911 A.2d at 373 ("The lacuna in the plaintiffs' argument is a failure to recognize

4    that the directors' good faith exercise of oversight responsibility may not invariably

5    prevent employees from violating criminal laws, or from causing the corporation to

6    incur significant financial liability, or both, as occurred in *Graham*, *Caremark* and this

7    very case."); *In re Citigroup*, 964 A.2d at 128 (same); *King*, 648 F. Supp. 2d at 625−26

8    (rejecting plaintiff's contention that criminal and legal settlement were red flags).

9    Without facts connecting the outcome of the Government Settlement with any bad-faith

10    inaction by the Directors, Plaintiffs' claim for breach of fiduciary duty must be

11    dismissed.

12  **D.**    **Section 309 Does Not Apply To A Delaware Corporation**

13       Plaintiffs' claim under California Corporations Code section 309 (Count VII) can

14    be rejected outright because section 309 does not apply to Allergan because it is a

15    Delaware corporation.  Cal. Corp. Code § 2116 (codifying internal affairs doctrine); *In*

16    *re Textainer P'Ship Sec. Litig.*, No. C 05-0969 MMC, 2005 WL 1791559, at *5 (N.D.

17    Cal. July 27, 2005) ("[C]ourts have consistently applied the internal affairs doctrine to

18    claims for breach of fiduciary duty.").

19  **E.**    **The Complaint Does Not State A Claim For Aiding And Abetting**

20       The only claim for which Plaintiffs specifically allege that Defendants may have

21    "aided and abetted" any wrongdoing is the general breach of fiduciary duty claim.

22    (Compl. ¶¶ 158-64.)  Under Delaware law, a valid claim for aiding and abetting a

23    breach of fiduciary duty requires: "(1) the existence of a fiduciary relationship, (2) the

24    fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly

25    participated in a breach, and (4) damages to the plaintiff resulted from the concerted

26    action of the fiduciary and the non-fiduciary."  *Jackson Nat. Life Ins. Co. v. Kennedy*,

27    741 A.2d 377, 386 (Del. Ch. 1999).  Plaintiffs have failed to adequately plead a claim

28    under this standard for three main reasons.  First, as discussed above, Plaintiffs failed to

31

adequately plead a breach of fiduciary duty by any of the Defendants.  Second, Plaintiffs have not alleged any intentional conduct by any Defendant necessary to establish an aiding and abetting claim.  *See Malpiede v. Townson*, 780 A.2d 1075, 1097 n.78 (Del. 2001) (comparing cases).  Third, and most importantly for this particular claim, each of the Individual Defendants were or are directors, owing independent fiduciary duties to the Company.  Accordingly, Plaintiffs are entirely unable to allege that each defendant "is not a fiduciary" as required to establish a claim for aiding and abetting.  *Jackson Nat. Life Ins. Co.*, 741 A.2d at 386.

## F.    Plaintiffs Have Not Stated A Claim For Waste Of Corporate Assets

The standard for pleading corporate waste under Delaware law is "high and the test is extreme . . . [and] very rarely satisfied by a shareholder plaintiff."  *In re 3COM Corp. S'holders Litig.*, No. C.A. 16721, 1999 WL 1009210, at *4 (Del. Ch. Oct. 25, 1999) (internal quotations omitted).  A claim for corporate waste involves "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."  *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (internal quotation marks omitted); *see White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001) (corporate waste claim requires plaintiff to show that expenditures were egregious and irrational).

Plaintiffs claim that the Individual Defendants committed corporate waste by allowing the Company to "illegally promot[e] Allergan's flagship product BOTOX®, for uses not approved by the [FDA]."  (Compl. ¶ 1.)  This conclusory statement— without any underlying factual support—does not satisfy the "high hurdle required" to establish a claim for waste.  *In re Walt Disney*, 906 A.2d at 75.  Plaintiffs never specify what corporate assets were wasted, other than by implicitly referencing the Government Settlement.  Nowhere do Plaintiffs assert that the legal costs or settlement served no corporate purpose.  *Boeing By Levit v. Shrontz*, No. 11273, 1992 WL 81228, at *4 (Del. Ch. Apr. 20, 1992) (finding a waste claim arising out of a settlement insufficiently pled when "there is nothing to suggest that the amounts [the company] agreed to pay

32

Gibson, Dunn & Crutcher LLP

1   were so enormous by comparison to the company's potential liability that no one of

2   sound mind would have agreed to the settlement").  Here, a claim for corporate waste

3   cannot stand because "[c]ourts are ill-fitted to attempt to weigh the 'adequacy' of

4   consideration under the waste standard."  *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del.

5   Ch. 1997).

6   **G.     The Complaint Does Not State A Claim For Unjust Enrichment**

7          Plaintiffs fail to point to any factual allegations sufficient to establish the elements

8   of unjust enrichment (enrichment, impoverishment, a relation between those facts, the

9   absence of justification, and no remedy).  *See Jackson*, 741 A.2d at 393.  Instead,

10   Plaintiffs state without elaboration that "the Individual Defendants were unjustly

11   enriched at the expense of and to the detriment of Allergan."  (Compl. ¶ 172.)  Plaintiffs

12   contend that the Directors were unjustly enriched "as a result of the compensation and

13   director remuneration they received," yet nowhere do Plaintiffs explain how any such

14   compensation was unjust.  The Directors provided services to Allergan and the

15   Complaint does not allege that the Directors were compensated in a manner that was

16   disproportionate to the value of their services.  *See Fleer Corp. v. Topps Chewing Gum,*

17   *Inc.*, 539 A.2d 1060, 1062 (Del. 1988) ("Before the court may properly order

18   restitution, it must find that the defendant was unjustly enriched at the expense of the

19   plaintiff.").

20   **H.     The Insider Trading Allegations Are Specious**

21          Plaintiffs have failed to allege facts that would support entitlement to relief under

22   California Corporations Code section 25402, which requires that Plaintiffs allege that

23   Pyott and Herbert acted with actual knowledge by trading because they possessed

24   material, adverse, nonpublic information.  Plaintiffs do not ever identify what material

25   nonpublic information Pyott and Herbert possessed at the time of their trades.  In fact,

26   Plaintiffs do not even specify when, exactly, the trades occurred, other than to cite a

27   range that spans several years.  (Compl. ¶ 123.)  Specifically, there is no allegation that

28   in 2006, when Pyott or Herbert sold Allergan stock on some unspecified date, they

33

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED COMPLAINT**

1  knew that the Company was violating the law or that four years later the Company

2  would agree to enter a plea agreement to resolve a DOJ investigation that had not yet

3  begun.

4      Even if Pyott and Herbert were required to predict the future, this claim

5  additionally fails because under section 25502.5(a), the offending director is only liable

6  to the company for damages in "the difference between the price at which the security

7  was purchased or sold and the market value which the security would have had at the

8  time of the purchase or sale if the information known to the [director] had been publicly

9  disseminated prior to that time"  Cal. Corp. Code § 25502.5.  When investors learned of

10 the Government Settlement, Allergan's stock price was ***unaffected***.  (Ex. T.)  Thus, the

11 Government Settlement did not cause investors to change the price of Allergan's stock.

12 So, even though Plaintiffs allege that had the alleged material "information been

13 generally available, it would have significantly reduced the market price of Allergan

14 shares at that time," the Court can take judicial notice of the ***facts*** which are to the

15 contrary.  (Compl. ¶ 177.)

## VI.  CONCLUSION

17     The Individual Defendants request that the Court dismiss this derivative action

18 because Plaintiffs have failed to make a demand, or in the alternative dismiss the

19 Section 14(a) and Section 29 claims for failure to state a claim, dismiss all claims based

20 on a lack of diversity jurisdiction, and decline to exercise supplemental jurisdiction over

21 the state law claims.  If the Court is inclined to exercise supplemental jurisdiction,

22 Individual Defendants request that the state law claims be dismissed for failure to state a

23 claim and that the entire Complaint be dismissed with prejudice.

24     Respectfully submitted,

25 Dated:  December 8, 2010     GIBSON, DUNN & CRUTCHER LLP

26     WAYNE W. SMITH
    JEFFREY H. REEVES

27     KRISTOPHER P. DIULIO

28     By:/s/ Wayne W. Smith
    Wayne W. Smith

Gibson, Dunn & Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for David E. I. Pyott; Herbert W. Boyer, Ph.D.; Louis J. Lavigne, Jr.; Gavin S. Herbert; Stephen J. Ryan, M.D.; Leonard D. Schaeffer; Michael R. Gallagher; Robert A. Ingram; Trevor M. Jones, Ph.D.; Dawn E. Hudson; Russell T. Ray; Deborah Dunsire, M.D.; Handel E. Evans; Ronald M. Cresswell, Ph.D.; Louis T. Rosso; Karen R. Osar; and Anthony H. Wild, Ph.D.

100976493_2.DOC

Gibson, Dunn & Crutcher LLP

35

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

# CERTIFICATE OF SERVICE

I, Dena Kennedy, declare as follows:

I am employed in the County of Orange, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 3161 Michelson Drive, Irvine, California 92612-4412 in said County and State.  On December 8, 2010, I served the following document(s):

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE; AND DECLARATION OF KRISTOPHER P. DIULIO

on the parties stated below, by placing a true copy thereof in an envelope addressed as shown below by the following means of service:

| | |
|---|---|
| Brett Steckler | Debra S. Goodman |
| Jeffrey J. Ciarlanto | Law Office of Debra S. Goodman PC |
| The Weiser Law Firm PC | 1301 Skip Pack Pike Suite 7A-133 |
| 121 North Wayne Avenue, Suite 100 | Blue Bell, PA  19422 |
| Wayne, PA  19087 | |

☒ **BY MAIL**:  I placed a true copy in a sealed envelope addressed as indicated above, on above-mentioned date.  I am familiar with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY PERSONAL SERVICE**:  I placed a true copy in a sealed envelope addressed to each person[s] named at the address[es] shown and giving same to a messenger for personal delivery before 5:00 p.m. on above-mentioned date.

☒ I am employed in the office of Kristopher P. Diulio, a member of the bar of this court, and that the foregoing document(s) was(were) printed on recycled paper.

☒ **(FEDERAL)**    I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 8, 2010.

_____
Dena Kennedy

36

CERTIFICATE OF SERVICE

Gibson, Dunn & Crutcher LLP