Exhibit A

# PASKOWITZ & ASSOCIATES

60 East 42nd Street--46th Floor

New York, New York 10165

TEL: (212) 685-0969

FAX: (212) 685-2306

lpaskowitz@pasklaw.com

October 7, 2010

By Overnight Mail
The Board of Directors of Allergan, Inc.
c/o David E.I. Pyott
Chairman of the Board
2525 Dupont Drive
Irvine, California 92612

Re:   Demand on the Allergan, Inc. Board of Directors to Take Legal Action With
Respect to the Conduct of Certain Officers, Directors and Employees

To the Members of the Allergan, Inc. Board of Directors:

We represent Ann G. Field, a longtime Allergan, Inc. ("Allergan" or the "Company") shareholder. On behalf of our client, this letter constitutes a Demand upon the Allergan Board of Directors (the "Board") to take appropriate action with respect to the wrongdoing by certain past and present officers, directors, employees and any potentially responsible third parties who damaged the Company. Therefore, we demand that, after due investigation, the Board initiate legal action to recover damages for breaches of fiduciary duty by officers, directors and employees responsible for causing the conduct that resulted in civil and criminal charges alleging that Allergan illegally engaged in the misbranding of Botox and in the off-label marketing of Botox, causing claims for reimbursement to be filed under various government healthcare programs that were ineligible for reimbursement. Such conduct (and related matters) has caused Allergan to agree to plead guilty to a federal misdemeanor and to agree to pay $600 million in fines and civil restitution. In addition, we demand that the Board quickly implement enhancements to corporate governance policies and procedures to reduce the risk of similar conduct occurring in the near future.

The scope of such an investigation, in our opinion, should include reviewing the actions, or any culpable inaction, of former and present officers, directors, employees and any potentially responsible third parties. In our view, it would unfair for the public shareholders to shoulder the

EXHIBIT A
PAGE 8

David E.I. Pyott, Chairman
Allergan, Inc. Board of Directors
October 7, 2010 -- Page 2

financial burden of such harms, and for responsible individuals to share in little or none of it.
Claims may be available to Allergan under state or federal law, and under various legal theories,
including but not limited to, breach of fiduciary duty and breach of contract.

We urge that this investigation be conducted by independent counsel.

As you are aware, claims have been asserted in federal court that Allergan engaged in the
unlawful misbranding of the prescription drug Botox and in the marketing of Botox for off-label
uses (and in off-label dosages). On May 27, 2008, Cher Beilfuss and Kathleen O'Conner-Masse
(collectively, "Relators") brought an action, *United States ex rel. Cher Beilfuss, et al. v.
Allergan, Inc.*, 08-cv-1883 (TWT) (N.D. Ga.), on behalf of the United States against Allergan for
treble damages and civil penalties under the *qui tam* provisions of the False Claims Act, 31
U.S.C. §§ 3729, *et seq.* (the "FCA"), and on behalf of various states under the respective *qui tam*
provisions of FCAs (or similarly named).[1]  Relators filed an Amended Complaint on February
19, 2010. The United States filed a Notice of Election to Intervene on April 2, 2010. On
September 1, 2010, the United States Department of Justice (the "DOJ") filed a Criminal
Information against Allergan. *United States v. Allergan, Inc.*, 10-cr-375 (ODE-1) (N.D. Ga.).
The allegations made in *United States v. Allergan, Inc.*, 10-cr-375 (ODE-1) (N.D. Ga.) and
*United States ex rel. Cher Beilfuss, et al. v. Allergan, Inc.*, 08-cv-1883 (TWT) (N.D. Ga.), are
incorporated herein by reference.

Relators have alleged that the United States Food, Drug and Cosmetic Act (the "FDCA")
prohibits pharmaceutical manufacturers from marketing or promoting a drug for uses the United
States Food and Drug Administration (the "FDA") has not approved. 21 U.S.C. §§ 331(d),
355(a). The DOJ has asserted that a drug that does not contain adequate directions for all of its
intended uses because such uses are not included in the FDA-approved labeling for the drug, is
"misbranded" under 21 U.S.C. § 352 (f)(1). Relators have asserted the dissemination of
information or materials by a pharmaceutical manufacturer of any unapproved or off-label use
constitutes misbranding and violates the FDCA. Further, the Anti-Kickback Act makes it
unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the
referral of any product for which payment is sought from any Federal health care program. 42
U.S.C. § 1320a-7b(b).

The FDA has approved Botox therapy for certain specific uses. However, the DOJ has
alleged that Allergen made it a top priority to illegally promote the sale of Botox for other, non-
approved uses. It has alleged that Allergan's off-label marketing efforts included, but were not
limited to: (1) sales representatives calling physicians who would not typically treat patients who
had any of the FDA-approved conditions; and (2) engaging in a successful marketing campaign
emphasizing that doctors could diagnose cervical dystonia, one of the FDA-approved uses, based
on headache and pain.

---

[1] Similarly, on June 5, 2007, Amy M. Lang and Charles J. Rushin brought an FCA action against
Allergan, *United States ex rel. Lang, et al. v. Allergan, Inc.*, 07-cv-1288 (WSD) (N.D. Ga).

David E.I. Pyott, Chairman
Allergan, Inc. Board of Directors
October 7, 2010 -- Page 3

Additionally, the DOJ has asserted that Allergan used various tactics to unlawfully promote off-label uses of Botox, including but not limited to: (1) in 2003, doubling the size of its reimbursement support team, an extension of the sales force, to "minimize customer barriers" for off-label uses of Botox; (2) funding and controlling the content of hundreds of programs at which speakers advocated Botox for off-label uses; (3) paying doctors to listen to off-label marketing presentations; and (4) creating and funding an on-line neurotoxin education organization to promote off-label uses. Relators have also alleged that Allergan facilitated the unlawful promotion of off-label uses of Botox and provided illegal kickbacks to health care providers through various tactics, as set forth in their Amended Complaint.

On September 1, 2010, Allergan announced that it agreed to plead guilty to a misdemeanor "misbranding" charge covering the period 2000 through 2005 and to pay the Government $375 million in criminal fines. Further, it agreed to pay $225 million to resolve civil claims asserted by the DOJ under the FCA.

It is incumbent upon the Board to thoroughly investigate all these allegations and the Company's guilty plea; to bring legal action to protect Allergan and its shareholders; and to implement enhancements to corporate governance policies and procedures. Please advise me within 60 days regarding what action you intend to take in response to this Demand.

Yours truly,

Laurence D. Paskowitz

EXHIBIT A
PAGE 10

**Exhibit  B**



U.S. Department of Health & Human Services

# FDA U.S. Food and Drug Administration

Home > News & Events > Newsroom > Press Announcements

## News & Events

**FDA NEWS RELEASE**

**For Immediate Release:** Oct. 15, 2010
**Media Inquiries:** Sandy Walsh, 301-796-4669; sandy.walsh@fda.hhs.gov
**Consumer Inquiries:** 888-INFO-FDA

**FDA approves Botox to treat chronic migraine**

The U.S. Food and Drug Administration today approved Botox injection (onabotulinumtoxinA) to prevent headaches in adult patients with chronic migraine. Chronic migraine is defined as having a history of migraine and experiencing a headache on most days of the month.

"Chronic migraine is one of the most disabling forms of headache," said Russell Katz, M.D., director of the Division of Neurology Products in the FDA's Center for Drug Evaluation and Research. "Patients with chronic migraine experience a headache more than 14 days of the month. This condition can greatly affect family, work, and social life, so it is important to have a variety of effective treatment options available."

Migraine headaches are described as an intense pulsing or throbbing pain in one area of the head. The headaches are often accompanied by nausea, vomiting, and sensitivity to light and sound. Migraine is three times more common in women than in men. Migraine usually begins with intermittent headache attacks 14 days or fewer each month (episodic migraine), but some patients go on to develop the more disabling chronic migraine.

To treat chronic migraines, Botox is given approximately every 12 weeks as multiple injections around the head and neck to try to dull future headache symptoms. Botox has not been shown to work for the treatment of migraine headaches that occur 14 days or less per month, or for other forms of headache. It is important that patients discuss with their physician whether Botox is appropriate for them.

The most common adverse reactions reported by patients being treated for chronic migraine were neck pain and headache.

OnabotulinumtoxinA, marketed as Botox and Botox Cosmetic, has a boxed warning that says the effects of the botulinum toxin may spread from the area of injection to other areas of the body, causing symptoms similar to those of botulism. Those symptoms include swallowing and breathing difficulties that can be life-threatening. There has not been a confirmed serious case of spread of toxin effect when Botox has been used at the recommended dose to treat chronic migraine, severe underarm sweating, blepharospasm, or strabismus, or when Botox Cosmetic has been used at the recommended dose to improve frown lines.

Botox is manufactured by Allergan Inc. of Irvine, Calif.

For more information:

National Institute of Neurological Disorders and Stroke: Hope Through Research[1]

#

Visit the FDA on Facebook[2]

RSS Feed for FDA News Releases[3] [what is RSS?[4]]

**Links on this page:**

1. http://www.ninds.nih.gov/disorders/headache/detail_headache.htm#156653138
2. http://www.facebook.com/FDA
3. http://www.fda.gov/AboutFDA/ContactFDA/StayInformed/RSSFeeds/PressReleases/rss.xml
4. http://www.fda.gov/AboutFDA/ContactFDA/StayInformed/RSSFeeds/ucm144575.htm

EXHIBIT B
PAGE 11

**Exhibit C**

Exhibit 99.1

# News Release



**ALLERGAN**
2525 Dupont Drive
Irvine, CA 92612-1599
(714) 246-4500
www.allergan.com

**FOR IMMEDIATE RELEASE**

### ALLERGAN COMMENTS ON THE UNITED STATES DEPARTMENT OF JUSTICE SUBPOENA FOR THE PRODUCTION OF DOCUMENTS RELATING TO PROMOTIONAL PRACTICES OF BOTOX® FOR THERAPEUTIC USES

(IRVINE, Calif., March 3, 2008) — Allergan, Inc. (NYSE: AGN) today announced that it received a subpoena from the United States Department of Justice, United States Attorney's Office for the Northern District of Georgia requesting the production of documents regarding promotional practices involving BOTOX® (botulinum toxin type A) for therapeutic indications.

The subpoena broadly requests documents regarding promotional, educational and other activities relating to BOTOX®. Allergan's current understanding is that the inquiry involves questions regarding alleged off label promotion relating to the use of BOTOX® for the treatment of headache. While Allergan is currently in phase III clinical studies investigating the use of BOTOX® for the treatment of headache, this is not an FDA-approved use.

Although healthcare professionals. exercising their medical judgment, may generally prescribe or dispense a drug for indications not approved by the FDA (i.e., off label), it is Allergan's policy to promote its products only in a manner consistent with the FDA-approved product labeling.

In all circumstances, it is Allergan's policy to fully comply with all applicable laws, rules and regulations. Allergan's Healthcare Law Compliance Program is intended to ensure continued compliance with all applicable laws, regulations and industry guidance governing the sale and marketing of pharmaceutical and medical device products, as well as laws and regulations governing the reporting of prices for Government-reimbursed products.

Since its first approval in 1989, BOTOX® is indicated and used in the United States to treat a variety of often serious medical conditions, including cervical dystonia. blepharospasm, strabismus and hyperhidrosis, and is approved for 20 different indications by regulatory authorities across 70 countries worldwide.

Allergan will provide updates as it responds to the subpoena, and will fully cooperate with the U.S. Department of Justice to satisfactorily address any and all of their questions regarding this matter.

# # #

**Important BOTOX® (Botulinum Toxin Type A) Information**
BOTOX® is indicated for the treatment of cervical dystonia in adults to decrease the severity of abnormal head position and neck pain associated with cervical dystonia.

BOTOX® is also indicated for the treatment of strabismus and blepharospasm associated with dystonia, including benign essential blepharospasm or VII nerve disorders in patients 12 years of age and above.

**EXHIBIT C**
**PAGE 12**

Powered by Morningstar® Document Research℠

The efficacy of BOTOX® treatment in deviations over 50 prism diopters, in restrictive strabismus, in Duane's syndrome with lateral rectus weakness, and in secondary strabismus caused by prior surgical over-recession of the antagonist has not been established. BOTOX® is ineffective in chronic paralytic strabismus except when used in conjunction with surgical repair to reduce antagonist contracture.

And BOTOX® is indicated for the treatment of severe primary axillary hyperhidrosis that is inadequately managed with topical agents.

**Important BOTOX® (Botulinum Toxin Type A) Safety Information**
BOTOX® treatment should not be injected in the presence of infection at the proposed injection site(s) and in individuals with known hypersensitivity to any ingredient in the formulation.

Serious heart problems and serious allergic reactions have been reported rarely. If you think you're having an allergic reaction or other unusual symptoms, such as difficulty swallowing, speaking or breathing, call your doctor immediately. Individuals with peripheral motor neuropathic diseases (e.g., amyotrophic lateral sclerosis, or motor neuropathy) or neuromuscular junctional disorders (e.g., myasthenia gravis or Lambert-Eaton syndrome) should only receive BOTOX® with caution. Patients with neuromuscular disorders may be at increased risk of clinically significant systemic side effects with BOTOX®. For full prescribing information, please visit www.botox.com and www.botoxcosmetic.com.

**BOTOX® for Blepharospasm in Patients ≥ 12 Years of Age**: Reduced blinking from BOTOX® injection of the orbicularis muscle can lead to corneal exposure, persistent epithelial defect and corneal perforation. The most frequently reported treatment-related adverse reactions in these patients are ptosis (20.8%), superficial punctate keratitis (6.3%) and eye dryness (6.3%).

**BOTOX® for Strabismus in Patients ≥ 12 Years of Age**: Inducing paralysis in one or more extraocular muscles may produce spatial disorientation, double vision or past pointing. The most commonly reported adverse effects are ptosis (16%) and vertical deviation (17%).

**BOTOX® for Cervical Dystonia in Adults**: There have been rare cases of dysphagia severe enough to warrant the insertion of a gastric feeding tube. The most frequently reported adverse reactions in patients with cervical dystonia are dysphagia (19%), upper respiratory infection (12%), neck pain (11%), and headache (11%).

**BOTOX® for Severe Primary Axillary Hyperhidrosis Inadequately Managed with Topical Agents**: The most frequently reported adverse events (3 — 10%) are injection site pain and hemorrhage, non-axillary sweating, infection, pharyngitis, flu syndrome, headache, fever, neck or back pain, pruritus, and anxiety.

**Forward-Looking Statements**
This press release contains "forward-looking statements," including statements regarding a federal subpoena and statements regarding the safety, effectiveness and adverse events associated with BOTOX®.

These statements are based on current expectations of future events. If underlying assumptions prove inaccurate or unknown risks or uncertainties materialize, actual results could vary materially from Allergan's expectations and projections. Risks and uncertainties include, among other things, general industry, economic, biologic and pharmaceutical market conditions; technological advances and patents attained by competitors; challenges inherent in the

---

**EXHIBIT C**
**PAGE 13**

Source: ALLERGAN INC, 8-K, March 04, 2008

Powered by Morningstar® Document Research℠

research and development and regulatory processes; inconsistency of treatment results among patients; potential difficulties in manufacturing; and governmental laws and regulations affecting domestic and foreign operations. Additional information concerning these and other risk factors can be found in press releases issued by Allergan, as well as Allergan's public periodic filings with the Securities and Exchange Commission, including the discussion under the heading "Risk Factors" in Allergan's 2007 Form 10-K. Copies of Allergan's press releases and additional information about Allergan is available on the World Wide Web at www.allergan.com or you can contact the Allergan Investor Relations Department by calling 1-714-246-4636.

**About Allergan, Inc.**
Founded in 1950, Allergan, Inc., with headquarters in Irvine, California, is a multi-specialty health care company that discovers, develops and commercializes innovative pharmaceuticals, biologics and medical devices that enable people to live life to its greatest potential — to see more clearly, move more freely, express themselves more fully. The Company employs more than 7,500 people worldwide and operates state-of-the-art R&D facilities and world-class manufacturing plants. In addition to its discovery-to-development research organization, Allergan has global marketing and sales capabilities with a presence in more than 100 countries.

SOURCE: Allergan, Inc.

**Allergan Contacts**
Jim Hindman (714) 246-4636 (investors)
Joann Bradley (714) 246-4766 (investors)
Emil Schultz (714) 246-4474 (investors)
Caroline Van Hove (714) 246-5134 (media)

© 2008 Allergan, Inc. Irvine, CA 92612. ® and ™ marks owned by Allergan, Inc.

---

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

EXHIBIT C
PAGE 14

**Exhibit  D**

Case 8:10-cv-01352-DOC -MLG  Document 52-1  Filed 12/08/10  Page 12 of 60  Page ID
#:154
Case 1:10-cr-00375-ODE  Document 154  Filed 10/05/10  Page 1 of 16

ORIGINAL

# GUILTY PLEA and PLEA AGREEMENT

United States Attorney
Northern District of Georgia

FILED IN OPEN COURT
U.S.D.C. - Atl.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

OCT - 5 2010

JAMES N. HATTEN, Clerk

By: _____ Deputy Clerk

### CRIMINAL NO. 1:10-CR-375-ODE

The United States Attorney's Office for the Northern District of Georgia as counsel for the

United States, and Defendant **ALLERGAN, INC.** ("Defendant" or "**ALLERGAN**"), hereby enter

into this Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

Defendant, having received a copy of the above-numbered Criminal Information and having been

arraigned, hereby pleads GUILTY to Count One of the Criminal Information thereof.

## I. ADMISSION OF GUILT

1.      The Defendant admits that it is pleading guilty because it is in fact guilty of the crime

charged in Count One of the Criminal Information.

## II. ACKNOWLEDGMENT & WAIVER OF RIGHTS

2.      The Defendant understands its rights and understands that by pleading guilty pursuant

to this Plea Agreement, it is giving up a number of rights including the right:

> (a)      to plead not guilty to the criminal charge brought against it;

> (b)      to have a trial by jury, at which it would be presumed not guilty of the

charge and the United States would have to prove every essential element of the charged

offense beyond a reasonable doubt for it to be found guilty;

> (c)      to confront and cross-examine witnesses against it and to subpoena witnesses

in its defense at trial;

EXHIBIT D
PAGE 15

Case 8:10-cv-01352-DOC -MLG   Document 52-1   Filed 12/08/10   Page 13 of 60   Page ID
#:1551
Case 1:10-cr-00375-ODE   Document 19-1   Filed 10/05/10   Page 2 of 16

(d)    to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment

claims, and other pretrial motions that have been filed or could have been filed;.

(e)    to appeal its conviction if it is found guilty; and

(f)    to appeal the imposition of sentence against it.

Subject to this Court's approval of this Plea Agreement, the Defendant knowingly and

voluntarily waives the rights set out in Paragraph 2(a)-(f) above.

The Defendant understands that by pleading guilty pursuant to this Plea Agreement, it is

giving up all of these rights and there will not be a trial of any kind.

The Defendant also understands that it ordinarily would have the right to appeal its sentence

and, under some circumstances, to attack the conviction and sentence in post-conviction proceedings.

By entering this Plea Agreement, the Defendant may be waiving some or all of those rights to appeal

and to collaterally attack its conviction and sentence, as specified below.

Finally, the Defendant understands that to plead guilty, it will, through a duly authorized

corporate representative, have to answer, under oath, questions posed by the Court concerning the

rights that the Defendant is giving up and the facts of this case, and the Defendant's answers, if

untruthful, may later be used against it.

## III.  ACKNOWLEDGMENT OF PENALTIES

3.    The Defendant understands that, based on its plea of guilty to Count One of the

Criminal Information, the statutory maximum penalty which may be imposed against it upon

conviction is the following:

(a)    Maximum Fine:  $200,000; or twice the gross pecuniary gain derived from

the crime, or twice the gross pecuniary loss caused to the victims of the crime (18 U.S.C.

2

Case 8:10-cv-01352-DOC -MLG   Document 52-1   Filed 12/08/10   Page 14 of 60   Page ID
#: 156
Case 1:10-cr-00375-ODE   Document 19   Filed 10/05/10   Page 3 of 16

§ 3571(c) and (d)), whichever is larger;

    (b)    Term of Probation:  Pursuant to 18 U.S.C. § 3561(c)(2), the Court may impose a term of probation of not more than five years;

    (c)    Mandatory special assessment:  $125.00 due and payable immediately; and

    (d)    Forfeiture of all misbranded drugs involved in the offense or substitute assets. The Defendant understands that, before imposing sentence in this case, the Court will be required to consider, among other factors, the provisions of the United States Sentencing Guidelines to the extent applicable to this offense and that the Court has the discretion to depart or vary from those Guidelines.

### IV. PLEA AGREEMENT

4.    The Defendant, its counsel, and the United States Attorney for the Northern District of Georgia ("Government"), as counsel for the United States, subject to approval by the Court, have agreed upon a negotiated plea in this case, the terms of which are as follows:

### A. NO ADDITIONAL CHARGES

5.    The Government, and the United States Attorney's Offices for each of the other 93 judicial districts of the United States, and the United States Department of Justice, agree that other than the charge in the Criminal Information in this case, they will not bring other criminal charges against the Defendant, **ALLERGAN**, or its present or former parents, affiliates, divisions, or subsidiaries; or their predecessors, successors, or assigns for (a) any conduct within the scope of the criminal investigation in the Northern District of Georgia related to the sales, marketing and promotion of BOTOX (therapeutic) and (b) any conduct related to the sales, marketing, and promotion of BOTOX (therapeutic) which is presently known to the United States Attorney's Office

3

EXHIBIT D
PAGE 17

Case 8:10-cv-01352-DOC -MLG   Document 52-1   Filed 12/08/10   Page 15 of 60   Page ID
Case 1:10-cr-00375-ODE   Document 15-1   Filed 10/05/10   Page 4 of 16
#:157

for the Northern District of Georgia as of the date of the execution of this Plea Agreement. The Defendant understands that this provision does not bar prosecution by any state or local jurisdiction and the non-prosecution terms of this paragraph do not apply to civil matters of any kind, to any violation of the federal tax or securities laws, or to any crime of violence. Further, the Defendant understands that the United States takes no position as to the proper tax treatment of any of the payments made by the Defendant pursuant to this Plea Agreement, the Civil Settlement Agreement, or the Corporate Integrity Agreement referenced in this Plea Agreement.

6.     The Defendant agrees to waive as set forth in this Paragraph the statute of limitations, and any other time-related defense, to the charge to which it is agreeing to plead guilty under this Plea Agreement. The Defendant understands and agrees that, should it seek to withdraw its plea, it may then be prosecuted for any criminal violation of which the United States has knowledge arising out of this investigation, subject to any applicable statute of limitation or other time-related protection not waived in this paragraph. The Defendant agrees that if it does not enter its plea, or withdraws its plea, after signing this agreement, the time period between April 08, 2010 and its withdrawal shall be excluded from calculation of the limitations or time period.

7.     The Defendant or anyone acting on its behalf also waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

4

## B. SENTENCING GUIDELINES

8.     Based upon the evidence currently known to the Government, the Government and

the Defendant agree that the 2009 version of the United States Sentencing Commission Guidelines

Manual is the appropriate Guidelines Manual to utilize.

## C. RECOMMENDED SENTENCE

9.     Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Government and **ALLERGAN** agree

that the appropriate disposition of this case is as follows:

(a)     that the Court impose a sentence requiring the Defendant **ALLERGAN** to

pay $375 million dollars ($375,000,000), in U.S. dollars, $350 million dollars ($350,000,000) of

which will be applied to a criminal fine, and $25,000,000 of which will be applied as substitute

assets to satisfy the forfeiture obligation. **ALLERGAN** will pay these amounts within 10 business

days of the date of sentencing. The Government and the Defendant agree that this fine and

forfeiture amount represent a fair and just resolution of all issues associated with loss/gain and

forfeiture calculations.

(b)     **ALLERGAN** agrees that as a result of its acts or omissions, the forfeitable

property, that is the drugs which were misbranded, are no longer available for forfeiture as they

cannot be located or have been transferred, sold or deposited with a third party, or otherwise

disposed of, within the meaning of federal law. As a result, **ALLERGAN** agrees to the entry and

satisfaction of a judgment and preliminary order of forfeiture on the date of the guilty plea, forfeiting

to the United States the sum of $25,000,000 as substitute assets for the pertinent drugs.

**ALLERGAN** agrees that, within 10 business days of the date of sentencing, **ALLERGAN** will

make payment to the United States, by means of a wire transfer to the United States Marshal Service

EXHIBIT D
PAGE 19

or check payable to same, in the amount of $25,000,000, this amount representing substitute assets of the offense for which it is pleading guilty, in full satisfaction of the judgment and preliminary order of forfeiture.

Forfeiture of substitute assets shall not be deemed an alteration of **ALLERGAN's** sentence. The forfeiture set forth herein shall not satisfy or offset any fine, or other penalty imposed upon **ALLERGAN**, nor shall the forfeiture be used to offset **ALLERGAN's** tax liability or any other debt owed to the United States. **ALLERGAN** agrees to consent to the entry of an order of forfeiture for the $25,000,000.00 in United States currency, and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, entry of a preliminary order of forfeiture, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. **ALLERGAN** acknowledges that it understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the Court to advise it of this, pursuant to Rule 11 (b)(1)(J), at the time the guilty plea is accepted.

In addition to all other waivers or releases set forth in this Agreement, **ALLERGAN** hereby waives any and all claims arising from or relating to the forfeitures set forth in this section, including, without limitation, any claims arising under the Double Jeopardy Clause of the Fifth Amendment, or the Excessive Fines Clause of the Eighth Amendment, to the United States Constitution, or any other provision of state or federal law.

(c)     **ALLERGAN** shall pay a mandatory special assessment of $125 pursuant to 18 U.S.C. § 3013.

(d)     In light of the Civil Settlement Agreement between **ALLERGAN** and others and the United States, attached hereto as Exhibit A, which requires the payment of $225 million plus

6

interest, the parties agree that the complication and prolongation of the sentencing process that would result from an attempt to fashion a restitution order outweighs the need to provide restitution to the non-federal victims of this case, if any.  Therefore, the Government agrees that it will not seek a separate restitution order as part of the negotiated guilty plea and the parties agree that the appropriate disposition of this case does not include a restitution order.

(e)     The Government recommends that in light of the Corporate Integrity Agreement executed contemporaneously with this guilty Plea Agreement, **ALLERGAN** should not be placed on probation.

10.     The Government and the Defendant understand that the Court retains complete discretion to accept or reject the recommended sentence provided for in Paragraph 9 of this Plea Agreement.

(a)     If the Court does not accept the recommended sentence in Paragraph 9, the United States and the Defendant agree that this Plea Agreement, except for Paragraph 10(b) below, shall be rendered void.

(b)     If the Court does not accept the recommended sentence, the Defendant will be free to withdraw its guilty plea (Fed. R. Crim. P. 11(c)(5) and (d)).  If the Defendant withdraws its plea of guilty, this Plea Agreement, the guilty plea, and any statement made in the course of any proceedings under Fed. R. Crim. P. 11 regarding the guilty plea or this Plea Agreement or made in the course of plea discussions with an attorney for the Government shall not be admissible against the Defendant in any criminal or civil proceeding, except as otherwise provided in Fed. R. Evid. 410.

7

## D. RIGHT TO ANSWER QUESTIONS AND CORRECT MISSTATEMENTS

11.    The Government reserves the right to inform the Court and the Probation Office of

all facts and circumstances regarding the Defendant and this case, and to respond to any questions

from the Court and the Probation Office, and to any misstatements of fact or law.

## E. SPECIAL ASSESSMENT

12.    The Defendant agrees that it will pay the mandatory special assessment in the amount

of $125 by money order or certified check made payable to the Clerk of Court, U.S. District Court,

2211 U.S. Courthouse, 75 Spring Street, S.W., Atlanta, Georgia  30303, on or before the date of

sentencing.

## V. LIMITED WAIVER OF APPEAL

13.    LIMITED WAIVER OF APPEAL:   To the maximum extent permitted by federal

law, **ALLERGAN** voluntarily and expressly waives the right to appeal its conviction and sentence

and the right to collaterally attack its conviction and sentence in any post-conviction proceeding

(including, but not limited to, motions filed pursuant to 28 U.S.C. § 2255) on any ground.  The

Defendant understands that this Plea Agreement does not limit the Government's right to appeal, but

if the Government initiates a direct appeal of the sentence imposed, the Defendant may file a cross-

appeal of that same sentence.

## VI. VOLUNTARY PLEA

14.    The Defendant's decision to enter into this Plea Agreement and to tender a plea of

guilty is freely and voluntarily made and is not the result of force, threats, assurances, promises, or

representations other than the representations contained in this Plea Agreement.  The United States

has made no promises or representations to the Defendant as to whether the Court will accept or

EXHIBIT D
PAGE 22

Case 8:10-cv-01352-DOC -MLG   Document 52-1   Filed 12/08/10   Page 20 of 60   Page ID
Case 1:10-cr-00375-ODE   Document 16-2   Filed 10/05/10   Page 9 of 16
#:162

reject the recommendations contained within this Plea Agreement.

## VII. PROBATION DEPARTMENT NOT BOUND BY AGREEMENT

15.    The sentencing disposition agreed upon by the parties and their respective calculations under the Sentencing Guidelines are not binding upon the United States Probation Office. **ALLERGAN** and the United States Attorney's Office agree to seek a sentencing by the District Court immediately following the Rule 11 plea hearing and do not object to the Court proceeding to sentence **ALLERGAN** in the absence of a Presentence Report in this case. **ALLERGAN** understands that the decision whether to proceed immediately following the plea hearing with the sentencing proceeding, and to do so without a Presentence Report, is exclusively that of the United States District Court.  This paragraph does not affect **ALLERGAN**'s rights under Paragraph 10 of this Plea Agreement.

## VIII. VIOLATION OF PLEA AGREEMENT

16.    At the time of the acceptance of the guilty plea by the Court, the Government will close its investigation of **ALLERGAN**. If the Government determines that **ALLERGAN** has failed to comply with any material provision of this Plea Agreement or prior to the entry of this plea of guilty has committed any crime following its execution of this Plea Agreement, the Government may, at its sole option, be released from its commitments under this Plea Agreement in its entirety by notifying **ALLERGAN**, through counsel or otherwise, in writing. The Government may also pursue all remedies available to it under the law, even if it elects not to be released from its commitments under this Plea Agreement. **ALLERGAN** recognizes that any such material breach by it of an obligation under this Plea Agreement shall not entitle it to withdraw from its guilty plea. **ALLERGAN** understands that, should it breach any material provision of this agreement, the

9

EXHIBIT D
PAGE 23

Case 8:10-cv-01352-DOC -MLG   Document 52-1   Filed 12/08/10   Page 21 of 60   Page ID
#: 1163
Case 1:10-cr-00375-ODE   Document 11-3   Filed 10/05/10   Page 10 of 16

Government will have the right to use against **ALLERGAN** before any grand jury, at any trial or hearing, or for sentencing purposes, any statements which may be made by it, and any information, materials, documents or objects which may be provided by it to the Government subsequent to this Plea Agreement, without any limitation.

17.    **ALLERGAN** understands and agrees that this Rule 11(c)(1)(C) plea agreement and its agreed-upon criminal disposition:

(A)    are wholly dependent upon **ALLERGAN**'s entering into and completing its obligations under the attached Civil Settlement Agreement, including the requirement in that agreement that **ALLERGAN** pay to the United States and the Medicaid Participating States the amount of two hundred twenty-five million dollars ($225,000,000) in accordance with the terms of the Civil Settlement Agreement; and

(B)    are wholly dependent upon **ALLERGAN**'s entering into a dismissal with prejudice, the lawsuit *Allergan, Inc. v. United States of America, et al.*, Civil Action No. 09-1879 (JDB), filed in the United States District Court for the District of Columbia.

The failure by **ALLERGAN** to comply with the material terms of either this Plea Agreement, the attached Civil Settlement Agreement, or the filing of the above-described dismissal with prejudice will constitute a breach of this Agreement, provided however, that a breach of the Corporate Integrity Agreement (the "CIA"), referred to in the Civil Settlement Agreement, does not constitute a breach of this Plea Agreement, and any disputes arising under the CIA shall be resolved exclusively through the dispute resolution provisions of the CIA.

10

EXHIBIT D
PAGE 24

18.    In the event **ALLERGAN** at any time hereafter breaches any material provision of this Plea Agreement, **ALLERGAN** understands that (1) the Government will as of the date of that breach be relieved of any obligations it may have in this Plea Agreement and the Civil Settlement Agreement; and (2) **ALLERGAN** will not be relieved of its obligation to make the payments set forth in this Plea Agreement and **ALLERGAN** will not be relieved of its obligation to make the payments set forth in the attached Civil Settlement Agreement, nor will it be entitled to return of any monies already paid.  In the event that the Government hereafter breaches any material provision of this Plea Agreement, the Government understands that **ALLERGAN** will as of the date of that breach be relieved of any obligations provided in this Plea Agreement.

## XI. CORPORATE AUTHORIZATION

19.    **ALLERGAN** shall provide to the U.S. Attorney and the Court a certified copy of a resolution of the Board of Directors of **ALLERGAN**, affirming that the Board of Directors of **ALLERGAN** has authority to enter into the Plea Agreement and has (1) reviewed the Criminal Information in this case and the proposed Plea Agreement or has been fully advised of the contents thereof; (2) consulted with legal counsel in connection with the matter; (3) voted to enter into the proposed Plea Agreement; (4) voted to authorize **ALLERGAN** to plead guilty to the charge specified in the Plea Agreement; and (5) voted to authorize the corporate officer identified below to execute the Plea Agreement and all other documents necessary to carry out the provisions of the Plea Agreement.

20.    **ALLERGAN** agrees that a duly authorized corporate officer will appear on behalf of **ALLERGAN** and will enter the guilty plea and will also appear for the imposition of sentence.

11

Case 8:10-cv-01352-DOC -MLG   Document 52-1   Filed 12/08/10   Page 23 of 60   Page ID
#:165
Case 1:10-cr-00375-ODE   Document 19   Filed 10/05/10   Page 12 of 16

## X. ENTRY OF AGREEMENT

21.     This Plea Agreement constitutes the entire agreement between the United States

Attorney's Office for the Northern District of Georgia and the Defendant concerning the disposition

of the criminal charge in this case.  There are no other agreements, promises, representations, or

understandings between the Defendant and the Government.  This Plea Agreement cannot be

modified except in writing, signed by the United States and the Defendant.

22.     The undersigned is authorized to enter this Plea Agreement on behalf of the

Defendant as evidenced by the Resolution of the Board of Directors of the Defendant, attached

hereto as Exhibit B, and incorporated by reference in, this Plea Agreement.

23.     A facsimile signature shall be deemed an original signature for the purpose of

executing this Plea Agreement. Multiple signature pages are authorized for the purpose of executing

this Plea Agreement.

In Open Court this  5th  day of , October 2010.

STEPHEN S. COWEN
PHYLLIS B. SUMNER
MATTHEW H. BAUGHMAN
VICTORIA M. CALVERT
KING & SPALDING LLP
Counsel for Defendant ALLERGAN, INC.

SAMUEL J. GESTEN
EXECUTIVE VICE PRESIDENT and
GENERAL COUNSEL
ALLERGAN, INC.
Corporate Representative

JOHN T. BENTIVOGLIO
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Counsel for Defendant ALLERGAN, INC.

12

EXHIBIT D
PAGE 26

RANDY S. CHARTASH
ASSISTANT UNITED STATES ATTORNEY

DOUGLAS W. GILFILLAN
ASSISTANT UNITED STATES ATTORNEY

SIGNATURE (Approving Official)
SALLY QUILLIAN YATES
UNITED STATES ATTORNEY
NORTHERN DISTRICT OF GEORGIA

October 05, 2010
DATE

The Defendant has been advised of the Criminal Information against it and has discussed it with its attorneys. The Defendant understands the charges and the elements of the charge that the Government would have to prove to convict it at a trial. The Defendant has read the foregoing Plea Agreement and has carefully reviewed every part of it with its attorneys. It understands the terms and conditions contained in the Plea Agreement and voluntarily agrees to them. The Defendant also has discussed with its attorneys the rights it may have to appeal or challenge its conviction and sentence, and it understands that the appeal waiver contained in the Plea Agreement will prevent it, with the narrow exceptions stated, from appealing its conviction and sentence or challenging its

13

EXHIBIT D
PAGE 27

Case 8:10-cv-01352-DOC -MLG   Document 52-1   Filed 12/08/10   Page 25 of 60   Page ID
Case 1:10-cr-00375-ODE   Document 1167   Filed 10/05/10   Page 14 of 16
#1867

conviction and sentence in any post-conviction proceeding. No one has threatened or forced it to plead guilty, and no promises or inducements have been made to it other than those discussed in the Plea Agreement. The discussions between Defendant's attorneys and the Government toward reaching a negotiated plea in this case took place with its permission. Defendant is fully satisfied with the representation provided to it by its attorneys in this case.

_____          October 05, 2010
SAMUEL J. GESTEN                          DATE
EXECUTIVE VICE PRESIDENT
and GENERAL COUNSEL
ALLERGAN, INC.

(Corporate Representative)


We are **ALLERGAN, INC.**'s lawyers. We have carefully reviewed the charges and the Plea Agreement with our client. To our knowledge, our client is making an informed and voluntary decision to plead guilty and to enter into the Plea Agreement.

_____          Oct 5, 2010
STEPHEN S. COWEN                          _____
(Defense Attorney)                        DATE

_____          October 5, 2010
JOHN T. BENTIVOGLIO                       _____
(Defense Attorney)                        DATE


14

EXHIBIT D
PAGE 28

## INFORMATION BELOW MUST BE TYPED OR PRINTED

Stephen S. Cowen
(Attorney for Defendant)

ALLERGAN, INC.
(Defendant)

_____

STREET

_____

STREET

_____

CITY & STATE   ZIP CODE

_____

CITY & COUNTRY   MAIL CODE

PHONE NUMBER _____

PHONE NUMBER _____

STATE BAR OF GEORGIA NUMBER _____

Filed in Open Court

_____

By _____

15

Case 8:10-cv-01352-DOC -MLG   Document 52-1   Filed 12/08/10   Page 27 of 60   Page ID
#:1169
Case 1:10-cr-00375-ODE   Document 19-1   Filed 10/05/10   Page 16 of 16

U. S. DEPARTMENT OF JUSTICE
Statement of Special Assessment Account

This statement reflects your special assessment only. There may be other penalties imposed at
sentencing.

| ACCOUNT INFORMATION | |
|---|---|
| CRIMINAL ACTION NO.: | 1:10-CR-00375-ODE |
| DEFENDANT'S NAME: | ALLERGAN, INC. |
| PAY THIS AMOUNT: | $125.00 |

INSTRUCTIONS:

1.    PAYMENT MUST BE MADE BY **CERTIFIED CHECK** OR **MONEY ORDER**
       PAYABLE TO:

              CLERK OF COURT, U.S. DISTRICT COURT

              ***PERSONAL CHECKS WILL NOT BE ACCEPTED***

2.    PAYMENT MUST REACH THE CLERK'S OFFICE WITHIN 30 DAYS OF THE
       ENTRY OF YOUR GUILTY PLEA

3.    PAYMENT SHOULD BE SENT OR HAND DELIVERED TO:

              Clerk, U.S. District Court
              2211 U.S. Courthouse
              75 Spring Street, S.W.
              Atlanta, Georgia  30303

              (Do not Send Cash)

4.    INCLUDE DEFENDANT'S NAME ON **CERTIFIED CHECK** OR **MONEY
       ORDER**

5.    ENCLOSE THIS COUPON TO INSURE PROPER AND PROMPT APPLICATION
       OF PAYMENT

6.    PROVIDE PROOF OF PAYMENT TO THE ABOVE-SIGNED AUSA WITHIN 30
       DAYS OF THE GUILTY PLEA

16

EXHIBIT D
PAGE 30

**Exhibit E**

# News Release



**ALLERGAN**
2525 Dupont Drive
Irvine, CA 92612-1599
(714) 246-4500
www.allergan.com

### ALLERGAN RESOLVES UNITED STATES GOVERNMENT INVESTIGATION
### OF PAST SALES AND MARKETING PRACTICES RELATING TO CERTAIN THERAPEUTIC USES OF BOTOX®

(IRVINE, Calif., September 1, 2010) – Allergan, Inc. (NYSE: AGN) today announced that it has reached a resolution with the United States Department of Justice (DOJ) regarding the previously reported Government investigation into Allergan's past U.S. sales and marketing practices relating to certain therapeutic uses of BOTOX® (onabotulinumtoxinA).

Allergan has been cooperating with the Government in a multi-year investigation in Atlanta, Georgia, regarding the use of BOTOX® for certain therapeutic treatments covering a period that commenced in January of 2000. The parties have resolved all issues involved in the investigation by entering into a global settlement, which includes the following:

Allergan has agreed to plead guilty to a single misdemeanor "misbranding" charge covering the period 2000 through 2005 and pay to the Government $375 million. This misbranding charge is known as a strict liability offense, and does not involve false or deceptive conduct. A prescription drug is deemed misbranded when its labeling does not contain adequate directions for its "intended uses," and, under the Government's view, a use that the U.S. Food and Drug Administration (FDA) has not approved (i.e., an "off-label" use) may be deemed "intended" based on written or oral statements made by the manufacturer. As part of its plea, Allergan has agreed that between 2000 through 2005, its marketing of BOTOX® resulted in intended uses for the therapeutic treatment of headache, pain, spasticity and juvenile cerebral palsy. These uses were off label during the relevant time frame and thus the labeling for BOTOX® did not bear directions for these intended uses, resulting in the product being misbranded. In March 2010, the FDA approved BOTOX® for the treatment of increased muscle stiffness in the elbow, wrist and fingers in adults with upper limb spasticity, the most substantial use during the relevant time period, and thus its label now includes directions for that use. Based on positive Phase III trials announced in September 2008, Allergan has filed for FDA approval of BOTOX® for the treatment of chronic migraine and expects FDA to rule on the application in 2010. Allergan is also in Phase III clinical trials investigating the use of BOTOX® to treat neurogenic and idiopathic overactive bladder. Although BOTOX® is approved in 70 countries around the world, including the United Kingdom, Canada, Brazil, Hong Kong, and recently Japan, to treat symptoms associated with juvenile cerebral palsy, it is currently off label in the United States. Allergan is in discussions with the FDA regarding additional clinical development for juvenile cerebral palsy in the United States.

In addition, Allergan has agreed to pay $225 million to resolve civil claims asserted by DOJ under the civil False Claims Act. The civil settlement is an element of a global settlement that Allergan believes is in the best interest of its stockholders. However, Allergan denies liability associated with these civil allegations and does not believe there is merit to them factually or legally.

To resolve the criminal and civil investigation, Allergan was required by the Government to dismiss Allergan's First Amendment lawsuit pending in Washington, D.C., in which Allergan sought a ruling that it could proactively share truthful scientific and medical information with the medical community to assist physicians in evaluating the risks and benefits if they choose to use BOTOX® off label to treat certain forms of spasticity. Allergan is disappointed that the court was not afforded an opportunity to hear and rule on these important First Amendment issues, as Allergan believes that physicians, patients, manufacturers, payers, and ultimately the quality of evidence-based medicine itself would have benefited from a ruling clarifying the law.

**EXHIBIT E
PAGE 31**

Powered by Morningstar® Document Research℠

Allergan is committed to conducting its business consistent with high ethical standards and in compliance with all applicable laws. In an effort to meet its compliance goals, Allergan has a robust and regularly reviewed and updated compliance program. Allergan has further enhanced its compliance program by developing additional comprehensive policies and procedures, supported by significant technology investments, including its state-of-the-art Business Execution Automated Compliance Navigator (BEACON) compliance system.

As part of its global settlement, Allergan has entered into a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the U.S. Department of Health and Human Services. Under the CIA, Allergan will maintain its current compliance program and undertake a series of compliance-related obligations, including additional monitoring, maintenance of specific written materials, auditing, training, education, reporting and disclosure, for five years. The CIA also provides for an independent third-party review organization to assess and report on Allergan's compliance program.

"This settlement is in the best interest of our stockholders as it resolves all matters at issue in the investigation, avoids substantial costs of litigation, as well as the substantial risks to Allergan associated with Government enforcement action in these matters, and permits us to focus our time and resources on productively developing new treatments for patients and the medical community," said Douglas S. Ingram, Allergan's Executive Vice President.

Allergan currently estimates that it will record total non-recurring pre-tax charges of between approximately $610 million and $615 million in its third fiscal quarter in connection with the global settlement with the DOJ. This amount includes estimated interest and certain attorneys' fees that Allergan is obligated to pay in connection with the global settlement, but excludes Allergan's ongoing administrative legal fees and other costs. Allergan is presently determining the tax treatment of the global settlement charges. As such, the tax impact of such charges cannot be reasonably estimated at this time. Allergan currently expects to pay the global settlement costs in its fourth fiscal quarter.

The criminal resolution is subject to approval by the federal court in Northern District of Georgia, and the civil settlement is contingent upon such approval.

**About BOTOX®**

BOTOX® is a prescription-only medical product that contains tiny amounts of highly purified botulinum toxin protein refined from the bacterium, *Clostridium botulinum*. BOTOX® has a unique, protected molecular structure that stabilizes the core toxin in BOTOX® from degradation. When injected at approved and labeled doses into a specific muscle or gland, BOTOX® neurotoxin is expected to diffuse locally and expected to produce a safe and effective result by producing a localized and temporary reduction in the overacting muscle or gland, usually lasting up to approximately 3 to 6.7 months depending on the individual patient and indication.

BOTOX® was first approved by the FDA 20 years ago for the treatment of strabismus and blepharospasm, two eye muscle disorders, making it the first botulinum toxin type A product approved in the world. Since its first approval, BOTOX® has been recognized by regulatory authorities worldwide as an effective treatment for 21 different indications in approximately 80 countries, benefiting patients worldwide. In the United States, BOTOX® is also approved to treat the abnormal head position and neck pain that happens with cervical dystonia (CD) in adults, symptoms of severe underarm sweating (severe primary axillary hyperhidrosis) when medicines used on the skin (topical) do not work well enough, and increased muscle stiffness in elbow, wrist and finger muscles in adults with upper limb spasticity.

In addition to its therapeutic uses, the same formulation of BOTOX® with dosing specific to glabellar lines was approved by the FDA in 2002 under the trade name BOTOX® Cosmetic (onabotulinumtoxinA).

In addition to 20 years of clinical experience, the safety and efficacy of BOTOX® have been well-established in approximately 50 randomized, placebo-controlled clinical trials and in approximately 11,000 patients treated with BOTOX® and BOTOX® Cosmetic in Allergan's clinical trials . Worldwide, approximately 26 million vials of BOTOX® and BOTOX® Cosmetic have been distributed and approximately 29 million treatment sessions have been performed over the

EXHIBIT E
PAGE 32

Powered by Morningstar® Document Research℠

past 20 years (1989-2009)[ii]. With approximately 2,100 articles on BOTOX® and BOTOX® Cosmetic in scientific and medical journals,[iii] BOTOX® neurotoxin is one of the most widely researched medicines in the world.

BOTOX® is a prescription medicine that is injected into muscles and used:

- to treat increased muscle stiffness in elbow, wrist, and finger muscles in adults with upper limb spasticity.

- to treat the abnormal head position and neck pain that happens with cervical dystonia (CD) in adults.

- to treat certain types of eye muscle problems (strabismus) or abnormal spasm of the eyelids (blepharospasm) in people 12 years and older.

BOTOX® is also injected into the skin to treat the symptoms of severe underarm sweating (severe primary axillary hyperhidrosis) when medicines used on the skin (topical) do not work well enough.

BOTOX® Cosmetic is a prescription medicine that is injected into muscles and used to improve the look of moderate to severe frown lines between the eyebrows (glabellar lines) in adults younger than 65 years of age for a short period of time (temporary).

It is not known whether BOTOX® is safe or effective in children younger than:

- 18 years of age for treatment of spasticity

- 16 years of age for treatment of cervical dystonia

- 18 years of age for treatment of hyperhidrosis

- 12 years of age for treatment of strabismus or blepharospasm

BOTOX® Cosmetic is not recommended for use in children younger than 18 years of age.

It is not known whether BOTOX® and BOTOX® Cosmetic are safe or effective for other types of muscle spasms or for severe sweating anywhere other than your armpits.

**IMPORTANT SAFETY INFORMATION INCLUDING BOXED WARNING:**

BOTOX® and BOTOX® Cosmetic may cause serious side effects that can be life threatening. Call your doctor or get medical help right away if you have any of these problems after treatment with BOTOX® or BOTOX® Cosmetic:

- **Problems swallowing, speaking, or breathing. These problems can happen hours to weeks after an injection of BOTOX® or BOTOX® Cosmetic** usually because the muscles that you use to breathe and swallow can become weak after the injection. Death can happen as a complication if you have severe problems with swallowing or breathing after treatment with BOTOX® or BOTOX® Cosmetic.

- Swallowing problems may last for several months. People who already have swallowing or breathing problems before receiving BOTOX® or BOTOX® Cosmetic have the highest risk of getting these problems.

- **Spread of toxin effects.** In some cases, the effect of botulinum toxin may affect areas of the body away from the injection site and cause symptoms of a serious condition called botulism. The symptoms of botulism include: loss of strength and muscle weakness all over the body, double vision, blurred vision and drooping eyelids, hoarseness or change or loss of voice (dysphonia), trouble saying words clearly (dysarthria), loss of bladder control, trouble breathing, trouble swallowing.

These symptoms can happen hours to weeks after you receive an injection of BOTOX® or BOTOX® Cosmetic.

There has not been a confirmed serious case of spread of toxin effect away from the injection site when BOTOX® has been used at the recommended dose to treat severe underarm sweating, blepharospasm, or strabismus, or when BOTOX® Cosmetic has been used at the recommended dose to treat frown lines.

EXHIBIT E
PAGE 33

Powered by Morningstar® Document Research℠

Do not take **BOTOX**® or **BOTOX Cosmetic** if you: are allergic to any of the ingredients in **BOTOX**® or **BOTOX**® **Cosmetic**. See the end of this Medication Guide for a list of ingredients in **BOTOX**® and **BOTOX**® **Cosmetic**; had an allergic reaction to any other botulinum toxin product such as *Myobloc*® or *Dysport*™; have a skin infection at the planned injection site.

**Tell your doctor about all your medical conditions, including if you have:** a disease that affects your muscles and nerves (such as amyotrophic lateral sclerosis [ALS or Lou Gehrig's disease], myasthenia gravis or Lambert-Eaton syndrome).

**Tell your doctor about all the medicines you take,** including prescription and nonprescription medicines, vitamins and herbal products.

**BOTOX**® and **BOTOX**® **Cosmetic** may cause loss of strength or general muscle weakness, or vision problems within hours to weeks of taking **BOTOX**® or **BOTOX**® **Cosmetic**. **If this happens, do not drive a car, operate machinery, or do other dangerous activities.**

**BOTOX**® can cause serious side effects. Other side effects of **BOTOX**® or **BOTOX**® **Cosmetic** include: dry mouth, discomfort or pain at the injection site, tiredness, headache, neck pain, and eye problems, double vision, blurred vision, decreased eyesight, drooping eyelids, swelling of your eyelids, and dry eyes. Symptoms of an allergic reaction to **BOTOX**® or **BOTOX**® **Cosmetic** may include: itching, rash, red itchy welts, wheezing, asthma symptoms, or dizziness or feeling faint. Tell your doctor or get medical help right away if you are wheezing or have asthma symptoms, or if you become dizzy or faint.

Tell your doctor if you have any side effect that bothers you or that does not go away.

For additional information refer to the Medication Guide. This Medication Guide summarizes the most important information about **BOTOX**® or **BOTOX**® **Cosmetic**. If you would like more information, talk with your doctor.

**Forward-Looking Statement**
This press release contains "forward-looking statements," including the statements by Mr. Ingram, statements regarding Allergan's global settlement with the DOJ, statements regarding Allergan's plea, statements regarding the estimated timing and amount of the payments that Allergan has agreed to make in connection with the global settlement with the DOJ, statements regarding the implementation and effect of the CIA, and other statements regarding the safety, effectiveness and adverse events associated with **BOTOX**® or **BOTOX**® **Cosmetic**.

These statements are based on current expectations of future events. If underlying assumptions prove inaccurate or unknown risks or uncertainties materialize, actual results could vary materially from Allergan's expectations and projections. Risks and uncertainties include, among other things, the risk that the court may not approve Allergan's plea or other aspects of the criminal resolution; the results of any pending or future litigation and Allergan's compliance with the CIA; general industry, biologic and pharmaceutical market conditions; technological advances and patents attained by competitors; challenges inherent in the research and development and regulatory processes; inconsistency of treatment results among patients; potential difficulties in manufacturing; and governmental laws and regulations affecting domestic and foreign operations. Additional information concerning these and other risk factors can be found in press releases issued by Allergan, as well as Allergan's public filings with the Securities and Exchange Commission, including the discussion under the heading "Risk Factors" in Allergan's 2009 Form 10-K and Allergan's quarterly reports on Form 10-Q for the quarters ended March 31, 2010 and June 30, 2010. Copies of Allergan's press releases and additional information about Allergan are available on the World Wide Web at www.allergan.com or you can contact the Allergan Investor Relations Department by calling 1-714-246-4636.

**About Allergan, Inc.**
Allergan, Inc. is a multi-specialty health care company established 60 years ago with a commitment to uncover the best of science and develop and deliver innovative and meaningful treatments to help people reach their life's potential. Today, we have more than 8,000 highly dedicated and talented employees, global marketing and sales capabilities with a presence in more than 100 countries, a rich and ever-evolving portfolio of pharmaceuticals, biologics and medical devices, and state-of-the-art resources in R&D, manufacturing and safety surveillance that help millions of patients see more clearly, move more freely and express themselves more fully. From our beginnings as an eye care company to our focus today on several medical specialties, including ophthalmology, neurosciences, obesity, urologics, medical

**EXHIBIT E**
**PAGE 34**

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

aesthetics and dermatology, Allergan is proud to celebrate 60 years of medical advances and proud to support the patients and physicians who rely on our products and the employees and communities in which we live and work.

SOURCE: Allergan, Inc.

**Allergan Contacts**
Caroline Van Hove          714-246-5134 (media)
Jim Hindman               714-246-4636 (investors)
Joann Bradley             714-246-4766 (investors)
Emil Schultz              714-246-4474 (investors)

© 2010 Allergan, Inc. Irvine, CA 92612. ® marks owned by Allergan, Inc.

---

i Allergan data on file; Medical Affairs
ii Allergan data on file; Global Regulatory Affairs
iii Allergan data on file; Global Literature & Information Services

---

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

**Exhibit  F**

State of Delaware
Secretary of State
Division of Corporations
Delivered 08:57 AM 04/30/2010
FILED 08:20 AM 04/30/2010
SRV 100444209 - 0837097 FILE

# AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

## OF

## ALLERGAN, INC.

\* \* \* \* \*

ALLERGAN, INC. (the "Corporation"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

1.    The Corporation was originally incorporated on April 14, 1977, under the name of ALLERGAN PHARMACEUTICALS, INC. Pursuant to a Certificate of Amendment filed on September 26, 1986, the name of the Corporation was changed and now is ALLERGAN, INC.

2.    Pursuant to Sections 242 and 245 of the General Corporation Law of the State of Delaware, this Amended and Restated Certificate of Incorporation (this "Certificate of Incorporation") restates and integrates and further amends the provisions of the Restated Certificate of Incorporation of the Corporation.

3.    This Certificate of Incorporation amends and restates in its entirety the Corporation's Restated Certificate of Incorporation filed on May 22, 1989, as heretofore amended, to read as follows:

### ARTICLE 1. Name

The name of the Corporation is Allergan, Inc.

### ARTICLE 2. Registered Office

The address of the registered office of the Corporation in the State of Delaware is The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Prentice-Hall Corporation System, Inc.

### ARTICLE 3. Purpose

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware, as may be amended from time to time. The Corporation shall have perpetual existence.

### ARTICLE 4. Authorized Capital Stock

The aggregate number of shares which the Corporation shall have authority to issue is 505,000,000, to be divided into (a) 500,000,000 shares of Common Stock, par value $.01 per share and (b) 5,000,000 shares of Preferred Stock, par value $.01 per share.

The Board of Directors is hereby empowered to cause the Preferred Stock to be issued from time to time for such consideration as it may from time to time fix, and to cause such Preferred Stock to be issued in series with such voting powers and such designations, preferences and relative, participating, optional or other special rights as designated by the Board of Directors in the resolution providing for the issue of such series. Shares of Preferred Stock of any one series shall be identical in all respects.

### ARTICLE 5. Bylaws

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind the bylaws of the Corporation.

### ARTICLE 6. Classified Board of Directors

The number of directors that shall constitute the whole Board of Directors shall be fixed by, or in the manner provided in, the bylaws of the Corporation. The directors of the Corporation shall be divided into three classes, as nearly equal in number as reasonably possible, with the directors in each class to hold office until their successors are elected and qualified. Each member of the Board of Directors in the first class of directors shall hold office until the annual meeting of stockholders in 2011, each member of the Board of Directors in the second class of directors shall hold office until the annual meeting of stockholders in 2012 and each member of the Board of Directors in the third class of directors shall hold office until the annual meeting of stockholders in 2013. At each annual meeting of stockholders of the Corporation, the successors to the class of directors whose term shall then expire shall be elected to hold office for a three-year term. If the number of directors is changed, any increase or decrease shall be apportioned among the classes so as to maintain the number of directors in each class as nearly equal as possible, and any additional directors of any class elected to fill a vacancy resulting from an increase in such class shall hold office for a term that shall coincide with the remaining term of that class, but in no case will a decrease in the number of directors shorten the term of any incumbent director. A director shall hold office until the annual meeting for the year in which his term expires and until his successor shall be elected and shall qualify, subject, however, to prior death, resignation, retirement, disqualification or removal from office.

Notwithstanding the foregoing, whenever the holders of any one or more classes or series of Preferred Stock issued by the Corporation shall have the right, voting separately by class or series, to elect directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by the terms of this Restated Certificate of Incorporation or the resolution or resolutions adopted by the Board of Directors pursuant to Article 4 hereof, and such directors so elected shall not be divided into classes pursuant to this unless expressly provided by such terms.

EXHIBIT F
PAGE 37

Elections of directors need not be by written ballot unless the bylaws of the
Corporation shall so provide.

### ARTICLE 7. Removal of Directors

Subject to the rights, if any, of the holders of shares of Preferred Stock then
outstanding, any or all of the directors of the Corporation may be removed from office by the
stockholders at any annual or special meeting of stockholders of the Corporation, the notice of
which shall state that the removal of a director or directors is among the purposes of the meeting,
but only for cause, by the affirmative vote of at least a majority of the outstanding shares of stock
of the Corporation entitled to vote generally in the election of directors of the Corporation.

### ARTICLE 8. Board of Directors Vacancies

Subject to the rights, if any, of the holders of shares of Preferred Stock then
outstanding, newly created directorships resulting from any increase in the number of directors
or any vacancy on the Board of Directors resulting from death, resignation, disqualification,
removal or other cause shall be filled solely by the affirmative vote of a majority of the
remaining directors then in office, even though less than a quorum, or by a sole remaining
director. Any director elected in accordance with the preceding sentence shall hold office for the
remainder of the full term of the class of directors in which the new directorship was created or
the vacancy occurred and until such director's successor shall have been elected and qualified.
No decrease in the number of directors constituting the Board of Directors shall shorten the term
of any incumbent director.

### ARTICLE 9. No Stockholder Action by Written Consent

Any action required or permitted to be taken at any annual or special meeting of
stockholders may be taken only upon the vote of the stockholders at an annual or special meeting
duly called and may not be taken by written consent of the stockholders.

### ARTICLE 10. Special Meetings of the Stockholders

Special meetings of the stockholders of the Corporation for any purpose or
purposes may be called at any time by the Board of Directors, the Chairman of the Board of
Directors or the Chief Executive Officer of the Corporation. Subject to the rights, if any, of the
holders of shares of Preferred Stock then outstanding, special meetings of the stockholders of the
Corporation may not be called by any other person or persons.

### ARTICLE 11. Annual Meetings of Stockholders

At an annual meeting of stockholders, only such business shall be conducted, and
only such proposals shall be acted upon, as shall have been brought before the annual meeting
(a) by, or at the direction of, a majority of the directors, or (b) by any stockholder of the
Corporation who complies with the notice procedures set forth in this Article 11. For a proposal
to be properly brought before an annual meeting by a stockholder, the stockholder must have
given timely notice thereof in writing to the Secretary of the Corporation. To be timely, a
stockholder's notice must be delivered to, or mailed and received at, the principal executive

3

offices of the corporation not less than 30 days nor more than 60 days prior to the scheduled annual meeting, regardless of any postponements, deferrals or adjournments of that meeting to a later date; *provided, however*, that if less than 40 days' notice or prior public disclosure of the date of the scheduled annual meeting is given or made, notice by the stockholder, to be timely, must be so delivered or received not later than the close of business on the tenth day following the earlier of the day on which such notice of the date of the scheduled annual meeting was mailed or the day on which such public disclosure was made. A stockholder's notice to the Secretary shall set forth as to each matter the stockholder proposes to bring before the annual meeting (a) a brief description of the proposal desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (b) the name and address, as they appear on the Corporation's books, of the stockholder proposing such business and any other stockholders known by such stockholder to be supporting such proposal, (c) the class and number of shares of the Corporation's stock which are beneficially owned by the stockholder on the date of such stockholder notice and by any other stockholders known by such stockholder to be supporting such proposal on the date of such stockholder notice, and (d) any financial interest of the stockholder in such proposal.

The presiding officer of the annual meeting shall determine and declare at the annual meeting whether the stockholder proposal was made in accordance with the terms of this Article 11. If the presiding officer determines that a stockholder proposal was not made in accordance with the terms of this Article 11, he shall so declare at the annual meeting and any such proposal shall not be acted upon at the annual meeting.

This provision shall not prevent the consideration and approval or disapproval at the annual meeting of reports of officers, directors and committees of the Board of Directors, but, in connection with such reports, no new business shall be acted upon at such annual meeting unless stated, filed and received as herein provided.

### ARTICLE 12. Stockholder Nomination of Directors

Subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, only persons who are nominated in accordance with the following procedures shall be eligible for election as directors. Nominations of persons for election to the Board of Directors of the Corporation may be made at a meeting of stockholders by or at the direction of the Board of Directors by any nominating committee or person appointed by the Board of Directors or by any stockholder of the Corporation entitled to vote for the election of directors at the meeting who complies with the notice procedures set forth in this Article 12. Such nominations, other than those made by or at the direction of the Board of Directors, shall be made pursuant to timely notice in writing to the Secretary of the Corporation. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not less than 30 days nor more than 60 days prior to the scheduled annual meeting, regardless of any postponements, deferrals or adjournments of that meeting to a later date; *provided, however*, that if less than 40 days' notice or prior public disclosure of the date of the scheduled annual meeting is given or made, notice by the stockholder, to be timely, must be so delivered or received not later than the close of business on the tenth day following the earlier of the day on which such notice of the date of the scheduled annual meeting was mailed or the day on which such public disclosure was made. A stockholder's notice to the

4

Secretary shall set forth (a) as to each person whom the stockholder proposes to nominate for election or re-election as a director, (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) the class and number of shares of capital stock of the Corporation which are beneficially owned by the person and (iv) any other information relating to the person that is required to be disclosed in solicitations for proxies for election of directors pursuant to Rule 14a under the Securities Exchange Act of 1934, as amended; and (b) as to the stockholder giving the notice (i) the name and address, as they appear on the Corporation's books, of the stockholder and (ii) the class and number of shares of the Corporation's stock which are beneficially owned by the stockholder on the date of such stockholder notice. The Corporation may require any proposed nominee to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as director of the Corporation.

The presiding officer of the annual meeting shall determine and declare at the annual meeting whether the nomination was made in accordance with the terms of this Article 12. If the presiding officer determines that a nomination was not made in accordance with the terms of this Article 12, he shall so declare at the annual meeting and any such defective nomination shall be disregarded.

### ARTICLE 13. Limitation of Director Liability

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended after the date hereof to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.

### ARTICLE 14. Indemnification

(a)    Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such

5

amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith. Such indemnification shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators; *provided, however,* that, except as provided in subparagraph (b) hereof, the Corporation shall indemnify any such indemnitee seeking indemnification in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. The right to indemnification conferred in this Article 14 shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition (an "expense advancement"); *provided, however,* that, if the Delaware General Corporation Law so requires, the payment of such expenses incurred by an indemnitee in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such indemnitee while a director or officer, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made upon delivery to the Corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified under this Article 14 or otherwise; and *provided, further,* that no expense advancement shall be paid by the Corporation if independent legal counsel shall advise the Board of Directors in a written opinion that, based upon the facts known to such counsel at the time, (a) the indemnitee acted in bad faith or deliberately breached his or her duty to the Corporation or its stockholders, and (b) as a result of such conduct by the indemnitee, it is more likely than not that it will ultimately be determined that such indemnitee has not met the standards of conduct which make it permissible under the Delaware General Corporation Law for the Corporation to indemnify such indemnitee. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of directors and officers.

(b)     If a claim under subparagraph (a) of this Article 14 is not paid in full by the Corporation within 30 days after a written claim has been received by the Corporation, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an expense advancement, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. It shall be a defense to any such action that the indemnitee has not met the standards of conduct which make it permissible under the Delaware General Corporation Law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the indemnitee is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) that the indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the indemnitee has not met the applicable standard of conduct; *provided, however,* that a determination by the board of directors denying

6

an expense advancement based upon the written opinion of independent legal counsel as provided for in subparagraph (a) above shall be a complete defense to any action seeking an expense advancement, but such determination shall not be a defense or create a presumption that the indemnitee is not entitled to be indemnified hereunder upon the final disposition of the proceeding.

(c)    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article 14 shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of this Certificate of Incorporation, bylaw, agreement, vote of stockholders or disinterested directors or otherwise.

(d)    The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any such expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

**ARTICLE 15. Business Combinations**

(a)    For purposes of this Article 15, the following terms shall have the meanings indicated, and all capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Section 203(c) of the Delaware General Corporation Law, as in effect on the date of filing of this Certificate of Incorporation:

(i)    "Business Combination" shall have the meaning ascribed to it in Section 203(c)(3) of the Delaware General Corporation Law; *provided, however,* that the term "interested stockholder," as used therein, shall have the meaning ascribed to it in subparagraph (a)(iv) below.

(ii)    "Disinterested Shares" shall mean the shares of Voting Stock of the Corporation held by Persons other than an Interested Stockholder, and each reference herein to a percentage or portion of the Disinterested Shares shall refer to such percentage or portion of the votes entitled to be cast by the holders of such Disinterested Shares.

(iii)    "Independent Directors" shall mean the members of the Board of Directors who were directors of the Corporation prior to any Person becoming an Interested Stockholder or were recommended for election or elected to succeed such directors by a majority of such directors.

(iv)    "Interested Stockholder" shall mean any Person (other than the Corporation and any direct or indirect majority-owned subsidiary of the Corporation) that (1) is the owner of 5% or more of the outstanding Voting Stock or (2) is an Affiliate or Associate of the Corporation and was the owner of 5% or more of the outstanding Voting Stock at any time within the three-year period immediately prior to the date on which it is sought to be determined whether such Person is an Interested Stockholder; and the Affiliates and Associates of such Person. For the purpose of determining whether a Person is an Interested Stockholder, the Voting Stock deemed to be outstanding shall

7

include stock deemed to be owned by the Person through application of Section 203(c)(8) of the Delaware General Corporation Law, but shall not include any other unissued stock of the Corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

(v)     "Voting Stock" shall mean stock of the Corporation of any class or series entitled to vote generally in the election of directors of the Corporation, and each reference herein to a percentage or portion of shares of Voting Stock shall refer to such percentage or portion of the votes entitled to be cast by the holders of such shares.

(b)     In addition to any affirmative vote required by applicable law or any other provision of this Certificate of Incorporation or specified in any agreement, and in addition to any voting rights granted to or held by the holders of any series of Preferred Stock, the approval or authorization of any Business Combination with an Interested Stockholder that has not been approved by a majority of the Independent Directors prior to the date that such stockholder became an Interested Stockholder, shall require the affirmative vote of the holders of not less than a majority of the Disinterested Shares then outstanding.

(c)     A majority of the Independent Directors shall have the power and duty to determine, on the basis of information known to them after reasonable inquiry, all facts necessary to determine compliance with this Article 15, including without limitation, (i) whether a Person is an Interested Stockholder; (ii) the number of shares of Voting Stock Owned by any Person, (iii) whether a Person is an Affiliate or Associate of another Person, (iv) whether a proposed transaction is a Business Combination and (v) whether a Business Combination shall have been approved by a majority of the Independent Directors prior to the date that a stockholder became an Interested Stockholder; and any such determination made in good faith by a majority of the Independent Directors shall be conclusive and binding for all purposes of this Article 15.

**ARTICLE 16. Board Considerations**

The Board of Directors, each committee of the Board and each individual director, in discharging their respective duties under applicable law and this Certificate of Incorporation and in determining what they each believe to be in the best interests of the Corporation and its stockholders, may consider the effects, both short-term and long-term, of any action or proposed action taken or to be taken by the Corporation, the Board of Directors or any committee of the Board on the interests of (i) the employees, distributors, customers, suppliers and/or creditors of the Corporation and its subsidiaries and (ii) the communities in which the Corporation and its subsidiaries own or lease property or conduct business, all to the extent that the Board, any committee of the Board or any individual director deems pertinent under the circumstances; *provided, however*, that the provisions of this Article 16 shall not limit in any way the right of the Board to consider any other lawful factors in making its determinations, including, without limitation, the effects, both short-term and long-term, of any action or proposed action on the Corporation or its stockholders directly; and *provided further* that this Article 16 shall be deemed solely to grant discretionary authority to the Board, each committee of the Board and each individual director and shall not be deemed to provide to any specific constituency any right to be considered.

8

**ARTICLE 17.  Amendment of Certificate of Incorporation**

The Corporation reserves this right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.  In addition to any affirmative vote required by applicable law or any other provision of this Certificate of Incorporation, and in addition to any voting rights granted to or held by the holders of any series of Preferred Stock, the affirmative vote of the holders of not less than a majority of the outstanding shares of stock of the Corporation entitled to vote generally in the election of directors of the Corporation shall be required to amend or repeal, or adopt any provisions inconsistent with, the provisions of this Certificate of Incorporation.

IN WITNESS WHEREOF, this Certificate of Incorporation has been signed by David E.I. Pyott, the Corporation's Chief Executive Officer, and attested by Douglas S. Ingram, the Corporation's Secretary, this 30th day of April, 2010.

_____
David E.I. Pyott, Chief Executive Officer

_____
Douglas S. Ingram, Secretary

9

**Exhibit G**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## FORM 8-K

---

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

August 30, 2010
Date of Report (Date of Earliest Event Reported)

---

# ALLERGAN, INC.
### (Exact Name of Registrant as Specified in its Charter)

| Delaware | 1-10269 | 95-1622442 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

2525 Dupont Drive
Irvine, California 92612
(Address of Principal Executive Offices) (Zip Code)

(714) 246-4500
(Registrant's Telephone Number, Including Area Code)

N/A
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

**EXHIBIT G**
**PAGE 45**

**Item 1.01.    Entry into a Material Definitive Agreement.**

On September 1, 2010, Allergan, Inc. (the "Company") announced that it reached resolution with the United States Department of Justice (the "DOJ") regarding the previously reported government investigation into the Company's past U.S. sales and marketing practices relating to certain therapeutic uses of Botox®. The Company hereby incorporates by reference the press release dated September 1, 2010 and filed as Exhibit 99.1 to this report (the "Settlement Press Release").

A copy of the agreement setting forth the terms and conditions of the civil settlement described in the Settlement Press Release (the "Federal Settlement Agreement") is filed as Exhibit 10.1 to this report and incorporated by reference herein. The Company, together with its subsidiary Allergan USA, Inc. ("Allergan USA"), entered into the Federal Settlement Agreement on August 31, 2010 with the United States of America, acting through the DOJ and the United States Attorney's Office for the Northern District of Georgia (the "USAO") and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS"), the TRICARE Management Activity, the United States Office of Personnel Management, the United States Department of Veterans Affairs, and Office of Workers' Compensation Programs of the United States Department of Labor; and the relators in the qui tam actions identified in the Federal Settlement Agreement.

A copy of the Corporate Integrity Agreement described in the Settlement Press Release (the "Corporate Integrity Agreement") is filed as Exhibit 10.2 to this report and incorporated by reference herein. The Company entered into the Corporate Integrity Agreement with OIG-HHS on August 30, 2010. Failure to comply with its obligations under the Corporate Integrity Agreement could result in the Company incurring financial penalties or being excluded from participation in federal health care programs.

The proposed terms and conditions of the Company's plea to the misdemeanor "misbranding" charge referenced in the Settlement Press Release are set forth in a written agreement with the USAO (the "Plea Agreement") that the Company expects will be executed contemporaneously with the plea hearing in the United States District Court for the Northern District of Georgia (the "Court"). The plea hearing has not yet been scheduled. The recommended sentence in the Plea Agreement is subject to approval by the Court, and there can be no assurance that the Court will approve the Plea Agreement or regarding the timing of any such approval. The form of the Plea Agreement is filed as Exhibit 10.3 to this report and incorporated by reference herein.

The Federal Settlement Agreement provides for payment by the Company of a settlement amount of $225 million, plus accrued interest, consisting of (1) a federal settlement amount of $210.15 million, plus applicable accrued interest, payable to the United States within seven business days after the later of (a) execution of the Federal Settlement Agreement and (b) approval by the Court of the Plea Agreement and (2) a state settlement amount of $14.85 million, plus applicable accrued interest, a designated portion of which state settlement amount and accrued interest would be payable to each U.S. state—including as a state, for this purpose, the District of Columbia—that enters into a separate state settlement agreement with the

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

Company and Allergan USA. If the Court does not accept the Company's guilty plea under, or impose the sentence contemplated by, the Plea Agreement, each of the Company or the United States may, at its option, elect to have the Federal Settlement Agreement become null and void and be rescinded.

The Plea Agreement provides for a sentence, to be imposed by the Court, requiring the Company to pay to the United States $375 million, consisting of a $350 million criminal fine and $25 million in satisfaction of a forfeiture obligation, within 10 business days of the date of sentencing.

Both the Federal Settlement Agreement and the Plea Agreement are conditioned on the Company's dismissal with prejudice of the declaratory judgment action filed by the Company in October 2009 in the United States District Court for the District of Columbia, captioned Allergan, Inc. v. United States, et al., 1:09-cv-01879, in which the Company sought a ruling that it could proactively share truthful scientific and medical information with the medical community to assist physicians in evaluating the risks and benefits if they choose to use *Botox*® off-label to treat certain forms of spasticity.

The description of the Federal Settlement Agreement, the Corporate Integrity Agreement and the Plea Agreement in this Item 1.01 is not complete and is qualified in its entirety by the terms of the Federal Settlement Agreement, the Corporate Integrity Agreement and the form of Plea Agreement, copies of which are filed as Exhibit 10.1, 10.2 and 10.3, respectively, hereto and incorporated herein by reference. If the Court does not approve the Plea Agreement, there can be no assurance that the Federal Settlement Agreement will take effect as currently contemplated or at all or that any charges or claims to which the Plea Agreement, the Federal Settlement Agreement or the government investigation relates would ultimately be resolved in a manner consistent with, or not materially more adverse to the Company than, the terms and conditions that would apply under the Plea Agreement, the Federal Settlement Agreement and related state settlement agreements and the Corporate Integrity Agreement as described in this report.

## Item 2.06.   Material Impairments.

On August 31, 2010, the Company concluded that the intangible assets and a related prepaid royalty asset associated with the *Sanctura*® franchise (the "*Sanctura*® Assets"), which the Company acquired in connection with its October 2007 acquisition of Esprit Pharma Holding Company, Inc. and certain subsequent licensing and commercialization transactions, have become impaired. The Company determined that an impairment charge was required with respect to the *Sanctura*® Assets because the estimated undiscounted future cash flows over their remaining useful life were not sufficient to recover the current carrying amount of the *Sanctura*® Assets and the carrying amount exceeded the estimated fair value of those assets due to a recent reduction in expected future financial performance for the *Sanctura*® franchise resulting from lower than anticipated acceptance by patients, physicians and payers. As a result, the Company's third quarter and full year 2010 financial results are expected to include an aggregate non-cash pretax impairment charge of approximately $340 million to $350 million related to the *Sanctura*® Assets. The Company has not yet completed its analysis of the fair value of the *Sanctura*® Assets and expects to complete that analysis by the end of its third fiscal quarter. The

**EXHIBIT G**
**PAGE 47**

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

amount of the impairment charge is dependent upon a final determination of the fair value of the *Sanctura*® Assets. This non-cash impairment charge will have no effect on the Company's cash balances, cash flows from operating activities or ongoing operations, and the Company will continue to market and sell the *Sanctura*® product line.

**Item 8.01.   Other Events.**

On September 1, 2010, the Company announced that it reached a resolution with the DOJ regarding the previously reported government investigation into the Company's past U.S. sales and marketing practices relating to certain therapeutic uses of *Botox*®. The Company hereby incorporates by reference (1) the press release dated September 1, 2010 and filed as Exhibit 99.1 to this report and (2) the disclosure in Item 1.01 of this report.

* * * * *

Statements made by the Company in this report that are not historical facts, including statements relating to the implementation and effect of the agreements described in Items 1.01 and 8.01 of this report, the estimated timing and amount of the pre-tax charges in connection with the global settlement with the DOJ, the timing of the payment of the global settlement costs and the timing, amount and impact of the impairment charge discussed in Item 2.06 of this report, are forward-looking statements. All forward-looking statements in this report reflect the Company's current analysis of existing trends and information and represent the Company's judgment only as of the date of this report. These statements are not guarantees of future performance and rely on a number of assumptions concerning future events, many of which are outside of the Company's control, and involve known and unknown risks and uncertainties that could cause the Company's actual results, performance or achievements to differ materially from those expressed or implied by such forward-looking statements. Such risks and uncertainties include, among other things, the risk that the Court may not approve the Plea Agreement, the actual amount of interest and attorneys' fees for which the Company will be liable in connection with the global settlement with the DOJ, the outcome of further analysis of the valuation of the Company's *Sanctura*® and *Sanctura XR*® business, the results of any pending or future litigation and the Company's compliance with the Corporate Integrity Agreement. Additional such risks and uncertainties are described in press releases issued by the Company, including the press release filed as Exhibit 99.1 to this report, as well as the Company's public filings with the Securities and Exchange Commission, including the discussion under the heading "Risk Factors" in the Company's Form 10-K for the fiscal year ended December 31, 2009 and Forms 10-Q for the quarters ended March 31, 2010 and June 30, 2010. Except as required under the federal securities laws and the rules and regulations of the U.S. Securities and Exchange Commission, the Company does not have any intention or obligation to update publicly any forward-looking statements made in this report, whether as a result of new information, future events, changes in assumptions or otherwise. The reader is cautioned not to rely on these forward-looking statements.

**EXHIBIT G**
**PAGE 48**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ALLERGAN, INC.**

Date:  September 1, 2010

By:  ___/s/ Matthew J. Maletta_____

Name:  Matthew J. Maletta

Title:  Vice President,
Associate General Counsel and Secretary

EXHIBIT G
PAGE 49

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

**Exhibit  H**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

## CURRENT REPORT
## Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**November 1, 2010**
**Date of Report (Date of Earliest Event Reported)**

---

# ALLERGAN, INC.
#### (Exact Name of Registrant as Specified in its Charter)

| | | |
|---|---|---|
| **Delaware** | **1-10269** | **95-1622442** |
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**2525 Dupont Drive**
**Irvine, California 92612**
**(Address of Principal Executive Offices) (Zip Code)**

**(714) 246-4500**
**(Registrant's Telephone Number, Including Area Code)**

**N/A**
**(Former Name or Former Address, if Changed Since Last Report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02.    Results of Operations and Financial Condition.**

On November 1, 2010, Allergan, Inc. ("Allergan") issued a press release announcing operating results for the third quarter ended September 30, 2010. In its press release, Allergan included non-GAAP financial measures, as defined in Regulation G promulgated by the Securities and Exchange Commission. A copy of the press release is furnished as Exhibit 99.1 hereto and is incorporated herein by reference.

This information and the information contained in the press release shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section. The information in Item 2.02 of this Current Report is not incorporated by reference into any filings of Allergan made under the Securities Act of 1933, as amended, whether made before or after the date of this Current Report, regardless of any general incorporation language in the filing unless specifically stated so therein.

**Item 9.01.    Financial Statements and Exhibits.**

(d)    Exhibits .

99.1  Allergan, Inc. press release dated November 1, 2010

EXHIBIT H
PAGE 51

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ALLERGAN, INC.**

Date:  November 1, 2010

By:     /s/ Matthew J. Maletta
Name:  Matthew J. Maletta
Title:   Vice President,
         Associate General Counsel and Secretary

**Exhibit Index**

| Exhibit | Description of Exhibit |
|---------|------------------------|
| 99.1 | Allergan, Inc. press release dated November 1, 2010 |

Exhibit 99.1

# News Release



**ALLERGAN**
2525 Dupont Drive
Irvine, CA 92612-1599
(714) 246-4500
www.allergan.com

### ALLERGAN REPORTS THIRD QUARTER 2010 OPERATING RESULTS
¡   Board of Directors Declares Third Quarter Dividend

(IRVINE, Calif., November 1, 2010) — Allergan, Inc. (NYSE: AGN) today announced operating results for the quarter ended September 30, 2010. Allergan also announced that its Board of Directors has declared a third quarter dividend of $0.05 per share, payable on December 1, 2010 to stockholders of record on November 10, 2010.

## Operating Results Attributable to Stockholders
For the quarter ended September 30, 2010:

- Allergan reported $2.21 diluted loss per share attributable to stockholders compared to $0.58 diluted earnings per share attributable to stockholders for the third quarter of 2009.

- Allergan reported $0.78 non-GAAP diluted earnings per share attributable to stockholders compared to $0.70 non-GAAP diluted earnings per share attributable to stockholders for the third quarter of 2009, an 11.4 percent increase.

## Product Sales
For the quarter ended September 30, 2010:

- Allergan reported $1,192.0 million total product net sales. Total product net sales increased 5.7 percent compared to total product net sales in the third quarter of 2009. On a constant currency basis, total product net sales increased 6.3 percent compared to total product net sales in the third quarter of 2009.

    - Total specialty pharmaceuticals net sales increased 5.2 percent, or 5.7 percent on a constant currency basis, compared to total specialty pharmaceuticals net sales in the third quarter of 2009.

    - Total medical devices net sales increased 8.3 percent, or 9.0 percent on a constant currency basis, compared to total medical devices net sales in the third quarter of 2009.

"We are very pleased with our third quarter results," said David E.I. Pyott, Allergan's Chairman of the Board and Chief Executive Officer. "Strong R&D performance led to a series of several important product approvals, including FDA approval of LUMIGAN ® 0.01%, OZURDEX ® for uveitis, and BOTOX ® for the prophylactic treatment of headaches in adults with chronic migraine, as well as approvals in Europe and Canada."

-more-

2-2-2

## Product and Pipeline Update

During the third quarter of 2010:

- Effective July 1, 2010, Allergan established direct operations in Poland and Turkey.

- On July 9, 2010, Allergan announced that BOTOX ® (botulinum toxin type A) was licensed by the Medicines and Healthcare Products Regulatory Agency in the United Kingdom for the prophylaxis of headaches in adults who have chronic migraine (headaches on at least 15 days per month of which at least 8 days are with migraine).

- On July 27, 2010, the European Medicines Agency granted marketing authorization for OZURDEX ® (dexamethasone 700mcg intravitreal implant in applicator) in the 27 member states of the European Union, making OZURDEX ® the first licensed treatment in Europe for macular edema in patients with retinal vein occlusion.

- On August 31, 2010, Allergan announced that the United States Food and Drug Administration (FDA) approved LUMIGAN ® (bimatoprost ophthalmic solution) 0.01% as a first-line therapy indicated for the reduction of elevated intraocular pressure in patients with open-angle glaucoma or ocular hypertension.

- On September 24, 2010, Allergan announced that the FDA approved OZURDEX ® (dexamethasone intravitreal implant) 0.7 mg for the treatment of non-infectious ocular inflammation, or uveitis, affecting the posterior segment of the eye.

- Health Canada approved RESTASIS ® (cyclosporine ophthalmic emulsion) 0.05% for the treatment of moderate to moderately severe aqueous deficient dry eye disease.

- Allergan acquired from Vistakon Pharmaceuticals, LLC, Janssen Pharmaceutica N.V., Beerse and Johnson & Johnson Vision Care Inc. the global license to manufacture and commercialize alacafadine 0.25%, a topical allergy medication for the prevention and treatment of itching associated with allergic conjunctivitis. Alcaftadine is FDA-approved in the United States under the brand name LASTACAFT™ (alcaftadine ophthalmic solution).

Following the end of the third quarter of 2010:

- On October 15, 2010, Allergan announced that the FDA approved BOTOX ® (onabotulinumtoxinA) for the prophylactic treatment of headaches in adults with chronic migraine, a distinct and severe neurological disorder characterized by patients who have a history of migraine and suffer from headaches on 15 or more days per month with headaches lasting four hours a day or longer.

- Allergan filed a supplemental Biologics License Application (sBLA) with the FDA for the use of BOTOX ® in the treatment of urinary incontinence due to neurogenic detrusor overactivity resulting from neurogenic bladder.

**-more-**

3-3-3

## Other Events

- On August 31, 2010, Allergan concluded that the intangible assets and a related prepaid royalty asset associated with the SANCTURA ® franchise (the "SANCTURA ® Assets"), which Allergan acquired in connection with its October 2007 acquisition of Esprit Pharma Holding Company, Inc. and certain subsequent licensing and commercialization transactions, had become impaired. Allergan determined that an impairment charge was required with respect to the SANCTURA ® Assets because the estimated undiscounted future cash flows over their remaining useful life were not sufficient to recover the current carrying amount of the SANCTURA ® Assets and the carrying amount exceeded the estimated fair value of those assets due to a reduction in expected future financial performance for the SANCTURA ® franchise resulting from lower than anticipated acceptance by patients, physicians and payers. As a result, the Company's third quarter 2010 financial results include an aggregate non-cash pre-tax charge of $369.1 million related to the impairment of the SANCTURA ® Assets.

- On September 1, 2010, Allergan announced that it had reached a resolution with the United States Department of Justice (DOJ) regarding the previously reported Government investigation into Allergan's past U.S. sales and marketing practices relating to certain therapeutic uses of BOTOX ®. Allergan cooperated with the Government in a multi-year investigation regarding the use of BOTOX ® for certain therapeutic treatments covering a period that commenced in January of 2000. The parties resolved all issues involved in the investigation by entering into a global settlement, pursuant to which:

  1) Allergan agreed to plead guilty to a single misdemeanor "misbranding" charge covering the period 2000 through 2005 and pay to the Government $375 million. This misbranding charge is known as a strict liability offense, and does not involve false or deceptive conduct. On October 5, 2010, the U.S. District Court in Atlanta, Georgia accepted Allergan's plea and approved the criminal fine.

  2) Allergan agreed to pay $225 million to resolve civil claims asserted by DOJ under the civil False Claims Act. The civil settlement is an element of a global settlement that Allergan believes is in the best interest of its stockholders. However, Allergan denies liability associated with these civil allegations and does not believe there is merit to them factually or legally.

  3) Allergan was required by the Government to dismiss Allergan's First Amendment lawsuit pending in Washington, D.C., in which Allergan sought a ruling that it could proactively share truthful scientific and medical information with the medical community to assist physicians in evaluating the risks and benefits if they choose to use BOTOX ® off-label to treat certain forms of spasticity.

  4) Allergan has entered into a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the U.S. Department of Health and Human Services. Under the CIA, Allergan will maintain its current compliance program and undertake a series of compliance-related obligations, including additional monitoring, maintenance of specific written standards, auditing, training, education, reporting and disclosure, for five years. The CIA also provides for an independent third-party review organization to assess and report on Allergan's compliance program.

-more-

4-4-4

5) Allergan recorded total pre-tax charges of $609.9 million in the third quarter in connection with the global settlement with the DOJ. This amount includes estimated interest and certain attorneys' fees that Allergan is obligated to pay in connection with the global settlement, but excludes Allergan's ongoing administrative legal fees and other costs. Allergan is presently determining the tax treatment of the global settlement charges. As such, the tax impact of such charges cannot be reasonably estimated at this time. Allergan paid substantially all of the global settlement costs in October 2010, and currently expects to pay the remaining balance by the end of 2010.

## Outlook

For the full year of 2010, Allergan expects:

- Total product net sales between $4,750 million and $4,800 million.
  - Total specialty pharmaceuticals net sales between $3,950 million and $3,970 million.
  - Total medical devices net sales between $800 million and $830 million.
  - ALPHAGAN ® franchise product net sales between $380 million and $390 million.
  - LUMIGAN ® franchise product net sales between $520 million and $530 million.
  - RESTASIS ® product net sales between $600 million and $610 million.
  - SANCTURA ® franchise product net sales at approximately $60 million.
  - BOTOX ® product net sales between $1,390 million and $1,400 million.
  - LATISSE ® product net sales at approximately $90 million.
  - Breast aesthetics product net sales between $300 million and $310 million.
  - Obesity intervention product net sales between $230 million and $240 million.
  - Facial aesthetics product net sales between $270 million and $280 million.
- Non-GAAP cost of sales to product net sales ratio between 15.5% and 16.0%.
- Non-GAAP other revenue at approximately $50 million.
- Non-GAAP selling, general and administrative expenses to product net sales ratio at approximately 40%.
- Non-GAAP research and development expenses to product net sales ratio at approximately 16%.
- Non-GAAP amortization of acquired intangible assets at approximately $20 million. This expectation excludes the amortization of acquired intangible assets associated with the Inamed, Cornéal, EndoArt, Esprit, Samil and Serica acquisitions, the ACZONE ® asset purchase and LASTACAFT™ license.
- Non-GAAP diluted earnings per share attributable to stockholders between $3.14 and $3.16.
- Diluted shares outstanding at approximately 308 million.
- Effective tax rate on non-GAAP earnings at approximately 28%.

For the fourth quarter of 2010, Allergan expects:

- Total product net sales between $1,220 million and $1,270 million.
- Non-GAAP diluted earnings per share attributable to stockholders between $0.86 and $0.88.

-more-

EXHIBIT H
PAGE 57

5-5-5

In this press release, Allergan reports certain historical and expected non-GAAP results, including earnings attributable to Allergan, Inc., non-GAAP basic and diluted earnings per share attributable to stockholders as well as non-GAAP other revenues, non-GAAP cost of sales, non-GAAP selling, general and administrative expenses, non-GAAP research and development expenses, non-GAAP amortization of acquired intangible assets, non-GAAP legal settlement, non-GAAP intangible asset impairment and related costs, non-GAAP restructuring charges, non-GAAP interest expense, non-GAAP gain on investments, non-GAAP other, net, non-GAAP provision for income taxes, non-GAAP net earnings and non-GAAP net sales reported in constant currency. Non-GAAP financial measures are reconciled to the most directly comparable GAAP financial measure in the financial tables of this press release and the accompanying footnotes.

### Forward-Looking Statements

In this press release, the statements regarding product development, market potential, expected growth, regulatory approvals, the statements by Mr. Pyott as well as Allergan's earnings per share, product net sales, revenue forecasts and any other statements that refer to Allergan's expected, estimated or anticipated future results, are forward-looking statements. Because forecasts are inherently estimates that cannot be made with precision, Allergan's performance at times differs materially from its estimates and targets, and Allergan often does not know what the actual results will be until after the end of the applicable reporting period. Therefore, Allergan will not report or comment on its progress during a current quarter except through public announcement. Any statement made by others with respect to progress during a current quarter cannot be attributed to Allergan.

All forward-looking statements in this press release reflect Allergan's current analysis of existing trends and information and represent Allergan's judgment only as of the date of this press release. Actual results may differ materially from current expectations based on a number of factors affecting Allergan's businesses, including, among other things the following: changing competitive, market and regulatory conditions; the timing and uncertainty of the results of both the research and development and regulatory processes; domestic and foreign health care and cost containment reforms, including government pricing, tax and reimbursement policies; technological advances and patents obtained by competitors; the performance, including the approval, introduction, and consumer and physician acceptance of new products and the continuing acceptance of currently marketed products; the effectiveness of advertising and other promotional campaigns; the timely and successful implementation of strategic initiatives; the results of any pending or future litigation, investigations or claims; the uncertainty associated with the identification of and successful consummation and execution of external corporate development initiatives and strategic partnering transactions; and Allergan's ability to obtain and successfully maintain a sufficient supply of products to meet market demand in a timely manner. In addition, U.S. and international economic conditions, including higher unemployment, financial hardship, consumer confidence and debt levels, taxation, changes in interest and currency exchange rates, international relations, capital and credit availability, the status of financial markets and institutions, as well as the general impact of continued economic volatility, can materially affect Allergan's results. Therefore, the reader is cautioned not to rely on these forward-looking statements. Allergan expressly disclaims any intent or obligation to update these forward-looking statements except as required to do so by law.

-more-

EXHIBIT H
PAGE 58

6-6-6

Additional information concerning the above-referenced risk factors and other risk factors can be found in press releases issued by Allergan, as well as Allergan's public periodic filings with the Securities and Exchange Commission, including the discussion under the heading "Risk Factors" in Allergan's 2009 Form 10-K and Form 10-Q for the quarters ended March 31, 2010 and June 30, 2010. Copies of Allergan's press releases and additional information about Allergan is available at www.allergan.com or you can contact the Allergan Investor Relations Department by calling 714-246-4636.

### About Allergan, Inc.

Allergan, Inc. is a multi-specialty health care company established 60 years ago with a commitment to uncover the best of science and develop and deliver innovative and meaningful treatments to help people reach their life's potential. Today, we have more than 9,000 highly dedicated and talented employees, global marketing and sales capabilities with a presence in more than 100 countries, a rich and ever-evolving portfolio of pharmaceuticals, biologics and medical devices, and state-of-the-art resources in R&D, manufacturing and safety surveillance that help millions of patients see more clearly, move more freely and express themselves more fully. From our beginnings as an eye care company to our focus today on several medical specialties, including ophthalmology, neurosciences, obesity, urologics, medical aesthetics and dermatology, Allergan is proud to celebrate 60 years of medical advances and proud to support the patients and physicians who rely on our products and the employees and communities in which we live and work.

### Allergan Contacts
Jim Hindman (714) 246-4636 (investors)
Joann Bradley (714) 246-4766 (investors)
Caroline Van Hove (714) 246-5134 (media)

® and ™ Marks owned by Allergan, Inc.

-more-