**Exhibit I**

## Thomson StreetEvents℠

### AGN - Q2 2008 Allergan Earnings Conference Call

Event Date/Time: Jul. 30. 2008 / 11:00AM ET



| THOMSON | www.streetevents.com | Contact Us |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT I
PAGE 60

FINAL TRANSCRIPT

Jul. 30. 2008 / 11:00AM, AGN - Q2 2008 Allergan Earnings Conference Call

## CORPORATE PARTICIPANTS

**Jim Hindman**
*Allergan - SVP, Treasury, Risk, IR*

**David Pyott**
*Allergan - Chairman, CEO*

**Jeff Edwards**
*Allergan - EVP-Fin., Bus. Devel., CFO*

**Scott Whitcup**
*Allergan - EVP, R&D*

**Joann Bradley**
*Allergan - IR*

## CONFERENCE CALL PARTICIPANTS

**Gary Nachman**
*Leerink Swann - Analyst*

**Gregg Gilbert**
*Merrill Lynch - Analyst*

**Peter Bye**
*Jefferies & Company - Analyst*

**Ronny Gal**
*Sanford Bernstein Research - Analyst*

**Larry Biegelsen**
*Wachovia - Analyst*

**David Buck**
*Buckingham Research - Analyst*

**Frank Pinkerton**
*Banc of America - Analyst*

**Amit Hazan**
*Oppenheimer and Company - Analyst*

## PRESENTATION

**Operator**

Hello, and welcome to the Allergan second quarter 2008 earnings conference call. Following today's presentation there will be a formal question-and-answer session. Today's conference call is scheduled to conclude at 9 a.m. Pacific time. To ensure that we are able to accommodate questions from as many participants as possible we ask that each of you limit to a maximum of two questions. (OPERATOR INSTRUCTIONS) At the request of the Company, today's conference is being recorded. If anyone has any objections, you may disconnect at this time. I would like to introduce today's conference host Mr. Jim Hindman, Senior Vice President, Treasury, Risk and Investor Relations. Sir, you may begin.



© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT I
PAGE 61

| Jul. 30. 2008 / 11:00AM, AGN - Q2 2008 Allergan Earnings Conference Call |
| --- |

**Scott Whitcup** - *Allergan - EVP, R&D*

On the first question, since the R&D date there isn't really much of a further update. The urology division realizes the unmet need. We've updated them on our proposals, what they wanted us to do was come back to them closer to the end of this year. They did signal to us that they'd be willing to look at us filing earlier with less treatment cycles which as you know the issue with overactive bladder is we have many patients where the treatment lasts a year or longer. So if you are wedded to three treatment cycles it makes the Phase III trial extremely long. So they realize that that's a hurdle that they might want to compromise on. But we won't have enough data on ultimate trial design until the end of the year. Your second question on the PDUFA date for the (inaudible) trial, we don't have the exact PDUFA date yet. We expect to hear back from the agency by the end of this quarter with the exact date.

**Ronny Gal** - *Sanford Bernstein Research - Analyst*

And David, going to the line shows, and I'm really impressed with your performance this quarter and one question comes to mind. Is, does that involve broadening the market? Is that primarily from going down marketing to groups of physicians who are currently not using fillers or is it more in a head to head competition with competitors in that market? And in addition to that is the question of Restylane plus Lidocaine. There was some discussion that that formulation will not work. What do you guys think? Maybe the competitive product can be formulated with Lidocaine.

**David Pyott** - *Allergan - Chairman, CEO*

Okay. I think in terms of dermal fillers as I really prefaced almost a year ago, we knew that the use of fillers in the U.S. was much lower than that of Europe. And so we therefore, more than instinctively we had really good models and reason to believe that the market would be very responsive to stimulation. Now, I think when one looks at the very top end of the market in terms of the top quintiles, I dare say Restylane has higher market share because that's where physicians were probably the earlier doctors of the product, built up a loyalty, built up a habit of use with Restylane and indeed their patients as well. So I think a large part of the expansion has been our ability to basically bring JUVEDERM to almost all of our BOTOX injectors and so of course if we can suggest to the physicians and then their patients to use both products side by side, there's a real opportunity for improving facial aesthetics results. In terms of JUVEDERM plus Lidocaine obviously we are very pleased with that, and we always just monitor what's going on with competition, and we know that Q-Med had a equivalent of our R&D day I recollect in May in Sweden and at least at that meeting there was no report of Restylane plus Lidocaine product. Now whether they have one, who knows. You'd have to go and ask them.

**Ronny Gal** - *Sanford Bernstein Research - Analyst*

Thank you. I'll get back in queue.

**Operator**

Our next question comes from Larry Biegelsen, from Wachovia.

**Larry Biegelsen** - *Wachovia - Analyst*

Thank you for taking my question. Just a couple of quick ones. LUMIGAN X, why the delay? Could you also give us an update on the status of the BOTOX labor negotiations? When do you expect a change? And lastly, why are the Department of Justice expenses so high and for how long do you expect this to continue? Thanks.

| THOMSON | www.streetevents.com | Contact Us |  |
| --- | --- | --- | --- |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT I
PAGE 62

| Jul. 30. 2008 / 11:00AM, AGN - Q2 2008 Allergan Earnings Conference Call |
| --- |

**David Pyott** - *Allergan - Chairman, CEO*

I think these are all pretty short and easy answers. I think regarding LUMIGAN X, I remarked that we are very pleased with the quality of our data package and of course we see frequently the FDA has just been backed up. That's why we have extended the date, Jeff in his comments remarked that we moved out our assumption from Q2 unfortunately into Q3. Regarding BOTOX label discussions, really we can't say anything there definitively. We have obviously submitted an enormous amount of data to the agency which they are reviewing and they will come back in due course with their comments to our recommendations.

I think regarding the DOJ, the best way to think about this is both the time and also you can imagine the word BOTOX features in many documents in this Company because it is our largest product, and of course BOTOX is used in many different areas both on label and of course whilst we're assiduous in avoiding off label promotion there's nevertheless internal documents that talk about future plans as we've been talking about on this call. Things like specificity et cetera and it has broad use backed up by Compendium.

**Larry Biegelsen** - *Wachovia - Analyst*

Any idea how long it will continue, David?

**David Pyott** - *Allergan - Chairman, CEO*

I think it's early days would be really nothing but wild expectation, but of course one knows looking at other cases, these things can take years.

**Larry Biegelsen** - *Wachovia - Analyst*

Thank you.

**Operator**

Our next question comes from David Buck from Buckingham Research.

**David Buck** - *Buckingham Research - Analyst*

Thanks for taking the question. The first one is either for David or Scott. Can you give us a sense of your confidence level into the data for headache BOTOX headache? For David can you talk a little about why you think the cash pay business so far has been holding up ex-U.S.? And why do you think led over the last couple of quarters starting to see more consumer impact on your cash pay businesses? And what role do you think safety concerns and headlines may have had on BOTOX in particular? Thanks.

**Scott Whitcup** - *Allergan - EVP, R&D*

David, this is Scott. I'll take the BOTOX headache. What we've said previously and everyone knows that migraine is a tough area. That said we think learning from the multiple phase programs that we designed the best study to show an effect in the right patient population. So the studies have gone well. They have been conducted well. We remain confident in the design and as we said at our R&D technology review we will have, through a press release the data from the Phase III program by the end of September.



© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT I
PAGE 63

**Exhibit J**

# ORIGINAL

FILED IN CHAMBERS
U.S.D.C. Atlanta

SEP   1 2010

JAMES N. HATTEN, Clerk
By: L. Wade-Child
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

UNITED STATES OF AMERICA :
:
:
:
v. : CRIMINAL ACTION NO.
:
: 1:10-CR-375
:
:
ALLERGAN, INC., :
:
Defendant. :

───────────────────────────

**<u>INFORMATION</u>**

THE UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF GEORGIA

CHARGES THAT:

At all times relevant to this Criminal Information:

### COUNT ONE

(Distribution of a Misbranded Drug/Biologic)
21 U.S.C. §§ 331(a) and 352(f)(1)

    1.    From on or about January 01, 2000, through on or about December 31, 2005, in the Northern District of Georgia and elsewhere, defendant,

**ALLERGAN, INC.,**

the producer and manufacturer of BOTOX, a prescription biological product containing botulinum toxin type A, a purified neurotoxin, introduced into interstate commerce, and caused to be introduced into interstate commerce, quantities of BOTOX, a drug and biologic within the meaning of 21 U.S.C. § 321(g)(1) and 42 U.S.C. § 262(i), which was misbranded under 21 U.S.C. § 352(f)(1), in that this drug and biologic lacked adequate directions for its use, because the defendant **ALLERGAN, INC.**, marketed and promoted the drug and biologic for uses that were outside its labeling, to wit, off-label uses specifically for the treatment of headache, pain, spasticity, and juvenile cerebral palsy, and these off-label uses had not been approved by the Food and Drug Administration.

-2-

EXHIBIT J
PAGE 65

Case 8:10-cv-01352-DOC -MLG   Document 52-2   Filed 12/08/10   Page 9 of 26   Page ID
Case 1:10-cr-00375-ODE   Document 11   Filed 09/01/10   Page 3 of 17
#:211

## The Defendant

2.    Defendant **ALLERGAN, INC.** (hereinafter referred to as
**"ALLERGAN"**), is a global corporation formed under the laws of the
state of Delaware, with its principal executive offices at 2525
Dupont Drive, Irvine, California 92612. **ALLERGAN** specializes in
manufacturing and marketing specialty pharmaceuticals (primarily
eye care, skin care, and neuromodulators) and medical devices
(primarily breast implants, gastric bands for obesity surgery, and
injectable dermal fillers used on facial wrinkles).

## BOTOX

3.    **ALLERGAN** and its wholly-owned subsidiaries produce and
manufacture a prescription pharmaceutical formulation of botulinum
toxin type A, a purified neurotoxin to which it received the rights
in 1991 from Oculinum, Inc., the drug's developer. **ALLERGAN** markets
and sells the toxin in the United States for therapeutic use under
the brand name: "BOTOX".

4.    During the relevant time period, one vial of BOTOX cost
approximately $400 to $500 for 100 units, and treatment of most
off-label uses of BOTOX required injections of anywhere between 100
to 400 units or more. Since BOTOX's effect on a muscle wears off
over time, patients get re-injected at periodic intervals,
generally every three months. BOTOX is a "buy and bill" drug,
meaning that doctors purchase BOTOX directly from **ALLERGAN** and
assume the risk that they will get reimbursed on the back end by a

-3-

EXHIBIT J
PAGE 66

Case 8:10-cv-01352-DOC -MLG   Document 52-2   Filed 12/08/10   Page 10 of 26   Page ID
#:1212
Case 1:10-cr-00375-ODE   Document 1-2   Filed 09/01/10   Page 4 of 17

healthcare payer after submitting the claim.  Consequently, doctors would not inject BOTOX for off-label uses if they could not get reimbursed.

### BOTOX's Limited FDA Approval

5.    BOTOX has limited approval and licensing by the Food and Drug Administration ("FDA") as a biological product and drug. Although perhaps best known for its use in connection with cosmetic facial aesthetics, the FDA first approved BOTOX for the treatment of certain neuromuscular disorders.

6.    In 1989, the FDA approved **ALLERGAN'**s Biological License Application ("BLA") to distribute and market BOTOX (botulinum toxin type A) in interstate commerce for the treatment of strabismus (crossed-eyes) and blepharospasm (involuntary eyelid muscle contractions) associated with dystonia. Thereafter, in December 2000, FDA approved **ALLERGAN'**s supplemental BLAs ("sBLAs") to distribute and market BOTOX in interstate commerce for the treatment of cervical dystonia (involuntary neck muscle contractions) in adults, to decrease the severity of abnormal head position and neck pain associated with cervical dystonia, and in July 2004, to treat severe primary axillary hyperhidrosis (excess sweating) that is inadequately managed with topical agents.

-4-

EXHIBIT J
PAGE 67

**THE FOOD DRUG AND COSMETICS ACT
(21 U.S.C. §§ 301 - 397) &
PUBLIC HEALTH SERVICE ACT
(42 U.S.C. §§ 262 et seq.)**

7.   Under the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-397, and the Public Health Services Act ("PHSA"), 42 U.S.C. § 262 et seq., the FDA is charged with, *inter alia*, ensuring that drugs and biological products are reasonably safe and effective as well as properly labeled.

8.   BOTOX qualifies as a "drug" under the FDCA because it is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man" and "intended to affect the structure or function of the body of man." 21 U.S.C. § 321(g)(1). In addition, BOTOX qualifies as a "biological product" under the PHSA because it is a "toxin...applicable to the prevention, treatment or cure of a disease or condition of human beings." 42 U.S.C. § 262(i); *see also* 21 C.F.R. § 600.3(h)   (defining "[b]iological product" as "any ... toxin ... or analogous product applicable to the prevention, treatment or cure of disease or injuries of man"). As a biologic that was shipped in interstate commerce, defendant **ALLERGAN** was required to obtain a biological license for each of intended uses of BOTOX, *see* 42 U.S.C. § 262, and otherwise must comply with all other federal prescription drug regulations, *see* 42 U.S.C. § 262.

-5-

EXHIBIT J
PAGE 68

Case 8:10-cv-01352-DOC -MLG   Document 52-2   Filed 12/08/10   Page 12 of 26   Page ID
#:1214
Case 1:10-cr-00375-ODE   Document 1   Filed 09/01/10   Page 6 of 17

9.    Biological products ("biologics"), such as BOTOX, are drugs derived from living material, rather than chemical synthesis. In light of additional manufacturing, storage, and safety issues raised by biologics, they undergo a different FDA approval process than other drugs and are issued a "biologics license," when they are approved. Other than the initial licensing process, all drug regulations in the FDCA apply to biologics with equal force and effect. *See* 42 U.S.C. § 262.

10.    No biological products may be introduced into, or distributed through, interstate commerce unless the sponsor of the product obtains a biologics license and properly labels the product. 42 U.S.C. § 262(a)(1). To obtain a biologics license, the sponsor must submit a BLA to the FDA, 21 C.F.R. §601.2, providing evidence that the biologic is "safe, pure, and potent," 42 U.S.C. § 262(a)(2)(C)(i)(I), which means that the product has been proven effective for a specific use "by appropriate laboratory tests or by adequately controlled clinical data." 21 C.F.R. § 600.3(s). The FDA approves new biologics based on an evaluation of the products' safety and efficacy demonstrated by randomized, prospective, and double-blind clinical trials. 21 C.F.R. § 601; FDA Release "Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products," May 1998.

11.    The indication and dosages approved by the FDA are set forth in the biologics' labeling, the content of which is also

-6-

reviewed by the FDA as part of the BLA process. *See, e.g.,* 21 C.F.R. §§ 600.3(dd); 601.2(b); 601.12. The label must also reveal all medically relevant information regarding the appropriate use of the biologic, such as dosage, directions for administration, known precautions, warnings, and contraindications. *Id.*

### FDA Prohibition on Off-Label Marketing

12.   Once a drug is approved for a particular use the FDA does not prevent doctors from prescribing the drug for uses that are different than those approved by the FDA. Allowing off-label prescriptions coincides with the FDA's mission to regulate the pharmaceutical industry without directly regulating the practice of medicine.

13.   The FDCA, at 21 U.S.C. § 352(f)(1), provides that a drug is misbranded if, among other things, the labeling does not contain "adequate directions for use." As the phrase is used in the FDCA, "adequate directions for use" cannot be written for medical indications or uses for which the drug had not been proven to be safe and effective, through well-controlled clinical studies. Any uses for a drug that are not approved by FDA as safe and effective, and thus that are not included in the drug's approved labeling, are known as "off-label" indications or uses. A drug that does not contain adequate directions for all intended uses because such uses are not included in the FDA-approved labeling for the drug is, therefore, misbranded under section 352(f)(1).

-7-

EXHIBIT J
PAGE 70

Case 8:10-cv-01352-DOC -MLG   Document 52-2   Filed 12/08/10   Page 14 of 26   Page ID
#:1216
Case 1:10-cr-00375-ODE   Document 16   Filed 09/01/10   Page 8 of 17

### ALLERGAN Was Prohibited from
### Marketing BOTOX for Off-Label Uses

14.   **ALLERGAN** was aware of the prohibitions on promoting and marketing a drug or biologic in interstate commerce for off-label uses. On June 21, 2002, **ALLERGAN** distributed to all sales and marketing personnel the PhRMA Code on Interaction with Healthcare Professionals and the "ALLERGAN Field Reference Guide." The ALLERGAN Field Reference Guide emphasized that

> you may not promote any Company product for uses that are not addressed in the approved product labeling or insert.... This promotional ban applies not only to sales calls, but to all marketing efforts such as product launches, sales meetings and activities of third-parties controlled by ALLERGAN.

15.   **ALLERGAN's** SEC Form 10-K annual report to shareholders for the calendar year ending December 31, 2004, acknowledges that:

> Physicians may prescribe pharmaceutical and biologic products, and utilize medical device products for uses that are not described in a product's labeling or differ from those tested by us and approved by the FDA. While such "off-label" uses are common and the FDA does not regulate a physician's choice of treatment, the FDA does restrict a manufacturer's communications on the subject of off-label use. Companies cannot actively promote FDA-approved pharmaceutical, biologic or medical device products for off-label uses, but they may disseminate to physicians articles published in peer reviewed journals.... If, however, our promotional activities fail to comply with the FDA's ... regulations or guidelines, we may be subject to warnings from, or enforcement action by, the FDA or another enforcement agency.

-8-

EXHIBIT J
PAGE 71

16. At all times relevant to this Information, the four conditions that BOTOX had been approved to treat were relatively rare in comparison to the off-label conditions that **ALLERGAN** actively promoted it to treat (*e.g.*, headache, pain, spasticity including juvenile cerebral palsy). For example, with respect to cervical dystonia ("CD"), **ALLERGAN's** 2003 BOTOX Foundation Training Materials estimated that in the United States the prevalence of CD was slightly less than 9 people out of 100,000 (0.0009%), which would correlate to approximately 27,000 Americans who had the condition in a population of approximately 300 million.

### ALLERGAN'S OFF-LABEL
### MARKETING PRACTICES

17. Since as early as its 1997-2001 Strategic Plan, **ALLERGAN** made it a top corporate priority to maximize sales of BOTOX for spasticity, migraine headache and pain, none of which were approved by the FDA. Many of **ALLERGAN's** yearly Strategic Plans forecast that BOTOX's on-label sales would shrink and that all incremental growth would come from off-label sales.

18. **ALLERGAN's** off-label marketing efforts included sales calls by **ALLERGAN** sales representatives ("BMCs," or BOTOX Medical Consultants, then later called "NMCs," Neurotoxin Medical Consultants) on physicians who would not typically treat patients who had any of the four FDA-approved conditions.

-9-

EXHIBIT J
PAGE 72

Case 8:10-cv-01352-DOC -MLG   Document 52-2   Filed 12/08/10   Page 16 of 26   Page ID
#:1218
Case 1:10-cr-00375-ODE   Document 18   Filed 09/01/10   Page 10 of 17

19.  **ALLERGAN** instructed its sales representatives to promote BOTOX for pain and headache - even when its own clinical studies showed limited support for these uses.

20.  **ALLERGAN** exploited its Cervical Dystonia ("CD") indication to grow headache and pain sales.  In 2003, **ALLERGAN** developed the "CD/HA Initiative" as a "rescue strategy" in the event of negative results of clinical trials, and a backup strategy to ensure continued expansion into the headache market.

21.  As part of this initiative, **ALLERGAN** asked the FDA to expand the BOTOX label to include treatment of headache associated with CD and the treatment of "pain" - not merely "neck pain" - associated with CD.  The FDA refused the headache request, and, during the relevant time period of this Criminal Information, the FDA had not yet denied the pain request.  Undeterred by the poor clinical trial results and FDA's unwillingness to expand the BOTOX label to include headache associated with CD without further evidence of efficacy, **ALLERGAN** continued to market and promote BOTOX for headache and pain by claiming that CD was misdiagnosed or underdiagnosed.  In an email, an **ALLERGAN** executive states:  "It's too bad that there is no easy way to obtain 'headache' in our label (even as part of CD). . . . Has the US Marketing group exploited the notion of much higher prevalence of CD in the population?"

22.  Soon thereafter, **ALLERGAN** launched a new BOTOX marketing campaign premised on the idea that CD is "underdiagnosed" and

-10-

"misdiagnosed" and to move toward emphasizing symptoms of mild/moderate CD (*i.e.*, Headache, Pain instead of severe CD). **ALLERGAN'S** "key messages" for the campaign emphasized that doctors could diagnose CD based on headache and pain symptoms, even when a doctor "doesn't see any cervical dystonia."

23.   **ALLERGAN's** new CD campaign marketing worked.   **ALLERGAN** listed the "CD expansion campaign" as one of the "key drivers" for BOTOX sales.

24.   **ALLERGAN** also leveraged other companies' relationships with doctors in off-label specialties by entering into "co-promotion" agreements.   In 2002, **ALLERGAN** agreed to sell a medical device manufacturer's device to doctors who treated spasticity, thereby giving **ALLERGAN** sales people opportunities to discuss BOTOX as an adjunctive therapy for spasticity and pain, uses which were not approved by FDA.

### ALLERGAN's Used a Variety of Tactics to Carry Out Its Unlawful, Off-Label Marketing Strategy

25.   **ALLERGAN** used a variety of tactics to carry out its illegal off-label marketing strategy including providing "value-added" reimbursement support services, lobbying healthcare payers to expand coverage for off-label uses, funding and controlling continuing medical education programs on off-label uses, paying doctors to attend Advisory Boards on off-label uses, promotional dinners to tout BOTOX's efficacy for off-label uses,

-11-

and creating and funding organizations to promote off-label uses of BOTOX. For most of the relevant time period, BOTOX "Customer Team Units," or "CTUs," coordinated sales initiatives among numerous different departments, including its sales/marketing, medical affairs (purportedly independent scientific advisors), and reimbursement divisions which permitted more focused communication of its off-label marketing messages.

### A. ALLERGAN Provided "Value-Added" Reimbursement Support Services to Grow Off-Label Sales.

26. **ALLERGAN** recognized that the "biggest obstacle" to growing BOTOX sales was the lack of reimbursement for off-label uses. Even though government and private healthcare payers covered BOTOX for every FDA-approved indication, **ALLERGAN** doubled the size of its reimbursement support team in 2003 to "minimize customer barriers" for the use of BOTOX for headache, pain and spasticity.

27. The BOTOX reimbursement team was an extension of the sales force, and its express goal was to improve injector economics by selling more BOTOX. The pitch for the BOTOX reimbursement programs - collectively referred to as the "BOTOX Advantage Program" - was: "Improving the Reimbursement Environment for Today and For the Future by Providing Comprehensive Reimbursement Assistance, Reducing Reimbursement Issues, Saving You Time and Effort!"

-12-

Case 8:10-cv-01352-DOC -MLG   Document 52-2   Filed 12/08/10   Page 19 of 26   Page ID
#:1221
Case 1:10-cr-00375-ODE   Document 41   Filed 09/01/10   Page 13 of 17

28.   **ALLERGAN** cited "reimbursement" as the "#1 reason limiting M.D. BOTOX use." **ALLERGAN** increased its reimbursement services to drive off-label sales.

        **B.**    **ALLERGAN Lobbied Healthcare Payers to
Expand Coverage for Off-Label Uses.**

29.   Notwithstanding the lack of scientific support for headache or pain, **ALLERGAN** initiated a carefully orchestrated campaign to: (1) expand BOTOX coverage for off-label uses, and (2) eliminate any payer-imposed limitation on the amount of BOTOX injected into patients (i.e., "dosing caps"). **ALLERGAN** recruited and used physician "advocates" to lobby Medicare and Medicaid decision-makers to expand coverage for off-label uses.

30.   **ALLERGAN** also funded and controlled a patient advocacy group, an organization whose mission is to expand patient access to BOTOX. Doctors were paid $1,000 each to attend the patient advocacy group's regional workshops where **ALLERGAN** reimbursement personnel coached them how to successfully lobby healthcare payers to cover off-label uses of BOTOX.

        **C.**    **ALLERGAN Directed Physician Training, Workshops,
and Dinners.**

31.   **ALLERGAN** funded and controlled the content of hundreds of continuing medical education ("CME") seminars, injection workshops, and promotional dinner programs at which paid speakers identified by the Company as "Key Opinion Leaders" ("KOLs") advocated BOTOX for off-label indications. For example, in 2004, a CME provider

-13-

EXHIBIT J
PAGE 76

Case 8:10-cv-01352-DOC -MLG   Document 52-2   Filed 12/08/10   Page 20 of 26   Page ID
#:1222
Case 1:10-cr-00375-ODE   Document 42   Filed 09/01/10   Page 14 of 17

worked with **ALLERGAN** to develop purported CME programs to address the use of BOTOX to treat pain and spasticity.   **ALLERGAN** also created the Centers of Excellence as an "independent" CME to drive the use of BOTOX for headache growth. It was also a "Management Business Objective" for **ALLERGAN's** scientific services group to create, edit and control the substance of off-label CMEs, including headache.

> **D.   ALLERGAN Paid Doctors to Attend "Advisory Boards."**

32.   **ALLERGAN** hosted numerous "Advisory Boards," purportedly designed to elicit feedback from doctors about their experience with BOTOX.   These "Advisory Boards" represented another opportunity for **ALLERGAN** to promote BOTOX for off-label indications and "build loyalty and solidify important relationships."   For example, in 2005, approximately 100 top-prescribing doctors attended the **"ALLERGAN** Institute of Distinction ("AIOD")," an invitation-only BOTOX marketing program held at **ALLERGAN's** corporate headquarters and the Balboa Bay Club and Resort in Newport Beach.   Doctors attending the AIOD provided no consulting services, but were paid $1,500 to listen to off-label marketing presentations.

> **E.   ALLERGAN Created and Funded Organizations to Promote BOTOX for Off-Label Uses.**

33.   In addition to the patient advocacy organization, **ALLERGAN** created and funded a purportedly independent organization,

-14-

EXHIBIT J
PAGE 77

an on-line neurotoxin education organization to "stimulate increased use of BOTOX." The Mission Statement for this on-line neurotoxin education organization was to "validate and disseminate consistent information regarding the expanding uses of BOTOX." While this on-line neurotoxin education organization purported to be an independent, third-party organization, **ALLERGAN** admitted its control over the organization, stating that "they act under our direction in creating the content and setting direction." From 1999 to 2005, **ALLERGAN** gave approximately $8 million in "unrestricted" grants to this on-line neurotoxin education organization. This on-line neurotoxin education organization maintained a web site to disseminate information about off-label uses, including videos of CME programs sponsored by **ALLERGAN** and other written materials prepared by **ALLERGAN**. **ALLERGAN**'s sales representatives were specifically trained to refer doctors to the on-line neurotoxin education organization website during sales calls.

## FORFEITURE

THE UNITED STATES FURTHER CHARGES THAT:

1. As a result of the violations of Title 21, United States Code, Sections 331 (a), 333(a)(1), and 352(f)(1) set forth in this information, defendant **ALLERGAN, INC.**, shall forfeit to the United States of America any quantities of BOTOX which between January 2000 and December 31, 2005 were misbranded when introduced into or

EXHIBIT J
PAGE 78

while in interstate commerce, or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of Title 21, United States Code, Section 331, be introduced into interstate commerce.

    2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant **ALLERGAN**:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be
       divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture, that is $25,000,000.

    All pursuant to Title 21, United States Code, Sections 331, 334, and Title 28, United States Code, Section 2461(c).

-16-

EXHIBIT J
PAGE 79

All in violation of Title 21, United States Code, Sections 331(a), 333(a)(1), and 352(f)(1).

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

RANDY S. CHARTASH
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 121760

DOUGLAS W. GILFILLAN
ASSISTANT UNITED STATE ATTORNEY
Georgia Bar No. 294713

600 RICHARD B. RUSSELL BUILDING
75 SPRING STREET, S.W.
ATLANTA, GEORGIA 30303
404.581.6009
404.581.6181

JOHN W. BURKE
Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
(202) 353-2001

-17-

EXHIBIT J
PAGE 80

**Exhibit  K**

**JUSTICE NEWS**

### Department of Justice

Office of Public Affairs

FOR IMMEDIATE RELEASE

Wednesday, September 1, 2010

### Allergan Agrees to Plead Guilty and Pay $600 Million to Resolve Allegations of Off-Label Promotion of Botox®

WASHINGTON – American pharmaceutical manufacturer Allergan Inc. has agreed to plead guilty and pay $600 million to resolve its criminal and civil liability arising from the company's unlawful promotion of its biological product, Botox® Therapeutic, for uses not approved as safe and effective by the Food and Drug Administration (FDA), the Justice Department announced today.  The resolution includes a criminal fine and forfeiture totaling $375 million and a civil settlement with the federal government and the states of $225 million.

Under the Food, Drug and Cosmetic Act (FDCA), a company in its application to the FDA must specify each intended use of a biological product.  After the FDA approves the product as safe and effective for a specified use, any promotion by the manufacturer for other uses – known as "off-label" uses – renders the product misbranded.

Tony West, Assistant Attorney General for the Civil Division of the Department of Justice, and Sally Quillian Yates, U.S. Attorney for the Northern District of Georgia, today announced the filing of a criminal information against Allergan for promoting Botox® for headache, pain, spasticity and juvenile cerebral palsy – none of which were approved by the FDA.  According to the criminal information, Allergan made it a top corporate priority to maximize sales of Botox® for such off-label uses.

In 1989, the FDA approved Botox®, a prescription biological product containing botulinum toxin type A, a purified neurotoxin, to treat strabismus (crossed eyes) and blepharospasm (involuntary eyelid muscle contraction).  In 2000 and 2004, approval was given to treat cervical dystonia (involuntary neck muscle contraction) and primary axillary hyperhidrosis (excessive underarm sweating), respectively.  In 2010, approval was given to treat adult upper-limb spasticity.

The criminal information alleges that Allergan exploited its on-label cervical dystonia (CD) indication to grow off-label pain and headache (HA) sales.  In 2003, Allergan developed the "CD/HA Initiative" as a "rescue strategy" in the event of negative results from its clinical trials to ensure continued expansion into the pain and headache markets.  As part of this initiative, Allergan claimed that cervical dystonia was "underdiagnosed" and that doctors could diagnose cervical dystonia based on headache and pain symptoms, even when the doctor "doesn't see any cervical dystonia."

Allergan's off-label marketing tactics also included calling on doctors who typically treat patients with off-label conditions.  In 2003, Allergan doubled the size of its reimbursement team to assist doctors in obtaining payment for off-label Botox® injections.  Allergan held workshops to teach doctors and their office staffs how to bill for off-label uses, conducted detailed audits of doctors' billing records to demonstrate how they could make money by injecting Botox®, and operated the Botox® Reimbursement Hotline, which provided a wide array of free on-demand services to doctors for off-label uses.  Allergan also lobbied government health care programs to expand coverage for off-label uses, directed physician workshops and dinners focused on off-label uses, paid doctors to attend "advisory boards" promoting off-label uses, and created a purportedly independent online neurotoxin education organization to stimulate increased use of Botox® for off-label indications.

"The Food, Drug and Cosmetic Act protects the public from drugs and biologic products that are not proven to be safe and effective.  When drug companies make unsubstantiated and misleading statements about their products, they undermine the Act's protection of public health," said Tony West, Assistant Attorney General for the Civil Division of the Department of Justice.  "We will continue to pursue drug companies that violate the Act for their own financial gain."

"The FDA had approved therapeutic uses of Botox for only four rare conditions, yet Allergan made it a top corporate priority to maximize sales of far more lucrative off-label uses that were not approved by FDA," said Sally Yates, U.S. Attorney for the Northern District of Georgia.  "Allergan further demanded tremendous growth in these off-label sales year after year, even when there was little clinical evidence that these uses were effective.  The FDA approval process ensures that pharmaceutical companies market their medications for uses that are proven to be safe and effective, and this case demonstrates that companies that fail to comply with these rules face criminal prosecution and stiff penalties."

Allergan has agreed to plead guilty to a criminal misdemeanor for misbranding Botox® in violation of the FDCA.  Under the plea agreement, the company will pay a criminal fine of $375 million, which includes forfeiting assets of $25 million.  Allergan's guilty plea and sentence is not final until accepted by the U.S. District Court.

"The FDA exists to assure that drugs marketed to the American people are safe and effective" said Dr. Margaret Hamburg, Commissioner, Food and Drug Administration.  "The 'off-label' promotion of drugs threatens public health and the role of the FDA, which has served our country well and has protected Americans from unsafe and ineffective drugs."

As part of the civil settlement, Allergan has agreed to pay an additional $225 million to the federal government and the states to resolve claims that its unlawful marketing practices caused false claims to be submitted to government health care programs such as Medicare, TRICARE, and the Federal Employees Health Benefit Program, the Department of Veterans' Affairs, and the Department of Labor's Office of Workers' Compensation Programs.  The civil settlement addresses allegations that from 2001 through at least 2008, Allergan promoted Botox for off-label indications that were not medically accepted and therefore not covered by federal health care programs, made unsubstantiated and misleading statements about the safety and efficacy of Botox® for off-label indications, instructed doctors to miscode Botox® claims for uncovered indications using inappropriate diagnosis codes to ensure payment by government health care programs, and provided inducements to doctors to inject more Botox®.  The federal share of the civil settlement amount is $210,250,000, and Allergan will pay up to $14,750,000 to states that opt to participate in the agreement.

The civil settlement resolves three lawsuits filed in federal court in the Northern District of Georgia under the qui tam, or whistleblower, provisions of the False Claims Act, which allow private citizens to bring civil actions on behalf of the United States and share in any recovery.  As part of today's resolution, the whistleblowers – Dr. Amy Lang, Charles Rushin, Cher Beilfuss, Kathleen O'Conner-Masse, and Edward Hallivis – will receive $37.8 million from the federal share of the settlement amount.

Allergan has also executed a Corporate Integrity Agreement (CIA) with the Department of Health and Human Services, Office of Inspector General (HHS-OIG).  The 5-year CIA requires, among other things, that the board of directors (or a committee of the board) annually review the company's compliance program and pass a resolution that it has implemented an effective compliance program; that certain senior executives annually certify that their departments or functional areas are compliant with federal health care program requirements; that Allergan send doctors a letter notifying them about the settlement; and that the company post on its website information about payments to doctors, such as honoraria, travel, or lodging.  Allergan is subject to exclusion from federal health care programs, including Medicare and Medicaid, for a

EXHIBIT K
PAGE 81

material breach of the CIA and subject to monetary penalties for less significant breaches.

"Fraudulent marketing of drugs through off-label promotion or kickbacks to prescribers undermines the protections afforded by the drug approval process and medical decision-making. This conduct will not be tolerated," said Daniel R. Levinson, Inspector General of the U.S. Department of Health and Human Services. "As a result of this settlement, OIG will oversee a Corporate Integrity Agreement with Allergan that increases the transparency of Allergan's interactions with physicians and helps to ensure the company's future compliance and accountability."

"This was a complex investigation that required much in terms of investigative resources in order to conduct the many interviews and document reviews needed to get us where we are today," said Brian D. Lamkin, Special Agent in Charge, FBI Atlanta. "The FBI, through its vast experience investigating health care fraud, is not only able to provide such resources, but is also able to recognize which circumstances need those resources the most. The off-label marketing tactics employed by Allergen was one of those aforementioned circumstances."

Allergan markets Botox® for its approved cosmetic use under the trade name Botox® Cosmetic. Botox® Cosmetic has its own FDA-approved label and drug code. The resolution announced today does not address Botox® Cosmetic.

The criminal case is being prosecuted by the Civil Division's Office of Consumer Litigation and the U.S. Attorney's Office for the Northern District of Georgia. The civil settlement was reached by the Civil Division's Commercial Litigation Branch and the U.S. Attorney's Office. The HHS Office of Counsel to the Inspector General, the Center for Medicare and Medicaid Services, FDA's Office of Chief Counsel, and the National Association of Medicaid Fraud Control Units provided assistance.

This matter was investigated by the FBI, the FDA's Office of Criminal Investigation, and the HHS-OIG. The Office of Personnel Management Office of Inspector General, TRICARE Program Integrity, the Department of Veterans' Affairs Office of Inspector General, and the Department of Labor Office of Inspector General provided investigative assistance.

"Federal employees and indeed the American taxpayers deserve health care providers and suppliers, including drug manufacturers, that meet the highest standards of ethical and professional behavior," said Patrick E. McFarland, Inspector General of the U.S. Office of Personnel Management. "Today's settlement once again reminds the pharmaceutical industry that it must observe those standards and reflects the commitment of federal law enforcement organizations to pursue improper and illegal conduct that places health care consumers at risk."

This settlement is part of the government's emphasis on combating health care fraud. One of the most powerful tools in that effort is the False Claims Act, which the Justice Department has used to recover approximately $3.1 billion since January 2009 in cases involving fraud against federal health care programs. The Justice Department's total recoveries in False Claims Act cases since January 2009 have topped $4 billion.

Belifuss O'Connor-Maase Complaint(PDF)

Hallivis Complaint(PDF)

Lang-Rushin Complaint(PDF)

10-988                                                                                                                              Civil Division

EXHIBIT K
PAGE 82