Exhibit M

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 2 of 126   Page ID
#:1306
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 1 of 125

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 19 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA James N. Hatten, Clerk
By: _____
Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA; and THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MICHIGAN, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, WISCONSIN, THE COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA; and THE DISTRICT OF COLUMBIA | CIVIL ACTION NO. 08-cv-1883 TWT FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) **FIRST AMENDED FALSE CLAIMS ACT COMPLAINT** |

*ex rel.* CHER BEILFUSS and KATHLEEN O'CONNOR-MASSE

Plaintiffs and Relators,

v.

ALLERGAN, INC.

Defendant

_____/

I.   **BACKGROUND**

1.   *Qui tam* Relators Cher Beilfuss and Kathleen O'Connor-Masse bring this

action on behalf of the United States against Allergan Inc., (hereinafter referred to as

Defendant) for treble damages and civil penalties arising from the Defendant's

EXHIBIT M
PAGE 158

conduct in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA").  The violations arise out of requests for payment by Medicaid, Medicare, TRICARE, and other federally-funded government healthcare programs (hereinafter collectively referred to as "Government Healthcare Programs").

2.    This action is also brought under the respective *qui tam* provisions of False Claims Acts (or similarly named) on behalf of the of the States of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Wisconsin, the District of Columbia, the Commonwealths of Massachusetts and Virginia. These states, together with the United States, are hereafter collectively referred to as the Government.

3.    The gravamen of Relators' claims is that the Defendant developed and successfully executed a sophisticated marketing plan with the purpose of inducing physicians to prescribe the prescription drug Botox® for particular off-label uses (and off-label dosages) which are neither FDA-approved nor demonstrated to be safe and effective.

4.    Defendant knew when it initiated this illegal marketing program, that there was little, and in some cases absolutely no, credible scientific basis to justify its

2

EXHIBIT M
PAGE 159

assertion that Botox® was safe and effective for these off-label uses and/or doses. Nonetheless, Defendant's conduct has caused submission for reimbursement by Government Healthcare Programs of millions of dollars worth of prescriptions which were ineligible for such reimbursement.

5.     This Complaint also describes unlawful remuneration, otherwise known as kickbacks, provided to physicians and other healthcare providers (hereinafter sometimes collectively referred to as "providers"), with a purpose of inducing them to prescribe Botox® for off-label use.

6.     Relators have complied with all procedural requirements of the laws under which this case is brought.

## II.   **JURISDICTION AND VENUE**

7.     Sufficient acts proscribed by 31 U.S.C. §3729 *et seq.* and complained of herein occurred within the Northern District of Georgia, and Defendant does business in the District of Georgia.   Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. 3732 (a), as well as under 28 U.S.C. § 1345.   This Court has supplemental jurisdiction over the state law actions pursuant to 31 U.S.C. §3732(b).

8.     Venue lies under 31 U.S.C. § 3732(a).

EXHIBIT M
PAGE 160

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 5 of 126   Page ID
#:1399
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 4 of 125

9.      The facts and circumstances which give rise to Defendant's violation of the False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

10.     Relators are the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

## III.   **PARTIES**

11.     Relator Cher Beilfuss, a Minnesota resident, was employed by Defendant as a Regional Healthcare Policy Manager (RHPM) from 2005 to 2007 . In her position as an RHPM, she was fully trained to, and required to implement the coverage portion of the unlawful off-label marketing plan described in this Complaint.

12.     Relator Kathleen O'Connor-Masse, an Arizona resident, was a Payor Reimbursement Account Manager from 2000 to 2004; and Director of Western Area Reimbursement Account Managers from 2004 until June 2005. In both positions, she was tasked with removing the barriers for off-label coverage for Botox therapeutic.

13.     Relators bring this action based on their direct knowledge and where

4

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 6 of 126   Page ID
#:1310
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 5 of 125

indicated, on information and belief.  None of the actionable allegations set forth in

this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4),

and Relators are an original source of the facts alleged in this Complaint.

14.     Defendant Allergan, Inc., is a public company with its headquarters

located at 2525 Dupont Drive, Irvine, CA 92612-1551. It is organized under the laws

of the State of Delaware.

15.     At all times relevant hereto, Defendant acted through its agents and

employees, and the acts of Defendant's agents and employees were within the scope

of their agency and employment. The policies and practices alleged in this Complaint

were, on information and belief, established and/or ratified at the highest corporate

levels of Defendant.


IV.     **THE REGULATORY ENVIRONMENT**

**Regulation of Prescription Drug Sales and Marketing**

16.     The United States Food, Drug and Cosmetic Act (FDCA) establishes the

framework for regulation of, *inter alia*, the sales and marketing activities of

pharmaceutical manufacturers in the United States, including the introduction of new

drugs into interstate commerce.   When the United States Food and Drug

EXHIBIT M
PAGE 162

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 7 of 126   Page ID
#:1311
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 6 of 125

Administration ("FDA") approves a drug, it approves the drug only for the particular use for which it was tested, but after the drug is approved for a particular use, the FDCA does not regulate how the drug may be prescribed. Thus, a drug that has been tested and approved for one use only can also be prescribed by a physician for another use, known as an "off-label" use.

17.     While a physician may prescribe a drug for a use other than one for which it is approved, the FDCA prohibits a drug manufacturer from *marketing or promoting* a drug for non-approved uses. 21 U.S.C. §§ 331(d), 355(a). It therefore is illegal for a drug manufacturer and its sales representatives to initiate discussions with medical professionals regarding any off-label use of the drug.

18.     The dissemination of information or materials by a pharmaceutical manufacturer of any unapproved or off-label use, also known as "misbranding," constitutes unlawful promotional advertising of the drug and violates the FDCA.

19.     In addition to prohibiting manufacturers from directly marketing and promoting a product's unapproved use, Congress and the FDA have acted to prevent manufacturers from employing indirect methods to accomplish the same end. For example, the FDA regulates two of the most prevalent indirect promotional strategies: (A) manufacturer dissemination of medical and scientific publications concerning the

6

off-label uses of their products; and (B) manufacturer support for Continuing Medical Education ("CME") programs that focus on off-label uses.

20.   With regard to the first practice—disseminating written information—the FDCA allows a manufacturer to disseminate information regarding off-label usage only in response to an "unsolicited request from a health care practitioner." 21 U.S.C. §360aaa-6 (emphasis added).   In any other circumstance, a manufacturer is permitted to disseminate information concerning the off-label uses of a drug only after the manufacturer has submitted an application to the FDA seeking approval of the drug for the off-label use; and has provided the materials to the FDA prior to dissemination.   The materials must be submitted in an unabridged form and must not be false or misleading.   21 U.S.C. §§ 360aaa(b) & (c);360aaa-1.

21.   In sum, the off-label regulatory scheme protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body—the FDA.

22.   Reasons why Congress made off-label marketing and promotion by drug manufacturers illegal include, without limitation, the following:

(a)   Off-label promotion diminishes or eliminates the drug manufacturer's incentive to study the use of its drug and obtain definitive safety and efficacy data;

7

EXHIBIT M
PAGE 164

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 9 of 126   Page ID
#:1313
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 8 of 125

(b)     Off-label promotion harms patients as the result of unstudied uses that
lead to adverse results, or are ineffective;

(c)     Off-label promotion diminishes the use of evidence-based medicine; and

(d)     Off-label promotion erodes the efficacy standard in medicine.

### The Anti-Kickback Act

23.     Pursuant to the Anti-Kickback Act, 42 U.S.C. Section 1320a-7b(b), it is
unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange
for the referral of any product (including a prescription drug product) for which
payment is sought from any federally-funded health care program, including Medicare,
Medicaid, and Tricare.

24.     The Anti-Kickback Act is designed to, *inter alia*, ensure that patient care
will not be improperly influenced by inappropriate compensation from the
pharmaceutical industry.

25.     Every federally-funded health care program requires every provider or
supplier to ensure compliance with the provisions of the Anti-Kickback Act and other
federal laws governing the provision of health care services in the United States.

26.     The Anti-Kickback Act prohibits suppliers such as pharmaceutical
manufacturers from compensating, in cash or in kind, a health care provider when a

8

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 10 of 126   Page ID
#:1314
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 9 of 125

purpose of the payment is to influence the provider's prescribing habits or to gain

favor for its product over the product of any competitor.

27.   The Federal False Claims Act provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be
> presented, to an officer or employee of the United States
> Government or a member of the Armed Forces of the
> United States a false or fraudulent claim for payment or
> approval; (2) knowingly makes, uses, or causes to be made
> or used, a false record or statement to get a false or
> fraudulent claim paid or approved by the Government; (3)
> conspires to defraud the Government by getting a false or
> fraudulent claim paid or approved by the Government;
> * * *
> is liable to the United States Government for a civil penalty
> of not less than $5,000 and not more than $10,000, plus 3
> times the amount of damages which the Government
> sustains because of the act of that person.

31 U.S.C. § 3729.

## V.   FACTS

### Botox®(Botulinum Toxin Type A)

28.   Botox® is a prescription biological product that contains tiny amounts of

highly purified botulinum toxin protein refined from a bacterium.  The product is

administered in small therapeutic doses by injection directly into the affected area, and

works by blocking the release of acetylcholine (a neurotransmitter that signals the

9

EXHIBIT M
PAGE 166

muscles to contract) at the neuromuscular junction.

29.     Botox® Therapeutic therapy was granted approval by the FDA in 1989 for the treatment of strabismus (crossed eyes) and blepharospasm (uncontrollable eye blinking) associated with dystonia, including benign essential blepharospasm or VII nerve disorders in patients 12 years of age and above.  Botox® has since received approval in December 2000 for the treatment of cervical dystonia in adults to decrease the severity of abnormal head position and neck pain associated with cervical dystonia.   In July 2004, Botox® therapeutic was granted FDA-approval for the treatment of severe primary axillary hyperhidrosis (excessive underarm sweating) that is inadequately managed with topical agents.

30.     Botox® is supplied in single use vial, and is to be reconstituted with sterile, non-preserved saline prior to intramuscular injection.  Once reconstituted, it must be stored in a refrigerator and used within 4 hours.

31.     Botox® therapeutic sales were $330,000,000 in 2006.

32.     Approximately 80% of reimbursement for Botox® has been for off-label prescriptions.

33.     The most common off-label uses/prescriptions for Botox® paid for by Government Healthcare Programs have generally been for adult spasticity patients,

10

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 12 of 126   Page ID
#:1316
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 11 of 125

spasticity in pediatric cerebral palsy patients to treat spasticity issues, and headache patients.

### Defendant's Illegal Off-Label Marketing Program

34.     Promotion for off-label uses was facilitated by Defendant and accomplished through various tactics and techniques, including:

a.     The use of Regional Scientific Specialists (RSS), known in the industry as "medical liaisons," typically PhD's, pharmacists, or physicians by training, who worked closely with the sales force to target physicians for off-label use, enticing them with kickbacks (which have included clinical trials, studies, or grants). These RSS's worked with and under the direction of the sales and marketing department.

b.     The Neurosciences Field Personnel Sample Vial Program allowing for sales representatives and field personnel to receive free vials of Botox every quarter and to disseminate the free vials to physicians.

c.     The use of Regional Business Managers f/k/a Provider Reimbursement Account Managers to target physicians and provide in-kind "consultation" services to them so that they may maximize reimbursement associated with prescribing off-label Botox. This includes reviewing physician claims payments,

11

EXHIBIT M
PAGE 168

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 13 of 126   Page ID
#:1317
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 12 of 125

provide analysis, and prepare excel spreadsheets on maximizing reimbursement; it also includes the provision of meals and other remuneration to physicians, and the provision of "cost recoveries."

        d.    The use of RHPM's f/k/a Payor Reimbursement Account Managers to work with the sales force to identify physician advocates to advance the policy goals of obtaining off-label coverage of Botox and dose restriction/maximum elimination.

        e.    The use of a third party vendor, Alphamedica, to facilitate Botox reimbursement information. These presentations often involved off-label coverage discussions. Alphamedica also administered the "BOTOX Speakers Bureau," which enabled Defendant to pay physicians for prescriptions.

        f.    The use of "preceptorships" to pay healthcare providers for prescriptions. For instance, Relator O'Connor-Masse "shadowed" a physician who saw 3 headache patients one morning and was paid approximately $1,000 by Defendant. Relator Beilfuss shadowed a physician who saw 2 headache patients and was paid approximately $1,000 by Defendant.

        g.    The use of "grants" to pay healthcare providers for prescriptions.

        h.    The use of physician speakers to pay them to influence other

12

physicians to prescribe off-label.

        i.     The use of clinical trials to pay physicians to prescribe off-label.

        j.     The use of Botox® Advantage Program™ - Defendant sponsored a third party hotline administered by Covance Market Access and funded it with $5-10 million yearly. The purpose of the hotline was for physicians to be able to call and obtain off-label billing assistance including draft letters written for them to get Botox® paid for by the insurance companies or government healthcare programs. Covance Market Access would provide packets of studies containing off-label studies to the physicians.

        k.     The use of the "Temporary Price Allowance Program" by Defendant which guaranteed targeted physicians a six-month dated price at which to purchase Botox®. The price they would pay is ASP plus 6% in effect, two quarters ago. They were always six months behind, minus any rebate, creating a "spread."

        l.     The use of organized third-party promotion of the use of Botox® for off-label uses, including "Alliance for Patient Access" ("AFPA"), which to this day is fully funded by Defendant. This organization assists with lowering coverage barriers by payors for off-label use. This also includes funding "WE MOVE," a not for profit corporation incorporated in and located in New York, NY. "WE MOVE" holds itself

13

out as a "Worldwide Education and Awareness for Movement Disorders Organization" and has available a copy of their "suggested Pediatric Botox ® Dosing" handout.

m.     The use of Botox reimbursement hotline (800-44botox) for physicians and their offices to determine billing requirements "to produce a clean claim." This was part of the Botox Advantage Program at one time.

n.     The use of physicians as "key opinion leaders" to influence other physicians, and as "advocates" to influence payors to cover off-label uses and doses.

o.     The use of misrepresentations made directly to the sales force (which includes Regional Business Managers and Regional Healthcare Policy Managers) involving the intention of Defendant to undertake Phase III trials to obtain FDA-approval for various additional uses for Botox, including for headache and spasticity.

p.     The use of paying physicians to be "traveling mentors" and taking part in the "Physician Partnership Program" to promote off-label uses and doses.

q.     The use of available, appropriate and "adequate codes for emerging and current uses of Botox.®"

r.     The use of partnering and co-promoting with a pharmaceutical

14

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 16 of 126   Page ID
#:1320
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 15 of 125

company that has FDA-approved headache drugs.   Defendant used this as an entry into off-label promotion to physicians who prescribed headache drugs resulting in increased sales of Botox® by Defendant.

### Kickbacks to Health Care Providers In Exchange for Provision of Off-Label Marketing Services

35.     Defendant illegally promoted the off-label uses of Botox® through offers and payments of remuneration in violation of the Anti-Kickback Statute. Activities prohibited by the Anti-Kickback Act described in this Complaint include without limitation payments for consulting services, training sessions, for "clinical trials," for "unrestricted educational grants," for "promotional programs," for physician speaker bureau speaking fees, entertainment, travel and lodging expenses, and  expensive meals and wine. Defendant spent $9,200,000 in 2006 alone for CME Programs, Professional CRM, Grants, and Residency Programs.

36.     Defendant also paid physicians and other healthcare providers for participation in such programs as preceptorships. The "preceptorship" payments paid to physicians and healthcare providers were ostensibly to allow a sales representative, reimbursement business managers and regional healthcare policy managers   to

15

"shadow" the physician. Sales representatives were expected to conduct a set number of preceptorships per year. Preceptorships were simply paid-for sales-pitch opportunities.

37.     "Preceptorships" are a sales tactic driven from Defendant's corporate offices in order to develop personal relationships between sales representatives and physicians.

38.     Remuneration offered and paid to physicians was determined in a manner that took into account the volume or value of business generated by the physician's prescriptions for off-label uses of Botox®, which were paid for in significant part by Government Health Care Programs.

39.     Defendant was aware that its actions did in fact result in the prescribing of Botox® for off-label uses and that those prescriptions were paid for in significant part by Government Health Care Programs.

40.     Defendant was aware that the payment of kickbacks to induce the ordering of drugs paid in whole or part by federal health care programs was in violation of the Anti-Kickback Act.

41.     Defendant was aware that violators of the Anti-Kickback Act are ineligible for payment under any federal health care program.

16

EXHIBIT M
PAGE 173

42.     Notwithstanding this fact, Defendant intentionally and purposefully offered and paid illegal kickbacks to physicians. Defendant knew that the foreseeable consequence of these actions was the submission of false claims to federal health care programs by violators of the Anti-Kickback Act.    Nevertheless, Defendant intentionally and purposefully implemented a strategy to cause the submission of increased false claims for the off-label use of Botox.®

**Patient Harm**

43.     Not surprisingly, the policies and practices of the Defendant in actively promoting Botox® for multiple off-label uses and doses may have resulted in patient harm and death.

44.     For instance, on February 8, 2008, the FDA issued its "Early Communication about an Ongoing Safety Review Botox and Botox Cosmetic (Botulinum toxin Type A) and Myobloc (Botulinum toxin Type B)." In it, the FDA stated:

> FDA has received reports of systemic adverse reactions including respiratory compromise and death following the use of botulinum toxins types A and B for both FDA-approved and unapproved uses. The reactions reported are suggestive of botulism, which occurs when botulinum

17

EXHIBIT M
PAGE 174

toxin spreads in the body beyond the site where it was injected. The most serious cases had outcomes that included hospitalization and death, and occurred mostly in children treated for **cerebral palsy-associated limb spasticity.** Use of botulinum toxins for treatment of limb spasticity (severe arm and leg muscle spasms) in children or adults is not an approved use in the U.S.

(Emphasis supplied.) It further stated:

FDA is aware of the body of literature describing the use of botulinum toxins to treat limb spasticity in children and adults. **The safety, efficacy and dosage of botulinum toxins have not been established for the treatment of limb spasticity of cerebral palsy or for use in any condition in children less than 12 years of age.**

(Emphasis supplied.)

45.    In a response set forth in a press release on the next day, Defendant made

the following statements, emphasizing that the potential safety issue is not applicable

to Botox® Cosmetic because, among other reasons, the dosing is much, much more

when Botox® is used off-label to treat juvenile cerebral palsy spasticities:

With respect to the therapeutic use of Botox® to treat juvenile cerebral palsy and other lower limb spasticities, one should keep in mind that the population, treatment paradigms and typical dosing of product is significantly greater than some of the other approved uses of the product, including specifically the FDA-approved use of Botox® Cosmetic to treat wrinkles between the brows.

18

EXHIBIT M
PAGE 175

In particular, the FDA on its teleconference pointed out that this population of patients tends to be "very sick" and that, sadly, this population is generally subject to greater than usual serious adverse events and a higher mortality rate than a healthy population, regardless of the use of the product.

Additionally, in actual practice the treatment of juvenile cerebral palsy tends to involve large lower limb muscles and the amount of Botox® used is typically far greater than the FDA-approved dosing for Botox® Cosmetic. In its "Early Communication," the FDA reported dose in the serious adverse events "ranged from 100 to 700 units" while the approved dosing for Botox® Cosmetic is 20 units.

**Reimbursement Criteria Used by Government-funded Health Care Programs**

46.    The federal government pays for prescription drug benefits under a variety of health care programs. One of these programs is Medicaid, which provides health care coverage, including prescription drug benefits, for the poor and disabled. The Medicaid program, which is administered by the Centers for Medicare and Medicaid Services (CMS), is funded in part by the federal government. Other government-funded health care programs that pay for prescription drugs include Medicare, CHAMPUS/ Tricare, the Veteran's Health Administration, Federal Employees' Health Benefits Program, and the Indian Health Bureau.

47.    While each government-funded health program establishes its own reim-

EXHIBIT M
PAGE 176

bursement criteria, none knowingly pay for medications that are not prescribed for a

medically accepted indication, or that are prescribed as a result of false or misleading

information disseminated by the pharmaceutical manufacturer to either the payors or

the healthcare providers.  In addition, none of the government-funded health care

programs willingly pay for prescription drugs, the prescribing of which was the result

of, or was influenced by, unlawful inducements from or unlawful marketing activities

by the pharmaceutical manufacturer.

48.    The off-label uses at issue in this case such as spasticity in children and

adults, headache, overactive bladder, pain, various movement disorders are:

a.    Not supported as medically acceptable by any major compendia such as
       those specified by 42 U.S.C. §1396r-8(g)(1)(B)(I) (describing federal
       Medicaid drug coverage);

b.    Not capable of being medically accepted by any Medicare contractor
       based on supportive clinical evidence in certain peer-reviewed medical
       literature as set forth in 42 U.S.C. §1395(x)(1); or, if medically accepted,
       based upon misrepresentations of clinical trials and other data;

c.    Not supported by reliable evidence as set forth in 32 C.F.R. §199.2 and
       TRICARE Policy Manual, Chapter 7, Section 2.1. (describing TRICARE
       drug coverage).

49.    Similarly, the FDA doses were not supported by reliable evidence or

otherwise medically acceptable.

EXHIBIT M
PAGE 177

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 22 of 126   Page ID
#:1336
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 21 of 125

### Defendant Caused Submission of False Claims to Medicaid and Other Federally-Funded Health Programs

50.   The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals.  The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through CMS.  42 U.S.C. §§ 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates.  42 U.S.C. §§ 1396b(a)(1), 1903(a)(1).  The federal government then pays each state a statutorily-established share of "the total amount expended ... as medical assistance under the State plan ..." See 42 U.S.C. §1396b(a)(1).  This federal-to-state payment is known as federal financial participation ("FFP").

51.   The Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program (Form CMS-64) is the accounting statement which states, in accordance with 42 C.F.R. § 430.30(c), must submit each quarter under Title XIX of the Social Security Act (the Act).  It shows the states' actual expenditures for the

21

EXHIBIT M
PAGE 178

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 23 of 126   Page ID
#:1337
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 22 of 125

quarter being reported and previous fiscal years, the recoupment made or refunds received, and income earned on grant funds. These amounts, including the amounts paid for prescription drugs such as Botox®, have a direct effect on the amount of FFP paid by the federal government.

52.    Although states may, under federal law, pay for any drug for any indication, they must do so without FFP if the drug, as prescribed, is not for a medically acceptable use.  FFP is available to states only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). "Covered outpatient drugs" do not include drugs that are "used for a medical indication which is not  a medically accepted indication."  *Id.*, § 1396r-8(k)(3). A medically-accepted indication is defined as a use "which is approved under the Federal Food Drug and Cosmetic Act" ("FDCA") or which is "supported by one or more citations included or approved for inclusion" in specified drug compendia. *Id.* § 1396r-8(k)(6).  42 U.S.C.§ 1396r-8(g)(1)(B)(I) These are: American Hospital Formulary Service Drug Information; United States Pharmacopeia-Drug Information; and the Drugdex Information System ("the Drug Compendia").

53.    When pharmacies, physicians and other healthcare providers submitted claims based upon a physician's prescription for Botox®to treat off-label and/or with off-label doses,  the claims they submitted were false because Botox®was not

22

EXHIBIT M
PAGE 179

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 24 of 126   Page ID
#:1328
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 23 of 125

medically indicated and necessary, and these off-label uses were not supported by a citation in one of the Drug Compendia specified by 42 U.S.C. § 1396r-8(g)(1)(B)(I).

54.    This was clarified further on May 4, 2006 by Edward C. Gendron in "News for State Medicaid Directors" that was sent to all State Drug Rebate Technical Contacts and all Regional Administrators; Compendia Clarification: "We are also reiterating the definition of medically accepted indication. Section 1927(k)(5) defines "medically accepted indication" to mean any use for a covered outpatient drug which is approved by the Food and Drug Administration, or a use which is supported by one or more citations included or approved for inclusion in the compendia specified in subsection (g)(1)(B)(II) – the American Hospital Formulary Service Drug Information, United States Pharmacopoeia-Drug Information (or its successor publications), and the Drugdex Information System. The statute requires coverage of off-label uses of FDA-approved drugs for indications that are supported (as opposed to listed) in the compendia specified in section 1927(g)(1)(B)(II) (the "Medicaid Compendia").

55.    As noted, the Medicaid Act defines "medically accepted indication" to include uses supported by one or more citations included in the congressionally-designated compendia. None of the compendia has a section entitled "Uses Supported by Citation" (i.e., tracking the language of the statute), and each is arranged

23

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 25 of 126   Page ID
#:1329
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 24 of 125

differently. Therefore, the requirements to cover drugs for their medically accepted

indications must be operationalized by looking in the compendia to determine their

organizational structure and where in that structure the supported uses are found.

56.    The Medicaid Compendia fails to provide supportive citations for the use

of Botox® for any type of spasticity in pediatric patients with cerebral palsy:

a.    USP - "Acceptance Not Established"

b.    American Hospital Formulary - No entry

c.    Drugdex - For upper limb spasticity (in pediatric patients), Drugdex
opines that the "evidence is inconclusive." For lower limb spasticity (in
pediatric patients), Drugdex opines that "evidence favors efficacy."
However, Drugdex only gives it a recommendation of "Pediatric, class
IIb,"and the actual citations do not amount to "supportive" citations for
the use of Botulinum Toxin A in lower limb spasticity.

57.    The Medicaid compendia provide no supportive citations for the use of

Botox® in adults with cerebral palsy for either lower limb or upper limb spasticity.

58.    There are no supportive citations using the Medicaid Compendia for

headaches including tension type headaches:

a.    USP does not mention headaches at all.

b.    AHF does not mention headaches at all.

c.    Drugdex provides that the "Evidence is Inconclusive" to support

24

the use of Botox® for tension-type headaches.

59.   Defendant constantly pushed the promotion of greater dosage caps or no dosage caps, without regard to FDA-approved limits or patient safety. The following progress notes are illustrative:

> Dosing limitations=
> MediCal - Removed 200 unit dosing CAP. Dosing is now unlimited. Myobloc remains restricted to 10,000 max. Working on this initiative since 2003
> Florida - Increased dosing max from 300-400, higher doses approved through medical review.
> Iowa - Removed 100 unit cap. Dosing is now limited.

60.   Defendant was aware that off-label uses of Botox®were not covered and payable by Medicaid. Defendant was aware that the natural and probable consequence of its promotion of off-label uses of Botox®was that health care providers would submit claims for payment to Medicaid and other government payors for the off-label use. Notwithstanding this fact, Defendant illegally promoted off-label uses of Botox®. Defendant was aware that its illegal promotion did in fact result in false claims to Medicaid and other government payors for the off-label use.  Defendant was aware that its promotion activities was a substantial causal factor in producing the claim.

61.   As a result of Defendant's actions, healthcare providers submitted

EXHIBIT M
PAGE 182

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 27 of 126   Page ID
#:1331
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 26 of 125

Pharmacy Claim Forms and CMS-1500, and other claim forms to state Medicaid programs, and the states submitted Form CMS-64, all claiming reimbursement for Botox® for such off-label use. Defendant caused the submission of these false claims.

62.   The overwhelming majority of the claims for off-label prescribing of Botox® was the direct and proximate result of unlawful off-label marketing efforts by Defendant.

63.   Defendant, through its illegal, off-label marketing campaigns, knowingly caused the submission of hundreds of thousands of false Medicaid claims which would not have been reimbursed had the responsible agencies known the circumstances under which such prescriptions were written.

Yearly Medicaid sales from 2002-2006 are as follows:

| Labeler | Product Code | Product | Year | Amount |
|---------|--------------|---------|------|--------|
| 00023 | 1145 | Botox | 2006 | $17,076,340 |
| 00023 | 1145 | Botox | 2005 | $22,477,645 |
| 00023 | 1145 | Botox | 2004 | $15,301,523 |
| 00023 | 1145 | Botox | 2003 | $12,307,506 |
| 00023 | 1145 | Botox | 2002 | $9,336,714 |
| | | | Total | $76,499,728.00 |

64.   In a presentation to HHSC (Texas Medicaid) in 2004, Defendant gave the

26

EXHIBIT M
PAGE 183

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 28 of 126   Page ID
#:1332
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 27 of 125

following statistics: 86% of all Botox® used is within the pediatric population, primarily in cerebral palsy; the remaining 14% is within the adult population, primarily adult spasticity.

### Claims for Off-label Botox®Did Not Qualify for Medicare Coverage

65.    Medicare Part A is funded primarily by a federal payroll tax, premiums paid by Medicare beneficiaries and appropriations from Congress. Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§1395e - 42 U.S.C. §1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting.

66.    Medicare Part B is optional to beneficiaries and covers some healthcare benefits not provided by Medicare Part A. Medicare Part B is funded by appropriations from Congress and premiums paid by Medicare beneficiaries who choose to participate in the program. 42 U.S.C. §§1395j - 42 U.S.C. §l395w-4. Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting. 42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.   These typically include drugs administered by a physician or other

27

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 29 of 126   Page ID
#:1333
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 28 of 125

provider in an outpatient setting, some orally administered anti-cancer drugs and antiemetics (drugs which control the side effects caused by chemotherapy), and drugs administered through durable medical equipment such as a nebulizer.  42 U.S.C. §1395k(a); 42 U.S.C. §1395x(s)(2); 42 C.F.R. §405.517.

67.    On January 1, 2006, Part D of the Medicare program began providing drug coverage for all beneficiaries.  The drug benefit covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. §1396r-8(k). The off-label uses discussed herein are not supported by "clinical research that appears in peer-reviewed medical literature," and could not, under any circumstances, be determined to be "medically accepted generally as safe and effective" for such uses.

68.    Defendant was aware that off-label uses of Botox® would not be covered and payable by Medicare, unless Defendant caused the coverage to occur by active lobbying and promotion of the off-label uses and doses to Medicare contractors. Defendant did in fact actively promote the off-label uses and doses to Medicare contractors, at times using misleading tactics to attain the goal.

69.    Defendant was aware that its improper attempts to remove coverage blocks and facilitate off-label coverage to Medicare Contractors did in fact result in claims to Medicare and other government payors for the off-label uses. Defendant was

28

EXHIBIT M
PAGE 185

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 30 of 126   Page ID
#:1334
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 29 of 125

aware that its promotion activities was a substantial factor in producing the coverage of various off-label uses and doses. Defendant was also aware that its coaching of physicians on how to bill to receive payment for off-label uses, without necessarily disclosing the off-label use in the claims coding, caused the payment of off-label claims.

70.    Claims to Medicare for off-label prescribing of Botox®was the direct and proximate result of misleading off-label marketing efforts by Defendant to Medicare Contractors.  As a result of these efforts, Defendant caused the submission of these false claims.

**Claims for Off-label Botox®Did not Qualify for Reimbursement Under Other Federal Health Care Programs**

**CHAMPUS/TRICARE, CHAMPVA and the FEHBP**

71.    In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of prescription drugs under several other federal health care programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA and the Federal Employees Health Benefit Program.

72.    The off-label uses of Botox® promoted by Defendant were not eligible for

29

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 31 of 126   Page ID
#:1335
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 30 of 125

reimbursement under any of the various federal health care programs. Coverage of off-label drug use under these programs is similar to coverage under the Medicaid program. See, e.g., TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

### Direct Purchases By Federal Agencies

73.    In addition to reimbursing drug purchases through Medicare, Medicaid, and other federal health care programs, the United States is a significant direct purchaser of prescription drugs through various federal programs. The United States paid money for Botox® claims which were the result of Defendant's unlawful off-label marketing plan. For instance, the Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

### Programs Administered by the Department of Veterans Affairs

74.    The Department of Veteran Affairs ("VA") maintains a system of medical facilities from which all pharmaceutical supplies, including prescription drugs, are

EXHIBIT M
PAGE 187

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 32 of 126   Page ID
#:1336
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 31 of 125

dispensed to beneficiaries. It also supports a mail service prescription program as part of the outpatient drug benefit. The system serves approximately four million veterans.

### Programs Administered By The Department of Defense

75.    The Department of Defense ("DOD") provides prescription drug coverage to approximately eight million active duty personnel, retirees, and their families through three points of service: military treatment facility outpatient pharmacies, TRICARE managed care contractor retail pharmacies, and the National Mail Order Pharmacy Program. DOD negotiates independent contracts to purchase the majority of the prescription drugs provided through these programs.

76.    Defendant was aware that off-label uses of Botox®were not covered and were not legally payable by any of these programs.

77.    Defendant was aware that the natural and probable consequence of its promotion of off-label uses of Botox®was that health care providers would submit claims for payment to these and other government payors for the off-label use.

78.    Notwithstanding this knowledge, Defendant illegally, vigorously, and without any thought to the possible negative health effects to which it subjected patients, promoted off-label uses of Botox®. Defendant was aware that its illegal

31

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 33 of 126   Page ID
#:1337
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 32 of 125

promotion did in fact result in false claims to these and other government payors for

the off-label use.  Defendant was aware that its promotion activities was a substantial

factor in producing the claim.

79.     False claims to these government programs for off-label prescribing of

Botox® was the direct and proximate result of unlawful off-label marketing efforts by

Defendant.  Defendant caused the submission of these claims.

## VI.   FALSE ASP & AWP: MARKETING THE SPREAD

80.     Drug manufacturers provide average wholesale prices ("AWPs") to

national reporting services, such as the Red Book and  First Data Bank.  Both

Medicare (up through 2004) and most Medicaid programs have used these AWPs as

reported, as a benchmark for reimbursing providers.  Medicare, and almost all

Medicaid programs calculated reimbursement based on approximately 10-15% off

AWP. Since 2005, however, Medicare has reimbursed for outpatient pharmaceuticals

based upon Average Sales Price (ASP) + 6%.

81.     The national reporting services have published the AWP for Botox®

each year since it was FDA-approved, and CMS has published the ASP since 2005.

These publications, in periodically announcing the AWP, simply published those

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 34 of 126   Page ID
#:1338
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 33 of 125

prices that Defendant supplied. Defendant supplied an artificially inflated AWP to the reporting services, as Defendant knew and understood that because the Medicaid and Medicare program (through 2004), relied upon the published prices to establish the AWP, Defendant could precisely control the cost to the healthcare provider by either falsely inflating its AWP, decreasing the provider's acquisition cost, or both. (Similarly, when Defendant provided its Average Sales Price (ASP) data for each given quarter, the resulting weighted average sales price calculated by CMS was artificially inflated.)

82.    Defendant increased the profit obtained by targeted healthcare providers from the Medicaid and Medicare Program by reducing the healthcare providers' acquisition cost of Botox®. The difference between the healthcare providers' acquisition cost, and the price paid by Medicare and other payors (AWP less a certain percentage or ASP + 6%), is referred to as "the spread."

83.    Defendant has targeted high utilizing physicians with an off-invoice discount strategy each year by giving targeted physicians and other healthcare providers an off-invoice discount of, at minimum, the annual price increase for that year. The programs included the Off-Invoice Discount Strategy (ODS) and the Temporary Price Allowance Program (TPA).

33

EXHIBIT M
PAGE 190

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 35 of 126   Page ID
#:1339
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 34 of 125

84.    Defendant offered and calibrated the off-invoice discounts to ensure that there would always be a spread between the physician acquisition cost of Botox® and the Medicaid and Medicare reimbursement amount for Botox,® for targeted physicians. Offered as an inducement to all top prescribing physicians on a consistent basis, Defendant intended to create enough of a spread to induce high volume prescribers.

85.    Reimbursement Business Managers would demonstrate to healthcare providers the financial benefit of using Botox® on patients because providers could earn approximately 20-30% over acquisition cost, for each patient vial/injection, worth an additional $50-$100 in revenue to the healthcare providers.   Due to this inducement, many healthcare providers then determined that it would be profitable to start, continue and expand the treatment of patients with Botox®.

86.    Reimbursement Business Managers would present healthcare providers with a recovery analysis spreadsheet/chart with billing codes to demonstrate to them that billing for Botox® could earn them a margin when reimbursed by Medicare and other payors.

87.    Defendant would educate and train its sales force so its Reimbursement Business Managers could help healthcare providers regarding reimbursement.

34

EXHIBIT M
PAGE 191

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 36 of 126   Page ID
#:1340
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 35 of 125

## COUNT I—FALSE CLAIMS ACT

88.    Relators reallege and incorporate by reference paragraphs 1 - 87  as though fully set forth herein.

89.    This is a claim by Relators, on behalf of the United States, for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* against Defendant for knowingly causing to be presented false claims to Government Healthcare Programs. From on or about January 2000 through present, in the Northern District of Georgia and elsewhere throughout the United States, Defendant has knowingly and willfully violated the False Claims Act by causing false claims to be submitted against federal funds by engaging in a massive off-label marketing campaign for Botox®.

90.    Defendant knowingly made, used, or caused to be made or used false records and/or statements to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. §3729(a)(2). Each prescription that was written as a result of Defendant's illegal marketing practices and illegal kickbacks represents a false or fraudulent record or statement.

91.    Defendant has knowingly caused pharmacies and other healthcare providers to submit Pharmacy, CMS-1500, and other claim forms for payment for

35

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 37 of 126   Page ID
#:1341
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 36 of 125

Botox®, knowing that such false claims would be submitted to state Medicaid programs for reimbursement, and knowing that such Government Healthcare Programs were unaware that they were reimbursing prescriptions for non-covered uses and therefore false claims. By virtue of the acts described in this Complaint, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, in violation of 31 U.S.C. §3729(a)(1) and 31 U.S.C. §3729(a)(2).

92.    Defendant has violated 31 U.S.C. §3729(a)(2) by causing the states to submit false claims to the United States Government in Form CMS-64 (Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program), which falsely certified that all drugs for which federal reimbursement was sought, including Botox®, were paid for in compliance with federal law.  States submitted false claims to the United States Government because *when Botox® was prescribed off-label, it was not a "covered outpatient drug,"* yet states sought reimbursement from the United States Government for all Botox® expenditures.

93.    Defendant caused false claims to be submitted for Botox®, resulting in Government Program reimbursement to healthcare providers in the millions of dollars, in violation of the False Claims Act, 31 U.S.C. §3729 et. seq. and the Anti-Kickback

EXHIBIT M
PAGE 193

Act 42 U.S.C. §1320a-7b(b)(2)(A).

94.     The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim presented or caused to be presented.

WHEREFORE, Relators respectfully request this Court enter judgment against Defendant, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the Government Healthcare Programs under the Federal False Claims Act;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

(d)     That the Relators be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e)     That the Court award such other and further relief as it deems proper.

## COUNT II
## CALIFORNIA FALSE CLAIMS ACT

95.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1

EXHIBIT M
PAGE 194

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 39 of 126   Page ID
#:1343
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 38 of 125

through 87 above as if fully set forth herein.

96.     This is a *qui tam* action brought by Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq*.

97.     Cal. Gov't Code § 12651(a) provides in pertinent part liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
> (3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.
> ...

98.     In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code §14107.2.

99.     Defendant violated Cal. Bus. & Prof. Code § § 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 by engaging in the conduct described herein.

100.    Defendant furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and

EXHIBIT M
PAGE 195

presented to the State of California by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Cal. Bus. & Prof. Code §§ 650-650.1 and Cal. Welf. & Inst. Code § 14107.2 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded healthcare programs.

101. The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

102. Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief; also an express condition of payment of claims submitted to the State of California in connection with Defendant's conduct. Compliance with applicable California statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of California.

103. Had the State of California known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-

EXHIBIT M
PAGE 196

Case 8:10-cv-01352-DOC -MLG · Document 52-4   Filed 12/08/10   Page 41 of 126   Page ID
#:1345
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 40 of 125

funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

104.   As a result of Defendant's violations of Cal. Gov't Code § 12651(a), Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

105.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

106.   This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF CALIFORNIA:
    (1)    Three times the amount of actual damages which the State of California has sustained as a result of Defendant's conduct;

EXHIBIT M
PAGE 197

    (2)    A civil penalty of up to $10,000 for each false claim which Defendant presented or caused to be presented to the State of California;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT III
## DELAWARE FALSE CLAIMS AND REPORTING ACT

107.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

108.   This is a *qui tam* action brought by Relators on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Title 6, Chapter 12 of the Delaware Code.

6 Del. C. § 1201(a) provides liability for any person who-

    (1) knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

41

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 43 of 126   Page ID
#:1347
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 42 of 125

(2)  knowingly makes, uses, or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved; or
(3)  conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

109.   In addition, 31 Del. C. § 1005 prohibits the solicitation or receipt of any remuneration (including kickbacks, bribes or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for the furnishing of any medical care or services for which payment may be made in whole or in part under any public assistance program.

110.   Defendant violated 31 Del. C. § 1005  by engaging in the conduct described herein.

111.   Defendant furthermore violated 6 Del. C. § 1201(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws, including the FDCA, the Anti-Kickback Act, and 31 Del. C. § 1005 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

112.   The State of Delaware, by and through the Delaware Medicaid program

42

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 44 of 126   Page ID
#:1348
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 43 of 125

and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

113.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendant's conduct. Compliance with applicable Delaware statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Delaware.

114.    Had the State of Delaware known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

115.    As a result of Defendant's violations of 6 Del. C. § 1201(a) and 31 Del. C. § 1005, the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

EXHIBIT M
PAGE 200

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 45 of 126   Page ID
#:1349
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 44 of 125

116.    Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of themselves and the State of Delaware.

117.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF DELAWARE:

(1)    Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendant's conduct;
(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Delaware;
(3)    Prejudgment interest; and
(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;
(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)    An award of reasonable attorneys' fees and costs; and

44

EXHIBIT M
PAGE 201

Case 8:10-cv-01352-DOC -MLG  Document 52-4  Filed 12/08/10  Page 46 of 126  Page ID
#:1859
Case 1:08-cv-01883-WSD  Document 52  Filed 02/19/10  Page 45 of 125

    (4)    Such further relief as this Court deems equitable and just.

## COUNT IV
## FLORIDA FALSE CLAIMS ACT

118. Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

119. This is a *qui tam* action brought by Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

120. Fla. Stat. § 68.082(2) provides liability for any person who-

> (a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;
> (b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;
> (c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed-or paid.

121. In addition, Fla. Stat. § 409.920 makes it a crime to:

> (c) knowingly charge, solicit, accept, or receive anything of value, other than an authorized copayment from a Medicaid recipient, from any source in addition to the amount legally payable for an item or service provided to a Medicaid recipient under the Medicaid program or knowingly fail to

45

credit the agency or its fiscal agent for any payment received from a third-party source;

\* \* \*

(e) knowingly, solicit, offer, pay or receive any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging, for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program.

122.   Fla. Stat. §456.054(2) also prohibits the offering, payment, solicitation, or receipt of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash or in kind, in exchange for referring or soliciting patients.

123.   Defendant violated Fla. Stat. § 409.920(c) and (e) and §456.054(2) by engaging in the conduct described herein.

124.   Defendant furthermore violated Fla. Stat. § 68.082(2) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Florida by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Fla. Stat. § 409.920(c) and (e) and §456.054(2) and by virtue of the fact that none of the claims submitted in connection

46

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 48 of 126   Page ID
#:1352
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 47 of 125

with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

125. The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

126. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendant's conduct. Compliance with applicable Florida statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Florida.

127. Had the State of Florida known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

128. As a result of Defendant's violations of Fla. Stat. §§ 68.082(2), 409.920

EXHIBIT M
PAGE 204

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 49 of 126   Page ID
#:1353
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 48 of 125

and 456.054(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

129.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of themselves and the State of Florida.

130.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF FLORIDA:

(1)   Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' conduct;
(2)   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Florida
(3)   Prejudgment interest; and
(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to Fla. Stat. § 68.085

EXHIBIT M
PAGE 205

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 50 of 126   Page ID
#:1354
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 49 of 125

and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action,

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT V
## GEORGIA FALSE MEDICAID CLAIMS ACT

131.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

132.   This is a *qui tam* action brought by Relators on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 (2008) *et seq.*

133.   O.C.G.A. § 49-4-168.1(a) provides liability for any person who:

(1)   knowingly presents, or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3)   conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

134.   In addition, O.C.G.A. § 49-4-168 *et seq.*  prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes,

49

rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the Louisiana medical assistance programs.

135.   Defendant violated O.C.G.A. § 49-4-168 *et seq.* by engaging in the conduct described herein.

136.   Defendant furthermore violated O.C.G.A. § 49-4-168 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and O.C.G.A. § 49-4-168 , and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

137.   The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

138.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendant's conduct. Compliance with applicable Georgia statutes,

50

regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Georgia.

139. Had the State of Georgia known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

140. As a result of Defendant's violation of O.C.G.A. § 49-4-168, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

141. Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to O.C.G.A. § 49-4-168 on behalf of themselves and the State of Georgia.

142. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

EXHIBIT M
PAGE 208

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the State of Georgia:

(1)     Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Georgia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to O.C.G.A. § 49-4-168 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

EXHIBIT M
PAGE 209

## COUNT VI
## HAWAII FALSE CLAIMS ACT

143.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

144.   This is a *qui tam* action brought by Relators on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

145.   Haw. Rev. Stat. § 661-21(a) provides liability for any person who-

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;
> (3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

146.   Defendant violated Haw. Rev. Stat. §661-21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii by its deliberate and systematic violation of federal and state laws, including the FDCA and Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the

EXHIBIT M
PAGE 210

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 55 of 126   Page ID
#:1359
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 54 of 125

government-funded healthcare programs.

147.   The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

148.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendant's conduct. Compliance with applicable Hawaii statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Hawaii.

149.   Had the State of Hawaii known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

150.   As a result of Defendant' violations of Haw. Rev. Stat. § 661-21(a), the State of Hawaii has been damaged in an amount far in excess of millions of dollars

54

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 56 of 126   Page ID
#:1360
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 55 of 125

exclusive of interest.

151.   Relators are private citizens with direct and independent knowledge of

the allegations of this Complaint, who have brought this action pursuant to Haw. Rev.

Stat. § 661-25(a) on behalf of themselves and the State of Hawaii.

152.   This Court is requested to accept pendant jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely

asserts separate damage to the State of Hawaii in the operation of its Medicaid

program.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against Defendant:

To the State of Hawaii:

    (1)    Three times the amount of actual damages which the State of
Hawaii has sustained as a result of Defendant's illegal conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000
for each false claim which Defendant caused to be presented to the
State of Hawaii;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to Haw. Rev. Stat. §661-
27 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred
in connection with this action;

EXHIBIT M
PAGE 212

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 57 of 126   Page ID
#:1361
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 56 of 125

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT VII
## ILLINOIS WHISTLEBLOWER REWARD & PROTECTION ACT

153.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1

through 87 above as if fully set forth herein.

154.    This is a *qui tam* action brought by Relators on behalf of the State of

Illinois to recover treble damages and civil penalties under the Illinois Whistleblower

Reward and Protection Act, 740 ILCS 175 *et seq.*

740 ILCS 175/3(a) provides liability for any person who:

> (1)    knowingly presents, or causes to be presented, to an
> officer or employee of the State or a member of the Guard
> a false or fraudulent claim for payment or approval;
> (2)    knowingly makes, uses, or causes to be made or used,
> a false record or statement to get a false or fraudulent claim
> paid or approved by the State;
> (3)    conspires to defraud the State by getting a false or
> fraudulent claim allowed or paid.

155.    In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor

Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration,

including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in

56

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 58 of 126   Page ID
#:1362
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 57 of 125

cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

156.   Defendant violated 305 ILCS 5/8A-3(b) by engaging in the conduct described herein.

157.   Defendant furthermore violated 740 ILCS 175/3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Illinois Vendor Fraud and Kickback statute (305 ILCS 5/8A-3(b), and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

158.   The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

159.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendant's conduct. Compliance with applicable Illinois statutes,

EXHIBIT M
PAGE 214

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 59 of 126   Page ID
#:1363
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 58 of 125

regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Illinois.

160.   Had the State of Illinois known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

161.   As a result of Defendant's violations of 740 ILCS 175/3(a) and 305 ILCS 5/8A-3(b), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

162.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

163.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

58

EXHIBIT M
PAGE 215

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against Defendant:

To the STATE OF ILLINOIS:

    (1)    Three times the amount of actual damages which the State of Illinois
                has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Illinois;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

EXHIBIT M
PAGE 216

**COUNT VIII**

**INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**

164. Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

165. This is a *qui tam* action brought by Relators on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq.* IC 5-11-5.5-2(b) provides liability for:

> (b) A person who knowingly or intentionally:
> (1) presents a false claim to the state for payment or approval;
> (2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;
> (3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;
> (4) with intent to defraud the state, authorizes issuance of a receipt without knowing that
> (5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;
> (6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;
> (7) conspires with another person to perform an act described in subdivisions (1) through (6); or
> (8) causes or induces another person to perform an act described in subdivisions (1) through (6)...
> to recover a penalty or damages.

60

166.    In addition, IC 5-11-5.5 *et seq.* prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Indiana Medicaid program.

167.    Defendant violated the IC 5-11-5.5 *et seq.* by engaging in the conduct described herein.

168.    Defendant furthermore violated IC 5-11-5.5 *et seq.* and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Indiana Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

169.    The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

170.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief,

EXHIBIT M
PAGE 218

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 63 of 126   Page ID
#:1367
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 62 of 125

also an express condition of payment of claims submitted to the State of Indiana in connection with Defendant's conduct. Compliance with applicable Indiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Indiana.

171.   Had the State of Indiana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

172.   As a result of Defendant's violations of IC 5-11-5.5 *et seq.*, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

173.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to IC 5-11-5.5 *et seq.* on behalf of themselves and the State of Indiana.

174.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely

62

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 64 of 126   Page ID
#:1368
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 63 of 125

asserts separate damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the State of Indiana:

    (1)    Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Indiana;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to IC 5-11-5.5 *et seq.* and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT IX
## LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

175.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

EXHIBIT M
PAGE 220

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 65 of 126   Page ID
#:1369
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 64 of 125

176.  This is a *qui tam* action brought by Relators on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*

177.  La. Rev. Stat. Ann. § 438.3 provides-

(A)  No person shall knowingly present or cause to be presented a false or fraudulent claim;
(B) No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;
(C) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim;

178.  In addition, La. Rev. Stat. Ann. § 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the Louisiana medical assistance programs.

179.  Defendant violated La. Rev. Stat. Ann. § 438.2(A)  by engaging in the conduct described herein.

180.  Defendant  furthermore  violated  La.  Rev.  Stat.  Ann.  §438.3  and

64

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 66 of 126   Page ID
#:1370
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 65 of 125

knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and La. Rev. Stat. Ann. § 438.2(A), and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

181.   The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

182.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendant's conduct. Compliance with applicable Louisiana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Louisiana.

183.   Had the State of Louisiana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with

65

EXHIBIT M
PAGE 222

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 67 of 126   Page ID
#:1371
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 66 of 125

Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

184.   As a result of Defendant's violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

185.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to La. Rev. Stat. Ann. §439.1(A) on behalf of themselves and the State of Louisiana.

186.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the State of Louisiana:

(1)   Three times the amount of actual damages which the State of

EXHIBIT M
PAGE 223

Louisiana has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Louisiana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT X
## MICHIGAN MEDICAID FALSE CLAIMS ACT

187. Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

188. This is a *qui tam* action brought by Relators on behalf of the State of Michigan to recover treble damages and civil penalties under the Michigan Medicaid False Claims Act. MI ST Ch. 400.603 *et seq.*

400.603 provides liability in pertinent part as follows:
Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits;
(2) A person shall not knowingly make or cause to be

67

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 69 of 126   Page ID
#:1373
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 68 of 125

made a false statement or false representation of a material
fact for use in determining rights to a medicaid benefit...

189. In addition, MI ST Ch. 400.604 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Michigan Medicaid program.

190. Defendant violated MI ST Ch. 400.603 *et seq*. by engaging in the conduct described herein.

191. Defendant furthermore violated, MI ST Ch. 400.603 *et seq*. and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

192. The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

68

EXHIBIT M
PAGE 225

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 70 of 126   Page ID
#:1374
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 69 of 125

193.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendant's conduct. Compliance with applicable Michigan statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Michigan.

194.   Had the State of Michigan known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

195.   As a result of Defendant's violations of MI ST Ch. 400.603 *et seq.* the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

196.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to MI ST Ch. 400.603 *et seq.* on behalf of themselves and the State of Michigan.

69

197.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the State of Michigan:

(1)   Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendant's conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Michigan;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to MI ST Ch. 400.603 *et seq.* and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT XI
## MONTANA FALSE CLAIMS ACT

70

EXHIBIT M
PAGE 227

198. Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

199. This is a *qui tam* action brought by Relators on behalf of the State of Montana to recover treble damages and penalties under the Montana False Claims Act, Mont. Code Ann § 17-8-403(1)(a)-(b) *et seq.*

200. §17-8-403 provides liability for any person who:

> (a) knowingly presenting or causing to be presented to an officer or employee of the governmental entity a false claim for payment or approval;
> (b) knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the governmental entity;
> (c) conspiring to defraud the governmental entity by getting false claim allowed or paid by the governmental entity.

201. In addition, Mont. Code Ann § 17-8-403(1)(a)-(b) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the Montana medical assistance programs.

202. Compliance with applicable Medicare, Medicaid and the various other

EXHIBIT M
PAGE 228

federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Montana in connection with Defendant's conduct. Compliance with applicable Montana statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Montana.

203.   Had the State of Montana known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

204.   The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's conduct.

205.   By reason of the Defendant's acts, the State of Montana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

EXHIBIT M
PAGE 229

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 74 of 126   Page ID
#:1378
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 73 of 125

206. Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Mont. Code Ann § 17-8-403(1)(a)-(b) on behalf of themselves and the State of Montana.

207. The State of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the State of Montana:

(1) Not less than two times and not more than three times the amount of actual damages which the State of Montana has sustained as a result of Defendant's conduct;

(2) A civil penalty of up to $10,000 for each false claim which Defendant caused to be presented to the State of Montana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Montana Code Ann. § 17-8-403(1)(A)-(B). and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

73

EXHIBIT M
PAGE 230

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 75 of 126   Page ID
#:1379
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 74 of 125

## COUNT XII
## NEVADA FALSE CLAIMS ACT

208.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

209.   This is a *qui tam* action brought by Relators on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010, *et. seq.*

210.   N.R.S. § 357.040(1) provides liability for any person who-

(a) knowingly presents or causes to be presented a false claim for payment or approval;
(b) knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim
(c) conspires to defraud by obtaining allowance or payment of a false claim.

211.   In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

212.   Defendant violated N.R.S. § 422.560  by engaging in the conduct described herein.

74

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 76 of 126   Page ID
#:1380
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 75 of 125

213.   Defendant furthermore violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and N.R.S. § 422.560, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

214.   The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

215.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendant's conduct.  Compliance with applicable Nevada statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Nevada.

216.   Had the State of Nevada known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-

EXHIBIT M
PAGE 232

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 77 of 126   Page ID
#:1381
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 76 of 125

funded healthcare programs or were premised on false and/or misleading information,

it would not have paid the claims submitted by healthcare providers and third party

payers in connection with that conduct.

217.   As a result of Defendant's violations of N.R.S. § 357.040(1) the State of

Nevada has been damaged in an amount far in excess of millions of dollars exclusive

of interest.

218.   Relators are private citizens with direct and independent knowledge of

the allegations of this Complaint, who have brought this action pursuant to N.R.S. §

357.080(1) on behalf of themselves and the State of Nevada.

219.   This Court is requested to accept pendant jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely

asserts separate damage to the State of Nevada in the operation of its Medicaid

program.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against Defendant:

To the State of Nevada:

    (1)    Three times the amount of actual damages which the State of
            Nevada has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $2,000 and not more than $10,000

EXHIBIT M
PAGE 233

for each false claim which Defendant caused to be presented to the State of Nevada;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action..

To Relators:

    (1)    The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XIII
## THE NEW HAMPSHIRE HEALTH CARE FALSE CLAIMS LAW

220.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

221.   This is a *qui tam* action brought by Relators on behalf of the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire False Claims Act Chapter 167, Section 2, RSA 167:61-b.

222.   New Hampshire False Claims Act, RSA 167:61-b provides liability for any person who:

    (a)    Knowingly presents, or causes to be presented, to an officer or employee of the department a false or fraudulent claim for payment or approval;

77

(b)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department;

(c)    Conspires to defraud the department by getting a false or fraudulent claim allowed or paid.

223.   Defendant violated N.H. Rev. Stat. Ann. §167:61-b, and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New Hampshire by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the New Hampshire Vendor Fraud and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

224.   The State of New Hampshire, by and through the New Hampshire Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

225.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New

78

Hampshire in connection with Defendant's conduct. Compliance with applicable New Hampshire statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Hampshire.

226.   Had the State of New Hampshire known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

227.   As a result of Defendant's violations of N.H. Rev.Stat. Ann. §167:61-b, the State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

228.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.H. Rev.Stat. Ann. §167:61-b on behalf of themselves and the State of New Hampshire.

229.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Hampshire in the operation of its

EXHIBIT M
PAGE 236

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 81 of 126   Page ID
#:1385
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 80 of 125

Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against Defendant:

To the State of New Hampshire:

(1)   Three times the amount of actual damages which the State of New
       Hampshire has sustained as a result of Defendant's conduct;
(2)   A civil penalty of not less than $5,000 and not more than $10,000
       for each false claim which Defendant caused to be presented to the
       State of New Hampshire;
(3)   Prejudgment interest; and
(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to N.H. Rev. Stat. Ann §
       167:61-b and/or any other applicable provision of law;
(2)   Reimbursement for reasonable expenses which Relators incurred
       in connection with this action;
(3)   An award of reasonable attorneys' fees and costs; and
(4)   Such further relief as this Court deems equitable and just.

## COUNT XIV
## NEW JERSEY FALSE CLAIMS ACT

230.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1

through 87 above as if fully set forth herein.

231.   This is a *qui tam* action brought by Relators on behalf of the State of New

EXHIBIT M
PAGE 237

Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 (2008) *et seq.*

232.  N.J. Stat. § 2A:32C-3 provides liability for any person who:

    (a)   knowingly presents, or causes to be presented, to an employee, officer, or agent of the State or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

    (b)   knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

    (c)   conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

233.  In addition, Section 17 of P.L. 1968, c.413 (C.30:4D-17) of the New Jersey False Claims Act prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the New Jersey Medicaid program.

234.  Defendant violated Section 17 of P.L. 1968, c.413 (C.30:4D-17) by engaging in the conduct described herein.

235.  Defendant furthermore violated N.J. Stat. § 2A:32C-1 *et seq.* and knowingly caused  false claims to be made, used and presented to the State of New

81

Jersey by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the New Jersey False Claims Act and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

236.  The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

237.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendant's conduct. Compliance with applicable New Jersey statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Jersey.

238.  Had the State of New Jersey known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-

EXHIBIT M
PAGE 239

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 84 of 126   Page ID
#:1388
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 83 of 125

funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

239.   As a result of Defendant's violation of N.J. Stat. § 2A:32C-1 *et seq.*, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

240.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.J. Stat. § 2A:32C-1 *et seq.* on behalf of herself and the State of New Jersey.

241.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the State of New Jersey:

(1)   Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendant's conduct;

(2)   A civil penalty of not less than and not more than the civil penalty

83

allowed under the federal False Claims Act (31 U.S.C. § 3729 *et seq.*) which Defendant caused to be presented to the State of New Jersey;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to N.J. Stat. § 2A:32C-1 *et seq.* and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

EXHIBIT M
PAGE 241

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 86 of 126   Page ID
#:1390
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 85 of 125

## COUNT XV
## NEW MEXICO MEDICAID FALSE CLAIMS ACT and
## NEW MEXICO MEDICAID FRAUD AGAINST TAXPAYERS ACT

242.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1

through 87 above as if fully set forth herein.

243.   This is a *qui tam* action brought by Relators on behalf of the State of New

Mexico to recover treble damages and civil penalties under the New Mexico Medicaid

False Claims Act and New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann.§§

27-14-1 *et seq*. and § 44-9-1 *et seq*.

244.   Section 44-9-3 provides liability in pertinent part as follows:

A. A person shall not:
(1)   knowingly present, or cause to be presented, to an
employee, officer or agent of the state or to a contractor,
grantee, or other recipient of state funds a false or
fraudulent claim for payment or approval;
(2)   knowingly make or use, or cause to be made or used,
a false, misleading or fraudulent record or statement to
obtain or support the approval of or the payment on a false
or fraudulent claim;
(3)   conspire to defraud the state by obtaining approval or
payment on a false or fraudulent claim...

245.   In addition, N.M. Stat. Ann. §§ 30-44-7 *et seq*. prohibits the solicitation

or receipt of any remuneration, including any kickback, bribe or rebate, directly or

indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or

85

EXHIBIT M
PAGE 242

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 87 of 126   Page ID
#:1391
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 86 of 125

service for which payment may be made in whole or in part under the New Mexico Medicaid program.

246.   Defendant violated N.M. Stat. Ann. §§ 30-44-7 *et seq.* by engaging in the conduct described herein.

247.   Defendant furthermore violated, N.M. Stat. Ann. §§ 27-14-1 *et seq.* and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New Mexico by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

248.   The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

249.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendant's conduct. Compliance with applicable New Mexico

EXHIBIT M
PAGE 243

statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of New Mexico.

250. Had the State of New Mexico known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

251. As a result of Defendant's violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.* the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

252. Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* on behalf of themselves and the State of New Mexico.

253. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

EXHIBIT M
PAGE 244

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 89 of 126   Page ID
#:1393
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 88 of 125

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against Defendant:

To the State of New Mexico:

    (1)    Three times the amount of actual damages which the State of New
Mexico has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000
for each false claim which Defendant caused to be presented to the
State of New Mexico;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 27-
14-1 *et seq.* and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred
in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XVI
## NEW YORK FALSE CLAIMS ACT

254.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1

through 87 above as if fully set forth herein.

255.    This is a *qui tam* action brought by Relators on behalf of the State of New

York to recover treble damages and civil penalties under the New York False Claims

EXHIBIT M
PAGE 245

Act, 2007 N.Y. Laws, Chapter 58, Section 39, Article XIII.

256.   Section 189.1 of the New York False Claims Act provides liability for

any person who:

>    (a)   knowingly presents, or causes to be presented, to any
>    employee, officer or agent of the state or local government,
>    a false or fraudulent claim for payment or approval;
>    (b)   knowingly makes, uses, or causes to be made or used,
>    a false record or statement to get a false or fraudulent claim
>    paid or approved by the state or local government;
>    (c) conspires to defraud the State by getting a false or
>    fraudulent claim allowed or paid.

257.   In addition, the New York State Consolidated Laws prohibits the

solicitation or receipt of any remuneration, including any kickback, bribe or rebate,

directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any

item or service for which payment may be made in whole or in part under the New

York Medicaid program.

258.   Defendant violated the New York State Consolidated Laws by engaging

in the conduct described herein.

259.   Defendant furthermore violated 2007 N.Y. Laws 58, Section 39, Article

XIII, and knowingly caused hundreds of thousands of false claims to be made, used

and presented to the State of New York by its deliberate and systematic violation of

EXHIBIT M
PAGE 246

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 91 of 126   Page ID
#:1395
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 90 of 125

federal and state laws, including the FDCA, federal Anti-Kickback Act, and the New

York Vendor Fraud and Kickback statute, and by virtue of the fact that none of the

claims submitted in connection with its conduct were even eligible for reimbursement

by the government-funded healthcare programs.

260.   The State of New York, by and through the New York Medicaid program

and other state healthcare programs, and unaware of Defendant's conduct, paid the

claims submitted by healthcare providers and third party payers in connection

therewith.

261.   Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief,

also an express condition of payment of claims submitted to the State of New York in

connection with Defendant's conduct. Compliance with applicable New York statutes,

regulations and Pharmacy Manuals was also an express condition of payment of

claims submitted to the State of New York.

262.   Had the State of New York known that Defendant was violating the

federal and state laws cited herein and/or that the claims submitted in connection with

Defendant conduct failed to meet the reimbursement criteria of the government-funded

healthcare programs or were premised on false and/or misleading information, it

EXHIBIT M
PAGE 247

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 92 of 126   Page ID
#:1396
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 91 of 125

would not have paid the claims submitted by healthcare providers and third party

payers in connection with that conduct.

263.   As a result of Defendant's violations of 2007 N.Y. Laws 58, Section 39,

Article XIII, the State of New York has been damaged in an amount far in excess of

millions of dollars exclusive of interest.

264.   Relators are private citizens with direct and independent knowledge of

the allegations of this Complaint, who have brought this action pursuant to 2007 N.Y.

Laws 58, Section 39, Article XIII, on behalf of themselves and the State of New York.

265.   This Court is requested to accept pendant jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely

asserts separate damage to the State of New York in the operation of its Medicaid

program.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against Defendant:

To the State of New York:

(1)   Three times the amount of actual damages which the State of New
      York has sustained as a result of Defendant's conduct;
(2)   A civil penalty of not less than $5,000 and not more than $10,000
      for each false claim which Defendant caused to be presented to the
      State of New York;

EXHIBIT M
PAGE 248

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 93 of 126   Page ID
#:1397
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 92 of 125

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to 2007 N.Y. Laws 58,
        Section 39, Article XIII, and/or any other applicable provision of
        law;

(2)     Reimbursement for reasonable expenses which Relators incurred
        in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.


## COUNT XVII

## NORTH CAROLINA FALSE CLAIMS ACT

266.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1

through 87 above as if fully set forth herein.

267.   This is a *qui tam* action brought by Relators on behalf of the State of

North Carolina to recover treble damages and civil penalties under the North Carolina

False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*

268.   N.C. Gen. Stat.  § 1-607(a) provides liability for any person who:

(1)     Knowingly presents or causes to be presented a false
        or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used, a false
        record or statement material to a false or fraudulent claim;

(3)     Conspires to commit a violation of subdivision (1), (2), (4), (5),

92

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 94 of 126   Page ID
#:1398
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 93 of 125

(6), or (7) of this section;

(7)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

269.   In addition, North Carolina Statutes prohibit the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the North Carolina Medicaid program.

270.   Defendant violated N.C. Gen. Stat. § 1-607(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and the North Carolina False Claims Act N.C. Gen. Stat. § 1-605 *et seq.* , and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

271.   The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendant's conduct,

EXHIBIT M
PAGE 250

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 95 of 126   Page ID
#:1399
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 94 of 125

paid the claims submitted by healthcare providers and third party payers in connection

therewith.

272.   Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief,

also an express condition of payment of claims submitted to the State of North

Carolina in connection with Defendant's conduct. Compliance with applicable North

Carolina statutes, regulations and Pharmacy Manuals was also an express condition

of payment of claims submitted to the State of North Carolina.

273.   Had the State of North Carolina known that Defendant was violating the

federal and state laws cited herein and/or that the claims submitted in connection with

Defendant's conduct failed to meet the reimbursement criteria of the government-

funded healthcare programs or were premised on false and/or misleading information,

it would not have paid the claims submitted by healthcare providers and third party

payers in connection with that conduct.

274.   As a result of Defendant's violation of N.C. Gen. Stat. § 1-605 *et seq.*,

and its anti kickback statutes, the State of North Carolina has been damaged in an

amount far in excess of millions of dollars exclusive of interest.

275.   Relators are private citizens with direct and independent knowledge of

EXHIBIT M
PAGE 251

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 96 of 126   Page ID
#:1400
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 95 of 125

the allegations of this Complaint, who have brought this action pursuant to N.C. Gen.

Stat. § 1-605(b) on behalf of themselves and the State of North Carolina.

276.   This Court is requested to accept pendant jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely

asserts separate damage to the State of North Carolina in the operation of its Medicaid

program.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against Defendant:

To the State of North Carolina:

| | | |
|---|---|---|
| (1) | Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendant's conduct; |
| (2) | A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Oklahoma; |
| (3) | Prejudgment interest; and |
| (4) | All costs incurred in bringing this action. |

To Relators:

| | |
|---|---|
| (1) | The maximum amount allowed pursuant to N.C. Gen. Stat. § 1-605 *et seq.* and/or any other applicable provision of law; |
| (2) | Reimbursement for reasonable expenses which Relators incurred in connection with this action; |
| (3) | An award of reasonable attorneys' fees and costs; and |
| (4) | Such further relief as this Court deems equitable and just. |

95

EXHIBIT M
PAGE 252

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 97 of 126   Page ID
#:1401
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 96 of 125

## COUNT XVIII
## OKLAHOMA MEDICAID FALSE CLAIMS ACT

277.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1

through 87 above as if fully set forth herein.

278.   This is a *qui tam* action brought by Relators on behalf of the State of

Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid

False Claims Act 63 Okl. St. §§ 5053 (2008) *et seq.*

279.   63 Okl. St. § 5053.1 (2)(B) provides liability for any person who:

(1)   knowingly presents, or causes to be presented, to an
officer or employee of the State of Oklahoma, a false
or fraudulent claim for payment or approval;

(2)   knowingly makes, uses, or causes to be made or used,
a false record or statement to get a false or fraudulent
claim paid or approved by the State;

(3)   conspires to defraud the State by getting a false or
fraudulent claim allowed or paid.

280.   In addition, 56 Okl. St. § 1005 (2008) of the Oklahoma Medicaid

Program Integrity Act prohibits the solicitation, receipt, offering or payment of any

financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly,

overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid

for in whole or in part by the Oklahoma Medicaid Program.

96

EXHIBIT M
PAGE 253

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 98 of 126   Page ID
#:1402
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 97 of 125

281.   Defendant violated 56 Okl. St. §§ 1005 *et seq.* by engaging in the conduct described herein.

282.   Defendant furthermore violated 63 Okl. St. §§ 5053.1 *et seq.* and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and the Oklahoma Medicaid Program Integrity Act and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

283.   The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

284.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendant's conduct. Compliance with applicable Oklahoma statutes, regulations and Pharmacy Manuals was also an express condition of payment of

97

EXHIBIT M
PAGE 254

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 99 of 126   Page ID
#:1403
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 98 of 125

claims submitted to the State of Oklahoma.

285. Had the State of Oklahoma known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

286. As a result of Defendant's violation of 63 Okl. St. §§ 5053.1 *et seq*., the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

287. Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 63 Okl. St. §§ 5053.1 *et seq*. on behalf of themselves and the State of Oklahoma.

288. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following

EXHIBIT M
PAGE 255

damages to the following parties and against Defendant:

To the State of Oklahoma:

(1)   Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendant's conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Oklahoma;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to 63 Okl. St. § 5053.1 *et seq.* and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT XIX
## RHODE ISLAND STATE FALSE CLAIMS ACT

289.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

290.   This is a *qui tam* action brought by Relators on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island State False Claims Act R.I.Gen. Laws §§ 9-1.1-1 (2008) *et seq.*

EXHIBIT M
PAGE 256

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 101 of 126   Page ID
#:1405
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 100 of 125

291.  R.I. Gen. Laws § 9-1.1-3 provides liability for any person who:

(1)  knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

(2)  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3)  conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

292.  In addition, R.I. Gen. Laws § 40-8.2-3(2)(i) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the Rhode Island Medicaid program.

293.  Defendant violated R.I. Gen. Laws §§ 40-8.2-3 *et seq.* by engaging in the conduct described herein.

294.  Defendant furthermore violated R.I.Gen. Laws §§ 9-1.1-1 *et seq.* and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Rhode Island by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Rhode

100

EXHIBIT M
PAGE 257

Island General Laws and Kickback statute, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

295. The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

296. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendant's conduct. Compliance with applicable Rhode Island statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Rhode Island.

297. Had the State of Rhode Island known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and

EXHIBIT M
PAGE 258

third party payers in connection with that conduct.

298.   As a result of Defendant's violation of R.I. Gen. Laws §§ 9-1.1-1 *et seq.*, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

299.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to R.I. Gen. Laws §§ 9-1.1-1 *et seq.* on behalf of themselves and the State of Rhode Island.

300.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the State of Rhode Island:

(1)   Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendant's conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Rhode Island;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

EXHIBIT M
PAGE 259

To Relators:

(1)   The maximum amount allowed pursuant to R.I. Gen. Laws § 9-1.1-1 and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT XX
## TENNESSEE FALSE CLAIMS ACT

301.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

302.   This is a *qui tam* action brought by Relators on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq*.

303.   § 71-5-182(a)(1) provides liability for any person who-

(A) Presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

(B) Makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the State knowing such record or statement is false;

(C) Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

103

EXHIBIT M
PAGE 260

304.   Defendant violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Tennessee by its deliberate and systematic violation of federal and state laws, including the FDCA and Anti-Kickback Act, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

305.   The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

306.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendant's conduct.   Compliance with applicable Tennessee statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Tennessee.

307.   Had the State of Tennessee known that Defendant was violating the

EXHIBIT M
PAGE 261

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 106 of 126   Page ID
#:1410
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 105 of 125

federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

308.   As a result of Defendant's violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

309.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of themselves and the State of Tennessee.

310.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF TENNESSEE:

EXHIBIT M
PAGE 262

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 107 of 126   Page ID
#:1411
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 106 of 125

    (1)    Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Tennessee;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XXI
## TEXAS FALSE CLAIMS ACT

311.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

312.   This is a *qui tam* action brought by Relators on behalf of the State of Texas to recover double damages and civil penalties under Medicaid Fraud Prevention Law Tex. Hum. Res. Code §§ 36.001 *et seq.*

313.   Tex. Hum. Res. Code § 36.002 (4)(B) provides liability for any person who-

EXHIBIT M
PAGE 263

(4)    knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
(B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

314.   Defendant violated V.T.C.A. Hum. Res. Code §§ 36.002 *et seq.* and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Texas  by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-kickback Act and §§ 36.002 *et seq.*, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

315.   The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

316.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendant's conduct.  Compliance with applicable Texas statutes,

107

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 109 of 126   Page ID
#:1413
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 108 of 125

regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Texas.

317.   Had the State of Texas known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

318.   As a result of Defendant's violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

319.   Defendant did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

320.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A.

EXHIBIT M
PAGE 265

Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

321.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF TEXAS:

(1)   Two times the amount of actual damages which the State of Texas has sustained as a result of Defendant's conduct;
(2)   A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum.. Res. Code § 36.052(3)(B) for each false claim which Defendant caused to be presented to the state of Texas;
(3)   Prejudgment interest; and
(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;
(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;
(3)   An award of reasonable attorneys' fees and costs; and
(4)   Such further relief as this Court deems equitable and just.

## COUNT XXII
## WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT

109

EXHIBIT M
PAGE 266

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 111 of 126   Page ID
#:1415
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 110 of 125

322.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

323.   This is a *qui tam* action brought by Relators on behalf of the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. §§ 20.931 *et seq.*

324.   Wis. Stat. § 20.931(2) provides liability for any person who:

(a)   Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.

(b)   Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.

(c)   conspires to defraud this State by obtaining allowance or payment of claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance Program;

(g)   knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance Program.

325.   In addition, Wis. Stat. § 49.49(2) of the Wisconsin Public Assistance Code prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return

110

EXHIBIT M
PAGE 267

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 112 of 126   Page ID
#:1416
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 111 of 125

for furnishing any item or service for which payment may be made in whole or in part

under the Wisconsin Medicaid program.

326.   Defendant violated Wis. Stat. § 49.49(2) by engaging in the conduct

described herein.

327.   Defendant furthermore violated Wis. Stat. §§ 20.931 *et seq.* and

knowingly caused  false claims to be made, used and presented to the State of

Wisconsin by its deliberate and systematic violation of federal and state laws,

including the FDCA, federal Anti-Kickback Act, and the Wisconsin Public Assistance

Code and Kickback statute, (Wis. Stat. § 49.42(2)) and by virtue of the fact that none

of the claims submitted in connection with its conduct were even eligible for

reimbursement by the government-funded healthcare programs.

328.   The State of Wisconsin, by and through the Wisconsin Medicaid program

and other state healthcare programs, and unaware of Defendant's conduct, paid the

claims submitted by healthcare providers and third party payers in connection

therewith.

329.   Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief,

also an express condition of payment of claims submitted to the State of Wisconsin in

111

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 113 of 126   Page ID
#:1417
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 112 of 125

connection with Defendant's conduct. Compliance with applicable Wisconsin statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the State of Wisconsin.

330. Had the State of Wisconsin known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

331. As a result of Defendant's violation of Wis. Stat. §§ 20.931 *et seq.*, the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

332. Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Wis. Stat. §§ 20.931 *et seq.* on behalf of themselves and the State of Wisconsin.

333. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Wisconsin in the operation of its Medicaid

EXHIBIT M
PAGE 269

program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the State of Wisconsin:

    (1)    Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Wisconsin;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to Wis. Stat. § 20.931 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XXIII
## MASSACHUSETTS FALSE CLAIMS ACT

334.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

335.    This is a *qui tam* action brought by Relators on behalf of the

113

Commonwealth of Massachusetts for treble damages and penalties under

Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12 §§ 5(A) *et seq.*

336.   Mass. Gen. Laws Ann. Chap. 12 § 5B provides liability for any person

who:

> (1)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (2)   knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or
> (3)   conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

337.   In addition, Mass. Gen. Laws Ann. Chap.  118E § 41 prohibits the

solicitation, receipt or offering of any remuneration, including any bribe or rebate,

directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any

good, service or item for which payment may be made in whole or in part under the

Massachusetts Medicaid program.

338.   Defendant violated Mass. Gen. Laws Ann. Chap. 118E § 41 by engaging

in the conduct described herein.

339.   Defendant furthermore violated Mass. Gen. Laws Ann. Chap. 12 § 5B

and knowingly caused hundreds of thousands of false claims to be made, used and

EXHIBIT M
PAGE 271

Case 8:10-cv-01352-DOC -MLG   Document 52-4    Filed 12/08/10   Page 116 of 126   Page ID
#:1420
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 115 of 125

presented to the Commonwealth of Massachusetts by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Mass. Gen. Law Ann. Chap. 118E § 41 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

340.   The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

341.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendant's conduct. Compliance with applicable Massachusetts statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Massachusetts.

342.   Had the Commonwealth of Massachusetts known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the

EXHIBIT M
PAGE 272

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 117 of 126   Page ID
#:1421
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 116 of 125

government-funded healthcare programs or were premised on false and/or misleading

information, it would not have paid the claims submitted by healthcare providers and

third party payers in connection with that conduct.

343.   As a result of Defendant's violations of Mass. Gen. Laws Ann. Chap. 12

§ 5B, the Commonwealth of Massachusetts has been damaged in an amount far in

excess of millions of dollars exclusive of interest.

344.   Relators are private citizens with direct and independent knowledge of

the allegations of this Complaint, who have brought this action pursuant to Mass. Gen.

Laws Ann. Chap. 12 § 5(c)(2) on behalf of themselves and the Commonwealth of

Massachusetts.

345.   This Court is requested to accept pendant jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely

asserts separate damage to the Commonwealth of Massachusetts in the operation of

its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following

damages to the following parties and against Defendant:

To the Commonwealth of Massachusetts:

(1)   Three   times   the   amount   of   actual   damages   which   the

116

Commonwealth of Massachusetts has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the Commonwealth of Massachusetts;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12, §5F and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

117

EXHIBIT M
PAGE 274

## COUNT XXIV
## VIRGINIA FRAUD AGAINST TAXPAYERS ACT

346.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 above as if fully set forth herein.

347.   This is a *qui tam* action brought by Relators on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Taxpayers Act, §§8.01-216.3(A) *et seq.* provides liability for any person who:

>    (1)   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>    (2)   Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or
>    (3)   Conspires to defraud the Commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim.

348.   In addition, Va. Code Ann. § 32.1-315 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Virginia Medicaid program.

349.   Defendant violated Va. Code Ann. § 32.1-315 by engaging in the conduct

EXHIBIT M
PAGE 275

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 120 of 126   Page ID
#:1424
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 119 of 125

described herein.

350.   Defendant furthermore violated Virginia Fraud Against Taxpayers Act §8.01-216.3(A) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Va. Code Ann. § 32.1-315 and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

351.   The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

352.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendant's conduct. Compliance with applicable Virginia statutes, regulations and Pharmacy Manuals was also an express condition of payment of claims submitted to the Commonwealth of Virginia.

EXHIBIT M
PAGE 276

353.   Had the Commonwealth of Virginia known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

354.   As a result of Defendant's violations of Virginia Fraud Against Taxpayers Act §8.01-216.3(A), the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

355.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Virginia Fraud Against Taxpayers Act §8.01-216.3 on behalf of themselves and the Commonwealth of Virginia.

356.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following

EXHIBIT M
PAGE 277

Case 8:10-cv-01352-DOC -MLG   Document 52-4    Filed 12/08/10   Page 122 of 126   Page ID
#:1426
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 121 of 125

damages to the following parties and against Defendant:

To the Commonwealth of Virginia:

(1)    Three times the amount of actual damages which the
Commonwealth of Virginia has sustained as a result of
Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000
for each false claim which Defendant caused to be presented to the
Commonwealth of Virginia;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Va. Code Ann. § 32.1-
315 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred
in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXV
## DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

357.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1

through 87 above as if fully set forth herein.

358.    This is a *qui tam* action brought by Relators and the District of Columbia

to recover treble damages and civil penalties under the District of Columbia

121

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 123 of 126   Page ID
#:1427
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 122 of 125

Procurement Reform Amendment Act, D.C. Code §§ 2-308.13 *et seq*.

359.   D.C. Code § 2-308.14(a) provides liability for any person who-

(1) Knowingly presents, or causes to be presented, to an
officer or employee of the District a false claim for payment
or approval;
(2) Knowingly makes, uses, or causes to be made or used,
a false record or statement to get a false claim paid or
approved by the District;
(3) Conspires to defraud the District by getting a false claim
allowed or paid by the District;

360.   In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or

agreeing to accept any type of remuneration for the following:

(1)   Referring a recipient to a particular provider of any
item or service or for which payment may be made under
the District of Columbia Medicaid program, or
(2)   Recommending the purchase, lease, or order of any
good, facility, service, or item for which payment may be
made under the District of Columbia Medicaid Program.

361.   Defendant violated D.C. Code § 4-802(c) by engaging in the illegal

conduct described herein.

362.   Defendant furthermore violated D.C. Code § 2-308.14(a) and knowingly

caused thousands of false claims to be made, used and presented to the District of

Columbia  by its deliberate and systematic violation of federal and state laws,

122

EXHIBIT M
PAGE 279

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 124 of 126   Page ID
#:1428
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 123 of 125

including the FDCA, federal Anti-Kickback Act D.C. Code § 4-802(c), and by virtue
of the fact that none of the claims submitted in connection with its illegal conduct
were even eligible for reimbursement by the government-funded healthcare programs.

363.   The District of Columbia, by and through the District of Columbia
Medicaid program and other state healthcare programs, and unaware of Defendant's
illegal conduct, paid the claims submitted by healthcare providers and third party
payers in connection therewith.

364.   Compliance with applicable Medicare, Medicaid and the various other
federal and state laws cited herein was an implied, and upon information and belief,
also an express condition of payment of claims submitted to the District of Columbia
in connection with Defendant's illegal conduct.   Compliance with applicable D.C.
statutes, regulations and Pharmacy Manuals was also an express condition of payment
of claims submitted to the District of Columbia.

365.   Had the District of Columbia known that Defendant was violating the
federal and state laws cited herein and/or that the claims submitted in connection with
Defendant's conduct failed to meet the reimbursement criteria of the government-
funded healthcare programs or were premised on false and/or misleading information,
it would not have paid the claims submitted by healthcare providers and third party

123

Case 8:10-cv-01352-DOC -MLG   Document 52-4   Filed 12/08/10   Page 125 of 126   Page ID
#:1429
Case 1:08-cv-01883-WSD   Document 32   Filed 02/19/10   Page 124 of 125

payers in connection with that conduct.

366.   As a result of Defendant's violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

367.   Relators are private citizens with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of themselves and the District of Columbia.

368.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the District of Columbia:

    (1)    Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's illegal conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the District of Columbia;

    (3)    Prejudgment interest; and

EXHIBIT M
PAGE 281

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

Dated this _19th_ day of _February_, 2010.

Respectfully submitted,

Leanne C. Mehrman
Georgia Bar No: 312910
Ford & Harrison LLP
1275 Peachtree Street, N.E., Ste. 600
Atlanta, GA 30309
Tel: (404) 888-3800
DD: (404) 888-3825
Fax: (404) 888-3863
E-mail: lmehrman@fordharrison.com

**Of Counsel:**
Kenneth J. Nolan, Esq.
Marcella Auerbach, Esq.
Nolan & Auerbach, P.A.
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL 33301
Phone: (954) 779-3943
Fax: (954) 779-3937

Counsel for *Qui Tam* Plaintiffs

EXHIBIT M
PAGE 282