Exhibit  N

Case 8:10-cv-01352-DOC -MLG   Document 52-5   Filed 12/08/10   Page 2 of 72   Page ID
#:1432
Case 1:09-cv-03434-WSD   Document 1   Filed 10/26/09   Page 1 of 12

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA                          :

    and                          :

*ex rel.* ALBERT EDWARD HALLIVIS                 :
    11321 College View Drive               :
    Silver Spring, MD 20902                :
                                           :
                                           :   **Case No.**
        Plaintiffs                 :   **FILED UNDER SEAL**
                                           :   Pursuant to 31 U.S.C. § 3730
    vs.                                    :   (False Claims Act)
                                           :
ALLERGAN, INC.                                    :
a/k/a ALLERGAN USA, INC.                          :
2525 Dupont Dr.                                   :
Irvine, CA 92612                                  :
                                           :
Serve : Resident Agent                            :
                                           :
    CSC-LAWYERS INCORPORATING              :
    SERVICE COMPANY                        :
    7 St. Paul Street, Suite 1660         :
    Baltimore, MD 21202                    :
                                           :
        Defendant                  :

## COMPLAINT

Relator-Plaintiff Albert Edward Hallivis, by and through his attorneys, Jay P. Holland,

Brian J. Markovitz, and the law firm Joseph, Greenwald & Laake, P.A., bring this False

Claims Act, 31 U.S.C. §3729-33§ ("FCA") Complaint, on behalf of the United States of

America, and sues the Defendant, ALLERGAN, Inc. (hereinafter "ALLERGAN"), and in

support thereof, states as follows:

### I.   INTRODUCTION

1.    This case involves a scheme by Defendant ALLERGAN to market and promote its

drug, Botox (onabotulinumtoxinA (a botulinum toxin)), which is a neurotoxin protein from

Joseph
Greenwald
& Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jgllaw.com

EXHIBIT N
PAGE 283

Case 8:10-cv-01352-DOC -MLG  Document 52-5   Filed 12/08/10  Page 3 of 72  Page ID
#:1433
Case 1:09-cv-03434-WSD  Document 1   Filed 10/26/09  Page 2 of 12

the bacterium Clostridium botulinum, for the off-label use for control of overactive bladder

("OAB") and incontinence due to neurogenic bladder ("NB"), when ALLERGAN knew that

the use of the drug for OAB and NB was not medically accepted and had not been found by

the Food and Drug Administration ("the FDA") to be safe and effective.

2.      In the course of its off-label marketing scheme, ALLERGAN made false and

misleading statements to treating doctors and other medical personnel who can prescribe

medicine to the effect that Botox was medically accepted for the off-label uses being

promoted, and therefore eligible for Medicare reimbursement.  In reliance on ALLERGAN's

false statements, treating physicians administered Botox to their patients.  ALLERGAN thus

caused physicians to present false claims for payment to Medicare.  ALLERGAN's false

statements caused Botox to be an unapproved new drug pursuant to Title 21, United States

Code, Section 355, and its shipment in interstate commerce violated Title 21, United States

Code, Section 331(d).  Additionally, ALLERGAN's false statements led to the submission of

and payment for false claims by the Medicare program, which violated Section 3729(a)(l)(a)

and (b) of the FCA.

3.      As the direct, proximate and foreseeable result of ALLERGAN's false and fraudulent

conduct as set forth above, ALLERGAN (a) caused physicians unwittingly to submit false

claims to the Medicare program seeking reimbursement for uses of Botox that ALLERGAN

knew were not medically accepted and therefore ineligible for Medicare reimbursement; and

(b) used false or fraudulent statements to get the Medicare program to reimburse millions of

dollars of false and fraudulent claims submitted by these physicians.  ALLERGAN's illegal

scheme to promote the use of Botox for indications that were neither FDA approved nor

medically accepted, greatly increased Botox sales to the financial benefit of ALLERGAN, but

Joseph
Greenwald
&Laake, P.A.

6404 Ivy Lane · Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2300
Fax: (301) 220-1214
www.jgllaw.com

2

caused the Medicare Program to pay millions of dollars for the administration of a drug with no proven medical value to patients suffering from OAB and NB.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732.

5. Venue is proper in this District under 31 U.S.C. § 3732(a) because many of the illegal acts of Defendant ALLERGAN prohibited by 31 U.S.C. §3729 have occurred in this District.

## III. PARTIES

6. Relator Albert Edward Hallivis is an adult citizen of the State of Maryland. Relator is the Territory Business Manager for the Southern Baltimore region [comprising of the geographic region from southern Baltimore to Laurel, Maryland] for Defendant. In January 2007, Relator became an employee of Defendant when his prior employer, Espirit Pharma, was acquired by Defendant because Defendant was seeking a sales staff that had experience working with urologists. At that time, Relator became part of Defendant's Urological Management Team. Relator's job duties include selling another drug (Sanctura XR) manufactured by Defendant for OAB (which has FDA approval for such use) and booking speakers in the Southern Baltimore region for Defendant to promote the drugs it produces.

7. Plaintiff, the United States of America, through the Department of Health and Human Services ("HHS"), is charged with administering the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS") formerly known as the Health Financing Administration.

8. Defendant ALLERGAN is a Delaware Corporation with its principal place of business at 2525 Dupont Drive, Irvine, California 92612. ALLERGAN is principally engaged in the development, manufacture and sale of pharmaceuticals, including prescription

Joseph
Greenwald
& Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jgflaw.com

3

pharmaceuticals subject to regulation by the FDA.  During the relevant time period,

ALLERGAN owned, manufactured, and sold the prescription drug Botox.

## IV. ALLEGATIONS

### ALLERGAN's Off-Label Promotion of Botox

9.      The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-99, governs,

among other things, the testing, approval, manufacture, labeling, and distribution in interstate

commerce of prescription medicines.  Under the FDCA a "new drug" means any drug the

composition of which is such that the new drug is not generally recognized among experts as

safe and effective for use under the conditions prescribed, recommended, or suggested in the

labeling thereof.  21 U.S.C. §321(p)(l).  "New drugs" cannot be distributed in interstate

commerce unless the person who seeks to distribute the drug demonstrates to the satisfaction

of the FDA that the drug is safe and effective for each of its intended uses, and there is in

effect for such drug an approval of a new drug application (NDA) pursuant to 21 U.S.C. §

355(b), or an abbreviated new drug application (ANDA) pursuant to 21 U.S.C. § 355(j), or an

investigational new drug (IND) submission pursuant to 21 U.S.C. § 355(i).  *See* 21 U.S.C. §§

355(a), (d), 331(d).  While physicians may prescribe approved drugs for off-label uses, drug

manufacturers are prohibited from marketing or promoting a drug for a use that the FDA has

not approved.  *See* 21 U.S.C. § 331(d) (prohibiting distribution of drugs for non-approved

uses); *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 44 (D. Mass. 2001)

(manufacturers that want to promote a drug for uses outside of FDA approval must resubmit

drug for FDA testing and approval process).

10.     On or about December 9, 1991, the FDA approved an NDA for Botox for the certain

treatment of strabismus and blepharospasm, two eye muscle disorders.  Since then, the FDA

Joseph
Greenwald
& Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jgllaw.com

4

Case 8:10-cv-01352-DOC -MLG   Document 52-5   Filed 12/08/10   Page 6 of 72   Page ID
#:1436
Case 1:09-cv-03434-WSD   Document 1   Filed 10/26/09   Page 5 of 12

has approved NDAs for Botox for other medical treatments. Botox, however, has never been approved by the FDA for the treatment of OAB or NB.

11.     The FDA approval of a drug is limited to the specific indications for use listed in the NDA, and the manufacturer may only market the drug for those specific indications. Because a drug approval is limited to those specific uses listed in the NDA, if a manufacturer promotes an approved drug for an indication not in the NDA, it is not covered by the approval, and is therefore an unapproved new drug as to that use.

12.     A licensed physician, however, may prescribe most approved drugs for any purpose that the doctor deems medically appropriate, regardless of whether the drug has been approved for that use by the FDA, so long as the use is considered within the reasonable practice of medicine under state law. *United States ex rel. Franklin*, 147 F. Supp. 2d at 44. Prescribing drugs for unapproved, but medically accepted, uses is common in medical practices.

13.     Medicare is a federal health insurance program for people aged 65 and older as well as persons under 65 who are blind or disabled. As set forth above, the Medicare program is administered by CMS, a division of HHS. CMS contracts with private companies to process and pay claims submitted by Medicare providers for the treatment of Medicare beneficiaries. Those private companies who process Medicare claims submitted by physicians are called "Medicare Carriers", and those who process Medicare claims submitted by hospitals are called "Medicare Intermediaries."

14.     During the time period covered by this Complaint, Medicare provided limited benefits for outpatient drugs. Specifically, Medicare paid for drugs (which would include Botox) in an out-patient context only if the drug was prescribed for an indication or use for which the drug

Joseph
Greenwald
&Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jgllaw.com

5

EXHIBIT N
PAGE 287

Case 8:10-cv-01352-DOC -MLG Document 52-5 Filed 12/08/10 Page 7 of 72 Page ID
#:1437
Case 1:09-cv-03434-WSD Document 1 Filed 10/26/09 Page 6 of 12

had been specifically approved by the FDA. *See* 21 U.S.C. § 331(d) (prohibiting

distribution of drugs for non-approved uses).

15.    Relator began working for Defendant in January of 2007. As part of his duties, he

booked physician speakers throughout the Southern Baltimore territory to promote

ALLERGAN drugs to other medical personnel, usually physicians, at dinners and other

speaking engagements.

16.    Since February of 2009, Relator's direct supervisor has been Jeffrey Fuller, Regional

Manager for the Southeast Region, consisting of Baltimore, Maryland to Florida. Prior to

that, from November of 2007 through February of 2009, Relator was managed by Robert Gill.

17.    Since on or about March of 2009, Relator became reacquainted with Dr. David A.

Gordon, an urologist from Chesapeake Urology Associates, P.A. ("CUA") in Owings Mills,

Maryland, whom he had made sales to for his prior employer, Espirit Pharma. Dr. Gordon is

well known at Defendant. Dr. Gordon is the most sought after speaker for the entire east

coast utilized by Defendant for purposes of promoting drugs for the treatment of OAB and

NB. Dr. Gordon also is the most sought after trainer for the entire east coast used by

Defendant to train other physicians who make presentations for Defendant for drugs related to

the treatment of OAB and NB. Several sales people at Defendant, including Melanie

Clatchey, Kathleen Dall, and Robert Scanlon routinely use Dr. Gordon as a speaker and/or

trainer.

18.    Dr. Gordon also is a member of the U.S. advisory boards for Defendant, as well as

Pfizer and Novartis. Dr. Gordon is usually compensated well over $1,000.00 to speak on

behalf of Defendant. Relator has a professional relationship with Dr. Gordon and speaks with

him frequently either in person or on the telephone.

Joseph
Greenwald
& Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jgllaw.com

EXHIBIT N
PAGE 288

Case 8:10-cv-01352-DOC -MLG  Document 52-5  Filed 12/08/10  Page 8 of 72  Page ID
#:1438
Case 1:09-cv-03434-WSD  Document 1  Filed 10/26/09  Page 7 of 12

19.     Since on or about April of 2009, Relator has been to Dr. Gordon's office several

times and had numerous discussions with Dr. Gordon about the operation of his practice and

CUA's practice. Dr. Gordon has explained and Relator has personally observed that the

majority of Dr. Gordon's patients are males in their late sixties (60's) and older. Dr. Gordon

further has explained to Relator that these male patients suffer from OAB and NB, resulting in

urinary symptoms of "frequency and urgency" and that he often treats them with Botox.

20.     On or about February of 2009, in the Miami area of Florida, at a training session

hosted by Defendant, Dr. Gordon trained over sixty (60) physicians with respect to the

promotion of drugs used by Defendant for OAB and NB. Upon information and belief, Dr.

Gordon promoted the off-label use of Botox to these physicians and trained them on

presenting to other medical personnel that Botox should be used for the treatment of OAB and

NB.

21.     On or about August through September 2009, Relator had discussions with Dr.

Gordon about speaking on Sanctura XR with respect to its uses for OAB. In September of

2009, during one of Relator's discussions with Dr. Gordon about this speaking opportunity,

Dr. Gordon mentioned that he would also speak about Botox's uses for OAB and NB.

Relator specifically instructed Dr. Gordon not to speak about Botox at all and to limit his

discussions to Sanctura XR. Relator's instruction to not talk about Botox was witnessed by

two staff members from Dr. Gordon's practice (CUA), including "Traci", Dr. Gordon's

assistant.

22.     Relator set up a speaking engagement for Dr. Gordon for September 30, 2009 to the

Surgical Urological Nurses Association ("SUNA") at the Oregon Grille, a restaurant in Hunt

Valley, Maryland with the intent that Sanctura XR would be the topic of discussion.

Joseph
Greenwald
&Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jgllaw.com

7

Case 8:10-cv-01352-DOC -MLG  Document 52-5  Filed 12/08/10  Page 9 of 72  Page ID
#:1439
Case 1:09-cv-03434-WSD  Document 1  Filed 10/26/09  Page 8 of 12

23.     In attendance at the SUNA speaking engagement were approximately eighteen (18) people. Many of the attendees at this event were nurse practitioners and physician assistants who have the ability to prescribe drugs. The individuals in attendance included Nancy Shachelford, Mary Kelly, Sally Bashaar, Charlene Mahoney and Ann Fabula from Greater Baltimore Medical Center, Maureen French from Kernan Hospital, and Sharon Muller from Carroll Hospital Center.

24.     Dr. Gordon began his presentation about pharmaceutical treatments for OAB by Sanctura XR. But approximately five (5) minutes into the presentation, despite being specifically instructed by Relator not to do so, Dr. Gordon went into a pre-arranged and pre-planned discussion about the use of Botox for the control of OAB and NB, especially for severe cases of these medical conditions. Included in the presentation were animated slides describing the origin of botulism and Botox, how Botox is used, and the pros of using Botox to treat OAB and NB. Dr. Gordon specifically described the experience of his patients and other patients within his practice group, at CUA who had been treated for OAB and NB with Botox, including patients from nursing homes. Upon information and belief, Dr. Gordon, as well as Dr. Kenneth F. Langer of CUA, treat patients on Medicare with Botox for OAB and NB.

25.     During his presentation, Dr. Gordon noted several times that ALLERGAN was the maker of Botox treatments for OAB and NB and indicated that Botox was superior to other treatments because of its ability to block nerve responses. Dr. Gordon also explained that, because Botox did not have permanent effects, patients such as his would have to return to physician's offices multiple times for multiple treatments. The presentation lasted approximately seventy-five (75) minutes.

Joseph
Greenwald
& Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jgllaw.com

8

EXHIBIT N
PAGE 290

Case 8:10-cv-01352-DOC -MLG   Document 52-5   Filed 12/08/10   Page 10 of 72   Page ID
#:1440
Case 1:09-cv-03434-WSD   Document 9   Filed 10/26/09   Page 9 of 12

26.     During Dr. Gordon's presentation, Relator, who was sitting in the audience next to his supervisor Mr. Fuller, expressed concern to Mr. Fuller that the presentation was "illegal" "off-label marketing". Mr. Fuller told Relator not to worry about the presentation and that Dr. Gordon made the same presentation all the time. As Dr. Gordon is the most frequently booked speaker for Defendant on the East Coast, the presentation has been made with some frequency to a large number of physicians and other medical personnel with the ability to prescribe.

27.     During Dr. Gordon's presentation, Relator specifically inquired of Mr. Fuller what he would do should a compliance officer be in attendance at a presentation like the one being given by Dr. Gordon. Mr. Fuller replied that if a compliance officer was present that Relator should interrupt the presentation, take the speaker aside, and remove the slides.

28.     After Dr. Gordon's presentation concluded, Relator approached Dr. Gordon and asked him where he got the slides for the presentation. Dr. Gordon explained that Defendant had provided them to him and that they were paid for by a publishing company hired by Defendant. Relator asked if he could have a copy of the slides but Dr. Gordon explained that sales personnel at Defendant that were higher up than Relator did not want any paper copies of the slides provided and had instructed him not to provide a copy of the presentation to anyone.

29.     False and misleading presentations were made by physicians contracted by Defendant, including the September 30, 2009 presentation created by Defendant and presented by Dr. Gordon, as well as other trainings given by Dr. Gordon, to Medicare Carriers with the intent to cause the Medicare Carriers to approve off-label prescriptions of Botox for Medicare reimbursement. These false and misleading statements had a natural tendency to influence

Joseph
Greenwald
& Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jgllaw.com

9

Case 8:10-cv-01352-DOC -MLG  Document 52-5  Filed 12/08/10  Page 11 of 72  Page ID
Case 1:09-cv-03434-WSD  Document 1  Filed 10/26/09  Page 10 of 12
#:1441

the decision of Medicare Carriers to use Botox off-label and were capable of influencing the decision of Medicare Carriers to seek reimbursement for Botox's off-label use.

30.     Physicians could and did rely on the presentations by and trainings of Dr. Gordon (and upon information and belief, other physicians hired by Defendant) to submit claims to carriers for Medicare reimbursement.

31.     The illegal promotion of off-label sales of Botox to treat OAB and NB was known by sales force management at the company, including Jeffrey Fuller, the Regional Manager for the Southeast territory and Relator's direct supervisor, and Kristine Grogan, a former Vice President of Marketing for Defendant. Moreover, Defendant's sales staff encouraged the illegal promotion of off-label sales by intentionally creating at least one power point presentation to assist in this illegal promotion. Upon information and belief, other power point presentations similar to the one used by Dr. Gordon have been created by Defendant for use in the same or similar illegal manner to market off-label uses of Botox for treatment of OAB and NB.

32.     Every off-label prescription of Botox approved for payment during the relevant statutory time period by a Medicare Carrier was false and/or fraudulent claims for purposes of the FCA.

## COUNT I
## False Claims Act 31 U.S.C. §3729(a)(1)(a)

33.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

34.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

Joseph
Greenwald
&Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jgllaw.com

10

EXHIBIT N
PAGE 292

Case 8:10-cv-01352-DOC -MLG  Document 52-5  Filed 12/08/10  Page 12 of 72  Page ID
#:1442
Case 1:09-cv-03434-WSD  Document 1  Filed 10/26/09  Page 11 of 12

## COUNT II
### False Claims Act 31 U.S.C. §3729(a)(1)(b)

35.     Relator realleges and incorporates by reference the allegations contained in the
foregoing paragraphs of this Complaint.

36.     By virtue of the acts described above, ALLERGAN knowingly made, used, or caused
to be made or used false records and statements, to get the false or fraudulent claims paid or
approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(b).

### PRAYER FOR RELIEF

WHEREFORE, Relator prays, on behalf of the United States and himself that, on final trial of
this case, judgment be entered in favor the United States and against Defendant as follows:

1.      On the First Cause of Action under the False Claims Act, as amended, for the amount
of the United States' damages, multiplied as required by law, and for such civil penalties as
are allowed by law;

2.      On the Second Cause of Action under the False Claims Act, as amended, for the
amount of the United States' damages, multiplied as required by law, and for such civil
penalties as are allowed by law; and

3.      For the costs or this action, prejudgment interest, interest on the judgment and for any
other and further relief to which Plaintiff, the United States, and Relator may be justly
entitled.

Joseph
Greenwald
&Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jglaw.com

11

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

By: _____

Jay P. Holland (Bar No. 06015)
Jholland@jgllaw.com
Brian J. Markovitz (Bar No. 15859)
Bmarkovitz@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
(301) 220-2200
(301) 220-1214 (facsimile)
*Attorneys for Relator Hallivis*

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues of triable fact in the foregoing complaint.

_____
Brian J. Markovitz

DATED: 10/26/09

Joseph
Greenwald
& Laake, P.A.

6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770
Tel: (301) 220-2200
Fax: (301) 220-1214
www.jgllaw.com

12

EXHIBIT N
PAGE 294

**Exhibit  O**



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

---

Food and Drug Administration
Center for Biologics Evaluation and Research
1401 Rockville Pike
Rockville MD 20852-1448

August 22, 2001

**CBER 01-025**

WARNING LETTER

<u>BY FACSIMILE AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED</u>

Mr. David Garbe
Director, Scientific Information and Medical Compliance
Allergan, Inc.
2525 Dupont Drive TL-1L
P.O. Box 19534
Irvine, CA  92623-9354

Dear Mr. Garbe:

This letter is in regard to Allergan, Inc.'s (Allergan) promotional activities and materials for the marketing of BOTOX (botulinum toxin type A).  As part of its routine monitoring and surveillance program, the Advertising and Promotional Labeling Branch (APLB) has reviewed your promotional activities and materials and has concluded that they are misleading and lacking in fair balance within the meaning of 21 U.S.C. § 352(a) of the Federal Food, Drug, and Cosmetic Act (the Act) and its implementing regulations under Title 21, <u>Code of Federal Regulations</u>, Parts 202 and 601.

You have engaged in repeated promotional activities that suggest the amount of protein in BOTOX minimizes the formation of antibodies.  No formal clinical studies have been performed to study BOTOX treatment with different amounts of protein with respect to the formation of antibodies.  Additionally, you have repeatedly included favorable data or conclusions from nonclinical studies of BOTOX in a way that suggests they have clinical significance when, in fact, no such clinical significance has been demonstrated.  We have previously objected to these activities in Review Memoranda dated December 12, 1998 and September 25, 2000, and untitled letters dated November 7, 2000, February 14, 2001, and April 12, 2001.

Specifically, we have identified a clinical update titled, "Immunologic Considerations" (BTX 0065), and the revised BOTOX Internet website at www.BOTOX.com, that are misleading and lack fair balance.

Scientific Information
Medical Compliance

EXHIBIT O
PAGE 295

Confidential - - FOIA Exempt

AL0046366

Page 2 – Mr. David Garbe

**Misleading**

<u>Nonclinical Data</u>

Your promotional material contains favorable data or conclusions from nonclinical studies, such as in laboratory animals or in vitro, in a way that suggests they have clinical significance when, in fact, no such clinical significance has been demonstrated. For example, your statements, "In the immunology literature, more frequent injections of a protein antigen have been shown to increase the immunological response," and "One of the fundamental findings in immunology is that higher amounts of a protein are associated with a higher probability of antibody formation," are misleading as they are based on animal data, but you fail to clearly define it as such and to note that the clinical significance of the animal data is unknown.

<u>Unsubstantiated Efficacy Claims</u>

Your promotional materials contain favorable information or conclusions from studies that are inadequate in design, scope, or conduct to furnish significant support for such information or conclusions. For example, the following statements are based on retrospective studies that do not provide sufficient details of study design that permit a valid comparison with a control and a quantitative assessment of drug effect:

> "The investigators found a relationship between the neurotoxin complex exposure (dose and, thus, protein load) that patients had received in the preceding year and the percentage of patients who tested positive for neutralizing antibodies."

> "The potential link between neurotoxin complex protein load and antibody formation is also suggested by the ophthalmic literature."

> "It can be derived that incidence of sensitization is not only related to dose exposure in $LD_{50}$ units per injection cycle but also nanograms of botulinum toxin exposure per injection cycle (protein load)."

> "They suggested that the higher risk of antibody formation in cervical dystonia patients was related to the higher doses per treatment and attendant higher protein load."

There have been no formal clinical studies performed to compare the formation of antibodies during treatment with botulinum toxin type A (BTX-A) formulations containing different amounts of protein.

In the absence of well-controlled clinical studies, which evaluate the predictive qualities of the Mouse Protection Assay (MPA) and the Frontalis Antibody Test (FTAT) for the potential for clinical response with BTX-A, your statements, "Although the sensitivity of the MPA may be somewhat low, its specificity for predicting clinical responses or treatment failure due to resistance is relatively high" and "Thus, the FTAT may provide physicians with a simple means of detecting the potential for clinical response with BTX-A" are misleading.

EXHIBIT O
PAGE 296

AL0046367

Page 3 – Mr. David Garbe

Statements that imply that antibody formation in clinical experience with the current BOTOX formulation will be lower than in the original formulations are unfounded.  You do not have well-controlled clinical studies to support the statement, "However, due to its lower neurotoxin complex protein load, it is theorized to have a lower antigenic potential than the original formulation."

<u>Unsubstantiated Comparison Claim</u>

Your promotional material contains a representation or suggestion that is not approved or permitted for use in the labeling that BTX-A is better, more effective, safer, has fewer or less incidence of, or less serious side effects or contraindications than has been demonstrated by substantial evidence or substantial clinical experience [21 CFR 202.1].  Your comparative claim of superiority, "However, patients who lose their ability to respond are faced with treatments that may be less effective or associated with more adverse events" is misleading.

**Lack of Fair Balance**

<u>Minimizing Side Effects</u>

You fail to present information relating to side effects and contraindications with a prominence and readability reasonably comparable with the presentation of information relating to effectiveness of the drug, taking into account all implementing factors, such as typography, layout, contrast, headlines, paragraphing, white space, and any other techniques apt to achieve emphasis [21CFR 202.1].  For example, the safety information contained in the clinical update is in a print size that is smaller than that of the efficacy information.

You minimize the side effects of BOTOX by stating, "All medications have some side effects" at the beginning of the website sections titled, "What Side Effects May Be Experienced When Using BOTOX."  This statement minimizes the risks of treatment with BOTOX by suggesting that it has the same risks as any other medication.  You go on to state, "With BOTOX, side effects are usually transient and mild to moderate in nature.  Some people notice temporary weakness of muscles or discomfort at the injection site."  Your presentation minimizes the side effects and is not consistent with the approved product labeling which presents this general information <u>after</u> the warnings, precautions, and reports of deaths.

<u>Omission of Important Risk Information</u>

You fail to present all of the serious and important risks associated with BOTOX therapy.  For example, your website pages that discuss the approved uses of BOTOX and your clinical update fail to present the following risk information:

1. There have been rare spontaneous reports of death, sometimes associated with dysphagia, pneumonia, and/or other significant debility, after treatment with botulinum toxin.

EXHIBIT O
PAGE 297

Confidential - - FOIA Exempt

AL0046368

Page 4 – Mr. David Garbe

2. Cervical dystonia patients with smaller neck muscle mass and patients who require bilateral injections into the sternocleidomastoid muscle have been reported to be at greater risk for dysphagia.

3. Injections into the levator scapulae may be associated with an increased risk of upper respiratory infection and dysphagia.

4. Reduced blinking from BOTOX injection of the orbicularis muscle in blepharospasm patients can lead to corneal exposure, persistent epithelial defect, and corneal ulceration, especially in patients with VII nerve disorders.

5. Patients with neuromuscular disorders may be at increased risk of clinically significant systemic effects, including severe dysphagia and respiratory compromise from typical doses of BOTOX.

6. The effects of BOTOX therapy may be increased with the use of aminoglycoside antibiotics or with other drugs that interfere with neuromuscular transmission.

7. During the administration of BOTOX for the treatment of strabismus, retrobulbar hemorrhages sufficient to compromise retinal circulation have occurred from needle penetration into the orbit.

Furthermore, in the website sections titled, "What Side Effects May Be Experienced When Using BOTOX," you state, "With BOTOX, side effects are usually transient and mild to moderate in nature" omitting that adverse events may have a duration of several months and may be severe in intensity, and "Some people notice temporary weakness of muscles or discomfort at the injection site" omitting that weakness of adjacent muscles may also occur due to spread of toxin.

**Other Violative BOTOX Promotional Materials**

We have identified the following promotional materials that are misleading and lack fair balance for similar reasons as stated above: a Journal ad (BTX 0101); a CD announcement letter for payers (SIMC01-091); a clinical update mailing, doctor follow-up letter and envelope (BTX 9907); a Questions and Answers Brochure (BTX 0124); a physician guide (BTX 9903); and BOTOX Clinical Update Slides from the www.BOTOX.com website.

In addition, the statement "Success that Endures" on the journal ad and the Questions and Answers Brochure is misleading in that it suggests better efficacy than has been shown in adequate and well-controlled clinical studies.

Furthermore, the statement, "Maintaining the response to botulinum neurotoxin therapy," on the clinical update mailing, doctor follow-up letter, and envelope is misleading since the efficacy of repeated treatments over long periods has not been evaluated in clinical trials; therefore, we do not have a complete understanding of the rate at which individuals cease to seek BOTOX therapy and their reasons for doing so.

EXHIBIT O
PAGE 298

Confidential - - FOIA Exempt

AL0046369

Page 5 – Mr. David Garbe

**Failure To Submit Promotional Material**

You failed to submit specimens of the revised promotional material for BOTOX on your Internet website at www.BOTOX.com at the time of initial dissemination of the revised material.

**Conclusions and Requested Actions**

The violations noted in this letter represent continuing examples of violative promotion or advertising materials disseminated by Allergan. You should take prompt action to correct the violations in the noted materials and all promotional materials for BOTOX that contain violations like those outlined in this letter. Failure to promptly correct these violations may result in the initiation of regulatory action by FDA without further notice. These actions include, but are not limited to, seizure, injunction, and/or civil penalties.

This letter is not intended to be an all-inclusive list of deficiencies that may be associated with Allergan's promotion of BOTOX. It is your responsibility to ensure that materials distributed are in conformance with the requirements of the Act and its implementing regulations.

Your written response with the specific steps that you have taken to correct the violations should be submitted to this office within 10 working days of receipt of this letter. Your response should be directed to the address listed below. If you have any questions involving this matter, please contact Ms. Miller at 301-827-3028. We remind you that only written communications are considered official.

> Ms. Catherine A. Miller
> Acting Branch Chief
> Advertising and Promotional Labeling Branch
> Food and Drug Administration
> Center for Biologics Evaluation and Research
> 1401 Rockville Pike, Suite 200S
> Rockville, MD 20852-1448

> Sincerely,

> Steven A. Masiello
> Director
> Office of Compliance and Biologics Quality
> Center for Biologics Evaluation and Research

EXHIBIT O
PAGE 299

Confidential - - FOIA Exempt

AL0046370

**ALLERGAN**



2625 Dupont Drive, P.O. Box 19534, Irvine, California, USA 92623-9534 Telephone: (714) 246-4500 Website: www.allergan.com

August 31, 2001

Catherine Miller
Acting Branch Chief
Center for Biologics Evaluation and Research
Advertising and Promotional Labeling Branch, HFM-602
1401 Rockville Pike, Suite 200S
Rockville, MD  20852-1448

Dear Ms. Miller,

This is in response to the Warning letter sent to David Garbe at Allergan, Inc. dated August 22, 2001. Allergan appreciates the opportunity to respond to this communication.

The Agency cited certain concerns specifically with a clinical update mailer titled "Immunologic Considerations in Botulinum Neurotoxin Therapy" and the BOTOX® Internet Website. A particular concern with these items is the inclusion of information relating to the immunogenicity of botulinum toxin without adequate and well-controlled trials.

This clinical update mailer is no longer being disseminated and has been removed from the Website effective August 28, 2001. In addition Allergan is reviewing all material currently being used in the promotional area and will discontinue items that discuss the immunologic aspect of botulinum toxin beyond that which appears in the approved package insert. This includes discontinuing the use of the statements, "However, due to its lower neurotoxin complex protein load, it is theorized to have a lower antigenic potential than the original formulation." and "However, patients who lose their ability to respond are faced with treatments that may be less effective or associated with more adverse events" where they appear. Allergan would like to point out, however, that we continue to disagree with the Agency's position on this matter. The approved package insert for BOTOX currently has a brief section on Immunogenicity. The information presented in the clinical update mailer provides factual information, including human clinical data, to the reader so they can be more fully informed of the additional data available on the topic of immunogenicity associated with botulinum toxin.

Allergan will add additional fair balance information into a revised BOTOX Website in the sections entitled "What side effects may be experienced when using BOTOX." The Agency should be aware that any viewer of this section has easy access to the entire package insert by simply clicking on the box titled prescribing information that is available in each section of the website.

EXHIBIT O
PAGE 300

Confidential - - FOIA Exempt

AL0046371

C. Miller                                                      August 31, 2001
                                                              Page 2

In order to address the comment on page 4 regarding additional violative promotional material the following items have been discontinued:

- Journal Ad (BTX 0101): final run to appear in August 2001
- CD announcement letter (SIMC01-091): used only once as a mailer
- Clinical update mailing (BTX9907): used only once as a mailer
- Questions and Answers brochure (BTX 0124): notification to discontinue to the field August 30, 2001
- Physician guide (BTX 9903): notification to discontinue to the field August 30, 2001
- BOTOX Clinical Update slides on the Website: Removed August 28, 2001

The Agency indicated they find the statement "Success that Endures" misleading because it suggests better efficacy than has been proven in adequate and well-controlled studies. Allergan does not agree that it suggests better clinical efficacy and intentionally did not select the terms "Efficacy..." or "Clinical success...." We expect the interpretation of this statement to be that BOTOX® is commercially successful and well established in the marketplace. BOTOX® is the only botulinum toxin that has over 10 years of commercial success in the US, and it has many years of expected future growth. Although we do not agree this statement is in any way misleading, we will revise this tagline in all new promotional material.

The August 22 letter also criticized the use of the statement, "Maintaining the response to botulinum neurotoxin therapy" indicating that it is misleading since the efficacy of repeated treatments over long periods has not been evaluated in clinical trials. However, the Agency is reviewing, reading and commenting on this statement out of context. The statement is included in the promotional material, along with the associated text, primarily to address the statements from the Immunogenicity section of the approved package insert that indicates, "The potential for antibody formation may be minimized by injecting with the lowest effective dose given at the longest feasible intervals between injections." As you will note, text to address these points follows this headline. When we do discuss efficacy, we include the language that the duration of effect is approximately 3 months. Regardless, Allergan will select other terminology that more closely aligns with this section of the package insert.

We hope this response adequately addresses your communication of August 22, 2001 regarding certain BOTOX® promotional items. If you have any additional questions, please contact Dave Garbe at (714) 246-4285 or via FAX at (714) 246-5913.

Respectfully submitted,

Dave Garbe
Allergan, Inc.

Confidential - - FOIA Exempt

EXHIBIT O
PAGE 301

AL0046372

# ALLERGAN



2525 Dupont Drive, P.O. Box 19534, Irvine, California, USA 92623-9534 Telephone: (714) 246-4500 Website: www.allergan.com

October 31, 2001

Catherine Miller
Center for Biologics Evaluation and Research
Advertising and Promotional Labeling Branch, HFM-602
1401 Rockville Pike, Suite 200S
Rockville, MD  20852-1448

Dear Ms. Miller,

This is in response to the telephone discussion of October 29, 2001 between Dave Garbe and Cathy Miller where you requested a listing of the promotional items discontinued by Allergan as a result of the Warning letter sent to David Garbe at Allergan, Inc. dated August 22, 2001.  You also requested a copy of our communication to our BOTOX® sales force  requiring that they discontinue use of these items.

Accompanying this letter is a communication that went to the field sales force on August 30, 2001 from the BOTOX Management Team.  This communication also delineates those items that were discontinued as a result of the Warning letter dated August 22, 2001.

I believe this adequately fulfills your request.  If there is anything else I can provide please contact me at (714) 246-4285 or via FAX at (714) 246-59131.

Sincerely,

Dave Garbe
Allergan, Inc.

Enc:  Communication dated August 30, 2001 to All Field Colleagues

EXHIBIT O
PAGE 302

Confidential - - FOIA Exempt

AL0046373

# ALLERGAN



| | | | |
|---|---|---|---|
| **TO:** | BMC's, RM's, RAM's, RSS's | **SUBJECT:** | Sales and Promotion Materials Direction |
| **FROM:** | E. Sanders and A. Elston | **DATE:** | **August 30, 2001** |
| **COPIES:** | T. Albright, R. Bancroft, D. Berglas, M. Dickason, W. Cetnarowski, R. Leird, S. Pal, D. Pearl, J. Sturek | | |

As all of you are aware, we will be meeting the week of September 10th to roll out new material for the third trimester. We will advance the efforts initiated at the meetings this past June, enhancing our focus on growth opportunities for the BOTOX® franchise. We are all very excited about what we have planned and believe that you will share in our excitement!

To make room for these new materials and in light of ongoing discussions with the FDA, you need to immediately discontinue the use of and either discard or destroy the following items.

- ❑ BTX9907 – Clinical Update Mailer #1
- ❑ BTX0065 – Clinical Update Mailer #2
- ❑ BTX0074 – Clinical Update Mailer #3
- ❑ BTX0102 – BOTOX® Sales Aid
- ❑ BTX0019 – Clinical and Pharmacologic Effects of BOTOX® (MAO)
- ❑ BTX0020 – Discussing BOTOX® Therapy with Patients
- ❑ BTX0124 – BOTOX® Q & A Brochure
- ❑ BTX9903 – Physician Guide: Discussing BOTOX® Therapy with Patients
- ❑ BTX0135 – BOTOX® The Injection Challenge CD-ROM
- ❑ BTX0007 – Response Detail Aid
- ❑ BTX0014 – Clinical Update Slide Kit #1
- ❑ NO ID # - BOTOX® Drug information Resource/Formulary Kit

Additionally, you will need to return all copies of *BTX0131 – BOTOX® Binder Patient Slide Series* to the attention Linda Kivinski at the home office. This item will be re-worked and returned.

Please keep in mind that exciting new materials will be presented at our up coming meetings in September and other items are under development for role-out later this year and early next year.

Please sign the attached acknowledgement form and return via Fax to the attention of Linda Kivinski at 714-246-6587. This needs to be returned no later than Friday, September 7th.

EXHIBIT O
PAGE 303

Confidential - - FOIA Exempt

AL0046374

**Understanding and Acknowledgement**

I fully understand that each of the following items must be destroyed and/or discarded and effective immediately I agree to no longer disseminate or use this material in any promotional activity.

- ☐ BTX9907 – Clinical Update Mailer #1
- ☐ BTX 0065– Clinical Update Mailer #2
- ☐ BTX0074 – Clinical Update Mailer #3
- ☐ BTX0102 – BOTOX® Sales Aid
- ☐ BTX0019 – Clinical and Pharmacologic Effects of BOTOX® (MAO)
- ☐ BTX0020 – Discussing BOTOX® Therapy with Patients
- ☐ BTX0124 – BOTOX® Q & A Brochure
- ☐ BTX9903 – Physician Guide: Discussing BOTOX® Therapy with Patients
- ☐ BTX0135 – BOTOX® The Injection Challenge CD-ROM
- ☐ BTX0007 – Response Detail Aid
- ☐ BTX0014 – Clinical Update Slide Kit #1
- ☐ NO ID #  - BOTOX® Drug information Resource/Formulary Kit

Additionally, I agree to return all copies of the following item to the attention of Linda Kivinski at the home office.

- ☐ BTX0131 (BOTOX® Binder Patient Slide Series)


_____

PRINT YOUR NAME


_____

SIGN AND DATE


**Immediately Return via Fax to**
**Linda Kivinski**
**At 714-246-6587**

EXHIBIT O
PAGE 304

Confidential - - FOIA Exempt

AL0046375



DEPARTMENT OF HEALTH & HUMAN SERVICES                Public Health Service

---

**NOV 0 2 2001**

Food and Drug Administration
Center for Biologics Evaluation and Research
1401 Rockville Pike
Rockville MD 20852-1448

Mr. David Garbe
Director, Scientific Information and Medical Compliance
Allergan, Inc.
2525 Dupont Drive TL-1L
P.O. Box 19534
Irvine, CA 92623-9354

Dear Mr. Garbe:

This letter is in response to your letter of August 31, 2001, regarding the promotion of BOTOX in a clinical mailer titled "Immunologic Consideration in Botulinum Neurotoxin Therapy," and on your Internet website at http://www.BOTOX.com. We have reviewed the corrective actions that you have taken: stopping dissemination of the promotional material mentioned in our Warning Letter of August 22, 2001; reviewing all material currently being used in the promotional area and discontinuing items that discuss the immunologic aspect of botulinum toxin beyond that which appears in the approved product labeling; adding additional fair balance information to the revised BOTOX Website; and revising the tagline, "Success that Endures," and the statement, "Maintaining the response to botulinum neurotoxin therapy." We acknowledge receipt of your letter to Ms. Catherine Miller on October 31, 2001, listing the promotional items discontinued by Allergan as a result of your review of current promotional materials. We feel that you have satisfactorily addressed our concerns.

Your continued interest in the dissemination of appropriate advertising and promotional materials is appreciated. Should you have any questions or concerns involving this matter, please contact Ms. Catherine A. Miller, Regulatory Review Officer, at the following address:

Center for Biologics Evaluation and Research
Office of Compliance and Biologics Quality
Division of Case Management
Advertising and Promotional Labeling Branch, HFM-602
1401 Rockville Pike
Rockville, MD 20852-1448

ALLERGAN, INC.
Received

NOV 1 2 2001

Scientific Information &
Medical Compliance

Sincerely,

*Mary A. Malarkey*

Mary A. Malarkey
Director
Division of Case Management
Office of Compliance and Biologics Quality
Center for Biologics Evaluation and Research

**EXHIBIT O**
**PAGE 305**

Confidential - - FOIA Exempt

AL0046376

**Exhibit  P**

U.S. Department of Health & Human Services

## FDA U.S. Food and Drug Administration

Home > Inspections, Compliance, Enforcement, and Criminal Investigations > Enforcement Actions > Warning Letters

## Inspections, Compliance, Enforcement, and Criminal Investigations

**Allergan, Inc. 23-Jun-03**



Public Health Service
Food and Drug Administration

Center for Biologics Evaluation
and Research
1401 Rockville Pike
Rockville MD 20852-1448

CBER-03-012
VIA FACSIMILE AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED

WARNING LETTER

Mr. Peter A. Kresel
Allergan, Inc.
2525 Dupont Drive
Irvine, CA 92713-9534

Dear Mr. Kresel:

June 23, 2003

This Warning Letter objects to Allergan, Inc.'s dissemination of promotional materials for the marketing of BOTOX® COSMETIC Botulinum Toxin Type A. Specifically, we refer to three journal advertisements for BOTOX® COSMETIC titled, "People Like You" (BTXC142) and (BTXC140) and "We promised to grow old together, not look old together" (BTXC141) that have been disseminated in May and June 2003. The Advertising and Promotional Labeling Branch (APLB) in the Food and Drug Administration's (FDA's) Office of Compliance and Biologics Quality has reviewed these advertisements and has concluded that they are in violation of Section 502(n) of the Federal Food, Drug and Cosmetic Act (the "Act") and its implementing regulations.

The agency has concluded that your journal advertisements are false and/or misleading because they falsely identify your product as a cosmetic treatment, fail to reveal material facts about the product's use, and minimize the risk information presented.

Moreover, we remind you that APLB previously objected, in an untitled letter dated September 5, 2002, to your dissemination of promotional materials for BOTOX® COSMETIC that failed to appropriately communicate the approved indication for use.

We are very concerned that by continuing to promote BOTOX® COSMETIC in a false and misleading manner these materials are raising significant public health concerns.

**Background**

Botulinum Toxin Type A is a drug under section 201(g) of the Food, Drug, and Cosmetic Act (the Act) [21 U.S.C.§ 321(g)] and a biologic, as defined in section 351(i) of the Public Health Service Act, (PHS Act) [42 U.S.C..§ 262]. On December 9, 1991, BOTOX® was approved for the treatment of cervical dystonia in adults to decrease the severity of abnormal head position and neck pain associated with cervical dystonia and the treatment of strabismus and blepharospasm associated with dystonia. On April 12, 2002, a supplement to the Botulinum Toxin Type A license application was approved for treatment of glabellular lines. Under this approval, Botulinum Toxin Type A is marketed and labeled for this new indication as BOTOX® COSMETIC.

**Misbranding Your Product**

Your advertisements misbrand your product by claiming that it is a cosmetic treatment, e.g., "More than half a million people have already been wowed by BOTOX® COSMETIC, America's most popular cosmetic treatment [emphasis added]". Your product is a drug as defined in section 201(g) of The Act and a biologic, as defined in section 351(i) of the PHS Act. Your advertisement and promotion of BOTOX® COSMETIC as a cosmetic treatment minimizes the risks associated with the use of this biological drug.

**Overbroadening of Indication**

Your advertisements misleadingly suggest that this drug is effective, for conditions beyond those that have been approved by the Food and Drug Administration.

The advertisements include the claims, "FDA-approved for the temporary treatment of frown line in people aged 18 to 65" and the phrases: "cause frown lines to form," and, "... the appearance of frown lines."

BOTOX® COSMETIC is not approved for the treatment of "frown lines." The approved indication for use is:

"BOTOX® COSMETIC is indicated for the temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients::; 65 years of age."

**EXHIBIT P**
**PAGE 306**

In our previous untitled letter of September 5, 2002, FDA advised Allergan about the use of the correct indication statement. We stated:

"In addition, the term "toughest wrinkle" does not adequately specify the approved indication for use and misleadingly suggests that BOTOX® Cosmetic is for use in all tough wrinkles. Please immediately cease distribution of these and similarly worded, materials and revise these statements... to appropriately identify the approved indication for use. .."

Allergan's response on October 18, 2002,

"As requested by the Agency, this revision will be made in subsequentlydistributed versions of this guide. It has already been revised on the BOTOX Cosmetic.net website."

Allergan continues to promote BOTOX® COSMETIC in a way that misrepresents the approved indications.

**Minimization of risk information**

The addition of the statement, ". ..if any occur. ..," to your fair balance statement minimizes important risks associated with the use of BOTOX® COSMETIC. In the absence of the presentation of more detailed data associated with the side effects that occur with this biological drug, the inclusion of this terminology minimizes the fact that adverse events do occur. In fact, the clinical trials supporting approval of the glabellar lines indication demonstrated that almost 44% of patients experienced some adverse event. The package insert states:

"In clinical trials of BOTOX® COSMETIC the most frequently reported adverse events following injection of BOTOX® COSMETIC were headache, respiratory infection, flu syndrome, blepharoptosis and nausea." "Adverse events of any cause [randomized, multi-center, placebo controlled studies] were reported for 177 subjects treated (43.7%) N=405 and 54 placebo treated subjects (41.5%) N= 130." In addition, the package insert includes the following: "In the open-label, repeat injection study, ...adverse events of any type were reported for 49.1% (183/373) of subjects overall."

The statement, ". ..if any occur...," minimizes the data from the clinical trials which documented that almost one-half of all BOTOX® COSMETIC subjects exhibited adverse events.

**Conclusions and Requested Actions**

You have disseminated promotional journal advertisements that:

1. fail to disclose that BOTOX® COSMETIC is a biological drug,

2. omit important limitations on the indicated use of the product, and

3. minimize important risk information.

We request that you immediately cease dissemination of these, and all promotional materials that contain the same or similar violations outlined in this letter. You should provide a detailed response to the issues raised in this Warning Letter that includes:

1) Your agreement to immediately cease the dissemination of these advertisements in the magazines and on the your website, and all promotional materials now, and in the future, that contain the same or similar violations outlined in this letter.

2) Providing a plan of action to disseminate accurate and complete corrective information to the audience(s) to which you have disseminated the misleading messages. Any plan must include a specific timeline for implementation.

3) A written statement of your intent to immediately comply with the above requests.

Please respond in writing to APLB within 10 days of the date of this letter, of your intent to comply with APLB's request. If you have any questions or comments, please contact Glenn N. Byrd, MBA, RAC, Chief, APLB, or Maryann Gallagher, by facsimile at 301-827-3528, or at the address listed below.

We remind you that only written communications are considered official. Failure to respond to this letter may result in regulatory action, including seizure or injunction, without further notice.

Food and Drug Administration
Center for Biologics Evaluation and Research
Office of Compliance and Biologics Quality, Division of Case Management
Advertising and Promotional Labeling Branch, HFM-602
1401 Rockville Pike, 200S
Rockville, MD 20852-1448

Sincerely,

/s/

Steven A. Masiello

Director, Office of Compliance and Biologics Quality
Center for Biologics Evaluation and Research

---

Links on this page:

**Exhibit  Q**



**FDA** U.S. Food and Drug Administration

Home > Inspections, Compliance, Enforcement, and Criminal Investigations > Enforcement Actions > Warning Letters

## Inspections, Compliance, Enforcement, and Criminal Investigations

Allergan, Inc. 06-Sep-05



Department of Health and Human Services

Public Health Service
Food and Drug Administration

Rockville, MD 20857

TRANSMITTED BY FACSIMILE

David E.I. Pyott
President and Chief Executive Officer
Allergan, Inc.
PO Box 19534
Irvine, CA 92623-9534

**RE : NDA # 21-275**
**Lumigan® (bimatoprost ophthalmic solution) 0.03%**
**MACMIS ID # 13256**

WARNING LETTER

Dear Mr. Pyott:

The Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed a sales aid (4942236) for Lumigan© (bimatoprost ophthalmic solution) submitted by Allergan, Inc. (Allergan) under cover of Form FDA 2253. The sales aid is false or misleading because it presents unsubstantiated superiority claims and thus misbrands the drug in violation of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. 352 (a) and 321(n).

Moreover, DDMAC had previously objected, in an untitled letter dated March 26, 2001, to the dissemination of a "Dear Doctor" letter that contained unsubstantiated superiority claims for Lumigan. We are concerned that you are continuing to promote Lumigan in a violative manner.

**Background**

According to the approved product labeling (PI):

LUMIGAN® (bimatoprost ophthalmic solution) 0.03% is indicated for the reduction of elevated intraocular pressure (IOP) in patients with open angle glaucoma or ocular hypertension who are intolerant of other intraocular pressure lowering medications or insufficiently responsive (failed to achieve target IOP determined after multiple measurements over time) to another intraocular pressure lowering medication.

According to the PI, Lumigan is associated with several risks, including the following bolded Warning and other Warnings [original emphasis]:

**LUMIGAN® (bimatoprost ophthalmic solution) 0.03% has been reported to cause changes to pigmented tissues. These reports include increased pigmentation and growth of eyelashes and increased pigmentation of the iris and periorbital tissue (eyelid). These changes may be permanent.**

LUMIGAN® may gradually change eye color, increasing the amount of brown pigment in the iris by increasing the number of melanosomes (pigment granules) in melanocytes. The longterm effects on the melanocytes and the consequences of potential injury to the melanocytes and/or deposition of pigment granules to other areas of the eye are currently unknown. The change in iris color occurs slowly and may not be noticeable for several months to years. Patients should be informed of the possibility of iris color change.

Eyelid skin darkening has also been reported in association with the use of LUMIGAN®.

LUMIGAN® may gradually change eyelashes ; these changes include increased length, thickness, pigmentation., and number of lashes.

Patients who are expected to receive treatment in only one eye should be informed about the potential for increased brown pigmentation of the iris, periorbital tissue, and eyelashes in the treated eye and thus, heterochromia between the eyes. They should also be advised of the potential for a disparity between the eyes in length, thickness, and/or number of eyelashes.

Pertinent precautions in the PI include the risk of "bacterial keratitis associated with the use of multiple-dose containers of topical ophthalmic products." In addition, Lumigan should be used with caution in patients with active intraocular inflammation, aphakic patients, pseudophakic patients with a torn posterior lens capsule and in patients with known risk factors for macular edema.

**Unsubstantiated Superiority Claims**

The sales aid presents the following false or misleading claims regarding the superiority of Lumigan over competitor products:

- "Weight of evidence proves LUMIGAN® produces lowest mean IOP. For example . . .vs beta-blockers . . . vs travoprost. . . vs latanoprost . . . vs dual therapy, 1-12"

- "When good enough' isn't low enough, turn to the proven performance of LUMIGAN®"

As discussed in more detail below, these claims are misleading because they suggest Lumigan is superior in its effectiveness to other medications used for reducing IOP when this has not been demonstrated by substantial evidence or substantial clinical experience. Furthermore, the claim that Lumigan is superior to "dual therapy" is misleading because it implies that Lumigan is better than combination ophthalmic therapy, such as a beta-blocker/prostaglandin combination, when this, too, has not been demonstrated by substantial evidence or substantial clinical experience.

The sales aid also contains the following claims which misleadingly imply that Lumigan is a superior choice because it is preferred by patients.

EXHIBIT Q
PAGE 308

"Vast majority of patients want lower IOP and will adhere to therapy to get it"

- "92% of patients prefer medication that lowers IOP the most 14[1]" [reference 1 below]

These claims contribute to the misleading impression created by the piece as a whole that Lumigan is superior to other medications that reduce elevated IOP. When considered in conjunction with the numerous superiority claims presented throughout the piece, the above claims imply that patients will adhere to and prefer Lumigan over other products because of its purported superior ability to lower IOP. Furthermore, these claims are misleading because they are not supported by substantial evidence. No references were cited to support the first claim. The reference cited (1)[2] for the second claim is not considered substantial evidence; rather it is a survey (Glaucoma Research Foundation Patient Survey) that included one question regarding a hypothetical situation assuming that all treatment options for glaucoma have the same safety profile and dosing requirements, which is not the case in actual use. Patient preference encompasses multiple aspects of patient experiences and cannot be adequately measured by a single item in a survey; rather, patient preference claims require well-designed and controlled studies using validated and well-developed instruments that can evaluate patient preference.

Finally, the claim "LUMIGAN® patients refill their prescription at the same rate as patients on other lipid therapies 16[3]" [reference 2 below] is misleading because it suggests that Lumigan therapy results in equivalent patient adherence as "other lipid therapies" when this has not been demonstrated by substantial evidence. The reference cited Z to support this claim is a medical and pharmacy database study poster presentation . The study protocol is inadequate to support an adherence claim because the protocol required that the patients stay on the same medication for 12 months, which essentially excludes patients who discontinued therapy for reasons such as lack of efficacy or side effects . There are many factors that affect patient adherence, including side effects, effectiveness, dosing schedule, dosage form, and cost. An adherence claim must be supported by substantial evidence taking into account these types of determinants of patient adherence. This refill database study does not support an adherence claim for Lumigan because it did not take these factors into account and does not reflect adherence rates that are experienced with actual real-world use.

Misleading Superiority to Beta-Blockers

The sales aid contains the following claims and presentations comparing Lumigan to beta-blockers:

- "LUMIGAN® produces lowest mean IOP. . .vs beta-blockers 1-4[4]" [references 3-5, and 9 below]
- Graph titled "Effects of LUMIGAN® replacement of prior beta-blocker therapy on mean IOP 3[5]," depicting that Lumigan provides a "4.4 mm Hg additional mean reduction" at month 2. [reference 5 below]

These claims are misleading because they imply Lumigan is superior to beta-blockers when this has not been demonstrated by substantial evidence or substantial clinical experience. The studies cited, Higginbotham et al.,3[6] Cohen et al.,4[7] and Walters et al.,9[8] demonstrated changes in Iop that are not considered clinically significant. Differences of 2-3 mm Hg are not considered clinically significant because such differences are commonly seen in clinical trials without a change in therapy. Further, the applanation tonometer is calibrated in 2 mm Hg increments . Since 2 mm Hg is the smallest change the instrument can detect, physicians are unlikely to alter patient therapy based on a 2 mm Hg change in Iop.

Further, the study cited 5[9] in support of the graph depicting a "4.4 mm Hg additional mean reduction" is not considered a well-controlled study because it is an open-label, single-arm, non-concurrently controlled study in which Lumigan was substituted for timolol . This design is sometimes referred to as a "baseline controlled" study, but, in actuality, it is uncontrolled because there is no comparison with a control group except insofar as one believes the Iop would have remained the same once patients entered the study. There is, however, no way to know whether the Iop would have remained the same. Compliance could be different (better) in the test drug (Lumigan) phase of the study because of different patient or investigator expectations or biased observations. The proper design for such a trial is randomization to Lumigan or timolol drops in a blinded study. Open-label studies are not appropriate for studying Iop changes because they do not include measures to minimize bias. Iop readings themselves may be biased and should be carried out without knowledge of treatment assignment. Therefore, the study cited does not constitute substantial evidence to support your claim because it was not adequate and well-controlled.

In addition, promotional materials are misleading if they fail to reveal facts that are material in light of the claims made in the piece. For comparative claims, it is misleading to compare the efficacy of two products with dissimilar indications without revealing the differences in indication. Lumigan is indicated as second-line therapy due to safety concerns, whereas timolol, the beta-blocker the sales aid compares Lumigan to, is indicated as first-line therapy. When comparing first-line therapies to second-line therapies it is important to reveal this difference because without doing so, you misleadingly suggest that the second-line therapy is superior to the first and should be used before the first-line therapy. This difference is not revealed in the sales aid.

Misleading Superiority to Travoprost

The sales aid contains the following claims and presentations comparing Lumigan to travoprost:

- "LUMIGAN® produces lowest mean IOP . . .vs travoprosts 5-7[10]" [references 6-8 below]
  - "16% to 29% greater mean IOP reduction 5[11]" [reference 6 below]
- "In a randomized, investigator-masked, 6-month clinical trial, LUMIGAN® (n = 14) provided greater mean IOP reduction than travoprost (n = 12)5[12]" [reference 6 below]
- Graph titled "LUMIGAN® vs travoprost: diurnal mean IOP at month 3" depicting a "lower mean IOP all day long 7[13]" [reference 8 below]

These claims are misleading because they imply Lumigan is superior to travoprost when this has not been demonstrated by substantial evidence or substantial clinical experience. The references cited in the sales aid are not sufficient to support these claims. First, Cantor et al.,6[14] the 6-month study comparing Lumigan and travoprost, showed no statistically significant difference in mean IOP lowering. While the sales aid does contain the statement "Differences not statistically significant due to small sample size"; this statement is false (the reason for lack of statistical significance cannot possibly be known) and, in any case, does not correct the overwhelmingly misleading impression that Lumigan is superior to travoprost. Second, Mundorf et al.,7[15] is a poster presentation and contains inadequate information regarding investigative methods, masking procedure, patient populations, washout periods, applanation tonometry protocol, and statistical analysis. If you have additional information, please submit it to FDA for review. Lastly, Parrish et al., 8[16] showed that Lumigan and travoprost were not statistically, different in their ability to reduce IOP.

Misleading Superiority to Latanoprost

The sales aid contains the following claims and presentations comparing Lumigan to latanoprost:

- "LUMIGAN® produces lowest mean IOP . . .vs latanoprosta 4[17], 7-11[18] [references 8-13 below]
  - "27% to 42% greater mean IOP reduction 8[19],, [reference 11 below]
- "In a randomized, investigator-masked, 6-month clinical trial, LUMGIAN® (n=133) provided statistically significantly greater mean IOP

reduction than latanoprost (n=136) at every time point, every study visit 8[20]" [reference 11 below]

- " Graph titled "Effects of LUMIGAN® replacement of latanoprost therapy on mean IOP" demonstrating a "3.6 mm Hg additional mean reduction 9[21]" [reference 12 below]

These claims are misleading because they imply Lumigan is superior to latanoprost when this has not been demonstrated by substantial evidence or substantial clinical experience. The references cited in the sales aire are not sufficient to support these claims. The studies cited, Parrish et al., 8[22] Walters et al.,9[23] and Dubiner et al.,10[24] demonstrated no statistically significant difference between Lumigan and latanoprost in their ability lower IOP. Furthermore, the other studies cited, Noecker et al ., 11 25[Bournias et al, 12]26 and Gandolfi et al., 13[27] are not considered substantial evidence. The study by Noecker et al. 11[28] did not take adequate measures to control for bias. For example, the statistical analysis did not adjust for multiple comparisons. If multiple comparisons were accounted for, the IOP reduction would not have been statistically significant at "every time point, every study visit." Bournias et al. 12[29] is an open-label, replacement trial in which Lumigan was used alone or in combination with other glaucoma medications at the physicians's discretion. As mentioned previously, such a design is sometimes referred to as a "baseline controlled" study, but, in actuality is uncontrolled because there is no comparison with a control group except insofar as one believes the IOP would have remained the same once patients entered the study. There is, however no way to know whether that would have been the case. Compliance could be different (better) in the test drug (Lumigan) phase of the study because of different patient or investigator expectations or biased observations . The proper design for such a trial is randomization to Lumigan or latanoprost done in a blinded study. Open-label studies are not appropriate for studying IOP changes because they do not include measures to minimize bias. IOP readings themselves may be biased and should be carried out without knowledge of treatment assignment. Finally, the study by Gandolfi et al. 13[30] is not considered substantial evidence because it utilizes an unacceptable primary efficacy variable. Measuring IOP at only one time point (8 AM) at all study visits is not considered an acceptable primary efficacy variable because it does not capture the variations of IOP throughout the day.

In addition, as stated above, promotional materials are misleading if they fail to reveal facts that are material in light of the claims made in the piece. It is misleading to compare the effectiveness of two products with dissimilar indications without revealing the differences in indication. Latanoprost is indicated as first-line therapy., while Lumigan is indicated as second-line therapy due to safety concerns, a fact that is not revealed. When comparing first-line therapies to second-line therapies it is important to reveal this difference because without doing so, you misleadingly suggest that the second- line therapy is superior to the first and should be used before the first-line therapy.

Misleading Superiority to Dual Therapy

The sales aid contains the following claims and presentations comparing Lumigan to dual therapy:

- "LUMIGAN® produces lowest mean IOP . . . . vs dual therapy 9[31], 12[32] " [reference 12, 14 below]

- "14% to 27% great mean IOP reduction than Cosopt®12[33]" [reference 14 below)

- " "In a randomized, investigator-masked, 3-month clinical trial, LUMIGAN® (n=90) provided statistically significantly greater mean IOP reduction than Cosopt® (n=87) at 3 out of the 4 measured time points, 12[34], " [reference 14 below]

- " Graph titled "Effects of LUMIGAN® replacement of dual therapy on mean IOP" for "any dual therapy to LUMIGAN" monotherapy" [emphasis added] depicting a "3.5 mm Hg additional mean reduction 13[35]" [reference 15 below]

These claims are misleading because they imply Lumigan is superior to any dual therapy, including Cosopt, when this has not been demonstrated by substantial evidence or substantial clinical experience. The references cited in the sales aid are not sufficient to support these claims. The study by Bournias et al.12[36] is an open-label, replacement trial in which Lumigan was used alone or in combination with other glaucoma medications at the physician's discretion. As explained above, such a design is sometimes referred to as a "baseline controlled" study, but, in actuality it is uncontrolled because there is no comparison with a control group except insofar as one believes the IOP would have remained the same once patients entered the study. The proper design for such a trial is randomization to Lumigan or dual therapy in a blinded study. Furthermore, while the study by Coleman et al. 14[37] indicates that Lumigan produces lower IOP than timolol/dorzafemide (Cosopt), these differences are not considered clinically significant . Differences of 2-3 mm Hg are not considered clinically significant because such differences are commonly seen in clinical trials without a change in therapy. Further, the applanation tonometer is calibrated in 2 mm. Hg increments. Since 2 mm Hg is the smallest change the instrument can detect, physicians are unlikely to alter patient therapy based on a 2 mm Hg change in IOP. Finally, the data on file 15[38] referenced contain insufficient information regarding the study design and methodology to be considered substantial evidence.

**Conclusion and Requested Action**

For the reasons discussed above, the sales aid presents unsubstantiated superiority claims for Lumigan. Accordingly, the sales aid misbrands Lumigan in violation of the Act. See 21 U.S.C. 352 (a) and 321 (n).

DDMAC requests that Allergan immediately cease the dissemination of violative promotional materials for Lumigan such as those described above. Please submit a written response to this letter on or before September 20, 2005, stating whether you intend to comply with this request, listing all violative promotional materials for Lumigan such as those described above, and explaining your plan for discontinuing use of such materials. Because the violations described above are serious, we request, further, that your submission include a comprehensive plan of action to disseminate truthful, non-misleading, and complete corrective messages about the issues discussed in this letter to the audience(s) that received the violative promotional materials. Please direct your response to me at the Food and Drug Administration, Center for Drug Evaluation and Research, Division of Drug Marketing, Advertising, and Communications, 5901-B Ammendale Road, Beltsville, MD 20705-1266, facsimile at 301-796-9878. In all future correspondence regarding this matter, please refer to MACMIS ID # 13256 in addition to the NDA number. We remind you that only written communications are considered official.

The violations discussed in this letter do not necessarily constitute an exhaustive list. It is your responsibility to ensure that your promotional materials for Lumigarl comply with each applicable requirement of the Act and FDA implementing regulations. Failure to correct the violations discussed above may result in FDA regulatory action, including seizure or injunction, without further notice.

1 Glaucoma Research Foundation . Glaucoma Patient Survey. August 2003.

2 Kline S, Walt J, Carlson A, Trygstad G. Patients' persistence and adherence with glaucoma therapy; a longitudinal retrospective database analysis of ophthalmic lipids . Poster presented at : the Annual Meeting of the Association of Research in Vision and Ophthalmology; April 25-29, 2004; Fort Lauderdale, Fla.

3 Higginbotham EJ, Schuman JS, Goldberg J, et al ., for the Bimatoprost Study Groups 1 and 2 . One-year, randomized study comparing bimatoprost and timolol in glaucoma and ocular hypertension . Arch Ophthalmol. 2002;120(10):1286-1293.

4 Cohen JS, Gross RL, Cheetham JK, VanDenburgh AM, Bernstein P, Whitcup, SM . Two-year double-masked comparison of bimatoprost with timolol in patients with glaucoma or ocular hypertension . Surv Ophthalmol. 2004;49(2 suppl 1) :S45- S52.

5 Lee D, Gross R, Mundorf T, Severin T, for the Lumigan® Early Experience Study. Efficacy and safety of bimatoprost 0.03% (Lumigan) in a large-scale, open-label clinical trial. Poster presented at : the annual Meeting of the Association for Research in Vision and Ophthalmology; May 5-10, 2002; Fort Lauderdale, Fla.

6 Cantor LB, WuDunn D, Cortes A, et al . Ocular hypotensive efficacy of bimatoprost 0.03% versus travoprost 0.004% in patients with glaucoma or

ocular hypertension . Surv Ophthalmol. 2004;49(2 supp 1) :S12-S18.

7 Mundorf T, Noecker R, Dirks M, Earl ML. A multicenter, randomized, investigator-masked comparison of the efficacy of bimatoprost 0.03% versus travoprost 0.004% in African Americans with glaucoma or ocular hypertension . Poster presented at : the Annual Meeting of the American Glaucoma Society; March 4-7, 2004: Sarasota, Fla. 8

8 Parrish RK, Palmberg P, Sheu W-P, for the XLT Study Group. A comparison of latanoprost, bimatoprost, and travoprost in patients with elevated intraocular pressure: a 12-week, randomized, masked-evaluator, multicenter study. Am J Ophthalmo/. 2003;135(5):688-703 .

9 Walters TR, DuBiner HB, Carpenter SP, Khan B, VanDenburgh AM, for the Bimatoprost Circadian IOP Study Group. 24-hour IOP control with once-daily bimatoprost, timolol gel-forming solution, or latanoprost: a 1-month, randomized, comparative clinical trial. Surv Ophthalmol. 2004; 49 (2 suppl 1) :S26-S35.

10 Dubiner H, Cooke D, Dirks M, Stewart WC, VanDenburgh AM, Felix C. Efficacy and safety of bimatoprost in patients with elevated intraocular pressure : a 30-day comparison with latanoprost. Surv Ophthalmol. 2001 ;45(suppl 4):S353-S360.

11 Noecker RS, Dirks MS, Choplin NT, et al . A six-month randomized clinical trial comparing the intraocular pressure- lowering efficacy of bimatoprost and latanoprost in patients with ocular hypcrtension or glaucoma . Am J Ophthalmol. 2003 ;135(1) :55-63.

12 Bournias T, Lee D, Gross R, Mattox C. Ocular hypotensive efficacy of bimatoprost when used as a replacement for latanoprost in the treatment of glaucoma and ocular hypertension . J Ocul Pharmacol Ther. 2003;19(3) :193-203.

13 Gandolfi S, Simmons ST, Sturm R, et al . Three-month comparison of bimatoprost and latanoprost in patients with glaucoma and ocular hypertension . Adrr Ther. 2001;18(3) :110-121 .

14 Coleman AL, Lerner SF, Bernstein P, Whitcup SM, for the Lumigan/Cosopt Study Group. A 3-month randomized controlled trial of bimatoprost (LUMIGAN) versus combined timolol and dorzolamide (Cosopt) in patients with glaucoma or ocular hypertension . Ophthalmology. 2003;110 (12) :2362-2368.

15 Data on file, Allergan, Inc. EPIC results.

Sincerely,
{See appended electronic signature page}
Thomas W. Abrams, RPh, MBA
Director
Division of Drug Marketing, Advertising, and Communications

This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.
/s/

Thomas Abrams
9/6/2005 04 :59 :49 :PM

Links on this page:

1.  http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
2.  http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
3.  http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
4.  http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
5.  http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
6.  http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
7.  http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
8.  http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
9.  http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
10. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
11. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
12. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
13. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
14. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
15. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
16. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
17. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
18. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
19. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
20. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1
21. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
22. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
23. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#1

24. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
25. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
26. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
27. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
28. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
29. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
30. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
31. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
32. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
33. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
34. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
35. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
36. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
37. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
38. http://www.fda.govfile:/U:/0_WORKAREA/4_VBIS/Site_Migration/WL/archive/2_TXT/g5470d.txt#14
39. http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/ViewingFiles/default.htm
40. http://www.fda.gov/default.htm
41. http://www.fda.gov/AboutFDA/default.htm
42. http://www.fda.gov/AboutFDA/ContactFDA/default.htm
43. http://www.fda.gov/SiteIndex/default.htm
44. http://www.fda.gov/SiteMap/default.htm
45. http://www.fda.gov/AboutFDA/AboutThisWebsite/default.htm
46. http://www.fda.gov/AboutFDA/Transparency/default.htm
47. http://www.fda.gov/RegulatoryInformation/FOI/default.htm
48. http://www.fda.gov/AboutFDA/AboutThisWebsite/Accessibility/default.htm
49. http://www.fda.gov/AboutFDA/WorkingatFDA/NoFearAct/default.htm
50. http://www.fda.gov/CombinationProducts/default.htm
51. http://www.fda.gov/AdvisoryCommittees/default.htm
52. http://www.fda.gov/ScienceResearch/default.htm
53. http://www.fda.gov/RegulatoryInformation/default.htm
54. http://www.fda.gov/Safety/default.htm
55. http://www.fda.gov/EmergencyPreparedness/default.htm
56. http://www.fda.gov/InternationalPrograms/default.htm
57. http://www.fda.gov/NewsEvents/default.htm
58. http://www.fda.gov/Training/default.htm
59. http://www.fda.gov/ICECI/default.htm
60. http://www.fda.gov/ForFederalStateandLocalOfficials/default.htm
61. http://www.fda.gov/ForConsumers/default.htm
62. http://www.fda.gov/ForIndustry/default.htm
63. http://www.fda.gov/ForHealthProfessionals/default.htm

EXHIBIT Q
PAGE 312

**Exhibit R**

**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
Silver Spring, MD 20993

TRANSMITTED BY FACSIMILE

David E.I. Pyott
Chairman of the Board and Chief Executive Officer
Allergan, Inc.
2525 Dupont Drive
Irvine, CA 92612

RE:   **NDA# 21-794**
      **ACZONE® (dapsone) Gel, 5%**
      **MACMIS ID #17769**

# WARNING LETTER

Dear Mr. Pyott:

The Division of Drug Marketing, Advertising, and Communications (DDMAC) of the U.S. Food
and Drug Administration (FDA) has reviewed a journal advertisement (APC021052008) for
ACZONE® (dapsone) Gel, 5% (ACZONE) submitted under cover of Form FDA-2253 by
Allergan, Inc. This journal advertisement is false or misleading because it overstates the
efficacy of ACZONE, and omits material facts and important risk information associated with
the use of the product. Therefore, this piece misbrands ACZONE in violation of the Federal
Food, Drug, and Cosmetic Act (Act), 21 U.S.C. 352(n) & 321(n), and FDA implementing
regulations. 21 CFR 202.1(e)(5); (e)(6)(i); (e)(6)(vi) & (e)(7)(iii).

**Background**

According to the INDICATIONS AND USAGE section of its FDA-approved product labeling
(PI), ACZONE Gel, 5%, is indicated "for the topical treatment of acne vulgaris."

The DRUG INTERACTIONS section of the PI states (in relevant part):

> Topical application of **ACZONE®** Gel followed by benzoyl peroxide in subjects with
> acne vulgaris resulted in a temporary local yellow or orange discoloration of the skin
> and facial hair (reported by 7 out of 95 subjects in a clinical study) with resolution in 4
> to 57 days.

In addition, the CLINICAL STUDIES section of the PI presents efficacy results from the two
randomized, double blind, vehicle controlled, clinical studies conducted to evaluate ACZONE
(in pertinent part):

> Efficacy was evaluated in terms of success on the Global Acne Assessment Score (no
> or minimal acne) and in the percent reduction in inflammatory, non-inflammatory, and
> total lesions.

EXHIBIT R
PAGE 313

David E.I. Pyott                                                                          Page 2
Allergan, Inc.
NDA # 21-794/MACMIS #17769

The success rates on the Global Acne Assessment Score (no or minimal acne) at
Week 12 are presented in Table 4.

Table 4 - Success (No or Minimal Acne) on the Global Acne Assessment Score at
Week 12

|  | Study 1* | | Study 2* | |
|---|---|---|---|---|
|  | ACZONE N=699 | Vehicle N=687 | ACZONE N=729 | Vehicle N=738 |
| Subjects with No or Minimal Acne | 291 (42%) | 223 (32%) | 253 (35%) | 206 (28%) |

*Analysis excludes subjects classified with minimal acne at baseline

Table 5 presents the mean percent reduction in inflammatory, non-inflammatory, and
total lesions from baseline to Week 12.

Table 5 - Percent Reduction in Lesions from Baseline to Week 12

|  | Study 1 | | Study 2 | |
|---|---|---|---|---|
|  | ACZONE N=745 | Vehicle N=740 | ACZONE N=761 | Vehicle N=764 |
| Inflammatory | 46% | 42% | 48% | 40% |
| Non-Inflammatory | 31% | 24% | 30% | 21% |
| Total | 38% | 32% | 37% | 29% |

**Overstatement of Efficacy/Omission of Material Facts**

Promotional materials are misleading if they represent or suggest that a drug is more
effective than has been demonstrated by substantial evidence or substantial clinical
experience. The journal ad claims that "[ACZONE] Works fast 24% reduction in
inflammatory lesions at 2 weeks[1]" (emphasis in original). **This claim is a complete
misrepresentation of the results of the Draelos study.** The wording clearly claims a
substantial effect of ACZONE at 2 weeks. That article, which presents combined data for
approximately 3,000 patients from two identically designed studies, did report very small
differences between Dapsone gel and the vehicle gel of 7% for total lesions, 8% for non-
inflammatory lesions, and 6% for inflammatory lesions at 12 weeks. However, at 2 weeks,
the mean percent change in inflammatory lesion count in patients on dapsone gel was 24%
and in patients on placebo was 22%, demonstrating an actual effect of 2%, which was not
even nominally statistically significant (p=0.052). Furthermore, this finding was one of several
possible analyses[2] that could be conducted with the 2 week data and was not pre-specified.

[1] Draelos ZD, Carter E, Maloney JM, et al; for the United States/Canada Dapsone Gel Study Group. Two
randomized studies demonstrate the efficacy and safety of dapsone gel, 5% for the treatment of acne vulgaris. J
Am Acad Dermatol. 2007;56(3):439.e1-439.e10.
[2] For example, the difference for non-inflammatory lesions and for combined lesions at 2 weeks was just 1%,
which is not close to significant.

EXHIBIT R
PAGE 314

David E.I. Pyott                                                             Page 3
Allergan, Inc.
NDA # 21-794/MACMIS #17769

Thus, this post-hoc analysis of inflammatory lesions cannot possibly be interpreted as
showing a statistically significant result.

Additionally, the journal ad **grossly** overstates the efficacy of the drug by presenting only the
most favorable result for ACZONE and ignoring the placebo response. Specifically, the
journal ad describes the effect of ACZONE on inflammatory lesions as a "48% reduction in
inflammatory lesions at 12 weeks.[1]" In fact, in the Draelos study, the placebo group had a
42% reduction in inflammatory lesions at week 12, for an actual effect of just 6%.

**Omission of Risk Information**

Promotional materials are misleading if they fail to reveal facts that are material in light of
the representations made by the materials or with respect to the consequences that may
result from the use of the drug as recommended or suggested by the materials. Although
the journal ad includes information from the WARNING AND PRECAUTIONS and
ADVERSE REACTIONS sections of the PI, it fails to include information from the DRUG
INTERACTIONS section of the PI, which states "Topical application of **ACZONE®** Gel
followed by benzoyl peroxide in subjects with acne vulgaris resulted in a temporary local
yellow or orange discoloration of the skin and facial hair (reported by 7 out of 95 subjects in
a clinical study) with resolution in 4 to 57 days." By omitting this important risk information,
the ad misleadingly suggests that ACZONE is safer than has been demonstrated by
substantial evidence or substantial clinical experience.

**Conclusion and Requested Action**

For the reasons discussed above, your professional journal advertisement misbrands
ACZONE in violation of the Act, and FDA's implementing regulations. 21 U.S.C. 352(n) and
321(n), and FDA implementing regulations. 21 CFR 202.1(e)(5); (e)(6)(i); (e)(6)(vi) &
(e)(7)(iii).

DDMAC requests that Allergan, Inc. immediately cease the dissemination of violative
promotional materials for ACZONE such as those described above. Please submit a written
response to this letter on or before August 28, 2009, stating whether you intend to comply
with this request, listing all promotional materials (with the 2253 submission date) in use for
ACZONE as of the date of this letter, identifying which of these materials contain violations
such as those described above, and explaining your plan for discontinuing use of such
violative materials. Because the violations described above are serious, we request, further,
that your submission include a comprehensive plan of action to disseminate truthful, non-
misleading, and complete corrective messages about the issues discussed in this letter to the
audience(s) that received the violative promotional materials. Please direct your response to
me at the Food and Drug Administration, Center for Drug Evaluation and Research, Division
of Drug Marketing, Advertising, and Communications, 5901-B Ammendale Road, Beltsville,
MD 20705-1266, facsimile at 301-847-8444. In all future correspondence regarding this
matter, please refer to MACMIS #17769 in addition to the NDA number. We remind you that
only written communications are considered official.

The violations discussed in this letter do not necessarily constitute an exhaustive list. It is
your responsibility to ensure that your promotional materials for ACZONE comply with each

EXHIBIT R
PAGE 315

David E.I. Pyott                                                              Page 4
Allergan, Inc.
NDA # 21-794/MACMIS #17769

applicable requirement of the Act and FDA implementing regulations.

Failure to correct the violations discussed above may result in FDA regulatory action, including seizure or injunction, without further notice.

Sincerely,

*{See appended electronic signature page}*

Thomas W. Abrams, RPh, MBA
Director
Division of Drug Marketing,
   Advertising, and Communications

EXHIBIT R
PAGE 316

This is a representation of an electronic record that was signed
electronically and this page is the manifestation of the electronic
signature.

/s/

THOMAS W ABRAMS
08/17/2009

EXHIBIT R
PAGE 317

**Exhibit S**

Exhibit 10.1

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and the United States Attorney's Office for the Northern District of Georgia and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS"), the TRICARE Management Activity ("TMA"), the United States Office of Personnel Management ("OPM"), the United States Department of Veterans Affairs ("VA"), and Office of Workers' Compensation Programs of the United States Department of Labor ("DOL-OWCP") (collectively "the United States"); Dr. Amy M. Lang, Charles J. Rushin, Cher Beilfuss, Kathleen O'Connor-Masse, and Albert Edward Hallivis (collectively, "Relators"); Allergan, Inc. and Allergan USA, Inc. (referred to individually and collectively as "Allergan"), through their authorized representatives. Collectively, all of the above will be referred to as "the Parties."

### PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

A.     Allergan, Inc. and Allergan USA, Inc. are Delaware corporations headquartered in Irvine, California. At all relevant times herein, Allergan developed, manufactured, distributed, marketed, and sold pharmaceutical products in the United States, including a drug sold under the trade name of Botox® Therapeutic ("Botox®"), which is billed to federal health care programs under HCPCS code J0585.

B.     Relators have filed the following qui tam actions against Allergan captioned as follows (collectively the "Civil Actions"):

      (i)     United States ex rel. Amy M. Lang and Charles J. Rushin v. Allergan, Inc., Civ. No. 1:07-cv-1288-WSD (N.D. Ga.) (hereinafter "Civil Action I");

**EXHIBIT S**
**PAGE 318**

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

(ii)    <u>United States ex rel. Cher Beilfuss and Kathleen O'Connor-Masse v. Allergan, Inc.</u>, Civ. No. 1:08-cv-1883-WSD (N.D. Ga.) (hereinafter "Civil Action II"); and

(iii)    <u>United States ex rel. Albert Edward Hallivis v. Allergan, Inc. a/k/a Allergan USA, Inc.</u>, Civ. No. 1:09-cv-3434-WSD (N.D. Ga.) (hereinafter "Civil Action III").

The United States intervened in Civil Action I and Civil Action II on April 2, 2010.

    C.    On such date as may be determined by the Court, Allergan, Inc. will enter into a plea of guilty pursuant to Fed. R. Crim. P. 11(c)(1)(C) (the "Plea Agreement") to an information to be filed in <u>United States v. Allergan, Inc.</u>, Criminal Action No. [to be assigned] (Northern District of Georgia) (the "Criminal Action") that will allege a violation of Title 21, United States Code, Sections 331(a) and 333(a)(1), a misdemeanor, namely, the introduction into interstate commerce of a misbranded drug, Botox*, in violation of the Food, Drug and Cosmetic Act.

    D.    Allergan has filed a declaratory judgment action pending in the United States District Court for the District of Columbia, captioned <u>Allergan, Inc. v. United States, et al.</u>, 1:09-cv-01879 (D.D.C.) (hereinafter, the "D.C. Litigation"). The D.C. Litigation is currently stayed at the joint request of Allergan and the United States.

    E.    Allergan has entered or will be entering into separate settlement agreements, described in Paragraph 1.b., below (hereinafter referred to as the "Medicaid State Settlement Agreements") with certain states and the District of Columbia in settlement of the Covered Conduct. States with which Allergan executes a Medicaid State Settlement Agreement in the form to which Allergan and the National Association of Medicaid Fraud Control Units ("NAMFCU") Negotiating Team have agreed, or in a form otherwise agreed to by Allergan and an individual State, shall be defined as "Medicaid Participating States."

-2-

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

F.      The United States alleges that Allergan caused claims for payment for Botox® to be submitted to the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh. The United States further alleges that Allergan caused claims for payment for Botox® to be submitted to the Medicaid Program ("Medicaid"), Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v. The United States further alleges that Allergan caused claims for payment of Botox® to be submitted to the TRICARE program, 10 U.S.C. §§ 1071-1109; the Federal Employees Health Benefits Program ("FEHBP"), 5 U.S.C. §§ 8901-8914; the following DOL-OWCP programs: the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101 et seq.; the Energy Employees Occupational Illness Compensation Program Act ("EEOICPA"), 42 U.S.C. § 7384 et seq.; and the Black Lung Benefits Act ("BLBA"), 30 U.S.C. § 901 et seq.; and caused purchases of Botox® by the VA, 38 U.S.C. §§ 1701-1743 (collectively, the "Other Federal Health Care Programs").

G.      The United States contends that it and the Medicaid Participating States have certain civil claims, as specified in Paragraph 2, below, against Allergan for engaging in the following conduct during the period January 1, 2001 through December 31, 2008 (hereinafter referred to as the "Covered Conduct"):

(i)      Allergan promoted the sale and use of Botox® for uses that were not approved by the Food and Drug Administration as safe and effective (including but not limited to headache, pain, spasticity, and overactive bladder) ("unapproved uses") and promoting the drug for unapproved uses renders the drug misbranded in violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331, et seq. Some of these unapproved uses were not medically accepted indications for which the United States and state Medicaid programs provided coverage for Botox®;

(ii)     Allergan made and/or disseminated unsubstantiated and/or misleading representations or statements that Botox® was safe and effective for some of these unapproved uses;

-3-

EXHIBIT S
PAGE 320

(iii)  Allergan instructed health care professionals to miscode claims for the treatment of headache and pain using inapplicable diagnosis codes (including but not limited to codes for spasm of muscle (ICD-9-CM 728.5), other facial nerve disorders (ICD-9-CM 351.8), spasmodic torticollis (ICD-9-CM 333.83), and torticollis unspecified (ICD-9-CM 723.5)) to ensure payment by Medicare, Medicaid and the Other Federal Health Care Programs; and

(iv)  Allergan offered and paid illegal remuneration to health care professionals that was intended to induce them to promote and/or prescribe Botox .

As a result of the foregoing conduct, the Government alleges that Allergan caused false or fraudulent claims for Botox[®] to be submitted to, or caused purchases by, Medicare, Medicaid and the Other Federal Health Care Programs.

With respect only to claims for Botox[®] submitted to Medicaid, Medicare and the Other Federal Health Care Programs with diagnosis codes for overactive bladder and neurogenic bladder conditions (ICD-9-CM 788.30, 788.31, 788.32, 788.33, 788.34, and 599.82), the Covered Conduct extends from January 1, 2001 through December 31, 2009.

Notwithstanding Preamble Paragraph G(iii), the Covered Conduct does not include conduct relating to claims for Botox[®] submitted to Medicaid, Medicare and the Other Federal Health Care Programs with the diagnosis codes ICD-9-CM 333.81 (blepharospasm) and ICD-9- CM 705.21, 705.22, and 780.8 (hyperhidrosis).

H.  The United States also contends that it has certain administrative claims against Allergan, as set forth in Paragraphs 4 through 7, below, for engaging in the Covered Conduct.

I.  This Agreement is made in compromise of disputed claims. This Agreement is not an admission of facts or liability by Allergan. With the exception of such admissions that are made in connection with any guilty plea by Allergan in connection with the Criminal Action, Allergan expressly denies the allegations of the United States and the Relators as set forth herein

-4-

**EXHIBIT S**
**PAGE 321**

Source: ALLERGAN INC, 8-K, September 01 2010

Powered by Morningstar® Document Research℠

and in the Civil Actions and denies that it engaged in any wrongful conduct in connection with the Covered Conduct. This Agreement is not a concession by the United States that its claims are not well founded. Neither this Agreement, its execution, nor the performance of any obligation under it, including any payment, nor the fact of any settlement, is intended to be, or shall be understood as, an admission of liability or wrongdoing, or other expression reflecting on the merits of the dispute by Allergan.

     J.    To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, the Parties reach a full and final settlement pursuant to the Terms and Conditions below.

-5-

EXHIBIT S
PAGE 322

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar ' Document Research℠

## TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1. Allergan agrees to pay to the United States and the Medicaid Participating States, collectively, the sum of Two Hundred and Twenty Five Million Dollars ($225,000,000), plus accrued interest at the rate of 3.5% per annum from January 25, 2010, and continuing until and including the day of payment (the "Settlement Amount"). The Settlement Amount shall constitute a debt immediately due and owing to the United States and the Medicaid Participating States on the Effective Date of this Agreement. This debt shall be discharged by payments to the United States and the Medicaid Participating States, under the following terms and conditions:

(a) Allergan shall pay to the United States the sum of $210,150,000 plus accrued interest as set forth above ("Federal Settlement Amount"). The Federal Settlement Amount shall be paid by electronic funds transfer pursuant to written instructions from the United States no later than seven (7) business days after (i) this Agreement is fully executed by the Parties and delivered to Allergan's attorneys; or (ii) the Court accepts a Fed. R. Crim. P. 11(c)(1)(C) guilty plea as described in Preamble Paragraph C in connection with the Criminal Action and imposes the agreed upon sentence, whichever occurs later.

(b) Allergan shall deposit the sum of $14,850,000, plus accrued interest as set forth above ("Medicaid State Settlement Amount") into one or more interest-bearing money market or bank accounts (the "State Settlement Accounts") that are held in the name of Allergan but segregated from other Allergan accounts, and shall pay the Medicaid Participating States

-6-

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

from the State Settlement Accounts pursuant to written instructions from the NAMFCU Negotiating Team and under the terms and conditions of the Medicaid State Settlement Agreements that Allergan will enter into with the Medicaid Participating States.

       (c)      Contingent upon the United States receiving the Federal Settlement Amount from Allergan, the United States agrees to pay, as soon as feasible upon receipt, Amy M. Lang and Charles J. Rushin $37,827,000, plus a proportionate share of the actual accrued interest paid to the United States by Allergan, as set forth in Paragraph 1.a., above, ("Relators' Share") as Relators' share of the proceeds pursuant to 31 U.S.C. § 3730(d). No other relator payments shall be made by the United States with respect to the matters covered by this Agreement. All Relators represent that they will abide by the terms of any written and executed separate agreements that they may have entered into with one or more of the other Relators concerning the allocation of the Relators' Share among themselves.

       (d)      If Allergan's agreed-upon guilty plea pursuant to Fed. R. Crim. P. 11(c)(1)(C) in the Criminal Action described in Preamble Paragraph C is not accepted by the Court or the Court does not impose the agreed-upon sentence for whatever reason, this Agreement shall be null and void at the option of either the United States or Allergan. If either the United States or Allergan exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within five (5) business days of the Court's decision, the Parties will not object and this Agreement will be rescinded. If this Agreement is rescinded, Allergan will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims, actions or proceedings arising from the Covered Conduct that are brought by the United States within 90

-7-

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

calendar days of rescission, except to the extent such defenses were available on the day on which the <u>qui tam</u> complaints listed in Preamble Paragraph B, above, were filed.

      (e)     If the stay of the D.C. Litigation described in Preamble Paragraph D is lifted before Allergan dismisses with prejudice the D.C. Litigation pursuant to Paragraph 19, below, this Agreement shall be null and void at the option of either the United States or Allergan. If either the United States or Allergan exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within five (5) business days of the Court's decision to lift the stay, the Parties will not object and this Agreement will be rescinded. If this Agreement is rescinded, Allergan will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims, actions or proceedings arising from the Covered Conduct that are brought by the United States within 90 calendar days of rescission, except to the extent such defenses were available on the day on which the <u>qui tam</u> complaints listed in Preamble Paragraph B, above, were filed.

      2.     Subject to the exceptions in Paragraph 8 (concerning excluded claims), below, in consideration of the obligations of Allergan set forth in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, the United States (on behalf of itself, its officers, agents, agencies, and departments) agrees to release Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees from any civil or administrative monetary claim the United States has or may have for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; any statutory provision for which the Civil

-8-

EXHIBIT S
PAGE 325

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar ® Document Research ℠

Division of the Department of Justice has actual and present authority to assert and compromise pursuant to 28 C.F.R. Part 0, Subpart I, Section 0.45(d); or the common law theories of payment by mistake, fraud, disgorgement, unjust enrichment, and, if applicable, breach of contract.

3.    Subject to the exceptions in Paragraph 8 (concerning excluded claims), below, in consideration of the obligations of Allergan in this Agreement, conditioned upon Allergan's full payment of the Settlement Amount, Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns, agree to release Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees from any liability to Relators arising from any claim the United States has, may have, or could have asserted relating to the Covered Conduct, and from all liability, claims, demands, actions or causes of action whatsoever existing as of the Effective Date of this Agreement, whether known or unknown, fixed or contingent, in law or in equity, in contract or in tort, under any federal or state statute or regulation or that they or their heirs, successors, attorneys, agents and assigns otherwise would have standing to bring, including any liability arising from the filing of the Civil Actions, except for: (1) claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d); (2) claims for a Relator's Share under the Medicaid State Settlement Agreements; and (3) any employment discrimination claims Albert Edward Hallivis may have against Allergan.

4.    In consideration of the obligations of Allergan in this Agreement and the Corporate Integrity Agreement (CIA) entered into between OIG-HHS and Allergan, Inc., and conditioned upon Allergan's full payment of the Settlement Amount, OIG-HHS agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from Medicare, Medicaid, and other Federal health care programs (as defined in 42 U.S.C. §

-9-

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

1320a-7b(f)) against Allergan under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law), or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities) for the Covered Conduct, or against Allergan, Inc. under 42 U.S.C. § 1320a-7(b)(1) based on Allergan, Inc.'s agreement to plead guilty to the charge in the Allergan Criminal Action referenced above in Preamble Paragraph C, except as reserved in Paragraph 8 (concerning excluded claims), below, and as reserved in this Paragraph. The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude Allergan from Medicare, Medicaid, and other Federal health care programs under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct. Nothing in this Paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

      5.     In consideration of the obligations of Allergan in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, TMA agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion or suspension from the TRICARE Program against Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees under 32 C.F.R. § 199.9 for the Covered Conduct, except as reserved in Paragraph 8 (concerning excluded claims), below, and as reserved in this Paragraph. TMA expressly reserves authority to exclude Allergan from the TRICARE Program under 32 C.F.R. §§ 199.9 (f)(1)(i)(A), (f)(1)(i)(B), and (f)(1)(iii), based upon the Covered Conduct. Nothing in this Paragraph precludes TMA or the TRICARE Program from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

-10-

**EXHIBIT S**
**PAGE 327**

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

6.      In consideration of the obligations of Allergan in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, OPM agrees to release and refrain from instituting, directing, or maintaining any administrative action against Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees under 5 U.S.C. § 8902a or 5 C.F.R. Part 919 for the Covered Conduct, except as reserved in Paragraph 8 (concerning excluded claims), below, and except if excluded by the OIG-HHS pursuant to 42 U.S.C. § 1320a-7(a). Nothing in this Paragraph precludes OPM from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

7.      In consideration of the obligations of Allergan in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, DOL-OWCP agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion and debarment from the FECA, EEOICPA and BLBA programs against Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees under 20 C.F.R. §§ 10.815, 30.715 and 702.431 for the Covered Conduct, except as reserved in Paragraph 8 (concerning excluded claims), below and except if excluded by the OIG-HHS pursuant to 42 U.S.C. § 1320a-7(a). Nothing in this Paragraph precludes the OWCP of the DOL from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

8.      Notwithstanding any term of this Agreement, the following claims of the United States are specifically reserved and excluded from the scope and terms of the Agreement as to any entity or person (including Allergan and the Relators):

-11-

Source: ALLERGAN INC. 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

(a)     Any civil, criminal, or administrative liability arising under Title 26, U.S. Code (Internal Revenue Code);

(b)     Any criminal liability;

(c)     Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs;

(d)     Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

(e)     Any liability based upon such obligations as are created by this Agreement;

(f)     Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

(g)     Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct;

(h)     Any liability for failure to deliver goods or services due; and

(i)     Any liability of individuals (including current or former directors, officers, employees, or agents of Allergan) who receive written notification that they are the target of a criminal investigation, are criminally indicted or charged, or are convicted, or who enter into a criminal plea agreement.

9.     Relators and their heirs, successors, attorneys, agents, and assigns agree not to object to this Agreement and agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B), and expressly waive the opportunity for a hearing on any objection to this Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon the United States' payment of the Relators' Share, as

-12-

**EXHIBIT S**
**PAGE 329**

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

set forth in Paragraph 1.c., above, Relators for themselves individually, and for their heirs, successors, agents, and assigns, fully and finally release, waive, and forever discharge the United States, and its officers, agents, and employees, from any claims arising from or relating to 31 U.S.C. § 3730; from any claims arising from the filing of the Civil Actions; and from any other claims for a share of the Settlement Amount or payment of any sort from the United States relating to the Agreement or the filing of the Civil Actions; and in full settlement of any claims Relators may have under this Agreement. This Agreement does not resolve or in any manner affect any claims the United States has or may have against the Relators arising under Title 26, U.S. Code (Internal Revenue Code), or any claims arising under this Agreement.

10.   Conditioned upon the United States' payment of the Relators' Share, as set forth in Paragraph 1.c., above, the Relators, for themselves, and for their respective heirs, successors, attorneys, agents, and assigns:

(a)      hereby fully and finally release and forever discharge Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors, and assigns, and their current and former officers, directors, trustees, agents, servants, employees, representatives, attorneys, consultants, executors, and administrators (collectively, "Allergan Releasees") from any and all claims for relief, actions, rights, causes of action, suits, debts, obligations, liabilities, demands, losses, damages (including treble damages and any civil penalties), punitive damages, costs, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, in law or in equity, in contract or in tort, or under any federal or state statute or regulation or otherwise that Relators or their heirs, successors, attorneys, agents or assigns would have standing to bring, and which Relators or their heirs, successors, attorneys, agents, or assigns may now have or claim to have against the Allergan

-13-

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

Releasees, arising in any way out of or connected in any way with the facts, claims, and circumstances alleged in, arising under, or arising from the filing of the Civil Actions, or from any other past activities and actions of the Allergan Releasees, except for: (1) claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d); (2) claims for a Relators' Share under the Medicaid State Settlement Agreements; and (3) any employment discrimination claims that Albert Edward Hallivis may have against Allergan; and

(b)     agree not to disseminate any documents or communications in their possession or control, or information from such documents or communications, that can be readily identified as having been created in whole or in part by, or at the direction of, Allergan. In this regard, Relators and their counsel will make a good faith effort to identify all such materials. The obligations in this subparagraph do not apply: (1) to documents or information in the public record or domain; (2) to the extent that compliance with the obligation would conflict with a statute or regulation; (3) if disclosure is required by a subpoena or court order; or (4) in the case of employee Albert Edward Hallivis, to the degree he is authorized by Allergan to utilize business records as necessary within the scope of his current employment.

11.    Allergan waives and shall not assert any defenses Allergan may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

-14-

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

12.   Allergan fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Allergan has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the Covered Conduct or arising from the United States' investigation and prosecution of the Civil Actions and the Criminal Action.

13.   Conditioned upon Relators' compliance with their obligations under this Agreement, Allergan, for itself, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors, and assigns, and their current and former officers, directors, trustees, agents, servants, employees, representatives, attorneys, consultants, executors, and administrators, when acting on behalf of Allergan or any of its affiliated companies, fully and finally releases and forever discharges Relators and their heirs, successors, attorneys, agents, and assigns (collectively, "Relator Releasees") from any and all claims for relief, actions, rights, causes of action, suits, debts, obligations, liabilities, demands, losses, damages (including treble damages and any civil penalties), punitive damages, costs, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, in law or in equity, in contract or in tort, or under any federal or state statute or regulation or otherwise that Allergan, its predecessors, or its current and former divisions, parents, affiliates, subsidiaries, successors, or assigns may now have or claim to have against the Relator Releasees, arising in any way out of or connected in any way with the facts, claims, and circumstances alleged in, arising under, or arising from the Civil Actions, or from any other past activities and actions of the Relator Releasees, except to the extent related to: (1) claims Relators may have under 31 U.S.C. § 3730(d); (2) claims for a Relators' Share under the Medicaid State Settlement Agreements; or (3)

-15-

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

any employment discrimination claim that Albert Edward Hallivis may have against Allergan, or rights Allergan may have arising out of any violation by him of the terms and conditions of his employment. Allergan attests that, upon inquiry of its Legal Department, it is not presently aware of any claims its officers, directors, employees, or agents may have against Relator Releasees.

14.   The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare carrier or intermediary or any other state or Federal payer, related to the Covered Conduct; and Allergan agrees not to resubmit to any Medicare carrier or intermediary or any other state or Federal payer any previously denied claims related to the Covered Conduct, and agrees not to appeal any such denials of claims.

15.   Allergan agrees to the following:

(a)   <u>Unallowable Costs Defined:</u> that all costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh and 1396-1396v; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Allergan, its present or former officers, directors, employees, shareholders, and agents in connection with the following shall be "Unallowable Costs" on government contracts and under the Medicare Program, Medicaid Program, TRICARE Program, and FEHBP:

(i)      the matters covered by this Agreement and any related plea agreement;

(ii)     the United States' audit(s) and civil and criminal investigation(s) of the matters covered by this Agreement;

(iii)    Allergan's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and criminal

-16-

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(iv)    the negotiation and performance of this Agreement, the Plea Agreement, and the Medicaid State Settlement Agreements;

(v)    the payments Allergan makes to the United States pursuant to this Agreement, the Plea Agreement, or the Medicaid State Settlement Agreements, and any payments that Allergan may make to Relators (including costs and attorneys' fees); and

(vi)    the negotiation of, and obligations undertaken pursuant to the CIA to:

(a)    retain an independent review organization to perform annual reviews as described in Section III of the CIA; and

(b)    prepare and submit reports to the OIG-HHS.

However, nothing in this Paragraph 15.a.vi. that may apply to the obligations undertaken pursuant to the CIA affects the status of costs that are not allowable based on any other authority applicable to Allergan. (All costs described or set forth in this Paragraph 15.a. are hereafter "Unallowable Costs.")

(b)    <u>Future Treatment of Unallowable Costs</u>: These Unallowable Costs shall be separately determined and accounted for by Allergan, and Allergan shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Allergan or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

(c)    <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: Allergan

-17-

**EXHIBIT S**
**PAGE 334**

further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Allergan or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. Allergan agrees that the United States, at a minimum, shall be entitled to recoup from Allergan any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Allergan or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on Allergan or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

(d)     Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Allergan's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

16.     This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except as explicitly stated in this

-18-

**EXHIBIT S**
**PAGE 335**

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

Agreement, including in Paragraph 17 (waiver for beneficiaries paragraph), below.

17.     Allergan agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

18.     Allergan warrants that it has reviewed its financial situation and that it currently is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and shall remain solvent following payment to the United States of the Settlement Amount. Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to Allergan, within the meaning of 11 U.S.C. § 547(c)(1); and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Allergan was or became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

19.     Within seven (7) days of making the payments described in Paragraph 1, above, Allergan shall file a stipulation of dismissal with prejudice in the D.C. Litigation.

20.     Upon the Effective Date of this Agreement, the United States shall file in Civil Action III a Notice of Intervention as to the Covered Conduct. Upon receipt of the payments described in Paragraph 1, above, and entry of an order dismissing the D.C. Litigation with prejudice, the United States and Relators shall file a Joint Stipulation of Dismissal in each of the

-19-

EXHIBIT S
PAGE 336

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

Civil Actions as follows:

(a)    each stipulation of dismissal shall be with prejudice as to the United States' and Relators' claims as to Allergan as to the Covered Conduct in each Civil Action pursuant to and consistent with the terms and conditions of this Agreement;

(b)    each stipulation of dismissal shall be without prejudice as to the United States and with prejudice as to Relators as to all other claims; and

(c)    provided, however, that the following claims against Allergan shall not be dismissed until they are settled, adjudicated, or otherwise resolved, and the Court is so informed: (a) Relators' claims for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); (b) Relators' claims for a Relators' Share under the Medicaid State Settlement Agreements; and (c) any employment discrimination claims that Albert Edward Hallivis may have against Allergan.

21.    Except as expressly provided to the contrary in this Agreement, each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

22.    Allergan represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

23.    Relators represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

24.    This Agreement is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement is the United States District Court for the Northern District of Georgia, except that disputes arising under the CIA shall be resolved exclusively under the dispute

-20-

**EXHIBIT S**
**PAGE 337**

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

resolution provisions in the CIA.

25.     For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

26.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

27.     The individuals signing this Agreement on behalf of Allergan represent and warrant that they are authorized by Allergan to execute this Agreement. The individuals signing this Agreement on behalf of Relators represent and warrant that they are authorized by Relators to execute this Agreement. The United States signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

28.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

29.     This Agreement is binding on Allergan's successors, transferees, heirs, attorneys, agents, and assigns.

30.     This Agreement is binding on Relators' successors, transferees, heirs, attorneys, agents, and assigns.

31.     All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

32.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

-21-

EXHIBIT S
PAGE 338

### THE UNITED STATES OF AMERICA

DATED:   8/31/10          BY:   /s/ Sally Quillian Yates
                                SALLY QUILLIAN YATES
                                United States Attorney
                                United States Attorney's Office
                                Northern District of Georgia

DATED:   8/31/10          BY:   /s/ Amy Berne
                                AMY BERNE
                                Chief, Civil Division
                                United States Attorney's Office
                                Northern District of Georgia

DATED:   8/31/10          BY:   /s/ Sally B. Molloy
                                SALLY B. MOLLOY
                                Assistant U.S. Attorney
                                United States Attorney's Office
                                Northern District of Georgia

DATED:   8/31/2010        BY:   /s/ Christopher J. Huber
                                CHRISTOPHER J. HUBER
                                Assistant U.S. Attorney
                                United States Attorney's Office
                                Northern District of Georgia

DATED:   8/31/10          BY:   /s/ Edward C. Crooke
                                EDWARD C. CROOKE
                                Trial Attorney
                                Commercial Litigation Branch
                                Civil Division
                                United States Department of Justice

-22-

EXHIBIT S
PAGE 339

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

DATED:    8/20/10         BY:    /s/ Gregory E. Demske
                                 GREGORY E. DEMSKE
                                 Assistant Inspector General for Legal Affairs
                                 Office of Counsel to the Inspector General
                                 Office of Inspector General
                                 United States Department of Health and Human Services


DATED:    18 Aug 2010      BY:    /s/ Laurel C. Gillespie
                                 LAUREL C. GILLESPIE
                                 Deputy General Counsel
                                 TRICARE Management Activity
                                 United States Department of Defense


DATED:    8/18/10          BY:    /s/ Shirley R. Patterson
                                 SHIRLEY R. PATTERSON
                                 Acting Deputy Associate Director Insurance Operations
                                 United States Office of Personnel Management


DATED:    8/19/2010        BY:    /s/ J. David Cope
                                 J. DAVID COPE
                                 Assistant Inspector General for Legal Affairs
                                 United States Office of Personnel Management


DATED:    8/18/2010        BY:    /s/ Cecily A. Rayburn
                                 CECILY A. RAYBURN
                                 Acting Deputy Director
                                 Office of Workers' Compensation Programs
                                 United States Department of Labor

-23-

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

**ALLERGAN**

DATED:   8/30/10          BY:   /s/ Samuel J. Gesten
                                SAMUEL J. GESTEN, ESQ.
                                Executive Vice President and General Counsel
                                Allergan, Inc.

                                Vice President and Assistant Secretary
                                Allergan USA, Inc.

DATED:   8/31/10          BY:   /s/ Stephen S. Cowen
                                STEPHEN S. COWEN, ESQ.
                                King & Spalding, LLP

DATED:   8/31/10          BY:   /s/ Matthew H. Baughman
                                MATTHEW H. BAUGHMAN, ESQ.
                                King & Spalding, LLP

DATED:   8/31/10          BY:   /s/ John T. Bentivoglio
                                JOHN T. BENTIVOGLIO, ESQ.
                                Skadden, Arps, Slate, Meagher & Flom, LLP

-24-

Source: ALLERGAN INC. 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

## RELATOR AMY M. LANG, M.D.

DATED:   8/18/2010                        BY:   /s/ Amy M. Lang, M.D.
                                                AMY M. LANG, M.D.

DATED:   08/18/10                         BY:   /s/ John E. Floyd
                                                JOHN E. FLOYD, ESQ.
                                                Bondurant, Mixson, & Elmore, LLP

DATED:   08/18/10                         BY:   /s/ Ben E. Fox
                                                BEN E. FOX, ESQ.
                                                Bondurant, Mixson, & Elmore, LLP

DATED:   8/18/2010                        BY:   /s/ Lance D. Lourie
                                                LANCE D. LOURIE, ESQ.
                                                Watkins, Lourie, Roll & Chance, P.C.

-25-

EXHIBIT S
PAGE 342

### RELATOR CHARLES J. RUSHIN

DATED:    8/18/2010       BY:    /s/ Charles J. Rushin

                                            CHARLES J. RUSHIN

DATED:    08/18/2010      BY:    /s/ John E. Floyd

                                            JOHN E. FLOYD, ESQ.
                                            Bondurant, Mixson, & Elmore, LLP

DATED:    08/18/10        BY:    /s/ Ben E. Fox

                                            BEN E. FOX, ESQ.
                                            Bondurant, Mixson, & Elmore, LLP

DATED:    8/18/10         BY:    /s/ Lance D. Lourie

                                            LANCE D. LOURIE, ESQ.
                                            Watkins, Lourie, Roll & Chance, P.C.

-26-

**EXHIBIT S**
**PAGE 343**

Source: ALLERGAN INC, 8-K, September 01, 2010

## RELATOR CHER BEILFUSS

DATED:   Aug 22, 2010      BY:    /s/ Cher Beilfuss
                                      CHER BEILFUSS

DATED:   8/23/10          BY:    /s/ Marcella Auerbach
                                        MARCELLA AUERBACH, ESQ.
                                        Nolan & Auerbach, P.A.

DATED:   8/23/10          BY:    /s/ Ken Nolan
                                        KEN NOLAN, ESQ.
                                        Nolan & Auerbach, P.A.

-27-

EXHIBIT S
PAGE 344

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

## RELATOR KATHLEEN O'CONNOR-MASSE

DATED: ___8/18/10_____   BY: ___/s/ Kathleen O'Connor-Masse_____
                                              KATHLEEN O'CONNOR-MASSE

DATED: ___8/23/10_____   BY: ___/s/ Marcella Auerbach_____
                                              MARCELLA AUERBACH, ESQ.
                                              Nolan & Auerbach, P.A.

DATED: ___8/23/10_____   BY: ___/s/ Ken Nolan_____
                                              KEN NOLAN, ESQ.
                                              Nolan & Auerbach, P.A.

-28-

**EXHIBIT S**
**PAGE 345**

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

### RELATOR ALBERT EDWARD HALLIVIS

DATED:   8/18/10                         BY:   /s/ Albert Edward Hallivis
                                                ALBERT EDWARD HALLIVIS

DATED:   8/18/10                         BY:   /s/ Jay P. Holland
                                                JAY P. HOLLAND, ESQ.
                                                Joseph, Greenwald & Laake, P.A.

DATED:   8/18/10                         BY:   /s/ Brian J. Markowitz
                                                BRIAN J. MARKOWITZ, ESQ.
                                                Joseph, Greenwald & Laake, P.A.

-29-

Source: ALLERGAN INC. 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

**Exhibit  T**

| Date | Close | Volume |
|------|-------|--------|
| 8/25/2010 | 63.36 | 2550200 |
| 8/26/2010 | 63.22 | 1955100 |
| 8/27/2010 | 63.17 | 1369100 |
| 8/30/2010 | 62.01 | 1705100 |
| 8/31/2010 | 61.42 | 2420500 |
| **9/1/2010 [1]** | **63.28** | **2406200** |
| 9/2/2010 | 63.67 | 1166500 |
| 9/3/2010 | 63.87 | 1364900 |
| 9/7/2010 | 63.58 | 1259200 |
| 9/8/2010 | 64.09 | 1594900 |
| 9/9/2010 | 65.14 | 1834400 |
| 9/10/2010 | 65.8 | 1787100 |
| 9/13/2010 | 65.78 | 1233500 |
| 9/14/2010 | 65.88 | 1168200 |
| 9/15/2010 | 66.14 | 1220100 |
| 9/16/2010 | 64.67 | 2733000 |
| 9/17/2010 | 65.21 | 2118700 |
| 9/20/2010 | 66.3 | 1399400 |
| 9/21/2010 | 65.97 | 1699500 |
| 9/22/2010 | 65.59 | 1486200 |
| 9/23/2010 | 64.93 | 1016600 |
| 9/24/2010 | 66.36 | 1227700 |
| 9/27/2010 | 66.17 | 1316200 |
| 9/28/2010 | 66.8 | 1768300 |
| 9/29/2010 | 66.71 | 1395500 |
| 9/30/2010 | 66.53 | 1872600 |
| 10/1/2010 | 66.25 | 1350400 |
| 10/4/2010 | 65.16 | 1344100 |
| **10/5/2010 [2]** | **66.62** | **1659800** |
| 10/6/2010 | 66.41 | 1248300 |
| 10/7/2010 | 66.73 | 938000 |
| 10/8/2010 | 67.32 | 1714100 |
| 10/11/2010 | 67.9 | 1303000 |
| 10/12/2010 | 67.54 | 2308300 |
| 10/13/2010 | 68.51 | 1861200 |
| 10/14/2010 | 68.26 | 1370500 |
| 10/15/2010 | 68.86 | 1836900 |
| 10/18/2010 | 72.61 | 8449300 |
| 10/19/2010 | 71.73 | 2619700 |
| 10/20/2010 | 72.19 | 1681700 |
| 10/21/2010 | 71.67 | 1705600 |
| 10/22/2010 | 71.83 | 993700 |
| 10/25/2010 | 71.8 | 1677100 |
| 10/26/2010 | 72 | 1283400 |
| 10/27/2010 | 72.17 | 2068500 |
| 10/28/2010 | 72.84 | 1479600 |
| 10/29/2010 | 72.41 | 3073900 |

[1] The date the DOJ and Allergan announced the Civil and Criminal Settlements.
[2] The date Allergan pleaded guilty.

EXHIBIT T
PAGE 347