1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  TRAVIS E. DOWNS III (148274)
   DAVID W. MITCHELL (199706)
3  BENNY C. GOODMAN III (211302)
   BRIAN O. O'MARA (229737)
4  655 West Broadway, Suite 1900
   San Diego, CA  92101
5  Telephone:  619/231-1058
   619/231-7423 (fax)
6  darrenr@rgrdlaw.com
   travisd@rgrdlaw.com
7  davidm@rgrdlaw.com
   bennyg@rgrdlaw.com
8  bomara@rgrdlaw.com

9  ROBBINS UMEDA LLP
   BRIAN J. ROBBINS (190264)
10 FELIPE J. ARROYO (163803)
   ARSHAN AMIRI (246874)
11 600 B Street, Suite 1900              THE WEISER LAW FIRM, P.C.
   San Diego, CA  92101                 KATHLEEN A. HERKENHOFF (168562)
12 Telephone:  619/525-3990             12707 High Bluff Drive, Suite 200
   619/525-3991 (fax)                   San Diego, CA  92130
13 brobbins@robbinsumeda.com            Telephone:  858/794-1441
   farroyo@robbinsumeda.com             858/794-1450 (fax)
14 aamiri@robbinsumeda.com              kah@weiserlawfirm.com

15 Co-Lead Counsel for Plaintiffs

16 [Additional counsel appear on signature page.]

17               UNITED STATES DISTRICT COURT

18              CENTRAL DISTRICT OF CALIFORNIA

19                    SOUTHERN DIVISION

20 In re ALLERGAN, INC.            )  Master File No.
   SHAREHOLDER DERIVATIVE          )    SACV-10-01352-DOC(MLGx)
21 ACTION                          )
                                   )  PLAINTIFFS' OMNIBUS
22 _____ )  OPPOSITION TO DEFENDANTS'
                                   )  MOTIONS TO DISMISS
23 This Document Relates To:       )
                                   )  DATE: February 28, 2011
24    ALL ACTIONS.                 )  TIME:  8:30 a.m.
   _____ )  COURTROOM: The Honorable
25                                             David O. Carter

26

27

28

593634_1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ............................................................................. 1

II.     FACTUAL BACKGROUND .......................................................... 4

        A.      The Company, Its Business and Its Flagship Product ....................... 4

        B.      Overview of the FDA Approval Process and the FDCA..................... 5

        C.      Defendants Consciously Permitted an Illicit Scheme to Inflate
                Sales of Botox Through Off-Label Prescriptions ............................. 6

        D.      Numerous *Qui Tam* Actions Were Filed Against Allergan,
                Prompting FBI and DOJ Action ...................................................... 10

        E.      Allergan Is Forced to Pay $600 Million in Civil and Criminal
                Penalties as a Result of Defendants' Misconduct............................. 11

III.    THE COMPLAINT STATES CLAIMS AS TO ALL COUNTS ............... 15

        A.      The Complaint Adequately Pleads Violations of Section 14(a)......... 15

                1.      The Legal Standard for Section 14(a) Claims .......................... 15

                2.      Allergan's Proxy Statements Were Materially False and
                        Misleading .................................................................... 17

                3.      Defendants Acted for Their Own Self-Benefit......................... 22

                4.      The Complaint Adequately Pleads an Essential Link
                        Between the Proxy Statements and Increased Executive
                        Compensation and Reelection of the Board of Director
                        Defendants .................................................................... 23

                5.      Plaintiffs' Section 14(a) Claim Is Timely .............................. 25

        B.      The Complaint Adequately Pleads Violations of Section 29(b)......... 27

        C.      The Complaint Adequately Pleads Claims for Breach of
                Fiduciary Duty as to All Defendants ............................................. 28

        D.      Plaintiffs Have Adequately Pled Insider Trading and a
                Corresponding Claim for Breach of Fiduciary Duty ....................... 33

        E.      The Complaint Adequately Pleads a Claim for Corporate Waste ...... 35

        F.      The Complaint Adequately Pleads an Unjust Enrichment Claim ...... 36

IV.     DEMAND IS EXCUSED ................................................................. 37

        A.      The Legal Standard for Demand Futility........................................ 37

- i -

593634_1

|  |  |  | **Page** |
|---|---|---|---|
| B. | Demand Is Excused Because the Directors' Adoption and/or Tacit Approval of an Illegal Business Strategy Is Not Protected by the Business Judgment Rule | | 40 |
| C. | Demand Is Also Excused Because a Majority of the Director Defendants Face a Substantial Likelihood of Liability in Connection with the Company's Illegal Business Strategy | | 48 |
| D. | Defendants Mischaracterize the Allegations in the Complaint and Cite Inapposite Authority | | 49 |
| E. | Demand Is Also Excused Because Plaintiffs Sufficiently Raise Reasonable Doubt that at Least Six Director Defendants Lack Disinterest and/or Independence | | 50 |
| | 1. | Lavigne, Gallagher, Ray, Hudson and Ryan Face a Substantial Likelihood of Liability for Their Conduct on the Audit Committee | 50 |
| | | a. Failure to Design and Implement Adequate Internal Controls | 51 |
| | | b. Issuance of False and Misleading Statements | 51 |
| | 2. | Boyer, Ingram, Dunsire, Jones and Schaeffer Face a Substantial Likelihood of Liability for Their Conduct on the Corporate Governance Committee | 52 |
| | 3. | Defendants Concede that Pyott Lacks Independence | 53 |
| F. | Defendants Cannot Hide Behind Allergan's Exculpatory Provision | | 53 |
| V. | CONCLUSION | | 55 |

1

# TABLE OF AUTHORITIES

2
**Page**

3

4
**CASES**

5

*Alaska Elec. Pension Fund v. Olofson*,
   No. 08-2344-CM, 2009 WL 1580296
6
   (D. Kan. June 3, 2009)...................................................................17

7

*Alston v. Parker*,
8
   363 F.3d 229 (3d Cir. 2004) ...........................................................29

9

*Am. Int'l Grp., Inc. v. Greenberg*,
10
   965 A.2d 763 (Del. Ch. 2009), *aff'd sub nom.*
   *Teachers' Ret. Sys. v. PricewaterhouseCoopers LLP*,
11
   2011 Del. LEXIS 1 (Del. Jan. 3, 2011) ...........................................48

12

*Aronson v. Lewis*,
13
   473 A.2d 805 (Del. 1984)........................................................*passim*

14

*Beard Research, Inc. v. Kates*,
15
   8 A.3d 573 (Del. Ch. 2010),
   *aff'd*, 2010 Del. LEXIS 596
16
   (Del. Nov. 23, 2010)........................................................................29

17

*Beck v. Dobrowski*,
18
   559 F.3d 680 (7th Cir. 2009) ..........................................................17

19

*Bell Atl. Corp. v. Twombly*,
20
   550 U.S. 544, 127 S. Ct. 1955,
   167 L. Ed. 2d (2007)........................................................................15

21

*Belova v. Sharp*,
22
   No. CV 07-299-MO, 2008 WL 700961
23
   (D. Or. Mar. 13, 2008)..............................................................17, 24

24

*Beneville v. York*,
25
   769 A.2d 80 (Del. Ch. 2000) .....................................................40, 41

26

*Berckeley Inv. Group Ltd. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006).............................................................27
27

28

593634_1

**Page**

*Cinerama, Inc. v. Technicolor, Inc.,*
   663 A.2d 1156 (Del. 1995)...................................................................29

*Daisy Sys. Corp. v. Finegold,*
   No. C 86-20719 (SW), 1988 WL 166235
   (N.D. Cal. Sept. 19, 1988) .............................................................30

*DCML LLC v. Danka Bus. Sys. PLC,*
   No. 08 Civ. 5829 (SAS), 2008 WL 5069528
   (S.D.N.Y. Nov. 26, 2008)..............................................................16

*Desimone v. Barrows,*
   924 A.2d 908 (Del. Ch. 2007) ........................................................41

*Emerald Partners v. Berlin,*
   726 A.2d 1215 (Del. 1999)..............................................................54

*Gaillard v. Natomas Co.,*
   208 Cal. App. 3d 1250,
   256 Cal. Rptr. 702 (1989) ........................................................30, 31

*Gaines v. Haughton,*
   645 F.2d 761 (9th Cir. 1981) ..........................................................17

*Gerstle v. Gamble-Skogmo, Inc.,*
   478 F.2d 1281 (2d Cir. 1973) .........................................................16

*Grimes v. Donald,*
   673 A.2d 1207 (Del. 1996)........................................................38, 39

*Grobow v. Perot,*
   539 A.2d 180 (Del. 1988) ...............................................................39

*In re Abbott Labs. Derivative S'holders Litig.,*
   325 F.3d 795 (7th Cir. 2003) .....................................................*passim*

*In re Amgen Inc. Sec. Litig.,*
   544 F. Supp. 2d 1009 (C.D. Cal. 2008)......................................15, 20

593634_1

**Page**

*In re Asyst Techs., Inc. Derivative Litig.*,
   No. C-06-04669 EDL, 2008 WL 2169021
   (N.D. Cal. May 23, 2008)......................................................................34, 35, 36

*In re Asyst Techs., Inc. Derivative Litig.*,
   No. C-06-04669 EDL, 2008 WL 4891220
   (N.D. Cal. Nov. 12, 2008) ...............................................................................27

*In re Baxter Int'l*,
   654 A.2d 1268 (Del. Ch. 1995) ......................................................................39

*In re Caremark Int'l*,
   698 A.2d 959 (Del. Ch. 1996) ...................................................................33, 49

*In re Cendant Corp. Derivative Action Litig.*,
   189 F.R.D. 117 (D.N.J. 1999) ........................................................................51

*In re Cooper Cos., Inc. S'holders Derivative Litig.*,
   No. 12584, 2000 WL 1664167
   (Del. Ch. Oct. 31, 2000) .................................................................................53

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008)......................................15, 17, 19, 20

*In re Donna Karan Int'l Sec. Litig.*,
   No. 97-CV-2011 CBA, 1998 WL 637547
   (E.D.N.Y. Aug. 14, 1998) ...............................................................................21

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008).............................................................20, 21, 22

*In re HealthSouth Corp. S'holders Litig.*,
   845 A.2d 1096 (Del. Ch. 2003),
   *aff'd*, 847 A.2d 1121 (Del. 2004) .....................................................................36

*In re iBasis, Inc. Derivative Litig.*,
   532 F. Supp. 2d 214 (D. Mass. 2007).............................................................24

*In re infoUSA, Inc. S'holders Litig.*,
   953 A.2d 963 (Del. Ch. 2007) ............................................................39, 51, 52

593634_1

**Page**

*In re Marvell Tech. Group Ltd. Sec. Litig.*,
  No. C-06-06286 RMW, 2008 WL 4544439
  (N.D. Cal. Sept. 29, 2008) ...................................................... 41

*In re Maxim Integrated Prods.*,
  574 F. Supp. 2d 1046 (N.D. Cal. 2008) ...................................... 34, 35

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...................................... 16

*In re MRV Commc'ns, Inc. Derivative Litig.*,
  No. CV 08-03800 GAF (RCx), 2010 WL 5313442
  (C.D. Cal. Dec. 27, 2010) .............................................. *passim*

*In re Openwave Sys. S'holder Derivative Litig.*,
  503 F. Supp. 2d 1341 (N.D. Cal. 2007) ...................................... 38

*In re Oracle Corp. Derivative Litig.*,
  824 A.2d 917 (Del. Ch. 2004) .............................................. 53

*In re Oxford Health Plans, Inc.*,
  192 F.R.D. 111 (S.D.N.Y. 2000) .......................................... 45, 51

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
  No. 2:06-cv-5774 (SRC), 2009 WL 2043604
  (D.N.J. July 10, 2009) .................................................... 26

*In re SFBC Int'l, Inc. Sec. & Derivative Litig.*,
  495 F. Supp. 2d 477 (D.N.J. 2007) ........................................ 44

*In re Taser Int'l S'holder Derivative Litig.*,
  No. CV-05-123-PHX-SRB,
  2006 U.S. Dist. LEXIS 11554
  (D. Ariz. Mar. 17, 2006) .................................................. 48

*In re Tower Air, Inc.*,
  416 F.3d 229 (3d Cir. 2005) ...................................... 29, 45, 46, 54

*In re Veeco Instruments, Inc. Sec. Litig.*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2006) .................................... 47, 48

- vi -

593634_1

**Page**

*In re Zoran Corp. Derivative Litig.*,
511 F. Supp. 2d 986 (N.D. Cal. 2007) ........................................................*passim*

*Int'l Equity Capital Growth Fund, L.P. v. Clegg*,
No. Civ.A. 14995, 1997 WL 208955
(Del. Ch. Apr. 22, 1997)........................................................................... 40

*Int'l Ins. Co. v. Johns*,
874 F.2d 1447 (11th Cir. 1989)................................................................ 42

*Kahn ex rel. DeKalb Genetics Corp. v. Roberts*,
679 A.2d 460 (Del. 1996)......................................................................... 42

*Kamen v. Kemper Fin. Servs.*,
500 U.S. 90, 111 S. Ct. 1711,
114 L. Ed. 2d 152 (1991).......................................................................... 37

*Kelley v. Rambus, Inc.*,
No. C-07-01238 JF (HRL),
2008 WL 5170598 (N.D. Cal. Dec. 9, 2008),
*aff'd*, 384 F. App'x 570 (9th Cir. 2010) ................................................. 24

*King v. Baldino*,
648 F. Supp. 2d 609 (D. Del. 2009),
*aff'd*, 2010 U.S. App. LEXIS 25490
(3d Cir. Dec. 14, 2010)........................................................................ 49, 50

*Lectrodryer v. SeoulBank*,
77 Cal. App. 4th 723,
91 Cal. Rptr. 2d 881 (2000)...................................................................... 36

*Malone v. Brincat*,
722 A.2d 5 (Del. 1998)........................................................................ 29, 52

*McCall v. Scott*,
239 F.3d 808 (6th Cir. 2001)................................................................... 46

*Melchior v. New Line Prods., Inc.*,
106 Cal. App. 4th 779,
131 Cal. Rptr. 2d 347 (2003)................................................................... 36

- vii -

**Page**

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.,*
  854 A.2d 121 (Del. Ch. 2004) ........................................................................ 41

*Miller v. AT&T,*
  507 F.2d 759 (3d Cir. 1974) .......................................................................... 42

*Mills Acquisition Co. v. MacMillan, Inc.,*
  559 A.2d 1261 (Del. 1989) ............................................................................ 51

*Mills v. Elec. Auto-Lite Co.,*
  396 U.S. 375, 90 S. Ct. 616,
  24 L. Ed. 2d 593 (1970) ......................................................................... 15, 27

*Mizel v. Connelly,*
  No. Civ.A. 16638, 1999 WL 550369
  (Del. Ch. Aug. 2, 1999) ................................................................................ 40

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000) .......................................................................... 17

*Pereira v. Cogan,*
  294 B.R. 449 (S.D.N.Y. 2003),
  *vacated on other grounds,* 413 F.3d 330
  (2d Cir. 2005) ................................................................................................ 41

*Rales v. Blasband,*
  634 A.2d 927 (Del. 1993) ......................................................................*passim*

*Ret. Sys. v. Coulter,*
  No. Civ.A. 19191, 2002 WL 31888343
  (Del. Ch. Dec. 18, 2002) ............................................................................... 42

*Rhoades v. Powell,*
  644 F. Supp. 645 (E.D. Cal. 1986),
  *aff'd without op.,* 961 F.2d 217
  (9th Cir. 1992) .............................................................................................. 27

*Ryan v. Gifford,*
  918 A.2d 341 (Del. Ch. 2007) .................................................................*passim*

- viii -

593634_1

**Page**

*Ryan v. Lyondell Chem. Co.*,
   No. 3176-VCN, 2008 WL 4174038
   (Del. Ch. Aug. 29, 2008) ......................................................................48, 54

*Sanders v. Wang*,
   No. 16640, 1999 Del. Ch. LEXIS 203
   (Del. Ch. Nov. 8, 1999) ................................................................................42

*Sanders v. Wang*,
   No. 16640, 1999 WL 1044880
   (Del. Ch. Nov. 8, 1999) ................................................................................20

*Shaffer v. Heitner*,
   433 U.S. 186, 97 S. Ct. 2569,
   53 L. Ed. 2d 683 (1977) ................................................................................29

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) ..............................................................................30

*Swingless Golf Club Corp. v. Taylor*,
   679 F. Supp. 2d 1060 (N.D. Cal. 2009) ......................................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499,
   168 L. Ed. 2d 179 (2007) ..............................................................................15

*TSC Indus. v. Northway, Inc.*,
   426 U.S. 438, 96 S. Ct. 2126,
   48 L. Ed. 2d 757 (1976) ................................................................................16

*Wall St. Sys., Inc. v. Lemence*,
   No. 04 Civ. 5299 (JSR),
   2005 WL 292744 (S.D.N.Y. Feb. 8, 2005) ............................................17, 18

*Weisberg v. Coastal States Gas Corp.*,
   609 F.2d 650 (2d Cir. 1979) ..........................................................................23

593634_1

**Page**

*Westinghouse Elec. Corp. v. Franklin*,
    789 F. Supp. 1313 (D.N.J. 1992),
    *rev'd on other statute-of-limitations grounds*,
    993 F.2d 349 (3d Cir. 1993) ...................................................................21

*Wilson v. Great Am. Indus.*,
    855 F.2d 987 (2d Cir. 1988) ..................................................................16

*ZRii, LLC v. Wellness Acquisition Grp., Inc.*,
    No. 4374-VCP, 2009 WL 2998169
    (Del. Ch. Sept. 21, 2009) ......................................................................29


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78 ..................................................................................................25, 28
    §78n(a) ...................................................................................................15
    §78cc .....................................................................................................15

21 U.S.C.
    §331(a) ...................................................................................................12
    §352(a) ............................................................................................*passim*
    §352(f)(1) ...............................................................................................12

28 U.S.C.
    §1658(b) .................................................................................................25
    §1658(b)(1) ............................................................................................25

31 U.S.C.
    §3729 .............................................................................................10, 11
    §3730 .............................................................................................10, 11
    §3731 .............................................................................................10, 11
    §3732 .............................................................................................10, 11
    §3733 .............................................................................................10, 11

593634_1

**Page**

California Corporations Code
 §309 ...............................................................................................28, 30
 §25402 ..........................................................................................33, 34
 §25402 ................................................................................................35
 §25502.5 .............................................................................................35

Delaware General Corporation Law
 §102(b)(7) ...........................................................................................54

Federal Rules of Civil Procedure
 Rule 8....................................................................................................29, 42
 Rule 8(a) .............................................................................................16
 Rule 9(b) ...........................................................................................17, 29
 Rule 12(b)(6) ......................................................................................15

17 C.F.R.
 §240.14a-9 .........................................................................................15


**SECONDARY AUTHORITIES**

Dennis J. Block, Nancy E. Barton & Stephen A. Radin,
 *The Business Judgment Rule: Fiduciary Duties of Corporate Directors*
 (4th ed. 1995)......................................................................................42

S. Samuel Arsht,
 *The Business Judgment Rule*, 8 Hofstra L. Rev. 93 (1979) ...............42

Richard W. Jennings & Harold Marsh, Jr.,
 *Securities Regulation: Cases and Materials* (3d ed. 1972)................16

593634_1

## I.   INTRODUCTION

Plaintiffs Willa Rosenbloom, Daniel Himmel, Pompano Beach Police & Firefighters' Retirement System and Western Washington Laborers-Employers Pension Trust (collectively, "plaintiffs"), by and through their undersigned attorneys, hereby respectfully submit this omnibus opposition to Nominal Defendant Allergan, Inc.'s Motion to Dismiss the Consolidated Complaint ("Allergan Mem.") and the Individual Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint ("Defs' Mem.").[1]  Plaintiffs' [Corrected] Verified Shareholder Derivative Consolidated Complaint for Violations of the Federal Securities Laws, Violations of California Corporations Code, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment ("Complaint") sufficiently pleads the claims alleged and raises a reasonable doubt regarding the disinterestedness and independence of Allergan's Board of Directors (the "Board"), rendering any pre-suit demand in this shareholder derivative action (the "Action") a futile gesture.[2]  Therefore, defendants' motions to dismiss should be denied in their entirety.

This derivative action seeks relief on behalf of Allergan for the severe harm that its directors and officers caused by sanctioning, implementing, and failing to disclose a long-term Company-wide scheme to violate criminal and civil drug marketing laws.

---

[1]     Because the issues of demand futility and adequacy of pleading are inextricably intertwined, plaintiffs respond to Allergan, Inc.'s ("Allergan" or the "Company") motion to dismiss and the Individual Defendants' motion to dismiss in this single omnibus opposition.  In its November 29, 2010 Order Regarding the Extension of Page Limits and Briefing Schedule, this Court ordered that plaintiffs have 35 pages to respond for **each** of defendants' three motions.  Consistent with the order, this omnibus opposition to **two** of defendants' motions does not exceed 70 pages.

[2]     The "Individual Defendants" are David E.I. Pyott ("Pyott"), Herbert W. Boyer ("Boyer"), Gavin S. Herbert ("Herbert"), Leonard D. Schaeffer ("Schaeffer"), Michael R. Gallagher ("Gallagher"), Stephen J. Ryan ("Ryan"), Russell T. Ray ("Ray"), Trevor M. Jones ("Jones"), Robert A. Ingram ("Ingram"), Louis J. Lavigne, Jr. ("Lavigne"), Deborah Dunsire ("Dunsire"), Dawn Hudson ("Hudson"), Handel E. Evans ("Evans"), Ronald M. Cresswell ("Cresswell"), Louis T. Rosso ("Rosso"), Karen R. Osar ("Osar") and Anthony H. Wild ("Wild").

593634_1

1    This scenario presents a textbook example of why Delaware and other jurisdictions

2    have developed the demand futility doctrine.  Equitable principles are born from

3    conscience, and stockholder plaintiffs should not be forced to proceed with empty and

4    futile ceremonies.  The facts alleged in the Complaint demonstrate that the Company's

5    Board could not have properly, dispassionately and disinterestedly considered a pre-

6    suit demand.  The Board knew or was recklessly unaware of the unlawful marketing

7    scheme for years, and the Individual Defendants' empty assertion now, that they

8    would have properly performed their duties had plaintiffs simply demanded it of them,

9    rings hollow.  Indeed, the Board was on notice for nearly ten years of the Company's

10   unlawful (albeit very profitable) scheme and failed to do anything to stop it.  The

11   Board cannot now be trusted to impartially consider a demand by plaintiffs.

12        The Board was comprised of 12 directors at the time this Action was initiated.[3]

13   Thus, Allergan's motion, brought on demand-futility grounds, must be denied if the

14   Court has a "***reason to doubt***" that at least six of the Director Defendants could have

15   properly considered a demand.  Plaintiffs satisfy the well-known "reasonable doubt"

16   standard because every Director Defendant is interested in the consideration of any

17   such demand and/or lacks independence, as set forth herein.  Plaintiffs' allegations,

18   particularly when considered in whole, easily create the "reasonable doubt" necessary

19   to defeat Allergan's motion.

20        Where director defendants face a substantial likelihood of liability, demand is

21   excused.  Here, the Director Defendants consciously implemented or permitted a

22   criminal business strategy to engage in the illegal, off-label marketing of the

23

24

25   _____

26   [3]      When the Action was initiated, the Board was comprised of the following
     "Director Defendants": Boyer, Dunsire, Gallagher, Herbert, Hudson, Ingram, Jones,
27   Lavigne, Pyott, Ray, Ryan and Schaeffer.

28

593634_1

Company's flagship product, Botox® ("Botox").[4]  By virtue of a multitude of "red flags," including numerous, well-publicized warning letters from the U.S. Food and Drug Administration ("FDA"),[5] the Board was undeniably well-aware of what was occurring at Allergan.  Indeed, at least one FDA warning letter, issued on September 5, 2002, was publicly commented on by Allergan and Director Defendant Pyott in a press release dated September 12, 2002 (the "September 12, 2002 Press Release"). Notably, half of the Director Defendants – Pyott, Boyer, Herbert, Schaeffer, Gallagher and Ryan – have served on the Board since September 2002 or prior thereto.  ¶¶27-32.[6]

In essence, the Director Defendants adopted the violation of federal law as a commercial strategy and gambled (with stockholders' money) that the consequences would be inconsequential.  They were wrong, and they must now be held accountable for that decision.  The business judgment rule does not protect bad-faith decisions, and it prohibits a director's decision to embrace an illegitimate business strategy in the hope that the profit will ultimately exceed the cost of the fallout.

In addition to repeated FDA warning letters issued from at least 2000 to 2009, between 2005 and 2007, the Company became the subject of an inquiry from the French government (which directly alleged that the off-label use of Botox resulted in deaths), an investigation by the Federal Bureau of Investigation ("FBI") and the first of multiple *qui tam* lawsuits (which would continue to be filed against the Company through 2009).  *See* §II.  Despite the myriad investigations and lawsuits, the Board did

---

[4]     Not only is the condoning and promoting of off-label marketing of drugs illegal, it presents an extreme health risk for the public, a fact of which the Director Defendants were well aware, as detailed herein.

[5]     The FDA publicly releases copies of its warning letters including those issued to Allergan on August 22, 2001, June 23, 2003, September 6, 2005 and August 17, 2009, on its website at http://www.fda.gov/ICECI/Enforcement Actions/Warning Letters.

[6]     Paragraph references ("¶__" or "¶¶__") are to the Complaint.

1    nothing to prevent the pervasive off-label marketing of Botox, which ultimately forced

2    the Company to pay well over a **_half-billion dollars_** to resolve civil and criminal

3    claims against it based on conduct that continued as late as December 31, 2009.

4         Unfortunately for the Director Defendants, breaking the law is not a legally

5    protected business decision, and such conduct is not, and cannot be, considered a valid

6    exercise of business judgment.  Directors who consciously look the other way in the

7    face of illegal conduct and permit that conduct to continue despite years of serious

8    governmental warnings and lawsuits face a substantial likelihood of liability and

9    cannot properly and impartially consider a pre-suit demand for action to correct the

10   harms caused by their own acts and omissions.  Accordingly, defendants' motions

11   should be denied in their entirety.

12   **II.    FACTUAL BACKGROUND**

13        **A.    The Company, Its Business and Its Flagship Product**

14        According to its public filings, Allergan is a global, multi-specialty health-care

15   company.    ¶26(a).    The Company specializes in manufacturing specialty

16   pharmaceuticals (primarily eye care, skin care and "neuromodulators") and medical

17   devices (primarily breast implants, gastric bands for obesity surgery and injectable

18   dermal fillers used on facial wrinkles). *Id.*

19        As acknowledged repeatedly by defendants, Botox is Allergan's flagship

20   product, and its importance to Allergan's bottom line cannot be overstated.  The

21   significance of the Botox product line to Allergan is undisputed and was well known

22   to defendants, including the Director Defendants.  ¶65.  Botox has been one of

23   Allergan's top-selling (and industry-leading) products for nearly a decade and has

24   comprised a material source of revenue for the Company during that time frame.

25   During the years 2000 to 2009, Allergan's total net sales of Botox were between $240

26   million and $1.31 billion.    ¶65.    During that time period, Botox sales were

27   approximately 34% of the Company's total sales. *Id.*  Anything greater than $1 billion

28

- 4 -

1    in annual sales is an important milestone for any pharmaceutical company, and if a

2    product crosses this mark, it is considered a "blockbuster" drug/product.

3            **B.      Overview of the FDA Approval Process and the FDCA**

4            Toward the end of the drug development process, pharmaceutical companies

5    such as Allergan must submit drugs for approval to the FDA.   ¶3.   When a

6    pharmaceutical company submits a drug to the FDA for approval, it has to specify the

7    particular purpose (or purposes) for which the drug is to be used. *Id*. Usually, there is

8    extensive testing of the drug to support its use for such purpose(s). *Id*. If the FDA

9    finds that the drug's benefits outweigh the risks, the FDA approves its use for the

10   specified purpose. *Id*. The specific approved use is called the "indication" for which

11   the drug may be prescribed. *Id*. The FDA specifies particular dosages determined to

12   be safe and effective for each indication. *Id*.

13           Although the FDA may approve a drug for a particular use, doctors are free to

14   prescribe that drug for other uses, known as "off-label" uses. ¶4.[7] Naturally, off-label

15   prescriptions of a drug can significantly increase its usage and, correspondingly, the

16   income to the pharmaceutical manufacturer of the drug. *Id*. The Food, Drug, and

17   Cosmetic Act ("FDCA"), however, specifically prohibits pharmaceutical companies

18   from ***promoting*** the off-label use of its drugs and from making misleading claims as to

19   a drug's safety or effectiveness. *Id*. The distinction between what a doctor can

20   lawfully prescribe of his/her own volition and the manner in which a pharmaceutical

21   company markets a drug is critical and was well-understood by defendants, including

22   the Director Defendants.   Indeed, it is one of the bases of the entire modern

23   pharmaceutical regulatory scheme.

24

25   _____

26   [7]     Off-label sales are a controversial topic in modern medicine for the obvious
     reason that there are myriad dangers which can arise from prescribing a drug for
27   unapproved, and often untested, uses. *Id*.

28

593634_1

Accordingly, the penalties for violating the FDCA are harsh. ¶5. In addition to substantial criminal and civil penalties and fines, violators of the FDCA can be excluded from participation in the Medicare and Medicaid programs. *Id.* The exclusion from these government-run insurance programs (known in the industry as "debarment") would cripple virtually any medical company, as the Company would no longer have access to the largest potential source of revenues. *Id.*

### C. Defendants Consciously Permitted an Illicit Scheme to Inflate Sales of Botox Through Off-Label Prescriptions

In order to maximize Botox sales, defendants devised, implemented and allowed a long-term, Company-wide scheme to convince medical providers to prescribe Botox in unapproved ways. ¶6. Defendants were aware that the marketing and promotional practices in which they caused Allergan to engage were improper and violated applicable federal laws. ¶¶6-7, 50, 77-80, 106. Indeed, defendants were notified of these improper and illegal practices on numerous occasions over nearly a decade and still did not stop them. ¶¶6-9, 79-80, 106.

First, on August 22, 2001, defendants received a letter informing them that the FDA had reviewed Allergan's Botox "promotional activities and materials and . . . concluded that they are misleading and lacking in fair balance within the meaning of 21 U.S.C. §352(a) of the [FDCA]." ¶79. The letter referenced previous FDA objections "***to these activities in Review Memoranda dated December 12, 1998 and September 25, 2000, and untitled letters dated November 7, 2000, February 14, 2001, and April 12, 2000***." *Id.*[8] Notably, defendants did not affirmatively disclose the August 22, 2001 warning letter, and publicly commented on the letter only when

---

[8] Emphasis is added and citations are omitted throughout unless otherwise noted.

- 6 -

they were forced to by the press.  ¶¶7, 79-80, 106; Plaintiffs' Request for Judicial

Notice filed herewith ("RJN"), Exs. C-E, H.[9]

On September 5, 2002, Allergan received another FDA letter (referred to as an

"untitled letter") concerning "misleading statements" made in connection with Botox

promotional materials.  RJN, Ex. I.  As with the August 22, 2001 FDA warning letter,

defendants responded only when prompted by press reaction to the news.   On

September 12, 2002, defendants caused Allergan to issue the September 12, 2002

Press Release concerning the September 5, 2002 FDA letter, with Director Defendant

Pyott quoted as stating:

> "In recent media accounts, the impression has been given that
> Allergan intends to 'take on the FDA' over the September 5 letter. This
> is incorrect. Allergan has the highest regard for the FDA and for its
> division, the Center for Biologics Evaluation and Research (CBER), with
> which Allergan has worked productively for many years," explained
> David E.I. Pyott, Allergan's Chairman of the Board, President and
> CEO. . . . "CBER has raised some concerns about some of our material,
> which is their right as it is our right to provide a detailed written response

---

[9]     Exhibit H is an article from the *Los Angeles Times*, dated September 5, 2001, entitled "FDA Warns Allergan About Claims" (the "September 5, 2001 LA Times Article").  In the September 5, 2001 LA Times Article, Allergan's spokeswoman, Christine Cassiano, is quoted as stating "[a]ny time we get a request from the FDA, our first concern is to make sure we comply."  RJN, Ex. H.  As alleged in the Complaint and as borne out by the history of events alleged therein, defendants did not cause Allergan to comply.  However, Ex. H documents that the existence of the August 22, 2001 FDA Letter was well known within Allergan.  It is unfathomable that the Board was not on notice of the August 22, 2001 FDA Letter.  Nevertheless, a review of Allergan's filings with the U.S. Securities and Exchange Commission ("SEC") has revealed that the majority of the FDA letters Allergan received were not affirmatively disclosed by the Company.  For example, it is only in the SEC Forms 10-K Allergan filed for fiscal years 2007 and 2008, that it is disclosed that Allergan received one warning letter in May 2007 from the FDA stating that Allergan had submitted false and misleading journal advertisements for Acular LS® (which indicates that the Board was indeed aware of such allegations).  However, the other FDA warning letters were not disclosed in any Form 10-K.

- 7 -

593634_1

1    for their review.  I am quite confident that we will be able to address

2    CBER's concerns to their complete satisfaction, as we have always done

3    in the past."

4          It would be premature for Allergan to make any decision about the

5    untitled letter without providing the FDA with a response and engaging

6    in a meaningful discussion with the FDA.  This is the normal process

7    after a routine review and comment by the FDA on promotional items.

8    If, after discussions with the FDA, changes to marketing material are

9    ultimately required, Allergan will of course make those changes.

10   RJN, Ex. G.  The September 12, 2002 Press Release documents that the Board was

11   fully aware of the September 5, 2002 FDA letter, and was on notice that the FDA

12   found Allergan's promotional materials for Botox to be misleading.  Notably, a

13   majority of the Director Defendants – Pyott, Boyer, Herbert, Schaeffer, Gallagher and

14   Ryan – were members of the Board in September 2002 (or earlier).  ¶¶27-32.

15         Despite the promises made by Pyott on Allergan's behalf in the September 12,

16   2002 Press Release, defendants continue to cause or permit Allergan to violate the

17   FDCA.  Indeed, defendants received another FDA warning letter on June 23, 2003

18   again informing them that several of Allergan's "advertisements are false and/or

19   misleading because they falsely identify [Botox] as a cosmetic treatment, fail to reveal

20   material facts about the product's use, and minimize the risk information presented."

21   ¶80.  This letter also referenced the earlier September 5, 2002 letter issued by the

22   FDA.  *Id.*  Notably, despite defendants' contentions to the contrary, as a matter of

23   law,[10] the Director Defendants cannot claim that they were somehow unaware[11] of the

---

25   [10]    As discussed *infra*, the publication of a company's problems can serve as the
26   basis for a reasonable inference of knowledge on the board's behalf.  *See, e.g., In re
     Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 809 (7th Cir. 2003).

27   [11]    This is indeed a bizarre argument for the Board to offer to demonstrate that they
28   acted in good faith – are they saying that journalists knew what was occurring inside the

593634_1

1  June 23, 2003 FDA warning letter because it was publicized by the media, and

2  certainly not the September 5, 2002 FDA letter upon which Director Defendant Pyott

3  commented in the September 12, 2002 Press Release.  RJN, Exs. A-B, G.

4       On September 6, 2005, another FDA warning letter was sent to defendant Pyott

5  informing him of the misbranding of Lumigan® by distributing sales aids that are

6  misleading in violation of the FDCA.  ¶106.  Yet another FDA warning letter was sent

7  to Pyott in 2009 regarding the Company's misleading advertising of ACZONE®.  *Id.*

8       Also in 2005, the French government, acting on behalf of the European

9  Medicines Agency, sent a letter to Allergan in which it described reports that the

10  spread of botulinum toxin beyond the injection site had caused aspiration and death

11  among patients using Botox.  ¶107.  In a confidential response to the French

12  government dated September 16, 2005, defendants admitted that Allergan's own

13  internal database contained 436 "serious adverse event" reports related to the use of

14  Botox.  *Id.*

15       Despite these warnings, which went undisclosed, defendants took no action to

16  prevent the widespread, illegal, improper, and dangerous off-label sales and marketing

17  practices at Allergan.  ¶9.  In particular, under defendants' direction, the Company

18  continued to engage in a decade-long comprehensive scheme to misbrand Botox and

19  other drugs.  ¶7.  As discussed herein, the Board's systematic disregard of the law was

20  conscious and blatant.  *Id.*  Under defendants' direction, the size of the Company's

21  support staff assisting doctors in obtaining payment for off-label Botox use was

22  doubled.  *Id.*  Company-wide initiatives to expand Botox's off-label use were

23  implemented (including coordinated efforts by three different divisions in the

24

25  Allergan while the Board did not?  *See* Allergan Mem. at 3.  This is especially

26  perplexing because the Director Defendants specifically told Allergan stockholders
   that they were required to closely monitor the precise issue – the legal marketing of

27  the Company's products – that caused the Company to later suffer over a half-billion
   dollars in damages.

28

- 9 -

Company) and allegedly "independent" educational organizations were created that promoted the off-label use of Botox and paid doctors to attend elaborate dinners and retreats focused on off-label uses for Botox.  *Id.*

### D. Numerous *Qui Tam* Actions Were Filed Against Allergan, Prompting FBI and DOJ Action

In 2007, the first of several "whistleblowers" filed a *qui tam* action against the Company.  Two other *qui tam* suits followed in 2008 and 2009.  The *qui tam* suits against Allergan include:

- *United States ex rel. Lang, et al. v. Allergan, Inc.*, Case No. 1:07-cv-01288 (N.D. Ga. June 5, 2007), alleging violations of the False Claims Act, 31 U.S.C. §§3729-3733 ("Civil Action I");

- *United States ex rel. Beilfuss, et al. v. Allergan, Inc.*, Case No. 1:08-cv-10305 (D. Mass. Feb. 22, 2008), alleging violations of the False Claims Act, 31 U.S.C. §§3729-3733 ("Civil Action II"); and

- *United States ex rel. Hallivis v. Allergan, Inc.*, Case No. 8:09-cv-02817 (D. Md. Oct. 26, 2009), alleging violations of the False Claims Act, 31 U.S.C. §§3729-3733 ("Civil Action III").[12]

In 2007, shortly after Civil Action I was filed, the FBI began an investigation into the Company's activities.  ¶112.  The Board was undeniably aware of the filing of the Civil *Qui Tam* Actions shortly after they were commenced.  Further, while only discovery will ultimately reveal the exact date that the Board was aware of the FBI investigation, the Board certainly was aware by March 2008 of the criminal investigation given that the Company issued a press release on March 3, 2008 announcing that it had received a subpoena from the U.S. Department of Justice

---

[12]     Civil Action I, Civil Action II and Civil Action III are collectively referred to herein as the "Civil *Qui Tam* Actions."

593634_1

1  ("DOJ") requesting documents concerning promotional practices involving Botox.

2  RJN, Ex. L.

**E.      Allergan Is Forced to Pay $600 Million in Civil and
         Criminal Penalties as a Result of Defendants' Misconduct**

Ultimately, the DOJ intervened on behalf of the Untied States in Civil Action I

and Civil Action II on April 2, 2010.  ¶10.  On August 31, 2010, a settlement

agreement was entered between the United States, the individuals who filed the Civil

*Qui Tam* Actions as "relators" and Allergan (the "Settlement Agreement"). ¶11. The

Settlement Agreement addresses defendants' conduct from January 1, 2001 through

December 31, 2008 (the "Covered Conduct Period") (with the Covered Conduct

Period running through December 31, 2009 for certain conduct specifically relating to

Botox), during which, under defendants' direction: (i) Botox was promoted for off-

label indications that were not medically accepted and therefore not covered by

federal health-care programs; (ii) unsubstantiated and misleading statements were

issued about the safety and efficacy of Botox for off-label indications; (iii) doctors

were instructed to miscode Botox claims for uncovered indications using

inappropriate diagnosis codes to ensure payment by government health-care

programs; and (iv) inducements were provided to doctors to promote and/or prescribe

more Botox (collectively referred to as the "Covered Conduct").  *Id.*

The Settlement Agreement sets forth in detail the lengths to which defendants

went in order to cause false or fraudulent claims for Botox to be submitted to, or

caused to be purchased by, the Medicare Program, the Medicaid Program and certain

defined "Other Federal Health Care Programs."  ¶12.  The Settlement Agreement

required the Company to pay ***$225 million*** (plus accrued interest) to the federal

government and various state governments (referred to in the Settlement Agreement

as the "Medicaid Participating States").  *Id.*  Allergan also agreed to plead guilty to a

1   criminal misdemeanor for misbranding Botox in violation of the FDCA. *Id.* No

2   individuals at Allergan were held accountable for their conduct.[13]

3          Further, on August 30, 2010, the Company entered into a five-year corporate

4   integrity agreement (the "CIA") with the U.S. Department of Health and Human

5   Services' Office of Inspector General (the "OIG").  ¶13.  Under the CIA, the

6   Company is now obligated to submit compliance reports to the OIG and undertake

7   additional compliance-related activities, such as additional monitoring, auditing and

8   training. *Id.*

9          On September 1, 2010, the DOJ filed a Criminal Information (the

10  "Information") against Allergan in the U.S. District Court for the Northern District of

11  Georgia in an action entitled *U.S.A. v. Allergan, Inc.*, No. 1:10-CR-375 (N.D. Ga.,

12  filed Sept. 1, 2010) (the "Criminal Action").  ¶14.  The Information charges the

13  Company with "Distribution of a Misbranded Drug/Biologic" in violation of multiple

14  provisions of the FDCA (including 21 U.S.C. §§331(a) and 352(f)(1)) during the

15  period from January 1, 2000 through December 31, 2005. *Id.* On October 5, 2010,

16  Allergan entered a Guilty Plea and Plea Agreement ("Guilty Plea"), where it admitted

17  that "it is in fact guilty of the crime charged in Count One of the Criminal

18  Information" during the period from 2000 through 2005 (the "Criminal Conduct"). *Id.*

19  Allergan agreed to pay a criminal fine of ***$375 million*** in connection with its Guilty

20  Plea. *Id.*

21

22

23  [13]      Incredibly, even after all of the above-referenced "red flags" (*i.e.*, the warning

24  letters, the Civil *Qui Tam* Actions, the FBI investigation and the French government investigation) were revealed, not only did the Board fail to do anything concerning the

25  allegations, but it actually handsomely rewarded the Company's senior executive officers (including defendant Pyott). Specifically, according to the Company's proxy

26  statement filed with the SEC on March 12, 2010, between 2007 and 2009, the Board awarded over ***$75 million*** in compensation to the Company's Section 16 officers (with

27  over ***$37 million*** being awarded to defendant Pyott himself).  RJN, Ex. E.  Further, none of this compensation was ever "clawed back" by the Board.

28

- 12 -

1   Allergan's core business rests upon the marketing of its drugs not only to
2   consumers but also to doctors. ¶15.  As noted by the DOJ's September 1, 2010 press
3   release (the "DOJ Press Release") announcing the $600 million in sanctions and fines
4   (the "Civil and Criminal Settlements") to resolve the Civil *Qui Tam* Actions and the
5   Criminal Action: "Allergan made it a ***top corporate priority*** to maximize sales of
6   Botox for off-label uses." *Id*.  In order to accomplish this task, defendants consciously
7   caused and permitted Allergan to openly violate and evade the legal marketing
8   restrictions applicable to its products pursuant to the FDCA. *Id*.

9   The DOJ Press Release also quoted Daniel R. Levinson, Inspector General of
10  the U.S. Department of Health and Human Services, as saying: "Fraudulent marketing
11  of drugs through off-label promotion or kickbacks to prescribers undermines the
12  protections afforded by the drug approval process and medical decision-making.  This
13  conduct will not be tolerated." ¶16.  Also quoted in the DOJ Press Release was Brian
14  D. Lamkin, Special Agent in Charge, FBI Atlanta, who noted:

15      "This was a complex investigation that required much in terms of
16      investigative resources in order to conduct the many interviews and
17      document reviews needed to get us where we are today. . . .  The FBI,
18      through its vast experience investigating health care fraud, is not only
19      able to provide such resources, but is also able to recognize which
20      circumstances need those resources the most. ***The off-label marketing***
21      ***tactics employed by Allergan was one of those aforementioned***
22      ***circumstances***."

23  *Id*.  As further explained by the U.S. Attorney in the DOJ Press Release:

24      Under the [FDCA], a company in its application to the FDA must
25      specify each intended use of a biological product.  After the FDA
26      approves the product as safe and effective for a specified use, any
27      promotion by the manufacturer for other uses – known as "off-label"
28      uses – renders the product misbranded.

- 13 -

*     *     *

"The FDA had approved therapeutic uses of Botox for only four rare conditions, yet ***Allergan made it a top corporate priority to maximize sales of far more lucrative off-label uses that were not approved by FDA***. . . . Allergan further demanded tremendous growth in these off-label sales year after year, even when there was little clinical evidence that these uses were effective. The FDA approval process ensures that pharmaceutical companies market their medications for uses that are proven to be effective, and this case demonstrates that companies that fail to comply with these rules face criminal prosecution and stiff penalties."

¶17.

As a result of defendants' illegal scheme to boost Botox sales via off-label sales and marketing, the Company has been forced to pay ***$600 million*** (excluding any applicable interest) to resolve both the Criminal Action and the Civil *Qui Tam* Actions via the Civil and Criminal Settlements. ¶18. Despite this, while their illicit scheme was ongoing, defendants touted their "corporate integrity." ¶¶50-54. In Allergan's Code of Conduct (the "Code of Conduct"), defendants represented that "[o]ne simple reason for upholding the law is that our continued success as a company depends on it." ¶50.

Accordingly, all of the defendants (and, in particular, the Director Defendants) were duty bound to act swiftly when they received notice of potential problems directly associated with the Company's marketing, particularly considering that debarment is a potentially catastrophic issue. Thus, to the extent that any of the defendants were unaware of the scheme at its onset – which is, as alleged in the Complaint, completely implausible – they were duty bound to affirmatively act upon its discovery. They did not do so. As a result, Allergan has suffered massive losses

- 14 -

1  while the Company's senior officers have been unjustly enriched.  ¶¶109-110, 170-

2  174.

3  **III.    THE COMPLAINT STATES CLAIMS AS TO ALL COUNTS**

4        In considering the sufficiency of a complaint asserting violations of the federal

5  securities laws under Fed. R. Civ. P. 12(b)(6), the court must accept plaintiff's

6  allegations as true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.

7  Ed. 2d (2007); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.

8  Ct. 2499, 168 L. Ed. 2d 179 (2007); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009

9  (C.D. Cal. 2008).   Here, as demonstrated below, the Complaint adequately states

10  claims for relief arising under §§14(a) and 29(b) of the Securities Exchange Act of

11  1934 ("Exchange Act") for breach of fiduciary duty, insider selling, corporate waste

12  and unjust enrichment.

13        **A.    The Complaint Adequately Pleads Violations of Section
              14(a)**

14
15              **1.    The Legal Standard for Section 14(a) Claims**

16        Section 14(a) and Rule 14a-9 prohibit a false or misleading declaration of

17  material fact in a statement soliciting a proxy, or an omission of material fact that

18  makes any portion of the proxy statement misleading.   15 U.S.C. §78n(a); *In re

19  Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008).  To

20  plead a claim under §14(a), plaintiffs must allege that: (a) defendants made a material

21  misrepresentation or omission in a proxy statement; (b) the statement omits a material

22  fact which was necessary to make the statement not false or misleading or which was

23  required to be disclosed by SEC regulations; (c) the misstatement or omission of a

24  material fact was the result of knowing, reckless or negligent conduct; and (d) the

25  proxy solicitation was an essential link in effecting corporate action.  *See Mills v.

26  Elec. Auto-Lite Co.,* 396 U.S. 375, 385, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970).

27        The touchstone of a §14(a) violation is a material misstatement – something

28  "***that a reasonable shareholder would consider . . . important in deciding how to***

593634_1

1   *vote*." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d

2   757 (1976).   Material information is information that, if disclosed in a proxy

3   statement, would likely be viewed by a reasonable investor as having "significantly

4   altered the 'total mix' of information made available." *Id.*

5        Claims under §14(a) are not subject to any requirement that a plaintiff

6   demonstrate scienter – rather, they are subject to the pleading standards of Fed. R.

7   Civ. P. 8(a), and mere negligence is sufficient to establish liability.  *In re McKesson*

8   *HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1265-66 (N.D. Cal. 2000) (finding

9   officers and directors liable under §14(a) negligence standard); *see Gerstle v. Gamble-*

10  *Skogmo, Inc.*, 478 F.2d 1281, 1301 (2d Cir. 1973) (Friendly, C.J.) (holding that

11  plaintiffs "are not required to establish any evil motive or even reckless disregard of

12  the facts").[14]  Indeed, the mere "preparation of a proxy statement by corporate insiders

13  containing materially false or misleading statements or omitting a material fact is

14  sufficient to satisfy the *Gerstle* negligence standard." *Wilson v. Great Am. Indus.*, 855

15  F.2d 987, 995 (2d Cir. 1988).

16       Nevertheless, defendants attempt to impose heightened pleading requirements

17  on plaintiffs' §14(a) claims.  Defs' Mem. at 12-13 & n.6.  In so doing, defendants

18  argue that heightened pleading requirements apply because plaintiffs' §14(a) claims

19  purportedly "sound in fraud." *Id.* at 12 n.6.  Defendants seek to require a showing that

20  far exceeds the relevant and applicable legal standards.  Where, as here, the complaint

21  does not attribute the material omissions from the proxy statements to fraudulent

22  intent or a similar state of mind, mere negligence is required to state a claim for

23  violation of §14(a).  *See DCML LLC v. Danka Bus. Sys. PLC*, No. 08 Civ. 5829

24

25  [14]   Some commentators have suggested that, by the clear text of §14(a), "[i]t would
26  appear that the liability of the corporation issuing a materially false or misleading
    proxy statement is virtually absolute, as under Section 11 of the 1933 Act with respect
27  to a registration statement."  Richard W. Jennings & Harold Marsh, Jr., *Securities*
    *Regulation: Cases and Materials* 1358 (3d ed. 1972).

28

593634_1

(SAS), 2008 WL 5069528, at *1 (S.D.N.Y. Nov. 26, 2008); *see also Beck v. Dobrowski*, 559 F.3d 680, 681-82 (7th Cir. 2009) (Posner, J.) (explaining that "negligence is not a state of mind").[15]

Moreover, even if plaintiffs' §14(a) claims were subject to heightened particularity requirements, the Complaint amply satisfies those standards as well. Under Fed. R. Civ. P. 9(b), a complaint must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Wall St. Sys., Inc. v. Lemence*, No. 04 Civ. 5299 (JSR), 2005 WL 292744, at *1 (S.D.N.Y. Feb. 8, 2005) (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). As illustrated below with respect to each aspect of defendants' material misstatements in, and omissions from, the proxy statements, the Complaint satisfies every element of the particularity requirement.

## 2. Allergan's Proxy Statements Were Materially False and Misleading

Allergan's proxy statements, filed with SEC on Form DEF 14A on or about March 20, 2008, March 19, 2009 and March 12, 2010, each contained materially inaccurate and incomplete disclosures. *See* RJN, Exs. C-E. They were materially misleading because, while defendants touted the Company's purported systems in place to ensure legal compliance, they completely failed to disclose any information which would impart to Allergan shareholders that the key driving force behind the

---

[15]   Defendants also assert that plaintiffs' §14(a) claim is not properly brought as a derivative claim. As this District has already held, this is incorrect. "It is well established that such a claim may be brought derivatively, because 'interference with the processes of corporate democracy results in direct harm to the corporation [as well as] to shareholders who were actually deceived.'" *Countrywide*, 554 F. Supp. 2d at 1075 n.35 (quoting *Gaines v. Haughton*, 645 F.2d 761, 776-77 (9th Cir. 1981)). Indeed, other federal courts have also upheld §14(a) claims that were raised derivatively. *See, e.g., In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1015-16 (N.D. Cal. 2007); *Belova v. Sharp*, No. CV 07-299-MO, 2008 WL 700961, at *7 (D. Or. Mar. 13, 2008); *Alaska Elec. Pension Fund v. Olofson*, No. 08-2344-CM, 2009 WL 1580296, at *8-*9 (D. Kan. June 3, 2009).

593634_1

1    Company's sales was an elaborate, decade-long, Company-wide scheme to market

2    and promote top-selling specialty pharmaceutical products such as Botox for off-label

3    uses such as spasticity, migraine headaches and pain, none of which was approved by

4    the FDA.[16]  ¶¶63, 84-102; *see* RJN, Exs. C-E.  Specifically, the 2008, 2009 and 2010

5    proxy statements were materially misleading because defendants omitted: (a) the

6    extent to which the Company's financial results depended on the off-label marketing

7    of Botox, which exposed the Company (and its shareholders) to serious regulatory,

8    reputational and financial risks; (b) the nature of the Board's performance of its duties

9    under the charters of the Board's various committees, including the reason for the

10   Board's decision to allow continued off-label and otherwise improper and illicit

11   marketing despite the risks to the Company, its shareholders or patients; and (c) the

12   numerous instances in which the Board was informed of legal compliance violations

13   concerning the unlawful marketing of Allergan drugs.  ¶¶7-9, 79-80, 106-107; *see*

14   RJN, Exs. C-E.

15       In the proxy statements, defendants represented to shareholders that the

16   Company was in compliance with applicable laws and regulations by touting that

17   Allergan had adopted an extensive Code of Business Conduct and Ethics[17] (RJN, Ex.

18   F) and by detailing the purportedly exhaustive responsibilities of the Audit and

19   Finance Committee and the Corporate Governance Committee to ensure legal and

20

21   [16]    Defendants effectuated their scheme by doubling the size of the Company's
      support staff; assisting doctors in obtaining payment for off-label Botox use;
22   implementing Company-wide initiatives to expand Botox's off-label use, which
      included coordinated efforts by three different divisions in the Company; creating
23   allegedly "independent" educational organizations that promoted the off-label use of
      Botox; and paying doctors to attend elaborate dinners and retreats focused on off-label
24   uses for Botox.  According to the DOJ, "Allergan made it a top corporate priority to
      maximize sales of more lucrative off-label uses that were not approved by the FDA."
25   ¶7.  Making this off-label marketing of Botox even worse is that "there was little
      clinical evidence that these [off-label] uses were even effective." *Id.*

26   [17]    Off-label marketing also is in violation of Allergan's "Field Reference Guide,"
27   issued in 2002 and updated in 2003, and "Best Practices Guide," issued in 2003, both
      of which  expressly prohibited off-label marketing and promotion.  ¶75.

28

1   regulatory compliance with all applicable laws.  ¶¶50-54; RJN, Ex. C at 30-34; RJN,

2   Ex. D at 15-20; RJN, Ex. E at 16-23.  In fact, Allergan had been repeatedly warned by

3   the FDA of its non-compliance.  ¶7 (quoting DOJ); *see also* RJN, Exs. I-K.  The

4   pervasive off-label marketing was unlawful, ¶¶12-14, 75, 109 (citing Guilty Plea), and

5   it was in flagrant violation of FDA-approved guidelines and the Company's own

6   corporate policy.  RJN, Ex. F; ¶¶50-54, 77.  Based on the misleading information and

7   omissions, the proxy statements sought the election and reelection of the Company

8   directors by Allergan shareholders, as well as their approval of the 2008 Incentive

9   Award Plan.  *See* ¶¶114, 196.

10       This District upheld a §14(a) claim based on similar allegations.   In

11  *Countrywide*, 554 F. Supp. 2d at 1076-77, the plaintiffs alleged that the challenged

12  proxy statements failed to disclose that the subject company had departed from its

13  own policies and used deceptive measures to meet its financial goals, thereby

14  subjecting it to heightened risk:

15       ***[Plaintiffs] allege that the proxy statements failed to disclose that***

16       ***Countrywide abandoned its underwriting standards, thus exposing***

17       ***itself to an undisclosed level of heightened risk*. . . .**

18       Furthermore, the "true operational and financial state of

19       Countrywide" would have been material to shareholders during a proxy

20       vote because of its impact on the Company's balance sheet.  *See Atlas v.*

21       *Accredited Home Lenders Holding Co*., 2008 WL 80949, at *10

22       (underwriting practices of mortgage originator "would be among the

23       most important information looked to by investors").  ***Shareholders***

24       ***would reasonably consider the Company's financial performance in***

25       ***deciding whether to reelect the directors*.**  Likewise, though Plaintiffs'

26       reasoning is a bit more circuitous on this point, ***shareholders would be***

27       ***interested in knowing whether the directors would use deceptive***

28       ***methods to achieve the performance measures that were the***

593634_1

1     ***benchmarks of the 2005 and 2006 compensation plans***.  Though it is

2     more difficult to evaluate the Board's statements regarding the

3     effectiveness of the director and executive compensation policies, ***the***

4     ***statements concerning the Company's extraordinary performance in a***

5     ***challenging environment were also material and misleading if, in fact,***

6     ***they failed to disclose the Company's true financial condition.***

7     ***Accordingly, Plaintiffs have adequately stated a §14(a) and Rule 14a-9***

8     ***claim*** for all Defendants except Dougherty and Snyder.

9     *Id*.

10         Here, it is self-evident that a reasonable Allergan shareholder would have

11     considered defendants' deceptive behavior in marketing drugs for off-label uses in

12     violation of federal law, FDA guidelines and Allergan's own policy important in

13     deciding how to vote. *Countrywide*, 554 F. Supp. 2d at 1076-77; *see also Sanders v.*

14     *Wang*, No. 16640, 1999 WL 1044880, at *11-*12 (Del. Ch. Nov. 8, 1999); *Amgen,*

15     544 F. Supp. 2d 1009 (finding defendants' failure to disclose off-label marketing

16     scheme materially false and misleading in securities fraud action); *In re Gilead Scis.*

17     *Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) (same).  Certainly, the off-label marketing

18     campaign at Allergan and serious risks associated therewith would have been viewed

19     by a reasonable Allergan stockholder as significantly altering the total mix of

20     available information. *Id.*

21         Just as the abandonment of underwriting standards subjected Countrywide to

22     "heightened risk" that the defendants in that case should have disclosed, here,

23     defendants' abandonment of corporate policy and FDA guidelines prohibiting off-

24     label marketing subjected Allergan to heightened risk, which should have been

25     disclosed (including potentially huge criminal and civil penalties and fines, as well as

26     the risk of exclusion from Medicare and Medicaid).  ¶¶5, 12-14, 75.  Indeed,

27     defendants chose not to be forthcoming with Allergan's shareholders about each FDA

28     warning letter Allergan received by affirmatively issuing a press release or other

- 20 -

1    public filing acknowledging the receipt of the letters.[18] Setting aside defendants'

2    failure to affirmatively keep investors aware of the FDA letters, even the disclosure of

3    such letters may have fallen short of the requisite standard. *Gilead*, 536 F.3d at 1053

4    (holding disclosure of FDA warning letter insufficient to put investors on notice of

5    Gilead's widespread off-label marketing because shareholders "failed to appreciate

6    the extent of Gilead's off-label marketing, and thus could not foresee the letter's

7    impact on Viread's sales").

8        Defendants' assertion that they were not required to disclose their unlawful off-

9    label marketing scheme because no misconduct had yet been charged or proven is

10   wholly without merit.  Defs' Mem. at 14-15.  "[T]he mere fact that the conduct in

11   question arguably constitutes mismanagement will not preclude a claim under the

12   federal securities laws if the defendant made a statement of material fact wholly

13   inconsistent with known existing mismanagement or failed to disclose a specific

14   material fact resulting from that mismanagement." *In re Donna Karan Int'l Sec.*

15   *Litig.*, No. 97-CV-2011 CBA, 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14, 1998);

16   *Westinghouse Elec. Corp. v. Franklin*, 789 F. Supp. 1313, 1320 (D.N.J. 1992)

17   _____

18   [18]    As detailed herein, on August 22, 2001, defendants received a letter addressed
19   to David Garbe, Director, Scientific Information and Medical Compliance (the
     "August 22, 2001 FDA Letter"), informing defendants that the FDA had reviewed
20   Allergan's Botox "promotional activities and materials and . . . concluded that they are
     misleading and lacking in fair balance within the meaning of 21 U.S.C. §352(a) of the
21   [FDCA]." ¶79.  On June 23, 2003, defendants received another FDA warning letter
     informing them that several of Allergan's "advertisements are false and/or misleading
22   because they falsely identify [Botox] as a cosmetic treatment, fail to reveal material
     facts about the product's use, and minimize the risk information presented." ¶80.  The
23   2003 letter referenced an earlier letter dated September 5, 2002, in which the FDA
     also objected to Allergan's promotional materials.  *Id*.  The June 2003 letter also
24   stated specifically that the Company engaged in false and misleading advertising
     about Botox.  ¶7.  Additionally, there were similar warning letters received in
25   September 2005 and August 2009 (the "August 2009 FDA Letter"). ¶106.  The only
     Company press release plaintiffs have located about these FDA letters is the
26   September 12, 2001 Press Release and a few articles wherein – in response to third
     parties issuing public commentary on the letters – the Company issued responsive
27   statements through a spokesperson to address the August 22, 2001 FDA Letter and the
     August 2009 FDA Letter.  *See* RJN, Exs. H, J-K.

28

- 21 -

1  (holding that "[a]llegations of failure to disclose illegal and deceptive practices will

2  survive a motion to dismiss" a §14(a) claim), *rev'd on other statute-of-limitations*

3  *grounds*, 993 F.2d 349 (3d Cir. 1993).  Defendants overlook the fact that they were

4  under an obligation to disclose all facts necessary to make their statements not

5  misleading.  *See Gilead*, 536 F.3d at 1051-52 ("Gilead's promotional scheme was

6  designed to, and did, create the impression that demand for Viread was strong.  This

7  campaign was misleading, however, because it was unlawful off-label marketing that

8  was driving prescription volume – and Gilead had already been ordered to cease such

9  marketing.").  As a result of defendants' deceptive practices, the Company was forced

10 to enter into a Guilty Plea and agreed to pay Criminal and Civil Settlements

11 approximating $600 million.  ¶¶14, 75, 109-110, 124, 136.

### 3.  Defendants Acted for Their Own Self-Benefit

13      Contrary to defendants' assertions, plaintiffs have more than adequately pled

14 that the defendants were acting for their own self-benefit.  Plaintiffs allege that as a

15 result of the materially misleading proxy statements, the Director Defendants were

16 reelected to the Board and entered into lucrative compensation contracts with the

17 Company, affording themselves a generous compensation program via shareholder

18 vote.  ¶¶113-122.  As a direct result of the 2008 proxy statement, shareholders voted

19 in favor of the 2008 Incentive Award Plan, which not only authorized a 20-million-

20 share increase in the stock available for grants to the Company's employees,

21 executives and directors for as little as one year of positive performance but also

22 *automatically* provided them each with 11,400 stock options and 14,400 shares of

23 restricted stock yearly.  ¶114; RJN, Ex. C at 2-3, 9, 13, 19, 22-25, 39, 49-54.

24      Thus, defendants had a substantial short-term financial incentive to break the

25 law by marketing and promoting the Company's drugs for uses and dosages not

26 proven to be medically safe and effective in order to secure their continued

27 employment and significantly increase their compensation packages, as well as to reap

28 outsized incentive compensation in the form of bonuses.  ¶73; RJN, Ex. C at 49-54

- 22 -

(detailing elaborate bonus structure tied to performance).  Had Allergan shareholders been provided with the complete and accurate disclosures from defendants that they were entitled to, they would have chosen not to reelect Board members and not to increase the compensation of those who participated in or permitted the illegal marketing misconduct and thereby reward them for their illegal activity.  The proxy statements at issue included reports by defendants Schaeffer, Gallagher, Hudson, Ingram, Ray, Lavigne and Ryan and recommendations by the Corporate Governance Committee (including Boyer).   The proxy statements were signed by defendant Ingram by order of the Board.[19]  RJN, Exs. C-E.

### 4. The Complaint Adequately Pleads an Essential Link Between the Proxy Statements and Increased Executive Compensation and Reelection of the Board of Director Defendants

The Complaint also satisfies the "essential link" element of a §14(a) claim because shareholder approval was necessary to accomplish the challenged transactions – *i.e.*, the reelection of the Director Defendants and the adoption of the 2008 Incentive Award Plan, which significantly increased each of their compensation packages. *See, e.g., Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 654 (2d Cir. 1979) (holding that "the challenged 'transaction' is the election of the directors, and we have no doubt that the 'proxy solicitation itself . . . was an essential link in the accomplishment of that transaction'").   Indeed, defendants apparently have not even challenged the "essential link" element of the §14(a) claim pertaining to the authorization of the 2008 Incentive Award Plan – nor could they.  Plaintiffs' §14(a) claims can proceed on this basis alone.

---

[19]     Additional Proxy Defendants include Pyott, Chairman of the Board and Chief Executive Officer ("CEO"), who signed the letter disseminating the proxy statements to shareholders and urging them to vote, and Herbert, who was the Company's founder and the Board's Chairman Emeritus since 1996.  ¶¶27, 29, 44.  Defendant Pyott is also referred to as an "Officer Defendant."  He has been Allergan's Chairman of the Board since 2001 and a director since 1998.  ¶¶27, 142.

1    Moreover, as set forth in the Complaint, defendants' material omissions from
2    the proxy statements ***directly*** harmed the Company by keeping the Board's
3    longstanding non-compliance with the law, FDA guidelines and corporate policy in
4    place.  Indeed, defendants' own authority recognizes that damages flowing from the
5    acts of directors who were elected pursuant to a misleading proxy statement satisfy the
6    essential link element of §14(a).  *See Kelley v. Rambus, Inc.*, No. C-07-01238 JF
7    (HRL), 2008 WL 5170598, at *8 (N.D. Cal. Dec. 9, 2008) ("the involvement of
8    directors authorized by the proxy vote in some future wrongdoing, has been critical in
9    every case that has found an essential link"), *aff'd*, 384 F. App'x 570 (9th Cir. 2010).[20]

10   In sum, in light of defendants' false and misleading statements detailing the
11   Company's compliance measures, purportedly designed, at least in part, to ferret out
12   and prevent unlawful off-label marketing; defendants' asserted adoption of the Code
13   of Business Conduct and Ethics and other policies which prohibited off-label
14   marketing; and defendants' affirmative acknowledgements in the Company's Form
15   10-K filings as to the illegality of off-label marketing, defendants' failure to disclose
16   in the proxy statements that they were nevertheless affirmatively causing Allergan to
17   use a variety of tactics[21] to effectuate an off-label marketing campaign was

18

19   [20]   *See also Zoran*, 511 F. Supp. 2d at 986 ("If defendants had not falsely stated in
20   Zoran's proxy statements that stock options were being granted properly under the
     plans, and that directors were complying with the terms of the plans that the
21   shareholders approved, shareholders would have voted those board members out, and
     the board members would no longer have had the means to grant more backdated
22   stock options."); *In re iBasis, Inc. Derivative Litig.*, 532 F. Supp. 214, 223 (D.
     Mass. 2007) (The court described the "essential link" as "transactional causation" and
23   explained that "[t]ransactional causation for stock option grant manipulation
     customarily involves a three-step-process.  First, there is a stock option grant
24   manipulation that pre-dates a proxy statement.  Then, there is a false or misleading
     proxy statement that leads to approval of the recommended action, generally the
25   reelection of directors or the amendment of the Company's stock option plan.  Finally,
     these directors grant additional manipulated stock options."); *Belova*, 2008
26   WL 700961 (finding an essential link between proxy electing directors and
     continuance of scheme to backdate options).

27   [21]   These tactics include: (i) providing "value-added" reimbursement support
28   service; (ii) lobbying health-care payers to expand coverage for off-label uses;

- 24 -

593634_1

1   misleading.   Allergan's promotional scheme was designed to, and did, create the

2   impression that demand for Botox was strong.  As a result, defendants were reelected,

3   received significant pay increases and handsome performance-based bonuses, engaged

4   in insider selling (Pyott and Herbert) for proceeds of $93 million, and essentially

5   drove the Company into a Guilty Plea and $600 million in attendant penalties and

6   settlements.   These allegations are sufficient to plead a §14(a) claim under the

7   Exchange Act.

8                **5.      Plaintiffs' Section 14(a) Claim Is Timely**

9          Contrary to defendants' assertions, plaintiffs' §14(a) claim is not time-barred.

10  Pursuant to 28 U.S.C. §1658(b):

11         [A] private right of action that involves a claim of fraud, deceit,

12         manipulation, or contrivance in contravention of a regulatory

13         requirement concerning the securities laws . . . may be brought not later

14         than the earlier of –

15                (1)    2 years after the discovery of the facts constituting the

16         violation; or

17                (2)    5 years after such violation.

18         Plaintiffs' claim for violation of §14(a) is clearly timely with respect to the two-

19  year statute-of-limitations period provided by 28 U.S.C. §1658(b)(1) as a result of the

20  facts that: (a) no reasonably diligent Allergan shareholder knew or reasonably could

21  have discovered the existence of the widespread off-label marketing of Botox and the

22

23  (iii) funding and controlling continuing medical education programs on off-label uses;
    and (iv) paying doctors to attend advisory boards on off-label, hosting

24  promotional dinners to highlight Botox's efficacy for off-label uses and creating and
    funding organizations to promote off-label uses of Botox.  ¶81.  Indeed, for most of

25  the relevant time period, defendants had in place Botox "Customer Team Units," or
    "CTUs," which coordinated sales initiatives among numerous different departments,

26  including Allergan's sales/marketing, medical affairs (purportedly independent
    scientific advisors) and reimbursement divisions, in order to permit more focused

27  communication of the Individual Defendants' off-label marketing messages. *Id.*; *see
    also* ¶¶82-102.

28

damages resulting therefrom prior to the September 1, 2010 Information filed by the DOJ (¶¶14, 153) and the October 4, 2010 Government Memorandum in Support of Binding Plea and Sentencing Memorandum (¶81); (b) defendants fraudulently concealed their wrongdoing by disseminating false information in, *inter alia*, Allergan's annual proxy statements; and (c) plaintiffs were entitled to rely on the good faith of the Individual Defendants.

In *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774 (SRC), 2009 WL 2043604 (D.N.J. July 10, 2009), the court rejected precisely the argument defendants have submitted here – that **reports** of a government investigation were sufficient to put plaintiffs on notice of Schering-Plough's off-label marketing.  The court found instead that it was not until the **results** of the government investigation were released that plaintiffs had actual or inquiry notice of the facts underlying the alleged fraud related to the company's off-label marketing scheme.[22] *Id*. at *22 (denying defendants' motion to dismiss on statute-of-limitations grounds). The same reasoning should be applied here.

---

[22]   Specifically, the court stated:

> [I]t is not at all clear that the FDA warning letter, public filings and newspaper articles reporting the Government's investigation of Schering's off-label marketing of the Subject Drugs provided warnings sufficient to put Plaintiffs on notice of their purported RICO claims as early as 2002 as alleged by Defendants.  In addition, Plaintiffs' allegation that Defendants concealed their illegal conduct raises the possibility that the applicable statutory periods should be tolled and, by implication, creates an additional hurdle to establishing that the RICO claims are barred.  Because there are legitimate questions of fact as to whether the Plaintiffs were on inquiry notice of the conduct and injury underlying their claims and of the alleged concealment by Defendants of their illegal conduct, the Defendants' motion to dismiss Plaintiffs' RICO and NJRICO claims as barred by the applicable statutes of limitations will be denied.

*Schering-Plough*, 2009 WL 2043604, at *22.

### B. The Complaint Adequately Pleads Violations of Section 29(b)

Section 29(b) "is the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions" of the securities laws. *Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 205 (3d Cir. 2006); *In re Asyst Techs., Inc. Derivative Litig.*, No. C-06-04669 EDL, 2008 WL 4891220, at *9 (N.D. Cal. Nov. 12, 2008) ("*Asyst I*"). To void a contract under §29(b), a plaintiff must prove the following: "(1) the contract involved a prohibited transaction; (2) he is in contractual privity with [defendant]; and (3) [plaintiff] is in the class of persons that the securities acts were designed to protect." *Berckeley*, 455 F.3d at 205.

In *Rhoades v. Powell*, 644 F. Supp. 645 (E.D. Cal. 1986), *aff'd without op.*, 961 F.2d 217 (9th Cir. 1992), the Eastern District of California upheld a §29(b) claim based on an underlying §14(a) claim and held that §29(b) serves as an independent basis for a private right of action for rescission of a contract. *Id.* at 661-62 (citing *Mills*, 396 U.S. at 387-88).

In *Asyst I*, the Northern District of California held that the plaintiffs had adequately pled their §29(b) claim when they alleged that they were "in privity with the defendants with respect to stock options granted to Defendants, that Defendants ha[d] engaged in prohibited conduct and that [plaintiffs were] a party deserving protection under the securities laws." *Asyst I*, 2008 WL 4891220, at *9.

Similarly, in *In re MRV Commc'ns, Inc. Derivative Litig.*, No. CV 08-03800 GAF (RCx), 2010 WL 5313442 (C.D. Cal. Dec. 27, 2010), this District held that where plaintiff shareholders alleged that defendants engaged in prohibited conduct by granting stock options in contravention of MRV's 1992 and 1997 stock option plans, their §29(b) claim was adequately pled. *Id.* at *11-*12.

Here, plaintiffs have alleged that the employment and compensation contracts, including the 2008 Incentive Award Plan, and all stock and options contracts entered

- 27 -

593634_1

into by the Company were entered into in violation of the Exchange Act and rules prescribed thereunder, including §14(a).   ¶¶155-157.   The employment and compensation contracts were authorized by defendants pursuant to the false and misleading proxy statements and other materially false statements and omissions, and the pervasive scheme to illegally market Botox and other drugs for off-label purposes that acted as a fraud upon Allergan. *Id*.; *see, e.g.*, RJN, Ex. C at 2-3, 9, 13, 19, 22-25, 39, 49-54.[23]   It is further alleged that there is contractual privity between Allergan and the recipients of the employment and compensation contracts, and Allergan and its public investors are in a class of persons the Exchange Act was designed to protect. ¶¶155-157.   Accordingly, plaintiffs have adequately pled a claim for violation of §29(b).[24]

### C.   The Complaint Adequately Pleads Claims for Breach of Fiduciary Duty as to All Defendants

Plaintiffs have pled three claims for breach of fiduciary duty.[25]  With respect to Count II against the Individual Defendants for breach of fiduciary duty and/or aiding and abetting breach of fiduciary duty, the law of the state of incorporation governs.

---

[23]   Defendants   assert   that   plaintiffs   have   not   alleged   that   the employment/compensation contracts themselves are unlawful. Defs' Mem. at 19. This is beside the point.  In *MRV*, this District addressed precisely the same argument with respect to option backdating contracts not being "illegal"; the court held that §29(b) "does not require such a narrow showing. Section 29(b) is a vehicle by which parties 'may rescind contracts that were made or performed in violation of other substantive provisions.'"  *MRV*, 2010 WL 5313442, at *11.

[24]   Defendants' assertion that the Court should refuse supplemental jurisdiction is without merit as, for the reasons set forth above, plaintiffs' federal claims are valid. Moreover, as set forth more fully in plaintiffs' Opposition to Nominal Defendant Allergan, Inc.'s Motion to Stay Judicial Proceedings, filed herewith and which plaintiffs incorporate fully herein, at 8-10, this Action and the Delaware action concern different claims, parties and legal theories.

[25]   Count II against the Individual Defendants for breach of fiduciary duty and/or aiding and abetting breach of fiduciary duty; Count VI against the Insider Selling Defendants for breach of fiduciary duties for insider selling and misappropriation of information; and Count VII against the Individual Defendants for breach of fiduciary duty in violation of California Corporations Code §309.

593634_1

1    *Shaffer v. Heitner*, 433 U.S. 186, 215 n.44, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977);

2    *MRV*, 2010 WL 5313442, at *20.  Allergan was incorporated under the laws of the

3    state of Delaware.  ¶26.

4          Under Delaware law, "[a] claim for breach of fiduciary duty requires proof of

5    two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that

6    duty."  *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010) (citing *ZRii,*

7    *LLC v. Wellness Acquisition Grp., Inc.*, No. 4374-VCP, 2009 WL 2998169, at *11

8    (Del. Ch. Sept. 21, 2009)), *aff'd*, 2010 Del. LEXIS 596 (Del. Nov. 23, 2010).  The

9    Delaware Supreme Court has repeatedly stated that Delaware officers and directors

10   owe the duties of care, good faith, and loyalty to their corporations and the

11   shareholders they serve.  *See, e.g.*, *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998);

12   *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del. 1995).[26]

13         Under the business judgment rule, there is a presumption that, in making a

14   business decision, the directors of a corporation acted on an informed basis, in good

15   faith and in the honest belief that the action taken was in the best interest of the

16   company.  *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007) (citing *Aronson v.*

17   *Lewis*, 473 A.2d 805, 812 (Del. 1984)); *MRV*, 2010 WL 5313442, at *14 (finding

18   allegations of backdating sufficient to rebut business judgment presumption).

19   However, allegations of bad faith will rebut the presumption, and bad faith can be

20   shown if a fiduciary commits an intentional act that is not in the best interest of the

21   corporation, has intent to violate applicable law, consciously disregards his or her

22   duties, or "demonstrates a faithlessness or lack of true devotion to the interests of the

23

24   _____

25   [26]     Rule 8 notice pleading applies to the fiduciary duty claims.  *In re Tower Air,*
     *Inc.*, 416 F.3d 229, 236-38 (3d Cir. 2005).  "A plaintiff need only make out a claim
26   upon which relief can be granted.  If more facts are necessary to resolve or clarify the
     disputed issues, the parties may avail themselves of civil discovery mechanisms under
27   the Federal Rules."  *Alston v. Parker*, 363 F.3d 229, 233 n.6 (3d Cir. 2004).
     Nevertheless, plaintiffs have met the requirements of Rule 9(b).

28

1  corporation and its shareholders." *MRV*, 2010 WL 5313442, at *12 (citing *Stone v.*

2  *Ritter*, 911 A.2d 362, 370 (Del. 2006)).

3       Similarly, under California law (with respect to Count VII alleging breach of

4  fiduciary duty in violation of Cal. Corp. Code §309), a defendant's failure to

5  undertake an adequate review and inquiry of the company's SEC filings and overall

6  operations may constitute a breach of the duties of care and inquiry.  Directors "ha[ve]

7  a duty to . . . exercise due care in overseeing the management of [the company],

8  regardless of whether they were involved in the scheme to defraud." *Daisy Sys. Corp.*

9  *v. Finegold*, No. C 86-20719 (SW), 1988 WL 166235, at *5 (N.D. Cal. Sept. 19,

10  1988) (upholding breach of fiduciary duty claim in violation of Cal. Corp. Code

11  §309).  "[D]irectors may not close their eyes to what is going on about them in

12  corporate business, and must in appropriate circumstances make such reasonable

13  inquiry as an ordinarily prudent person under similar circumstances." *Gaillard v.*

14  *Natomas Co.*, 208 Cal. App. 3d 1250, 1264-65, 256 Cal. Rptr. 702 (1989).

15       All of the Individual Defendants named in this Action were directors during the

16  relevant time period; accordingly, all of them owed fiduciary duties of due care, good

17  faith, and loyalty to the Company and its shareholders.  ¶¶27-44.  Here, the Complaint

18  provides specific allegations implicating all defendants and specifying how each of

19  them, including the Director, Officer, Audit Committee, Proxy and Insider Selling

20  Defendants, breached his or her fiduciary duties.  ¶¶1-19, 27-60, 75-112 (alleging that

21  defendants knowingly or recklessly caused and or permitted a Company-wide illegal

22  marketing strategy to promote sales of Botox and other drugs).

23       First, the scheme allegations are so pervasive that the defendants could not have

24  helped but to have known about the illegal marketing activity that was a "top

25  corporate priority" (¶138) at the Company from 2000 to the present.  ¶103.  Botox

26  accounted for approximately 30% – hundreds of millions of dollars – of the

27  Company's sales.  *Id*.  In 2006 alone, Allergan had $510 million worth of Botox

28  Therapeutic sales.   *Id*.   Considering that Botox had only four FDA-approved

1    indications during this time frame, all of which were rare, or rarely required Botox

2    treatment, it would have been impossible for the Company to have hit these numbers

3    without massive off-label sales.  ¶¶103-105.  Moreover, at all times during the

4    relevant period, the Company maintained robust internal controls and financial

5    reporting systems, pursuant to which the Board timely received information

6    concerning Allergan's financial performance, sales and earnings, projections of the

7    actual results, and actual and contingent risks facing Allergan's business – including

8    the off-label marketing of Botox.  ¶141.  At no time did defendants ever report any

9    failure in these controls or the reporting system.  *Id*.

10         Even if these facts alone were somehow insufficient to put the directors on

11   notice, it cannot reasonably be disputed that the FDA warning letters put defendants

12   on notice of the widespread off-label marketing and misbranding at the Company.

13   ¶¶7, 79-80.  Indeed, the June 2003 warning letter expressly stated that the Company

14   was engaging in false and misleading advertising about Botox.  ¶7.

15         Additionally, the Complaint specifically pleads that Pyott ran the daily

16   operations of the Company and thus would have been aware that one of Allergan's

17   "top corporate priorities" was to expand the use of Botox via off-label marketing.

18   ¶¶138, 142, 144.  Pyott received at least two FDA warning letters (dated September 6,

19   2005 and August 17, 2009, respectively) informing him of the Company's

20   misbranding of drugs and other potential violations of the FDCA.  ¶106.[27]  The

21   Complaint further pleads that Pyott was in charge of Allergan's legal compliance and

22   that the Compliance Department reported to the Chief Compliance Officer, who, in

23   turn, reported directly to Pyott.  ¶76.  Taken together, these allegations, combined with

24   the insider-selling allegations discussed below and the allegations regarding the scope,

25   _____

26   [27]    The September 12, 2002 Press Release also substantiates that Pyott knew of the

27   September 5, 2002 "untitled" FDA letter about misleading Botox promotional

materials.  RJN, Ex. G.

28

593634_1

pervasiveness and duration of the off-label marketing campaign, clearly support a claim for breach of fiduciary duty on the part of Pyott.

The Complaint also includes specific allegations regarding the Audit Committee Defendants (¶¶29-33, 36, 38-39, 41-44), who had additional duties placed on them to ensure legal compliance, including: (a) *to review* the integrity of the financial statements, reporting process, and *systems of internal controls regarding* finance, accounting and *legal compliance*; (b) to adhere to the Audit and Finance Committee's Charter, which specifically required members to, among other things, *assist the Board in its oversight of the Company's compliance with legal and regulatory requirements*; and (c) to *establish, review and update the Company's Code of Conduct and Ethics policy and ensure management established a system to enforce the Code*. ¶53. According to the Company's proxy statements, the Audit Committee "monitor[ed] the implementation of [Allergan's] Code of Business Conduct and Ethics for . . . employees, and receive[d] regular reports from [the] chief ethics officer, who coordinate[d] compliance reviews and investigate[d] compliance matters." *See, e.g.*, RJN, Ex. C at 31. Had the Board, and particularly the Audit Committee Defendants, been fulfilling their fiduciary duties (or had they performed even a cursory review of how Allergan was achieving the immense sales it was of a drug approved only for very rare conditions), they would have been aware of the massive off-label selling occurring in violation of the law and the Company's own internal codes and policies. ¶¶50-54, 77.

The Complaint also includes specific allegations regarding the responsibilities of those defendants that served on the Corporate Governance Committee – Boyer, Ingram, Dunsire, Evans, Jones and Schaeffer. ¶¶50-54. As members of this Committee, these individuals were specifically tasked by its charter with "*[r]eview[ing] comprehensive reports from management regarding compliance-related matters* affecting the Company and *provid[ing] general compliance oversight*

- 32 -

593634_1

1    to Allergan." ¶¶30, 34, 54, 139.  Thus, they, too, would have been aware of the off-
2    label marketing.

3        Additionally, the Complaint sets forth particularized allegations specific to the
4    Proxy Defendants (¶¶44, 195-201), including, as set forth above, that they caused
5    Allergan to issue proxy statements to solicit shareholder votes for the election of
6    directors and approval of the 2008 Incentive Award Plan by failing to disclose that the
7    financial results were completely dependent on the Company's widespread, unlawful,
8    off-label marketing of its drugs or the extent to which the Company had received
9    repeated FDA warning letters complaining about such practices.  ¶¶79-80, 195-201.[28]

10       **D.    Plaintiffs Have Adequately Pled Insider Trading and a
                 Corresponding Claim for Breach of Fiduciary Duty**

11       California law governs insider trading within the state.  Cal. Corp. Code
12   §25402.  Under California law:

13           It is unlawful for an issuer or any person who is an officer,
14           director or controlling person of an issuer . . . to purchase or sell any
15           security of the issuer in this state at a time when he knows material
16           information about the issuer gained from such relationship which would
17           significantly affect the market price of that security and which is not
18           generally available to the public, and which he knows is not intended to

---

19
20   [28]    Defendants' argument that the Complaint does not plead claims under
21   *Caremark* (failure of oversight) is predicated entirely upon defendants' assertion that
22   plaintiffs do not allege that Allergan's directors were otherwise aware of the off-label
     marketing scheme.  Defs' Mem. at 24 (citing *In re Caremark Int'l*, 698 A.2d 959 (Del.
     Ch. 1996)).  Indeed, defendants do not (and cannot) dispute that *Caremark* claims
23   exist if Allergan's directors were aware of the off-label marketing.  As shown herein,
     the Complaint alleges Allergan's directors were aware of the off-label marketing by
24   virtue of the scope and duration of the scheme, the rarity of the diseases for which
     Botox Therapeutic had been approved as compared to the volume of its sales,
25   defendants' duties and responsibilities on various Board committees, the reporting and
     internal controls in place, the FDA warning letters, newspaper articles, civil *qui tam*
26   actions and government inquiries, and that, instead of putting a stop to it, they actually
     made off-label marketing of Botox a top priority of the Company.  ¶¶17, 65-66, 79-80,
27   106.  That is more than a failure of oversight.

28

1    be so available, unless he has reason to believe that the person selling to

2    or buying from him is also in possession of the information.

3    *Id*.  Insider trading also gives rise to a claim for breach of fiduciary duty.  *In re Maxim*

4    *Integrated Prods.*, 574 F. Supp. 2d 1046, 1070 (N.D. Cal. 2008); *In re Asyst Techs.,*

5    *Inc. Derivative Litig.*, No. C-06-04669 EDL, 2008 WL 2169021, at *9-*10 (N.D. Cal.

6    May 23, 2008) ("*Asyst II*").

7          Here, the Complaint includes the following specific allegations regarding the

8    Insider Selling Defendants, Pyott and Herbert.  ¶¶27, 29, 44, 123, 182-187.  Pyott and

9    Herbert sold over 1.34 million shares and over 147,000 shares, respectively, of

10   Allergan stock for unlawful insider-trading proceeds of almost $85 million and $8.5

11   million, respectively, based upon their knowledge of adverse, material, nonpublic

12   information regarding the illegal sales and marketing at Allergan.   ¶123.   The

13   allegations in the Complaint support that Pyott and Herbert were both aware of the

14   unlawful marketing campaign that drove the tremendous growth of off-label sales of

15   Botox and that they sold their stock based, at least in part, on this knowledge.  *See*

16   ¶¶123-125.  Indeed, Pyott and Herbert received repeated FDA warning letters in 2001,

17   2002, 2003, 2005 and 2009 (the 2005 letter was sent to Pyott (¶106) and Pyott

18   commented upon the 2002 letter (RJN, Ex. G)) advising them of the Company's

19   misbranding and other potential violations of the FDCA.   ¶¶79-80, 106.   Included

20   among Pyott's direct reports was the Company's Chief Compliance Officer.   It is

21   simply not conceivable that Pyott, having himself written the letter attached to the

22   Code of Business Conduct and Ethics (¶50), and Herbert, having served on the

23   Corporate Governance Committee for the duration, would not have had knowledge of

24   the Company's off-label marketing of Botox – which was responsible for 30% of the

25   Company's overall net sales, reaching a staggering $1.31 billion per year during the

26   relevant period, despite the fact that it was only approved by the FDA for very rare

27   conditions.  ¶¶65, 103-104.

28

- 34 -

In *Maxim*, 574 F. Supp. 2d 1046, the court upheld claims for insider selling and associated breach of fiduciary duty where defendants traded securities based, in part, on their knowledge of an unlawful backdating scheme.   In *Asyst II*, 2008 WL 2169021, at *9-*10, the Northern District did the same.  Similarly, here, plaintiffs allege that the Insider Selling Defendants traded their stocks based, at least in part, on their knowledge of an unlawful off-label marketing scheme.  As in *Maxim* and *Asyst II*, the information that the Company was engaged in deceptive practices in violation of the law and corporate policy, which subjected it to tremendous risk, was information that the Insider Selling Defendants used for their own benefit when they sold their common stock.  ¶¶182-187.  These allegations, taken together, are sufficient to support claims for insider selling in violation of Cal. Corp. Code §§25402 and 25502.5 and breach of fiduciary duty for insider selling and misappropriation of information.  *See Maxim*, 574 F. Supp. at 1070; *Asyst II*, 2008 WL 2169021, at *9-*10.

### E.    The Complaint Adequately Pleads a Claim for Corporate Waste

It is established under Delaware law that, to plead a claim for corporate waste: "a plaintiff is required to 'allege facts showing that no person of ordinary sound business judgment could view the benefits received in the transaction as a fair exchange for the consideration paid by the corporation.'  Unless there is a reasonable doubt that the board was proceeding in the corporation's best interest, the board's decisions are entitled to deference."  *MRV*, 2010 WL 5313442, at *16; *Zoran*, 511 F. Supp. 2d 986.

In *Zoran*, the court held that the plaintiff had pled enough facts for its waste claim to survive a motion to dismiss because backdating is a form of fraud, and "[a]ny directors engaging in self-dealing and making misrepresentations to shareholders cannot be said to act in the corporation's best interest."  511 F. Supp. 2d at 1019.  In

593634_1

*MRV*, this District did the same.  *MRV*, 2010 WL 5313442, at \*16; *see also Swingless Golf Club Corp. v. Taylor*, 679 F. Supp. 2d 1060, 1071-72 (N.D. Cal. 2009) (only "plausible" claim of corporate waste is required to survive motion to dismiss).  Here, plaintiffs have pled that defendants acted in their own personal interest or benefit by making misrepresentations in SEC filings, including proxy statements by which they solicited votes in support of their reelection to the Board and their lucrative compensation contracts with the Company, and affording themselves the generous compensation program embodied in the 2008 Incentive Award Plan, which not only authorized a 20-million-share increase in the stock available for grants to the Company's employees, executives and directors for as little as one year of positive performance but also ***automatically*** provided them each with 11,400 stock options and 14,400 shares of restricted stock yearly.  ¶¶114-116.  As such, plaintiffs have adequately pled a claim for corporate waste under Delaware law.

## F.   The Complaint Adequately Pleads an Unjust Enrichment Claim

A claim of unjust enrichment has two elements: receipt of a benefit and unjust retention of the benefit at the expense of another.  *Asyst II*, 2008 WL 2169021, at \*11 (citing *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726, 91 Cal. Rptr. 2d 881 (2000); *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793, 131 Cal. Rptr. 2d 347 (2003) (unjust enrichment is synonymous with restitution)).  Delaware law is in accord.  *See In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1105 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004).

In *Asyst II*, plaintiffs alleged that senior officers were unjustly enriched through their salaries and bonuses based on false financial results.  2008 WL 2169021, at \*11.  They further alleged that the selling defendants were unjustly enriched by retaining profits from their stock sales.  *Id*.  The *Asyst II* court  held that these allegations were sufficient to plead a claim for unjust enrichment.  *Id*.; *see also MRV*, 2010

- 36 -

1  WL 5313442, at *14-*15 (sustaining allegations that defendant officers were unjustly
2  enriched via unlawful backdating scheme).

3       Here, plaintiffs have alleged that defendants were unjustly enriched as a result
4  of the generous compensation and director remuneration they received while
5  breaching fiduciary duties owed to Allergan.  ¶¶170-174.  Specifically, defendants
6  entered into lucrative compensation contracts with the Company, affording themselves
7  a generous compensation program via shareholder vote on the false and misleading
8  proxy statements.  ¶¶113-122.  As a direct result of the 2008 proxy statement,
9  shareholders voted in favor of the 2008 Incentive Award Plan, which not only
10 authorized a 20-million-share increase in the stock available for grants to the
11 Company's employees but also automatically provided them with 11,400 stock
12 options and 14,400 shares of restricted stock yearly.  Plaintiffs have also alleged
13 insider sales by defendants Pyott and Herbert for proceeds exceeding $85 million and
14 $8.5 million, respectively.  Accordingly, plaintiffs have adequately alleged that
15 defendants were unjustly enriched as a result of their unlawful off-label marketing
16 scheme.

17 **IV.   DEMAND IS EXCUSED**

18      **A.   The Legal Standard for Demand Futility**

19      The parties agree that Delaware law controls the instant demand futility
20 analysis. Defs' Mem. at 10; s*ee Kamen v. Kemper Fin. Servs*., 500 U.S. 90, 108-09,
21 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991) ("a court that is entertaining a derivative
22 action . . . must apply the demand futility exception as it is defined by the law of the
23 State of incorporation").  Under Delaware law, a demand on the Board is not required
24 if the facts pled show that such a demand would have been futile. *Aronson v. Lewis*,
25 473 A.2d 805, 807 (Del. 1984).  A plaintiff is excused from making a pre-suit demand
26 if there is reason to doubt that: (i) a majority of a board's directors are independent or
27 interested; or (ii) the challenged acts are a valid exercise of business judgment. *Id*. at
28 812; *see also Zoran*, 511 F. Supp. 2d at 1002.  To implicate the *Aronson* test, a

- 37 -

plaintiff must challenge a board decision where its members exercised business judgment.  *Aronson*, 473 A.2d at 812; *see also In re Openwave Sys. S'holder Derivative Litig.*, 503 F. Supp. 2d 1341, 1347 (N.D. Cal. 2007) (where at least "'one half of the current board members approved' at least some of the 'challenged transaction[s]' . . . 'approval may be imputed to the entire board for purposes of proving demand futility, [and] the *Aronson* test applies'").

Where a complaint does not challenge a specific action or decision of the board, demand is excused where the complaint raises a ***reasonable doubt*** that a majority of the directors are disinterested ***or*** independent.  *Rales v. Blasband*, 634 A.2d 927, 930 (Del. 1993).  Under this test:

> [A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a ***reasonable doubt*** that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.  If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Id*. at 934.[29]  This reasonable doubt standard "is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where [as here], the claim is not based on mere suspicions or stated solely in conclusory terms."  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996) (footnote omitted).  "Reasonable doubt," as applied by Delaware courts, is "reason to doubt" that a board is capable of making an independent or disinterested decision.  *Id*.[30]  Thus, plaintiffs

---

[29]   At bottom, both the *Aronson* and *Rales* tests simply ask whether "the directors are incapable of making an impartial decision regarding such litigation."  *Rales*, 634 A.2d at 932.

[30]   In *Rales*, the Delaware Supreme Court rejected a more stringent standard: "[W]e reject the defendants' proposal that, for purposes of this derivative suit and future similar suits, we adopt either a universal demand requirement or a requirement

only need allege with particularity facts that would give a reasonable shareholder reason to doubt the Director Defendants' ability to consider a demand disinterestedly.[31]  This liberal standard is particularly appropriate in derivative suits because plaintiffs typically have not had the benefit of discovery.  *Rales*, 634 A.2d at 934 (requiring a reasonable probability of success on the merits would be "an extremely onerous burden to meet at the pleading stage without the benefit of discovery").

A plaintiff properly alleges reasonable doubt that a director is disinterested in a demand where that director "is personally interested in the outcome of the litigation, in that the director will personally benefit or suffer as a result of the lawsuit."  *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007).  A plaintiff may also raise reasonable doubt regarding the disinterestedness of directors by demonstrating that they are subject to a "substantial likelihood of liability."  *Ryan*, 918 A.2d at 355.  As the Delaware Chancery Court explained, directors who are sued "have a disabling interest for pre-suit demand purposes when 'the potential for liability is not a mere threat but instead may rise to a substantial likelihood.'"  *Id.* (quoting *In re Baxter Int'l*, 654 A.2d 1268, 1269 (Del. Ch. 1995)); *see also Abbott Labs.*, 325 F.3d at 808.

Independence, meanwhile, "means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."  *Aronson*, 473 A.2d at 816.  A director also lacks independence where

that a plaintiff must demonstrate a reasonable probability of success on the merits." 634 A.2d at 934; *see also Grobow v. Perot*, 539 A.2d 180, 186-87 (Del. 1988) (rejecting the more stringent "judicial finding" standard for pleading director interest).

[31]   *See Grobow*, 539 A.2d at 186-87 (endorsing the reasonable doubt standard); *Grimes*, 673 A.2d at 1217 n.17 ("the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule").

he or she is "beholden" to interested directors or "so under their influence that [his or her] discretion would be sterilized." *Rales*, 634 A.2d at 935-37.  For example, a lack of independence has traditionally been found where a director holds a position as an employee of the corporation.  *Id*. at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices"); *see also Mizel v. Connelly*, No. Civ.A. 16638, 1999 WL 550369, at *3 (Del. Ch. Aug. 2, 1999) ("Since [employee-directors] each derive their principal income from their employment at [the corporation], it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment.").[32]

As stated above, when this Action was initiated, the Board consisted of the 12 Director Defendants.  Thus, plaintiffs need only raise a reason to doubt the disinterestedness or independence of six Director Defendants. *See Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000).  Plaintiffs satisfy this standard.  The Complaint alleges particularized facts creating a reasonable doubt that all of the Director Defendants could have responded disinterestedly and independently to a demand.

**B.  Demand Is Excused Because the Directors' Adoption and/or Tacit Approval of an Illegal Business Strategy Is Not Protected by the Business Judgment Rule**

The gravamen of the Complaint is that the Director Defendants consciously caused Allergan to engage in illegal activity for years, which caused severe harm to

---

[32]      Further, even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's independence, the totality of the plaintiff's allegations in combination may be sufficient to do so.  *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, No. Civ.A. 14995, 1997 WL 208955, at *5 (Del. Ch. Apr. 22, 1997).

- 40 -

1   the Company and its shareholders.[33]   This is not a protected business judgment

2   excusing demand.  *See Pfizer*, 722 F. Supp. 2d at 459-60.

3          Moreover, the Director Defendants' decision not to intervene is a known and

4   ongoing violation of the law not protected by the business judgment rule.  *Id*.  Both

5   law and logic support this rule.  *See Pereira v. Cogan*, 294 B.R. 449, 531 n.76

6   (S.D.N.Y. 2003) ("In any case, the business judgment rule would not protect the

7   illegal acts complained of . . . ."), *vacated on other grounds*, 413 F.3d 330 (2d Cir.

8   2005); *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) ("Delaware

9   corporate law has long been clear on this rather obvious notion; namely, that it is

10  utterly inconsistent with one's duty of fidelity to the corporation to consciously cause

11  the corporation to act unlawfully."); *Metro Commc'n Corp. BVI v. Advanced*

12  *Mobilecomm Techs., Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("Under Delaware law,

13  a fiduciary may not choose to manage an entity in an illegal fashion, even if the

14

15

---

16  [33]    Defendants' repeated claims that the Board somehow "did not know" what was
17  going on at Allergan are completely untenable.  *See, e.g.*, Allergan Mem. at 17.  As
    discussed herein, not only was the Board repeatedly placed on notice of illicit
18  activities through the various FDA warning letters, the FBI investigation, other
    governmental investigations and *qui tam* actions, but, by virtue of their own
19  admissions in the Company's SEC filings, they also had a duty to oversee these
    matters. *See In re Marvell Tech. Group Ltd. Sec. Litig.*, No. C-06-06286 RMW, 2008
20  WL 4544439, at *2 (N.D. Cal. Sept. 29, 2008) ("In deciding a motion to dismiss, the
    court must accept as true all factual allegations in the complaint and must draw all
21  reasonable inferences from those allegations, construing the complaint in the light
    most favorable to the plaintiff.").  The Complaint alleges (and defendants admit) that
22  defendants were warned of the exact conduct in which they later caused the Company
    to engage.  Specifically, in Allergan's Forms 10-K, defendants stated: "[T]he FDA
23  does restrict a manufacturer's communications on the subject of off-label use.
    Companies cannot actively promote FDA-approved pharmaceutical, biologic or
24  medical device products for off-label uses." ¶77.  The Director Defendants knew "[if]
    our promotional activities fail to comply with the FDA's . . . regulations or guidelines,
25  we may be subject to warnings from, or enforcement action by, the FDA or another
    enforcement agency." *Id*.  Indeed, in the September 12, 2002 Press Release, Director
26  Defendant Pyott himself acknowledges awareness of the September 5, 2002 "untitled"
    FDA letter about misleading Botox promotional materials. *See* RJN, Ex. G. Further,
27  on at least three occasions, a Company spokesperson responded to media about the
    August 22, 2001 FDA Letter and the August 2009 FDA Letter. *See* RJN, Exs. H, J-K.

28

1   fiduciary believes that the illegal activity will result in profits for the entity.").[34]

2   Corporate directors do not have the discretion to act beyond their lawful powers, and

3   their conscious decision to do so is not a "valid exercise of business judgment"

4   because it is not a business judgment at all.  *Aronson*, 473 A.2d at 814; *see also Ryan*,

5   918 A.2d at 354 (excusing demand because "[t]he board had no discretion to

6   contravene the terms of the stock option plans . . . [which] raise[s] a reason to doubt

7   that the challenged transactions resulted from a valid exercise of business judgment");

8   *Sanders v. Wang*, No. 16640, 1999 Del. Ch. LEXIS 203, at *14-*15 (Del. Ch. Nov. 8,

9   1999) (same).  As one treatise explains:

> The business judgment rule does not protect decisions by directors that
>
> constitute . . . illegality, or *ultra vires* conduct.  Therefore . . . a decision
>
> by directors that a violation of law or fraudulent or *ultra vires* conduct
>
> would serve the best interests of the corporation is not protected by the
>
> business judgment rule.

15  Dennis J. Block, Nancy E. Barton & Stephen A. Radin, *The Business Judgment Rule:*

16  *Fiduciary Duties of Corporate Directors* 41-42 (4th ed. 1995).

17      Because directors cannot exercise "business judgment" to consciously allow

18  company-wide illegal conduct, it is no surprise that defendants cite cases for

19

---

20  [34]    *See also Cal. Pub. Emps.' Ret. Sys. v. Coulter*, No. Civ.A. 19191, 2002
    WL 31888343, at *10 (Del. Ch. Dec. 18, 2002) (accepting *ultra vires* argument
21  excusing demand futility because "the business judgment rule may not be invoked to
    shelter unauthorized actions of a board of directors"); *Kahn ex rel. DeKalb Genetics*
22  *Corp. v. Roberts*, 679 A.2d 460, 465 (Del. 1996) ("business judgment rule normally
    protects all *lawful* actions of a board"); *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1461
23  (11th Cir. 1989) (explaining that the court will "substitute its judgment for that of the
    board" upon a "showing of abuse of discretion, fraud, bad faith, or illegality"); *Miller*
24  *v. AT&T*, 507 F.2d 759, 762 (3d Cir. 1974) (business judgment does not insulate
    directors from liability for willful violation of federal statute; "directors must be
25  restrained from engaging in activities which are against public policy"); *see also* S.
    Samuel Arsht, *The Business Judgment Rule*, 8 Hofstra L. Rev. 93, 129 (1979) ("Bad
26  faith may preclude application of the business judgment defense where directors
    knowingly violate a statute or comparable expression of public policy, even if such a
27  violation is undertaken in the corporation's best interests.").

28

unremarkable legal propositions without discussing or analyzing the actual facts underlying those actions.  None of these cases is factually on point.  By contrast, cases with comparable facts illustrate the clear rule of law that a board's conscious abandonment of duty evidences bad faith and is not protected by the business judgment rule excusing demand.

The Seventh Circuit's seminal decision in *Abbott Labs.*, 325 F.3d 795, is instructive.  In that case, the plaintiffs alleged that the directors ignored red flags raised by the FDA about violations of health-care regulations over a six-year period and consciously took no action to remedy those problems or exercise reasonable oversight.  *See id.* at 802-03.  Specifically, the plaintiffs in *Abbott Labs.* alleged (and the court eventually held) that the board's knowledge of the company's problems could be reasonably inferred based on, *inter alia*, "six years of noncompliance, inspections, 483s, Warning Letters, and notice in the press."  *Id.* at 809.  Plaintiffs further alleged that these failures caused the directors to violate their fiduciary duty of good faith and were not valid exercises of business judgment.  Plaintiffs argued that the board:

> "[K]new of the continuing pattern of noncompliance with FDA regulations and knew that the continued failure to comply with FDA regulations would result in severe penalties and yet ignored repeated red flags raised by the FDA and in media reports ***and chose not to bring a prompt halt to the improper conduct causing the noncompliance, nor to reprimand those persons involved, nor to seek redress for Abbott for the serious damages it has sustained*** . . . ."

*Id.* at 802-03.  The Seventh Circuit reversed the district court's dismissal, holding:

> [T]he facts support a reasonable assumption that there was a "sustained and systematic failure of the board to exercise oversight," in this case intentional in that ***the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to***

- 43 -

1   *take any action for such an inordinate amount of time resulted in*

2   *substantial corporate losses, establishing a lack of good faith*.

3   \* \* \*

4   *With respect to demand futility based on the directors' conscious*

5   *inaction, we find that the plaintiffs have sufficiently pleaded*

6   *allegations, if true, of a breach of the duty of good faith to reasonably*

7   *conclude that the directors' actions fell outside the protections of the*

8   *business judgment rule*.

9   *Id*. at 809.[35]

10   Here, the Complaint similarly alleges that the Director Defendants, over many

11   years, consciously disregarded their fiduciary duties of loyalty and good faith by

12   deliberately turning a blind eye to ongoing illegal misconduct related to the core of

13   Allergan's business.   As in *Abbott Labs.*, plaintiffs allege that the Board was

14   affirmatively on notice of the Company's problems through, *inter alia*, FDA warning

15   letters (including the September 5, 2002 FDA letter concerning misleading

16   promotional materials for Botox that prompted Allergan and Director Defendant Pyott

17   to issue the September 12, 2002 Press Release) and other notice in the press.   *See*

18   RJN, Exs. A-B, G-K.   This is not a case where a board was justifiably unaware of a

19   discreet illicit scheme that just happened to hurt a corporation.[36]   The Director

20

21   [35]   *See also In re SFBC Int'l, Inc. Sec. & Derivative Litig.*, 495 F. Supp. 2d 477,

22   485-86 (D.N.J. 2007) (where plaintiffs' complaint alleged "endemic mismanagement

23   of the company, raising plenty of red flags concerning the improper and even possibly

23   illegal practices in which the company was engaged," demand was excused because

24   "the alleged misconduct related to the core of PDG's business," and the directors

25   ignored "particularly flagrant and reprehensible wrongdoing, which unquestionably

25   resulted in a 'potentially life-threatening situation' more immediately to the trials'

26   participants and in the longer-run to public consumers").

27   [36]   Even if this were a case where an illicit scheme went undetected (and it is not),

28   federal courts have held that "where liability is based upon a failure to supervise and

- 44 -

593634_1

1  Defendants' breaches are particularly egregious in this case because the Director

2  Defendants engaged in a scheme by which they placed the public's health in jeopardy

3  to "turn a quick buck." *See Tower Air*, 416 F.3d at 239 ("Lives are on the line. . . .

4  The officers' alleged passivity in the face of negative maintenance reports seems so

5  far beyond the bounds of reasonable business judgment that its only explanation is bad

6  faith.").[37]

7       The Southern District of New York's recent decision in *Pfizer*, 722 F. Supp. 2d

8  453, which expressly followed *Abbott Labs.*, is likewise instructive.  In that case, very

9  similar to the instant Action, the plaintiffs alleged that Pfizer's directors ignored

10 repeated red flags over the course of nearly a decade and consciously implemented or

11 condoned a business strategy to, *inter alia*: (i) engage in pervasive, illegal off-label

12 marketing and promotion of various drugs in violation of federal laws, including the

13 FDCA; (ii) fund allegedly "independent" educational programs intended to promote

14 off-label uses of Pfizer products; and (3) pay doctors to promote off-label

15 prescriptions of Pfizer products at purportedly "independent" continuing medical

16 education meetings.  *Id*. at 456-57.  These illicit activities (and other related

17 misconduct) ultimately resulted in Pfizer's having to pay $2.3 billion in civil and

18 criminal fines and penalties as part of a settlement reached with the DOJ in 2009.  *Id*.

19 at 454-57.

20      The *Pfizer* plaintiffs further alleged, similarly to plaintiffs in this Action, that

21 the court could reasonably infer that Pfizer's directors were aware of Pfizer's

22 continuing illegal activities and chose to disregard them because of, among other

---

24 monitor, and to keep adequate supervisory controls in place, ***demand futility is

25 ordinarily found, especially where the failure involves a scheme of significant

25 magnitude and duration which went undiscovered by the directors***." *In re Oxford

26 Health Plans, Inc*., 192 F.R.D. 111, 117 (S.D.N.Y. 2000) (applying Delaware law).

27 [37]   Although *Tower Air* was not a derivative action, the Third Circuit nevertheless
conducted an expansive analysis of the protections afforded directors by Delaware's

28 business judgment rule.  *Id*. at 238-42.

1   things, repeated red flags, including various FDA violation notices and warning

2   letters, and allegations raised in multiple *qui tam* lawsuits filed against Pfizer. *Id.* at

3   460. The Southern District of New York, based on these allegations, held that it could

4   reasonably infer at the pleading stage that Pfizer's board of directors, "at a minimum,

5   knew of a high probability that Pfizer was continuing to purposely promote off-label

6   marketing and deliberately decided to let it continue by blinding themselves to that

7   knowledge," thus satisfying the second prong of the *Aronson* test. *Id.*

8        The court in *Pfizer* held that demand is futile, "especially when the alleged

9   wrongdoing is of substantial 'magnitude and duration.'" *Id.* (citing *Abbott Labs.*, 325

10  F.3d at 806 (quoting *McCall v. Scott*, 239 F.3d 808, 823 (6th Cir. 2001))). Similarly,

11  the Complaint here alleges that the Action does not arise from a single incident, but

12  numerous civil and criminal violations which involved hundreds of millions of dollars

13  and were common knowledge throughout the Company. ¶133. Additionally, as in

14  *Pfizer*, the Board here was affirmatively on notice of the Company's problems

15  through the receipt of FDA warning letters, the FBI investigation, other government

16  inquiries and numerous *qui tam* complaints. ¶134.[38] The September 12, 2002 Press

17  Release documents that the Board was fully aware of the September 5, 2002 FDA

18  letter, and was on notice that the FDA found Allergan's promotional materials for

19  Botox to be misleading. A majority of the Director Defendants – Pyott, Boyer,

20

21

---

22  [38]   Further, pursuant to the Code of Conduct, the Board was required to remain apprised of these things and represented affirmatively that it would do so.

23  Specifically, the Code of Conduct states that directors are required "to comply with all applicable laws and regulations and Allergan policies" as a "condition of

24  employment" and that "[f]ailure to do so could subject an employee [including directors] and Allergan to sanctions, could harm Allergan's reputation and

25  competitive position, and could result in disciplinary measures up to and including the termination of employment." ¶51; *see also* RJN, Ex. F. The Code of Conduct further

26  requires directors and officers to "ensur[e] compliance with worldwide clinical and regulatory standards, including conduct of clinical studies, marketing approvals, good

27  manufacturing practice requirements, labeling and advertising controls, and other mandated product regulations." ¶52; *see also* RJN, Ex. F.

28

593634_1

1    Herbert, Schaeffer, Gallagher and Ryan – were members of the Board in September

2    2002 (or earlier).  ¶¶27-32.

3          While this Court need look no further than the decisions in *Abbott Labs.* and

4    *Pfizer* to hold that demand is futile, *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F.

5    Supp. 2d 267 (S.D.N.Y. 2006), is also instructive.  In *Veeco*, the derivative plaintiffs

6    alleged that board members were aware of a pattern of material violations of the

7    federal export laws due to, *inter alia*, multiple internal reports of these violations.  *Id.*

8    at 272.  Plaintiffs asserted that pre-suit demand upon the members of the board's audit

9    committee would have been futile because it "abdicated its responsibility to monitor

10   legal compliance and investigate whistleblower claims relating to the Company's

11   allegedly flagrant, systematic and repeated violations of export control laws."  *Id.* at

12   277-78.  The court agreed because *Veeco* was "not a case where the directors had 'no

13   grounds for suspicion' or 'were blamelessly unaware of the conduct leading to the

14   corporate liability'" but, rather, a situation where the complaint adequately alleged

15   that "the director-Committee members 'conscientiously permitted a known violation

16   of law by the corporation to occur.'"  *Id.* at 278.  The same is true here.  The Director

17   Defendants were regularly informed of numerous red flags indicating Company-wide

18   violations of federal health-care regulations.  Further, as discussed above, defendants

19   were regularly and directly warned of the consequences of causing the Company to

20   engage in off-label marketing and the potential penalties it could bring.  ¶77.

21         The holdings in *Abbott Labs.*, *Pfizer* and *Veeco* excusing demand strongly

22   support demand excusal here, especially in light of the various FDA warning letters,

23   *qui tam* complaints, the FBI investigation, other government inquiries and notice in

24   the press, which evidence pervasive and prolonged wrongdoing at Allergan.[39]  Simply

25   _____

26   [39]     Indeed, to find otherwise, this Court would have to draw the implausible
     inference that, despite these particularized allegations, a majority of the Director
27   Defendants were somehow kept entirely in the dark about unlawful drug marketing
     practices that were sufficiently widespread and severe so as to warrant the Company
28

- 47 -

1   put, consciously permitting illegal conduct is not a protected business judgment, and

2   demand is excused on this basis alone.

3          **C.     Demand Is Also Excused Because a Majority of the Director Defendants Face a Substantial Likelihood of Liability in Connection with the Company's Illegal Business Strategy**

4

5          Demand was not required because a majority of the Director Defendants were

6   not disinterested and could not properly consider demand.  *See Pfizer*, 722 F. Supp. 2d

7   at 460 (holding not only that demand was excused under the second prong of *Aronson*

8   but that demand was also not required because Pfizer's directors were interested in a

9   demand due to "a substantial threat of personal liability").  First, demand was futile

10  because every Director Defendant has served on the Board since at least 2006 and,

11  thus, during the Covered Conduct time period (defined as running through December

12  31, 2008 for all conduct and through December 31, 2009 for specific conduct relating

13  to Botox) covered by the Settlement Agreement.  ¶138.  Further, defendants have all

14  served on the Board since at least 2005 – right in the middle of the overall time period

15  during which the wrongdoing was occurring.  *Id.*

16         Their conscious decision to condone ongoing, widespread illegal conduct

17  constituted an "'intentional dereliction of duty'" and "'a conscious disregard for one's

18  responsibilities,'" each of which is "'properly treated as a non-exculpable, non-

19  indemnifiable violation of the fiduciary duty to act in good faith.'"  *Ryan v. Lyondell

20  Chem. Co.*, No. 3176-VCN, 2008 WL 4174038, at *2-*3 (Del. Ch. Aug. 29, 2008)

21  ("*Lyondell*"); *Pfizer*, 722 F. Supp. 2d at 460 (finding that directors were interested in a

22  demand because it could be reasonably inferred that they knew of illegality, chose to

23

24  being forced to pay $600 million in sanctions to resolve the various civil and criminal claims against Allergan.  The Director Defendants are not entitled to that inference.

25  *See, e.g., Am. Int'l Grp., Inc. v. Greenberg*, 965 A.2d 763, 777 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. v. PricewaterhouseCoopers LLP*, 2011 Del. LEXIS 1

26  (Del. Jan. 3, 2011).  In assessing demand futility, all reasonable inferences must be drawn in the light most favorable to plaintiffs.  *In re Taser Int'l S'holder Derivative

27  Litig.*, No. CV-05-123-PHX-SRB, 2006 U.S. Dist. LEXIS 11554, at *23-*24 (D. Ariz. Mar. 17, 2006); *Zoran*, 511 F. Supp. 2d at 1001-02.

28

593634_1

disregard it and thus faced a substantial likelihood of liability "arising from their alleged breach of their non-exculpated fiduciary duties"). Because the Complaint adequately alleges that every Director Defendant breached his or her fiduciary duties to act in good faith, every director faces a substantial likelihood of liability, and demand was futile. *See, e.g.*, *Rales,* 634 A.2d at 936.

### D.   Defendants Mischaracterize the Allegations in the Complaint and Cite Inapposite Authority

Defendants' motion reflects a fundamental disconnect with the Complaint. The core theory of the Complaint rests on conscious and deliberate acts of misconduct by the Board. Defendants' brief attacks a very different theory of the case. Defendants pretend that plaintiffs merely allege negligent failure of oversight claims, or so-called "*Caremark*" claims. *See* Allergan Mem. at 14-15. But plaintiffs are not asserting that the Board was "blissfully unaware" of Allergan's ongoing violations, and no fair reading of the Complaint supports that conclusion. *Caremark*, 698 A.2d at 969; *see also id*. at 972 (*Caremark* action "presents no occasion to apply a principle to the effect that knowingly causing the corporation to violate a criminal statute constitutes a breach of a director's fiduciary duty").

If defendants' argument were accepted, the mere act of creating committees and implementing monitoring mechanisms would absolutely immunize directors from liability or even the prospect of demand futility. That is not the law in Delaware or anywhere else. Despite the detailed allegations in the Complaint alleging the Director Defendants' conscious disregard for their responsibilities, defendants rely heavily on cases involving passive failures to monitor. However, none of the cited cases involved allegations of (i) nearly a decade of continuous, Company-wide illegal conduct; (ii) receipt of numerous FDA warning letters; (iii) numerous government and FBI investigations; and (iv) the filing of numerous *qui tam* complaints.

Defendants rely heavily on *King v. Baldino*, 648 F. Supp. 2d 609 (D. Del. 2009), *aff'd*, 2010 U.S. App. LEXIS 25490 (3d Cir. Dec. 14, 2010). In that case, the

- 49 -

1    court dismissed the complaint for failure to make a demand after expressly finding

2    that "plaintiff fail[ed] to plead particularized facts demonstrating that the Board was

3    aware of the actions of the alleged 'principal wrongdoers' and consciously failed to

4    act in light of that knowledge." *Id.* at 626.  A comparison of the Complaint here to the

5    complaint dismissed in *King* – a 21-page document consisting largely of multi-page

6    quotations from newspapers strung together with boilerplate allegations – makes clear

7    the significant distinctions between the two cases.

8         Defendants also argue that the Complaint does not plead that the Board

9    consciously ignored red flags.  Allergan Mem. at 16.  Any fair reading of the

10   Complaint reveals detailed allegations about the specific, direct oversight role of the

11   Board concerning Allergan's marketing operations, the control mechanisms in place at

12   Allergan to prevent off-label marketing violations and the numerous red flags that

13   were brought to the Board's attention in direct contravention of the Board's own

14   warnings concerning off-label marketing.  ¶¶45-54, 75.  The Complaint also alleges

15   with particularity that a majority of the Board consciously ignored those red flags and

16   their duty to intervene, which resulted in the Company being forced to pay over a half-

17   billion dollars in sanctions.  ¶¶1-19, 45-54, 75, 79-80, 106.

18   **E.   Demand Is Also Excused Because Plaintiffs Sufficiently**
         **Raise Reasonable Doubt that at Least Six Director**
19       **Defendants Lack Disinterest and/or Independence**

20       **1.   Lavigne, Gallagher, Ray, Hudson and Ryan Face a**
              **Substantial Likelihood of Liability for Their Conduct**
21            **on the Audit Committee**

22        Defendants Lavigne, Gallagher, Ray, Hudson and Ryan (the "Audit Committee

23   Defendants") also face a substantial likelihood of liability based on their conduct as

24   Audit Committee members during the relevant period.  ¶140.  Allergan's Audit

25   Committee Charter obligated them, *inter alia*, to maintain adequate internal controls

26   over financial reporting and the integrity of the Company's financial statements.  *Id.*

27   The Audit Committee Defendants had a specific duty to ensure the Company's

28

- 50 -

compliance with applicable laws and regulations.  *Id*.  For the following reasons, the
Audit Committee Defendants face a substantial threat of liability.

### a.   Failure to Design and Implement Adequate Internal Controls

Plaintiffs' allegations that the Audit Committee Defendants face a substantial
likelihood of liability are underscored by the Board's pervasive willingness to run the
Company in an illegal fashion, which resulted in the systematic failure to maintain
adequate internal controls (despite defendants' repeated touting of the Company's
internal controls).   In *Oxford Health*, 192 F.R.D. 111, and *In re Cendant Corp.
Derivative Action Litig.*, 189 F.R.D. 117 (D.N.J. 1999), demand was excused as to the
entire board where there were such systemic failures "to supervise and monitor, and to
keep adequate supervisory controls in place . . . especially where the failure involves a
scheme of significant magnitude and duration." *Oxford Health*, 192 F.R.D. at 117.[40]
Here, where defendants knew of or recklessly disregarded a decade-long, illegal off-
label marketing scheme, demand is not required on the Audit Committee Defendants.

### b.   Issuance of False and Misleading Statements

The Audit Committee Defendants face a substantial likelihood of liability based
on defendants' repeated false and misleading statements.  When the directors of a
Delaware corporation communicate with shareholders, the "shareholders are entitled
to honest communication from directors, given with complete candor and in good
faith."   *infoUSA*, 953 A.2d at 990.  "Communications that depart from this
expectation, particularly where it can be shown that the directors involved issued their
communication with the knowledge that it was deceptive or incomplete, violate the
fiduciary duties that protect shareholders.  Such violations are sufficient to subject
directors to a derivative claim." *Id*.  Directors who knowingly issue false and

---

[40]    *See also Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1282 n.32
(Del. 1989) (finding that the board's virtual abandonment of oversight functions was a
breach of the fundamental duties of loyalty and care).

- 51 -

1  misleading statements to shareholders "may be considered to be interested for

2  purposes of demand." *Id*. at 991; *see also Malone*, 722 A.2d at 10.

3      As the Delaware Chancery Court confirmed, audit committee oversight over

4  corporate communications is no small matter.  In *Ryan*, 918 A.2d at 345, Chancellor

5  Chandler discussed how the filing and dissemination of financial filings containing

6  false and misleading statements "runs afoul of many state and federal common and

7  statutory laws that prohibit dissemination of false and misleading information."

8  Chancellor Chandler specifically noted that the members of Maxim Integrated

9  Products, Inc.'s ("Maxim") audit committee were directly responsible for, *inter alia*,

10  reviewing and approving false financial statements.  *Id*. at 356 n.38.  As such,

11  Chancellor Chandler opined that Maxim's audit committee members had subjected

12  themselves to potential criminal liability for, *inter alia*, securities fraud, mail fraud

13  and wire fraud, and expressed no doubt that they also faced a substantial likelihood of

14  liability for breaching their fiduciary duties under Delaware law.  *Id*.

15      Accordingly, demand was not required on the Audit Committee Defendants,

16  who similarly caused Allergan to issue repeated false and misleading statements

17  concerning the adequacy of the Company's internal controls and the accuracy of its

18  financial statements.

19          **2.  Boyer, Ingram, Dunsire, Jones and Schaeffer Face a Substantial Likelihood of Liability for Their Conduct on the Corporate Governance Committee**

20

21      Defendants Boyer, Ingram, Dunsire, Jones and Schaeffer (the "Governance

22  Committee Defendants") served on the Company's Corporate Governance Committee

23  (the "Governance Committee") during the period of wrongdoing.  ¶139.  Pursuant to

24  the Governance Committee Charter, its members were required to "regularly receive[]

25  comprehensive reports from management regarding compliance-related matters

26  affecting the Corporation and provide general compliance oversight to the

27  Corporation."  *Id*.  As such, the Governance Committee Defendants were essentially

28  required to be aware of the various FDA warning letters and the other "red flags."

593634_1

1   ¶138.  The Governance Committee Defendants' failure to act in accordance with these

2   duties in good faith is a breach of their fiduciary duties and subjects them to a

3   substantial likelihood of liability.  *Id*.; *Abbott Labs.*, 325 F.3d at 808.

4   ### 3.       Defendants Concede that Pyott Lacks Independence

5   Demand is also excused with respect to defendant Pyott because he lacks

6   independence from demonstrably "interested" directors due to his employment as

7   CEO of the Company when the Action was initiated.  ¶142.  Additionally, in the

8   Company's proxy statement filed on March 12, 2010, defendants have conceded that

9   defendant Pyott is not an independent director.  RJN, Ex. E at 16.

10   The issue of a director's independence "'turns on whether a director is, for any

11   substantial reason, incapable of making a decision with only the best interests of the

12   corporation in mind.'"  *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 920 (Del.

13   Ch. 2004) (emphasis in original).  The independence test is ultimately focused on a

14   director's "'impartiality and objectivity.'"  *Id.*

15   Delaware courts have consistently held that employee-directors of a corporation

16   cannot be considered independent of directors who are their employers and/or

17   management superiors.  *See, e.g.*, *Rales*, 634 A.2d at 937 ("there is a reasonable doubt

18   that [an employee-director] can be expected to act independently considering his

19   substantial financial stake in maintaining his current offices"); *In re Cooper Cos., Inc.

20   S'holders Derivative Litig.*, No. 12584, 2000 WL 1664167, at *6-*7 (Del. Ch. Oct. 31,

21   2000) (directors who also served as CFO/Treasurer and Vice President/General

22   Counsel could not respond impartially to a demand).  Because Pyott's principal

23   professional occupation was his position as Allergan's CEO when the Action was

24   initiated, Pyott could not have independently responded to a demand.

25   ### F.       Defendants Cannot Hide Behind Allergan's Exculpatory Provision

26

27   Defendants' references to Allergan's Restated Certificate of Incorporation are

28   merely a red herring.  Allergan Mem. at 13.  First, plaintiffs cannot be dismissed at the

593634_1

1  pleading stage based on the "exculpatory provision" of Allergan's charter because this
2  argument is treated as an affirmative defense, which is not suitable at the pleading
3  stage.  *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999) (use of
4  exculpatory provisions to shield directors from personal liabilities presents an
5  affirmative defense not amenable for pretrial disposition); *see also Tower Air*, 416
6  F.3d at 242 (same).

7        Further, even assuming, *arguendo*, that defendants properly raised this defense
8  at the pleading stage (which they have not), the liability bar of §102(b)(7) of the
9  Delaware General Corporation Law does not extend to "acts or omissions not in good
10 faith" or which "involve intentional misconduct or a knowing violation of law."  *See*
11 *Abbott Labs.*, 325 F.3d at 810 ("breaches other than duty of care may not exempt the
12 directors from liability and would disable the directors from considering a demand
13 fairly").  Indeed, §102(b)(7) does not shield defendants from liability where, as here,
14 there are allegations of multiple violations of law and other serious internal control
15 deficiencies. *See, e.g.*, *Lyondell*, 2008 WL 4174038, at *3 ("a conscious disregard of
16 one's responsibilities" is "'properly treated as a non-exculpable, non-indemnifiable
17 violation of the fiduciary duty to act in good faith'"); *Pfizer,* 722 F. Supp. 2d at 460
18 (same).  Consequently, plaintiffs have adequately alleged that defendants' breaches
19 are not violations of the duty of care alone but that their conduct here was not in
20 "good faith" under §102(b)(7)(ii).

21
22
23
24
25
26
27
28

593634_1

1

## V.  CONCLUSION

2

For the foregoing reasons, plaintiffs respectfully request that defendants'

3

motions to dismiss be denied in their entirety.[41]

4

DATED:  January 18, 2011            Respectfully submitted,

5

ROBBINS GELLER RUDMAN
  & DOWD LLP

6

AELISH M. BAIG

7

8

                                      s/ AELISH M. BAIG
                                   AELISH M. BAIG

9

10

Post Montgomery Center
One Montgomery Street, Suite 1800

11

San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

12

ROBBINS GELLER RUDMAN
  & DOWD LLP

13

DARREN J. ROBBINS

14

TRAVIS E. DOWNS III
DAVID W. MITCHELL

15

BENNY C. GOODMAN III
BRIAN O. O'MARA

16

655 West Broadway, Suite 1900
San Diego, CA  92101

17

Telephone:  619/231-1058
619/231-7423 (fax)

18

ROBBINS UMEDA LLP

19

BRIAN J. ROBBINS
FELIPE J. ARROYO

20

ARSHAN AMIRI
600 B Street, Suite 1900

21

San Diego, CA  92101
Telephone:  619/525-3990

22

619/525-3991 (fax)

23

24

25

26

---

27

[41]      If the Court grants the motions to dismiss in whole, or in part, plaintiffs respectfully request leave to amend.

28

593634_1

- 55 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF
12707 High Bluff Drive, Suite 200
San Diego, CA  92130
Telephone:  858/794-1441
858/794-1450 (fax)

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
121 N. Wayne Avenue, Suite 100
Wayne, PA  19087
Telephone:  610/225-2677
610/225-2678 (fax)

Co-Lead Counsel for Plaintiffs

593634_1

1

<u>CERTIFICATE OF SERVICE</u>

2

     I hereby certify that on January 18, 2011, I authorized the electronic filing of

3

the foregoing with the Clerk of the Court using the CM/ECF system which will send

4

notification of such filing to the e-mail addresses denoted on the attached Electronic

5

Mail Notice List, and I hereby certify that I caused to be mailed the foregoing

6

document or paper via the United States Postal Service to the non-CM/ECF

7

participants indicated on the attached Manual Notice List.

8

     I certify under penalty of perjury under the laws of the United States of America

9

that the foregoing is true and correct.  Executed on January 18, 2011.

10

                                        _s/ AELISH M. BAIG_

11

                                    AELISH M. BAIG

12

                                    ROBBINS GELLER RUDMAN

13

                                       & DOWD LLP
                                    Post Montgomery Center

14

                                    One Montgomery Street, Suite 1800

15

                                    San Francisco, CA  94104
                                    Telephone:  415/288-4545

16

                                    415/288-4534 (fax)
                                    E-mail:      aelishb@rgrdlaw.com

17

18

19

20

21

22

23

24

25

26

27

28

593634_1

# Mailing Information for a Case 8:10-cv-01352-DOC -MLG

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Arshan Amiri**
  aamiri@ruflaw.com

- **Felipe J Arroyo**
  farroyo@robbinsumeda.com,notice@robbinsumeda.com,mozaki@robbinsumeda.com

- **Aelish M Baig**
  aelishb@rgrdlaw.com

- **Kristopher Price Diulio**
  kdiulio@gibsondunn.com,dfkennedy@gibsondunn.com,crussell@gibsondunn.com

- **Rusty E. Glenn**
  rusty@shumanlawfirm.com

- **Kathleen Ann Herkenhoff**
  kah@weiserlawfirm.com

- **John C Hueston**
  jhueston@irell.com,lhiles@irell.com

- **Daniel P Lefler**
  dlefler@irell.com

- **Brian Oliver O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brian J Robbins**
  notice@robbinsumeda.com

- **Kip B Shuman**
  kip@shumanlawfirm.com

- **Wayne W Smith**
  wsmith@gibsondunn.com,dfkennedy@gibsondunn.com

- **Robert B Weiser**
  rw@weiserlawfirm.com

- **Lillie A Werner**
  lwerner@irell.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Jeffrey J. Ciarlanto**
The Weiser Law Firm  PC
121 North Wayne Ave  Suite 100
Wayne, PA 19087

**Debra S Goodman**
Law Office of Debra S Goodman PC
1301 Skippack Pike  Suite 7A – 133
Blue Bell, PA 19422

**Brett Steckler**
The Weiser Law Firm PC
121 North Wayne Avenue
Suite 100
Wayne, PA 19087