1  WAYNE W. SMITH, SBN 54593
      WSmith@gibsondunn.com
2  JEFFREY H. REEVES, SBN 156648
      JReeves@gibsondunn.com
3  KRISTOPHER P. DIULIO, SBN 229399
      KDiulio@gibsondunn.com
4  GIBSON, DUNN & CRUTCHER LLP
   3161 Michelson Drive
5  Irvine, California 92612-4412
   Telephone: 949.451.3800
6  Facsimile: 949.451.4220

7  Attorneys for Defendants,
   David E. I. Pyott; Herbert W. Boyer,
8  Ph.D.; Louis J. Lavigne, Jr.; Gavin S.
   Herbert; Stephen J. Ryan, M.D.; Leonard
9  D. Schaeffer; Michael R. Gallagher;
   Robert A. Ingram; Trevor M. Jones,
10 Ph.D.; Dawn E. Hudson; Russell T. Ray;
   Deborah Dunsire, M.D.; Handel E.
11 Evans; Ronald M. Cresswell, Ph.D.;
   Louis T. Rosso; Karen R. Osar; and
12 Anthony H. Wild, Ph.D.

13                 UNITED STATES DISTRICT COURT

14          FOR THE CENTRAL DISTRICT OF CALIFORNIA

15                     SOUTHERN DIVISION

16

17 | In re ALLERGAN, INC.          | CASE NO. SACV10-1352 DOC (MLGx)
18 | SHAREHOLDER DERIVATIVE
   | LITIGATION                    | **INDIVIDUAL DEFENDANTS' REPLY**
19 |                               | **BRIEF IN SUPPORT OF THEIR**
   |                               | **MOTION TO DISMISS PLAINTIFFS'**
20 |                               | **CONSOLIDATED COMPLAINT**
21 | This Document Relates To:     | **Hearing:**
22 | ALL ACTIONS                   | Date:    February 28, 2011
23 |                               | Time:    8:30 a.m.
   |                               | Place:   Courtroom 9D
24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

II. PLAINTIFFS' FEDERAL CLAIMS SHOULD BE DISMISSED ...........................3

    A.      Plaintiffs' Section 14(a) Claim Must Be Dismissed................................3

          1.      The Section 14(a) Claim Is Barred By The Statute Of Limitations ..............................................................................4

          2.      The Section 14(a) Claim Does Not Satisfy The Heightened Pleading Standards Imposed By Rule 9(b) And The PSLRA ..........................................................5

          3.      The Complaint Fails To State A Section 14(a) Claim.....................6

    B.      Plaintiffs' Section 29(b) Claim Fails ...................................................12

III. PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED....................13

    A.      The Court Should Refuse Supplemental Jurisdiction And Defer Resolving State-Law Issues While Those Issues Are Pending In State Court ..........................................................................................13

    B.      Plaintiffs Have Failed To State A Claim For Breach Of Fiduciary Duty..................................................................................14

          1.      Plaintiffs Have Not Identified Any Bad Faith Inaction By The Board ........................................................................14

    C.      Plaintiffs Have Failed To State A Claim For Insider Trading .................22

    D.      Plaintiffs' Complaint Does Not State A Claim For Corporate Waste......................................................................................23

    E.      Plaintiffs Have Not Stated A Claim For Unjust Enrichment ...................24

IV. CONCLUSION......................................................................................................24

Gibson, Dunn &
Crutcher LLP

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Beck v. Dobrowski*
   559 F.3d 680 (7th Cir. 2009 ) ..................................................................6

*Brehm v. Eisner*
   746 A.2d 244 (Del. 2000)........................................................................23

*Buckman Co. v. Plaintiffs' Legal Comm.*
   531 U.S. 341 (2001)................................................................................17

*Corp. v. Topps Chewing Gum, Inc.*
   539 A.2d 1060 (Del. 1988).....................................................................24

*Cowin v. Bresler*
   741 F.2d 410 (D.C. Cir. 1984) ...............................................................12

*Desaigoudar v. Meyercord*
   223 F.3d 1020 (9th Cir. 2000) ..................................................................5

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*
   594 F.3d 783 (11th Cir. 2010) ...............................................................12

*Fagin v. Gilmartin*
   432 F.3d 276 (3d Cir. 2005) ..................................................................19

*Gaines v. Haughton*
   645 F.2d 761 (9th Cir. 1981) ..................................................2, 7, 10, 11

*Gen. Elec. Co. by Levit v. Cathcart*
   980 F.2d 927 (3d Cir. 1992) ..................................................................12

*GFL Advantage Fund, Ltd. v. Colkitt*
   272 F.3d 189 (3d Cir. 2001) ..................................................................12

*In re Abbott Laboratories Derivative Shareholders Litigation*
   325 F.3d 795 (7th Cir. 2001) .......................................................1, 18, 19

*In re Actimmune Mktg. Litig.*
   614 F. Supp. 2d 1037 (N.D. Cal. 2009) .................................................17

*In re Amgen Inc. Securities Litigation*
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...................................................9

*In re Asyst Technologies, Inc. Derivative Litigation*
   2008 WL 216902 (N.D. Cal. May 23, 2008) .........................................24

*In re Asyst Techs., Inc. Derivative Litig.*
   2008 WL 4891220 (N.D. Cal. Nov. 12, 2008)......................................13

*In re Caremark Int'l Derivative Litig.*
   698 A.2d 959 (Del. Ch. 1996)...........................................................2, 14

*In re Countrywide Financial Corp. Derivative Litig.*
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...................................................8

*In re Donna Karan Int'l Sec. Litig.*
   1998 WL 637547 (E.D.N.Y. Aug. 14, 1998) ..........................................7

Gibson, Dunn &
Crutcher LLP

**INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

*In re Exxon Mobil Corp. Sec. Litig.*
   500 F.3d 189 (3d Cir. 2007)................................................................................4

*In re Fannie Mae Derivative Litig.*
   503 F. Supp. 2d 9 (D.D.C. 2007)......................................................................19

*In re Gilead Sci. Sec. Litig.*
   536 F.3d 1049 (9th Cir. 2008) ...........................................................................9

*In re Hansen Natural Corp. Sec. Litig.*
   527 F. Supp. 2d 1142 (C.D. Cal. 2007)..............................................................6

*In re Ibasis, Inc. Derivative Litig.*
   532 F. Supp. 2d 214 (D. Mass. 2007)...............................................................12

*In re Intel Corp. Derivative Litig.*
   621 F. Supp. 2d 165 (D. Del. 2009)..................................................................19

*In re J.P. Morgan Chase & Co. S'holder Litig.*
   906 A.2d 766 (Del. 2006)...................................................................................3

*In re McKesson HBOC, Inc. Sec. Litig.*
   126 F. Supp. 2d 1248 (N.D. Cal. 2000)..............................................................6

*In re McLinn*
   739 F.2d 1395 (9th Cir. 1984) ...........................................................................2

*In re MRV Commc'ns, Inc. Derivative Litig.*
   2010 WL 5313442 (C.D. Cal. Dec. 27, 2010)..................................................13

*In re Mut. Funds Inv. Litig.*
   384 F. Supp. 2d 873 (D. Md. 2005)..................................................................12

*In re Pfizer Inc. Shareholder Derivative Litigation*
   2010 WL 2747447 (S.D.N.Y. July 13, 2010) ........................................1, 19, 20

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*
   2009 WL 2043604 (D.N.J. July 10, 2009).................................................5, 17

*In re Silicon Graphics Int'l Sec. Litig.*
   183 F.3d 970 (9th Cir. 1999) ...........................................................................16

*In re Teledyne Def. Contracting Derivative Litig.*
   849 F. Supp. 1369 (C.D. Cal. 1993) ...............................................................7, 9

*In re Veeco Instruments, Inc. Securities Litigation*
   434 F. Supp. 2d 267 (S.D.N.Y. 2006)........................................................20, 21

*In re VeriSign, Inc., Derivative Litig.*
   531 F. Supp. 2d 1173 (N.D. Cal. 2007)............................................................11

*In re Zoran Corp. Derivative Litig.*
   511 F. Supp. 2d 986 (N.D. Cal. 2007)..............................................................11

*Indiana Elec. Workers Pension Trust Fund v. Dunn*
   2007 WL 1223220 (N.D. Cal. Mar. 1, 2007)....................................................4

*Kelley v. Rambus, Inc.*
   2008 WL 5170598 (N.D. Cal. Dec. 9, 2008)...................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

iii

**INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

*King v. Baldino*
   648 F. Supp. 2d 609 (D. Del. 2009), *aff'd* 2010 U.S. App. LEXIS 25490
   (3d Cir. Dec. 14, 2010) .................................................................21

*Knollenberg v. Harmonic, Inc.*
   152 F. App'x 674 (9th Cir. 2005) ...................................................5

*La. Mun. Police Emps.' Ret. Sys. v. Pyott*
   No. 5795-VCL, Argument and Ruling on Motion to Intervene Transcript
   (Del. Ch. Ct. Jan. 21, 2011) .........................................................14

*Log On Am., Inc. v. Promethean Asset Mgmt. LLC*
   223 F. Supp. 2d 435 (S.D.N.Y. 2001) ..........................................12

*New York City Employees' Ret. Sys. v. Jobs*
   593 F.3d 1018 (9th Cir. 2010).........................................................3

*Paskowitz v. Pac. Capital Bancorp*
   2009 WL 4911850 (C.D. Cal. Nov. 6, 2009).................................9

*Potter v. Hughes*
   546 F.3d 1051 (9th Cir. 2008) ......................................................16

*Rudolph v. Utstarcom*
   560 F. Supp. 2d 880 (N.D. Cal. 2008) ............................................4

*Schneider v. Ca. Dep't of Corr.*
   151 F.3d 1194 (9th Cir. 1998) ......................................................15

*Smith v. Ortiz*
   234 Fed. App'x 698 (9th Cir. 2007) ........................................15, 25

*Stone v. Ritter*
   911 A.2d 362 (Del. 2006)..............................................................16

*United States v. Ritchie*
   342 F.3d 903 (9th Cir. 2003) ........................................................15

*Wash Legal Found. v. Henney*
   202 F.3d 331 (D.C. Cir. 2000) ......................................................17

*Weisberg v. Coastal States Gas Corp.*
   609 F.2d 650 (2d. Cir. 1979) ...................................................10, 11

**Other Authorities**

28 U.S.C. § 1332(a)(2).......................................................................13

28 U.S.C. § 1367(c)(3).......................................................................13

28 U.S.C. § 1658 .................................................................................4

**INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

# I. INTRODUCTION

The majority of the Opposition is dedicated to casting aspersions against Allergan and the Individual Defendants, yet those efforts are founded on misrepresentations, distortions, omissions, and the substitution of conclusions for allegations of fact (many of which do not even appear in the Complaint).[1]  Plaintiffs heavily rely on the Government Investigation, asserting that it was thorough and that its existence was a red flag ignored by the Board.  But the very fact that Plaintiffs have to rely on the Government Investigation reveals the fundamental weakness of their derivative claims:  After an extensive investigation by the Government, no individual Director or Officer was charged with any improper conduct, and nowhere in the criminal Information or Sentencing Memorandum is there so much as **one word** implicating any Director or Officer in any wrongdoing, let alone the type of misconduct that could result in derivative liability.

Although the Company pleaded guilty to a single strict liability misdemeanor charge, that plea, alone, does not support derivative claims against the Individual Defendants.  Apparently because of this shortcoming, Plaintiffs put forward a slew of arguments that mischaracterize the pleadings and underlying facts.  For example:

- Plaintiffs misrepresent the nature and substance of FDA letters with Allergan, none of which concerned off-label marketing of BOTOX® Therapeutic;

- Plaintiffs distort the FDA regulatory scheme and the legal and proper role of off-label uses in the medical community;

- Plaintiffs argue that the *Abbott Labs* and *Pfizer* cases control as to demand futility by omitting all of the myriad facts making those cases dramatically different from the facts present here; and

- Plaintiffs cite bald conclusions alleged in the Complaint as if they were "detailed" and "particularized" factual allegations.

---

[1]  Capitalized terms have the same definitions as set forth in the Individual Defendants' Memorandum of Points and Authorities in support of their Motion to Dismiss Plaintiffs' Consolidated Complaint.

**INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

1   Piercing through the distortions and fabrications underlying Plaintiffs' arguments,

2   it is readily apparent that Plaintiffs have neither pleaded demand futility nor any viable

3   claims, let alone facts sufficient to meet the onerous requirements for a *Caremark* claim.

4   Furthermore, Plaintiffs' allegations are already being litigated in Delaware Chancery

5   Court, where they were originally filed.  Using a fairly new tactic to try to accomplish

6   an end run around an earlier-filed Delaware action, Plaintiffs grafted onto their

7   Complaint inapplicable federal securities claims.  Not only does the Complaint fail to

8   allege the required elements for the federal securities claims, but permitting this tactic to

9   succeed would improperly "federalize" state law derivative claims that Congress

10  specifically excluded from federal securities law. *See*, *e.g.*, *Gaines v. Haughton*, 645

11  F.2d 761, 779 (9th Cir. 1981) (rejecting attempt to broaden scope of Section 14 and

12  finding that "[a] contrary holding . . . would represent a move toward the federalization

13  of corporate law that the Supreme Court has repeatedly and emphatically rejected")

14  *overruled on other grounds by In re McLinn*, 739 F.2d 1395 (9th Cir. 1984).

15  Nominal Defendant Allergan concurrently filed a Motion to Stay this action in

16  favor of the first-filed Delaware action.  Plaintiffs' claims raise complex issues of

17  Delaware state law, including the standing of any derivative plaintiff to pursue these

18  claims without making a pre-suit demand on the Board.  Principles of comity and

19  judicial efficiency dictate that these Delaware state law issues should be resolved by the

20  Delaware court, and that federal action should be stayed pending resolution of the

21  Delaware case.

22  If the Court declines to stay this action, it must first consider Allergan's demand

23  futility motion.  This case should be dismissed because Plaintiffs failed to make a pre-

24  suit demand on the Board and have not pled with particularity why demand should be

25  excused, as required by Rule 23.1 and governing Delaware law.  If the Court grants the

26  demand futility motion, then the Court need not rule on this Motion to Dismiss for

27  failure to state a claim.

28

If the Court does not grant Allergan's demand futility motion, the Individual Defendants believe the Court should next address the purported federal law claims alleged to exist under Sections 14 and 29 of the Securities Exchange Act. These claims are wholly without merit, and upon their dismissal, no federal question will remain as a basis for jurisdiction. Without a federal question, this action should be dismissed because there is no dispute that diversity jurisdiction is unavailable.

Whether or not the Court dismisses the federal claims, the Court should decline to exercise supplemental jurisdiction over the state law claims, which are already pending in Delaware. Only after resolving these issues, should the Court—if appropriate— consider whether the Complaint states a claim, and because Plaintiffs' Complaint fails to state a claim, the Complaint should be dismissed on that basis.

## II.  PLAINTIFFS' FEDERAL CLAIMS SHOULD BE DISMISSED

### A.    Plaintiffs' Section 14(a) Claim Must Be Dismissed

Whether a Section 14(a) claim is a direct or derivative claim "is governed by the law of the state of incorporation." *New York City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010). Plaintiffs argue that under some circumstances a Section 14(a) claim "may be brought derivatively." (Opp. at 17 n.15.) But this response ignores that under Delaware law, claims of inadequate disclosures impacting stockholders' ability to exercise their voting rights, like the claim asserted here, are direct claims. *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006) ("[W]here it is claimed that a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct."); (Compl. ¶ 115 (arguing that inadequate disclosure impaired "how [shareholders] cast their votes")).[2]

---

[2] Although the plaintiffs in *In re Countrywide Financial Corp. Derivative Litigation*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008), proceeded derivatively, in that action the plaintiffs alleged that the defendants failed to disclose that they were making fundamental changes to the company, which ultimately resulted in the collapse of the company's stock. Here, Plaintiffs have not pleaded any similar allegations against Allergan, Allergan has not collapsed, and the Directors are not alleged to have fundamentally changed how the Company operates.

Because Plaintiffs have not alleged the elements necessary to sustain a direct claim, the Section 14(a) claims should be dismissed.

### 1.    The Section 14(a) Claim Is Barred By The Statute Of Limitations

Plaintiffs' Section 14(a) claim is subject to a one-year statute of limitations, rather than the two-year period incorrectly argued by Plaintiffs.  (Opp. at 25.)  Plaintiffs rely on 28 U.S.C. § 1658, but fail to acknowledge that "every court that has considered the issue . . . has held that § 1658 does not apply to claims brought under § 14(a)." *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 892 (N.D. Cal. 2008).[3]  Applying the proper one-year statute of limitations, it is clear that Plaintiffs' Section 14(a) claim is untimely; it was filed more than one year after Allergan's March 3, 2008 disclosure of the existence of the DOJ investigation (Ex. C).  Moreover, Plaintiffs allege that the red flags the Board ignored were FDA warning letters, but Allergan made numerous public statements as early as September 5, 2001 regarding these letters and the letters themselves were publicly disclosed on the FDA's website.  (*See*, *e.g.*, Opp. at 3 n.5, 21 n.18, 41 n.33; Pls.' Exs. A, B, G, H, J, K.)

Plaintiffs argue that no shareholder was on reasonable notice of the off-label marketing allegations until the September 1, 2010 Information or the October 4, 2010 Sentencing Memorandum.  (Opp. at 25-26.)  But the statute of limitations is triggered when the plaintiff has "knowledge of facts sufficient to put a reasonable person on notice." *Indiana Elec. Workers Pension Trust Fund v. Dunn*, No. C-06-01711 RMW, 2007 WL 1223220, at *4 (N.D. Cal. Mar. 1, 2007).  This occurred when the Company disclosed the DOJ investigation into off-label marketing in March 2008—if not earlier

---

[3]  Although the Sarbanes-Oxley Act of 2002 extended the statute of limitations in 28 U.S.C. § 1658 for certain claims, that extension does not apply to claims under Section 14(a).  *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 196-97 (3d Cir. 2007) (rejecting argument that § 1658(b) should apply to Section 14(a) claims that sound in fraud); *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1212-13 (N.D. Cal. 2007) (collecting cases); *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 424 (D.N.J. 2005) ("The fact that Plaintiffs are required to plead their Section 14(a) claim against Defendants with particularity pursuant to the PSLRA does not entitle Plaintiffs to the lengthened statute of limitations.").

Gibson, Dunn & Crutcher LLP

1    when the alleged red flag FDA letters were disclosed.[4]  (Ex. C.)  Plaintiffs argue that

2    somehow shareholders were not aware of the potential to claim wrongdoing by the

3    Board until the release of the Information or the Sentencing Memorandum—even

4    though neither contains any discussion about the Directors.

5         Plaintiffs rely on *In re Schering-Plough Corp. Intron/Temodar Consumer Class*

6    *Action*, in which the court dismissed RICO claims, but found that there was a factual

7    question whether the plaintiffs were on inquiry notice of their claims when the

8    defendants allegedly ***concealed*** their illegal conduct and ***admitted to the concealment***

9    in a guilty plea.  No. 2:06-cv-5774 (SRC), 2009 WL 2043604, at *22 (D.N.J. July 10,

10   2009).  Here, the Directors have not pleaded guilty to any charge (let alone

11   concealment), the Government did not make any allegations concerning the Directors,

12   and there is no suggestion that the Company's disclosures regarding the Investigation

13   concealed its subject or significance.  Rather, the multiple disclosures by Allergan

14   regarding the Government Investigation during the two years prior to the Settlement

15   placed investors on notice and triggered the running of the statute of limitations.

16   **2.      The Section 14(a) Claim Does Not Satisfy The Heightened Pleading**
17   **          Standards Imposed By Rule 9(b) And The PSLRA**

18        Plaintiffs confuse the concept of state of mind with the applicable pleading

19   standard by incorrectly arguing that the Complaint is only subject to the pleading

20   standards of Rule 8(a).  (Opp. at 16.)  The Ninth Circuit has held that Section 14(a)

21   claims are subject to the heightened pleading standard imposed by the Private Securities

22   Litigation Reform Act (the "PSLRA").  *Desaigoudar v. Meyercord*, 223 F.3d 1020,

23   1022-23 (9th Cir. 2000) (affirming dismissal of Section 14(a) claim for failure to comply

24   with Rule 9(b) and the PSLRA); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682

25   (9th Cir. 2005) ("[T]he PSLRA pleading requirements apply to claims brought under

26   _____

27   [4] Defendants disagree that the FDA warning letters were red flags about off-label marketing of BOTOX®, or that they were ignored.  However, Plaintiffs cannot base a claim on these letters as red flags, but ignore that Plaintiffs themselves were on notice.

28

Section 14(a) and Rule 14a-9.").  This heightened pleading standard applies to a Section 14(a) claim regardless of the underlying mental state alleged by the plaintiff.  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000) (dismissing Section 14(a) claims for failing to meet the PSLRA heightened pleading standard).[5]  *But see Beck v. Dobrowski*, 559 F.3d 680, 681-82 (7th Cir. 2009) (applying PSLRA pleading standard, but finding that there is no required state of mind for a Section 14 claim).  Plaintiffs failed to include **any** particularized allegations about the role of each Individual Defendant in the alleged wrongdoing or in the preparation of the allegedly misleading proxies, and for this reason alone the Section 14(a) claim should be dismissed.  *See In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153-54 (C.D. Cal. 2007) (holding that the "group-pleading doctrine" did not survive the PSLRA).

### 3.    The Complaint Fails To State A Section 14(a) Claim

#### a.    Plaintiffs Failed To Plead With Particularity The Existence Of Any Material Misrepresentation Or Omission

Plaintiffs' Complaint does not allege with particularity any misrepresentation or omission, but instead relies on generalizations and distortions in an attempt to cast Allergan's 2008, 2009, and 2010 proxy statements as false or misleading.  At root, Plaintiffs argue that because the **Company** pled guilty to a strict liability misbranding offense in 2010, the Individual Defendants must have committed securities fraud.  To make this argument, however, Plaintiffs are forced to grossly distort the 2010 guilty plea by incorrectly suggesting that the Company or the Individual Defendants acknowledged improper off-label marketing.  The guilty plea concerned misbranding.  Nowhere does it contain any acknowledgement of improper off-label marketing.  Furthermore, the Government never suggested that the Individual Defendants engaged in any improper

---

[5]  Rule 9(b) also applies because Plaintiffs base their Section 14(a) claim on allegations of fraud.  *See* Compl. ¶¶ 8, 12, 56 ("[T]he Individual Defendants . . . did (i) **conceal** . . . and (iii) **deceive** the investing public"), 156 (defendants' "false statements, omissions, and/or schemes or practices that **acted as a fraud**")).

Gibson, Dunn & Crutcher LLP

1    conduct.  Simply put, Plaintiffs' Section 14(a) claim is built on a series of assumptions

2    that cannot survive the scrutiny required by the PSLRA.

3           Plaintiffs claim that Defendants were required to disclose unfounded allegations

4    of their failure to satisfy their duties to the Company and its shareholders.  (Opp. at 21

5    ("Defendants' assertion that they were not required to disclose *their* unlawful off-label

6    marketing scheme because no misconduct had yet been charged or proven is wholly

7    without merit.").)  This theory has been rejected by the Ninth Circuit, which held that

8    "misconduct of the type traditionally regulated by state corporate law ***need not be***

9    ***disclosed in proxy solicitations*** for director elections."  *See Gaines*, 645 F.2d at 779

10   (emphasis added).  This is because directors are not required to engage in self-

11   flagellation by disclosing mere allegations of wrongdoing before they are charged.  *See*

12   *In re Teledyne Def. Contracting Derivative Litig.*, 849 F. Supp. 1369, 1381-82 (C.D.

13   Cal. 1993) ("[Section] 14(b) requires disclosure of material facts, and the Defendants'

14   culpability . . . does not become a fact that must be disclosed until it is at least charged

15   (in which case the charge is material) or proven (in which case the proven conduct is

16   material).").

17          Plaintiffs rely on *In re Donna Karan International Securities Litigation*, No. 97-

18   CV-2011 CBA, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998), in which the court

19   dismissed securities claims for failure to allege an actionable false or misleading

20   statement, to argue that Defendants should disclose the unproven and uncharged off-

21   label marketing allegations.  *Id.* at *14, *17, & *21.  But the *Donna Karan* court held

22   that "securities laws do not require corporate management 'to direct conclusory

23   accusations at itself or to characterize its behavior in a pejorative manner.'"  *Id.* at *10

24   n.9.  Instead, only "***known objective facts*** that existed at the time" of the statement

25   could render it misleading.  *Id.* at *10.  Here, Plaintiffs have not alleged any known

26   objective facts that existed at the time the proxies were issued that rendered statements

27   in the proxies misleading.

28

Gibson, Dunn &
Crutcher LLP

7

In contrast, in *In re Countrywide Financial Corp. Derivative Litigation*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008), on which Plaintiffs also rely, the complaint detailed the company's improper modification of its structure to incur greater risk. *Id.* at 1050. The complaint provided evidence of the directors' knowledge of the misconduct because the individual directors were specifically tasked with oversight of the areas in which the misconduct occurred. *Id.* at 1052-53. As a result of the misconduct, Countrywide's stock collapsed from $45 to under $5 in less than a year. *Id.* at 1055. The court sustained the complaint based on the alleged failure to disclose that Countrywide had abandoned its underwriting standards. *Id.* at 1076-77.

Plaintiffs here have not provided any particularized allegations demonstrating that any of the Directors knew of or participated in any alleged misconduct or that the Directors abandoned the standards that form the core of the Company's business. Furthermore, the determinative facts relied upon by the *Countrywide* court are not present here: Allergan's stock has not collapsed, its core business remains intact, and the single strict-liability misdemeanor charge to which the Company pleaded guilty related to only one of Allergan's many products and did not impact the Company's ability to continue as a thriving business.[6]

Recognizing that they must allege red flags with particularity, Plaintiffs rely heavily on FDA warning letters, but they are red herrings for two reasons. (Opp. at 20-21 ("[D]efendants chose not to be forthcoming with Allergan's shareholders about each FDA warning letter Allergan received.").) First, the letters did not concern either off-label marketing or BOTOX® Therapeutic—the subjects of the Government Investigation.[7] Second, Plaintiffs acknowledge that the FDA warning letters were

---

[6] Plaintiffs repeatedly emphasize the size of the Settlement, but ignore that $600 million, although substantial, is a mere fraction of Allergan's sales of BOTOX®. (Compl. ¶ 65 (alleging BOTOX® sales of $1.31 billion in 2009 alone).)

[7] (*See* Ex. O (addressing promotional activities and materials related to BOTOX® but did not allege misbranding or off-label usage); P (addressing marketing information for BOTOX® Cosmetic); Q (addressing superiority claims regarding LUMIGAN®); R (addressing a medical journal advertisement for ACZONE®)).

INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT

publicly disclosed by the FDA, which means that the letters cannot be the basis of a disclosure claim.  (Opp. at 3 n.5; Pl.'s Exs. A, B, G, H, J, K.); *Paskowitz v. Pac. Capital Bancorp*, No. CV 09-6449 ODW, 2009 WL 4911850, at *6 (C.D. Cal. Nov. 6, 2009) (dismissing Section 14(a) claim because "[s]ecurities laws do not require disclosure of information that is readily available in the public domain").

Plaintiffs rely on *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049 (9th Cir. 2008), to argue that even disclosure of the FDA warning letters "may have fallen short of the requisite standard."  (Opp. at 21.)  But *Gilead* addresses loss causation in the context of a direct Section 10(b) claim, not whether a statement contains a material omission under Section 14(a).  *Id.* at 1058 ("leav[ing] it to the district court to determine whether [plaintiffs] . . . sufficiently alleged the other elements of their claims").  Moreover, in *Gilead* the plaintiffs brought suit after "the market was 'stunned'" by the company's poor financial results three months after the issuance of an FDA warning letter that was allegedly the direct cause of decreased prescriptions for the subject drug. *Id.* at 1053-54.  Here, there is no allegation that any warning letter contained stunning information that caused an economic loss to Allergan's shareholders—in particular because the warning letters were publicly disclosed by the FDA, the letters are unrelated to the later Government Settlement, and Plaintiffs do not allege that any letter resulted in any negative impact on BOTOX® sales or Allergan's stock price.[8]

Plaintiffs next argue that they "more than adequately pled that the defendants were acting for their own self-benefit" because the Directors were reelected and received compensation as a result of the proxy statements.  (Opp. at 22.)  As the court explained in *Teledyne*, "the trouble with Plaintiffs' argument is that it blurs the critical distinction drawn in *Gaines* between simple corporate mismanagement (which inures to

---

[8] Plaintiffs cite *In re Amgen Inc. Securities Litigation*, 544 F. Supp. 2d 1009, 1016 (C.D. Cal. 2008), which concerned a direct Section 10(b) claim, not a derivative Section 14 claim.  There, the court dismissed claims against defendants for whom the complaint provided only group allegations.  *Id.* at 1036 (holding that the "group pleading presumption no longer applies since the passage of the PSLRA").

Gibson, Dunn &
Crutcher LLP

the detriment of the corporation and its directors equally) and self-dealing (which inures to the detriment of the corporation but to the benefit of the self-dealer)."  849 F. Supp. at 1381.  Without "'credible allegations of self-dealing . . . or dishonesty or deceit which inure[d] to the direct, personal benefit of the directors,'" Plaintiffs' Section 14(a) claim fails.  *Id.* (quoting *Gaines*, 645 F.2d at 779).  Here, there are no allegations of self-dealing by the Directors.[9]

### b.   Plaintiffs Have Failed To Plead An "Essential Link" Between The Proxy Statements And Alleged Illegal Activity

To the extent Plaintiffs are seeking monetary damages, the Section 14 claim must be dismissed because any alleged financial damage to the Company is not linked to any proxy solicitation.  Plaintiffs cite *Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 654 (2d. Cir. 1979), for the contention that the challenged transactions are the election of the directors and adoption of the 2008 Incentive Award Plan, and that the proxy solicitations were an essential link in those transactions.  (Opp. at 23.)  This argument ignores that Plaintiffs are seeking monetary damages from the Defendants.  (Compl. at 66.)  When a plaintiff seeks to recover damages, the plaintiff must allege "transaction causation" linking the alleged loss causing corporate wrongdoing to the proxy statement.  *Gaines*, 645 F.2d 776 (finding that "directors' failure to disclose . . . alleged misconduct [was] not the legal cause of the pecuniary loss to the corporation, if any.").  Plaintiffs have not done so, and for this reason alone, the Section 14(a) claim should be dismissed.

---

[9]  Plaintiffs do not allege any injury because the misconduct alleged by Plaintiffs was not the subject of shareholder vote and Plaintiffs specifically emphasize that the Defendants' bonus structure was tied to the performance of the Company.  (*See* Opp. at 23; Compl. ¶ 114.)  In fact, Plaintiffs allege that "[p]rior to [the September 1, 2010 announcement of the Settlement], Allergan *suffered no damage*."  (Compl. ¶ 153.)  For this additional reason, the Section 14 claim should be dismissed.  *See In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1213 (N.D. Cal. 2007) (holding that "plaintiffs fail[ed] to allege any injury suffered as a result of the allegedly misleading proxy statements – that is, they allege no direct injury suffered by [the corporation] as a direct result of the transaction that was at immediate issue in the proxy (election of the directors).").

When a plaintiff seeks money damages, "[t]he essential link requirement can only be established when the proxy statement at issue *directly authorizes* the loss-generating corporate action." *Kelley v. Rambus, Inc.*, No. C 07-1238 JF (HRL), 2008 WL 5170598, at *7 (N.D. Cal. Dec. 9, 2008) (internal quotation marks omitted); *see also In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1213 (N.D. Cal. 2007) ("Damages are recoverable under § 14(a) only when the votes for a specific corporate transaction requiring shareholder authorization . . . are obtained by a false proxy statement, and that transaction was the direct cause of pecuniary injury for which the recovery is sought." (internal quotation marks omitted)).  Here, the proxy statements were not used to obtain shareholder approval for any alleged illegal action, and thus fail to meet the essential link requirement.[10]  To the extent Plaintiffs are seeking equitable relief based on the election of the Directors, the Ninth Circuit has held that the analysis shifts to materiality and that the nondisclosure of "allegations of simple breach of fiduciary duty/waste of corporate assets . . . is *never material* for § 14(a) purposes." *Gaines*, 645 F.2d 776 (expressly declining to follow *Weisberg*).

Plaintiffs argue that *Kelley* "recognizes that damages flowing from the acts of directors who were elected pursuant to a misleading proxy statement satisfy the essential link element of § 14(a)."  (Opp. at 24.)  However, *Kelley* expressly rejected that argument and stated, "it is clear that Plaintiffs may not claim that the re-election of the directors was an essential link to loss-generating corporate action because of the directors' subsequent mismanagement."  2008 WL 5170598, at *8 n.8; *see also Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 797 (11th Cir.

---

[10]  Plaintiffs rely on stock option backdating cases to support their claims, but the backdating cases on which they rely are not dispositive because they include allegations of self-dealing (the defendants directly benefited from the improper options) and a direct link between the proxy and the conduct (the proxy solicited a vote on the options plan). *See, e.g.*, *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1015-16 (N.D. Cal. 2007) (board self-dealing is material because shareholders would "want to know that the board was feathering the nests of insiders via backdated options to the detriment of stockholders at large"). Here, there are no facts alleged to support a claim that the Defendants improperly benefited from self-dealing.

Gibson, Dunn &
Crutcher LLP

**INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

2010) ("The adoption of a compensation scheme and reelection of directors was not an essential link to the losses of which the shareholders complain; the insiders' decision to violate company policies was not accomplished or endorsed by any proxy solicitation materials."); *Gen. Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992) ("[T]he mere fact that omissions in proxy materials, by permitting directors to win re-election, *indirectly* lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss."); *Cowin v. Bresler*, 741 F.2d 410, 428 (D.C. Cir. 1984) (dismissing Section 14(a) claim and holding that "[a]ppellant is alleging a subsequent breach of fiduciary duty which is only an incident to the election of directors and not actionable under section 14(a).  This claim is actionable, if at all, as a state law claim for breach of fiduciary duty.").[11]  Plaintiffs cannot establish an essential link between the proxy statements and the alleged illegal conduct, because that conduct did not require a stockholder vote and was only incident to the election of the directors.

**B.    Plaintiffs' Section 29(b) Claim Fails**

Plaintiffs' Section 29(b) claim fails because they have failed to plead a viable underlying securities violation.  *See Log On Am., Inc. v. Promethean Asset Mgmt. LLC*, 223 F. Supp. 2d 435, 452 (S.D.N.Y. 2001).  Even if Plaintiffs could establish a violation of the Exchange Act—which they cannot—they must also demonstrate a direct relationship between that violation and the performance of a contract (*i.e.*, the violation must be "inseparable from the performance of the contract" rather than "collateral or tangential to the contract").  *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 201 (3d Cir. 2001) (internal quotation marks omitted); *see also In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873, 880-81 (D. Md. 2005) (dismissing Section 29(b) claim because

---

[11]  Plaintiffs also cite *In re iBasis, Inc. Derivative Litigation*, 532 F. Supp. 2d 214, 223 n.7 (D. Mass. 2007) (Opp. at 24 n.20), in which the court dismissed the Section 14(a) claim and found that allowing a claim "anytime a director commits a bad act and is re-elected without the bad act being disclosed" is "untenable, since it would essentially negate the transactional causation requirement."

Gibson, Dunn &
Crutcher LLP

**INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

performance of the contracts was not necessarily unlawful and the alleged activities were "collateral and tangential to" the contracts).

Plaintiffs refer generally to employment and compensation contracts, including the 2008 Incentive Award Plan, and "all stock and options contracts entered by the Company," but do not provide any facts related to the alleged agreements. (Compl. ¶ 156.) Plaintiffs do not allege that the contracts themselves are unlawful. Plaintiffs again rely on stock option backdating cases, *In re Asyst Techs., Inc. Derivative Litig.*, No. C-06-04669 EDL, 2008 WL 4891220 (N.D. Cal. Nov. 12, 2008) and *In re MRV Commc'ns, Inc. Derivative Litig.*, 2010 WL 5313442 (C.D. Cal. Dec. 27, 2010), but those cases concern improper stock option grants that directly benefited the defendants. For example, the *MRV* court held that "Section 29(b) is a vehicle by which parties may rescind contracts that were made **or performed in violation** of other substantive provisions" and found that the defendants engaged in prohibited conduct by granting stock options in contravention of the stock option plans. *Id.* at *11-12 (internal citation and quotation marks omitted). Similarly, in *Asyst*, the defendants admitted that options were backdated. 2008 WL 4891220, at *3. Plaintiffs have not alleged that the Directors' employment and compensation contracts are unlawful or that they were performed in violation of the securities laws, and without an alleged prohibited transaction, the Section 29(b) claim must be dismissed.

## III.  PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED

### A.  The Court Should Refuse Supplemental Jurisdiction And Defer Resolving State-Law Issues While Those Issues Are Pending In State Court

Because the federal claims should be dismissed, this Court should refuse to exercise supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(c)(3). The state claims are creatures of state law and there is a pending first-filed action in Delaware state court. Furthermore, Plaintiffs do not dispute in their Opposition that there is no complete diversity for purposes of jurisdiction under 28 U.S.C. § 1332(a)(2). (Mot. at 20 n.9.) Even if this Court were inclined to exercise

supplemental jurisdiction over the state law claims, those claims should be stayed pending the Delaware court's resolution of the demand futility question —which is a complex state law issue.

**B.      Plaintiffs Have Failed To State A Claim For Breach Of Fiduciary Duty**

**1.      Plaintiffs Have Not Identified Any Bad Faith Inaction By The Board**

Plaintiffs concede that they are proceeding on a theory of inaction, by failing to identify any alleged improper act by the Individual Defendants and instead arguing that "the scheme allegations are so pervasive that the defendants could not have helped but to have known about the illegal marketing activity." (Opp. at 30.)  Recovery under this so-called "*Caremark* theory" is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996), and requires a showing of bad faith.  (*See also* Opp. at 29.)[12]  Plaintiffs concede that "there is a presumption that, in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." (Opp. at 29.)  Plaintiffs' Complaint does not overcome this presumption and Plaintiffs' Opposition does not excuse this failure.  Plaintiffs' allegations of facts not pled in the Complaint, a Company guilty plea, unrelated FDA warning letters, Botox® sales, and functioning internal controls are not red flags sufficient to create oversight liability.

**a.      New Facts In Plaintiffs' Opposition**

Because Plaintiffs allege a *Caremark* claim, they argue in the Opposition that various "red flags" should have put the Directors on notice of illegal marketing within

---

[12]  The judge in the earlier-filed Delaware action, Vice Chancellor Laster, considering the same underlying facts and claims, recognized that plaintiffs are making *Caremark* claims. *La. Mun. Police Employees' Ret. Sys. v. Pyott*, No. 5795-VCL, Argument and Ruling on Motion to Intervene Transcript at 16-19 (Del. Ch. Jan. 21, 2011) (the "Delaware Transcript," which was filed in this action [ECF No. 58], as ordered by the Delaware court).

the Company.  As an initial matter, Plaintiffs cite "facts" in their Opposition that are not
alleged in the Complaint:[13]

- Plaintiffs reference a May 2007 warning letter regarding Acular LS®
  (Opp. at 7 n.9) that is not mentioned anywhere in the Complaint;

- Plaintiffs' Opposition refers to newspaper articles as evidence of off-
  label marketing of BOTOX® (Opp. at 33 n.28), but Plaintiffs'
  Complaint contains no such allegation or reference to any articles; and

- Plaintiffs argue that the "defendants did not affirmatively disclose the
  August 22, 2001 warning letter, and publicly commented on the letter
  only when they were forced to by the press."  (Opp. at 6-7.)  Nowhere
  in the Complaint do Plaintiffs allege that the Board did not publicly
  comment on the letter until forced to by the press.

The Court should reject Plaintiffs' arguments based on allegations not contained in the
Complaint.  *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (facts outside of
the pleadings should not be considered in ruling on a motion to dismiss); *Schneider v.
Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("'[N]ew' allegations
contained in . . . [an] opposition . . . are irrelevant for Rule 12(b)(6) purposes.").

### b.  Guilty Plea

In addition to citing facts outside the record, Plaintiffs distort the contents and
impact of the Company's guilty plea.  Allergan only pleaded guilty to a single strict
liability misdemeanor charge of misbranding that does not and cannot establish any bad
faith mental state by the Company.  *See United States v. Dotterweich*, 320 U.S. 277,
280-81 (1943) (observing that FDCA offenses "dispense[] with the conventional
requirement for criminal conduct-awareness of some wrongdoing")  Specifically, the

---

[13]  Many of these new facts are also not in Plaintiffs' Request for Judicial Notice
("RJN").  As for the facts mentioned for the first time in Plaintiffs' Opposition but
which are also contained in the RJN, the Directors do not object to the extent that those
documents are not being offered for the truth of their contents.  *See, e.g., Smith v. Ortiz*,
234 F. App'x 698 (9th Cir. 2007) (noting that court may only take judicial notice of the
existence of another court's opinion and not the truth of the statements contained
therein); *Tracy v. Cooley*, No. CV 09-8645 AHM (DTB), 2010 WL 4318876, at *3 n.3
(C.D. Cal. June 15, 2010) (denying request for judicial notice of the truth of statements).

1    guilty plea did not include any admission concerning the Company's mental state or

2    intent to commit any wrongdoing.  And no Individual Defendant was included in the

3    guilty plea, named in the Information, or mentioned in the Government's Sentencing

4    Memorandum.  Without some particularized facts connecting the Individual Defendants

5    to the bad outcome, the resulting guilty plea does not, in hindsight, suggest bad faith.

6    *Stone v. Ritter*, 911 A.2d 362, 373 (Del. 2006).  As such, Plaintiffs fail to rebut the

7    presumption that the Directors acted in good faith.  *Potter v. Hughes*, 546 F.3d 1051,

8    1059 n.3 (9th Cir. 2008); *In re Silicon Graphics Int'l Sec. Litig.*, 183 F.3d 970, 990 (9th

9    Cir. 1999).

10                  **c.     Warning Letters**

11          Plaintiffs mischaracterize the warning letters received by the Company, and fail to

12   rebut the fact that none of the letters concerned BOTOX® Therapeutic or the alleged

13   off-label marketing that is the subject of Plaintiffs' claims.  Plaintiffs state that "it cannot

14   reasonably be disputed that the FDA warning letters put defendants on notice of the

15   widespread off-label marketing and misbranding at the Company." (*Id.* (citing Compl.

16   ¶¶ 7, 79-80).)  The cited paragraphs of the Complaint, however, refer to three letters

17   that do not relate to the alleged misbranding that led to the Government Settlement.

18   Paragraph 79 refers to the August 22, 2001 letter that relates to the marketing of

19   BOTOX®, but specifically to representations regarding the effects of protein in

20   BOTOX®.  (Compl. ¶ 79.)  Moreover, paragraph 80 refers to the June 23, 2003 and

21   September 5, 2002 letters that concern BOTOX® Cosmetic—not BOTOX®

22   Therapeutic—and do not concern the improper off-label marketing alleged by Plaintiffs

23   in this litigation.  (*Id.* ¶ 80; Ex. P.)  None of these relate to the alleged misbranding that

24   led to the Government Settlement about which Plaintiffs complain, and thus none of

25   these letters could have put the Board on notice of the alleged wrongdoing.

26                  **d.     Sales Volume**

27          Plaintiffs claim that "the scheme allegations are so pervasive that the defendants

28   could not have helped but to have known about the illegal marketing activity . . . ."

16

(Opp. at 30.)  Such allegations do not demonstrate knowledge of misconduct, however, because off-label sales are not illegal.  First, there are no specific allegations in the Complaint from which the Court could infer that the Directors knew about the amount of off-label sales.  Second, even if the Board was aware of off-label sales, any such sales are perfectly legal.  Physicians are obligated to exercise their independent medical judgment to prescribe drugs, and doctors regularly prescribe drugs for non-approved uses.  *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 n.5 (2001) (recognizing that off-label prescription and use is "widespread" and "often is essential to giving patients optimal medical care" (internal quotations omitted)); *see also In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1041 n.1 (N.D. Cal. 2009) ("Physicians . . . may lawfully prescribe a drug for 'off-label' indications.").  Indeed, "off-label use of pharmaceutical products . . . is, often times, the best means for providing effective treatment for patients." *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, at *9-10 (granting motion to dismiss and stating that "this theory of injury—injury based solely on the off-label promotion of the Subject Drugs— is patently illogical and plainly untenable").  The Supreme Court has specifically concluded that "[o]ff-label usage . . . is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine." *Buckman*, 531 U.S. at 350; *see also Wash. Legal Found. v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000) ("[I]t is undisputed that the prescription of drugs for unapproved uses is commonplace in modern medical practice and ubiquitous in certain specialties.").

Moreover, the 30% sales percentage cited by Plaintiffs is for all sales of BOTOX®, which include sales for cosmetic uses, sales for on-label therapeutic uses, international sales for therapeutic uses approved outside of the United States, as well as sales for off-label uses in the United States.  (*See* Opp. at 30 (citing Compl. ¶ 103).) Given the legality and prevalence of all of these sales, the Complaint simply does not provide facts explaining why the Directors should have regarded increased sales as

17

**INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

1   evidence of illegal conduct.  Plaintiffs entirely fail to account for the fact that increased
2   prescriptions for BOTOX® were likely because of doctors' satisfaction with its results
3   as well as advances in science and research (as evidenced by subsequent FDA
4   approvals).

5             **e.    Internal Controls**

6             In their Opposition, Plaintiffs focus on the fact that the Company "maintained
7   robust internal controls and financial reporting systems," as well as legal compliance
8   systems, claiming that these controls necessarily would have informed the Directors
9   about any misbranding or illegal marketing.  (Opp. at 31.)  That extensive monitoring
10  systems were in place are, if anything, evidence of the Directors' good-faith attempt to
11  carry out its responsibilities, not evidence of bad faith.  This is particularly so where
12  Plaintiffs have not alleged that the internal controls were deficient or that they failed to
13  respond to some indication of non-compliance.  (Compl. ¶ 141 (admitting that internal
14  controls "functioned as designed").)  Plaintiffs seek to analogize the facts of this case to
15  three cases (Opp. at 43-48), all of which are distinguishable from the case at hand.

16            **(i)    *Abbott Labs***

17            Plaintiffs attempt to compare the facts to *In re Abbott Laboratories Derivative*
18  *Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003), which is misplaced for two
19  reasons.  First, *Abbott* is factually distinct because it concerned extensive warnings from
20  the FDA regarding regulatory non-compliance (13 notices of noncompliance, four
21  warning letters, a required Compliance Plan that was not followed by the company, and
22  a threatened injunction by the FDA).  *Id.* at 799-801.  These extensive problems were
23  highlighted by detailed coverage in news articles and an analyst who publicly
24  questioned "why Abbott continues to 'drag . . . their feet fixing the FDA problems.'"
25  *Id.* at 808.  Based on these facts, and public statements acknowledging the problems,
26  the Seventh Circuit found that the company and the board of directors knew of the
27  problems.  *Id.*  In contrast, Plaintiffs' Complaint does not cite any facts suggesting
28  continuing and widely publicized violations similar to those at issue in *Abbott*.  At best,

18

Plaintiffs cite to disparate warning letters from the FDA, but those letters did not even concern the same alleged violation that became the subject of the Investigation or guilty plea.  Additionally, Plaintiffs have not put forth any evidence suggesting that the Directors' responses to these warning letters were insufficient.  Without detailed allegations of significant and uncorrected violations, Plaintiffs' Complaint does not come close to alleging that the Directors were aware of violations.  *See In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 176-77 (D. Del. 2009) (rejecting plaintiff's contention that the facts of *Abbott* were similar to those at issue in the case and finding that the alleged wrongdoing by Intel did not rise to the "*Abbott* level of wrongdoing").

Second, the Seventh Circuit in *Abbott* purported to apply Illinois law, not Delaware law.  *Abbott*, 325 F.3d at 803.  Although Illinois generally follows Delaware law, several courts have recognized that the Seventh Circuit in *Abbott* improperly interpreted and applied Delaware law.  *See, e.g., Fagin v. Gilmartin*, 432 F.3d 276, 282 (3d Cir. 2005) (holding that the Seventh Circuit's interpretation of Illinois law in *Abbott* was not a proper interpretation or application of Delaware law); *In re Fannie Mae Derivative Litig.*, 503 F. Supp. 2d 9, 18 n.6 (D.D.C. 2007) (same); *see also* Delaware Transcript at 53 (distinguishing *Abbott Labs* and noting that the opinion "shocked everybody when it came out, because [the Seventh Circuit] drew an inference just from the idea that it was a big, bad problem").

### (ii)   *Pfizer*

Plaintiffs also attempt to analogize this case with the Southern District of New York's decision in *In re Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010) .  As with *Abbott*, however, the facts in *Pfizer* are in sharp contrast to the case at hand and highlight the types of facts missing from Plaintiffs' Complaint.  In *Pfizer*, the company settled allegations of improper marketing by agreeing to pay $2.3 billion, including the largest criminal fine ever imposed in the United States.  *Id.* at 457.  In *Pfizer*, there was an extensive history of misconduct of which the board was aware.  Most significantly, the complaint in *Pfizer* detailed three

19

prior settlements approved by Pfizer's board, two of which included the implementation of CIAs that affirmatively required Pfizer's board to create and implement compliance and reporting mechanisms that would bring information about illegal marketing activities directly to the board's attention.  *Id.* at 455-57.  This was critical to the court's analysis because the existing CIAs "imposed affirmative obligations on Pfizer's board that went well beyond the basic fiduciary duties required by Delaware law." *Id.* at 461.  The *Pfizer* court also emphasized that the size of the fines at issue were indicative of the fact that the wrongdoing alleged was pervasive and "was committed in the face of the board's repeated promises to closely monitor and prevent such misconduct, as required by the . . . CIAs." *Id.*

In contrast, the Government Settlement here was the first of its kind for Allergan.  At the time of the alleged improper conduct, Allergan was not subject to any CIA and the Board had not affirmatively taken on the specific obligation to monitor Allergan's marketing programs.  As explained by Vice Chancellor Laster who recently addressed this exact claim in the first-filed action in Delaware, Pfizer's prior settlement requiring board reporting established "a direct link to the board."  Delaware Transcript at 16-17 (distinguishing *Pfizer* from the facts alleged against Allergan).

### (iii)   *Veeco Instruments*

This matter is also distinguishable from *In re Veeco Instruments, Inc. Securities Litigation*, in which the plaintiffs alleged fraudulent revenue recognition, accounting improprieties and export law violations.  434 F. Supp. 2d 267 (S.D.N.Y. 2006).  In determining that a demand on the board for these claims would be futile, the court discussed numerous and glaring red flags that signaled to the board that company controls were insufficient.  For example, the accounting department of a recently acquired company, which was directly responsible for the accounting violations complained of, was reduced by 75%. *Id.* at 277.  Notably, the individual board members each signed a Form 10-K recognizing that a deficiency existed, yet apparently did nothing to correct the problem. *Id.*  Moreover, the same violations ***continued***,

Gibson, Dunn &
Crutcher LLP

suggesting that the board either did nothing or established procedures that were wholly inadequate. *Id.* at 278. By contrast, Plaintiffs here have not alleged that the company took any steps to reduce compliance programs. In fact, Plaintiffs detail the many steps that the Company has taken to *increase* its monitoring efforts. (Compl. ¶¶ 75-76.) Similarly, Plaintiffs have failed to allege any facts about the Board's response to the FDA warning letters. Plaintiffs even explain that the Board's first priority upon receiving a warning letter is to respond and comply. (Opp. at 7 n.9.) Moreover, whereas in *Veeco* the board was told about the specific accounting violations complained of and expressly acknowledged that their monitoring was insufficient, *Veeco*, 434 F. Supp.2d at 277, here none of the warning letters that purportedly put the board members on notice related to the specific conduct that led to the Government Settlement.

### (iv)   *King v. Baldino*

The facts of this case are much more analogous to those in *King v. Baldino*, 648 F. Supp. 2d 609 (D. Del. 2009), *aff'd* No. 09-3834, 2010 U.S. App. LEXIS 25490 (3d Cir. Dec. 14, 2010). There, just as in this case, the plaintiffs alleged that members of the board of a pharmaceutical company allowed, through their inaction, improper off-label marketing that ultimately resulted in a criminal guilty plea and financial settlements. The court dismissed the claim even though sales of one drug allegedly increased in one year by 92%, a company audit concluded that FDA violations had occurred, and several regulators had launched investigations into the alleged illegal practices. *Id.* at 623.

As acknowledged by the Third Circuit, the *King* plaintiffs failed to "identify which individual director defendants breached his or her fiduciary duties, and when those duties were breached." *King*, 2010 U.S. App. LEXIS 25490, at *6 (internal quotation marks omitted). Like here, while the complaint in *King*, "acknowledge[d] the existence of certain controls at [the company], including an Audit Committee and internal compliance auditors, [it did] not allege any procedural deficiencies in those

21

mechanisms." *Id.* And finally, the purported "red flags" alleged by the *King* plaintiffs related to the **company's** marketing practices, and the plaintiffs failed to connect any of those practices with individual board members. *Id.* at *7. Because the facts of this case are so closely analogous to those in *King*, and Plaintiffs' Complaint suffers from the same deficiencies, it should likewise be dismissed.

### f.      Plaintiffs have not stated a claim for aiding and abetting

As set forth in the Directors' motion, Plaintiffs cannot state an aiding and abetting claim because, amongst other reasons, the Directors were each fiduciaries who owed an independent duty to the Company. (Mot. at 32.) Plaintiffs do not dispute this in their Opposition or otherwise attempt to defend the aiding and abetting claim. Therefore, any claim of aiding and abetting must be dismissed.

### g.      Plaintiffs' claim under section 309 must be dismissed

Plaintiffs' claim under California Corporations Code section 309 (Count VII) fails because section 309 does not apply to a Delaware corporation such as Allergan. (Mot. at 31.) Plaintiffs' Opposition does not address this attempt to make this action appear different from the concurrent derivative action pending in Delaware. Plaintiffs admit that Delaware law governs their other breach of fiduciary duty claims (Opp. at 28, 30), and for this reason alone, Count VII must be dismissed because California Corporations Code is inapplicable.

## C.      Plaintiffs Have Failed To State A Claim For Insider Trading

Plaintiffs claim that Directors Pyott and Herbert should be liable for insider trading under California Corporations Code section 25402. Plaintiffs' claim fails because the Complaint never identifies what material nonpublic information Pyott and Herbert had at the time of their trades. Instead of addressing this deficiency, Plaintiffs conclusorily state that it is "simply not conceivable that Pyott . . . and Herbert . . . would not have had knowledge of the Company's off-label marketing of Botox." (Opp. at 34.) The only specific information cited by Plaintiffs in an attempt to support this bald conclusion is the FDA warning letters, apparently claiming that the letters were material

Gibson, Dunn & Crutcher LLP

1  and non-public.  (*Id.*)  This response is unsatisfactory because the FDA warning letters

2  were publicly disclosed by the FDA—as admitted by Plaintiffs.  (Opp. at 3 n.5.)

3  Moreover, they were not material to Plaintiffs' claims because they concerned topics

4  unrelated to the alleged conduct that formed the basis of the Government Settlement.

5  Furthermore, when publicly disseminated, neither the letters nor the Government

6  Settlement had an effect on the price of Allergan's stock.  Thus, even if there was some

7  unidentified non-public information, it did not "significantly reduce[] the market price of

8  Allergan shares" as Plaintiffs allege.  (Compl. ¶ 177.)  For these reasons, and as set

9  forth in the Directors' motion, the insider trading claims should be dismissed.

10 **D.    Plaintiffs' Complaint Does Not State A Claim For Corporate Waste**

11 In their Motion, the Directors laid out the high standard required to state a claim

12 for corporate waste under Delaware law and explained why the Directors failed to meet

13 that standard.  (Mot. at 32.)  A plaintiff must allege "an exchange of corporate assets for

14 consideration so disproportionately small as to lie beyond the range at which any

15 reasonable person might be willing to trade."  *Brehm v. Eisner*, 746 A.2d 244, 263

16 (Del. 2000) (internal quotation marks omitted).  Plaintiffs have never specified what

17 corporate assets were wasted, except by implicitly referencing the Government

18 Settlement, and Plaintiffs fail to assert that the legal costs or settlement served no

19 corporate purposes.

20 Perhaps realizing their original theory had no merit, Plaintiffs appear to make a

21 different argument in their Opposition.  Now Plaintiffs claim that the Directors

22 committed waste not by entering the Government Settlement, but by seeking reelection

23 and being paid pursuant to the 2008 Incentive Award Plan.  (Opp. at 36.)  The Plan

24 authorized a 20-million-share increase in the stock available for grants to employees,

25 executives, and directors, and automatically provided them with 11,400 stock options

26 and 14,400 shares of restricted yearly stock.  (*Id.*)  The problem with this analysis is

27 that it ignores the value of the services provided by the Directors and looks only to what

28 the Company expended on them.  Plaintiffs have not asserted why these expenditures

23

served no corporate purpose.  In fact, the assertions in the Complaint suggest that the Company received much from having the Directors at the helm.  As Plaintiffs emphasize throughout their pleadings, while these Directors were on the Board, the Company was extremely profitable.  (*See, e.g.*, Compl. ¶ 65; Opp. at 34.)  Accordingly, Plaintiffs have yet to explain why "'no person of ordinary sound business judgment could view'" the services provided by the Directors "'as a fair exchange for the consideration paid by the corporation.'"  (Opp. at 35 (quoting *MRV*, 2010 WL 5313442, at *16).)

**E.    Plaintiffs Have Not Stated A Claim For Unjust Enrichment**

Like corporate waste, the unjust enrichment analysis involves the comparison of two values: what was provided by directors and what they received in return.  *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988).  Plaintiffs never allege that the Directors were compensated in a manner that was disproportionate to the services that they provided to the Company.  (Mot. at 33.)  Plaintiffs' citation to *In re Asyst Technologies, Inc. Derivative Litigation*, No. C-06-04669 EDL, 2008 WL 2169021 (N.D. Cal. May 23, 2008), is inapplicable because there the shareholders alleged that officers received salaries and bonuses based on false financial results.  *Id.* at *11.  Here, Plaintiffs have not alleged that any of Allergan's financial results were false.  In fact, Plaintiffs repeatedly emphasize the billions of dollars that the Company actually made from BOTOX® sales.  (Compl. ¶ 65; Opp. at 34.)

## IV.  CONCLUSION

The Individual Defendants respectfully request that the Court stay this putative derivative action until the first-filed Delaware action is resolved.  If this Court is inclined to proceed with this action regardless of the process taking place in Delaware, the Individual Defendants respectfully request that the Court dismiss this derivative action because Plaintiffs did not make the required pre-suit demand and have failed to adequately allege demand futility.  If the Court is inclined to excuse Plaintiffs' failure to make a demand, the Individual Defendants respectfully urge the Court to dismiss the Complaint with prejudice for failure to state a federal claim, in which case this Court

should decline to exercise supplemental jurisdiction over the state law claims.  If the Court invokes supplemental jurisdiction over the state law claims, this Court should nonetheless dismiss those claims for failure to state a claim.

Respectfully submitted,

Dated:  February 8, 2011

GIBSON, DUNN & CRUTCHER LLP
WAYNE W. SMITH
JEFFREY H. REEVES
KRISTOPHER P. DIULIO

By:/s/ Wayne W. Smith
          Wayne W. Smith

Attorneys for David E. I. Pyott; Herbert W. Boyer, Ph.D.; Louis J. Lavigne, Jr.; Gavin S. Herbert; Stephen J. Ryan, M.D.; Leonard D. Schaeffer; Michael R. Gallagher; Robert A. Ingram; Trevor M. Jones, Ph.D.; Dawn E. Hudson; Russell T. Ray; Deborah Dunsire, M.D.; Handel E. Evans; Ronald M. Cresswell, Ph.D.; Louis T. Rosso; Karen R. Osar; and Anthony H. Wild, Ph.D.

101014428_2.DOC

Gibson, Dunn & Crutcher LLP

**INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

# CERTIFICATE OF SERVICE

I, Dena Kennedy, declare as follows:

I am employed in the County of Orange, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 3161 Michelson Drive, Irvine, California 92612-4412 in said County and State.  On February 8, 2011, I served the following document(s):

**INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

on the parties stated below, by placing a true copy thereof in an envelope addressed as shown below by the following means of service:

| | |
|---|---|
| Brett Steckler | Debra S. Goodman |
| Jeffrey J. Ciarlanto | Law Office of Debra S. Goodman PC |
| The Weiser Law Firm PC | 1301 Skip Pack Pike Suite 7A-133 |
| 121 North Wayne Avenue, Suite 100 | Blue Bell, PA  19422 |
| Wayne, PA  19087 | |

☒ **BY MAIL**:  I placed a true copy in a sealed envelope addressed as indicated above, on above-mentioned date.  I am familiar with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY PERSONAL SERVICE**:  I placed a true copy in a sealed envelope addressed to each person[s] named at the address[es] shown and giving same to a messenger for personal delivery before 5:00 p.m. on above-mentioned date.

☒ I am employed in the office of Kristopher P. Diulio, a member of the bar of this court, and that the foregoing document(s) was(were) printed on recycled paper.

☒ **(FEDERAL)**     I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 8, 2011.

/s/ Dena Kennedy
Dena Kennedy

26

CERTIFICATE OF SERVICE

Gibson, Dunn & Crutcher LLP