ROBBINS GELLER RUDMAN
   & DOWD LLP
TRAVIS E. DOWNS III (148274)
DAVID W. MITCHELL (199706)
BENNY C. GOODMAN III (211302)
BRIAN O. O'MARA (229737)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
travisd@rgrdlaw.com
davidm@rgrdlaw.com
bennyg@rgrdlaw.com
bomara@rgrdlaw.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS (190264)
FELIPE J. ARROYO (163803)
ARSHAN AMIRI (246874)
600 B Street, Suite 1900
San Diego, CA  92101
Telephone:  619/525-3990
619/525-3991 (fax)
brobbins@robbinsumeda.com
farroyo@robbinsumeda.com
aamiri@robbinsumeda.com

THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA  92130
Telephone:  858/794-1441
858/794-1450 (fax)
kah@weiserlawfirm.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| In re ALLERGAN, INC. SHAREHOLDER DERIVATIVE ACTION | ) ) ) ) |
| _____ | ) ) ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) |
| _____ | ) ) ) |

Master File No.
   SACV-10-01352-DOC(MLGx)

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, VIOLATIONS OF CALIFORNIA CORPORATIONS CODE, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

DEMAND FOR JURY TRIAL

**[PUBLICLY FILED – REDACTED VERSION]**

640138_1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................... 13

III.   THE PARTIES .................................................................................... 13

IV.    DUTIES OF THE DEFENDANTS ..................................................... 18

V.     THE COMPANY AND ITS FLAGSHIP PRODUCT, BOTOX.............. 23

VI.    THE REGULATORY SCHEME........................................................... 26

VII.   THE INDIVIDUAL DEFENDANTS' ILLEGAL MARKETING SCHEME................................................................................................ 28

     A.     ████████ Maximizing Sales of Botox for Unapproved Uses Was Among the Company's "Top Corporate Priorities" from as Far Back as 1997 ................................................................................. 28

          1.   ████████████ ............................................................. 28

          2.   ████████ ...................................................................... 30

          3.   ████████ ...................................................................... 31

          4.   ████████████ ............................................................. 32

          5.   █████████████ ............................................................ 33

     B.     Consistent with the Board's "Top Corporate Priorities" to "Maximize [Botox] Sales" for Unapproved Uses, Allergan Launched Its "Headache Development" Program in 2003 ............... 33

     C.     Consistent with the Board's "Top Corporate Priorities" to "Maximize [Botox] Sales" for Unapproved Uses, Allergan Launched the Cervical Dystonia/Headache Expansion Initiative, Encouraging Physicians to Diagnose Headaches and Pain as Symptoms of Cervical Dystonia ......................................................... 34

     D.     Consistent with the Board's "Top Corporate Priorities," the Individual Defendants Affirmatively Caused Allergan to Employ a Variety of Tactics to Carry Out the Illegal Off-Label Marketing ............................................................................................. 36

          1.   At the Board's Direction, Allergan Instructed Sales Representatives to Promote Botox for Uses for Which the Efficacy of the Drug Had Not Been Demonstrated................... 37

640138_1

**Page**

2. At the Board's Direction, Allergan Targeted Physicians with Off-Label Specialties Through Call Plans, Co-Promotion Agreements and Acquisitions ................................. 38

    a. Call Plans ................................................................. 39

    b. Co-Promotion Agreements ..................................... 39

    c. Acquisitions ............................................................ 41

3. At the Board's Direction, Allergan Directed and Funded Physician Training, Workshops and Dinners to Market Botox for Off-Label Uses ........................................... 42

    a. Allergan Paid and Otherwise Incentivized Physicians to Promote and Prescribe Botox for Off-Label Uses ....................................................... 44

    b. Allergan Paid Doctors to Attend "Advisory Boards" to Promote Botox for Off-Label Uses .............. 45

    c. Allergan Created and Funded "Educational" Organizations to Promote Botox for Off-Label Uses ........................................................................ 45

4. At the Board's Direction, Allergan Provided "Value-Added" Reimbursement Support Services to Grow Off-Label Sales ................................................................... 46

5. At the Board's Direction, Allergan Dramatically Expanded Its Therapeutic Botox Sales Force Far Beyond Levels Justified by the Drug's Approved Indications .............. 50

E. Defendants' Unlawful Marketing Campaign Drove Tremendous Growth of Off-Label Uses of Botox .................................................. 50

VIII. THE INDIVIDUAL DEFENDANTS WERE WARNED REPEATEDLY TO STOP THE ILLEGAL OFF-LABEL MARKETING OF BOTOX ....................................................... 51

A. In August 2001, the FDA Warned Allergan that Its Promotional Activities and Materials for Botox Were "Misleading" and "Lacking in Fair Balance" ............................................... 51

B. In September 2002, the FDA Warned Allergan Regarding "Misleading Statements" in Botox Promotional Materials ............... 52

C. In June 2003, the FDA Warned Allergan that Its Promotional Activities and Materials for Botox Were "Misleading" and "Lacking in Fair Balance" ............................................... 54

640138_1

**Page**

D.   In September 2005, the FDA Sent a Warning Letter to
     Defendant Pyott Warning the Company About Misleading
     Sales Aids for Lumingan ................................................................ 55

E.   In 2005, the French Government Sent a Letter to Allergan
     Warning the Company that Botox Injections Had Resulted in
     Aspiration and Death Among Patients .......................................... 56

F.   ████████████████████████████████████
     ████████████████████████████████
     █ ..................................................................... 56

G.   ████████████████████████████████
     ██████████ .................................................. 58

H.   ████████████████████████████████████
     ████████ ........................................................ 58

I.   In August 2009, the FDA Warned Allergan that Its Promotional
     Activities and Materials for ACZONE® Were False or
     Misleading and Omitting Important Risk Information ..................... 59

IX.   THE OFF-LABEL MARKETING SCHEME WAS IN CLEAR
      VIOLATION OF ALLERGAN'S OWN POLICIES AND
      PROCEDURES ........................................................................ 59

X.    CONSPIRACY, AIDING AND ABETTING AND CONCERTED
      ACTION ................................................................................. 61

XI.   THE MATERIALLY MISLEADING PROXY STATEMENTS ................ 62

XII.  UNLAWFUL INSIDER TRADING ................................................ 67

XIII. DAMAGES TO ALLERGAN CAUSED BY THE INDIVIDUAL
      DEFENDANTS ........................................................................ 67

XIV.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ................. 68

A.   Demand Is Excused Because the Director Defendants' Conduct
     Is Not a Valid Exercise of Business Judgment .............................. 69

B.   Demand Is Excused Because a Majority of the Board Faces a
     Substantial Likelihood of Liability and Is Not Disinterested and
     Independent .................................................................................... 71

COUNT I ............................................................................................. 80

Against All Defendants For Violation of Section 29(b) of the Exchange Act ........ 80

COUNT II ........................................................................................... 80

- iii -

640138_1

**Page**

Against the Individual Defendants For Breach of Fiduciary Duty and/or Aiding and Abetting Breach of Fiduciary Duty ............................................ 80

COUNT III .................................................................................................... 81

Against All Defendants For Waste of Corporate Assets ............................ 81

COUNT IV .................................................................................................... 82

Against All Defendants For Unjust Enrichment ........................................ 82

COUNT V ...................................................................................................... 83

Against the Insider Selling Defendants For Violations of California Corporations Code Sections 25402 and 25502.5 ............................ 83

COUNT VI ..................................................................................................... 84

Against the Insider Selling Defendants For Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information ..................... 84

COUNT VII ................................................................................................... 85

Against All Defendants For Breach of Fiduciary Duty in Violation of California Corporations Code Section 309 ...................................... 85

COUNT VIII .................................................................................................. 86

Against the Proxy Defendants For Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder, Based upon Material Misstatements in and Omissions from Allergan's Proxy Statements ........................................................... 86

PRAYER FOR RELIEF ............................................................................... 88

JURY DEMAND ........................................................................................... 89

VERIFICATION ........................................................................................... 91

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

640138_1

1    Plaintiffs Willa Rosenbloom, Daniel Himmel, Pompano Beach Police &
2  Firefighters' Retirement System and Western Washington Laborers-Employers
3  Pension Trust ("Plaintiffs"), by their attorneys, submit this First Amended Verified
4  Shareholder Derivative Consolidated Complaint (the "Complaint") on behalf of
5  Allergan, Inc. ("Allergan" or the "Company") against the defendants named herein.

6  **I.    INTRODUCTION**

7    1.    This is a shareholder derivative action brought on behalf of nominal
8  defendant Allergan against its entire Board of Directors (the "Board"), including Chief
9  Executive Officer ("CEO") and Chairman of the Board David E.I. Pyott ("Pyott"),[1] for
10  violations of §§14(a) and 29(b) of the Securities Exchange Act of 1934 ("Exchange
11  Act") (and United States Securities and Exchange Commission ("SEC") Rule 14a-9
12  promulgated thereunder), breach of fiduciary duty, corporate waste, unjust
13  enrichment, and insider trading. By this action, Plaintiffs seek to recover damages and
14  obtain other relief against the Individual Defendants (as defined herein) for illegally
15  promoting Allergan's flagship product, Botox, for uses not approved by the U.S. Food
16  and Drug Administration ("FDA"). The Individual Defendants are responsible for
17  severely damaging Allergan's corporate franchise by repeatedly causing or permitting
18  the Company to violate state and federal law.

19    2.    This shareholder derivative action arises from the Individual Defendants'
20  actions in knowingly causing and permitting the Company to engage in a decade-long,
21  systematic, illegal, marketing and promotion scheme for its most important product,

22

23  [1]    As defined herein, the 12 "Director Defendants" making up Allergan's current
24  "Board" are: Pyott, Herbert W. Boyer ("Boyer"), Deborah Dunsire ("Dunsire"),
    Michael R. Gallagher ("Gallagher"), Gavin S. Herbert ("Herbert"), Dawn Hudson
25  ("Hudson"), Robert A. Ingram ("Ingram"), Trevor M. Jones ("Jones"), Louis J.
    Lavigne, Jr. ("Lavigne"), Russell T. Ray ("Ray"), Stephen J. Ryan ("Ryan") and
26  Leonard D. Schaeffer ("Schaeffer"). The Director Defendants currently serve on the
    Board and did so on the date this action was initiated. At least half of the Director
27  Defendants (Pyott, Boyer, Herbert, Schaeffer, Gallagher and Ryan) have served on the
    Board since September 2002 or prior thereto.

28

- 1 -

Botox, as well as certain other drugs. On September 1, 2010, Allergan pled guilty to the off-label promotion of Botox, and the U.S. Department of Justice ("DOJ") announced *$600 million in sanctions* to be paid by the Company to resolve civil and criminal claims (including criminal fines totaling $375 million and a civil settlement of $225 million).

3. The FDA has a well-established procedure in place for granting marketing approvals for drug products on the basis of adequate and well-controlled clinical trials to ensure that the drug products are safe and effective for their intended use(s). Toward the end of the drug development process, pharmaceutical companies submit drugs for approval to the FDA. When a pharmaceutical company submits a drug, it specifies the particular purpose for which the drug is to be used. Usually, there is extensive testing of the drug to support its use for an intended purpose. If the FDA finds the drug's benefits outweigh the risks, the FDA approves its use for the specified purpose. The specific, approved use is called the "indication" for which drug may be prescribed. The FDA also specifies particular dosages determined to be safe and effective for each indication.

4. Physicians are permitted to prescribe drugs for uses which have not been FDA-approved, commonly known as "off-label" uses. Off-label prescriptions can significantly increase the sales of a drug and thus increase the income to the pharmaceutical company that manufactures the drug. However, there are obvious dangers inherent in prescribing drugs for unapproved, and often untested, uses. Accordingly, the Federal Food, Drug and Cosmetic Act ("FDCA") prohibits a pharmaceutical company from promoting the off-label use of its drug or from making misleading claims as to a drug's safety or effectiveness.

5. The penalties for violating the FDCA are harsh, and defendants were undoubtedly aware of this at all relevant times. In addition to substantial criminal and

640138_1

1   civil penalties and fines, violators of the FDCA can be excluded from participation in

2   the Medicare and Medicaid programs.[2]  Exclusion from these government-run

3   insurance programs could essentially cripple a drug company as it would no longer

4   have access to a massive potential source of revenue.  In other words, when a drug

5   manufacturer violates the FDCA by promoting off-label uses of its drugs or making

6   misleading claims as to the safety or efficacy of its drugs, it is not a mere "problem" –

7   rather, it is a "bet the company" issue.

8        6.    Nevertheless, despite the serious perils to Allergan and its shareholders

9   presented by the Company's illegal, off-label, marketing practices, the upside –

10   millions of dollars in terms of increased revenues – was tremendous.  Thus, the

11   Individual Defendants strategized, planned, implemented and approved a Company-

12   wide scheme to encourage medical providers to prescribe Botox for unapproved uses.

13        7.    Indeed, according to the DOJ, and supported by the Board materials

14   produced in this action,[3] it was none other than the Board, including Director

15   Defendants Pyott, Boyer, Herbert, Schaeffer and Gallagher, and Individual

16   Defendants Evans, Cresswell, Rosso, Osar and Wild (all of whom were on the Board

17   during the 1997-2001 time frame), who actually approved and authorized ▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21       8.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23

_____

24  [2]     Such exclusion is also known as "debarment."

25  [3]     On June 9, 2011, Allergan produced to Plaintiffs the Board materials that were

26 produced to the U.F.C.W. Local 1776 & Participating Employers Pension Fund
("UFCW") by Allergan in response to the UFCW's inspection demand under §220 of

27 the Delaware General Corporation Law brought in the Delaware Chancery Court on
February 28, 2011 (the "Section 220 Board Marterials").

28

640138_1

1  ███████████████████████████████████████████████████

2  ████████████████████████████████████████

3  9.  ██████████████████████████████

4  ███████████████████████████████████████████████████

5  ███████████████████████████████████████████████████

6  ███████████████████████████████████████████████████

7  ████████████████████████████████ None of these

8  were FDA-approved indications for Botox at the time.

9  10.  Nor did the Board curb its off-label marketing strategy after 2001.

10  ███████████████████████████████████████████████████

11  ███████████████████████████████████████████████████

12  ███████████████████████████████████████████████████

13  ███████████████████████████████████████████████████

14  ███████████████████████████████████████████████████

15  ███████████████████████████████████████████████████

16  ███████████████████████████████████████████████████

17  ███████████████████████████████████████████████████

18  ███████████████████████████████████████████████████

19  ███████████████████████████████████████████████████

20  ███████████████████████████████████████████████████

21  ███████████████████████████████████████████████████

22  ███████████████████████████████████████████████████

23  ████████████████████████████████████

24  11.  ██████████████████████████████████████████

25  ███████████████████████████████████████████████████

26  ──────────────

27  ███████████████████████████████████████████████████

28

640138_1

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ despite receiving and reviewing numerous

2 warnings and complaints about such activities over a multi-year period from the FDA,

3 the French government, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮   As alleged further herein, demand is therefore excused as to each of the

5 Director Defendants because: (1) they are interested in a demand based on a

6 substantial likelihood of liability or (2) there is reason to doubt that they are entitled to

7 the protections of the business judgment rule.

8      12.   For example, in August 2001, the FDA expressly warned Defendants of

9 its off-label marketing of Botox, reminding Allergan of *five prior warnings* on the

10 topic (the "August 2001 FDA Warning Letter"):

11     *[Y]ou have repeatedly included favorable data or conclusions from*

12     *nonclinical studies of BOTOX in a way that suggests they have clinical*

13     *significance when, in fact, no such clinical significance has been*

14     *demonstrated.  We have previously objected to these activities in*

15     *Review Memoranda dated December 12, 1998 and September 25, 2000,*

16     *and untitled letters dated November 7, 2000, February 14, 2001, and*

17     *April 12, 2001.*

18      13.   The Director Defendants on the Board at the time, including Pyott,

19 Boyer, Herbert, Schaeffer and Gallagher, as well as Individual Defendants Evans,

20 Cresswell, Rosso, Osar and Wild, were certainly aware of this warning (which

21 referenced five prior warnings).  Indeed, the August 2001 FDA Warning Letter was

22 expressly reported in a September 5, 2001 *Los Angeles Times* article.

23      14.   One year later, on September 5, 2002, the FDA warned Defendants again

24 regarding "misleading statements" made in Botox promotional materials (the

25 "September 5, 2002 FDA Warning Letter").  Director Defendants Pyott, Boyer,

26 Herbert, Schaeffer, Ryan and Gallagher, as well as Individual Defendants Evans,

27 Cresswell, Rosso, Osar and Wild, were on the Board at the time, and Pyott issued a

28 press release regarding the warning. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- 5 -

1 █████████████████████████████████████████

2 █████████████████████████████████████████

3 █████████████████████████████████████████

4 ████████████████████

5     15.    In June 2003, less than a year after the September 5, 2002 Warning

6 Letter, the Board, including Director Defendants Pyott, Boyer, Herbert, Schaeffer,

7 Ryan, Ray and Gallagher, as well as Individual Defendants Evans, Cresswell, Rosso

8 and Osar, received and reviewed yet another letter from the FDA warning of

9 "misleading" promotional materials for Botox (the "June 23, 2003 FDA Warning

10 Letter"). █████████████████████████████████

11 █████████████████████████████████████████

12 █████████████████████████████████████████

13 ████████████████████████[5]

14     16.    In September 2006, Defendants received and reviewed yet another

15 warning letter from the FDA regarding the Company's funding of dinner programs

16 promoting Botox in violation of the FDCA. █████████████████████

17 █████████████████████████████████████████

18 █████████████████████████████████████████

19 █████████████████████████████████████████

20 █████████████████████████████████████████

21 █████████████████████████████████████████

22 █████████████████████████████████████████

23 █████████████████████

24 _____

25 [5]    A subsequent FDA warning regarding the off-label marketing of another drug

26 and a letter from the French government warning that Botox had resulted in aspiration
   and death among patients were also received and reviewed by the Board in 2005.

27 █████████████████████████████████████████

28

640138_1

17.   Notably, in 2008, the very same Dr. Schim was still being paid by the Company to promote Botox for headaches, as is supported by the article he published in a headache journal promoting the use of Botox for headaches while disclosing, as a conflict of interest, his financial ties to Allergan.[7]   In 2010, according to the Company's website disclosing physician payments, Dr. Schim remained among the Company's highest-paid physicians.[8]

18.   ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████

19.   ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[7]   Andrew M. Blumenfeld, Jack D. Schim & Thomas J. Chippendale, *Botulinum Toxin Type A and Divalproex Sodium for Prophylactic Treatment of Episodic or Chronic Migraine*, Headache: The Journal of Head and Face Pain, Vol. 48, Issue 2, at 210-20, Feb. 2008.

[8]   *See*   http://onlinelibrary.wiley.com/doi/10.1111/j.1526-4610.2007.00949.x/abstract; http://www.allergan.com/responsibility/hcp_partnership_payments/physician_payments.htm.

-7-

640138_1



20.

21.     Thus, despite receiving and reviewing repeated, official warnings from the FDA,                                                  consistent with their "Top Corporate Priorit[y]," the Individual Defendants (including the Director Defendants) continued to step up their efforts to "maximize sales" of Botox for off-label uses.  They caused Allergan to enter into co-promotion agreements with, and even acquire, other companies so as to provide their sales force with access to physicians with off-label specialties.  They further caused Allergan to double its support staff available to assist doctors in obtaining reimbursements for off-label Botox use; create "independent" medical educational organizations for the purpose of promoting off-label uses; and to expend significant Company funds to pay doctors for their attendance at elaborate dinners and retreats focused on off-label uses for Botox. Making matters worse, as reported by the DOJ, "there was little clinical evidence that these [off-label] uses were [even] effective."

640138_1

22.     The off-label marketing by Allergan on the Individual Defendants' watch
was so widespread that numerous whistleblowers filed *qui tam* actions on behalf of
the United States alleging violations of the False Claims Act, including:

(a)     *United States ex rel. Lang, et al. v. Allergan, Inc.*, Case No.
1:07-cv-01288 (N.D. Ga. June 5, 2007), alleging violations of the False Claims Act,
31 U.S.C. §§3729-3733 ("Civil Action I");

(b)     *United States ex rel. Beilfuss, et al. v. Allergan, Inc.*, Case No.
1:08-cv-10305 (D. Mass. Feb. 22, 2008), alleging violations of the False Claims Act,
31 U.S.C. §§3729-3733 ("Civil Action II"); and

(c)     *United States ex rel. Hallivis v. Allergan, Inc.*, Case No.
8:09-cv-02817 (D. Md. Oct. 26, 2009), alleging violations of the False Claims Act, 31
U.S.C. §§3729-3733 ("Civil Action III").[9]

23.     While the Individual Defendants were each sufficiently aware of the
illegal off-label marketing scheme at the Company, Allergan's shareholders were not.
In seeking reelection to their lucrative positions as well as increased benefits under a
shareholder-approved incentive plan, each of the Individual Defendants failed to
disclose material information to the Company's shareholders necessary to make an
adequately informed decision, in violation of federal law (as well as their fiduciary
duties under Delaware law).  As a result, the Company's shareholders reelected
members of the Board, including each of the Director Defendants, and approved
incentive compensation plans, allowing these defendants to continue to harm the
Company and unjustly reap undeserved and outsized compensation.

24.     In 2007, shortly after Civil Action I was filed, the FBI began an
investigation into Allergan's off-label marketing of Botox.  On March 3, 2008,
Allergan issued a Current Report on Form 8-K (attaching a press release also dated

---

[9]     Civil Actions I, II and III are collectively referred to herein as the "Civil *Qui
Tam* Actions."

640138_1

March 3, 2008) announcing that the Company had received a subpoena from the DOJ requesting documents concerning promotional activities involving Botox. Notably, at the time the March 2008 press release was issued, a majority of the Individual Defendants, including Pyott, Boyer, Herbert, Schaeffer, Gallagher, Ryan, Ray, Jones, Ingram, Lavigne, Dunsire and Hudson, were serving on Allergan's Board. Ultimately, the DOJ intervened on behalf of the United States in Civil Actions I and II on April 2, 2010.

25.   On August 31, 2010, a Settlement Agreement was entered between the United States, the individuals or "relators" who filed the Civil *Qui Tam* Actions and Allergan to resolve the Civil *Qui Tam* Actions. The Settlement Agreement addresses Defendants' conduct from January 1, 2001 through at least December 31, 2008, in which Defendants: (a) promoted Botox for off-label indications that were not medically accepted and therefore not covered by federal health care programs; (b) made unsubstantiated and misleading statements about the safety and efficacy of Botox for off-label indications; (c) instructed doctors to miscode Botox claims for uncovered indications using inappropriate diagnosis codes to ensure payment by government health care programs; and (d) provided inducements to doctors to promote and/or prescribe more Botox (collectively referred to as the "Covered Conduct").

26.   Further to the Settlement Agreement, the Covered Conduct period extends from January 1, 2001 to December 31, 2009 and concerns Defendants' illegal and improper conduct, including miscoding of claims for Botox submitted to Medicare, Medicaid and other federal health care programs with diagnosis codes for overactive bladder and neurogenic bladder conditions.

27.   The Settlement Agreement also sets forth in detail the lengths to which Defendants were willing to go in order to encourage the submission of false or fraudulent claims for Botox to Medicare, Medicaid and other federal health care programs.  The Settlement Agreement requires the Company to pay $225 million

640138_1

1  (plus accrued interest) to the United States and to various state governments referred

2  to in the Settlement Agreement as the "Medicaid Participating States."

3      28.    As a further result of the Settlement Agreement, on August 30, 2010,

4  Allergan entered into a five-year corporate integrity agreement ("CIA") with the

5  Department of Health and Human Services' Office of Inspector General ("OIG").

6  Under the CIA, the Company will have to submit compliance reports to the OIG and

7  undertake additional compliance-related activities, such as significant monitoring,

8  auditing and training, as well as disclosing payments to physicians, charitable

9  contributions and grants on the Company website.

10     29.    On September 1, 2010, the DOJ filed a Criminal Information (or the

11  "Information") against Allergan in the United States District Court for the Northern

12  District of Georgia in an action entitled *United States of America v. Allergan, Inc.*,

13  Criminal Action No. 1:10-CR-375 (N.D. Ga. Sept. 1, 2010) (the "Criminal Action").

14  The Information charges the Company with "Distribution of a Misbranded

15  Drug/Biologic" in violation of provisions of the FDCA (including 21 U.S.C. §§331(a)

16  and 352(f)(1)) during the period from January 1, 2000 through December 31, 2005.

17  On October 5, 2010, Allergan entered a Guilty Plea and Plea Agreement ("Guilty

18  Plea") wherein it admitted that the Company was pleading guilty "because it [was] in

19  fact guilty of the crime charged in Count One of the Criminal Information" during the

20  period from 2000 through 2005 (the "Criminal Conduct").  Allergan agreed to pay a

21  criminal fine of $375 million in connection with its Guilty Plea.

22     30.    In a September 1, 2010 press release, the Inspector General of the U.S.

23  Department of Health and Human Services, Daniel R. Levinson, stated that conduct,

24  such as that engaged in by Allergan here under the Individual Defendants' direction

25  and on their watch, simply will not be tolerated: "Fraudulent marketing of drugs

26  through off-label promotion or kickbacks to prescribers undermines the protections

27  afforded by the drug approval process and medical decision-making.  This conduct

28

- 11 -

640138_1

will not be tolerated."[10]   The U.S. Attorney succinctly summarized the situation as follows:

> *"The FDA had approved therapeutic uses of Botox for only four rare conditions, yet Allergan made it a top corporate priority to maximize sales of far more lucrative off-label uses that were not approved by FDA. . . . Allergan further demanded tremendous growth in these off-label sales year after year, even when there was little clinical evidence that these uses were effective. The FDA approval process ensures that pharmaceutical companies market their medications for uses that are proven to be safe and effective, and this case demonstrates that companies that fail to comply with these rules face criminal prosecution and stiff penalties."*

31.    As a result of illicit off-label marketing sanctioned by the Individual Defendants, Botox sales skyrocketed. According to the October 4, 2010 Government Memorandum in Support of Binding Plea and Sentencing Memorandum ("*Government Plea and Sentencing Memo*"), "[b]etween 1999 and 2006, spasticity sales grew by 332 percent, headache sales grew by 1,407 percent, and pain sales grew by 504 percent. By 2007, Allergan had over $500 million in annual Botox sales for therapeutic uses, and 70 to 80 percent of those sales were attributable to off-label indications, primarily for spasticity, headache and pain."

32.    Through this derivative action, Plaintiffs seek damages on behalf of Allergan for the severe harm caused to the Company by the Individual Defendants,

---

[10]    Also quoted in the September 1, 2010 press release was Brian D. Lamkin, Special Agent in Charge, FBI Atlanta, who noted, "[t]his was a complex investigation that required much in terms of investigative resources in order to conduct the many interviews and document reviews needed to get us [to] where we are today. . . . The FBI, through its vast experience investigating health care fraud, is not only able to provide such resources, but is also able to recognize which circumstances need those resources the most. The off-label marketing tactics employed by Allergan was one of those aforementioned circumstances."

- 12 -

640138_1

1  each of whom, as a director of the Board and/or an executive manager of the
2  Company, is liable for breaching their fiduciary duties by strategically planning,
3  approving and allowing the Company's unlawful, off-label marketing in violation of
4  state and federal law to the great detriment of the Company.

5  **II.   JURISDICTION AND VENUE**

6       33.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331
7  and 1332(a)(2) in that this Complaint presents a federal question, Plaintiffs and
8  Defendants are citizens of different states and the matter in controversy exceeds
9  $75,000, exclusive of interests and costs.  This Court has supplemental jurisdiction
10 over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action
11 is not a collusive one to confer jurisdiction on a court of the United States that it
12 would not otherwise have.

13      34.    Venue is proper in this District because a substantial portion of the
14 transactions and wrongs complained of herein, including Defendants' primary
15 participation in the wrongful acts detailed herein, occurred in this District.  Several
16 Defendants either reside, or maintain executive offices, in this County and have
17 received substantial compensation in this County by engaging in numerous activities
18 and conducting business here, which has an effect in this District.

19 **III.   THE PARTIES**

20      35.    Plaintiff Willa Rosenbloom ("Rosenbloom") has continuously been a
21 shareholder of Allergan since at least 1989.  Plaintiff Rosenbloom is a citizen of
22 Pennsylvania.

23      36.    Plaintiff Daniel Himmel ("Himmel") has continuously been a shareholder
24 of Allergan since at least 2005.  Plaintiff Himmel is a citizen of Florida.

25      37.    Plaintiff Pompano Beach Police & Firefighters' Retirement System
26 ("Pompano Beach") has continuously been a shareholder of Allergan since at least
27 2003.  Plaintiff Pompano Beach is a citizen of Florida.

28

640138_1

38.     Plaintiff Washington Laborers-Employers Pension Trust ("Washington Laborers") has continuously been a shareholder of Allergan since 2004.  Plaintiff Washington Laborers is a citizen of Washington.

39.     Nominal defendant Allergan is incorporated under the laws of the State of Delaware.

(a)     Allergan is a global, multi-specialty health care company.  The Company specializes in specialty pharmaceuticals (primarily eye care, skin care and neuromodulators) and medical devices (primarily breast implants, gastric bands for obesity surgery and injectable dermal fillers used on facial wrinkles).  The Company offers a number of specialty products, including: Botox® (onabotulinum toxin A), RESTASIS® (cyclosporine ophthalmic emulsion), LUMIGAN® (bimatoprost ophthalmic solution), Botox Cosmetic (onabotulinum toxin A) the JUVEDERM family of dermal fillers and the LAP-BAND® Adjustable Gastric Banding System.

(b)     Allergan maintains its principal executive office at 2525 Dupont Drive, Irvine, California, and its primary administrative and research facilities are located in Irvine, California.  Allergan also utilizes additional facilities in California to provide administrative, research and raw material support, manufacturing, warehousing and distribution.  Allergan's only facility outside of California, located in Texas, is used for manufacturing and warehousing.

40.     Defendant David E.I. Pyott ("Pyott") has been Allergan's CEO since January 1998.  Pyott has also been Allergan's Chairman of the Board since 2001 and a director since 1998.  Pyott was Allergan's President from January 1998 to February 2006.  Pyott was a director when the 2008, 2009 and 2010 proxy statements were issued.  Defendant Pyott also sold over 1.34 million shares of Allergan stock, for unlawful insider-trading proceeds of almost $85 million, based upon his knowledge of material, nonpublic information regarding the illegal sales and marketing scheme, in breach of his fiduciary duties and the securities laws.  Defendant Pyott is a citizen of California.

- 14 -

41.   Defendant Herbert W. Boyer ("Boyer") has been Allergan's Vice Chairman since 2001, Lead Independent Director since at least March 2004 and a director since 1994. Boyer was also Allergan's Chairman of the Board from 1998 to 2001. Boyer has been a member of Allergan's Corporate Governance and Science and Technology Committees since at least March 1999. Boyer was a director when the 2008, 2009 and 2010 proxy statements were issued. Defendant Boyer is a citizen of California.

42.   Defendant Gavin S. Herbert ("Herbert") is a founder of Allergan. He has been Allergan's Chairman Emeritus since 1996 and a director since 1950. Herbert was also Allergan's Chairman of the Board from 1977 to 1996, CEO from 1961 to 1991 and President from 1961 to 1977. Herbert has been a member of Allergan's Science and Technology Committee since at least March 1999 and a member of the Audit and Finance Committee from at least March 1999 to September 2004. Herbert was a director when the 2008, 2009 and 2010 proxy statements were issued. Defendant Herbert also sold over 147,000 shares of Allergan stock, for unlawful insider-trading proceeds exceeding $8.5 million, based upon his knowledge of material, nonpublic information regarding the illegal sales and marketing scheme, in breach of his fiduciary duties and the securities laws. Defendant Herbert is a citizen of California.

43.   Defendant Leonard D. Schaeffer ("Schaeffer") has been an Allergan director since 1993. Schaeffer has also been a member of Allergan's Corporate Governance Committee since April 2003 and a member of the Audit and Finance Committee from at least March 1999 to April 2003. Schaeffer was a director when the 2008, 2009 and 2010 proxy statements were issued. Defendant Schaeffer is a citizen of California.

44.   Defendant Michael R. Gallagher ("Gallagher") has been an Allergan director since 1998. Gallagher has also been a member of Allergan's Audit and Finance Committee since at least March 2005 and a member of the Corporate

- 15 -

1  Governance Committee from at least March 1999 to January 2005. Gallagher was a

2  director when the 2008, 2009 and 2010 proxy statements were issued. Defendant

3  Gallagher is a citizen of California.

4      45.    Defendant Stephen J. Ryan ("Ryan") has been an Allergan director since

5  September 23, 2002. Ryan has also been Chairman of Allergan's Science and

6  Technology Committee since at least March 2004 and a member of such committee

7  since September 2002. Ryan has been a member of Allergan's Audit and Finance

8  Committee since September 2002. Ryan was a director when the 2008, 2009 and

9  2010 proxy statements were issued. Defendant Ryan is a citizen of California.

10      46.    Defendant Russell T. Ray ("Ray") has been an Allergan director since

11  April 2003. Ray has also been Chairman of Allergan's Audit and Finance Committee

12  since at least March 2005 and a member since April 2003. Ray was a director when

13  the 2008, 2009 and 2010 proxy statements were issued. Defendant Ray is a citizen of

14  Massachusetts.

15      47.    Defendant Trevor M. Jones ("Jones") has been Allergan director since

16  July 2004. Jones has also been a member of Allergan's Corporate Governance and

17  Science and Technology Committees since at least March 2004. Jones was a director

18  when the 2008, 2009 and 2010 proxy statements were issued. Defendant Jones is a

19  citizen of the United Kingdom.

20      48.    Defendant Robert A. Ingram ("Ingram") has been an Allergan director

21  since January 2005. Ingram has also been Chairman of Allergan's Corporate

22  Governance Committee since May 2007 and a member since January 2005. Ingram

23  was a member of Allergan's Science and Technology Committee from at least March

24  2005 to May 2007. Ingram was a director when the 2008, 2009 and 2010 proxy

25  statements were issued. Defendant Ingram is a citizen of North Carolina.

26      49.    Defendant Louis J. Lavigne, Jr. ("Lavigne") has been an Allergan

27  director since July 2005. Lavigne has also been a member of Allergan's Audit and

28  Finance and Science and Technology Committees since at least March 2006. Lavigne

640138_1

1  was a director when the 2008, 2009 and 2010 proxy statements were issued.
2  Defendant Lavigne is a citizen of California.

3       50.    Defendant Deborah Dunsire ("Dunsire") has been an Allergan director
4  since December 2006.  Dunsire has also been a member of Allergan's Corporate
5  Governance and Science and Technology Committees since December 2006.  Dunsire
6  was a director when the 2008, 2009 and 2010 proxy statements were issued.
7  Defendant Dunsire is a citizen of Massachusetts.

8       51.    Defendant Dawn Hudson ("Hudson") has been an Allergan director since
9  January 28, 2008.  Hudson has also been a member of the Audit and Finance
10  Committee since January 2008.  Hudson was a director when the 2008, 2009 and 2010
11  proxy statements were issued.  Defendant Hudson is a citizen of New York.

12      52.    Defendant Handel E. Evans ("Evans") was an Allergan director from
13  1989 to May 2007.  Evans was also Chairman of Allergan's Corporate Governance
14  Committee from at least March 2001 to May 2007 and a member of the Audit and
15  Finance Committee from at least March 1999 to at least March 2001.  Defendant
16  Evans is a citizen of Pennsylvania.

17      53.    Defendant Ronald M. Cresswell ("Cresswell") was an Allergan director
18  from 1998 to July 2004.  Cresswell was also Chairman of Allergan's Science and
19  Technology Committee from at least March 2000 to July 2004 and a member from at
20  least March 1999 to July 2004.  Cresswell was a member of Allergan's Corporate
21  Governance Committee from at least March 1999 to at least March 2004.  Defendant
22  Cresswell is a citizen of Michigan.

23      54.    Defendant Louis T. Rosso ("Rosso") was an Allergan director from 1989
24  to April 2005.  Rosso was also a member of Allergan's Audit and Finance Committee
25  from at least March 1999 to April 2005 and served as Chairman of the Committee
26  from at least March 1999 to at least March 2000.  Rosso was a member of Allergan's
27  Science and Technology Committee from at least March 2001 to April 2005.
28  Defendant Rosso is a citizen of California.

640138_1

55.     Defendant Karen R. Osar ("Osar") was an Allergan director from 1998 to September 2005.   Osar was also Chairman of Allergan's Audit and Finance Committee from at least March 2001 to September 2005.   Defendant Osar is a citizen of Connecticut.

56.     Defendant Anthony H. Wild ("Wild") was an Allergan director from 2000 to September 2002.   Wild was also a member of Allergan's Audit and Finance Committee in at least 2002 and a member of the Science and Technology Committee from at least March 2001 to at least March 2002.   Defendant Wild is a citizen of New York.

57.     The defendants identified in ¶¶40-51 are referred to herein as the "Director Defendants."   The defendant identified in ¶40 is referred to herein as the "Officer Defendant."   The defendants identified in ¶¶42-46, 49, 51-52 and 54-56 are referred to herein as the "Audit Committee Defendants."   The defendants indentified in ¶¶40-51 are referred to herein as the "Proxy Defendants." The defendants identified in ¶¶40 and 42 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, Officer Defendant, Audit Committee Defendants, Proxy Defendants and Insider Selling Defendants are referred to herein as the "Individual Defendants." The Individual Defendants and Allergan are collectively referred to herein as the "Defendants."

## IV.    DUTIES OF THE DEFENDANTS

58.     By reason of their positions as officers, directors and/or fiduciaries of Allergan and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Allergan and its shareholders fiduciary obligations of trust, loyalty and good faith, and were and are required to use their utmost ability to control and manage Allergan in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Allergan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

640138_1

59.     Each director and officer of the Company owes to Allergan and its shareholders the fiduciary duty to exercise good faith in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

60.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Allergan, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Allergan, and was at all times acting within the course and scope of such agency.

62.     To discharge their duties, each of the Individual Defendants, as officers and/or directors of Allergan, was required to supervise the management, policies, practices and controls of the financial affairs of the Company in good faith. By virtue of such duties, the Individual Defendants were required to, among other things:

          (a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority;

          (b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets; and

          (c)     Remain informed as to how Allergan conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws and regulations.

63.     In addition, the Individual Defendants had a responsibility to ensure that the Company acted in accordance with its stated Company policy.  The Company stated that it was committed to ethically selling its products and underscored the importance of its reputation.  In Defendant Pyott's "Letter from the Chief Executive

- 19 -

1   Officer," found in Allergan's Code of Business Conduct and Ethics (the "Code"), he

2   noted that *"THERE IS NO RIGHT WAY TO DO A WRONG THING."* He further

3   stated that:

4           A large part of Allergan's success may be attributed to our

5       reputation in the marketplace for the quality and safety of our products

6       and for the values and principles that guide our business relationships,

7       including our strong sense of ethics. This Code of Business Conduct and

8       Ethics represents our formal commitment to the principles of honesty,

9       integrity, and fairness in everything we do, so that as a company our

10      activities reflect positively on our stockholders, the marketplaces we

11      serve, the community, and on ourselves. These principles are not new at

12      Allergan. They are simply the statements of our long-standing policy

13      that all business conducted by Allergan employees and representatives

14      will be conducted ethically and in compliance with all applicable laws.

15          One simple reason for upholding the law is that our continued

16      success as a company depends on it. In the health care business, any

17      legal or ethical violation has the potential to harm patients and damage

18      our reputation. I believe that the best reason for abiding by the law and

19      the principles contained in this Code of Business Conduct and Ethics is

20      that it is simply the right thing to do. We all want to work for a company

21      that we believe consistently strives to do the right thing. The best way to

22      ensure that Allergan does the right thing is for each employee to obey the

23      law in his or her own job responsibilities and to help others do what is

24      right.

25      64.   The Code itself states that all directors, officers, employees, and

26   independent consultants are required to "comply with all applicable laws and

27   regulations." In addition, the Code states that "know[ing] and observ[ing] applicable

28   laws and regulations and Allergan policies" is a "condition of employment" and that

640138_1