"[f]ailure to do so could subject an employee [defined earlier as an officer, director, employee, or independent consultant] and Allergan to sanctions, could harm Allergan's reputation and competitive position, and could result in disciplinary measures up to and including the termination of employment." The Code also requires annual certification by all members of the Board and all other key employees.

65. Moreover, the Code requires directors and officers to "ensur[e] compliance with worldwide clinical and regulatory standards, including conduct of clinical studies, ***marketing approvals***, good manufacturing practice requirements, labeling and advertising controls, and other mandated product regulations."

66. In addition to their fiduciary duties as directors and those imposed by the Code, certain of the Director Defendants were members of committees that placed additional duties on them. For example, the Audit Committee Defendants were bound to adhere to the Audit and Finance Committee's Charter, which specifically required its members to:

(a) Review the integrity of the Company's financial statements, financial reporting process and systems of internal controls regarding finance, accounting and legal compliance;

(b) Assist the Board in its oversight of the Company's compliance with legal and regulatory requirements; and

(c) Establish, review and update periodically the Company's Code of Business Conduct and Ethics policy and ensure that management has established a system to enforce the Code.

67. Pursuant to the Audit and Finance Committee Charter (as revised at the December 1, 2008 Board of Directors' Meeting), the members of the Audit and Finance Committee are specificially required to, *inter alia*, "review the integrity of the Corporation's . . . systems of internal controls regarding . . . legal compliance"; "assist the Board in its oversight of the Corporation's compliance with legal and regulatory requirements"; "[o]n at least an annual basis, review with the Corporation's counsel

any legal matters that could have a significant impact on the Corporation's financial statements, compliance with applicable laws and regulations, and inquiries received from regulators and governmental agencies"; receive from management an "annual compliance report"; and "[e]stablish, review and update periodically the Corporation's *Code of Business Conduct and Ethics* policy and ensure that management has established a system to enforce this *Code*." Director Defendants Herbert, Schaeffer, Gallagher, Ryan, Ray, Lavigne and Hudson, as well as Individual Defendants Evans, Rosso, Osar and Wild, were all members of the Audit and Finance Committee at various times during the relevant period.

68. Pursuant to the Corporate Governance Committee's Charter, the members of the Corporate Governance Committee were specifically required, *inter alia*, to "[r]eceive comprehensive reports from management regarding compliance-related matters affecting the corporation and provide[] general compliance oversight to Allergan." Director Defendants Boyer, Schaeffer, Gallagher, Jones, Ingram and Dunsire, as well as Individual Defendants Evans and Cresswell all served on the Corporate Governance Committee at various times during the relevant period.

69. Pursuant to the Science and Technology Committee's Charter (as approved at the December 3, 2007 Board meeting) setting out the Committee's responsibilities, the Committee:

1. Reviews the Discovery and Development research portfolio;

2. Reviews the science underlying the major Discovery and Development Programs;

3. Reviews the staffing of key scientific and management positions within the R&D organization;

4. Evaluates the investment allocation for the R&D portfolio including project expenditures;

5. Reviews the major strategic priorities within R&D and the competitive environment surrounding these priorities;

6. Reviews variances to Plan for major development projects;

7. Monitors progress of Allergan research including milestones;

8. Reviews the process for R&D patents and the portfolio of strategic patents;

9. Provides scientific guidance, where appropriate, in connection with major technology-based transactions and licensing agreements; and

10. Reviews significant changes to the organization structure.

70. Director Defendants Ingram, Lavigne, Ryan and Dunsire, as well as Individual Defendants Creswell, Rosso and Wild, all served on the Science and Technology Committee in the last decade.

## V. THE COMPANY AND ITS FLAGSHIP PRODUCT, BOTOX

71. Allergan is a Delaware-incorporated company based in Irvine, California. The Company specializes in manufacturing and marketing specialty pharmaceuticals (primarily eye care, skin care and neuromodulators) and medical devices (primarily breast implants, gastric bands for obesity, and injectable dermal fillers used on facial wrinkles).

72. Botox is a prescription-only medical product that contains tiny amounts of highly purified botulinum toxin protein relined from the bacterium *Clostridium botulinum*. In other words, Botox is a purified toxin. When injected at approved and labeled doses into a specific muscle or gland, Botox neurotoxin is expected to diffuse locally, safely and effectively by producing a localized and temporary reduction in the overacting muscle or gland, usually lasting up to approximately three to six months, depending on the individual patient and indication. Allergan markets and sells the toxin under two distinct trade names, "Botox Therapeutic" and "Botox Cosmetic," although these products are exactly the same.

73. Though Botox is widely known for its cosmetic use, the FDA has approved the drug for therapeutic treatment of a few limited indications. In 1989, the FDA first approved Allergan's Biological License Application ("BLA") to distribute and market Botox for the treatment of strabismus (crossed eyes) and blepharospasm (involuntary eyelid muscle contractions) associated with dystonia. In December 2000, the FDA approved Allergan's supplemental BLAs to distribute and market Botox for the treatment of cervical dystonia (involuntary neck muscle contractions) in adults.

74. In July 2004, the FDA approved Allergan's BLA to distribute and market Botox to treat axillary hyperhidrosis (excessive sweating) that cannot be managed effectively by topical treatments.

75. In March 2010, the FDA approved the use of Botox for the treatment of increased muscle stiffness in the elbow, wrist and finger muscles in adults with upper-limb spasticity.

76. In October 2010, the FDA approved the use of Botox for headache prophylaxis in patients with adult chronic migraine who suffer headaches on 15 or more days per month, each lasting more than four hours. The October 15, 2010 statement issued by the FDA in connection with the approval, defined migraine headaches as "an intense pulsing or throbbing pain in one area of the head . . . often accompanied by nausea, vomiting and sensitivity to light and sound." It further noted that Botox has not been shown to work for the treatment of episodic migraine headaches that occur 14 days or fewer per month, or for other forms of headache.

77. During the relevant period, one vial of Botox cost approximately $400 to $500 for 100 units, and treatment of most off-label uses of Botox required injections of anywhere between 100 and 400 units or more. Since Botox's effect on a muscle wears off over time, patients require reinjection at periodic intervals, generally every three months. Botox is a "buy and bill" drug, meaning that doctors purchase Botox directly from Allergan and assume the risk that they will get reimbursed on the back

end by a health care payer after submitting the claim. Consequently, doctors would not inject Botox for off-label uses if they were not sure that they could be reimbursed.

78. The significance of the Botox product line to Allergan's bottom line is indisputable and was certainly well known to each of the Individual Defendants throughout the 2000s. Botox has been one of Allergan's top-selling specialty pharmaceutical products for nearly a decade and has comprised a major source of revenue for the Company. During the years 2000 to 2009, Allergan's total net sales of Botox were $240 million, $310 million, $440 million, $564 million, $705 million, $831 million, $982 million, $1.21 billion, $1.3 billion and $1.31 billion, respectively. Expressed as a percentage of the Company's total net sales across all product lines, this equates to 24%, 27%, 32%, 34%, 36%, 33% (37% of total specialty pharmaceutical sales), 32% (39% of total specialty pharmaceutical sales), 30% (37% of total specialty pharmaceutical sales) and 29% (36% of total specialty pharmaceutical sales).

79. According to Allergan's SEC Form 10-K filed on February 26, 2010, "Botox was the only neuromodulator approved by the FDA until 2000," and the Individual Defendants were fully aware that sales of Botox could be materially and negatively impacted by competition from other companies that might obtain FDA approval to market a neuromodulator similar to Botox. The threat of potential competition put pressure on Defendants to maintain and increase Allergan's more than 80% worldwide market share for neuromodulators. Due to the fact that Botox Therapeutic was only approved for four relatively rare indications during the 2000s, the Individual Defendants knew that the Company's Botox Therapeutic sales figures and growth targets required aggressive marketing and massive sales for off-label uses.

80. Sales of Botox Therapeutic have historically constituted a significant portion of Allergan's total Botox sales. For example, in 2002 and 2003, sales of Botox Therapeutic were $264 million and $338 million, respectively, which represented 60% of the Company's total Botox sales for those years. However, the

pressure to aggressively market Botox Therapeutic was amplified as sales of Botox Therapeutic and Botox Cosmetic started to level out between 2006 and 2008.

81. Further, according to the Civil *Qui Tam* Actions [redacted] the majority of Allergan's sales of Botox Therapeutic were for off-label uses, and approximately 80% of government or insurance company reimbursements for Botox were for off-label prescriptions. According to the Civil *Qui Tam* Actions, Medicaid paid more than $76 million between 2002 and 2006 for Botox treatments that generally would not have otherwise been reimbursed "had the responsible agencies known the circumstances under which such prescriptions were written." The off-label treatments and prescriptions that were most commonly reimbursed by government healthcare programs were generally for adult spasticity, pediatric cerebral palsy and headaches.

## VI. THE REGULATORY SCHEME

82. Allergan's business is the focus of extensive regulation and regulatory oversight by the FDA. The FDCA, 21 U.S.C. §301 *et seq.*, regulates the development, manufacturing and distribution of all drugs in the United States.

83. Prior to 1962, pharmaceutical companies were permitted to promote drugs for any use in the United States. Congress banned the practice in 1962, however, after the disastrous consequences of the drug Thalidomide, a sedative that was widely prescribed to thousands of women suffering from morning sickness during pregnancy. The drug caused tragic birth defects in thousands of babies. As a result of this calamity, and in a legislative effort to prevent similar occurrences, the FDCA was enacted, requiring drug companies to scientifically establish that their drugs are safe and effective for specified intended uses and prohibiting the marketing of drugs for any use other than as specifically approved.

84. Under the FDCA, drug companies are not allowed to market a drug until it has been approved by the FDA. Once approved, the marketing of the drug must be confined to the approved use and dosage, as described on the drug's label. Drug

companies may not engage in marketing or promoting unapproved or "off-label" uses or dosages, *i.e.*, uses or dosages for which the drug has not been approved by the FDA and that are not on the label, because such off-label uses or dosages have not been proven safe and effective.

85. The FDCA also prohibits the marketing or promotion of any drug that is misbranded. A drug is misbranded if the labeling or the advertising for the drug is false or misleading or if the labeling or the advertising contains inadequate directions for the drug's intended use. Because the FDA will not approve labels with directions for off-label uses or dosages, off-label marketing also violates the FDCA's prohibition on the marketing or promotion of drugs that are misbranded.

86. Establishing that a specific use or dosage is safe and effective for large numbers of patients is costly and requires lengthy clinical trials. Moreover, drug companies derive immediate and substantial profits from off-label prescriptions. As a result, executives at drug companies have a significant, short-term, financial incentive to market and promote their drugs for uses and dosages that are not established to be medically safe and effective in treating large numbers of patients, in order to reap outsized incentive compensation, such as bonuses. For the same reasons, these executives have a short-term, financial incentive to allow improper gifts, money, and other kickbacks to be provided to doctors to induce and encourage off-label prescriptions. The resulting improper prescriptions are frequently reimbursed by federal health care programs such as Medicaid and Medicare. This, in turn, subjects the drug company to liability under the False Claims Act and federal anti-kickback statute.

87. Drug companies that violate the FDCA prohibition against misbranding or marketing drugs for unapproved indications are also subject to criminal prosecution and, if convicted, face exclusion or "debarment" from federal health care programs. Such federal debarment could result in catastrophic damage to the drug company and its shareholders because Medicaid and Medicare would no longer cover the costs of

the drug. Thus, patients would likely find an alternative drug sold by a competitor or forego treatment altogether.

## VII. THE INDIVIDUAL DEFENDANTS' ILLEGAL MARKETING SCHEME

88. As detailed herein, each of the Individual Defendants was keenly aware of the prohibitions in the FDCA and other applicable laws concerning the promotion and marketing of drugs for off-label uses. However, they also knew they had to maximize sales of Botox via off-label sales in order to achieve future growth opportunities for Allergan.

### A. [redacted] Maximizing Sales of Botox for Unapproved Uses Was Among the Company's "Top Corporate Priorities" from as Far Back as 1997

#### 1. [redacted]

[redacted] As detailed by the DOJ [redacted] Allergan's yearly Strategic Plans [redacted] "***Top Corporate Priorities***" that the Company maximize sales of Botox for the off-label uses of spasticity and migraine. (As noted above, FDA approval for these uses – and only on very limited terms – did not occur until 2010). [redacted]

90. [11]

[11] On the Individual Defendants' watch, Allergan has, over the years, aggressively promoted Botox to treat several different types of headache conditions, including chronic headache, resulting in an increase in sales for that indication of over 1,400%. Allergan did this despite recognizing lacking scientific evidence that Botox was more effective in treating headache than a placebo. Allergan's Phase 2 FDA headache trials were not successful. According to the Criminal Information and *Government Plea and Sentencing Memo* (collectively, "*DOJ Facts*"), nine out of ten trials failed to meet their primary endpoint, and Allergan itself concluded that these trials were "negative." In December 2004, the FDA agreed, finding that the "Botox headache primary efficacy results for the extensive phase 2 development plan have been largely negative." The FDA also expressed concern over the existing public perception of a "broad utility" for Botox and required Allergan to refrain from funding any medical education programs for headache until it had published all of the Phase 2 headache studies. Nevertheless, according to the DOJ, Allergan directed its employees to refer to the trials as "inconclusive," not "negative."

1  ████████████████████████████████████████

2  ████████████████████████████████████████

3  ████████████████████████████████████████

4  ████

5  91.  ████████████████████████████████████

6  ████████████████████████████████████████

7  ████████████████████████████████████████

8  ████████████████████████████████████████

9  ██████████████████████████████

10  92.  ███████████████████████████████████

11  ████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17  ████████████████████████████████████████

18  ████████

19  93.    Director Defendants Pyott, Boyer, Herbert, Schaeffer and Gallagher, as

20  well as Individual Defendants Evans, Cresswell, Rosso, Osar and Wild, were all

21  Board members during the 1997-2001 time frame when this particular Strategic Plan

22  was in effect and reviewed and approved by each member of the Board.

23     2.    ███████████████

24  94.  █████████████████████████████████████

25  ████████████████████████████████████████

26  ████████████████████████████████████████

27  ████████████████████████████████████████

28

640138_1

[redacted]

95. Director Defendants Pyott, Boyer, Herbert, Schaeffer, Gallagher, Ryan, Ray and Jones, as well as Individual Defendants Evans, Cresswell, Rosso and Osar, were all members of the Board during 2004. Further, Director Defendants Ingram and Lavigne joined the Board in early to mid-2005, during the period that the 2004 Strategic Plan was set to be in full operation.

**3. [redacted]**

96. [redacted]

---

[redacted]

640138_1



97. Director Defendants Pyott, Boyer, Herbert, Schaeffer, Gallagher, Ryan, Ray, Jones, Ingram and Lavigne, as well as Individual Defendants Evans, Rosso and Osar were all members of the Board during 2005.

**4.**

98.

99.

100. During the time period of the [REDACTED] Director Defendants Pyott, Boyer, Herbert, Schaeffer, Gallagher, Ryan, Ray, Jones, Ingram, Lavigne, and Dunsire served on the Board.

**5.** [REDACTED]

101. [REDACTED]

102. During the period from 2009 to the present, each of the Director Defendants has served on the Board.

**B. Consistent with the Board's "Top Corporate Priorities" to "Maximize [Botox] Sales" for Unapproved Uses, Allergan Launched Its "Headache Development" Program in 2003**

103. At the direction of the Individual Defendants (including the Director Defendants), Allergan aggressively promoted Botox to treat several different types of headache conditions in addition to chronic headache for more than a decade, which caused Botox sales for that indication to increase by over 1,400%. At the same time, Allergan recognized that it lacked scientific evidence that Botox was more effective in treating headache than even a placebo. Allergan's Phase 2 FDA headache trials were not successful. In fact, nine out of ten trials failed to meet their primary endpoints, and Allergan concluded that these trials were "negative."

104. In December 2004, the FDA agreed, finding that the "Botox headache primary efficacy results for the extensive phase 2 development plan have been largely negative." The FDA also expressed its concern about the existing public perception of the "broad utility" of Botox and required Allergan to refrain from funding any medical education programs for headache until it had published all of the Phase 2 headache studies. Although Allergan ultimately published the studies, the Individual Defendants caused Allergan to direct employees to refer to the trials as "inconclusive"

– not "negative." Although Allergan's employees candidly recognized at the time that the "data just isn't there for headache," at the Board's direction, Allergan continued to promote Botox as an effective treatment for headache.[14]

105. In or about 2003, Allergan launched what it referred to as its "Headache Development Program," seeking out physicians who treated headaches. [redacted]

### C. Consistent with the Board's "Top Corporate Priorities" to "Maximize [Botox] Sales" for Unapproved Uses, Allergan Launched the Cervical Dystonia/Headache Expansion Initiative, Encouraging Physicians to Diagnose Headaches and Pain as Symptoms of Cervical Dystonia

106. In or about 2003, Allergan developed its Cervical Dystonia/Headache Initiative ("CD/HA Initiative") to maximize off-label Botox sales by encouraging doctors to diagnose headache and pain as symptoms of Botox's on-label cervical

---

[14] [redacted] marketing guided Allergan's headache development program. For example, an e-mail from the lead scientist for Allergan's headache development program to the Marketing Department inquired, "if both trial[s] failed to meet the primary [endpoint], would marketing want to give up pursuit of the indication?" Likewise, an Allergan executive reported that Allergan reimbursement personnel planned to develop a "Headache Contingency Plan," which she described as "critical communication and key activities for payers to maintain current coverage and continue to gain coverage for headache," even if "phase II data [is] not positive."

dystonia ("CD") indication. CD, also known as "spasmodic torticollis," is a rare movement disorder. Only approximately 27,000 individuals in the United States currently have the condition. However, with its "Headache Development Program" in jeopardy and no prospect of obtaining a general pain indication, the Individual Defendants caused Allergan to expand its approved CD indication to grow headache and pain sales.

107. Allergan developed the "CD/HA Initiative" as a "rescue strategy in the event of negative phase II data" and a "backup strategy to ensure continued expansion into the headache market" with the goal of establishing a connection between CD and headache to "augment existing use of Botox in the treatment of headache and give an entry point for use of Botox in headache for skeptical markets." As part of this initiative, Allergan asked the FDA to expand the Botox label to include treatment of headache associated with CD and the treatment of "pain" – not merely "neck pain" – associated with CD. The FDA rejected both requests, and, according to the DOJ,[15] an ***Allergan executive*** stated: "***It's too bad that there is no easy way to obtain 'headache' in our label (even as part of CD) . . . . Has the US Marketing group exploited the notion of much higher prevalence of CD in the population?***"

108. Soon thereafter, Allergan launched a new Botox marketing campaign premised on the idea that CD is "underdiagnosed" and "misdiagnosed" in order to "strategically move toward emphasizing symptoms of mild/moderate CD (i.e., HA, Pain, Tremors) instead of severe CD." The Company's "key messages" for the campaign emphasized that doctors could diagnose CD based on headache and pain symptoms even when a doctor "doesn't see any cervical dystonia."

109. Allergan's new CD campaigns worked. The sales and reimbursement teams successfully convinced doctors to change patients' diagnoses from headache to

---

15 Details concerning such conduct are provided in the *DOJ Facts*.

CD. Allergan listed the "CD expansion campaign" as one of the "key drivers" for Botox sales. Upon learning that one doctor was audited by Medicare and asked to pay back over $120,000 for purported "CD claims," Allergan sales and marketing management called for the field to "be more aggressive during their consults" with doctors. Management emphasized that sales representatives should stress "the need for more thorough chart documentation in order to justify a CD diagnosis, especially in those situations where a patient may have been diagnosed with headache previously, but the doctor is changing the diagnosis based upon a better understanding of CD and how a patient may present with CD (we are routinely reviewing with a physician the symptoms of CD-HA, muscle contractions, abnormal posture, pain, etc.)." Allergan's Vice President of Neurosciences listed the "CD expansion campaign" as one of the "key drivers" for Botox sales, but at the same time worried whether Allergan could "actually defend 'unspecified torticollis' as a labeled indication."

110. [redacted]

**D. Consistent with the Board's "Top Corporate Priorities," the Individual Defendants Affirmatively Caused Allergan to Employ a Variety of Tactics to Carry Out the Illegal Off-Label Marketing**

111. As detailed by the DOJ [redacted] the Individual Defendants caused Allergan to

employ a variety of tactics to carry out its "[t]op [c]orporate [p]riorit[y] of maximizing sales for off-label uses." These strategies included, but were not limited to: funding and controlling continuing medical education ("CME") programs, "Advisory Boards" and dinners promoting Botox's efficacy for off-label uses; lobbying health care payers to expand coverage for off-label uses; providing "value-added" reimbursement support services to health care providers; and creating and funding organizations to promote off-label uses of Botox.[16]

**1. At the Board's Direction, Allergan Instructed Sales Representatives to Promote Botox for Uses for Which the Efficacy of the Drug Had Not Been Demonstrated**

112. Allergan aggressively promoted Botox for unapproved uses such as headache, pain and spasticity at a time when the efficacy of the drug to treat those conditions had not been demonstrated by clinical trials. For example, one document produced to the DOJ instructs Allergan sales representatives to promote the message that Botox "works!" for ***pain management***. Allergan stated in the same internal document that there was no clinical support and "'a lack of successful [Double-Blind, Placebo-Controlled] trial(s)' for using Botox injections to relieve pain." *See Government Plea and Sentencing Memo* (citing Allergan internal documents entitled "Key Pain Messages Neurology – It works"; "Clinical Data Support is Modest"; "Teach [sales representatives] how to discuss the role of Botox in pain management"; "Lack of peer reviewed, credible data to support this use").

113. As further detailed in the *Government Plea and Sentencing Memo*, after years of clinical trials involving the treatment of back pain, Allergan placed its FDA application on inactive status in 2003 after its Phase 3 studies were "[n]ot successful."

---

[16] For most of the relevant time period, Botox "Customer Team Units," or "CTUs," coordinated sales initiatives among numerous different departments, including its Sales/Marketing, Medical Affairs (which included purportedly independent scientific advisors) and Reimbursement divisions, which permitted more focused communication of off-label marketing messages.

Despite these negative results, Allergan sought to "drive market development of back pain" by "focus[ing] on areas where there is the path of least resistance," including upper and lower back pain.

114.

115. Moreover, according to the *Government Plea and Sentencing Memo*, "[l]ooking back in 2007, Allergan itself recognized ***that for more than a decade***, it had marketed Botox in 'areas where there was not even supportive clinical literature, such as pain.'"

**2. At the Board's Direction, Allergan Targeted Physicians with Off-Label Specialties Through Call Plans, Co-Promotion Agreements and Acquisitions**

116. Allergan promoted Botox by targeting medical specialists who did not routinely treat patients with any of the conditions that Botox was FDA approved to treat. Specifically, Allergan targeted neurologists (and other physicians who treated headaches), anesthesiologists, pain specialists and pediatricians.

**a. Call Plans**

117. Allergan implemented "call plans" to target physicians in off-label specialties. For example, as reported in the *DOJ Facts*, in 2001 Allergan sought to establish Botox in the "back pain market" by calling on "1,000 pain specialists." According to the *Government Plea and Sentencing Memo*, a 2004 marketing plan identified Allergan's goals for new Botox injectors by medical practice category, including a target of 110 new pediatrician injectors and 230 new pain specialty injectors. Similarly, Allergan's 2007 call plan was designed to target 20% more pain and headache specialists and pediatricians than the Company had targeted in 2006.

**b. Co-Promotion Agreements**

118. The Individual Defendants also authorized co-promotion agreements between Allergan and other companies so as to allow Allergan's sales representatives direct access to physicians specializing in off-label uses. These agreements enabled Allergan's sales force to exploit relationships with physicians in off-label specialties cultivated by other companies. For example, the *Government Plea and Sentencing Memo* recites that in 2002, Allergan agreed to sell another manufacturer's medical device to doctors who treated spasticity so as to provide Allergan representatives with the opportunity to discuss Botox as an adjunctive therapy for spasticity and pain with such doctors.

119. According to the DOJ's Criminal Information, in 2006, Allergan entered into a co-promotion agreement with an undisclosed top-tier pharmaceutical company to gain an audience with neurologists who treated headache. Allergan had no drug approved for the treatment of headache at the time but agreed to ***double*** the other company's sales force selling headache drugs so that Allergan could then also sell Botox to the neurologists who were customers of the other company. Internal documents obtained by the DOJ from Allergan reflect that a significant motivation for the deal was to "[a]llow [Allergan] to Sell More Botox!!!" According to the *DOJ Facts*, when Allergan was not on track to meet either the 2006 or 2007 sales targets

for selling the other company's drugs, Allegan's Senior Director of Marketing reported that "there was no concern expressed" by Allergan's executives because "we've seen the positive impact the deal has had on Botox." Ultimately, as the DOJ found in its review, Allergan was successful in converting the other company's neurologists to Botox. Indeed, about half of Allergan's new Botox injectors in 2007 were cultivated as a result of this co-promotion agreement. The *DOJ Facts* further note that, as a result of the success of this co-promotion agreement, Allergan's marketing department executives requested additional funding to expand their sales forces to call on more physical medicine and rehabilitation doctors ("PM&Rs").

120. Similarly, the Company's SEC Form 10-K filed for the fiscal year ended December 31, 2010, signed by Director Director Defendants Pyott, Boyer, Dunsire, Gallagher, Herbert, Hudson, Ingram, Jones, Lavigne, Ray, Ryan and Schaeffer, states that "in 2005 [Allergan] entered into a long-term arrangement with GlaxoSmithKline, or GSK, under which GSK agreed to develop and promote Botox in Japan and China and [Allergan] agreed to co-promote GSK's products Imitrex STATdose System (sumatriptan succinate) and Amerge (naratriptan hydrochloride) in the United States until the third quarter of 2010." Both Imitrex and Amerge are drugs used to treat the symptoms of migraine headaches.

121. The Individual Defendants authorized such co-promotion agreements, as demonstrated by the fact that [redacted] Director Defendants Pyott, Boyer, Herbert, Schaeffer, Gallagher, Ryan, Ray, Jones, Ingram, Lavigne and Dunsire all served on the Board in 2007.

122. [redacted]



[redacted] The Director Defendants [redacted] included Pyott, Boyer, Dunsire, Gallagher, Herbert, Hudson, Ingram, Jones, Lavigne, Ray, Ryan and Schaeffer. Allergan could not, and did not, enter into such cross-promotion agreements with other companies without the approval of the Board.

**c. Acquisitions**

123. The Individual Defendants also caused Allergan to merge with and/or acquire companies for the purpose of acquiring sales staff that had experience working in off-label specialties. For example, as reported in Allergan's 2008 SEC Form 10-K, in October 2007 Allergan acquired Esprit Pharma for approximately $370 million. According to the allegations of a *qui tam* relator, Allergan did so because it was seeking a sales staff that had cultivated relationships with urologists so that it could market Botox for the off-label indications of overactive bladder ("OAB") and neurogenic bladder ("NB"). By acquiring Esprit Pharma, Allergan obtained an exclusive license to market Sancturao and Sanctura XR in the United States and its territories from Indevus Pharmaceuticals, Inc. Allergan also entered into a co-promotion agreement with Indevus pursuant to which Indevus co-promoted Sancturao and Sanctura XR with Allergan in the U.S. through 3Q 2009.

124. [redacted]



[redacted]

125. Indeed, the Board was contemplating OAB as a "new indication" for Botox [redacted]

### 3. At the Board's Direction, Allergan Directed and Funded Physician Training, Workshops and Dinners to Market Botox for Off-Label Uses

126. According to the *Government Plea and Sentencing Memo*, which summarizes internal documents produced by Allergan to the DOJ, the tremendous growth in off-label Botox sales was caused by Allergan's sales and marketing organization in accordance with the Individual Defendants' overarching strategic plans for the Company. Allergan recognized that doctors who "[were] naïve to Botox demonstrate[d] limited interest in picking up the needle." Allergan viewed "[t]he barrier to entry into the [Botox] world [as] still relatively high for clinicians [with i]ssues of interventional invasive treatments and lack of prior training." Studies commissioned by Allergan found that doctors had a "Limited Interest in Learning How to Inject" Botox, and that "[n]on-users of Botox for HA [were] still 'on the fence'" in part because "[n]on-users perceive the published data supporting use of Botox in chronic HA to be . . . unimpressive." Allergan concluded that a threat to

increased sales of Botox was the "[l]imited perception of need [and] apathy" of potential injectors.

127. Therefore, the Individual Defendants caused Allergan to recruit and use physician "advocates" to lobby Medicare and Medicaid decision makers to expand coverage for off-label uses. Additionally, Allergan funded and controlled patient advocacy groups (organizations whose mission it was to "expand patient access to Botox"). Doctors were paid $1,000 each to attend regional physician advocacy workshops where Allergan reimbursement personnel coached them on how to successfully lobby health care payers to cover off-label uses of Botox.

128. Defendants viewed ***physician advocates*** as the ***ultimate "critical success factor***" for Allergan's gaining policy expansions for pain and headache and referred to the advocates as the Company's "***Trojan horses***." *See Government Plea and Sentencing Memo* (citing e-mail dated February 8, 2008 reporting that a health care payer's medical director "would not talk to Allergan but they respected this advocate so [Allergan] used him as a trojan horse").

129. Allergan funded and controlled the content of hundreds of CME seminars, injection workshops and promotional dinner programs, at which paid speakers identified by the Company as "Key Opinion Leaders" ("KOLs")[17] advocated Botox for off-label indications. For example, in 2004, a CME provider worked with Allergan to develop purported CME programs to address pain and spasticity.

640138_1

130. Allergan also created the centers of excellence as an "independent" CME to drive headache growth. [REDACTED] Consistent with the Board's mandate, Allergan paid physicians and "educational" organizations to promote Botox for off-label uses. As alleged above, Director Defendants Pyott, Boyer, Herbert, Schaeffer, and Gallagher, as well as Individual Defendants Evans, Cresswell, Rosso, Osar and Wild were all Board members during the 1997-2001 time frame [REDACTED]

**a. Allergan Paid and Otherwise Incentivized Physicians to Promote and Prescribe Botox for Off-Label Uses**

131. In addition to the above, the Individual Defendants also caused Allergan to pay so-called "honoraria" to high volume Botox injectors, *i.e.*, paying money to doctors through the speaker's bureau, CMEs and one-on-one training. Allergan also used its medical grants, in part, as an extension of sales and marketing to reward top purchasers and to grow sales of Botox. According to the *DOJ Facts*, an Allergan executive recognized the leverage provided by medical grants, saying that "***[b]efore we give [this grant request] further thought, would you check whether [the requesters] are significant users of Botox . . . . Upon receiving your reply, I will decide how to handle.***" The DOJ also asserts that the Vice President of Medical Affairs understood the importance of marketing to the grant-making process, quoting the executive as stating that, "***[o]bviously, [grant] proposals that would negatively***

***impact the goals of Marketing should not be funded and studies that would support Marketing goals should be given careful consideration***."

132. According to the *DOJ Facts*, in 2005 alone, Allergan paid hundreds of thousands of dollars to doctors for the speaker's bureau and "Practice with the Experts" dinner programs. In 2004 and 2005, Allergan paid approximately $2.5 million in grants to individual doctors. These so-called grants were a priority for the marketing and sales teams and paid great dividends to Allergan, allowing its off-label sales of Botox to climb dramatically through the decade. In 2006, Allergan sponsored over 1,200 programs, with each program having at least one paid physician.

**b. Allergan Paid Doctors to Attend "Advisory Boards" to Promote Botox for Off-Label Uses**

133. Allergan hosted numerous "Advisory Boards" purportedly designed to elicit feedback from doctors about their experience with Botox. The Individual Defendants used "Advisory Boards" to promote Botox for off-label indications. According to the *DOJ Facts*, in 2005 and 2006, over 200 top-prescribing doctors attended the "Allergan Institute of Distinction" ("AIOD"), a two-day, invitation-only Botox marketing program held at Allergan's corporate headquarters and the Balboa Bay Club and Resort in Newport Beach. Doctors attending the AIOD provided no consulting services but were paid $1,500 to listen to the presentations that included off-label topics. These "Engagement Plans" demonstrate Allergan's intent to reward hundreds of its top injectors with consulting fees and corporate attention in an effort to expand these physicians' use of Botox.

**c. Allergan Created and Funded "Educational" Organizations to Promote Botox for Off-Label Uses**

134. The Individual Defendants also caused Allergan to create and fund an online neurotoxin educational organization to "stimulate increased use of Botox." The *DOJ Facts* reveal that, in 2003, Allergan had a website designed to appear as the educational arm of an independent public interest entity. Allergan had an online