1   neurotoxin institute created and directed its operations in order to distribute off-label

2   promotional material about Botox to the medical and scientific communities.  *The*

3   *Mission Statement for the online neurotoxin educational organization was to*

4   *"validate and disseminate consistent information regarding the expanding uses of*

5   *Botox.*"  The *DOJ Facts* state that an Allergan executive admitted the Company's

6   control over the organization, revealing that "they act under our direction in creating

7   the content and setting direction."   From 1999 to 2007, *Allergan issued*

8   *approximately $10 million in "unrestricted" grants to the online neurotoxin*

9   *education organization*.  The online neurotoxin education organization maintained a

10  website to disseminate information about off-label uses, including videos of CME

11  programs sponsored by Allergan and other written materials prepared by Allergan.

12  According to the DOJ, Allergan's sales representatives were to refer doctors to the

13  online neurotoxin education organization's website and distribute "Awareness Cards"

14  with the website's information on them to all doctors during sales calls.

> **4.   At the Board's Direction, Allergan Provided "Value-Added" Reimbursement Support Services to Grow Off-Label Sales**

17      135.   The commercial success of Botox heavily depended on the ability of

18  doctors to obtain reimbursement from federal health care programs.  Botox is an

19  expensive treatment considering the high drug and administration costs and the fact

20  that its effects are temporary and palliative (not curative).  During the relevant time

21  period, one vial of Botox cost approximately $400-$500 for 100 units, and treatment

22  of most off-label uses of Botox required injections of anywhere between 100 to 400

23  units or more.  Since Botox's effect on a muscle wears off over time, patients have to

24  be reinjected at periodic intervals, generally every three months.

25      136.   Doctors can bill a health care payer for the cost of performing the Botox

26  injection procedure and any associated diagnostic tests, which provide a source of

27  revenue for a doctor's practice.  However, unlike most drugs where the doctor writes a

28  prescription and the patient purchases the drug from a pharmacy, Botox is a "buy and

- 46 -

bill" drug, meaning that doctors purchase Botox directly from Allergan and assume the risk of reimbursement on the back end by a health care payer after submitting the claim.  Consequently, as a practical matter, doctors would not inject Botox for off-label uses if they could not get reimbursed.

137.   The Individual Defendants recognized that Allergan's "biggest obstacle" to growing Botox sales was the lack of reimbursement for off-label uses.  Even though government and private health care payers covered Botox for every FDA-approved indication, Allergan doubled the size of its reimbursement support team in 2003 to "minimize customer barriers" for headache, pain and spasticity.   The Botox reimbursement team was an extension of the sales force, and its express goal was to "Improve Injector Economics = (Sell More Botox)."   According to materials uncovered by the DOJ, the pitch for the Botox reimbursement programs was collectively referred to as the "Botox Advantage Program," and the message to physicians was: "Improving the Reimbursement Environment for Today and for the Future by Providing Comprehensive Reimbursement Assistance, Reducing Reimbursement Issues, Saving You Time and Effort!"

640138_1

1 ██████████████████████████ in October of 2004, when the Board was

2 comprised of Director Defendants Pyott, Boyer, Herbert, Schaeffer, Gallagher, Ryan,

3 Ray and Jones, and Individual Defendants Rosso and Osar.

4     138.  Through the Botox Advantage Program, Allergan provided customized

5 reimbursement support services to doctors and their office practice managers,

6 expended millions of dollars each year to operate the **Botox Reimbursement Hotline**

7 and performed detailed audits (or "interventions") of physician billing records to

8 demonstrate "the value of Botox to their practice" (*i.e.*, you can make money injecting

9 Botox).

10     139.  The *DOJ Facts* reveal that Allergan's reimbursement team created a

11 package of materials for the advocate to submit to the payer, which included a cover

12 letter requesting the policy expansion for headache, a consensus statement signed by

13 "headache experts" (doctors with whom the *DOJ Facts* state that Allergan had

14 financial ties) stating that Botox was an effective treatment for headache, selected

15 medical literature about the use of Botox for headache and an annotated literature

16 review. Allergan's involvement in the submission was not disclosed, according to the

17 DOJ.

18     140.  The *DOJ Facts* further state that Allergan's reimbursement team went to

19 great lengths to ensure that the "ghostwritten" materials that were submitted to

20 different health care payers did not look too much alike if anyone were to compare

21 them. Indeed, two Allergan employees went so far as to request an in-person meeting

22 with a Medicare Part B Carrier Medical Director to find out why he expanded the

23 policy to cover headache "even though [they] kn[e]w the process that took place" –

24 because it would be a "[g]ood opportunity to learn more on process side using naïve

25 approach on HA [headache] situation. (Or to learn what he may know/perceive as to

26 what our involvement was)."

27     141.  According to the *DOJ Facts*, Allergan cited "high value [reimbursement]

28 services" as a key driver of Botox sales and touted their reimbursement support as one

640138_1

- 48 -

of the "most valued services Allergan provides." Ultimately, Allergan was able to quantify the success of its reimbursement services, noting that, on average, accounts with an intervention grew by $6,000, as compared to accounts without an intervention, which grew by only $1,000.

142. The Individual Defendants recognized that reimbursement issues were key to improving Botox sales, and they therefore approved and monitored the Company's programs to facilitate reimbursement for off-label uses. Indeed,





640138_1

**5.**   **At the Board's Direction, Allergan Dramatically Expanded Its Therapeutic Botox Sales Force Far Beyond Levels Justified by the Drug's Approved Indications**

143.   Between February 2003 and February 2008, Allergan almost tripled its payroll of sales personnel, while obtaining only one very narrow label extension (severe primary axillary hyperhydrosis).  According to the *DOJ Facts*, the "clearest connection" between the number of sales representatives and off-label sales growth was made in Allergan's 2007-2011 Strategic Plan, which stated that in "2006 [Allergan] Added 45 New NMCs [sales representatives] & Spasticity grew 25% [and in] 2007 [it] Added 19 New NMCs & Spasticity Est[imated] 18%."  In its 2005 Strategic Planning process, Allergan concluded that sales for pain, headache and spasticity were negatively affected by a "decrease in calls to Pain [doctors]/Ped[iatricians]."  Allergan also projected further sales declines for pain in its 2006-2010 Strategic Plan because there would be "no promotion" for that indication (and at the same time projecting increases for other indications, presumably because Allergan's promotion would continue).  The 2006 Marketing Plan recognized that "Growth is Detail Sensitive" and that "BMCs [sales representatives] Have Impact on Sales."  Thus, Allergan's studies supported the conclusion that Allergan's sales and marketing efforts drove higher sales.  In particular, Allergan found that "[a]cross all specialties, Botox sales/MD increase with higher call frequency" and that expanding sales calls to rehabilitation doctors would increase sales by $14.3 million over three years.  In short, the DOJ found "overwhelming" evidence that Allergan's sales and marketing efforts drove the substantial increases in off-label sales of Botox from 2001-2008.

**E.**   **Defendants' Unlawful Marketing Campaign Drove Tremendous Growth of Off-Label Uses of Botox**

144.   Over the years, Allergan's studies fully supported the conclusion that Allergan's off-label marketing efforts drove higher sales.  In particular, Allergan found that "[a]cross all specialties, Botox sales/MD increase with higher call

- 50 -

1   frequency" and that expanding sales calls to rehabilitation doctors would increase

2   sales by $14.3 million over three years.  In short, the DOJ found "overwhelming"

3   evidence that it was Allergan's off-label marketing efforts (under the direction of the

4   Director Defendants as detailed herein) that drove the substantial increases in off-label

5   sales of Botox from 2001-2008.

6   **VIII.  THE INDIVIDUAL DEFENDANTS WERE WARNED
        REPEATEDLY TO STOP  THE ILLEGAL OFF-LABEL**
7       **MARKETING OF BOTOX**

8       145.   There can be no doubt that the Individual Defendants were on

9   contemporaneous notice throughout the relevant period of the Company's illegal off-

10   label marketing.  They directed, authorized and approved the unlawful conduct and

11   took no steps to put a halt to it.

12      **A.    In August 2001, the FDA Warned Allergan that Its
               Promotional Activities and Materials for Botox Were**
13             **"Misleading" and "Lacking in Fair Balance"**

14      146.   On August 22, 2001, the FDA issued the August 2001 FDA Warning

15   Letter to Allergan addressed to David Garbe, Director of Scientific Information and

16   Medical Compliance, warning that the FDA had reviewed Allergan's Botox

17   "promotional activities and materials and . . . conclud[ing] that they [were] misleading

18   and lacking in fair balance within the meaning of 21 U.S.C. §352(a) of the Federal

19   Food, Drug, and Cosmetic Act (the Act)."  The August 2001 FDA Warning Letter

20   cautioned:

21              *You have engaged in repeated promotional activities that suggest*

22         *the amount of protein in BOTOX minimizes the formation of*

23         *antibodies.  No formal clinical studies have been performed to study*

24         *BOTOX treatment with different amounts of protein with respect to the*

25         *formation of antibodies.  Additionally, you have repeatedly included*

26         *favorable data or conclusions from nonclinical studies of BOTOX in a*

27         *way that suggests they have clinical significance when, in fact, no such*

28         *clinical significance has been demonstrated.  We have previously*

640138_1

*objected to these activities in Review Memoranda dated December 12, 1998 and September 25, 2000, and untitled letters dated November 7, 2000, February 14, 2001, and April 12, 2001.*

147.   The FDA concluded the August 2001 FDA Warning Letter by stating that *"[t]he violations noted in this letter represent continuing examples of violative promotion or advertising materials disseminated by Allergan"* and explaining that a "written response with the specific steps that you have taken to correct the violations should be submitted to this office within 10 working days of receipt of this letter."

148.   Although this FDA letter was not specifically directed to the Board, there is no doubt that the Board knew or should have known about it – indeed, it quickly became the subject of public knowledge. Specifically, the August 2001 FDA Warning Letter did not escape notice by the news media. In a *Los Angeles Times* article dated September 5, 2001 entitled "FDA Warns Allergan About Claims," Allergan's spokeswoman, Christine Cassiano, is quoted as stating, "[a]ny time we get a request from the FDA, our first concern is to make sure we comply." As detailed herein, however, this was a falsehood, as the Individual Defendants continued to cause Allergan to engage in off-label marketing activities that failed to comply with FDA requirements.

149.   Notably, Director Defendants Pyott, Boyer, Herbert, Schaeffer, and Gallagher, as well as Individual Defendants Evans, Cresswell, Rosso, Osar and Wild, were members of the Board in August 2001.

**B.   In September 2002, the FDA Warned Allergan Regarding "Misleading Statements" in Botox Promotional Materials**

150.   On September 5, 2002, Allergan received another FDA letter (the September 5, 2002 FDA Warning Letter) concerning "misleading statements" made in connection with Botox promotional materials. On September 12, 2002, the Individual Defendants caused Allergan to issue a press release regarding the September 5, 2002 FDA Warning Letter, in which Director Defendant Pyott is quoted:

- 52 -

640138_1

1       "In recent media accounts, the impression has been given that

2    Allergan intends to 'take on the FDA' over the September 5 letter. This

3    is incorrect. Allergan has the highest regard for the FDA and for its

4    division, the Center for Biologics Evaluation and Research (CBER), with

5    which Allergan has worked productively for many years," explained

6    David E.I. Pyott, Allergan's Chairman of the Board, President and

7    CEO. . . . "CBER has raised some concerns about some of our material,

8    which is their right as it is our right to provide a detailed written response

9    for their review. I am quite confident that we will be able to address

10    CBER's concerns to their complete satisfaction, as we have always done

11    in the past."

12       It would be premature for Allergan to make any decision about the

13    untitled letter without providing the FDA with a response and engaging

14    in a meaningful discussion with the FDA. This is the normal process

15    after a routine review and comment by the FDA on promotional items.

16    ***If, after discussions with the FDA, changes to marketing material are***

17    ***ultimately required, Allergan will of course make those changes.***

18    151.   The September 12, 2002 press release documents that the Director

19  Defendants were on notice of the September 5, 2002 FDA Warning Letter and were

20  on notice that the FDA found Allergan's promotional materials for Botox to be

21  misleading.

22    152.   Notably, a majority of the Director Defendants – Pyott, Boyer, Herbert,

23  Schaeffer, Evans, Cresswell, Rosso, Ryan, Osar, Wild and Gallagher – were members

24  of the Board in September 2002.

25    153.   Moreover, the September 5, 2002 FDA Warning Letter was expressly

26  referenced in the subsequent June 23, 2003 FDA Warning Letter, which, according to

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████

640138_1

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ████████████████████████████████████████████

10 ████████████████ the June 23, 2003 FDA Warning Letter expressly references

11 the September 5, 2002 FDA Warning Letter.

**C.    In June 2003, the FDA Warned Allergan that Its
Promotional Activities and Materials for Botox Were
"Misleading" and "Lacking in Fair Balance"**

14    154.  On June 23, 2003, Defendants received another FDA letter (the June 23,

15 2003 FDA Warning Letter) again informing the Individual Defendants that several of

16 Allergan's "advertisements are false and/or misleading because they falsely identify

17 [Botox] as a cosmetic treatment, fail to reveal material facts about the product's use,

18 and minimize the risk information presented." As set forth above, the June 23, 2003

19 FDA Warning Letter also referenced the September 5, 2002 FDA Warning Letter.

20    155.  The Individual Defendants did not cause Allergan to make its own public

21 disclosure of the June 23, 2003 FDA Warning Letter, choosing instead to respond

22 only when necessary to address media criticism.  For example, on June 25, 2003, the

23 *Los Angeles Times* published an article entitled "Allergan Is Warned on Botox Ads"

24 (the "June 25, 2003 *LA Times* Article"), wherein the newspaper states: "For the

25 second time in less than a year, the Food and Drug Administration has warned Irvine-

26 based Allergan Inc. that advertisements for its anti-wrinkle drug Botox are misleading

27 and should be pulled."  The June 25, 2003 *LA Times* Article quotes FDA

28 spokeswoman Lenore Gelb as stating that the June 23, 2003 FDA Warning Letter is a

640138_1

"very serious event" and that the FDA is "concerned that by continuing to promote Botox in a false and misleading manner these materials are raising significant public health concerns." In counterpoint, the June 25, 2003 *LA Times* Article quotes Allergan spokesperson Christine Cassiano as stating that unspecified Company executives "believe we can easily address the FDA's requests with minor changes."

156.   Notably, a majority of the Director Defendants – Pyott, Boyer, Herbert, Schaeffer, Evans, Cresswell, Rosso, Ryan, Ray, Osar and Gallagher – were members of the Board in June 2003.

157.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

**D.     In September 2005, the FDA Sent a Warning Letter to
Defendant Pyott Warning the Company About Misleading
Sales Aids for Lumingan**

158.   On September 6, 2005, yet another FDA warning letter was sent to Allergan, specifically addressed to Defendant Pyott, informing the Company of the misbranding of Lumingan via the distribution of misleading sales aids in violation of the FDCA.  While this letter did not pertain to Botox, it provided the Board with additional notice of the fact that the Company was engaged in illegal and improper off-label marketing of its products.

- 55 -

640138_1

1   159.   Notably, a majority of the Director Defendants – Pyott, Boyer, Herbert,

2   Schaeffer, Gallagher, Ryan, Ray, Jones, Ingram and Lavigne (as well as Individual

3   Defendants Evans and Osar) – were members of the Board in September 2005.

4   **E.    In 2005, the French Government Sent a Letter to Allergan
         Warning the Company that Botox Injections Had Resulted
5        in Aspiration and Death Among Patients**

6   160.   In or about 2005, the French government, acting on behalf of the

7   European Medicines Agency, sent a letter to Allergan in which it described reports

8   that the spread of botulinum toxin beyond the injection site had caused aspiration and

9   death among patients using Botox.   In a confidential response to the French

10  government dated September 16, 2005, Defendants admitted that Allergan's own

11  internal database contained 436 "serious adverse event" reports related to the use of

12  Botox.

13  161.   Notably, a majority of the Director Defendants – Pyott, Boyer, Herbert,

14  Schaeffer, Gallagher, Ryan, Ray, Jones, Ingram and Lavigne (as well as Individual

15  Defendants Evans, Rosso and Osar) – were members of the Board in 2005.

16  **F.**

17

18  162.

19

20

21

22

23

24  163.

25

26

27

28



- 56 -

640138_1



1

2

3

4

5  164.

6

7

8

9

10

11

12

13  165.

14

15  this same doctor was still being paid by Allergan to promote Botox for headache two

16  years later.  Indeed, in February 2008, he published an article in *Headache: The*

17  *Journal of Head and Face Pain* entitled "Botulinum Toxin Type A and Divalproex

18  Sodium for Prophylactic Treatment of Episodic or Chronic Migraine," disclosing the

19  following conflict of interest: "Dr. Schim has received research grants from Allergan,

20  Inc., has been a consultant for Allergan, Inc., and serves on the speaker's bureau for

21  Allergan." *See supra* n.7.

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it would not have allowed the continued payment by

23  Allergan to Dr. Schim for promoting Botox for headaches for at least two more years.

24  Indeed, according to Allergan's current disclosure of payments to physicians for the

25  period July 1, 2010 to December 31, 2010, now located on the Company website

26  pursuant to the Company's obligations under the CIA, Dr. Schim was one of the

27  Company's highest-paid physicians for that period.  *See* http://www.allergan.com/

28  responsibility/hcp_partnership_payments/physician_payments.htm.

640138_1

**G.** ████████████████████████████████████████████

166. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

**H.** ████████████████████████████████████████████

167. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████

- 58 -

168.   At the same 2007 Board meeting, according to the Section 220 Board Materials, these same Director Defendants reviewed another such "ethics complaint" to the effect that Allergan's marketing director participated in a Medical Affairs intradepartmental teleconference after being informed that he should not be present so as to ensure appropriate separation between Medical Affairs and Marketing.

**I.     In August 2009, the FDA Warned Allergan that Its Promotional Activities and Materials for ACZONE® Were False or Misleading and Omitting Important Risk Information**

169.   On August 17, 2009, Allergan received yet another FDA warning letter concerning ACZONE® (dapsone) Gel, 5%. The August 2009 FDA letter was sent to the attention of Defendant Pyott, CEO and Chairman of the Board, to inform Allergan of violations of the FDCA and FDA implementing regulations regarding ACZONE® by: (a) false or misleading advertising overstating the efficacy of ACZONE®; and (b) omitting material facts and important risk information associated with the use of the product.  While this letter did not pertain to Botox, it provided the Board with additional notice of the fact that the Company was off-label marketing its products.

170.   Notably, Director Defendants Pyott, Boyer, Herbert, Schaeffer, Gallagher, Ryan, Ray, Jones, Ingram, Lavigne, Dunsire and Hudson were members of the Board in August 2009 (or earlier).

**IX.   THE OFF-LABEL MARKETING SCHEME WAS IN CLEAR VIOLATION OF ALLERGAN'S OWN POLICIES AND PROCEDURES**

171.   The Individual Defendants' off-label marketing scheme was not just in violation of the FCPA. In addition, Allergan's Strategic Plans Mandating the off-label marketing scheme were in clear violation of the Company's own written policies and procedures.  Indeed, the Company's "Principles Concerning Off-Labeled Uses of Botox" explicitly prohibited "the improper dissemination of off-labeled use information concerning Botox." *See* October 4, 2010 Memorandum of Defendant Allergan, Inc. in Support of Recommended Sentence ("*Allergan Criminal Memo*")

- 59 -

640138_1

filed in the Criminal Action.  In January 1998, Director Defendant Pyott distributed to all employees a comprehensive Code of Ethics that was approved by Allergan's Board, which instituted a compliance hotline ("EthicsHelp").  Allergan continued to update and disseminate written policy manuals throughout the period covered by the Guilty Plea (2000 to 2005) and after, including a "Field Reference Guide" (2002), a "Best Practices Guide" (2003) and a Healthcare Law Compliance Program Manual (2006), in efforts to feign compliance with the risk areas identified in the OIG's 2003 Compliance Program Guidance for Pharmaceutical Manufacturers, as well as other agency and industry guidance.  68 Fed. Reg. 23731, 23731-43 (May 5, 2003).

172.   As a result of having to enter into a Corporate Integrity Agreement, there are now 12 full-time employees in the Compliance Department, and these individuals report to a Chief Compliance Officer who reports directly to the CEO, Director Defendant Pyott.  Oversight of the program is provided by a Corporate Compliance Committee and the Board.

173.   Allergan's SEC Form 10-K annual report to shareholders for the calendar year ending December 31, 2004 acknowledged the promotional ban on off-label marketing and warned shareholders that in the event Allergan did not comply, it may be subject to warnings and/or enforcement action:

> [T]he FDA does restrict a manufacturer's communications on the subject of off-label use.  Companies cannot actively promote FDA-approved pharmaceutical, biologic or medical device products for off-label uses . . . .  [If] our promotional activities fail to comply with the FDA's regulations or guidelines, we may be subject to warnings from, or enforcement action by, the FDA or another enforcement agency.

174.   Similar language appears in the 2005, 2006 and 2007 SEC Form 10-K filings by Allergan.  These Forms 10-K were all signed by Director Defendants Pyott, Boyer, Dunsire, Gallagher, Herbert, Ingram, Jones, Lavigne, Ray, Ryan and

640138_1

Schaeffer. Additionally, Individual Defendant Evans signed the 2005 and 2006 Forms 10-K and Director Defendant Hudson signed the 2007 Form 10-K.

175.    Nevertheless, the Board's corporate strategic plans and the Company's aggressive marketing practices to increase off-label sales of Botox continued to violate Allergan's own compliance measures, their affirmative cautionary statements in the Company's Form 10-K filings and the repeated warnings from the FDA, demonstrating that those at the helm were directing the Company to maximize sales of Botox for off-label indications in clear violation of Company policy and state and federal law.

## X.    CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

176.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with, and conspired with one another in furtherance of, their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

177.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (a) conceal the fact that the Company was engaging in the off-label and illegal marketing programs described herein; (b) enhance the Individual Defendants' executive and directorial positions at Allergan and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (c) deceive the investing public, including shareholders of Allergan, regarding the Individual Defendants' management of Allergan's operations. In furtherance of this plan, conspiracy and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

- 61 -

178.   The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the relevant period.   During this time, Defendants concealed the true fact that Allergan was misrepresenting its business prospects and methods.

179.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment, and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

180.   The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by reviewing, participating in and/or allowing the Company to purposefully or recklessly engage in the illegal activity described herein.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

181.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## XI.   THE MATERIALLY MISLEADING PROXY STATEMENTS

182.   The Individual Defendants caused Allergan to file annual proxy statements with the SEC on Form DEF 14A on or about March 20, 2008 (the "2008 Proxy Statement"), March 19, 2009 (the "2009 Proxy Statement") and March 12, 2010 (the "2010 Proxy Statement") (collectively, the "Proxy Statements").   Director

640138_1

Defendant Pyott signed each of the Proxy Statements. In addition, each of the Proxy Statements was signed by Director Defendant Ingram "By Order of the Board of Directors." At the time Ingram signed the Proxy Statements (on and after March 20, 2008), each of the Director Defendants served on the Board. Among other things, one or more of the Proxy Statements included reports by Director Defendants Schaeffer, Gallagher, Hudson, Ingram and Ray (as members of the Organization and Compensation Committee ("Compensation Committee")) and by Directors Defendants Ray, Gallagher, Hudson, Lavigne and Ryan (as members of the Audit and Finance Committee).

183.   Each of the Proxy Statements was materially inaccurate in that it failed to disclose numerous highly material facts and circumstances. The materially inaccurate Proxy Statements caused direct harm to the Company in that, among other things, Defendants' omissions perpetuated systematic legal violations within the Company, which brought about the severe fines, penalties and other liabilities to which the Company was ultimately subjected, as well as through the creation of compensation obligations by the Company that would not have existed but for the materially inaccurate and incomplete Proxy Statements.

184.   Each of the Proxy Statements was intended to, and did, procure Allergan's shareholders' votes with respect to matters materially affecting the Company that legally required shareholder approval. All three Proxy Statements sought and obtained election of the Director Defendants by shareholder vote, in each case upon the Board's explicit recommendation as to which directors should be elected.

185.   In addition, the 2008 Proxy Statement sought and obtained shareholder approval for the 2008 Incentive Award Plan, which authorized a 20-million-share increase in the stock available for grants to the Company's employees, executives and directors for as little as one year of positive performance. The 2008 Incentive Award Plan was particularly lucrative to the Company's directors since it *automatically*

640138_1

- 63 -

provides them with 11,400 stock options and 14,400 shares of restricted stock yearly. The Board portrayed the 2008 Incentive Award Plan as a necessary increase in potential compensation to reward high performing employees, officers and outside directors. Specifically, each of the Director Defendants, as a member of the Board, caused the 2008 Proxy Statement to represent that Allergan's "BOARD RECOMMENDS THAT YOU VOTE 'FOR' THE APPROVAL OF THE ALLERGAN, INC. 2008 INCENTIVE AWARD PLAN."

186.   As a result of the false and misleading 2008 Proxy Statement and their reelection to the Board in 2008, the Individual Defendants entered into compensation contracts with the Company and afforded themselves a generous compensation program via a shareholder vote on the false and misleading 2008 Proxy Statement.

187.   As a result of the false and misleading 2008 Proxy Statement and 2009 Proxy Statement, the Director Defendants were reelected to the Board in 2009 and entered into compensation contracts with the Company, affording themselves a generous compensation program via a shareholder vote on the false and misleading 2009 Proxy Statement.

188.   Each of the Director Defendants was duty bound, pursuant to his or her general fiduciary duties under Delaware law and by the provisions of federal securities laws, to fully disclose all information material to the shareholders' decision concerning how to cast their votes in connection with the election of Board members in 2008, 2009 and 2010 and with respect to their decision whether to vote to approve the massive potential compensation increases embodied in the 2008 Incentive Award Plan.

189.   Despite the Director Defendants' fiduciary duties and in violation of state and federal law, the Board caused Allergan to file and disseminate the materially inaccurate Proxy Statements. Specifically, in Allergan's definitive Proxy Statements, Defendants provided materially misleading information and disclosures concerning the Company, the general responsibilities of the Board and its committees, and the

640138_1

basis upon which the members of the Board (or prospective members of the Board) were seeking election to another (or initial) term of office.  In the Proxy Statements, Defendants uniformly failed to disclose material information to shareholders concerning critical aspects of the Board's responsibilities and activities, including its obligation to ensure compliance with applicable drug marketing laws and regulations. The Proxy Statements also failed to disclose that the financial and operating metrics were the result of widespread criminal misconduct within Allergan that the Board was duty bound to prevent.

190.   The Proxy Statements were materially inaccurate and incomplete because, among other things, Defendants failed to disclose:

(a)   the extent to which the Company's financial performance depended on the Company's off-label marketing of Allergan drugs – including Allergan's most important drug, Botox – which exposed the Company and its shareholders to tremendous regulatory, reputational and financial risk;

(b)   the circumstances surrounding the Board's waiver or constructive waiver of explicit provisions of the Code of Business Conduct and Ethics – including with respect to Defendants' duties to ensure legal compliance, to ensure the reporting of legal violations and to themselves report suspected non-compliance – even though the Board had waived or otherwise determined to deviate from these clear requirements;

(c)   the nature of the Board's performance of their duties under the charters of the Board's various committees, including the reason for the then-current directors' decision to allow continued off-label and otherwise improper marketing despite the risks to the Company, its shareholders or its patients; and

(d)   the numerous instances in which the Board was informed of legal compliance violations concerning the unlawful marketing of Allergan drugs.

191.   In light of the Director Defendants' highly material omissions from the Proxy Statements, the votes and the consequent election of directors to the Board were

- 65 -

640138_1

obtained on the basis of inaccurate disclosures.  Had shareholders been provided with complete and accurate information concerning the Board's performance of its duties – including with respect to presiding over the Company's extensive criminal violations – the members of the Board would not have been elected (or reelected).

192.  The election (or reelection) of the Director Defendants inflicted significant harm on the Company.  This reliance on the Board's assumption of duty caused direct detriment to the Company, which, in the absence of the Board's fulfillment of its obligations, was left helpless to prevent the misconduct occurring in its name.  The consequent penalties levied upon the Company, as well as the numerous other liabilities to patients and other third parties, were a direct result of the Board's perpetuation of the Company's misconduct, which was only made possible by the materially inaccurate and incomplete statements that caused the Director Defendants' election to the Board.  But for the Board's refusal to carry out its duties, the harm that befell the Company would not have occurred.

193.  Further, shareholders would not have voted in favor of the 2008 Incentive Award Plan but for the materially misleading 2008 Proxy Statement.  Had they been provided with complete and accurate disclosures, Allergan shareholders would have chosen not to increase the compensation of employees, officers and directors who participated in illegal marketing misconduct, thereby rewarding them for their illegal activity.  Rather, Allergan's shareholders would have instead demanded that appropriate legal action be taken against those employees, officers and outside directors who participated in this widespread misconduct.  The shareholders' approval of the 2008 Incentive Award Plan likewise harmed the Company by drawing off 20 million shares of stock directly from the Company in order to offer lavish compensation to senior executives and others at Allergan – including the outside directors – in return for engaging in extensive criminal misconduct in Allergan's name.

640138_1

194.   Accordingly, Allergan has been damaged by the materially inaccurate statements and omissions in the Proxy Statements that procured the election and reelection of the Director Defendants to the Board, thus perpetuating their misconduct, as well as shareholders' approval for an increase in compensation for employees, officers and outside directors who had been involved in wide-ranging criminal conduct – a proposal that would have been rejected had the true facts been disclosed to shareholders.

## XII.   UNLAWFUL INSIDER TRADING

195.   While the Individual Defendants were engaging in their unlawful and illegal sales and marketing scheme, Director Defendants Pyott and Herbert sold almost 1.5 shares of Allergan stock for insider-trading proceeds of $93 million, based upon their knowledge of material nonpublic information regarding the illegal sales and marketing scheme:

| DEFENDANT/ INSIDER | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| David E.I. Pyott | 08/14/06-12/07/07 | 1,344,866 | $84,941,181 |
| Gavin S. Herbert | 04/03/06-12/29/09 | 147,106 | $8,532,114 |

## XIII.   DAMAGES TO ALLERGAN CAUSED BY THE INDIVIDUAL DEFENDANTS

196.   As a result of the Individual Defendants' improprieties, Allergan has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)   the **$600 million** in civil and criminal settlements due to the admitted illegal promotion of Allergan's pharmaceutical products;

(b)   costs incurred in investigating the Civil *Qui Tam* Actions, the Criminal Action, and other complaints of wrongdoing made by whistleblowers and governmental agencies, including investigations conducted by governmental agencies;

- 67 -

640138_1

1             (c)    costs incurred in defending Allergan in the Civil *Qui Tam* Actions,

2 the Criminal Action, and in connection with other complaints of wrongdoing by

3 whistleblowers and governmental agencies, including investigations conducted by

4 governmental agencies; and

5             (d)    costs incurred from compensation and benefits paid to the

6 Individual Defendants who have breached their duties to Allergan.

7      197.   These actions have irreparably damaged Allergan's corporate image and

8 goodwill.  Further, the Company now faces increased scrutiny, as evidenced by the

9 CIA.   It is likely that the DOJ and FDA will not be as forgiving of any future

10 violations, increasing the risk that the Company will be barred from participating in

11 Medicare and Medicaid.

12 **XIV.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

13      198.   Plaintiffs incorporate by reference and reallege each and every allegation

14 set forth herein.

15      199.   Plaintiffs bring this action derivatively in the right and for the benefit of

16 Allergan to redress injuries suffered, and to be suffered, by Allergan as a direct result

17 of the Individual Defendants' violations of federal law, breaches of fiduciary duty,

18 waste of corporate assets and unjust enrichment, as well as the aiding and abetting

19 thereof.  Allergan is named as a nominal defendant solely in a derivative capacity.

20 This is not a collusive action to confer jurisdiction on this Court that it would not

21 otherwise have.

22      200.   The Individual Defendants knew of the unlawful off-label marketing

23 practices taking place at the Company.  Nevertheless, they chose to continue the off-

24 label marketing practices despite the risk of loss to the Company arising from such

25 unlawful sales practices.

26      201.   Plaintiffs were shareholders of Allergan at the time of the continuing

27 wrong of which they complain.   Since becoming shareholders, Plaintiffs have

28 continuously been Allergan shareholders.

640138_1

1    202.   Plaintiffs have not made a demand on the present Board to institute this

2  action because such a demand would have been a futile, wasteful and useless act.

3    203.   Allergan's current Board consists of the following 12 Director

4  Defendants:  Boyer, Dunsire, Gallagher, Herbert, Hudson, Ingram, Jones, Lavigne,

5  Pyott, Ray, Ryan and Schaeffer.   The below chart identifies the year each began

6  serving on the Board and shows that five have served for a decade or longer:

| Names | Year Began Serving on the Board |
|-------|----------------------------------|
| Herbert | 1950 |
| Schaeffer | 1993 |
| Pyott | 1998 |
| Gallagher | 1998 |
| Boyer | 2001 |
| Ryan | 2002 |
| Ray | 2003 |
| Jones | 2004 |
| Lavigne | 2005 |
| Ingram | 2005 |
| Dunsire | 2006 |
| Hudson | 2008 |

**A.    Demand Is Excused Because the Director Defendants'
Conduct Is Not a Valid Exercise of Business Judgment**

204.   The Director Defendants' challenged misconduct at the heart of this case

constitutes the direct facilitation of violations of state and federal law, including

knowingly and consciously presiding over the Company's systematic violations of the

FDCA and actively concealing this misconduct via materially misleading Proxy

Statements.   As the ultimate decision-making body of the Company, the Board

- 69 -

640138_1

affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law. Breaking the law is not a legally protected business decision, and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

205. This action does not arise from a single incident, but numerous civil and criminal violations which involved hundreds of millions of dollars and were common knowledge throughout the Company. Serious violations of applicable law occurred systematically and at every level of the Company as a direct result of the Board's decision to embrace or consciously disregard a policy of calculated legal violations as the Company's deliberate business strategy. There is no legitimate "business judgment" involved in devising or carrying out such an unlawful policy. Accordingly, demand on the Board is excused.

206. Any claim of ignorance concerning compliance failures here is untenable. In this case, each of the Director Defendants, as Board members, made it a "top corporate priorit[y]" to maximize sales of Botox for off-label uses. Moreover, the Board oversaw various of the Company's off-label marketing programs and was also repeatedly made aware of the improper conduct occurring at the Company ███████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████ through FDA warning letters, and through ███████████████████████ Further, the length of time and the scope of the wrongdoing occurring at the Company concerning its illegal off-label marketing practices make it implausible that the Board would not be aware of the wrongdoing if its members were fulfilling their fiduciary duties. The Board's express approval of the illegal actions occurring at the Company over a multi-year period could not have been the result of a fully informed business decision taken with the requisite due care. Demand is therefore excused.

640138_1