# Exhibit A

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

O

### CIVIL MINUTES - GENERAL

Case No. SACV 10-01352 DOC (MLGx)                     Date: April 12, 2011

Title: IN RE ALLERGAN, INC., SHAREHOLDER DERIVATIVE LITIGATION

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

|  Julie Barrera  |  Not Present  |
|---|---|
| Courtroom Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFFS: ATTORNEYS PRESENT FOR DEFENDANTS:

|  NONE PRESENT  |  NONE PRESENT  |
|---|---|

PROCEEDING (IN CHAMBERS):         ORDER GRANTING MOTIONS TO DISMISS

     Before the Court is Nominal Defendant Allergan, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Complaint ("Nominal Defendant's Motion to Dismiss") (Docket 47) and the Individual Defendants' Motion to Dismiss Plaintiff's Consolidated Complaint ("Individual Defendants' Motion to Dismiss") (Docket 51). The Court finds this matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local Rule 7-15. After considering the moving, opposing, and replying papers, the Court GRANTS Nominal Defendant's and Individual Defendants' Motions to Dismiss.

## I.     BACKGROUND

    This is a shareholder derivative suit. Shareholder Plaintiffs ("Plaintiffs") bring this action on behalf of nominal Defendant Allergan, Inc, ("Allergan" or the "Company") against its entire Board of Directors ("Board") and its Chief Executive Officer, David E.I. Pyott ("Defendant Pyott") (Pyott and the Board collectively referred to as "Director Defendants"). Consolidated Complaint ("CC") (Docket 39) at ¶ 1. Plaintiffs allege that Director Defendants knowingly caused Allergan to engage in an illegal marketing and promotion scheme for its most important product, Botox, and certain other drugs. *Id.* at ¶ 2. Plaintiffs allege that Director Defendants were notified of their improper practices on several occasions, but nonetheless continued to misbrand Botox and certain other drugs for unapproved uses. *Id.* at ¶ 6. Plaintiffs aver that all of Director Defendants' conduct occurred without the shareholders' knowledge.

EXHIBIT A
PAGE 7

On September 1, 2010, the U.S. Department of Justice ("DOJ") announced a $600 million sanction to resolve civil and criminal cases regarding Allergan's promotion of Botox for uses not approved by the Federal Drug Administration ("FDA"). CC ¶ 2.  The DOJ subsequently pursued action against Allergan in federal court.  *Id.* at ¶ 14.  On October 5, 2010, Allergan entered a guilty plea and agreed to pay a criminal fine of $375 million for its alleged illegal marketing of Botox.  *Id.*

Plaintiffs seek damages for this $375 million judgement due its alleged illegal marketing of Botox, as well as recovery for other damages allegedly caused by Director Defendants' actions, for a total of $600 million in damages.  Plaintiffs further request that the Court order Allergan to take all necessary actions to reform and improve its corporate governance to comply with applicable laws.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b). Once it has adequately stated a claim, a plaintiff may support the allegations in its complaint with any set of facts consistent with those allegations.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957)).  Dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief.  *Id.* at 1968.  In order for a complaint to survive a 12(b)(6) motion, it must state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).  A claim for relief is facially plausible when the plaintiff pleads enough facts, taken as true, to allow a court to draw a reasonable inference that the defendant is liable for the alleged conduct.  *Id.* at 1949.  If the facts only allow a court to draw a reasonable inference that the defendant is possibly liable, then the complaint must be dismissed.  *Id.*  Mere legal conclusions are not to be accepted as true and do not establish a plausible claim for relief.  *Id.* at 1950.  Determining whether a complaint states a plausible claim for relief will be a context-specific task requiring the court to draw on its judicial experience and common sense.  *Id.*  Moreover, under a 12(b)(6) motion analysis, the Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006); *Balistreri*, 901 F.2d at 699.

### B.    Demand Futility Under Delaware Law

Under Fed. R. Civ. P. 23.1, a plaintiff seeking to initiate a derivative action is required to "plead with particularity either the efforts made to spur directors to take the action sought, and why these efforts were unsuccessful, or the reasons why no effort was made to demand action from the board." *Kanter v. Barella*, 489 F.3d 180, 176 (3d Cir. 2007).  The pleading "must comply with stringent requirements of factual particularity that differ substantially from the permissive notice

MINUTES FORM 11 DOC
CIVIL - GEN

EXHIBIT A
PAGE 8

pleadings governed solely by [Fed. R. Civ. P. 8]." *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000). "Rule 23.1 is not satisfied by conclusory statements or mere notice pleading. On the other hand, the pleader is not required to plead evidence. What the pleader must set forth are particularized factual statements that are essential to the claim." *Id.* A complaint that is full of "conclusory language . . . does not comply with these fundamental pleading mandates." *Id.*

"Rule 23.1 does not establish the circumstances under which demand would have been futile." *In re Silicon Graphics, Inc. Sec. Litig* ., 183 F.3d 970, 989-90 (9th Cir. 1999) (citing Fed. R. Civ. P. 23.1) (*abrogation recognized on other grounds by Simmonds v. Credit Suisse Securities (USA) LLC*, 2011 WL 135693, at *11 (9th Cir. 2011)). To determine demand futility standards, courts look to the law of the state of incorporation. *Id.* at 990. In this case, Allergan is incorporated in the State of Delaware, CC ¶ 26; therefore, the Court applies Delaware law to determine whether Plaintiffs have adequately plead demand futility.

The Delaware Supreme Court has held that demand on a board is futile if there is a substantial likelihood that a company's directors would face personal liability for the conduct complained of in the demand. *See Wood*, 953 A.2d at 144, n. 11 (stating that a "reasonable doubt that a majority of directors is incapable of considering demand should only be found where 'a substantial likelihood of personal liability exists.'") (quoting *Aronson*, 473 A.2d at 814; *Rales*, 634 A.2d at 936).

Delaware law recognizes two tests that may be applied to determine whether a demand on a board would be futile due to the likelihood of personal liability on the part of the directors. The first test, established by the Delaware Supreme Court in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), applies when a plaintiff is challenging a "*decision* of the board of directors." *Id.* at 814 (emphasis added). The second test, established by the Delaware Supreme Court in *Rales v. Blasband*, 634 A.2d 927 (Del.1993), applies when the derivative action is based on a board's *inaction* or a violation of the board's oversight duties. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 367 (Del. 2006) ("The standards for determining demand futility *in the absence of a business decision* are set forth in *Rales v. Blasband*.") (internal quotations omitted); *see also In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 170 (D. Del. 2009) (stating "'where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties,' the trial court must apply the *Rales* test." (quoting *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008)). In *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996), the Delaware Supreme Court held that demand futility under the *Rales* standard can be based on allegations of a board's inaction in the face of "red flags" suggesting that the company's internal controls are inadequate and that these inadequacies give rise to substantial risk of illegal activity occurring. *Intel*, 621 F. Supp. 2d at 174; *see also King v. Baldino*, 648 F. Supp. 2d 609, 623 (D. Del. 2009) *aff'd sub nom. King ex rel. Cephalon Inc. v. Baldino*, 09-3834, 2010 WL 5078008 (3d Cir. Dec. 14, 2010).

### III.   DISCUSSION

In this case, Plaintiffs argue that the Board faced a substantial likelihood of personal liability and that any demand on them would have been futile. Plaintiffs advance three theories to explain how the conduct complained of in this case subjected the Director Defendants to a significant risk of personal liability: (1) the Director Defendants are liable under an oversight liability theory, under the analysis explained in *Caremark*; (2) the Director Defendants were not disinterested and independent and thus subject to liability under the test set forth in *Rales*; and (3) the Director Defendants did not exercise valid business judgment in making board decisions, much like the board member defendants in *Aronson*.

## A. Oversight Liability Theory under *Caremark*

The bulk of Plaintiffs' demand futility arguments rest on the theory of liability articulated by the Delaware Supreme Court in *Caremark*. In order to plead demand futility under a *Caremark* theory, a plaintiff "must plead the existence of facts suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or material harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed." *King*, 648 F. Supp. 2d at 621. A plaintiff may satisfy this pleading burden by alleging "particular facts which demonstrate that the directors 'ignored red flags indicating misconduct in defiance of their duties.'" *Id.*

Claims under *Caremark* are carefully scrutinized. The Delaware Supreme Court has stated that this theory of oversight liability "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Caremark*, 698 A.2d at 967.

### 1. Plaintiffs Alleged "Red Flags" Are Not Sufficient

In the CC, Plaintiffs allege that Director Defendants "could not help but know about the illegal marketing activity at the Company due to its scope and pervasiveness at Allergan." CC ¶ 103. To support this contention, Plaintiffs allege two "red flags" that supposedly gave Director Defendants notice of the illegal off-label marketing. Plaintiffs first "red flag" asserts that due to the FDA's limited approved indications, it "was impossible for the Company to hit" such a high volume of sales "without significant off-label sales." *Id.* at ¶ 103. This assertion fails for two reasons. First, Plaintiffs incorrectly equate off-label *sales* with off-label *marketing*. The Plaintiffs themselves recognize that it is the off-label marketing of an FDA approved drug that is illegal, not the off-label sale. *See id.* at ¶ 4. Plaintiffs fail to plead any facts showing that the Board's knowledge of alleged off-label *sales* provided notice to the Director Defendants of the alleged illegal off-label *marketing*. Instead, Plaintiffs rely solely on the assertion that the Director Defendants should have inferred the use of illegal marketing due to the high number of sales. Courts have deemed such allegations insufficient for purposes of establishing demand futility. *See King*, 648 F. Supp. 2d at 624 (stating that an "increase [in sales of a drug] does not lead to the conclusion that the increase in sales was due to illegal activity by [defendant] employees which the Board, or those actually serving on the Board at the time, consciously ignored. . . .

MINUTES FORM 11 DOC
CIVIL - GEN

Initials of Deputy Clerk jcb
Page 4 of 8

EXHIBIT A
PAGE 10

The court determines, therefore, that plaintiff has not alleged particularized facts supporting his contention that the increase sales of [the drug] raised a red flag warning the Board of illegal sales activities . . . .").

Plaintiffs' second purported "red flag" indicating that Director Defendants should have known about the illegal marketing is based on the allegation that the board "was repeatedly made aware of the improper conduct occurring at the Company through" warning letters sent by the FDA. CC ¶ 134. This assertion also fails. Plaintiffs do allege the existence of various letters from the FDA regarding Allergan's allegedly misleading promotional activities. *See id.* at ¶¶ 79-80, 106. Plaintiffs, however, fail to provide particular supporting facts indicating that these letters were sufficient to put the Director Defendants on notice of Allergan's illegal marketing of off-label uses for Botox. For example, Plaintiffs fail to allege which, if any, Director Defendants actually received notice of Botox's alleged illegal off-label marketing through the letters from the FDA on August 22, 2001, and June 23, 2003. *See id.* at ¶¶ 79-80. Plaintiffs do allege that Defendant Pyott received two letters from the FDA in September 2005 and August 2009 regarding false or misleading advertisements regarding two other Allergan drugs Lumigan and ACZONE. *See id.* at ¶ 106. Plaintiffs, however, fail to allege how these letters in any way implicate the illegal off-label marketing of Botox the activity which ultimately lead to the Settlement Agreement at issue here.

2.    <u>Plaintiffs Have Not Adequately Alleged that the Board Ignored Their Duties</u>

Even if the Plaintiffs had shown that its alleged red flags put the Director Defendants on notice of the illegal marketing of Botox, Plaintiffs fail to plausibly allege that the Director Defendants took no steps in a good faith effort to prevent or remedy the situation. Plaintiffs conclusorily claim that Director Defendants "consciously ignored the information" of the wrongdoings that ultimately led to extensive legal violations. CC ¶¶ 137-38. Plaintiffs, however, fail to allege facts with particularly in support of this contention. Plaintiffs even contradict this contention by pleading that some of the Defendants actually enacted policies attempting to push compliance with FDA regulations concerning the marketing of off-label uses for its drugs. *See id.* at ¶¶ 75-76. As such, Plaintiffs have failed to plead that the Director Defendants ignored alleged "red flags" in defiance of their duties.

**B.    Disinterested and Independent Analysis under *Rales***

Plaintiffs' second theory of director liability is grounded in the allegations that the Director Defendants would not have exercised independent and disinterested business judgment in responding to a demand. *See Rales*, 634 A.2d at 934. A court applying the analysis from *Rales* first considers "'whether the underlying conduct complained of in the complaint . . . renders any of the board members 'interested.''" *King*, 648 F. Supp. 2d at 617 (quoting *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003)). Second, if a court determines that any of the board members are interested, the court next considers "'whether any of the other members of the board are compromised in their ability

MINUTES FORM 11 DOC
CIVIL - GEN

to act independently of the directors found to be interested.'" *Id.* (quoting *Guttman*, 823 A.2d at 501-02). Finally, "[i]f a majority of the board is impartial under [the] initial analysis," the court must then "consider whether the complaint sets forth particularized facts that plead a non-exculpated claim of breach of fiduciary duty against a majority of the board, thereby stripping away their first-blush veneer of impartiality." *Id.* (quoting *Guttman*, 823 A.2d at 502).

### 1. Whether any of the Director Defendants are "Interested"

In order to for the Plaintiffs to establish that the Director Defendants are interested for demand futility purposes under *Rales*, Plaintiffs must plead facts showing that Director Defendants received "benefit from [the alleged conduct] that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936 (quoting *Aronson*, 473 A.2d at 812). Director interest also exists "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id.* "In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision." *Id.*

Plaintiffs' CC does not adequately allege that the Director Defendants are "interested" under the analysis set forth in *Rales*. Plaintiffs offer conclusory allegations regarding the Director Defendants' interest in the conduct alleged. CC ¶¶ 140-50. Plaintiffs, however, allege no specific facts in support of these contentions. Plaintiffs merely predicate their claims of director interest and lack of independence on the grounds that the Director Defendants were part of the Company board during the time in which Allergan was allegedly involved in illegal off-label marketing. Nowhere in the complaint do the Plaintiffs allege actual facts showing that any of the Director Defendants received a benefit from the alleged illegal conduct that was "not equally shared by the stockholders." *Rales*, 634 A.2d at 936. Therefore, Plaintiffs have failed to establish that the Director Defendants were "interested" for the purposes of demand futility.

### 2. Whether any of the Director Defendants Lack "Independence"

Even if the Court were to find that Plaintiffs adequately alleged the "interestedness" of certain Board members, Plaintiffs' demand futility allegations would still be insufficient. As previously stated, in order to establish demand futility, Plaintiffs must show that other members of the board "are compromised in their ability to act independently of the directors found to be interested." *Guttman*, 823 A.2d at 501-02. A plaintiff satisfies this pleading standard by alleging facts showing that a director's conduct is based on "extraneous considerations or influence" from the director deemed to be interested, rather than the "corporate merits of the subject matter before the board." *Rales*, 634 A.2d at 936 (quoting *Aronson*, 473 A.2d at 816).

Plaintiffs fail to assert particular facts to support the allegations that any of the Director Defendants lack independence from one another. Plaintiffs merely allege, in conclusory fashion, that

MINUTES FORM 11 DOC
CIVIL - GEN

Initials of Deputy Clerk jcb
Page 6 of 8

EXHIBIT A
PAGE 12

the Director Defendants lack independence due to their roles as board members during the time Allergan was allegedly involved in conduct leading to extensive legal violations. These allegations, devoid of reference to particular facts, are insufficient for purposes of establishing the existence of "extraneous considerations or influences" as required under *Rales*. *Rales*, 634 A.2d at 969. Moreover, Plaintiffs fail to assert that the alleged board conduct was not based on the "corporate merits of the subject matter before the board." *Id.* Therefore, Plaintiffs have failed to plead that none of the Director Defendants could be independent from any director alleged to be "interested."

## C. Exercise of Business Judgment Analysis under *Aronson*

Although the bulk of Plaintiffs' claims are grounded in the Director Defendants' inaction, thereby implicating analysis under *Rales*, Plaintiffs' CC also invokes the *Aronson* standard by arguing that the Director Defendants "affirmatively adopted" a business strategy leading to violations of the law. *See* CC ¶ 132. As previously stated, *Aronson* applies when a shareholder is challenging "a *decision* of the board of directors." *Rales*, 634 A.2d 927, 933 (Del. 1993) (emphasis in original). Under *Aronson*, a court evaluates whether, under the particularized facts alleged, a reasonable doubt is created: (1) that the directors are disinterested and independent; *or* (2) that the challenged action was otherwise the result of a valid exercise of business judgment. *Aronson*, 473 A .2d at 812; *see also Rales*, 634 A.2d at 932 n.6. As also explained above, Plaintiffs have failed to plead particular facts creating a reasonable doubt that the Director Defendants were disinterested and independent; therefore, the Court now focuses on the second instance creating liability under *Aronson* that the challenged action was not the result of a valid exercise of business judgment.

Plaintiffs' claim that the Director Defendants are liable under a failure to exercise valid business judgment theory because the board "affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law." CC ¶ 132. This allegation is based on the claim that "violations of the applicable law occurred . . . at every level of the Company as a direct result of the Board's decision to embrace a policy of calculated legal violations." *Id.* at ¶ 133. Plaintiffs, however, fail to support this contention with supporting facts to show that such a board decision actually existed. Nowhere in the complaint do the Plaintiffs allege facts with particularity that suggest that the Director Defendants actually made a *decision* to embrace a policy supporting the illegal use of off-label marketing. In fact, Plaintiffs claim that some of the Director Defendants did the opposite by enacting policies prohibiting the promotion of off-label uses of drugs. *See id.* at ¶¶ 75-76. The only decisions alleged in the complaint are those ambiguously claimed by the Company itself. *See id.* at ¶ 82 ("Allergan promoted Botox . . ."); *id.* at ¶ 82 ("Allergan aggressively promoted Botox for unapproved uses . . ."); *id.* at ¶ 83 ("Allergan also leveraged . . . doctors in off-label specialties . . ."). Courts have held that allegations of a decision by the Company itself does not adequately plead a lack of business judgment by the individual directors. *See King*, 648 F. Supp. 2d at 623-24 (finding plaintiff's allegations insufficient for purposes of claiming demand futility because the complaint broadly alleged the actions of the "defendants" and not the individual Board members themselves); *see also In re Computer Sciences Corp. Derivative Litig.*, 244 F.R.D. 580, 590 (C.D. Cal.

MINUTES FORM 11 DOC
CIVIL - GEN

Initials of Deputy Clerk jcb
Page 7 of 8

EXHIBIT A
PAGE 13

2007) (stating that "a plaintiff cannot show that a director, or a whole board, is interested . . . because the board . . . failed to oversee subordinates who engaged in the questioned transactions") (quoting *Rales*, 634 A.2d at 934 n.9). Plaintiffs' allegations are therefore insufficiently particular to trigger an inference of director liability due to an invalid exercise of business judgment.

## IV. DISPOSITION

For the foregoing reasons, the Court GRANTS Director Defendants' and Nominal Defendant's Motions to Dismiss. Plaintiff's claims are DISMISSED WITH LEAVE TO AMEND. Plaintiffs shall file any amended complaint by May 9, 2011.

The Clerk shall serve this minute order on all parties to the action.

MINUTES FORM 11 DOC
CIVIL - GEN

Initials of Deputy Clerk jcb
Page 8 of 8

EXHIBIT A
PAGE 14

# Exhibit B

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 08:57 AM 04/30/2010*
*FILED 08:20 AM 04/30/2010*
*SRV 100444209 – 0837097 FILE*

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

## OF

## ALLERGAN, INC.

\* \* \* \* \*

ALLERGAN, INC. (the "Corporation"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

1.    The Corporation was originally incorporated on April 14, 1977, under the name of ALLERGAN PHARMACEUTICALS, INC. Pursuant to a Certificate of Amendment filed on September 26, 1986, the name of the Corporation was changed and now is ALLERGAN, INC.

2.    Pursuant to Sections 242 and 245 of the General Corporation Law of the State of Delaware, this Amended and Restated Certificate of Incorporation (this "Certificate of Incorporation") restates and integrates and further amends the provisions of the Restated Certificate of Incorporation of the Corporation.

3.    This Certificate of Incorporation amends and restates in its entirety the Corporation's Restated Certificate of Incorporation filed on May 22, 1989, as heretofore amended, to read as follows:

**ARTICLE 1. Name**

The name of the Corporation is Allergan, Inc.

**ARTICLE 2. Registered Office**

The address of the registered office of the Corporation in the State of Delaware is The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Prentice-Hall Corporation System, Inc.

**ARTICLE 3. Purpose**

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware, as may be amended from time to time. The Corporation shall have perpetual existence.

EXHIBIT B
PAGE 15

### ARTICLE 4.  Authorized Capital Stock

The aggregate number of shares which the Corporation shall have authority to issue is 505,000,000, to be divided into (a) 500,000,000 shares of Common Stock, par value $.01 per share and (b) 5,000,000 shares of Preferred Stock, par value $.01 per share.

The Board of Directors is hereby empowered to cause the Preferred Stock to be issued from time to time for such consideration as it may from time to time fix, and to cause such Preferred Stock to be issued in series with such voting powers and such designations, preferences and relative, participating, optional or other special rights as designated by the Board of Directors in the resolution providing for the issue of such series.  Shares of Preferred Stock of any one series shall be identical in all respects.

### ARTICLE 5.  Bylaws

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind the bylaws of the Corporation.

### ARTICLE 6.  Classified Board of Directors

The number of directors that shall constitute the whole Board of Directors shall be fixed by, or in the manner provided in, the bylaws of the Corporation.  The directors of the Corporation shall be divided into three classes, as nearly equal in number as reasonably possible, with the directors in each class to hold office until their successors are elected and qualified. Each member of the Board of Directors in the first class of directors shall hold office until the annual meeting of stockholders in 2011, each member of the Board of Directors in the second class of directors shall hold office until the annual meeting of stockholders in 2012 and each member of the Board of Directors in the third class of directors shall hold office until the annual meeting of stockholders in 2013.  At each annual meeting of stockholders of the Corporation, the successors to the class of directors whose term shall then expire shall be elected to hold office for a three-year term.  If the number of directors is changed, any increase or decrease shall be apportioned among the classes so as to maintain the number of directors in each class as nearly equal as possible, and any additional directors of any class elected to fill a vacancy resulting from an increase in such class shall hold office for a term that shall coincide with the remaining term of that class, but in no case will a decrease in the number of directors shorten the term of any incumbent director.  A director shall hold office until the annual meeting for the year in which his term expires and until his successor shall be elected and shall qualify, subject, however, to prior death, resignation, retirement, disqualification or removal from office.

Notwithstanding the foregoing, whenever the holders of any one or more classes or series of Preferred Stock issued by the Corporation shall have the right, voting separately by class or series, to elect directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by the terms of this Restated Certificate of Incorporation or the resolution or resolutions adopted by the Board of Directors pursuant to Article 4 hereof, and such directors so elected shall not be divided into classes pursuant to this unless expressly provided by such terms.

EXHIBIT B
PAGE 16

Elections of directors need not be by written ballot unless the bylaws of the Corporation shall so provide.

## ARTICLE 7. Removal of Directors

Subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, any or all of the directors of the Corporation may be removed from office by the stockholders at any annual or special meeting of stockholders of the Corporation, the notice of which shall state that the removal of a director or directors is among the purposes of the meeting, but only for cause, by the affirmative vote of at least a majority of the outstanding shares of stock of the Corporation entitled to vote generally in the election of directors of the Corporation.

## ARTICLE 8. Board of Directors Vacancies

Subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, newly created directorships resulting from any increase in the number of directors or any vacancy on the Board of Directors resulting from death, resignation, disqualification, removal or other cause shall be filled solely by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum, or by a sole remaining director. Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of directors in which the new directorship was created or the vacancy occurred and until such director's successor shall have been elected and qualified. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

## ARTICLE 9. No Stockholder Action by Written Consent

Any action required or permitted to be taken at any annual or special meeting of stockholders may be taken only upon the vote of the stockholders at an annual or special meeting duly called and may not be taken by written consent of the stockholders.

## ARTICLE 10. Special Meetings of the Stockholders

Special meetings of the stockholders of the Corporation for any purpose or purposes may be called at any time by the Board of Directors, the Chairman of the Board of Directors or the Chief Executive Officer of the Corporation. Subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, special meetings of the stockholders of the Corporation may not be called by any other person or persons.

## ARTICLE 11. Annual Meetings of Stockholders

At an annual meeting of stockholders, only such business shall be conducted, and only such proposals shall be acted upon, as shall have been brought before the annual meeting (a) by, or at the direction of, a majority of the directors, or (b) by any stockholder of the Corporation who complies with the notice procedures set forth in this Article 11. For a proposal to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive

3

offices of the corporation not less than 30 days nor more than 60 days prior to the scheduled annual meeting, regardless of any postponements, deferrals or adjournments of that meeting to a later date; *provided, however,* that if less than 40 days' notice or prior public disclosure of the date of the scheduled annual meeting is given or made, notice by the stockholder, to be timely, must be so delivered or received not later than the close of business on the tenth day following the earlier of the day on which such notice of the date of the scheduled annual meeting was mailed or the day on which such public disclosure was made. A stockholder's notice to the Secretary shall set forth as to each matter the stockholder proposes to bring before the annual meeting (a) a brief description of the proposal desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (b) the name and address, as they appear on the Corporation's books, of the stockholder proposing such business and any other stockholders known by such stockholder to be supporting such proposal, (c) the class and number of shares of the Corporation's stock which are beneficially owned by the stockholder on the date of such stockholder notice and by any other stockholders known by such stockholder to be supporting such proposal on the date of such stockholder notice, and (d) any financial interest of the stockholder in such proposal.

The presiding officer of the annual meeting shall determine and declare at the annual meeting whether the stockholder proposal was made in accordance with the terms of this Article 11. If the presiding officer determines that a stockholder proposal was not made in accordance with the terms of this Article 11, he shall so declare at the annual meeting and any such proposal shall not be acted upon at the annual meeting.

This provision shall not prevent the consideration and approval or disapproval at the annual meeting of reports of officers, directors and committees of the Board of Directors, but, in connection with such reports, no new business shall be acted upon at such annual meeting unless stated, filed and received as herein provided.

## ARTICLE 12. Stockholder Nomination of Directors

Subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, only persons who are nominated in accordance with the following procedures shall be eligible for election as directors. Nominations of persons for election to the Board of Directors of the Corporation may be made at a meeting of stockholders by or at the direction of the Board of Directors by any nominating committee or person appointed by the Board of Directors or by any stockholder of the Corporation entitled to vote for the election of directors at the meeting who complies with the notice procedures set forth in this Article 12. Such nominations, other than those made by or at the direction of the Board of Directors, shall be made pursuant to timely notice in writing to the Secretary of the Corporation. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not less than 30 days nor more than 60 days prior to the scheduled annual meeting, regardless of any postponements, deferrals or adjournments of that meeting to a later date; *provided, however,* that if less than 40 days' notice or prior public disclosure of the date of the scheduled annual meeting is given or made, notice by the stockholder, to be timely, must be so delivered or received not later than the close of business on the tenth day following the earlier of the day on which such notice of the date of the scheduled annual meeting was mailed or the day on which such public disclosure was made. A stockholder's notice to the

4

Secretary shall set forth (a) as to each person whom the stockholder proposes to nominate for election or re-election as a director, (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) the class and number of shares of capital stock of the Corporation which are beneficially owned by the person and (iv) any other information relating to the person that is required to be disclosed in solicitations for proxies for election of directors pursuant to Rule 14a under the Securities Exchange Act of 1934, as amended; and (b) as to the stockholder giving the notice (i) the name and address, as they appear on the Corporation's books, of the stockholder and (ii) the class and number of shares of the Corporation's stock which are beneficially owned by the stockholder on the date of such stockholder notice. The Corporation may require any proposed nominee to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as director of the Corporation.

The presiding officer of the annual meeting shall determine and declare at the annual meeting whether the nomination was made in accordance with the terms of this Article 12. If the presiding officer determines that a nomination was not made in accordance with the terms of this Article 12, he shall so declare at the annual meeting and any such defective nomination shall be disregarded.

## ARTICLE 13. Limitation of Director Liability

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended after the date hereof to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.

## ARTICLE 14. Indemnification

(a)      Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such

5

amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith. Such indemnification shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators; *provided, however,* that, except as provided in subparagraph (b) hereof, the Corporation shall indemnify any such indemnitee seeking indemnification in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation. The right to indemnification conferred in this Article 14 shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition (an "expense advancement"); *provided, however,* that, if the Delaware General Corporation Law so requires, the payment of such expenses incurred by an indemnitee in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such indemnitee while a director or officer, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made upon delivery to the Corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified under this Article 14 or otherwise; and *provided, further,* that no expense advancement shall be paid by the Corporation if independent legal counsel shall advise the Board of Directors in a written opinion that, based upon the facts known to such counsel at the time, (a) the indemnitee acted in bad faith or deliberately breached his or her duty to the Corporation or its stockholders, and (b) as a result of such conduct by the indemnitee, it is more likely than not that it will ultimately be determined that such indemnitee has not met the standards of conduct which make it permissible under the Delaware General Corporation Law for the Corporation to indemnify such indemnitee. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of directors and officers.

(b)    If a claim under subparagraph (a) of this Article 14 is not paid in full by the Corporation within 30 days after a written claim has been received by the Corporation, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an expense advancement, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. It shall be a defense to any such action that the indemnitee has not met the standards of conduct which make it permissible under the Delaware General Corporation Law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the indemnitee is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel), or its stockholders) that the indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the indemnitee has not met the applicable standard of conduct; *provided, however,* that a determination by the board of directors denying

6

an expense advancement based upon the written opinion of independent legal counsel as provided for in subparagraph (a) above shall be a complete defense to any action seeking an expense advancement, but such determination shall not be a defense or create a presumption that the indemnitee is not entitled to be indemnified hereunder upon the final disposition of the proceeding.

(c)      The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article 14 shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of this Certificate of Incorporation, bylaw, agreement, vote of stockholders or disinterested directors or otherwise.

(d)      The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any such expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

**ARTICLE 15. Business Combinations**

(a)      For purposes of this Article 15, the following terms shall have the meanings indicated, and all capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Section 203(c) of the Delaware General Corporation Law, as in effect on the date of filing of this Certificate of Incorporation:

(i)      "Business Combination" shall have the meaning ascribed to it in Section 203(c)(3) of the Delaware General Corporation Law; *provided, however,* that the term "interested stockholder," as used therein, shall have the meaning ascribed to it in subparagraph (a)(iv) below.

(ii)      "Disinterested Shares" shall mean the shares of Voting Stock of the Corporation held by Persons other than an Interested Stockholder, and each reference herein to a percentage or portion of the Disinterested Shares shall refer to such percentage or portion of the votes entitled to be cast by the holders of such Disinterested Shares.

(iii)      "Independent Directors" shall mean the members of the Board of Directors who were directors of the Corporation prior to any Person becoming an Interested Stockholder or were recommended for election or elected to succeed such directors by a majority of such directors.

(iv)      "Interested Stockholder" shall mean any Person (other than the Corporation and any direct or indirect majority-owned subsidiary of the Corporation) that (1) is the owner of 5% or more of the outstanding Voting Stock or (2) is an Affiliate or Associate of the Corporation and was the owner of 5% or more of the outstanding Voting Stock at any time within the three-year period immediately prior to the date on which it is sought to be determined whether such Person is an Interested Stockholder; and the Affiliates and Associates of such Person.  For the purpose of determining whether a Person is an Interested Stockholder, the Voting Stock deemed to be outstanding shall

7

include stock deemed to be owned by the Person through application of Section 203(c)(8) of the Delaware General Corporation Law, but shall not include any other unissued stock of the Corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

(v)     "Voting Stock" shall mean stock of the Corporation of any class or series entitled to vote generally in the election of directors of the Corporation, and each reference herein to a percentage or portion of shares of Voting Stock shall refer to such percentage or portion of the votes entitled to be cast by the holders of such shares.

(b)     In addition to any affirmative vote required by applicable law or any other provision of this Certificate of Incorporation or specified in any agreement, and in addition to any voting rights granted to or held by the holders of any series of Preferred Stock, the approval or authorization of any Business Combination with an Interested Stockholder that has not been approved by a majority of the Independent Directors prior to the date that such stockholder became an Interested Stockholder, shall require the affirmative vote of the holders of not less than a majority of the Disinterested Shares then outstanding.

(c)     A majority of the Independent Directors shall have the power and duty to determine, on the basis of information known to them after reasonable inquiry, all facts necessary to determine compliance with this Article 15, including without limitation, (i) whether a Person is an Interested Stockholder; (ii) the number of shares of Voting Stock Owned by any Person, (iii) whether a Person is an Affiliate or Associate of another Person, (iv) whether a proposed transaction is a Business Combination and (v) whether a Business Combination shall have been approved by a majority of the Independent Directors prior to the date that a stockholder became an Interested Stockholder; and any such determination made in good faith by a majority of the Independent Directors shall be conclusive and binding for all purposes of this Article 15.

**ARTICLE 16. Board Considerations**

The Board of Directors, each committee of the Board and each individual director, in discharging their respective duties under applicable law and this Certificate of Incorporation and in determining what they each believe to be in the best interests of the Corporation and its stockholders, may consider the effects, both short-term and long-term, of any action or proposed action taken or to be taken by the Corporation, the Board of Directors or any committee of the Board on the interests of (i) the employees, distributors, customers, suppliers and/or creditors of the Corporation and its subsidiaries and (ii) the communities in which the Corporation and its subsidiaries own or lease property or conduct business, all to the extent that the Board, any committee of the Board or any individual director deems pertinent under the circumstances; *provided, however*, that the provisions of this Article 16 shall not limit in any way the right of the Board to consider any other lawful factors in making its determinations, including, without limitation, the effects, both short-term and long-term, of any action or proposed action on the Corporation or its stockholders directly; and *provided further* that this Article 16 shall be deemed solely to grant discretionary authority to the Board, each committee of the Board and each individual director and shall not be deemed to provide to any specific constituency any right to be considered.

EXHIBIT B
PAGE 22

**ARTICLE 17. Amendment of Certificate of Incorporation**

The Corporation reserves this right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.  In addition to any affirmative vote required by applicable law or any other provision of this Certificate of Incorporation, and in addition to any voting rights granted to or held by the holders of any series of Preferred Stock, the affirmative vote of the holders of not less than a majority of the outstanding shares of stock of the Corporation entitled to vote generally in the election of directors of the Corporation shall be required to amend or repeal, or adopt any provisions inconsistent with, the provisions of this Certificate of Incorporation.

IN WITNESS WHEREOF, this Certificate of Incorporation has been signed by David E.I. Pyott, the Corporation's Chief Executive Officer, and attested by Douglas S. Ingram, the Corporation's Secretary, this 30 day of April, 2010.

_____
David E.I. Pyott, Chief Executive Officer

_____
Douglas S. Ingram, Secretary

9

EXHIBIT B
PAGE 23

# Exhibit C

(Filed Under Seal)

# Exhibit D



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

Food and Drug Administration
Center for Biologics Evaluation and Research
1401 Rockville Pike
Rockville MD 20852-1448

August 22, 2001

CBER 01-025

## WARNING LETTER

BY FACSIMILE AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. David Garbe
Director, Scientific Information and Medical Compliance
Allergan, Inc.
2525 Dupont Drive TL-1L
P.O. Box 19534
Irvine, CA  92623-9354

Dear Mr. Garbe:

This letter is in regard to Allergan, Inc.'s (Allergan) promotional activities and materials for the marketing of BOTOX (botulinum toxin type A).  As part of its routine monitoring and surveillance program, the Advertising and Promotional Labeling Branch (APLB) has reviewed your promotional activities and materials and has concluded that they are misleading and lacking in fair balance within the meaning of 21 U.S.C. § 352(a) of the Federal Food, Drug, and Cosmetic Act (the Act) and its implementing regulations under Title 21, Code of Federal Regulations, Parts 202 and 601.

You have engaged in repeated promotional activities that suggest the amount of protein in BOTOX minimizes the formation of antibodies.  No formal clinical studies have been performed to study BOTOX treatment with different amounts of protein with respect to the formation of antibodies.  Additionally, you have repeatedly included favorable data or conclusions from nonclinical studies of BOTOX in a way that suggests they have clinical significance when, in fact, no such clinical significance has been demonstrated.  We have previously objected to these activities in Review Memoranda dated December 12, 1998 and September 25, 2000, and untitled letters dated November 7, 2000, February 14, 2001, and April 12, 2001.

Specifically, we have identified a clinical update titled, "Immunologic Considerations" (BTX 0065), and the revised BOTOX Internet website at www.BOTOX.com, that are misleading and lack fair balance.

ALLERGAN, INC.
Received

JUL 8 ? ?,01

Scientific Information
Medical Compliance

EXHIBIT D
PAGE 26

Confidential - - FOIA Exempt                                    AL0046366

Page 2 – Mr. David Garbe

**Misleading**

Nonclinical Data

Your promotional material contains favorable data or conclusions from nonclinical studies, such as in laboratory animals or in vitro, in a way that suggests they have clinical significance when, in fact, no such clinical significance has been demonstrated. For example, your statements, "In the immunology literature, more frequent injections of a protein antigen have been shown to increase the immunological response," and "One of the fundamental findings in immunology is that higher amounts of a protein are associated with a higher probability of antibody formation," are misleading as they are based on animal data, but you fail to clearly define it as such and to note that the clinical significance of the animal data is unknown.

Unsubstantiated Efficacy Claims

Your promotional materials contain favorable information or conclusions from studies that are inadequate in design, scope, or conduct to furnish significant support for such information or conclusions. For example, the following statements are based on retrospective studies that do not provide sufficient details of study design that permit a valid comparison with a control and a quantitative assessment of drug effect:

> "The investigators found a relationship between the neurotoxin complex exposure (dose and, thus, protein load) that patients had received in the preceding year and the percentage of patients who tested positive for neutralizing antibodies."

> "The potential link between neurotoxin complex protein load and antibody formation is also suggested by the ophthalmic literature."

> "It can be derived that incidence of sensitization is not only related to dose exposure in $LD_{50}$ units per injection cycle but also nanograms of botulinum toxin exposure per injection cycle (protein load)."

> "They suggested that the higher risk of antibody formation in cervical dystonia patients was related to the higher doses per treatment and attendant higher protein load."

There have been no formal clinical studies performed to compare the formation of antibodies during treatment with botulinum toxin type A (BTX-A) formulations containing different amounts of protein.

In the absence of well-controlled clinical studies, which evaluate the predictive qualities of the Mouse Protection Assay (MPA) and the Frontalis Antibody Test (FTAT) for the potential for clinical response with BTX-A, your statements, "Although the sensitivity of the MPA may be somewhat low, its specificity for predicting clinical responses or treatment failure due to resistance is relatively high" and "Thus, the FTAT may provide physicians with a simple means of detecting the potential for clinical response with  BTX-A" are misleading.

EXHIBIT D
PAGE 27

Confidential - - FOIA Exempt

AL0046367

Page 3 – Mr. David Garbe

Statements that imply that antibody formation in clinical experience with the current BOTOX formulation will be lower than in the original formulations are unfounded. You do not have well-controlled clinical studies to support the statement, "However, due to its lower neurotoxin complex protein load, it is theorized to have a lower antigenic potential than the original formulation."

Unsubstantiated Comparison Claim

Your promotional material contains a representation or suggestion that is not approved or permitted for use in the labeling that BTX-A is better, more effective, safer, has fewer or less incidence of, or less serious side effects or contraindications than has been demonstrated by substantial evidence or substantial clinical experience [21 CFR 202.1]. Your comparative claim of superiority, "However, patients who lose their ability to respond are faced with treatments that may be less effective or associated with more adverse events" is misleading.

**Lack of Fair Balance**

Minimizing Side Effects

You fail to present information relating to side effects and contraindications with a prominence and readability reasonably comparable with the presentation of information relating to effectiveness of the drug, taking into account all implementing factors, such as typography, layout, contrast, headlines, paragraphing, white space, and any other techniques apt to achieve emphasis [21 CFR 202.1]. For example, the safety information contained in the clinical update is in a print size that is smaller than that of the efficacy information.

You minimize the side effects of BOTOX by stating, "All medications have some side effects" at the beginning of the website sections titled, "What Side Effects May Be Experienced When Using BOTOX." This statement minimizes the risks of treatment with BOTOX by suggesting that it has the same risks as any other medication. You go on to state, "With BOTOX, side effects are usually transient and mild to moderate in nature. Some people notice temporary weakness of muscles or discomfort at the injection site." Your presentation minimizes the side effects and is not consistent with the approved product labeling which presents this general information after the warnings, precautions, and reports of deaths.

Omission of Important Risk Information

You fail to present all of the serious and important risks associated with BOTOX therapy. For example, your website pages that discuss the approved uses of BOTOX and your clinical update fail to present the following risk information:

1. There have been rare spontaneous reports of death, sometimes associated with dysphagia, pneumonia, and/or other significant debility, after treatment with botulinum toxin.

EXHIBIT D
PAGE 28

Confidential - - FOIA Exempt

AL0046368

Page 4 – Mr. David Garbe

2. Cervical dystonia patients with smaller neck muscle mass and patients who require bilateral injections into the sternocleidomastoid muscle have been reported to be at greater risk for dysphagia.

3. Injections into the levator scapulae may be associated with an increased risk of upper respiratory infection and dysphagia.

4. Reduced blinking from BOTOX injection of the orbicularis muscle in blepharospasm patients can lead to corneal exposure, persistent epithelial defect, and corneal ulceration, especially in patients with VII nerve disorders.

5. Patients with neuromuscular disorders may be at increased risk of clinically significant systemic effects, including severe dysphagia and respiratory compromise from typical doses of BOTOX.

6. The effects of BOTOX therapy may be increased with the use of aminoglycoside antibiotics or with other drugs that interfere with neuromuscular transmission.

7. During the administration of BOTOX for the treatment of strabismus, retrobulbar hemorrhages sufficient to compromise retinal circulation have occurred from needle penetration into the orbit.

Furthermore, in the website sections titled, "What Side Effects May Be Experienced When Using BOTOX," you state, "With BOTOX, side effects are usually transient and mild to moderate in nature" omitting that adverse events may have a duration of several months and may be severe in intensity, and "Some people notice temporary weakness of muscles or discomfort at the injection site" omitting that weakness of adjacent muscles may also occur due to spread of toxin.

**Other Violative BOTOX Promotional Materials**

We have identified the following promotional materials that are misleading and lack fair balance for similar reasons as stated above:  a Journal ad (BTX 0101); a CD announcement letter for payers (SIMC01-091); a clinical update mailing, doctor follow-up letter and envelope (BTX 9907); a Questions and Answers Brochure (BTX 0124); a physician guide (BTX 9903); and BOTOX Clinical Update Slides from the www.BOTOX.com website.

In addition, the statement "Success that Endures" on the journal ad and the Questions and Answers Brochure is misleading in that it suggests better efficacy than has been shown in adequate and well-controlled clinical studies.

Furthermore, the statement, "Maintaining the response to botulinum neurotoxin therapy," on the clinical update mailing, doctor follow-up letter, and envelope is misleading since the efficacy of repeated treatments over long periods has not been evaluated in clinical trials; therefore, we do not have a complete understanding of the rate at which individuals cease to seek BOTOX therapy and their reasons for doing so.

EXHIBIT D
PAGE 29

Confidential - - FOIA Exempt

AL0046369

Page 5 – Mr. David Garbe

**Failure To Submit Promotional Material**

You failed to submit specimens of the revised promotional material for BOTOX on your Internet website at www.BOTOX.com at the time of initial dissemination of the revised material.

**Conclusions and Requested Actions**

The violations noted in this letter represent continuing examples of violative promotion or advertising materials disseminated by Allergan. You should take prompt action to correct the violations in the noted materials and all promotional materials for BOTOX that contain violations like those outlined in this letter. Failure to promptly correct these violations may result in the initiation of regulatory action by FDA without further notice. These actions include, but are not limited to, seizure, injunction, and/or civil penalties.

This letter is not intended to be an all-inclusive list of deficiencies that may be associated with Allergan's promotion of BOTOX. It is your responsibility to ensure that materials distributed are in conformance with the requirements of the Act and its implementing regulations.

Your written response with the specific steps that you have taken to correct the violations should be submitted to this office within 10 working days of receipt of this letter. Your response should be directed to the address listed below. If you have any questions involving this matter, please contact Ms. Miller at 301-827-3028. We remind you that only written communications are considered official.

   Ms. Catherine A. Miller
   Acting Branch Chief
   Advertising and Promotional Labeling Branch
   Food and Drug Administration
   Center for Biologics Evaluation and Research
   1401 Rockville Pike, Suite 200S
   Rockville, MD 20852-1448

                    Sincerely,

                    Steven A. Masiello
                    Director
                    Office of Compliance and Biologics Quality
                    Center for Biologics Evaluation and Research

EXHIBIT D
PAGE 30

Confidential - - FOIA Exempt

AL0046370

# ALLERGAN



2625 Dupont Drive, P.O. Box 19534, Irvine, California, USA 92623-9534 Telephone: (714) 246-4500 Website: www.allergan.com

August 31, 2001

Catherine Miller
Acting Branch Chief
Center for Biologics Evaluation and Research
Advertising and Promotional Labeling Branch, HFM-602
1401 Rockville Pike, Suite 200S
Rockville, MD  20852-1448

Dear Ms. Miller,

This is in response to the Warning letter sent to David Garbe at Allergan, Inc. dated August 22, 2001.  Allergan appreciates the opportunity to respond to this communication.

The Agency cited certain concerns specifically with a clinical update mailer titled "Immunologic Considerations in Botulinum Neurotoxin Therapy" and the BOTOX® Internet Website.  A particular concern with these items is the inclusion of information relating to the immunogenicity of botulinum toxin without adequate and well-controlled trials.

This clinical update mailer is no longer being disseminated and has been removed from the Website effective August 28, 2001.  In addition Allergan is reviewing all material currently being used in the promotional area and will discontinue items that discuss the immunologic aspect of botulinum toxin beyond that which appears in the approved package insert.  This includes discontinuing the use of the statements, "However, due to its lower neurotoxin complex protein load, it is theorized to have a lower antigenic potential than the original formulation." and "However, patients who lose their ability to respond are faced with treatments that may be less effective or associated with more adverse events" where they appear.  Allergan would like to point out, however, that we continue to disagree with the Agency's position on this matter.  The approved package insert for BOTOX currently has a brief section on Immunogenicity.  The information presented in the clinical update mailer provides factual information, including human clinical data, to the reader so they can be more fully informed of the additional data available on the topic of immunogenicity associated with botulinum toxin.

Allergan will add additional fair balance information into a revised BOTOX Website in the sections entitled "What side effects may be experienced when using BOTOX." The Agency should be aware that any viewer of this section has easy access to the entire package insert by simply clicking on the box titled prescribing information that is available in each section of the website.

EXHIBIT D
PAGE 31

Confidential - - FOIA Exempt

AL0046371

C. Miller                                                    August 31, 2001
                                                            Page 2

In order to address the comment on page 4 regarding additional violative promotional material the following items have been discontinued:

- Journal Ad (BTX 0101): final run to appear in August 2001
- CD announcement letter (SIMC01-091): used only once as a mailer
- Clinical update mailing (BTX9907): used only once as a mailer
- Questions and Answers brochure (BTX 0124): notification to discontinue to the field August 30, 2001
- Physician guide (BTX 9903): notification to discontinue to the field August 30, 2001
- BOTOX Clinical Update slides on the Website: Removed August 28, 2001

The Agency indicated they find the statement "Success that Endures" misleading because it suggests better efficacy than has been proven in adequate and well-controlled studies. Allergan does not agree that it suggests better clinical efficacy and intentionally did not select the terms "Efficacy…" or "Clinical success…." We expect the interpretation of this statement to be that BOTOX® is commercially successful and well established in the marketplace. BOTOX® is the only botulinum toxin that has over 10 years of commercial success in the US, and it has many years of expected future growth. Although we do not agree this statement is in any way misleading, we will revise this tagline in all new promotional material.

The August 22 letter also criticized the use of the statement, "Maintaining the response to botulinum neurotoxin therapy" indicating that it is misleading since the efficacy of repeated treatments over long periods has not been evaluated in clinical trials. However, the Agency is reviewing, reading and commenting on this statement out of context. The statement is included in the promotional material, along with the associated text, primarily to address the statements from the Immunogenicity section of the approved package insert that indicates, "The potential for antibody formation may be minimized by injecting with the lowest effective dose given at the longest feasible intervals between injections." As you will note, text to address these points follows this headline. When we do discuss efficacy, we include the language that the duration of effect is approximately 3 months. Regardless, Allergan will select other terminology that more closely aligns with this section of the package insert.

We hope this response adequately addresses your communication of August 22, 2001 regarding certain BOTOX® promotional items. If you have any additional questions, please contact Dave Garbe at (714) 246-4285 or via FAX at (714) 246-5913.

Respectfully submitted,

Dave Garbe
Allergan, Inc.

EXHIBIT D
PAGE 32

Confidential - - FOIA Exempt

AL0046372

ALLERGAN 

2525 Dupont Drive, P.O. Box 19534, Irvine, California, USA 92623-9534 Telephone: (714) 246-4500 Website: www.allergan.com

October 31, 2001

Catherine Miller
Center for Biologics Evaluation and Research
Advertising and Promotional Labeling Branch, HFM-602
1401 Rockville Pike, Suite 200S
Rockville, MD  20852-1448

Dear Ms. Miller,

This is in response to the telephone discussion of October 29, 2001 between Dave Garbe and Cathy Miller where you requested a listing of the promotional items discontinued by Allergan as a result of the Warning letter sent to David Garbe at Allergan, Inc. dated August 22, 2001.  You also requested a copy of our communication to our BOTOX® sales force  requiring that they discontinue use of these items.

Accompanying this letter is a communication that went to the field sales force on August 30, 2001 from the BOTOX Management Team.  This communication also delineates those items that were discontinued as a result of the Warning letter dated August 22, 2001.

I believe this adequately fulfills your request.  If there is anything else I can provide please contact me at (714) 246-4285 or via FAX at (714) 246-5913I.

Sincerely,

Dave Garbe
Allergan, Inc.

Enc:  Communication dated August 30, 2001 to All Field Colleagues

EXHIBIT D
PAGE 33

Confidential - - FOIA Exempt

AL0046373

# ALLERGAN



| | | | |
|---|---|---|---|
| **TO:** | BMC's, RM's, RAM's, RSS's | **SUBJECT:** | Sales and Promotion Materials Direction |
| **FROM:** | E. Sanders and A. Elston | **DATE:** | **August 30, 2001** |

**COPIES:**   T. Albright, R. Bancroft, D. Berglas, M. Dickason, W. Cetnarowski, R. Leird, S. Pal, D. Pearl, J. Sturek

As all of you are aware, we will be meeting the week of September 10th to roll out new material for the third trimester. We will advance the efforts initiated at the meetings this past June, enhancing our focus on growth opportunities for the BOTOX® franchise. We are all very excited about what we have planned and believe that you will share in our excitement!

To make room for these new materials and in light of ongoing discussions with the FDA, you need to immediately discontinue the use of and either discard or destroy the following items.

- ❑ BTX9907 – Clinical Update Mailer #1
- ❑ BTX0065 – Clinical Update Mailer #2
- ❑ BTX0074 – Clinical Update Mailer #3
- ❑ BTX0102 – BOTOX® Sales Aid
- ❑ BTX0019 – Clinical and Pharmacologic Effects of BOTOX® (MAO)
- ❑ BTX0020 – Discussing BOTOX® Therapy with Patients
- ❑ BTX0124 – BOTOX® Q & A Brochure
- ❑ BTX9903 – Physician Guide: Discussing BOTOX® Therapy with Patients
- ❑ BTX0135 – BOTOX® The Injection Challenge CD-ROM
- ❑ BTX0007 – Response Detail Aid
- ❑ BTX0014 – Clinical Update Slide Kit #1
- ❑ NO ID #  -  BOTOX® Drug information Resource/Formulary Kit

Additionally, you will need to return all copies of ***BTX0131 – BOTOX® Binder Patient Slide Series*** to the attention Linda Kivinski at the home office. This item will be re-worked and returned.

Please keep in mind that exciting new materials will be presented at our up coming meetings in September and other items are under development for role-out later this year and early next year.

Please sign the attached acknowledgement form and return via Fax to the attention of Linda Kivinski at 714-246-6587. This needs to be returned no later than Friday, September 7th.

EXHIBIT D
PAGE 34

Confidential - - FOIA Exempt

AL0046374

### Understanding and Acknowledgement

I fully understand that each of the following items must be destroyed and/or discarded and effective immediately I agree to no longer disseminate or use this material in any promotional activity.

- ☐ BTX9907 – Clinical Update Mailer #1
- ☐ BTX 0065– Clinical Update Mailer #2
- ☐ BTX0074 – Clinical Update Mailer #3
- ☐ BTX0102 – BOTOX® Sales Aid
- ☐ BTX0019 – Clinical and Pharmacologic Effects of BOTOX® (MAO)
- ☐ BTX0020 – Discussing BOTOX® Therapy with Patients
- ☐ BTX0124 – BOTOX® Q & A Brochure
- ☐ BTX9903 – Physician Guide: Discussing BOTOX® Therapy with Patients
- ☐ BTX0135 – BOTOX® The Injection Challenge CD-ROM
- ☐ BTX0007 – Response Detail Aid
- ☐ BTX0014 – Clinical Update Slide Kit #1
- ☐ NO ID #  - BOTOX® Drug information Resource/Formulary Kit

Additionally, I agree to return all copies of the following item to the attention of Linda Kivinski at the home office.

- ☐ BTX0131 (BOTOX® Binder Patient Slide Series)

---
PRINT YOUR NAME

---
SIGN AND DATE

**Immediately Return via Fax to**
**Linda Kivinski**
**At 714-246-6587**

EXHIBIT D
PAGE 35

Confidential - - FOIA Exempt

AL0046375



DEPARTMENT OF HEALTH & HUMAN SERVICES                           Public Health Service

**NOV 02 2001**

Food and Drug Administration
Center for Biologics Evaluation and Research
1401 Rockville Pike
Rockville MD 20852-1448

Mr. David Garbe
Director, Scientific Information and Medical Compliance
Allergan, Inc.
2525 Dupont Drive TL-1L
P.O. Box 19534
Irvine, CA 92623-9354

Dear Mr. Garbe:

This letter is in response to your letter of August 31, 2001, regarding the promotion of BOTOX in a clinical update mailer titled "Immunologic Consideration in Botulinum Neurotoxin Therapy," and on your Internet website at http://www.BOTOX.com. We have reviewed the corrective actions that you have taken: stopping dissemination of the promotional material mentioned in our Warning Letter of August 22, 2001; reviewing all material currently being used in the promotional area and discontinuing items that discuss the immunologic aspect of botulinum toxin beyond that which appears in the approved product labeling; adding additional fair balance information to the revised BOTOX Website; and revising the tagline, "Success that Endures," and the statement, "Maintaining the response to botulinum neurotoxin therapy." We acknowledge receipt of your letter to Ms. Catherine Miller on October 31, 2001, listing the promotional items discontinued by Allergan as a result of your review of current promotional materials. We feel that you have satisfactorily addressed our concerns.

Your continued interest in the dissemination of appropriate advertising and promotional materials is appreciated. Should you have any questions or concerns involving this matter, please contact Ms. Catherine A. Miller, Regulatory Review Officer, at the following address:

Center for Biologics Evaluation and Research
Office of Compliance and Biologics Quality
Division of Case Management
Advertising and Promotional Labeling Branch, HFM-602
1401 Rockville Pike
Rockville, MD 20852-1448

ALLERGAN, INC.
Received

NOV 1 5 2001

Scientific Information &
Medical Compliance

Sincerely,

*Mary A. Malarkey*

Mary A. Malarkey
Director
Division of Case Management
Office of Compliance and Biologics Quality
Center for Biologics Evaluation and Research

EXHIBIT D
PAGE 36

Confidential - - FOIA Exempt                                              AL0046376

# Exhibit E

**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
Center for Biologics Evaluation and Resea
1401 Rockville Pike
Rockville MD 20852-1448

**VIA FACSIMILE AND USPS**

September 5, 2002

Mr. Peter A. Kresel
Allergan, Inc.
2525 Dupont Drive
Irvine, CA 92623-9534

Dear Mr. Kresel:

Through routine monitoring and surveillance the Advertising and Promotional Labeling
Branch (APLB) of FDA's Center for Biologics Evaluation and Research has identified
promotional materials for your product, BOTOX® COSMETIC Botulinum Toxin Type
A, that are in violation of the Food, Drug and Cosmetic Act and its implementing
regulations. APLB has reviewed several direct-to-consumer (DTC) promotional and
broadcast (15 and 30 second air-time) pieces and has concluded that these materials
contain misleading statements about BOTOX® Cosmetic. Copies of all referenced
materials are enclosed.

**Misleading statements:**

"It seems like everybody is talking about Botox® Cosmetic, the highly effective, non-
surgical procedure that can dramatically reduce your toughest wrinkle within 7 days."
This statement is prominently presented at the beginning of the Patient Brochure (Tab A)
and is misleading because it does not emphasize that this is a temporary procedure. In
addition, the term "toughest wrinkle" does not adequately specify the approved indication
for use and misleadingly suggests that Botox Cosmetic is for use in all tough wrinkles.
Please immediately cease distribution of these, and similarly worded, materials and revise
these statements to clearly emphasize the temporary duration of this product and to
appropriately identify the approved indication for use, e.g. "those tough lines between
your eyebrows."

"Is BOTOX® Cosmetic right for you? If doing all you can to look your best is important
to you, Botox® Cosmetic may be for you." These statements in the Patient Brochure
(Tab A) are misleading because they fail to state that the product is indicated for patients
from 18 to 65 years of age. It is not until several pages later in the brochure that the
approved age range is presented to the reader. Please revise this, and all similar
presentations, at the time of your next printing to accurately and clearly define the
approved population when discussing "Is BOTOX® Cosmetic …right for you?"

EXHIBIT E
PAGE 37

Page 2  Mr. Kresel

The dilution table on the physician page of your website, www.botoxcosmetic.net, (Tab
B) listing the amount of diluents to be added to the lyophilized vial of BOTOX®
Cosmetic and the resulting dose in units per 0.1mL is misleading. The chart promotes
four other dilutions and doses that are not approved for the glabellar lines indication for
BOTOX® Cosmetic, which could confuse the physician and/or promote off-label use.
Please immediately revise this chart to only include the approved dilution scheme. In
addition, please revise the statement, "Recommended dose is 4 units at each of the 5
injection sites," to "recommended dose is 4.0 units per 0.1 mL at each of the 5 injection
sites for a total treatment dose of 20 units in 0.5mL."

"So you can frown, smile, or look surprised—without the furrows, creases, and
wrinkles." This and similar quotes were identified in your Patient Brochure, Quick
Reference Guide, and Patient Education Video (Tabs A, C, and D). These statements do
not adequately identify the approved indication for use and are misleading to the reader.
Please revise this, and similar, statements to appropriately identify the approved
indication for use, e.g. "…so you can frown, …, and wrinkles between your eyebrows."

**Violative Reminder Advertisements:**

The "WOW" DTC television (TV) reminder advertisements (ads), transcripts in Tab E,
are in violation of 21 CFR 202.1(e)(2)(i), regarding reminder advertisements. These ads,
which 1) focus attention on complexion and image, 2) make repeated references to age,
and 3) make the statement, "Ask your dermatologist or plastic surgeon about BOTOX
Cosmetic" include the indication for use of the product. These examples strongly suggest
that the product is intended to treat the signs of aging or glabellar lines.

Allergan should immediately stop all broadcasts of these ads and all other promotional
activities for Botox Cosmetic that contain the same or similar presentations until such
time that you have revised these, and all other relevant, pieces to comply with the
applicable regulations and have submitted them to FDA.

This is not intended to be an all-inclusive list of deficiencies associated with your
promotion of the above product. It is your responsibility to ensure that all materials
distributed within the United States are in conformance with each requirement of the Act
and applicable regulations.

You should respond in writing within ten days of the date of this letter. Your response
should include a statement confirming that the requested items were immediately
discontinued, of your intent to comply with each recommendation above, a list of all
similarly violative materials, and a description of the method for discontinuation and the
discontinuation date.

Your response should be directed by facsimile, to 301-827-3528, or in writing to Mr.
Glenn N. Byrd, Chief, APLB, at the address listed on the following page. Should you

Page 3  Mr. Kresel

have any questions or concerns involving this matter, please contact Ms. Maryann Gallagher, Regulatory Review Officer at 301-827-3028.

Center for Biologics Evaluation and Research
Office of Compliance and Biologics Quality
Division of Case Management
Advertising and Promotional Labeling Branch, HFM-602
1401 Rockville Pike, 200S
Rockville, MD  20852-1448

Sincerely,

*Kathleen M Lewis*

for Mary A. Malarkey
Director, Division of Case Management
Office of Compliance and Biologics Quality
Center for Biologics Evaluation
    and Research

Enclosures

cc: Mr. David Garbe

EXHIBIT E
PAGE 39

# Exhibit F

 **U.S. Department of Health & Human Services**

 **U.S. Food and Drug Administration**

Home > Inspections, Compliance, Enforcement, and Criminal Investigations > Enforcement Actions > Warning Letters

## Inspections, Compliance, Enforcement, and Criminal Investigations

### Allergan, Inc. 23-Jun-03



Public Health Service
Food and Drug Administration

Center for Biologics Evaluation
and Research
1401 Rockville Pike
Rockville MD 20852 1448

CBER 03 012

VIA FACSIMILE AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED

WARNING LETTER

Mr. Peter A. Kresel
Allergan, Inc.
2525 Dupont Drive
Irvine, CA 92713 9534

Dear Mr. Kresel:

June 23, 2003

This Warning Letter objects to Allergan, Inc.'s dissemination of promotional materials for the marketing of BOTOX® COSMETIC Botulinum Toxin Type A. Specifically, we refer to three journal advertisements for BOTOX® COSMETIC titled, "People Like You" (BTXC142) and (BTXC140) and "We promised to grow old together, not look old together" (BTXC141) that have been disseminated in May and June 2003. The Advertising and Promotional Labeling Branch (APLB) in the Food and Drug Administration's (FDA's) Office of Compliance and Biologics Quality has reviewed these advertisements and has concluded that they are in violation of Section 502(n) of the Federal Food, Drug and Cosmetic Act (the "Act") and its implementing regulations.

The agency has concluded that your journal advertisements are false and/or misleading because they falsely identify your product as a cosmetic treatment, fail to reveal material facts about the product's use, and minimize the risk information presented.

Moreover, we remind you that APLB previously objected, in an untitled letter dated September 5, 2002, to your dissemination of promotional materials for BOTOX® COSMETIC that failed to appropriately communicate the approved indication for use.

We are very concerned that by continuing to promote BOTOX® COSMETIC in a false and misleading manner these materials are raising significant public health concerns.

**Background**

Botulinum Toxin Type A is a drug under section 201(g) of the Food, Drug, and Cosmetic Act (the Act) [21 U.S.C.§ 321(g)] and a biologic, as defined in section 351(i) of the Public Health Service Act, (PHS Act) [42 U.S.C..§ 262]. On December 9, 1991, BOTOX® was approved for the treatment of cervical dystonia in adults to decrease the severity of abnormal head position and neck pain associated with cervical dystonia and the treatment of strabismus and blepharospasm associated with dystonia. On April 12, 2002, a supplement to the Botulinum Toxin Type A license application was approved for treatment of glabellular lines. Under this approval, Botulinum Toxin Type A is marketed and labeled for this new indication as BOTOX® COSMETIC.

**Misbranding Your Product**

Your advertisements misbrand your product by claiming that it is a cosmetic treatment, e.g., "More than half a million people have already been wowed by BOTOX® COSMETIC, America's most popular cosmetic treatment [emphasis added]". Your product is a drug as defined in section 201(g) of The Act and a biologic, as defined in section 351(i) of the PHS Act. Your advertisement and promotion of BOTOX® COSMETIC as a cosmetic treatment minimizes the risks associated with the use of this biological drug.

**Overbroadening of Indication**

Your advertisements misleadingly suggest that this drug is effective, for conditions beyond those that have been approved by the Food and Drug Administration.

The advertisements include the claims, "FDA approved for the temporary treatment of frown line in people aged 18 to 65" and the phrases: "cause frown lines to form," and, "... the appearance of frown lines."

BOTOX® COSMETIC is not approved for the treatment of "frown lines." The approved indication for use is:
"BOTOX® COSMETIC is indicated for the temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients::; 65 years of age."

EXHIBIT F
PAGE 40

In our previous untitled letter of September 5, 2002, FDA advised Allergan about the use of the correct indication statement. We stated:

"In addition, the term "toughest wrinkle" does not adequately specify the approved indication for use and misleadingly suggests that BOTOX® Cosmetic is for use in all tough wrinkles. Please immediately cease distribution of these and similarly worded, materials and revise these statements... to appropriately identify the approved indication for use. .."

Allergan's response on October 18, 2002,

"As requested by the Agency, this revision will be made in subsequentlydistributed versions of this guide. It has already been revised on the BOTOX Cosmetic.net website."

Allergan continues to promote BOTOX® COSMETIC in a way that misrepresents the approved indications.

**Minimization of risk information**

The addition of the statement, ". ..if any occur. ..," to your fair balance statement minimizes important risks associated with the use of BOTOX® COSMETIC. In the absence of the presentation of more detailed data associated with the side effects that occur with this biological drug, the inclusion of this terminology minimizes the fact that adverse events do occur. In fact, the clinical trials supporting approval of the glabellar lines indication demonstrated that almost 44% of patients experienced some adverse event. The package insert states:

"In clinical trials of BOTOX® COSMETIC the most frequently reported adverse events following injection of BOTOX® COSMETIC were headache, respiratory infection, flu syndrome, blepharoptosis and nausea." "Adverse events of any cause [randomized, multi center, placebo controlled studies] were reported for 177 subjects treated (43.7%) N=405 and 54 placebo treated subjects (41.5%) N= 130." In addition, the package insert includes the following: "In the open label, repeat injection study, ...adverse events of any type were reported for 49.1% (183/373) of subjects overall."

The statement, ". ..if any occur...," minimizes the data from the clinical trials which documented that almost one half of all BOTOX® COSMETIC subjects exhibited adverse events.

**Conclusions and Requested Actions**

You have disseminated promotional journal advertisements that:

1. fail to disclose that BOTOX® COSMETIC is a biological drug,

2. omit important limitations on the indicated use of the product, and

3. minimize important risk information.

We request that you immediately cease dissemination of these, and all promotional materials that contain the same or similar violations outlined in this letter. You should provide a detailed response to the issues raised in this Warning Letter that includes:

1) Your agreement to immediately cease the dissemination of these advertisements in the magazines and on the your website, and all promotional materials now, and in the future, that contain the same or similar violations outlined in this letter.

2) Providing a plan of action to disseminate accurate and complete corrective information to the audience(s) to which you have disseminated the misleading messages. Any plan must include a specific timeline for implementation.

3) A written statement of your intent to immediately comply with the above requests.

Please respond in writing to APLB within 10 days of the date of this letter, of your intent to comply with APLB's request. If you have any questions or comments, please contact Glenn N. Byrd, MBA, RAC, Chief, APLB, or Maryann Gallagher, by facsimile at 301 827 3528, or at the address listed below.

We remind you that only written communications are considered official. Failure to respond to this letter may result in regulatory action, including seizure or injunction, without further notice.

Food and Drug Administration
Center for Biologics Evaluation and Research
Office of Compliance and Biologics Quality, Division of Case Management
Advertising and Promotional Labeling Branch, HFM 602
1401 Rockville Pike, 200S
Rockville, MD 20852 1448

Sincerely,

/s/

Steven A. Masiello

Director, Office of Compliance and Biologics Quality
Center for Biologics Evaluation and Research

---

Links on this page:

EXHIBIT F
PAGE 41

# Exhibit G



 **U.S. Food and Drug Administration**

Home > Inspections, Compliance, Enforcement, and Criminal Investigations > Enforcement Actions > Warning Letters

## Inspections, Compliance, Enforcement, and Criminal Investigations

**Allergan, Inc. 06-Sep-05**

 **Department of Health and Human Services**

Public Health Service
Food and Drug Administration

Rockville, MD 20857

TRANSMITTED BY FACSIMILE
David E.I. Pyott
President and Chief Executive Officer
Allergan, Inc.
PO Box 19534
Irvine, CA 92623 9534
**RE : NDA # 21-275**
**Lumigan® (bimatoprost ophthalmic solution) 0.03%**
**MACMIS ID # 13256**

WARNING LETTER

Dear Mr. Pyott:

The Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed a sales aid (4942236) for Lumigan© (bimatoprost ophthalmic solution) submitted by Allergan, Inc. (Allergan) under cover of Form FDA 2253. The sales aid is false or misleading because it presents unsubstantiated superiority claims and thus misbrands the drug in violation of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. 352 (a) and 321(n).

Moreover, DDMAC had previously objected, in an untitled letter dated March 26, 2001, to the dissemination of a "Dear Doctor" letter that contained unsubstantiated superiority claims for Lumigan. We are concerned that you are continuing to promote Lumigan in a violative manner.

**Background**

According to the approved product labeling (PI):

LUMIGAN® (bimatoprost ophthalmic solution) 0.03% is indicated for the reduction of elevated intraocular pressure (IOP) in patients with open angle glaucoma or ocular hypertension who are intolerant of other intraocular pressure lowering medications or insufficiently responsive (failed to achieve target IOP determined after multiple measurements over time) to another intraocular pressure lowering medication.

According to the PI, Lumigan is associated with several risks, including the following bolded Warning and other Warnings [original emphasis]:

**LUMIGAN® (bimatoprost ophthalmic solution) 0.03% has been reported to cause changes to pigmented tissues. These reports include increased pigmentation and growth of eyelashes and increased pigmentation of the iris and periorbital tissue (eyelid). These changes may be permanent.**

LUMIGAN® may gradually change eye color, increasing the amount of brown pigment in the iris by increasing the number of melanosomes (pigment granules) in melanocytes. The longterm effects on the melanocytes and the consequences of potential injury to the melanocytes and/or deposition of pigment granules to other areas of the eye are currently unknown. The change in iris color occurs slowly and may not be noticeable for several months to years. Patients should be informed of the possibility of iris color change.

Eyelid skin darkening has also been reported in association with the use of LUMIGAN®.

LUMIGAN® may gradually change eyelashes ; these changes include increased length, thickness, pigmentation., and number of lashes.

Patients who are expected to receive treatment in only one eye should be informed about the potential for increased brown pigmentation of the iris, periorbital tissue, and eyelashes in the treated eye and thus, heterochromia between the eyes. They should also be advised of the potential for a disparity between the eyes in length, thickness, and/or number of eyelashes.

Pertinent precautions in the PI include the risk of "bacterial keratitis associated with the use of multiple dose containers of topical ophthalmic products." In addition, Lumigan should be used with caution in patients with active intraocular inflammation, aphakic patients, pseudophakic patients with a torn posterior lens capsule and in patients with known risk factors for macular edema.

**Unsubstantiated Superiority Claims**

The sales aid presents the following false or misleading claims regarding the superiority of Lumigan over competitor products:

- "Weight of evidence proves LUMIGAN® produces lowest mean IOP. For example . . .vs beta blockers . . . vs travoprost. . . vs latanoprost . . . vs dual therapy, 1 12"

- "When good enough' isn't low enough, turn to the proven performance of LUMIGAN®"

As discussed in more detail below, these claims are misleading because they suggest Lumigan is superior in its effectiveness to other medications used for reducing IOP when this has not been demonstrated by substantial evidence or substantial clinical experience. Furthermore, the claim that Lumigan is superior to "dual therapy" is misleading because it implies that Lumigan is better than combination ophthalmic therapy, such as a beta blocker/prostaglandin combination, when this, too, has not been demonstrated by substantial evidence or substantial clinical experience.

The sales aid also contains the following claims which misleadingly imply that Lumigan is a superior choice because it is preferred by patients.

EXHIBIT G
PAGE 42

"Vast majority of patients want lower IOP and will adhere to therapy to get it"

- "92% of patients prefer medication that lowers IOP the most 1₁[1]" [reference 1 below]

These claims contribute to the misleading impression created by the piece as a whole that Lumigan is superior to other medications that reduce elevated IOP. When considered in conjunction with the numerous superiority claims presented throughout the piece, the above claims imply that patients will adhere to and prefer Lumigan over other products because of its purported superior ability to lower IOP. Furthermore, these claims are misleading because they are not supported by substantial evidence. No references were cited to support the first claim. The reference cited (1)[2] for the second claim is not considered substantial evidence; rather it is a survey (Glaucoma Research Foundation Patient Survey) that included one question regarding a hypothetical situation assuming that all treatment options for glaucoma have the same safety profile and dosing requirements, which is not the case in actual use. Patient preference encompasses multiple aspects of patient experiences and cannot be adequately measured by a single item in a survey; rather, patient preference claims require well designed and controlled studies using validated and well developed instruments that can evaluate patient preference.

Finally, the claim "LUMIGAN® patients refill their prescription at the same rate as patients on other lipid therapies 16³[3]" [reference 2 below] is misleading because it suggests that Lumigan therapy results in equivalent patient adherence as "other lipid therapies" when this has not been demonstrated by substantial evidence. The reference cited Z to support this claim is a medical and pharmacy database study poster presentation . The study protocol is inadequate to support an adherence claim because the protocol required that the patients stay on the same medication for 12 months, which essentially excludes patients who discontinued therapy for reasons such as lack of efficacy or side effects . There are many factors that affect patient adherence, including side effects, effectiveness, dosing schedule, dosage form, and cost. An adherence claim must be supported by substantial evidence taking into account these types of determinants of patient adherence. This refill database study does not support an adherence claim for Lumigan because it did not take these factors into account and does not reflect adherence rates that are experienced with actual real world use.

Misleading Superiority to Beta Blockers

The sales aid contains the following claims and presentations comparing Lumigan to beta blockers:

- "LUMIGAN® produces lowest mean IOP. . .vs beta blockers 1₁4[4]" [references 3 5, and 9 below]

- Graph titled "Effects of LUMIGAN® replacement of beta blocker therapy on mean IOP 3[5]," depicting that Lumigan provides a "4.4 mm Hg additional mean reduction" at month 2. [reference 5 below]

These claims are misleading because they imply Lumigan is superior to beta blockers when this has not been demonstrated by substantial evidence or substantial clinical experience. The studies cited, Higginbotham et al.,3[6] Cohen et al.,4[7] and Walters et al.,9[8] demonstrated changes in Iop that are not considered clinically significant. Differences of 2 3 mm Hg are not considered clinically significant because such differences are commonly seen in clinical trials without a change in therapy. Further, the applanation tonometer is calibrated in 2 mm Hg increments . Since 2 mm Hg is the smallest change the instrument can detect, physicians are unlikely to alter patient therapy based on a 2 mm Hg change in Iop.

Further, the study cited 5[9] in support of the graph depicting a "4.4 mm Hg additional mean reduction" is not considered a well controlled study because it is an open label, single arm, non concurrently controlled study in which Lumigan was substituted for timolol . This design is sometimes referred to as a "baseline controlled" study, but, in actuality, it is uncontrolled because there is no comparison with a control group except insofar as one believes the Iop would have remained the same once patients entered the study. There is, however, no way to know whether the Iop would have remained the same. Compliance could be different (better) in the test drug (Lumigan) phase of the study because of different patient or investigator expectations or biased observations. The proper design for such a trial is randomization to Lumigan or timolol drops in a blinded study. Open label studies are not appropriate for studying Iop changes because they do not include measures to minimize bias. Iop readings themselves may be biased and should be carried out without knowledge of treatment assignment. Therefore, the study cited does not constitute substantial evidence to support your claim because it was not adequate and well controlled.

In addition, promotional materials are misleading if they fail to reveal facts that are material in light of the claims made in the piece. For comparative claims, it is misleading to compare the efficacy of two products with dissimilar indications without revealing the differences in indication. Lumigan is indicated as second line therapy due to safety concerns, whereas timolol, the beta blocker the sales aid compares Lumigan to, is indicated as first line therapy. When comparing first line therapies to second line therapies it is important to reveal this difference because without doing so, you misleadingly suggest that the second line therapy is superior to the first and should be used before the first line therapy. This difference is not revealed in the sales aid.

Misleading Superiority to Travoprost

The sales aid contains the following claims and presentations comparing Lumigan to travoprost:

- "LUMIGAN® produces lowest mean IOP . . .vs travoprosts s 7[10]" [references 6 8 below]

  ○ "16% to 29% greater mean IOP reduction 5[11]" [reference 6 below]

- "In a randomized, investigator masked, 6 month clinical trial, LUMIGAN® (n = 14) provided greater mean IOP reduction than travoprost (n = 12)5[12]" [reference 6 below]

- Graph titled "LUMIGAN® vs travoprost: diurnal mean IOP at month 3" depicting a "lower mean IOP all day long 7[13]" [reference 8 below]

These claims are misleading because they imply Lumigan is superior to travoprost when this has not been demonstrated by substantial evidence or substantial clinical experience. The references cited in the sales aid are not sufficient to support these claims. First, Cantor et al.,6[14] the 6 month study comparing Lumigan and travoprost, showed no statistically significant difference in mean IOP lowering. While the sales aid does contain the statement "Differences not statistically significant due to small sample size"; this statement is false (the reason for lack of statistical significance cannot possibly be known) and, in any case, does not correct the overwhelmingly misleading impression that Lumigan is superior to travoprost. Second, Mundorf et al.,7[15] is a poster presentation and contains inadequate information regarding investigative methods, masking procedure, patient populations, washout periods, applanation tonometry protocol, and statistical analysis. If you have additional information, please submit it to FDA for review. Lastly, Parrish et al., 8[16] showed that Lumigan and travoprost were not statistically, different in their ability to reduce IOP.

Misleading Superiority to Latanoprost

The sales aid contains the following claims and presentations comparing Lumigan to latanoprost:

- "LUMIGAN® produces lowest mean IOP . . .vs latanoprosta 4[17], 7 11[18] [references 8 13 below]

  ○ "27% to 42% greater mean IOP reduction 8[19],. [reference 11 below]

- "In a randomized, investigator masked, 6 month clinical trial, LUMIGAN® (n=133) provided statistically significantly greater mean IOP

reduction than latanoprost (n=136) at every time point, every study visit 8[20]" [reference 11 below]

- " Graph titled "Effects of LUMIGAN® replacement of latanoprost therapy on mean IOP" demonstrating a "3.6 mm Hg additional mean reduction 9[21]" [reference 12 below]

These claims are misleading because they imply Lumigan is superior to latanoprost when this has not been demonstrated by substantial evidence or substantial clinical experience. The references cited in the sales aid are not sufficient to support these claims. The studies cited, Parrish et al., 8[22] Walters et al.,9[23] and Dubiner et al.,10[24] demonstrated no statistically significant difference between Lumigan and latanoprost in their ability lower IOP. Furthermore, the cited studies, Noecker et al ., 11 [25]Bournias et al ., 12[26] and Gandolfi et al., 13[27] are not considered substantial evidence. The study by Noecker et al. 11[28] did not take adequate measures to control for bias. For example, the statistical analysis did not adjust for multiple comparisons. If multiple comparisons were accounted for, the IOP reduction would not have been statistically significant at "every time point, every study visit." Bournias et al. 12[29] is an open label, replacement trial in which Lumigan was used alone or in combination with other glaucoma medications at the physician's discretion. As mentioned previously, such a design is sometimes referred to as a "baseline controlled" study, but, in actuality is uncontrolled because there is no comparison with a control group except insofar as one believes the IOP would have remained the same once patients entered the study. There is, however no way to know whether that would have been the case. Compliance could be different (better) in the test drug (Lumigan) phase of the study because of different patient or investigator expectations or biased observations. The proper design for such a trial is randomization to Lumigan or latanoprost drops in a blinded study. Open label studies are not appropriate for studying IOP changes because they do not include measures to minimize bias. IOP readings themselves may be biased and should be carried out without knowledge of treatment assignment. Finally, the study by Gandolfi et al. 13[30] is not considered substantial evidence because it utilizes an unacceptable primary efficacy variable. Measuring IOP at only one time point (8 AM) at all study visits is not considered an acceptable primary efficacy variable because it does not capture the variations of IOP throughout the day.

In addition, as stated above, promotional materials are misleading if they fail to reveal facts that are material in light of the claims made in the piece. It is misleading to compare the effectiveness of two products with dissimilar indications without revealing the differences in indication. Latanoprost is indicated as first line therapy., while Lumigan is indicated as second line therapy due to safety concerns, a fact that is not revealed. When comparing first line therapies to second line therapies it is important to reveal this difference because without doing so, you misleadingly suggest that the second  line therapy is superior to the first and should be used before the first line therapy.

Misleading Superiority to Dual Therapy

The sales aid contains the following claims and presentations comparing Lumigan to dual therapy:

- "LUMIGAN® produces lowest mean IOP . . . . vs dual therapy 9[31], 12[32] " [reference 12, 14 below]

- "14% to 27% great mean IOP reduction than Cosopt®12[33]" [reference 14 below]

- " "In a randomized, investigator masked, 3 month clinical trial, LUMIGAN® (n=90) provided statistically significantly greater mean IOP reduction than Cosopt® (n=87) at 3 out of the 4 measured time points 12[34], [reference 14 below]

- " Graph titled "Effects of LUMIGAN® replacement of dual therapy on mean IOP" for "any dual therapy to LUMIGAN" monotherapy" [emphasis added] depicting a "3.5 mm Hg additional mean reduction 13[35]" [reference 15 below]

These claims are misleading because they imply Lumigan is superior to any dual therapy, including Cosopt, when this has not been demonstrated by substantial evidence or substantial clinical experience. The references cited in the sales aid are not sufficient to support these claims. The study by Bournias et al.12[36] is an open label, replacement trial in which Lumigan was used alone or in combination with other glaucoma medications at the physician's discretion. As explained above, such a design is sometimes referred to as a "baseline controlled" study, but, in actuality it is uncontrolled because there is no comparison with a control group except insofar as one believes the IOP would have remained the same once patients entered the study. The proper design for such a trial is randomization to Lumigan or dual therapy in a blinded study. Furthermore, while the study by Coleman et al. 14[37] indicates that Lumigan produces lower IOP than timolol/dorzolamide (Cosopt), these differences are not considered clinically significant . Differences of 2 3 mm IOP are not considered clinically significant because such differences are commonly seen in clinical trials without a change in therapy. Further, the applanation tonometer is calibrated in 2 mm. Hg increments. Since 2 mm Hg is the smallest change the instrument can detect, physicians are unlikely to alter patient therapy based on a 2 mm Hg change in IOP. Finally, the data on file 15[38] referenced contain insufficient information regarding the study design and methodology to be considered substantial evidence.

**Conclusion and Requested Action**

For the reasons discussed above, the sales aid presents unsubstantiated superiority claims for Lumigan. Accordingly, the sales aid misbrands Lumigan in violation of the Act. See 21 U.S.C. 352 (a) and 321 (n).

DDMAC requests that Allergan immediately cease the dissemination of violative promotional materials for Lumigan such as those described above. Please submit a written response to this letter on or before September 20, 2005, stating whether you intend to comply with this request, listing all violative promotional materials for Lumigan such as those described above, and explaining your plan for discontinuing use of such materials. Because the violations described above are serious, we request, further, that your submission include a comprehensive plan of action to disseminate truthful, non misleading, and complete corrective messages about the issues discussed in this letter to the audience(s) that received the violative promotional materials. Please direct your response to me at the Food and Drug Administration, Center for Drug Evaluation and Research, Division of Drug Marketing, Advertising, and Communications, 5901 B Ammendale Road, Beltsville, MD 20705 1266, facsimile at 301 796 9878. In all future correspondence regarding this matter, please refer to MACMIS ID # 13256 In addition to the NDA number. We remind you that only written communications are considered official.

The violations discussed in this letter do not necessarily constitute an exhaustive list. It is your responsibility to ensure that your promotional materials for Lumigari comply with each applicable requirement of the Act and FDA implementing regulations. Failure to correct the violations discussed above may result in FDA regulatory action, including seizure or injunction, without further notice.

1 Glaucoma Research Foundation . Glaucoma Patient Survey. August 2003.

2 Kline S, Walt J, Carlson A, Trygstad G. Patients' persistence and adherence with glaucoma therapy; a longitudinal retrospective database analysis of ophthalmic lipids . Poster presented at : the Annual Meeting of the Association of Research in Vision and Ophthalmology; April 25 29, 2004; Fort Lauderdale, Fla.

3 Higginbotham EJ, Schuman JS, Goldberg I, et al ., for the Bimatoprost Study Groups 1 and 2 . One year, randomized study comparing bimatoprost and timolol in glaucoma and ocular hypertension . Arch Ophthalmol. 2002;120(10):1286 1293.

4 Cohen JS, Gross RL, Cheetham JK, VanDenburgh AM, Bernstein P, Whitcup, SM . Two year double masked comparison of bimatoprost with timolol in patients with glaucoma or ocular hypertension . Surv Ophthalmol. 2004;49(2 suppl 1) :S45  S52.

5 Lee D, Gross R, Mundorf T, Severin T, for the Lumigan® Early Experience Study. Efficacy and safety of bimatoprost 0.03% (Lumigan) in a large scale, open label clinical trial. Poster presented at : the annual Meeting of the Association for Research in Vision and Ophthalmology; May 5 10, 2002; Fort Lauderdale, Fla.

6 Cantor LB, WuDunn D, Cortes A, et al . Ocular hypotensive efficacy of bimatoprost 0.03% versus travoprost 0.004% in patients with glaucoma or

ocular hypertension . Surv Ophthalmol. 2004;49(2 supp 1) :S12 S18.

7 Mundorf T, Noecker R, Dirks M, Earl ML. A multicenter, randomized, investigator masked comparison of the efficacy of bimatoprost 0.03% versus travoprost 0.004% in African Americans with glaucoma or ocular hypertension . Poster presented at : the Annual Meeting of the American Glaucoma Society; March 4 7, 2004: Sarasota, Fla. 8

8 Parrish RK, Palmberg P, Sheu W P, for the XLT Study Group. A comparison of latanoprost, bimatoprost, and travoprost in patients with elevated intraocular pressure: a 12 week, randomized, masked evaluator, multicenter study. Am J Ophthalmo/. 2003;135(5):688 703 .

9 Walters TR, DuBiner HB, Carpenter SP, Khan B, VanDenburgh AM, for the Bimatoprost Circadian IOP Study Group. 24 hour IOP control with once daily bimatoprost, timolol gel forming solution, or latanoprost: a 1 month, randomized, comparative clinical trial. Surv Ophthalmol. 2004; 49 (2 suppl 1) :S26 S35.

10 Dubiner H, Cooke D, Dirks M, Stewart WC, VanDenburgh AM, Felix C. Efficacy and safety of bimatoprost in patients with elevated intraocular pressure : a 30 day comparison with latanoprost. Surv Ophthalmol. 2001 ;45(suppl 4):S353 S360.

11 Noecker RS, Dirks MS, Choplin NT, et al . A six month randomized clinical trial comparing the intraocular pressure  lowering efficacy of bimatoprost and latanoprost in patients with ocular hypertension or glaucoma . Am J Ophthalmol. 2003 ;135(1) :55 63.

12 Bournias T, Lee D, Gross R, Mattox C. Ocular hypotensive efficacy of bimatoprost when used as a replacement for latanoprost in the treatment of glaucoma and ocular hypertension . J Ocul Pharmacol Ther. 2003;19(3) :193 203.

13 Gandolfi S, Simmons ST, Sturm R, et al . Three month comparison of bimatoprost and latanoprost in patients with glaucoma and ocular hypertension . Adrr Ther. 2001;18(3) :110 121 .

14 Coleman AL, Lerner SF, Bernstein P, Whitcup SM, for the Lumigan/Cosopt Study Group. A 3 month randomized controlled trial of bimatoprost (LUMIGAN) versus combined timolol and dorzolamide (Cosopt) in patients with glaucoma or ocular hypertension . Ophthalmology. 2003;110 (12) :2362 2368.

15 Data on file, Allergan, Inc. EPIC results.

Sincerely,
{See appended electronic signature page}
Thomas W. Abrams, RPh, MBA
Director
Division of Drug Marketing, Advertising, and Communications

---

This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.
/s/

Thomas Abrams
9/6/2005 04 :59 :49 :PM

---

Links on this page:

1.  http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#14
2.  http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
3.  http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#14
4.  http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
5.  http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
6.  http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
7.  http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
8.  http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
9.  http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
10. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
11. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
12. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
13. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
14. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
15. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
16. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
17. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
18. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#14
19. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
20. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
21. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#14
22. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1
23. http://www.fda.govfile:/U:/0 WORKAREA/4 VBIS/Site Migration/WL/archive/2 TXT/g5470d.txt#1

EXHIBIT G
PAGE 45

24.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

25.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

26.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

27.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

28.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

29.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

30.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

31.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

32.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

33.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

34.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

35.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

36.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

37.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

38.  http://www.fda.govfile:/U:/0  WORKAREA/4  VBIS/Site  Migration/WL/archive/2  TXT/g5470d.txt#14

39.  http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/ViewingFiles/default.htm

40.  http://www.fda.gov/default.htm

41.  http://www.fda.gov/AboutFDA/default.htm

42.  http://www.fda.gov/AboutFDA/ContactFDA/default.htm

43.  http://www.fda.gov/SiteIndex/default.htm

44.  http://www.fda.gov/SiteMap/default.htm

45.  http://www.fda.gov/AboutFDA/AboutThisWebsite/default.htm

46.  http://www.fda.gov/AboutFDA/Transparency/default.htm

47.  http://www.fda.gov/RegulatoryInformation/FOI/default.htm

48.  http://www.fda.gov/AboutFDA/AboutThisWebsite/Accessibility/default.htm

49.  http://www.fda.gov/AboutFDA/WorkingatFDA/NoFearAct/default.htm

50.  http://www.fda.gov/CombinationProducts/default.htm

51.  http://www.fda.gov/AdvisoryCommittees/default.htm

52.  http://www.fda.gov/ScienceResearch/default.htm

53.  http://www.fda.gov/RegulatoryInformation/default.htm

54.  http://www.fda.gov/Safety/default.htm

55.  http://www.fda.gov/EmergencyPreparedness/default.htm

56.  http://www.fda.gov/InternationalPrograms/default.htm

57.  http://www.fda.gov/NewsEvents/default.htm

58.  http://www.fda.gov/Training/default.htm

59.  http://www.fda.gov/ICECI/default.htm

60.  http://www.fda.gov/ForFederalStateandLocalOfficials/default.htm

61.  http://www.fda.gov/ForConsumers/default.htm

62.  http://www.fda.gov/ForIndustry/default.htm

63.  http://www.fda.gov/ForHealthProfessionals/default.htm

# Exhibit H



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

                                                            Food and Drug Administration
                                                            Silver Spring, MD  20993

TRANSMITTED BY FACSIMILE

David E.I. Pyott
Chairman of the Board and Chief Executive Officer
Allergan, Inc.
2525 Dupont Drive
Irvine, CA 92612

RE:    NDA# 21-794
       ACZONE® (dapsone) Gel, 5%
       MACMIS ID #17769

# WARNING LETTER

Dear Mr. Pyott:

The Division of Drug Marketing, Advertising, and Communications (DDMAC) of the U.S. Food
and Drug Administration (FDA) has reviewed a journal advertisement (APC021052008) for
ACZONE® (dapsone) Gel, 5% (ACZONE) submitted under cover of Form FDA-2253 by
Allergan, Inc.  This journal advertisement is false or misleading because it overstates the
efficacy of ACZONE, and omits material facts and important risk information associated with
the use of the product.  Therefore, this piece misbrands ACZONE in violation of the Federal
Food, Drug, and Cosmetic Act (Act), 21 U.S.C. 352(n) & 321(n), and FDA implementing
regulations.  21 CFR 202.1(e)(5); (e)(6)(i); (e)(6)(vi) & (e)(7)(iii).

**Background**

According to the INDICATIONS AND USAGE section of its FDA-approved product labeling
(PI), ACZONE Gel, 5%, is indicated "for the topical treatment of acne vulgaris."

The DRUG INTERACTIONS section of the PI states (in relevant part):

> Topical application of **ACZONE®** Gel followed by benzoyl peroxide in subjects with
> acne vulgaris resulted in a temporary local yellow or orange discoloration of the skin
> and facial hair (reported by 7 out of 95 subjects in a clinical study) with resolution in 4
> to 57 days.

In addition, the CLINICAL STUDIES section of the PI presents efficacy results from the two
randomized, double blind, vehicle controlled, clinical studies conducted to evaluate ACZONE
(in pertinent part):

> Efficacy was evaluated in terms of success on the Global Acne Assessment Score (no
> or minimal acne) and in the percent reduction in inflammatory, non-inflammatory, and
> total lesions.

                                                            EXHIBIT H
                                                            PAGE 47

The success rates on the Global Acne Assessment Score (no or minimal acne) at Week 12 are presented in Table 4.

Table 4 - Success (No or Minimal Acne) on the Global Acne Assessment Score at Week 12

|  | Study 1* | | Study 2* | |
|---|---|---|---|---|
|  | ACZONE N=699 | Vehicle N=687 | ACZONE N=729 | Vehicle N=738 |
| Subjects with No or Minimal Acne | 291 (42%) | 223 (32%) | 253 (35%) | 206 (28%) |

*Analysis excludes subjects classified with minimal acne at baseline

Table 5 presents the mean percent reduction in inflammatory, non-inflammatory, and total lesions from baseline to Week 12.

Table 5 - Percent Reduction in Lesions from Baseline to Week 12

|  | Study 1 | | Study 2 | |
|---|---|---|---|---|
|  | ACZONE N=745 | Vehicle N=740 | ACZONE N=761 | Vehicle N=764 |
| Inflammatory | 46% | 42% | 48% | 40% |
| Non-Inflammatory | 31% | 24% | 30% | 21% |
| Total | 38% | 32% | 37% | 29% |

**Overstatement of Efficacy/Omission of Material Facts**

Promotional materials are misleading if they represent or suggest that a drug is more effective than has been demonstrated by substantial evidence or substantial clinical experience. The journal ad claims that "[ACZONE] **Works fast** 24% reduction in inflammatory lesions at 2 weeks[1]" (emphasis in original). **This claim is a complete misrepresentation of the results of the Draelos study.** The wording clearly claims a substantial effect of ACZONE at 2 weeks. That article, which presents combined data for approximately 3,000 patients from two identically designed studies, did report very small differences between Dapsone gel and the vehicle gel of 7% for total lesions, 8% for non-inflammatory lesions, and 6% for inflammatory lesions at 12 weeks. However, at 2 weeks, the mean percent change in inflammatory lesion count in patients on dapsone gel was 24% and in patients on placebo was 22%, demonstrating an actual effect of 2%, which was not even nominally statistically significant (p=0.052). Furthermore, this finding was one of several possible analyses[2] that could be conducted with the 2 week data and was not pre-specified.

---

[1] Draelos ZD, Carter E, Maloney JM, et al; for the United States/Canada Dapsone Gel Study Group. Two randomized studies demonstrate the efficacy and safety of dapsone gel, 5% for the treatment of acne vulgaris. *J Am Acad Dermatol.* 2007;56(3):439.e1–439.e10.
[2] For example, the difference for non-inflammatory lesions and for combined lesions at 2 weeks was just 1%, which is not close to significant.

David E.I. Pyott                                                                    Page 3
Allergan, Inc.
NDA # 21-794/MACMIS #17769

Thus, this post-hoc analysis of inflammatory lesions cannot possibly be interpreted as
showing a statistically significant result.

Additionally, the journal ad **grossly** overstates the efficacy of the drug by presenting only the
most favorable result for ACZONE and ignoring the placebo response. Specifically, the
journal ad describes the effect of ACZONE on inflammatory lesions as a "48% reduction in
inflammatory lesions at 12 weeks.[1]" In fact, in the Draelos study, the placebo group had a
42% reduction in inflammatory lesions at week 12, for an actual effect of just 6%.

## Omission of Risk Information

Promotional materials are misleading if they fail to reveal facts that are material in light of
the representations made by the materials or with respect to the consequences that may
result from the use of the drug as recommended or suggested by the materials. Although
the journal ad includes information from the WARNING AND PRECAUTIONS and
ADVERSE REACTIONS sections of the PI, it fails to include information from the DRUG
INTERACTIONS section of the PI, which states "Topical application of **ACZONE®** Gel
followed by benzoyl peroxide in subjects with acne vulgaris resulted in a temporary local
yellow or orange discoloration of the skin and facial hair (reported by 7 out of 95 subjects in
a clinical study) with resolution in 4 to 57 days." By omitting this important risk information,
the ad misleadingly suggests that ACZONE is safer than has been demonstrated by
substantial evidence or substantial clinical experience.

## Conclusion and Requested Action

For the reasons discussed above, your professional journal advertisement misbrands
ACZONE in violation of the Act, and FDA's implementing regulations. 21 U.S.C. 352(n) and
321(n), and FDA implementing regulations. 21 CFR 202.1(e)(5); (e)(6)(i); (e)(6)(vi) &
(e)(7)(iii).

DDMAC requests that Allergan, Inc. immediately cease the dissemination of violative
promotional materials for ACZONE such as those described above. Please submit a written
response to this letter on or before August 28, 2009, stating whether you intend to comply
with this request, listing all promotional materials (with the 2253 submission date) in use for
ACZONE as of the date of this letter, identifying which of these materials contain violations
such as those described above, and explaining your plan for discontinuing use of such
violative materials. Because the violations described above are serious, we request, further,
that your submission include a comprehensive plan of action to disseminate truthful, non-
misleading, and complete corrective messages about the issues discussed in this letter to the
audience(s) that received the violative promotional materials. Please direct your response to
me at the Food and Drug Administration, Center for Drug Evaluation and Research, Division
of Drug Marketing, Advertising, and Communications, 5901-B Ammendale Road, Beltsville,
MD 20705-1266, facsimile at 301-847-8444. In all future correspondence regarding this
matter, please refer to MACMIS #17769 in addition to the NDA number. We remind you that
only written communications are considered official.

The violations discussed in this letter do not necessarily constitute an exhaustive list. It is
your responsibility to ensure that your promotional materials for ACZONE comply with each

David E.I. Pyott                                                                    Page 4
Allergan, Inc.
NDA # 21-794/MACMIS #17769

applicable requirement of the Act and FDA implementing regulations.

Failure to correct the violations discussed above may result in FDA regulatory action,
including seizure or injunction, without further notice.

Sincerely,

*(See appended electronic signature page)*

Thomas W. Abrams, RPh, MBA
Director
Division of Drug Marketing,
   Advertising, and Communications

EXHIBIT H
PAGE 50

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

/s/

THOMAS W ABRAMS
08/17/2009

# Exhibit I

Exhibit 10.1

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and the United States Attorney's Office for the Northern District of Georgia and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS"), the TRICARE Management Activity ("TMA"), the United States Office of Personnel Management ("OPM"), the United States Department of Veterans Affairs ("VA"), and Office of Workers' Compensation Programs of the United States Department of Labor ("DOL-OWCP") (collectively "the United States"); Dr. Amy M. Lang, Charles J. Rushin, Cher Beilfuss, Kathleen O'Connor-Masse, and Albert Edward Hallivis (collectively, "Relators"); Allergan, Inc. and Allergan USA, Inc. (referred to individually and collectively as "Allergan"), through their authorized representatives. Collectively, all of the above will be referred to as "the Parties."

## PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

A.        Allergan, Inc. and Allergan USA, Inc. are Delaware corporations headquartered in Irvine, California. At all relevant times herein, Allergan developed, manufactured, distributed, marketed, and sold pharmaceutical products in the United States, including a drug sold under the trade name of Botox® Therapeutic ("Botox®"), which is billed to federal health care programs under HCPCS code J0585.

B.        Relators have filed the following qui tam actions against Allergan captioned as follows (collectively the "Civil Actions"):

(i)        United States ex rel. Amy M. Lang and Charles J. Rushin v. Allergan, Inc., Civ. No. 1:07-cv-1288-WSD (N.D. Ga.) (hereinafter "Civil Action I");

EXHIBIT I
PAGE 52

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

(ii)   United States ex rel. Cher Beilfuss and Kathleen O'Connor-Masse v. Allergan, Inc., Civ. No. 1:08-cv-1883-WSD (N.D. Ga.) (hereinafter "Civil Action II"); and

(iii)   United States ex rel. Albert Edward Hallivis v. Allergan, Inc. a/k/a Allergan USA, Inc., Civ. No. 1:09-cv-3434-WSD (N.D. Ga.) (hereinafter "Civil Action III").

The United States intervened in Civil Action I and Civil Action II on April 2, 2010.

C.   On such date as may be determined by the Court, Allergan, Inc. will enter into a plea of guilty pursuant to Fed. R. Crim. P. 11(c)(1)(C) (the "Plea Agreement") to an information to be filed in United States v. Allergan, Inc., Criminal Action No. [to be assigned] (Northern District of Georgia) (the "Criminal Action") that will allege a violation of Title 21, United States Code, Sections 331(a) and 333(a)(1), a misdemeanor, namely, the introduction into interstate commerce of a misbranded drug, Botox[®], in violation of the Food, Drug and Cosmetic Act.

D.   Allergan has filed a declaratory judgment action pending in the United States District Court for the District of Columbia, captioned Allergan, Inc. v. United States, et al., 1:09-cv-01879 (D.D.C.) (hereinafter, the "D.C. Litigation"). The D.C. Litigation is currently stayed at the joint request of Allergan and the United States.

E.   Allergan has entered or will be entering into separate settlement agreements, described in Paragraph I.b., below (hereinafter referred to as the "Medicaid State Settlement Agreements") with certain states and the District of Columbia in settlement of the Covered Conduct. States with which Allergan executes a Medicaid State Settlement Agreement in the form to which Allergan and the National Association of Medicaid Fraud Control Units ("NAMFCU") Negotiating Team have agreed, or in a form otherwise agreed to by Allergan and an individual State, shall be defined as "Medicaid Participating States."

-2-

EXHIBIT I
PAGE 53

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

F.      The United States alleges that Allergan caused claims for payment for Botox® to be submitted to the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh. The United States further alleges that Allergan caused claims for payment for Botox® to be submitted to the Medicaid Program ("Medicaid"), Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v. The United States further alleges that Allergan caused claims for payment of Botox® to be submitted to the TRICARE program, 10 U.S.C. §§ 1071-1109; the Federal Employees Health Benefits Program ("FEHBP"), 5 U.S.C. §§ 8901-8914; the following DOL-OWCP programs: the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101 et seq.; the Energy Employees Occupational Illness Compensation Program Act ("EEOICPA"), 42 U.S.C. § 7384 et seq.; and the Black Lung Benefits Act ("BLBA"), 30 U.S.C. § 901 et seq.; and caused purchases of Botox® by the VA, 38 U.S.C. §§ 1701-1743 (collectively, the "Other Federal Health Care Programs").

G.      The United States contends that it and the Medicaid Participating States have certain civil claims, as specified in Paragraph 2, below, against Allergan for engaging in the following conduct during the period January 1, 2001 through December 31, 2008 (hereinafter referred to as the "Covered Conduct"):

(i)      Allergan promoted the sale and use of Botox® for uses that were not approved by the Food and Drug Administration as safe and effective (including but not limited to headache, pain, spasticity, and overactive bladder) ("unapproved uses") and promoting the drug for unapproved uses renders the drug misbranded in violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331, et seq. Some of these unapproved uses were not medically accepted indications for which the United States and state Medicaid programs provided coverage for Botox®;

(ii)     Allergan made and/or disseminated unsubstantiated and/or misleading representations or statements that Botox® was safe and effective for some of these unapproved uses;

-3-

EXHIBIT I
PAGE 54

Source: ALLERGAN INC, 8-K, September 01, 2010

    (iii)    Allergan instructed health care professionals to miscode claims for the treatment of headache and pain using inapplicable diagnosis codes (including but not limited to codes for spasm of muscle (ICD-9-CM 728.5), other facial nerve disorders (ICD-9-CM 351.8), spasmodic torticollis (ICD-9-CM 333.83), and torticollis unspecified (ICD-9-CM 723.5)) to ensure payment by Medicare, Medicaid and the Other Federal Health Care Programs; and

    (iv)    Allergan offered and paid illegal remuneration to health care professionals that was intended to induce them to promote and/or prescribe Botox .

As a result of the foregoing conduct, the Government alleges that Allergan caused false or fraudulent claims for Botox[®] to be submitted to, or caused purchases by, Medicare, Medicaid and the Other Federal Health Care Programs.

With respect only to claims for Botox[®] submitted to Medicaid, Medicare and the Other Federal Health Care Programs with diagnosis codes for overactive bladder and neurogenic bladder conditions (ICD-9-CM 788.30, 788.31, 788.32, 788.33, 788.34, and 599.82), the Covered Conduct extends from January 1, 2001 through December 31, 2009.

Notwithstanding Preamble Paragraph G(iii), the Covered Conduct does not include conduct relating to claims for Botox[®] submitted to Medicaid, Medicare and the Other Federal Health Care Programs with the diagnosis codes ICD-9-CM 333.81 (blepharospasm) and ICD-9- CM 705.21, 705.22, and 780.8 (hyperhidrosis).

H.    The United States also contends that it has certain administrative claims against Allergan, as set forth in Paragraphs 4 through 7, below, for engaging in the Covered Conduct.

I.    This Agreement is made in compromise of disputed claims. This Agreement is not an admission of facts or liability by Allergan. With the exception of such admissions that are made in connection with any guilty plea by Allergan in connection with the Criminal Action, Allergan expressly denies the allegations of the United States and the Relators as set forth herein

-4-

EXHIBIT I
PAGE 55

Source: ALLERGAN INC, 8-K September 01, 2010

Powered by Morningstar ® Document Research℠

and in the Civil Actions and denies that it engaged in any wrongful conduct in connection with the Covered Conduct. This Agreement is not a concession by the United States that its claims are not well founded. Neither this Agreement, its execution, nor the performance of any obligation under it, including any payment, nor the fact of any settlement, is intended to be, or shall be understood as, an admission of liability or wrongdoing, or other expression reflecting on the merits of the dispute by Allergan.

     J.     To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, the Parties reach a full and final settlement pursuant to the Terms and Conditions below.

-5-

EXHIBIT I<br/>PAGE 56

## TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.    Allergan agrees to pay to the United States and the Medicaid Participating States, collectively, the sum of Two Hundred and Twenty Five Million Dollars ($225,000,000), plus accrued interest at the rate of 3.5% per annum from January 25, 2010, and continuing until and including the day of payment (the "Settlement Amount"). The Settlement Amount shall constitute a debt immediately due and owing to the United States and the Medicaid Participating States on the Effective Date of this Agreement. This debt shall be discharged by payments to the United States and the Medicaid Participating States, under the following terms and conditions:

(a)    Allergan shall pay to the United States the sum of $210,150,000 plus accrued interest as set forth above ("Federal Settlement Amount"). The Federal Settlement Amount shall be paid by electronic funds transfer pursuant to written instructions from the United States no later than seven (7) business days after (i) this Agreement is fully executed by the Parties and delivered to Allergan's attorneys; or (ii) the Court accepts a Fed. R. Crim. P. 11(c)(1)(C) guilty plea as described in Preamble Paragraph C in connection with the Criminal Action and imposes the agreed upon sentence, whichever occurs later.

(b)    Allergan shall deposit the sum of $14,850,000, plus accrued interest as set forth above ("Medicaid State Settlement Amount") into one or more interest-bearing money market or bank accounts (the "State Settlement Accounts") that are held in the name of Allergan but segregated from other Allergan accounts, and shall pay the Medicaid Participating States

-6-

EXHIBIT I
PAGE 57

Powered by Morningstar  Document Research℠

from the State Settlement Accounts pursuant to written instructions from the NAMFCU Negotiating Team and under the terms and conditions of the Medicaid State Settlement Agreements that Allergan will enter into with the Medicaid Participating States.

(c)     Contingent upon the United States receiving the Federal Settlement Amount from Allergan, the United States agrees to pay, as soon as feasible upon receipt, Amy M. Lang and Charles J. Rushin $37,827,000, plus a proportionate share of the actual accrued interest paid to the United States by Allergan, as set forth in Paragraph 1.a., above, ("Relators' Share") as Relators' share of the proceeds pursuant to 31 U.S.C. § 3730(d). No other relator payments shall be made by the United States with respect to the matters covered by this Agreement. All Relators represent that they will abide by the terms of any written and executed separate agreements that they may have entered into with one or more of the other Relators concerning the allocation of the Relators' Share among themselves.

(d)     If Allergan's agreed-upon guilty plea pursuant to Fed. R. Crim. P. 11(c)(1)(C) in the Criminal Action described in Preamble Paragraph C is not accepted by the Court or the Court does not impose the agreed-upon sentence for whatever reason, this Agreement shall be null and void at the option of either the United States or Allergan. If either the United States or Allergan exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within five (5) business days of the Court's decision, the Parties will not object and this Agreement will be rescinded. If this Agreement is rescinded, Allergan will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims, actions or proceedings arising from the Covered Conduct that are brought by the United States within 90

-7-

EXHIBIT I
PAGE 58

calendar days of rescission, except to the extent such defenses were available on the day on which the qui tam complaints listed in Preamble Paragraph B, above, were filed.

(e)     If the stay of the D.C. Litigation described in Preamble Paragraph D is lifted before Allergan dismisses with prejudice the D.C. Litigation pursuant to Paragraph 19, below, this Agreement shall be null and void at the option of either the United States or Allergan. If either the United States or Allergan exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within five (5) business days of the Court's decision to lift the stay, the Parties will not object and this Agreement will be rescinded. If this Agreement is rescinded, Allergan will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims, actions or proceedings arising from the Covered Conduct that are brought by the United States within 90 calendar days of rescission, except to the extent such defenses were available on the day on which the qui tam complaints listed in Preamble Paragraph B, above, were filed.

2.     Subject to the exceptions in Paragraph 8 (concerning excluded claims), below, in consideration of the obligations of Allergan set forth in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, the United States (on behalf of itself, its officers, agents, agencies, and departments) agrees to release Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees from any civil or administrative monetary claim the United States has or may have for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; any statutory provision for which the Civil

-8-

EXHIBIT I
PAGE 59

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

Division of the Department of Justice has actual and present authority to assert and compromise pursuant to 28 C.F.R. Part 0, Subpart I, Section 0.45(d); or the common law theories of payment by mistake, fraud, disgorgement, unjust enrichment, and, if applicable, breach of contract.

3.      Subject to the exceptions in Paragraph 8 (concerning excluded claims), below, in consideration of the obligations of Allergan in this Agreement, conditioned upon Allergan's full payment of the Settlement Amount, Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns, agree to release Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees from any liability to Relators arising from any claim the United States has, may have, or could have asserted relating to the Covered Conduct, and from all liability, claims, demands, actions or causes of action whatsoever existing as of the Effective Date of this Agreement, whether known or unknown, fixed or contingent, in law or in equity, in contract or in tort, under any federal or state statute or regulation or that they or their heirs, successors, attorneys, agents and assigns otherwise would have standing to bring, including any liability arising from the filing of the Civil Actions, except for: (1) claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d); (2) claims for a Relator's Share under the Medicaid State Settlement Agreements; and (3) any employment discrimination claims Albert Edward Hallivis may have against Allergan.

4.      In consideration of the obligations of Allergan in this Agreement and the Corporate Integrity Agreement (CIA) entered into between OIG-HHS and Allergan, Inc., and conditioned upon Allergan's full payment of the Settlement Amount, OIG-HHS agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from Medicare, Medicaid, and other Federal health care programs (as defined in 42 U.S.C. §

-9-

EXHIBIT I
PAGE 60

1320a-7b(f)) against Allergan under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law), or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities) for the Covered Conduct, or against Allergan, Inc. under 42 U.S.C. § 1320a-7(b)(1) based on Allergan, Inc.'s agreement to plead guilty to the charge in the Allergan Criminal Action referenced above in Preamble Paragraph C, except as reserved in Paragraph 8 (concerning excluded claims), below, and as reserved in this Paragraph. The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude Allergan from Medicare, Medicaid, and other Federal health care programs under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct. Nothing in this Paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

5.      In consideration of the obligations of Allergan in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, TMA agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion or suspension from the TRICARE Program against Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees under 32 C.F.R. § 199.9 for the Covered Conduct, except as reserved in Paragraph 8 (concerning excluded claims), below, and as reserved in this Paragraph. TMA expressly reserves authority to exclude Allergan from the TRICARE Program under 32 C.F.R. §§ 199.9 (f)(1)(i)(A), (f)(1)(i)(B), and (f)(1)(iii), based upon the Covered Conduct. Nothing in this Paragraph precludes TMA or the TRICARE Program from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

-10-

EXHIBIT I
PAGE 61

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

6.      In consideration of the obligations of Allergan in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, OPM agrees to release and refrain from instituting, directing, or maintaining any administrative action against Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees under 5 U.S.C. § 8902a or 5 C.F.R. Part 919 for the Covered Conduct, except as reserved in Paragraph 8 (concerning excluded claims), below, and except if excluded by the OIG-HHS pursuant to 42 U.S.C. § 1320a-7(a). Nothing in this Paragraph precludes OPM from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

7.      In consideration of the obligations of Allergan in this Agreement, and conditioned upon Allergan's full payment of the Settlement Amount, DOL-OWCP agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion and debarment from the FECA, EEOICPA and BLBA programs against Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors and assigns, and their current and former directors, officers, and employees under 20 C.F.R. §§ 10.815, 30.715 and 702.431 for the Covered Conduct, except as reserved in Paragraph 8 (concerning excluded claims), below and except if excluded by the OIG-HHS pursuant to 42 U.S.C. § 1320a-7(a). Nothing in this Paragraph precludes the OWCP of the DOL from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8, below.

8.      Notwithstanding any term of this Agreement, the following claims of the United States are specifically reserved and excluded from the scope and terms of the Agreement as to any entity or person (including Allergan and the Relators):

-11-

EXHIBIT I
PAGE 62

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar  Document Research℠

(a)     Any civil, criminal, or administrative liability arising under Title 26, U.S. Code (Internal Revenue Code);

(b)     Any criminal liability;

(c)     Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs;

(d)     Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

(e)     Any liability based upon such obligations as are created by this Agreement;

(f)     Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

(g)     Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct;

(h)     Any liability for failure to deliver goods or services due; and

(i)     Any liability of individuals (including current or former directors, officers, employees, or agents of Allergan) who receive written notification that they are the target of a criminal investigation, are criminally indicted or charged, or are convicted, or who enter into a criminal plea agreement.

9.     Relators and their heirs, successors, attorneys, agents, and assigns agree not to object to this Agreement and agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B), and expressly waive the opportunity for a hearing on any objection to this Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon the United States' payment of the Relators' Share, as

-12-

EXHIBIT I
PAGE 63

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

set forth in Paragraph 1.c., above, Relators for themselves individually, and for their heirs, successors, agents, and assigns, fully and finally release, waive, and forever discharge the United States, and its officers, agents, and employees, from any claims arising from or relating to 31 U.S.C. § 3730; from any claims arising from the filing of the Civil Actions; and from any other claims for a share of the Settlement Amount or payment of any sort from the United States relating to the Agreement or the filing of the Civil Actions; and in full settlement of any claims Relators may have under this Agreement. This Agreement does not resolve or in any manner affect any claims the United States has or may have against the Relators arising under Title 26, U.S. Code (Internal Revenue Code), or any claims arising under this Agreement.

10.   Conditioned upon the United States' payment of the Relators' Share, as set forth in Paragraph 1.c., above, the Relators, for themselves, and for their respective heirs, successors, attorneys, agents, and assigns:

(a)     hereby fully and finally release and forever discharge Allergan, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors, and assigns, and their current and former officers, directors, trustees, agents, servants, employees, representatives, attorneys, consultants, executors, and administrators (collectively, "Allergan Releasees") from any and all claims for relief, actions, rights, causes of action, suits, debts, obligations, liabilities, demands, losses, damages (including treble damages and any civil penalties), punitive damages, costs, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, in law or in equity, in contract or in tort, or under any federal or state statute or regulation or otherwise that Relators or their heirs, successors, attorneys, agents or assigns would have standing to bring, and which Relators or their heirs, successors, attorneys, agents, or assigns may now have or claim to have against the Allergan

-13-

EXHIBIT I
PAGE 64

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

Releasees, arising in any way out of or connected in any way with the facts, claims, and circumstances alleged in, arising under, or arising from the filing of the Civil Actions, or from any other past activities and actions of the Allergan Releasees, except for: (1) claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d); (2) claims for a Relators' Share under the Medicaid State Settlement Agreements; and (3) any employment discrimination claims that Albert Edward Hallivis may have against Allergan; and

      (b)     agree not to disseminate any documents or communications in their possession or control, or information from such documents or communications, that can be readily identified as having been created in whole or in part by, or at the direction of, Allergan. In this regard, Relators and their counsel will make a good faith effort to identify all such materials. The obligations in this subparagraph do not apply: (1) to documents or information in the public record or domain; (2) to the extent that compliance with the obligation would conflict with a statute or regulation; (3) if disclosure is required by a subpoena or court order; or (4) in the case of employee Albert Edward Hallivis, to the degree he is authorized by Allergan to utilize business records as necessary within the scope of his current employment.

    11.   Allergan waives and shall not assert any defenses Allergan may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

-14-

EXHIBIT I
PAGE 65

12.   Allergan fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Allergan has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the Covered Conduct or arising from the United States' investigation and prosecution of the Civil Actions and the Criminal Action.

13.   Conditioned upon Relators' compliance with their obligations under this Agreement, Allergan, for itself, its predecessors, and its current and former divisions, parents, affiliates, subsidiaries, successors, and assigns, and their current and former officers, directors, trustees, agents, servants, employees, representatives, attorneys, consultants, executors, and administrators, when acting on behalf of Allergan or any of its affiliated companies, fully and finally releases and forever discharges Relators and their heirs, successors, attorneys, agents, and assigns (collectively, "Relator Releasees") from any and all claims for relief, actions, rights, causes of action, suits, debts, obligations, liabilities, demands, losses, damages (including treble damages and any civil penalties), punitive damages, costs, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, in law or in equity, in contract or in tort, or under any federal or state statute or regulation or otherwise that Allergan, its predecessors, or its current and former divisions, parents, affiliates, subsidiaries, successors, or assigns may now have or claim to have against the Relator Releasees, arising in any way out of or connected in any way with the facts, claims, and circumstances alleged in, arising under, or arising from the Civil Actions, or from any other past activities and actions of the Relator Releasees, except to the extent related to: (1) claims Relators may have under 31 U.S.C. § 3730(d); (2) claims for a Relators' Share under the Medicaid State Settlement Agreements; or (3)

-15-

EXHIBIT I
PAGE 66

Source: ALLERGAN INC, 8-K September 01, 2010

Powered by Morningstar ' Document Research℠

any employment discrimination claim that Albert Edward Hallivis may have against Allergan, or rights Allergan may have arising out of any violation by him of the terms and conditions of his employment. Allergan attests that, upon inquiry of its Legal Department, it is not presently aware of any claims its officers, directors, employees, or agents may have against Relator Releasees.

14.    The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare carrier or intermediary or any other state or Federal payer, related to the Covered Conduct; and Allergan agrees not to resubmit to any Medicare carrier or intermediary or any other state or Federal payer any previously denied claims related to the Covered Conduct, and agrees not to appeal any such denials of claims.

15.    Allergan agrees to the following:

(a)    Unallowable Costs Defined: that all costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh and 1396-1396v; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Allergan, its present or former officers, directors, employees, shareholders, and agents in connection with the following shall be "Unallowable Costs" on government contracts and under the Medicare Program, Medicaid Program, TRICARE Program, and FEHBP:

(i)    the matters covered by this Agreement and any related plea agreement;

(ii)    the United States' audit(s) and civil and criminal investigation(s) of the matters covered by this Agreement;

(iii)    Allergan's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and criminal

-16-

EXHIBIT I
PAGE 67

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar Document Research℠

investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(iv)   the negotiation and performance of this Agreement, the Plea Agreement, and the Medicaid State Settlement Agreements;

(v)   the payments Allergan makes to the United States pursuant to this Agreement, the Plea Agreement, or the Medicaid State Settlement Agreements, and any payments that Allergan may make to Relators (including costs and attorneys' fees); and

(vi)   the negotiation of, and obligations undertaken pursuant to the CIA to:

(a)   retain an independent review organization to perform annual reviews as described in Section III of the CIA; and

(b)   prepare and submit reports to the OIG-HHS.

However, nothing in this Paragraph 15.a.vi. that may apply to the obligations undertaken pursuant to the CIA affects the status of costs that are not allowable based on any other authority applicable to Allergan. (All costs described or set forth in this Paragraph 15.a. are hereafter "Unallowable Costs.")

(b)   Future Treatment of Unallowable Costs: These Unallowable Costs shall be separately determined and accounted for by Allergan, and Allergan shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Allergan or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

(c)   Treatment of Unallowable Costs Previously Submitted for Payment: Allergan

-17-

EXHIBIT I
PAGE 68

Source: ALLERGAN INC, 8-K, September 01, 2010

further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Allergan or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. Allergan agrees that the United States, at a minimum, shall be entitled to recoup from Allergan any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Allergan or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on Allergan or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

(d)      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Allergan's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

16.      This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except as explicitly stated in this

-18-

EXHIBIT I
PAGE 69

Source: ALLERGAN INC, 8-K, September 01, 2010                    Powered by Morningstar® Document Research℠

Agreement, including in Paragraph 17 (waiver for beneficiaries paragraph), below.

17.     Allergan agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

18.     Allergan warrants that it has reviewed its financial situation and that it currently is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and shall remain solvent following payment to the United States of the Settlement Amount. Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to Allergan, within the meaning of 11 U.S.C. § 547(c)(1); and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Allergan was or became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

19.     Within seven (7) days of making the payments described in Paragraph 1, above, Allergan shall file a stipulation of dismissal with prejudice in the D.C. Litigation.

20.     Upon the Effective Date of this Agreement, the United States shall file in Civil Action III a Notice of Intervention as to the Covered Conduct. Upon receipt of the payments described in Paragraph 1, above, and entry of an order dismissing the D.C. Litigation with prejudice, the United States and Relators shall file a Joint Stipulation of Dismissal in each of the

-19-

EXHIBIT I
PAGE 70

Powered by Morningstar  Document Research℠

Civil Actions as follows:

(a)     each stipulation of dismissal shall be with prejudice as to the United States' and Relators' claims as to Allergan as to the Covered Conduct in each Civil Action pursuant to and consistent with the terms and conditions of this Agreement;

(b)     each stipulation of dismissal shall be without prejudice to the United States and with prejudice as to Relators as to all other claims; and

(c)     provided, however, that the following claims against Allergan shall not be dismissed until they are settled, adjudicated, or otherwise resolved, and the Court is so informed: (a) Relators' claims for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); (b) Relators' claims for a Relators' Share under the Medicaid State Settlement Agreements; and (c) any employment discrimination claims that Albert Edward Hallivis may have against Allergan.

21.     Except as expressly provided to the contrary in this Agreement, each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

22.     Allergan represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

23.     Relators represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

24.     This Agreement is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement is the United States District Court for the Northern District of Georgia, except that disputes arising under the CIA shall be resolved exclusively under the dispute

-20-

EXHIBIT I
PAGE 71

Source: ALLERGAN INC, 8-K, September 01, 2010

Powered by Morningstar® Document Research℠

resolution provisions in the CIA.

25.    For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

26.    This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

27.    The individuals signing this Agreement on behalf of Allergan represent and warrant that they are authorized by Allergan to execute this Agreement. The individuals signing this Agreement on behalf of Relators represent and warrant that they are authorized by Relators to execute this Agreement. The United States signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

28.    This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

29.    This Agreement is binding on Allergan's successors, transferees, heirs, attorneys, agents, and assigns.

30.    This Agreement is binding on Relators' successors, transferees, heirs, attorneys, agents, and assigns.

31.    All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

32.    This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

-21-

EXHIBIT I
PAGE 72

Source: ALLERGAN INC, 8-K, September 01, 2010                         Powered by Morningstar® Document Research℠

## THE UNITED STATES OF AMERICA

DATED:    8/31/10            BY:    /s/ Sally Quillian Yates
                                    SALLY QUILLIAN YATES
                                    United States Attorney
                                    United States Attorney's Office
                                    Northern District of Georgia


DATED:    8/31/10            BY:    /s/ Amy Berne
                                    AMY BERNE
                                    Chief, Civil Division
                                    United States Attorney's Office
                                    Northern District of Georgia


DATED:    8/31/10            BY:    /s/ Sally B. Molloy
                                    SALLY B. MOLLOY
                                    Assistant U.S. Attorney
                                    United States Attorney's Office
                                    Northern District of Georgia


DATED:    8/31/2010          BY:    /s/ Christopher J. Huber
                                    CHRISTOPHER J. HUBER
                                    Assistant U.S. Attorney
                                    United States Attorney's Office
                                    Northern District of Georgia


DATED:    8/31/10            BY:    /s/ Edward C. Crooke
                                    EDWARD C. CROOKE
                                    Trial Attorney
                                    Commercial Litigation Branch
                                    Civil Division
                                    United States Department of Justice

-22-

EXHIBIT I
PAGE 73

Source: ALLERGAN INC, 8-K, September 01, 2010          Powered by Morningstar® Document Research℠

DATED:   8/20/10         BY:   /s/ Gregory E. Demske
                               GREGORY E. DEMSKE
                               Assistant Inspector General for Legal Affairs
                               Office of Counsel to the Inspector General
                               Office of Inspector General
                               United States Department of Health and Human Services

DATED:   18 Aug 2010     BY:   /s/ Laurel C. Gillespie
                               LAUREL C. GILLESPIE
                               Deputy General Counsel
                               TRICARE Management Activity
                               United States Department of Defense

DATED:   8/18/10         BY:   /s/ Shirley R. Patterson
                               SHIRLEY R. PATTERSON
                               Acting Deputy Associate Director Insurance Operations
                               United States Office of Personnel Management

DATED:   8/19/2010       BY:   /s/ J. David Cope
                               J. DAVID COPE
                               Assistant Inspector General for Legal Affairs
                               United States Office of Personnel Management

DATED:   8/18/2010       BY:   /s/ Cecily A. Rayburn
                               CECILY A. RAYBURN
                               Acting Deputy Director
                               Office of Workers' Compensation Programs
                               United States Department of Labor

-23-

EXHIBIT I
PAGE 74

Source: ALLERGAN INC, 8-K, September 01, 2010                    Powered by Morningstar Document Research℠

**ALLERGAN**

DATED:   8/30/10                                    BY:   /s/ Samuel J. Gesten
                                                          SAMUEL J. GESTEN, ESQ.
                                                          Executive Vice President and General Counsel
                                                          Allergan, Inc.

                                                          Vice President and Assistant Secretary
                                                          Allergan USA, Inc.

DATED:   8/31/10                                    BY:   /s/ Stephen S. Cowen
                                                          STEPHEN S. COWEN, ESQ.
                                                          King & Spalding, LLP

DATED:   8/31/10                                    BY:   /s/ Matthew H. Baughman
                                                          MATTHEW H. BAUGHMAN, ESQ.
                                                          King & Spalding, LLP

DATED:   8/31/10                                    BY:   /s/ John T. Bentivoglio
                                                          JOHN T. BENTIVOGLIO, ESQ.
                                                          Skadden, Arps, Slate, Meagher & Flom, LLP

-24-

EXHIBIT I
PAGE 75

**RELATOR AMY M. LANG, M.D.**

DATED:   8/18/2010              BY:   /s/ Amy M. Lang, M.D.
                                     AMY M. LANG, M.D.

DATED:   08/18/10              BY:   /s/ John E. Floyd
                                     JOHN E. FLOYD, ESQ.
                                     Bondurant, Mixson, & Elmore, LLP

DATED:   08/18/10              BY:   /s/ Ben E. Fox
                                     BEN E. FOX, ESQ.
                                     Bondurant, Mixson, & Elmore, LLP

DATED:   8/18/2010              BY:   /s/ Lance D. Lourie
                                     LANCE D. LOURIE, ESQ.
                                     Watkins, Lourie, Roll & Chance, P.C.

-25-

EXHIBIT I
PAGE 76

## RELATOR CHARLES J. RUSHIN

DATED:   8/18/2010          BY:   /s/ Charles J. Rushin
                                  CHARLES J. RUSHIN

DATED:   08/18/2010         BY:   /s/ John E. Floyd
                                  JOHN E. FLOYD, ESQ.
                                  Bondurant, Mixson, & Elmore, LLP

DATED:   08/18/10           BY:   /s/ Ben E. Fox
                                  BEN E. FOX, ESQ.
                                  Bondurant, Mixson, & Elmore, LLP

DATED:   8/18/10            BY:   /s/ Lance D. Lourie
                                  LANCE D. LOURIE, ESQ.
                                  Watkins, Lourie, Roll & Chance, P.C.

-26-

EXHIBIT I
PAGE 77

Powered by Morningstar   Document Research℠

## RELATOR CHER BEILFUSS

DATED:    Aug 22, 2010 _____    BY:    /s/ Cher Beilfuss _____
                                          CHER BEILFUSS

DATED:    8/23/10 _____    BY:    /s/ Marcella Auerbach _____
                                          MARCELLA AUERBACH, ESQ.
                                          Nolan & Auerbach, P.A.

DATED:    8/23/10 _____    BY:    /s/ Ken Nolan _____
                                          KEN NOLAN, ESQ.
                                          Nolan & Auerbach, P.A.

-27-

EXHIBIT I
PAGE 78

### RELATOR KATHLEEN O'CONNOR-MASSE

DATED:    8/18/10                           BY:    /s/ Kathleen O'Connor-Masse
                                                   KATHLEEN O'CONNOR-MASSE

DATED:    8/23/10                           BY:    /s/ Marcella Auerbach
                                                   MARCELLA AUERBACH, ESQ.
                                                   Nolan & Auerbach, P.A.

DATED:    8/23/10                           BY:    /s/ Ken Nolan
                                                   KEN NOLAN, ESQ.
                                                   Nolan & Auerbach, P.A.

-28-

EXHIBIT I
PAGE 79

## RELATOR ALBERT EDWARD HALLIVIS

DATED:    8/18/10                         BY:    /s/ Albert Edward Hallivis
                                                 ALBERT EDWARD HALLIVIS

DATED:    8/18/10                         BY:    /s/ Jay P. Holland
                                                 JAY P. HOLLAND, ESQ.
                                                 Joseph, Greenwald & Laake, P.A.

DATED:    8/18/10                         BY:    /s/ Brian J. Markowitz
                                                 BRIAN J. MARKOWITZ, ESQ.
                                                 Joseph, Greenwald & Laake, P.A.

-29-

EXHIBIT I
PAGE 80

# Exhibit J

# ALLERGAN FIELD REFERENCE GUIDE

## PURPOSE OF THIS GUIDE

The Policies in this Field Reference Guide address legal limitations on how Allergan can promote its products and how to avoid activities that may be viewed as improper inducements to increase the purchase or use of Allergan products.

You should use this Guide as a daily reference tool. If you have questions about anything in this Guide or Allergan's Policies in general, do not hesitate to call your supervisor or the Allergan Legal Department for clarification. Your questions will be treated confidentially.

Allergan is committed to complying with all applicable laws governing the sale and marketing of, and price reporting for, our products. Violations may not only result in a broad range of Company disciplinary measures, up to and including termination, but also could result in large criminal or civil penalties, jail sentences, or exclusion of the Company from Government reimbursement programs such as Medicare and Medicaid.

Finally, Allergan has adopted, and is committed to complying with, the PhRMA Code on Interactions with Healthcare Professionals (the "PhRMA Code"). The PhRMA Code provides very specific guidance on dealing with healthcare professionals. The PhRMA Code is attached as an exhibit to this Field Guide and incorporated by reference. As part of the Field Guide, Allergan strongly urges you to use the PhRMA Code as a reference tool.

## ESSENTIAL RULES

### THE OFF-LABEL PROMOTION RULE

The Food & Drug Administration ("FDA") generally prohibits promotion of a drug or device for uses that are not addressed in the approved product labeling or patient package insert.

### THE ANTI-KICKBACK STATUTE

"Anti-kickback" laws generally make it illegal to offer remuneration – or payment – of any kind to encourage the prescribing or purchase of any Allergan product. Remuneration can be almost anything of value, including rebates, discounts, grants,

EXHIBIT J
PAGE 81

ALII1178146

referral fees, cash, frequent flier miles, lottery tickets, entertainment, or gifts.  In
providing any type of payment or value to a customer or prospective customer, the
key point is to avoid the intent to exert improper influence over that customer's
independent judgment in prescribing or purchasing product.  There are a limited
number of exceptions (or "safe harbors") to the Anti-Kickback Statute that allow the
Company to offer certain price concessions to customers without violating the law.

## POLICIES

## PROMOTIONAL ACTIVITIES

### GIFTS AND  EDUCATIONAL AND PRACTICE-RELATED ITEMS

You may not provide gifts or other items to encourage customers (including
physicians, formulary committees, pharmacists and PBM account executives) to
prescribe or purchase Allergan products.  To that end, and as set forth in the
PhRMA Code, items that are primarily for the benefit of patients may occasionally be
provided to healthcare professionals if the value of the item is $100 or less.  For
example, an anatomical model for use in an examination room is for patient care and
is permissible.  Items that are not primarily for the benefit of patients, including items
for the personal benefit of healthcare professionals, such as golf balls and sport
bags with the Allergan logo, floral arrangements, artwork, music CDs, tickets to a
sporting event, VCRs and CD players are not permissible.  Cash and gift certificates,
except as compensation for bona fide services performed as a consultant, are never
permissible.

*Examples/Guidance:*  The PhRMA Code, which is attached, provides many specific
*examples of permissible and impermissible gifts.  Allergan encourages you to refer
often to the PhRMA Code for guidance.*

### ENTERTAINMENT

You may not provide business courtesies or entertainment to encourage customers
(including physicians, formulary committees, pharmacists and PBM account
executives) to prescribe or purchase Allergan products.  The PhRMA Code provides
that, other than bona fide consultants, entertainment may be provided to healthcare
professionals in only very limited circumstances.  Specifically, a company
representative may occasionally treat a healthcare professional to a modest meal
(as judged by local standards) provided that the venue is conducive to informational
communication and scientific or educational value is provided.  Spouses or other
guests may not attend.  You may also provide a modest meal to the office staff if it is

EXHIBIT J
PAGE 82
ALII1178147

combined with an informational presentation. No other entertainment is permitted. For example, inviting a physician to a sporting event or a round of golf is not permitted, as is hosting a group of physicians at a corporate suite for a sporting event, even if it is preceded by an educational presentation.

*Examples/Guidance:  The PhRMA Code, which is attached, provides many specific examples of permissible and impermissible entertainment.  Allergan encourages you to refer often to the PhRMA Code for guidance.*

## GIFTS TO GOVERNMENT EMPLOYEES

In addition to the provisions of the PhRMA Code, Federal law requires that gifts and business courtesies provided to Federal Government employees (including the military and employees of Veterans hospitals) may not exceed $20 per person per event or a total of $50 per person per year.  These totals apply to Allergan as a company, not to an individual salesperson.  Some Government facilities may have stricter limits, which you should always follow.  Gifts may *never* be given to Government employees to encourage the prescription or purchase of Allergan products.

*Examples/Guidance:  Part-time Government employees are still subject to these limits, even when they are physically located at a civilian facility.  For instance, it would be appropriate to provide $50 worth of Chinese food for 10 military residents.*

## EDUCATIONAL GRANTS

Educational grants may be provided only to an institution to foster the increased understanding of scientific, clinical or health care issues that contribute to the improvement of patient care.  As referenced in the PhRMA Code, grants may not be made in order to promote, or in exchange for, the dispensing or ordering of Allergan products, to encourage off-label use,  to reward "high volume prescribers," or for a commitment to continue prescribing Allergan products.  Grants may be provided only in response to a written request from the recipient and must be approved by Allergan's Professional Education Department.

*Examples/Guidance:  You may not suggest that Allergan will supply an educational grant in return for an agreement to prescribe or purchase Allergan Products. Similarly, providing a "grant" to a hospital pharmacist for a social function to increase the chance the pharmacist will place a large product order is neither legitimate nor educational.  Grants support educational purposes and may not be conditioned on the expected "return" on Allergan's "investment."  Grants to individual healthcare professionals should be avoided if possible and, when provided, should be granted only to foster an increased understanding of scientific, clinical and healthcare issues.*

EXHIBIT J
PAGE 83
ALII1178148

## CHARITABLE CONTRIBUTIONS

Allergan strongly supports charitable donations of money and products.  Indeed, Allergan has created the Allergan Foundation, a charitable organization focused on advancing health and human services, education, civic and community programs and the arts through community organizations.  Donations may be made to IRS recognized tax-exempt organizations.  However, donations may never be made to encourage anyone to prescribe or order Allergan products, nor may they be used as part of a contract negotiation.  All charitable contributions must be approved by the home office.

*Examples/Guidance:  You may not make charitable donations to private physicians or private practice groups or clinics.  If a physician or pharmacist asks you to donate to his or her favorite charity, you should consult your management or the Legal Department.*

## SAMPLES AND VOUCHERS

Samples and vouchers may not be sold or traded and may be distributed only with Company approval.  Prescription drug samples may be provided only upon receipt of a written request.  Please refer to the Sampling Procedures administered by the Sample Compliance Department for guidance or contact the Legal Department for a more comprehensive explanation of the laws governing the distribution of samples.

*Examples/Guidance:  Although you may distribute samples to promote sales of a product, you may not provide them to reward a physician's prescribing habits. Likewise, samples may not be given as a "thank you" for a large purchase or as a discount on the purchase of product.  Never suggest that physicians may sell or seek reimbursement for samples.  Retail packages of products are not samples and may not be distributed without management approval.  Samples of products that are used directly by the physician should only be distributed under procedures approved by the Sample Compliance Department.*

## NO "OFF-LABEL" PROMOTION

You may not promote any Company product for uses that are not addressed in the approved product labeling or package insert.  Physicians may generally prescribe or dispense a drug for a use that has not been FDA-approved since the FDA does not regulate the practice of medicine, but you may not *promote* a drug for unapproved uses.

*Examples/Guidance:  This promotional ban applies not only to sales calls, but to all marketing efforts such as product launches, sales meetings and activities of third-parties controlled by Allergan.  Budgets and quotas may account for all product use*

EXHIBIT J
PAGE 84
ALII1178149

*(including off-label use) but you should not interpret budgets or quotas as a directive to promote off-label.  There should be no marketing influence on independently run CME or science-related activities.*

## USE OF REPRINTS AND ADVERTISING/PROMOTIONAL MATERIALS

You may use for advertising and promotion only those materials that have been approved by the Regulatory Department and Legal Department.  You may not alter approved materials in any way.

*Examples/Guidance:  Alteration includes highlighting, handwritten notes, or editing.*

## INQUIRIES ABOUT OFF-LABEL USES

If a healthcare provider asks about off-label uses for Allergan products, you must direct him/her to SIMCOM at 1-800-433-8871 (or fill out a request for information card), or when appropriate to the healthcare team at his facility.  You may not answer or solicit off-label questions.

*Examples/Guidance:  It would be improper to mention a recent journal article dealing with on-and off-label uses hoping that the doctor will ask about the off-label use.*

## VALUE-ADDED SERVICES

Value-added services should be limited to services that are directly related to product support or are nominal.  Services are directly related to product support if they assist in the delivery or use of products.  Services are nominal if they are limited in both scope and amount so as to not create a significant value for the recipient.  Any other services provided to a customer should be charged back to the customer to avoid the appearance of providing something of value to the customer.

*Examples/Guidance:  Provision of surgical support kits which have a value of less than $5 generally would be considered nominal.  Provision of generic practice management information that can be put together with minimal time involvement and is not tailored to the facts and circumstances of a particular practice generally would be considered nominal.*

## BUNDLING OF ITEMS

In general, customers should be permitted to purchase individual items and services without being required to purchase or accept other items or services.  In some cases, it may be acceptable to offer discounts that are more generous if more than

EXHIBIT J
PAGE 85
ALII1178150

one product is purchased.  In other cases, an item or service might be treated as a discount on the purchase of another product.  In no case, however, may a discount on one service or a bundling arrangement be used as a financial inducement to purchase another product.  Such arrangements should be reviewed by counsel to ensure that the bundle or discount is not a financial inducement.

*Examples/Guidance:  If a service is being offered as a discount on another product, the customer should be given the choice of purchasing the item in isolation, perhaps with the option of a cash discount.  It may be permissible to offer certain valuable services as a discount if (1) the customer has the option of receiving some form of cash discount; (2) the value of the services that are being treated as a discount are fully disclosed on invoices and (3) the customer understands reimbursement and reporting obligations relating to the discount.*

## NO PROMOTION BASED ON THE "SPREAD"

You may not suggest that a customer purchase or prescribe Allergan products based on the "spread" between the amount the customer pays Allergan for the product and the amount the customer receives from the Government in Medicaid or Medicare reimbursement.

*Examples/Guidance:  You may provide accurate information regarding prices at which Allergan products are sold or reimbursed but may not suggest that a customer will receive a larger "profit" from Government reimbursement by purchasing Allergan products.*

## NO "SIDE DEALS" IN CONTRACT NEGOTIATIONS

Anything of value that is provided to a customer in connection with a purchase agreement must be clearly stated in the written contract.  You may not offer any "side deal" – or price concession -- that is not included in the written contract or contract addendum.

*Examples/Guidance:  If you were to provide a "side deal," that information may not be included in prices that Allergan is required to report to the Government.  Failure to report accurate prices can have serious consequences for the Company. Therefore, it is extremely important that you never offer a customer anything of value that is not included in the written contract or approved by management -- including grants, gifts, entertainment, and free goods tied to the purchase of products.*

EXHIBIT J
PAGE 86
ALII1178151

## FREE GOODS

Products, both prescription and over-the counter, given at little or no charge are considered "free goods." Allergan may donate free goods to charities or to indigent patients. Other than samples, free goods may never be provided to encourage a physician to prescribe or purchase Allergan products.

*Examples/Guidance:  Product samples are not considered "free goods" as defined by this Policy.  Under the AMA guidelines, you may provide small amounts of product (other than controlled drugs) to physicians for patient use on a "trial basis" or for emergency or short-term courses of therapy.  Providing more than a small trial amount of free product for the treatment of a chronic condition or providing a physician a case of product would be improper.  In any event, use of retail packages of products should not be used without the express approval of the Legal Department.*

## PURCHASING SERVICES FROM PBMs AND OTHER ENTITIES

Allergan will not purchase services from pharmacy benefit managers, managed care organizations and other entities in a position to influence referrals as a reward for formulary status or other acts to encourage referrals.  Allergan can only consider a purchase of services from such entities when (1) Allergan separately has determined a need for the services to be purchased; (2) the entity charges fair market value for the services purchased; (3) Allergan actually uses the services purchased; and (4) the purchase is not tied to or used to influence a formulary or other purchase decision.

*Examples/Guidance:  There are some cases where a PBM may have access to information regarding prescribing practices or patient compliance that a pharmaceutical company would find useful in its marketing efforts.  Fair market value purchases of useful and used information can be acceptable where the request for such data or services is driven by the pharmaceutical company and not by the PBM. The purchase of services is not acceptable, even if for fair market value, if the PBM requires the purchase of services as a condition for a product to be placed on formulary.*

## ADMINISTRATIVE FEES TO GROUP PURCHASING ORGANIZATIONS AND PHARMACY BENEFIT MANAGERS

Allergan seeks to limit administrative fees paid to GPOs and PBMs to amounts and arrangements that satisfy the anti-kickback safe harbor for GPO arrangements. Allergan will limit GPO/PBM arrangements to those that are subject to a written contract which specifies the amounts to be paid by the vendor to the GPO and discloses the amount actually received by the GPO.  To the extent possible, Allergan

EXHIBIT J
PAGE 87
ALII1178152

will avoid GPO arrangements that provide for an administrative fee exceeding 3% of sales. The Legal Department will review any GPO/PBM proposals that provide for an administrative fee exceeding 3%. In any such arrangement, the GPO/PBM must also annually disclose to its health care provider members any amounts actually received in administrative fees. Administrative fees will be limited to reasonable fees for services typically provided by GPOs.

*Examples/Guidance: It is not permissible to pay excessive administrative fees as a quid pro quo for an agreement by a PBM to grant formulary status or to arrange for or recommend enhanced sales. It generally is not appropriate to pay administrative fees to hospital or nursing home chains that purchase product on behalf of their constituent hospitals or nursing homes. Administrative fees should be limited to fees for administrative services rendered, not payments to a customer to advantage, purchase, or recommend Allergan's products. It is not permissible to pay a PBM an enhanced administrative fee in exchange for formulary status or enhanced formulary status.*

## PRICE REPORTING

Allergan will comply with all applicable laws and regulations in determining the way prices are reported to government agencies. If there is a reasonable question regarding an interpretation, Allergan will specifically define all terms that may be ambiguous so that reports are not misinterpreted. Allergan will promptly correct any errors that are discovered after a price is reported and report any subsequent adjustments to reported prices. Allergan will interpret the terms "discount" and "rebate" in a reasonable way to capture price reductions in all forms. Allergan also will properly allocate "bundled" discounts to the products in the bundle and identify the existence of any discount or rebate where the value of a discount or rebate is unknown at the time of a report.

*Examples/Guidance:* Ambiguous statements of price should be explained. For example, "wholesale" price reports should describe whether the price is gross or net of chargebacks. Likewise, if an audit requests prices to "pharmacies," the response should specify the type of pharmacy at issue. The Medicaid Rebate Agreement specifies that the "best price for a quarter shall be adjusted by the Manufacturer if cumulative discounts, rebates or other arrangements subsequently adjust the prices actually realized." All price reductions, in whatever form, should be considered discounts or rebates for price reporting purposes. If free or services goods have been provided, the Legal Department should be consulted for a determination with respect to whether such items constitute reportable discounts or rebates.

EXHIBIT J
PAGE 88
ALII1178153

# MEDICAL EDUCATION AND RESEARCH

## BONA FIDE CONSULTANTS

Allergan may pay bona fide consultants reasonable fees to perform certain services, such as speaking, speaker training or participating on advisory committees, if specific criteria are met.  These criteria are set forth in the PhRMA Code.  Consulting arrangements may not be made to encourage physicians to purchase or use Allergan products or to reward "high volume prescribers."  Consultants should not be chosen on the basis of their prescribing or purchasing decisions.  The PhRMA Code specifically provides that honoraria, travel expenses or lodging expenses may not be paid to non-faculty and non-consulting attendees at company sponsored meetings, even if the attendees participate in interactive sessions.

*Examples/Guidance:  The PhRMA Code, which is attached, provides the criteria for a bona fide consulting arrangement, as well as specific examples of permissible and impermissible uses of consultants in particular and healthcare professionals in general.  Allergan encourages you to refer often to the PhRMA Code for guidance.*

## SPONSORSHIP AND SUPPORT OF MEDICAL EDUCATION PROGRAMS

Allergan sponsors educational programs directly and through use of third party planners.  When using a third party planner for events such as CME, Allergan must sign a Company-approved letter of agreement that restricts Allergan's control over the program content, audience, and speakers, and that requires certain financial and off-label disclosures.  No promotion may take place within the physical program space.  Programs directly sponsored and controlled by Allergan may include only on-label uses of Allergan products, in which case product promotion is allowed and Allergan employees and contracted consultants may participate.  Allergan urges you to consult the PhRMA Code, which provides specific guidance about sponsorship and support of third party educational or professional meetings.

## ACTIVITIES AT MEDICAL EDUCATION PROGRAMS

You may attend some Company-sponsored educational events upon approval from the Legal Department, but may not engage in any promotional activity at programs that include discussion of off-label uses of Allergan products.  Appropriate promotional activity may take place away from event meeting rooms, such as at nearby product exhibits.  Off-label reprints or other information may not be provided at promotional booths.  Separate medical information booths for this purpose may be used with prior approval of the Legal Department and SIMCOM.

EXHIBIT J
PAGE 89
ALII1178154

*Examples/Guidance:*  *You should avoid off-label promotion at events, such as medical education programs that deal with off-label uses.  Thus, you may not "plant" questions that will direct the conversation toward off-label uses, nor may you distribute studies that address unapproved uses.*

## PRECEPTORSHIPS

Preceptorships facilitate the exchange of current medical treatment information between physicians and Allergan employees.  Preceptorships will not be conducted in order to induce the physician to prescribe or purchase Allergan products or to reward a high prescriber.

*Examples/Guidance:*  *The purpose of preceptorships is to educate Allergan employees and not to promote products.  Paying to learn about a physician's billing practices or to get 15 minutes of his or her time would not constitute a legitimate preceptorship request.  Allergan employees participating in preceptorships may not provide individual treatment advice.  All preceptorships must be approved by the Professional Education Department and they must comply with the Company's privacy policy.*

## DRUG PREPARATION AND ADMINISTRATION PRESENTATIONS

You may give drug preparation and administration presentations on approved product uses.  You may not give such presentations for off-label uses.  Off label presentations are only acceptable in the context of a true scientific exchange or clinical advisory meeting and only with approval from regulatory affairs or SIMCOM. Refer any questions on unapproved uses to SIMCOM at 1-800-433-8871.

*Examples/Guidance:*  *You may give "in-service" presentations to hospital staff provided they address on-label, approved product uses.*

## RESEARCH AND CLINICAL STUDIES

Allergan-supported research and clinical studies should promote legitimate research goals.  Support for clinical studies should not be provided with the requirement or expectation that it will encourage the prescription or purchase of Allergan products. Allergan-sponsored research may only be conducted pursuant to a written agreement, approved by the Legal Department.

*Examples/Guidance:*  *Studies designed to "seed" the market with product and increase product use are not permitted.  Clinical investigators should be selected based solely on their credentials and reputations, not based on prior history as a "high-volume prescriber."  Study results should be useful to Allergan and results documented and reported back to the appropriate department.*

EXHIBIT J
PAGE 90
ALII1178155

# OTHER POLICIES

## ADVERSE EVENT REPORTING

"Adverse Events" are any unintended event associated with the use of a marketed product, whether or not it appears that the event was *caused by* the product. If you hear about an Adverse Event involving a patient receiving an Allergan product, you must report it **directly** to SIMCOM within 48 hours. You should not question your manager about whether these are Adverse Events. SIMCOM will make that determination. You must report these events even if you are unsure whether they were related to use of Allergan's product. These events may be reported via email or by phone (1-800-433-8871).

## PROMOTION OUTSIDE THE UNITED STATES

If Allergan products are being promoted for use in the United States – even if the promotion is taking place outside the United States – the policies in this Guide apply.

*Examples/Guidance*: *If you attend a medical conference in Canada, you may not discuss off label uses for Allergan products with New York physicians simply because you are outside the U.S.*

EXHIBIT J
PAGE 91
ALII1178156

## PROTECTING CONFIDENTIAL MEDICAL INFORMATION

All Allergan employees must help protect the privacy of individual health information. You should never disclose any individually identifying patient information without first consulting the Legal Department, except in the case of Adverse Event reporting.

*Examples/Guidance:* *You may obtain information regarding particular individuals who are using Allergan drugs through work with clinical trials, through preceptorships, or in discussions with customers. If, for example, you learn that your neighbor uses a particular product, you may not share that personal information with your friends, relatives, colleagues, or anyone else without first consulting the Legal Department.*

## CONFIDENTIAL HOTLINE

Allergan encourages employees to report issues related to the laws and regulations governing Federal reimbursement programs, such as Medicaid and Medicare, as well as issues related to the Company's Policies and Procedures. Reports may be made confidentially and anonymously to the toll-free Ethics Hotline, 1-888-645-0090. All reports will be followed up by the Chief Ethics Officer, and where applicable, by appropriate individuals within Company management.

**Allergan will not retaliate against any employee for reporting concerns via the confidential disclosure program.**

**Nothing in this Guide is intended to alter an employee's employment-at-will status, to create legal rights, or to create a contract between the Company and any of its employees.**

EXHIBIT J
PAGE 92
ALII1178157

## PhRMA Code on Interactions with Healthcare Professionals

### Preamble

*The Pharmaceutical Research and Manufacturers of America (PhRMA) represents research-based pharmaceutical and biotechnology companies. Our members develop and market new medicines to enable patients to live longer and healthier lives.*

*Ethical relationships with healthcare professionals are critical to our mission of helping patients by developing and marketing new medicines. An important part of achieving this mission is ensuring that healthcare professionals have the latest, most accurate information available regarding prescription medicines, which play an ever-increasing role in patient healthcare. This document focuses on our interactions with healthcare professionals that relate to the marketing of our products.*

*Effective marketing of medicines ensures that patients have access to the products they need and that the products are used correctly for maximum patient benefit. Our relationships with healthcare professionals are critical to achieving these goals because they enable us to –*

- *inform healthcare professionals about the benefits and risks of our products,*
- *provide scientific and educational information,*
- *support medical research and education, and*
- *obtain feedback and advice about our products through consultation with medical experts.*

*In interacting with the medical community, we are committed to following the highest ethical standards as well as all legal requirements. We are also concerned that our interactions with healthcare professionals not be perceived as inappropriate by patients or the public at large. This Code is to reinforce our intention that our interactions with healthcare professionals are to benefit patients and to enhance the practice of medicine. The Code is based on the principle that a healthcare professional's care of patients should be based, and should be perceived as being based, solely on each patient's medical needs and the healthcare professional's medical knowledge and experience.*

*Therefore, PhRMA adopts, effective July 1 2002, the following voluntary Code on relationships with healthcare professionals. This Code addresses interactions with respect to marketed products and related pre-launch activities. It does not address relationships with clinical investigators relating to pre-approval studies.*

**PhRMA Code on Interactions with Healthcare Professionals**

1.   BASIS OF INTERACTIONS

Our relationships with healthcare professionals are intended to benefit patients and to enhance the practice of medicine. Interactions should be focused on informing healthcare professionals about products, providing scientific and educational information, and supporting medical research and education.

2.   INFORMATIONAL PRESENTATIONS BY OR ON BEHALF OF A PHARMACEUTICAL COMPANY

Informational presentations and discussions by industry representatives and others speaking on behalf of a company provide valuable scientific and educational benefits. In connection with such presentations or discussions, occasional meals (but no entertainment/recreational events) may be offered so long as they: (a) are modest as judged by local standards; and (b) occur in a venue and manner conducive to informational communication and provide scientific or educational value. Inclusion of a healthcare professional's spouse or other guests is not appropriate. Offering "take-out" meals or meals to be eaten without a company representative being present (such as "dine & dash" programs) is not appropriate.

3.   THIRD-PARTY EDUCATIONAL OR PROFESSIONAL MEETINGS

a.   Continuing medical education (CME) or other third-party scientific and educational conferences or professional meetings can contribute to the improvement of patient care and therefore, financial support from companies is permissible. Since the giving of any subsidy directly to a healthcare professional by a company may be viewed as an inappropriate cash gift, any financial support should be given to the conference's sponsor which, in turn, can use the money to reduce the overall conference registration fee for all attendees. In addition, when companies underwrite medical conferences or meetings other than their own, responsibility for and control over the selection of content, faculty, educational methods, materials, and venue belongs to the organizers of the conferences or meetings in accordance with their guidelines.

b.   Financial support should not be offered for the costs of travel, lodging, or other personal expenses of non-faculty healthcare professionals attending CME or other third-party scientific or educational conferences or professional meetings, either directly to the individuals attending the conference or indirectly to the conference's sponsor (except as set out in section 6 below). Similarly, funding should not be offered to compensate

for the time spent by healthcare professionals attending the conference or meeting.

c.     Financial support for meals or receptions may be provided to the CME sponsors who in turn can provide meals or receptions for all attendees. A company also may provide meals or receptions directly at such events if it complies with the sponsoring organization's guidelines. In either of the above situations, the meals or receptions should be modest and be conducive to discussion among faculty and attendees, and the amount of time at the meals or receptions should be clearly subordinate to the amount of time spent at the educational activities of the meeting.

d.     A conference or meeting shall mean any activity, held at an appropriate location, where (a) the gathering is primarily dedicated, in both time and effort, to promoting objective scientific and educational activities and discourse (one or more educational presentations(s) should be the highlight of the gathering), and (b) the main incentive for bringing attendees together is to further their knowledge on the topic(s) being presented.

4.     CONSULTANTS

a.     It is appropriate for consultants who provide services to be offered reasonable compensation for those services and to be offered reimbursement for reasonable travel, lodging, and meal expenses incurred as part of providing those services. Compensation and reimbursement that would be inappropriate in other contexts can be acceptable for bona fide consultants in connection with their consulting arrangements. Token consulting or advisory arrangements should not be used to justify compensating healthcare professionals for their time or their travel, lodging, and other out-of-pocket expenses. The following factors support the existence of a bona fide consulting arrangement (not all factors may be relevant to any particular arrangement):

    • a written contract specifies the nature of the services to be provided and the basis for payment of those services;

    • a legitimate need for the services has been clearly identified in advance of requesting the services and entering into arrangements with the prospective consultants;

    • the criteria for selecting consultants are directly related to the identified purpose and the persons responsible for selecting the consultants have the expertise necessary to evaluate whether the particular healthcare professionals meet those criteria;

[Page]
EXHIBIT J
PAGE 95

ALII1178160

- the number of healthcare professionals retained is not greater than the number reasonably necessary to achieve the identified purpose;

- the retaining company maintains records concerning and makes appropriate use of the services provided by consultants;

- the venue and circumstances of any meeting with consultants are conducive to the consulting services and activities related to the services are the primary focus of the meeting, and any social or entertainment events are clearly subordinate in terms of time and emphasis.

b.   It is not appropriate to pay honoraria or travel or lodging expenses to non-faculty and non-consultant attendees at company-sponsored meetings including attendees who participate in interactive sessions.

5.   SPEAKER TRAINING MEETINGS

It is appropriate for healthcare professionals who participate in programs intended to recruit and train speakers for company sponsored speaker bureaus to be offered reasonable compensation for their time, considering the value of the type of services provided, and to be offered reimbursement for reasonable travel, lodging, and meal expenses, when (1) the participants receive extensive training on the company's drug products and on compliance with FDA regulatory requirements for communications about such products, (2) this training will result in the participants providing a valuable service to the company, and (3) the participants meet the criteria for consultants (as discussed in part 4.a. above).

6.   SCHOLARSHIPS AND EDUCATIONAL FUNDS

Financial assistance for scholarships or other educational funds to permit medical students, residents, fellows, and other healthcare professionals in training to attend carefully selected educational conferences may be offered so long as the selection of individuals who will receive the funds is made by the academic or training institution. "Carefully selected educational conferences" are generally defined as the major educational, scientific, or policy-making meetings of national, regional, or specialty medical associations.

7.   EDUCATIONAL AND PRACTICE-RELATED ITEMS

a.   Items primarily for the benefit of patients may be offered to healthcare professionals if they are not of substantial value ($100 or less). For example, an anatomical model for use in an examination room primarily involves a patient benefit, whereas a VCR or CD player does not. Items should not be offered on more than an occasional basis, even if each

individual item is appropriate.  Providing product samples for patient use in accordance with the Prescription Drug Marketing Act is acceptable.

b.    Items of minimal value may be offered if they are primarily associated with a healthcare professional's practice (such as pens, notepads, and similar "reminder" items with company or product logos).

c.    Items intended for the personal benefit of healthcare professionals  (such as floral arrangements, artwork, music CDs or tickets to a sporting event) should not be offered.

d.    Payments in cash or cash equivalents (such as gift certificates) should not be offered to healthcare professionals either directly or indirectly, except as compensation for bona fide services (as described in parts 4 and 5).  Cash or equivalent payments of any kind create a potential appearance of impropriety or conflict of interest.

8.    INDEPENDENCE OF DECISION MAKING

No grants, scholarships, subsidies, support, consulting contracts, or educational or practice related items should be provided or offered to a healthcare professional in exchange for prescribing products or for a commitment to continue prescribing products.  Nothing should be offered or provided in a manner or on conditions that would interfere with the independence of a healthcare professional's prescribing practices.

9.    ADHERENCE TO CODE

Each member company is strongly encouraged to adopt procedures to assure adherence to this Code.

**Frequently Asked Questions**

a.    **Question**
Under the Code, may items such as stethoscopes be offered to healthcare professionals?

**Answer**
Yes, because these items primarily benefit patients, so long as the items are not of substantial value and are only occasionally offered to the healthcare professional. Items that are of more than minimal value and do not primarily benefit patients are also not permitted even if they bear a company or product name.

b.   **Question**
Under the Code, may golf balls and sports bags be provided if they bear a company or product name?

**Answer**
No. Golf balls and sports bags, even if of minimal value, do not primarily entail a benefit to patients and are not primarily associated with the healthcare professional's practice, even if they bear the name of a company or product.

c.   **Question**
Under the Code, may healthcare professionals be provided with gasoline for their cars if they are provided with product information at the same time?

**Answer**
No. Items intended for the personal benefit of a healthcare professional should not be offered.

d.   **Question**
The Code says that informational presentations and discussions may be accompanied by occasional, modest meals. What types of presentations and meals would this include?

**Answer**
An informational presentation or discussion may be accompanied by a modest meal provided that the venue and manner of presentation/discussion is conducive to a scientific or educational interchange. For example, if a medical or scientific expert (who is a consultant to or employee of the company) is providing information about recently obtained study data to an audience of healthcare professionals, this could be done over lunch or dinner at a quiet restaurant providing the meal was of modest value as judged by local standards.

Following the same logic, if a sales representative is providing substantial scientific or educational information regarding a company's products to one or a few healthcare practitioners, this could also be done during a modest meal which could be at or outside of a physician's office.

However, if the nature or location of the meal would not facilitate communication of the information, then a meal would not be appropriate. Further, the use of modest meals on more than an occasional basis would not be appropriate.

e.   **Question**
A representative of Company X provides pizza for the staff of a medical office.  Is this consistent with the Code?

**Answer**
This would be consistent with the Code if the representative will provide an informational presentation to the medical staff in conjunction with the meal of modest value, so long as the location of the presentation is conducive to a scientific or educational communication.  Merely dropping off food for the office staff, however, would not be consistent with the Code.

f.   **Question**
A representative of Company X invites physicians to meet to hear a scientific and educational presentation about a new drug at the café at a nearby bookstore.  Coffee and cake are provided by the representative and, following the presentation (which is in small groups), each physician is given a gift certificate for books in the amount of $30.  Does this conform to the Code?

**Answer**
No. While the presentation may present scientific or educational information and the coffee and cake may appropriately be provided, an open-ended gift certificate is a cash equivalent.  A medical textbook, a book on patient care, or a gift certificate redeemable solely for a medical textbook or book on patient care could be provided if it is not of substantial value.

g.   **Question**
Company C invites 30 physicians to a corporate suite at a professional baseball game for a 45-minute scientific and educational presentation followed by a buffet and the three-hour game.  Does this conform to the Code?

**Answer**
No.  A modest buffet meal accompanying a scientific or educational would be acceptable.  However, the provision of entertainment and/or recreational activities, including entertainment at sporting events in connection with an educational or scientific presentation or discussion, is inconsistent with the Code.

h.   **Question**
Under what circumstances would the Code permit a company to provide entertainment or recreational activities directly to healthcare practitioners?

**Answer**
Companies may provide modest entertainment or recreational activities to healthcare practitioners in a context where those practitioners are providing a legitimate service to the companies, such as when they act as bona fide consultants on an advisory board or are trained at a speaker-training meeting.

Companies should generally not provide entertainment or recreational activities to healthcare practitioners. Thus, companies should not invite healthcare professionals to sporting events, concerts, or shows, or provide them with recreational activities such as hunting, fishing, boating, ski trips, or golf outings, even if those entertainment events or recreational activities are used to facilitate informational interchanges between the company representative and the healthcare professional. Similarly, it would be inappropriate to provide these types of entertainment and recreational events in conjunction with promotional scientific presentations by medical experts.

i.    **Question**

Company A retains a small group of 15 nationally known physicians regarding a therapeutic area relevant to company A's products to advise on general medical and business issues and provide guidance on product development and research programs for those products. These physicians are paid significant fees, but those fees are typical of the fees paid to thought leaders in this therapeutic area. They normally meet once or twice a year at resort locations to discuss the latest product data, research programs and Company plans for the product(s). Does this comply with the Code? If it does, is it appropriate to pay for the spouse of the healthcare professional to attend, as well?

**Answer**

This arrangement appears to comply with the Code. The number of advisors seems reasonably small. The advisors seem to have been selected based on their expertise in the areas where advice is needed. While the consultants are paid significant fees, these appear to be reasonable under the circumstances. Finally, while holding consultant meetings at resort locations is not prohibited, the facilities chosen should be conducive to the services provided as well as reasonable and appropriate to the conduct of the meeting.

It would not be appropriate to pay for the cost of the spouse of the advisor. If the spouse attends, it should be at the cost of the advisor.

j.    **Question**

Company A invites 300 physicians/consultants to a two-day and one-night speaker-training program at a regional golf resort. All attendees are compensated for their participation and their expenses are reimbursed. Prospective speakers are selected based on recommendations of the Company's district managers and an assessment of their qualifications by the Company's medical or scientific personnel. Each of the attendees is required to sign an agreement in advance covering the services they will provide. They are educated by a faculty on the full range of data surrounding the disease state and the Company's drug product, on presentation skills, and on FDA regulatory requirements. The Company plans to use at least 280 participants as speakers over the coming year, and it needs to train 300

speakers in order to ensure that 280 will actually be available when needed.
Training sessions take both days, and the Company provides for a few hours of
golf and meals. Does this program conform to the Code? If so, is it appropriate to
pay for a spouse of the healthcare professional, as well?

**Answer**

This arrangement appears to comply with the Code.  Speaker training is an
essential activity because FDA holds companies accountable for the presentations
of their speakers.  In this case, the participants undergo extensive training that will
result in a valuable service being provided to the company, and the arrangement
meets reasonable indicia of a bona fide consulting relationship.  While resort
locations are not prohibited, the Company may want to consider whether it would
be more appropriate to hold the training session at a non-resort location.  In this
case, the number of speakers being trained is important; if significantly more
participants were trained than were to be used as speakers, this arrangement would
not comply with the Code.

The amount of time spent training speakers should be reasonable in relation to the
material that has to be covered.  The compensation offered to prospective
speakers, including the value of any entertainment, should be evaluated to assure
that it is reasonable compensation for that time.

It would not be appropriate to pay for the cost of the spouse of the healthcare
professional.  If the spouse attends, it should be at the cost of the healthcare
professional.

k.    **Question**

A sales representative invites a physician out for a round of golf and lunch
following the golf.  The physician is very busy and is difficult to see in her office.
The cost of the golf and the lunch combined are $65.  Does this comply with the
code?

**Answer**

No.  It is inconsistent with the Code to provide entertainment or recreational
activities such as golf.

# Exhibit K

| Date | Close | Volume |
|------|-------|--------|
| 8/25/2010 | 63.36 | 2550200 |
| 8/26/2010 | 63.22 | 1955100 |
| 8/27/2010 | 63.17 | 1369100 |
| 8/30/2010 | 62.01 | 1705100 |
| 8/31/2010 | 61.42 | 2420500 |
| *9/1/2010* [1] | *63.28* | *2406200* |
| 9/2/2010 | 63.67 | 1166500 |
| 9/3/2010 | 63.87 | 1364900 |
| 9/7/2010 | 63.58 | 1259200 |
| 9/8/2010 | 64.09 | 1594900 |
| 9/9/2010 | 65.14 | 1834400 |
| 9/10/2010 | 65.8 | 1787100 |
| 9/13/2010 | 65.78 | 1233500 |
| 9/14/2010 | 65.88 | 1168200 |
| 9/15/2010 | 66.14 | 1220100 |
| 9/16/2010 | 64.67 | 2733000 |
| 9/17/2010 | 65.21 | 2118700 |
| 9/20/2010 | 66.3 | 1399400 |
| 9/21/2010 | 65.97 | 1699500 |
| 9/22/2010 | 65.59 | 1486200 |
| 9/23/2010 | 64.93 | 1016600 |
| 9/24/2010 | 66.36 | 1227700 |
| 9/27/2010 | 66.17 | 1316200 |
| 9/28/2010 | 66.8 | 1768300 |
| 9/29/2010 | 66.71 | 1395500 |
| 9/30/2010 | 66.53 | 1872600 |
| 10/1/2010 | 66.25 | 1350400 |
| 10/4/2010 | 65.16 | 1344100 |
| *10/5/2010* [2] | *66.62* | *1659800* |
| 10/6/2010 | 66.41 | 1248300 |
| 10/7/2010 | 66.73 | 938000 |
| 10/8/2010 | 67.32 | 1714100 |
| 10/11/2010 | 67.9 | 1303000 |
| 10/12/2010 | 67.54 | 2308300 |
| 10/13/2010 | 68.51 | 1861200 |
| 10/14/2010 | 68.26 | 1370500 |
| 10/15/2010 | 68.86 | 1836900 |
| 10/18/2010 | 72.61 | 8449300 |
| 10/19/2010 | 71.73 | 2619700 |
| 10/20/2010 | 72.19 | 1681700 |
| 10/21/2010 | 71.67 | 1705600 |
| 10/22/2010 | 71.83 | 993700 |
| 10/25/2010 | 71.8 | 1677100 |
| 10/26/2010 | 72 | 1283400 |
| 10/27/2010 | 72.17 | 2068500 |
| 10/28/2010 | 72.84 | 1479600 |
| 10/29/2010 | 72.41 | 3073900 |

[1] The date the DOJ and Allergan announced the Civil and Criminal Settlements.
[2] The date Allergan pleaded guilty.

EXHIBIT K
PAGE 102

# Exhibit L

Exhibit 99.1

# News Release



**ALLERGAN**
2525 Dupont Drive
Irvine, CA 92612-1599
(714) 246-4500
www.allergan.com

**FOR IMMEDIATE RELEASE**

### ALLERGAN COMMENTS ON THE UNITED STATES DEPARTMENT OF JUSTICE SUBPOENA FOR THE PRODUCTION OF DOCUMENTS RELATING TO PROMOTIONAL PRACTICES OF BOTOX® FOR THERAPEUTIC USES

(IRVINE, Calif., March 3, 2008) — Allergan, Inc. (NYSE: AGN) today announced that it received a subpoena from the United States Department of Justice, United States Attorney's Office for the Northern District of Georgia requesting the production of documents regarding promotional practices involving BOTOX® (botulinum toxin type A) for therapeutic indications.

The subpoena broadly requests documents regarding promotional, educational and other activities relating to BOTOX®. Allergan's current understanding is that the inquiry involves questions regarding alleged off label promotion relating to the use of BOTOX® for the treatment of headache. While Allergan is currently in phase III clinical studies investigating the use of BOTOX® for the treatment of headache, this is not an FDA-approved use.

Although healthcare professionals, exercising their medical judgment, may generally prescribe or dispense a drug for indications not approved by the FDA (i.e., off label), it is Allergan's policy to promote its products only in a manner consistent with the FDA-approved product labeling.

In all circumstances, it is Allergan's policy to fully comply with all applicable laws, rules and regulations. Allergan's Healthcare Law Compliance Program is intended to ensure continued compliance with all applicable laws, regulations and industry guidance governing the sale and marketing of pharmaceutical and medical device products, as well as laws and regulations governing the reporting of prices for Government-reimbursed products.

Since its first approval in 1989, BOTOX® is indicated and used in the United States to treat a variety of often serious medical conditions, including cervical dystonia, blepharospasm, strabismus and hyperhidrosis, and is approved for 20 different indications by regulatory authorities across 70 countries worldwide.

Allergan will provide updates as it responds to the subpoena, and will fully cooperate with the U.S. Department of Justice to satisfactorily address any and all of their questions regarding this matter.

# # #

**Important BOTOX® (Botulinum Toxin Type A) Information**
BOTOX® is indicated for the treatment of cervical dystonia in adults to decrease the severity of abnormal head position and neck pain associated with cervical dystonia.

BOTOX® is also indicated for the treatment of strabismus and blepharospasm associated with dystonia, including benign essential blepharospasm or VII nerve disorders in patients 12 years of age and above.

**EXHIBIT L
PAGE 103**

The efficacy of BOTOX® treatment in deviations over 50 prism diopters, in restrictive strabismus, in Duane's syndrome with lateral rectus weakness, and in secondary strabismus caused by prior surgical over-recession of the antagonist has not been established. BOTOX® is ineffective in chronic paralytic strabismus except when used in conjunction with surgical repair to reduce antagonist contracture.

And BOTOX® is indicated for the treatment of severe primary axillary hyperhidrosis that is inadequately managed with topical agents.

**Important BOTOX® (Botulinum Toxin Type A) Safety Information**
BOTOX® treatment should not be injected in the presence of infection at the proposed injection site(s) and in individuals with known hypersensitivity to any ingredient in the formulation.

Serious heart problems and serious allergic reactions have been reported rarely. If you think you're having an allergic reaction or other unusual symptoms, such as difficulty swallowing, speaking or breathing, call your doctor immediately. Individuals with peripheral motor neuropathic diseases (e.g., amyotrophic lateral sclerosis, or motor neuropathy) or neuromuscular junctional disorders (e.g., myasthenia gravis or Lambert-Eaton syndrome) should only receive BOTOX® with caution. Patients with neuromuscular disorders may be at increased risk of clinically significant systemic side effects with BOTOX®. For full prescribing information, please visit www.botox.com and www.botoxcosmetic.com.

**BOTOX® for Blepharospasm in Patients ≥ 12 Years of Age:** Reduced blinking from BOTOX® injection of the orbicularis muscle can lead to corneal exposure, persistent epithelial defect and corneal perforation. The most frequently reported treatment-related adverse reactions in these patients are ptosis (20.8%), superficial punctate keratitis (6.3%) and eye dryness (6.3%).

**BOTOX® for Strabismus in Patients ≥ 12 Years of Age:** Inducing paralysis in one or more extraocular muscles may produce spatial disorientation, double vision or past pointing. The most commonly reported adverse effects are ptosis (16%) and vertical deviation (17%).

**BOTOX® for Cervical Dystonia in Adults:** There have been rare cases of dysphagia severe enough to warrant the insertion of a gastric feeding tube. The most frequently reported adverse reactions in patients with cervical dystonia are dysphagia (19%), upper respiratory infection (12%), neck pain (11%), and headache (11%).

**BOTOX® for Severe Primary Axillary Hyperhidrosis Inadequately Managed with Topical Agents:** The most frequently reported adverse events (3 — 10%) are injection site pain and hemorrhage, non-axillary sweating, infection, pharyngitis, flu syndrome, headache, fever, neck or back pain, pruritus, and anxiety.

**Forward-Looking Statements**
This press release contains "forward-looking statements," including statements regarding a federal subpoena and statements regarding the safety, effectiveness and adverse events associated with BOTOX®.

These statements are based on current expectations of future events. If underlying assumptions prove inaccurate or unknown risks or uncertainties materialize, actual results could vary materially from Allergan's expectations and projections. Risks and uncertainties include, among other things, general industry, economic, biologic and pharmaceutical market conditions; technological advances and patents attained by competitors; challenges inherent in the

EXHIBIT L
PAGE 104

research and development and regulatory processes; inconsistency of treatment results among patients; potential difficulties in manufacturing; and governmental laws and regulations affecting domestic and foreign operations. Additional information concerning these and other risk factors can be found in press releases issued by Allergan, as well as Allergan's public periodic filings with the Securities and Exchange Commission, including the discussion under the heading "Risk Factors" in Allergan's 2007 Form 10-K. Copies of Allergan's press releases and additional information about Allergan is available on the World Wide Web at www.allergan.com or you can contact the Allergan Investor Relations Department by calling 1-714-246-4636.

**About Allergan, Inc.**
Founded in 1950, Allergan, Inc., with headquarters in Irvine, California, is a multi-specialty health care company that discovers, develops and commercializes innovative pharmaceuticals, biologics and medical devices that enable people to live life to its greatest potential — to see more clearly, move more freely, express themselves more fully. The Company employs more than 7,500 people worldwide and operates state-of-the-art R&D facilities and world-class manufacturing plants. In addition to its discovery-to-development research organization, Allergan has global marketing and sales capabilities with a presence in more than 100 countries.

SOURCE: Allergan, Inc.

<u>Allergan Contacts</u>
Jim Hindman (714) 246-4636 (investors)
Joann Bradley (714) 246-4766 (investors)
Emil Schultz (714) 246-4474 (investors)
Caroline Van Hove (714) 246-5134 (media)

© 2008 Allergan, Inc. Irvine, CA 92612. ® and ™ marks owned by Allergan, Inc.

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

**EXHIBIT L
PAGE 105**

# Exhibit M

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 8-K

---

## CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

August 30, 2010
Date of Report (Date of Earliest Event Reported)

---

# ALLERGAN, INC.
### (Exact Name of Registrant as Specified in its Charter)

| Delaware | 1-10269 | 95-1622442 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

2525 Dupont Drive
Irvine, California 92612
(Address of Principal Executive Offices) (Zip Code)

(714) 246-4500
(Registrant's Telephone Number, Including Area Code)

N/A
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

EXHIBIT M
PAGE 106

**Item 1.01.   Entry into a Material Definitive Agreement.**

On September 1, 2010, Allergan, Inc. (the "Company") announced that it reached resolution with the United States Department of Justice (the "DOJ") regarding the previously reported government investigation into the Company's past U.S. sales and marketing practices relating to certain therapeutic uses of Botox®. The Company hereby incorporates by reference the press release dated September 1, 2010 and filed as Exhibit 99.1 to this report (the "Settlement Press Release").

A copy of the agreement setting forth the terms and conditions of the civil settlement described in the Settlement Press Release (the "Federal Settlement Agreement") is filed as Exhibit 10.1 to this report and incorporated by reference herein. The Company, together with its subsidiary Allergan USA, Inc. ("Allergan USA"), entered into the Federal Settlement Agreement on August 31, 2010 with the United States of America, acting through the DOJ and the United States Attorney's Office for the Northern District of Georgia (the "USAO") and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS"), the TRICARE Management Activity, the United States Office of Personnel Management, the United States Department of Veterans Affairs, and Office of Workers' Compensation Programs of the United States Department of Labor; and the relators in the *qui tam* actions identified in the Federal Settlement Agreement.

A copy of the Corporate Integrity Agreement described in the Settlement Press Release (the "Corporate Integrity Agreement") is filed as Exhibit 10.2 to this report and incorporated by reference herein. The Company entered into the Corporate Integrity Agreement with OIG-HHS on August 30, 2010. Failure to comply with its obligations under the Corporate Integrity Agreement could result in the Company incurring financial penalties or being excluded from participation in federal health care programs.

The proposed terms and conditions of the Company's plea to the misdemeanor "misbranding" charge referenced in the Settlement Press Release are set forth in a written agreement with the USAO (the "Plea Agreement") that the Company expects will be executed contemporaneously with the plea hearing in the United States District Court for the Northern District of Georgia (the "Court"). The plea hearing has not yet been scheduled. The recommended sentence in the Plea Agreement is subject to approval by the Court, and there can be no assurance that the Court will approve the Plea Agreement or regarding the timing of any such approval. The form of the Plea Agreement is filed as Exhibit 10.3 to this report and incorporated by reference herein.

The Federal Settlement Agreement provides for payment by the Company of a settlement amount of $225 million, plus accrued interest, consisting of (1) a federal settlement amount of $210.15 million, plus applicable accrued interest, payable to the United States within seven business days after the later of (a) execution of the Federal Settlement Agreement and (b) approval by the Court of the Plea Agreement and (2) a state settlement amount of $14.85 million, plus applicable accrued interest, a designated portion of which state settlement amount and accrued interest would be payable to each U.S. state   including as a state, for this purpose, the District of Columbia   that enters into a separate state settlement agreement with the

**EXHIBIT M
PAGE 107**

Powered by Morningstar Document Research℠

Company and Allergan USA. If the Court does not accept the Company's guilty plea under, or impose the sentence contemplated by, the Plea Agreement, each of the Company or the United States may, at its option, elect to have the Federal Settlement Agreement become null and void and be rescinded.

The Plea Agreement provides for a sentence, to be imposed by the Court, requiring the Company to pay to the United States $375 million, consisting of a $350 million criminal fine and $25 million in satisfaction of a forfeiture obligation, within 10 business days of the date of sentencing.

Both the Federal Settlement Agreement and the Plea Agreement are conditioned on the Company's dismissal with prejudice of the declaratory judgment action filed by the Company in October 2009 in the United States District Court for the District of Columbia, captioned Allergan, Inc. v. United States, et al., 1:09-cv-01879, in which the Company sought a ruling that it could proactively share truthful scientific and medical information with the medical community to assist physicians in evaluating the risks and benefits if they choose to use Botox® off-label to treat certain forms of spasticity.

The description of the Federal Settlement Agreement, the Corporate Integrity Agreement and the Plea Agreement in this Item 1.01 is not complete and is qualified in its entirety by the terms of the Federal Settlement Agreement, the Corporate Integrity Agreement and the form of Plea Agreement, copies of which are filed as Exhibit 10.1, 10.2 and 10.3, respectively, hereto and incorporated herein by reference. If the Court does not approve the Plea Agreement, there can be no assurance that the Federal Settlement Agreement will take effect as currently contemplated or at all or that any charges or claims to which the Plea Agreement, the Federal Settlement Agreement or the government investigation relates would ultimately be resolved in a manner consistent with, or not materially more adverse to the Company than, the terms and conditions that would apply under the Plea Agreement, the Federal Settlement Agreement and related state settlement agreements and the Corporate Integrity Agreement as described in this report.

**Item 2.06.   Material Impairments.**

On August 31, 2010, the Company concluded that the intangible assets and a related prepaid royalty asset associated with the *Sanctura®* franchise (the "*Sanctura®* Assets"), which the Company acquired in connection with its October 2007 acquisition of Esprit Pharma Holding Company, Inc. and certain subsequent licensing and commercialization transactions, have become impaired. The Company determined that an impairment charge was required with respect to the *Sanctura®* Assets because the estimated undiscounted future cash flows over their remaining useful life were not sufficient to recover the current carrying amount of the *Sanctura®* Assets and the carrying amount exceeded the estimated fair value of those assets due to a recent reduction in expected future financial performance for the *Sanctura®* franchise resulting from lower than anticipated acceptance by patients, physicians and payers. As a result, the Company's third quarter and full year 2010 financial results are expected to include an aggregate non-cash pretax impairment charge of approximately $340 million to $350 million related to the *Sanctura®* Assets. The Company has not yet completed its analysis of the fair value of the *Sanctura®* Assets and expects to complete that analysis by the end of its third fiscal quarter. The

**EXHIBIT M**
**PAGE 108**

Source: ALLERGAN INC, 8-K, September 01, 2010                                    Powered by Morningstar® Document Research℠

amount of the impairment charge is dependent upon a final determination of the fair value of the *Sanctura*® Assets. This non-cash impairment charge will have no effect on the Company's cash balances, cash flows from operating activities or ongoing operations, and the Company will continue to market and sell the *Sanctura*® product line.

**Item 8.01.  Other Events.**

On September 1, 2010, the Company announced that it reached a resolution with the DOJ regarding the previously reported government investigation into the Company's past U.S. sales and marketing practices relating to certain therapeutic uses of *Botox*®. The Company hereby incorporates by reference (1) the press release dated September 1, 2010 and filed as Exhibit 99.1 to this report and (2) the disclosure in Item 1.01 of this report.

* * * * *

Statements made by the Company in this report that are not historical facts, including statements relating to the implementation and effect of the agreements described in Items 1.01 and 8.01 of this report, the estimated timing and amount of the pre-tax charges in connection with the global settlement with the DOJ, the timing of the payment of the global settlement costs and the timing, amount and impact of the impairment charge discussed in Item 2.06 of this report, are forward-looking statements. All forward-looking statements in this report reflect the Company's current analysis of existing trends and information and represent the Company's judgment only as of the date of this report. These statements are not guarantees of future performance and rely on a number of assumptions concerning future events, many of which are outside of the Company's control, and involve known and unknown risks and uncertainties that could cause the Company's actual results, performance or achievements to differ materially from those expressed or implied by such forward-looking statements. Such risks and uncertainties include, among other things, the risk that the Court may not approve the Plea Agreement, the actual amount of interest and attorneys' fees for which the Company will be liable in connection with the global settlement with the DOJ, the outcome of further analysis of the valuation of the Company's *Sanctura*® and *Sanctura XR*® business, the results of any pending or future litigation and the Company's compliance with the Corporate Integrity Agreement. Additional such risks and uncertainties are described in press releases issued by the Company, including the press release filed as Exhibit 99.1 to this report, as well as the Company's public filings with the Securities and Exchange Commission, including the discussion under the heading "Risk Factors" in the Company's Form 10-K for the fiscal year ended December 31, 2009 and Forms 10-Q for the quarters ended March 31, 2010 and June 30, 2010. Except as required under the federal securities laws and the rules and regulations of the U.S. Securities and Exchange Commission, the Company does not have any intention or obligation to update publicly any forward-looking statements made in this report, whether as a result of new information, future events, changes in assumptions or otherwise. The reader is cautioned not to rely on these forward-looking statements.

**EXHIBIT M
PAGE 109**

**Item 9.01.    Financial Statements and Exhibits.**

(d)    Exhibits.

10.1   Settlement Agreement, dated August 31, 2010, among the United States of America, acting through the United States Department of Justice and the United
       States Attorney's Office for the Northern District of Georgia and on behalf of the Office of Inspector General of the Department of Health and Human
       Services, the TRICARE Management Activity, the United States Office of Personnel Management, the United States Department of Veterans Affairs, and
       Office of Workers' Compensation Programs of the United States Department of Labor; the relators identified therein; and Allergan, Inc. and Allergan
       USA, Inc.

10.2   Corporate Integrity Agreement, dated August 30, 2010, between the Office of Inspector General of the Department of Health and Human Services and
       Allergan, Inc.

10.3   Form of Plea Agreement between the United States Attorney's Office for the Northern District of Georgia as counsel for the United States and Allergan,
       Inc.

99.1   Press Release dated September 1, 2010

EXHIBIT M
PAGE 110

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ALLERGAN, INC.**

Date:  September 1, 2010

| | |
|---|---|
| By: | /s/ Matthew J. Maletta |
| Name: | Matthew J. Maletta |
| Title: | Vice President, |
| | Associate General Counsel and Secretary |

**EXHIBIT M**
**PAGE 111**

Powered by Morningstar® Document Research℠

# Exhibit N

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

## CURRENT REPORT
## Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**November 1, 2010**
**Date of Report (Date of Earliest Event Reported)**

---

# ALLERGAN, INC.
#### (Exact Name of Registrant as Specified in its Charter)

| **Delaware** | **1-10269** | **95-1622442** |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**2525 Dupont Drive**
**Irvine, California 92612**
#### (Address of Principal Executive Offices) (Zip Code)

**(714) 246-4500**
#### (Registrant's Telephone Number, Including Area Code)

**N/A**
#### (Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13c-4(c) under the Exchange Act (17 CFR 240.13c-4(c))

**Item 2.02.   Results of Operations and Financial Condition.**

On November 1, 2010, Allergan, Inc. ("Allergan") issued a press release announcing operating results for the third quarter ended September 30, 2010. In its press release, Allergan included non-GAAP financial measures, as defined in Regulation G promulgated by the Securities and Exchange Commission. A copy of the press release is furnished as Exhibit 99.1 hereto and is incorporated herein by reference.

This information and the information contained in the press release shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section. The information in Item 2.02 of this Current Report is not incorporated by reference into any filings of Allergan made under the Securities Act of 1933, as amended, whether made before or after the date of this Current Report, regardless of any general incorporation language in the filing unless specifically stated so therein.

**Item 9.01.   Financial Statements and Exhibits.**

(d)   Exhibits.

99.1  Allergan, Inc. press release dated November 1, 2010

EXHIBIT N
PAGE 113

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ALLERGAN, INC.**

Date:  November 1, 2010

By:   /s/ Matthew J. Maletta
Name:  Matthew J. Maletta
Title:  Vice President,
Associate General Counsel and Secretary

EXHIBIT N
PAGE 114

Exhibit Index

| Exhibit | Description of Exhibit |
|---------|------------------------|
| 99.1 | Allergan, Inc. press release dated November 1, 2010 |

EXHIBIT N
PAGE 115

Exhibit 99.1

# News Release



**ALLERGAN**

2525 Dupont Drive
Irvine, CA 92612-1599
(714) 246-4500
www.allergan.com

## ALLERGAN REPORTS THIRD QUARTER 2010 OPERATING RESULTS
### Board of Directors Declares Third Quarter Dividend

(IRVINE, Calif., November 1, 2010)     Allergan, Inc. (NYSE: AGN) today announced operating results for the quarter ended September 30, 2010. Allergan also announced that its Board of Directors has declared a third quarter dividend of $0.05 per share, payable on December 1, 2010 to stockholders of record on November 10, 2010.

### Operating Results Attributable to Stockholders
For the quarter ended September 30, 2010:

· Allergan reported $2.21 diluted loss per share attributable to stockholders compared to $0.58 diluted earnings per share attributable to stockholders for the third quarter of 2009.

· Allergan reported $0.78 non-GAAP diluted earnings per share attributable to stockholders compared to $0.70 non-GAAP diluted earnings per share attributable to stockholders for the third quarter of 2009, an 11.4 percent increase.

### Product Sales
For the quarter ended September 30, 2010:

· Allergan reported $1,192.0 million total product net sales. Total product net sales increased 5.7 percent compared to total product net sales in the third quarter of 2009. On a constant currency basis, total product net sales increased 6.3 percent compared to total product net sales in the third quarter of 2009.

  · Total specialty pharmaceuticals net sales increased 5.2 percent, or 5.7 percent on a constant currency basis, compared to total specialty pharmaceuticals net sales in the third quarter of 2009.

  · Total medical devices net sales increased 8.3 percent, or 9.0 percent on a constant currency basis, compared to total medical devices net sales in the third quarter of 2009.

"We are very pleased with our third quarter results," said David E.I. Pyott, Allergan's Chairman of the Board and Chief Executive Officer. "Strong R&D performance led to a series of several important product approvals, including FDA approval of LUMIGAN ® 0.01%, OZURDEX ® for uveitis, and BOTOX ® for the prophylactic treatment of headaches in adults with chronic migraine, as well as approvals in Europe and Canada."

-more-

2-2-2

## Product and Pipeline Update

During the third quarter of 2010:

- Effective July 1, 2010, Allergan established direct operations in Poland and Turkey.

- On July 9, 2010, Allergan announced that BOTOX ® (botulinum toxin type A) was licensed by the Medicines and Healthcare Products Regulatory Agency in the United Kingdom for the prophylaxis of headaches in adults who have chronic migraine (headaches on at least 15 days per month of which at least 8 days are with migraine).

- On July 27, 2010, the European Medicines Agency granted marketing authorization for OZURDEX ® (dexamethasone 700mcg intravitreal implant in applicator) in the 27 member states of the European Union, making OZURDEX ® the first licensed treatment in Europe for macular edema in patients with retinal vein occlusion.

- On August 31, 2010, Allergan announced that the United States Food and Drug Administration (FDA) approved LUMIGAN ® (bimatoprost ophthalmic solution) 0.01% as a first-line therapy indicated for the reduction of elevated intraocular pressure in patients with open-angle glaucoma or ocular hypertension.

- On September 24, 2010, Allergan announced that the FDA approved OZURDEX ® (dexamethasone intravitreal implant) 0.7 mg for the treatment of non-infectious ocular inflammation, or uveitis, affecting the posterior segment of the eye.

- Health Canada approved RESTASIS ® (cyclosporine ophthalmic emulsion) 0.05% for the treatment of moderate to moderately severe aqueous deficient dry eye disease.

- Allergan acquired from Vistakon Pharmaceuticals, LLC, Janssen Pharmaceutica N.V., Beerse and Johnson & Johnson Vision Care Inc. the global license to manufacture and commercialize alacafadine 0.25%, a topical allergy medication for the prevention and treatment of itching associated with allergic conjunctivitis. Alcaftadine is FDA-approved in the United States under the brand name LASTACAFT™ (alcaftadine ophthalmic solution).

Following the end of the third quarter of 2010:

- On October 15, 2010, Allergan announced that the FDA approved BOTOX ® (onabotulinumtoxinA) for the prophylactic treatment of headaches in adults with chronic migraine, a distinct and severe neurological disorder characterized by patients who have a history of migraine and suffer from headaches on 15 or more days per month with headaches lasting four hours a day or longer.

- Allergan filed a supplemental Biologics License Application (sBLA) with the FDA for the use of BOTOX ® in the treatment of urinary incontinence due to neurogenic detrusor overactivity resulting from neurogenic bladder.

-more-

3-3-3

## Other Events

- On August 31, 2010, Allergan concluded that the intangible assets and a related prepaid royalty asset associated with the SANCTURA ® franchise (the "SANCTURA ® Assets"), which Allergan acquired in connection with its October 2007 acquisition of Esprit Pharma Holding Company, Inc. and certain subsequent licensing and commercialization transactions, had become impaired. Allergan determined that an impairment charge was required with respect to the SANCTURA ® Assets because the estimated undiscounted future cash flows over their remaining useful life were not sufficient to recover the current carrying amount of the SANCTURA ® Assets and the carrying amount exceeded the estimated fair value of those assets due to a reduction in expected future financial performance for the SANCTURA ® franchise resulting from lower than anticipated acceptance by patients, physicians and payers. As a result, the Company's third quarter 2010 financial results include an aggregate non-cash pre-tax charge of $369.1 million related to the impairment of the SANCTURA ® Assets.

- On September 1, 2010, Allergan announced that it had reached a resolution with the United States Department of Justice (DOJ) regarding the previously reported Government investigation into Allergan's past U.S. sales and marketing practices relating to certain therapeutic uses of BOTOX ®. Allergan cooperated with the Government in a multi-year investigation regarding the use of BOTOX ® for certain therapeutic treatments covering a period that commenced in January of 2000. The parties resolved all issues involved in the investigation by entering into a global settlement, pursuant to which:

  1) Allergan agreed to plead guilty to a single misdemeanor "misbranding" charge covering the period 2000 through 2005 and pay to the Government $375 million. This misbranding charge is known as a strict liability offense, and does not involve false or deceptive conduct. On October 5, 2010, the U.S. District Court in Atlanta, Georgia accepted Allergan's plea and approved the criminal fine.

  2) Allergan agreed to pay $225 million to resolve civil claims asserted by DOJ under the civil False Claims Act. The civil settlement is an element of a global settlement that Allergan believes is in the best interest of its stockholders. However, Allergan denies liability associated with these civil allegations and does not believe there is merit to them factually or legally.

  3) Allergan was required by the Government to dismiss Allergan's First Amendment lawsuit pending in Washington, D.C., in which Allergan sought a ruling that it could proactively share truthful scientific and medical information with the medical community to assist physicians in evaluating the risks and benefits if they choose to use BOTOX ® off-label to treat certain forms of spasticity.

  4) Allergan has entered into a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the U.S. Department of Health and Human Services. Under the CIA, Allergan will maintain its current compliance program and undertake a series of compliance-related obligations, including additional monitoring, maintenance of specific written standards, auditing, training, education, reporting and disclosure, for five years. The CIA also provides for an independent third-party review organization to assess and report on Allergan's compliance program.

-more-

EXHIBIT N
PAGE 118

4-4-4

5) Allergan recorded total pre-tax charges of $609.9 million in the third quarter in connection with the global settlement with the DOJ. This amount includes estimated interest and certain attorneys' fees that Allergan is obligated to pay in connection with the global settlement, but excludes Allergan's ongoing administrative legal fees and other costs. Allergan is presently determining the tax treatment of the global settlement charges. As such, the tax impact of such charges cannot be reasonably estimated at this time. Allergan paid substantially all of the global settlement costs in October 2010, and currently expects to pay the remaining balance by the end of 2010.

**Outlook**
For the full year of 2010, Allergan expects:
- Total product net sales between $4,750 million and $4,800 million.
  - Total specialty pharmaceuticals net sales between $3,950 million and $3,970 million.
  - Total medical devices net sales between $800 million and $830 million.
  - ALPHAGAN ® franchise product net sales between $380 million and $390 million.
  - LUMIGAN ® franchise product net sales between $520 million and $530 million.
  - RESTASIS ® product net sales between $600 million and $610 million.
  - SANCTURA ® franchise product net sales at approximately $60 million.
  - BOTOX ® product net sales between $1,390 million and $1,400 million.
  - LATISSE ® product net sales at approximately $90 million.
  - Breast aesthetics product net sales between $300 million and $310 million.
  - Obesity intervention product net sales between $230 million and $240 million.
  - Facial aesthetics product net sales between $270 million and $280 million.
- Non-GAAP cost of sales to product net sales ratio between 15.5% and 16.0%.
- Non-GAAP other revenue at approximately $50 million.
- Non-GAAP selling, general and administrative expenses to product net sales ratio at approximately 40%.
- Non-GAAP research and development expenses to product net sales ratio at approximately 16%.
- Non-GAAP amortization of acquired intangible assets at approximately $20 million. This expectation excludes the amortization of acquired intangible assets associated with the Inamed, Cornéal, EndoArt, Esprit, Samil and Serica acquisitions, the ACZONE ® asset purchase and LASTACAFT™ license.
- Non-GAAP diluted earnings per share attributable to stockholders between $3.14 and $3.16.
- Diluted shares outstanding at approximately 308 million.
- Effective tax rate on non-GAAP earnings at approximately 28%.

For the fourth quarter of 2010, Allergan expects:
- Total product net sales between $1,220 million and $1,270 million.
- Non-GAAP diluted earnings per share attributable to stockholders between $0.86 and $0.88.

**-more-**

EXHIBIT N
PAGE 119

5-5-5

In this press release, Allergan reports certain historical and expected non-GAAP results, including earnings attributable to Allergan, Inc., non-GAAP basic and diluted earnings per share attributable to stockholders as well as non-GAAP other revenues, non-GAAP cost of sales, non-GAAP selling, general and administrative expenses, non-GAAP research and development expenses, non-GAAP amortization of acquired intangible assets, non-GAAP legal settlement, non-GAAP intangible asset impairment and related costs, non-GAAP restructuring charges, non-GAAP interest expense, non-GAAP gain on investments, non-GAAP other, net, non-GAAP provision for income taxes, non-GAAP net earnings and non-GAAP net sales reported in constant currency. Non-GAAP financial measures are reconciled to the most directly comparable GAAP financial measure in the financial tables of this press release and the accompanying footnotes.

**Forward-Looking Statements**
In this press release, the statements regarding product development, market potential, expected growth, regulatory approvals, the statements by Mr. Pyott as well as Allergan's earnings per share, product net sales, revenue forecasts and any other statements that refer to Allergan's expected, estimated or anticipated future results, are forward-looking statements. Because forecasts are inherently estimates that cannot be made with precision, Allergan's performance at times differs materially from its estimates and targets, and Allergan often does not know what the actual results will be until after the end of the applicable reporting period. Therefore, Allergan will not report or comment on its progress during a current quarter except through public announcement. Any statement made by others with respect to progress during a current quarter cannot be attributed to Allergan.

All forward-looking statements in this press release reflect Allergan's current analysis of existing trends and information and represent Allergan's judgment only as of the date of this press release. Actual results may differ materially from current expectations based on a number of factors affecting Allergan's businesses, including, among other things the following: changing competitive, market and regulatory conditions; the timing and uncertainty of the results of both the research and development and regulatory processes; domestic and foreign health care and cost containment reforms, including government pricing, tax and reimbursement policies; technological advances and patents obtained by competitors; the performance, including the approval, introduction, and consumer and physician acceptance of new products and the continuing acceptance of currently marketed products; the effectiveness of advertising and other promotional campaigns; the timely and successful implementation of strategic initiatives; the results of any pending or future litigation, investigations or claims; the uncertainty associated with the identification of and successful consummation and execution of external corporate development initiatives and strategic partnering transactions; and Allergan's ability to obtain and successfully maintain a sufficient supply of products to meet market demand in a timely manner. In addition, U.S. and international economic conditions, including higher unemployment, financial hardship, consumer confidence and debt levels, taxation, changes in interest and currency exchange rates, international relations, capital and credit availability, the status of financial markets and institutions, as well as the general impact of continued economic volatility, can materially affect Allergan's results. Therefore, the reader is cautioned not to rely on these forward-looking statements. Allergan expressly disclaims any intent or obligation to update these forward-looking statements except as required to do so by law.

-more-

EXHIBIT N
PAGE 120

6-6-6

Additional information concerning the above-referenced risk factors and other risk factors can be found in press releases issued by Allergan, as well as Allergan's public periodic filings with the Securities and Exchange Commission, including the discussion under the heading "Risk Factors" in Allergan's 2009 Form 10-K and Form 10-Q for the quarters ended March 31, 2010 and June 30, 2010. Copies of Allergan's press releases and additional information about Allergan is available at www.allergan.com or you can contact the Allergan Investor Relations Department by calling 714-246-4636.

**About Allergan, Inc.**

Allergan, Inc. is a multi-specialty health care company established 60 years ago with a commitment to uncover the best of science and develop and deliver innovative and meaningful treatments to help people reach their life's potential. Today, we have more than 9,000 highly dedicated and talented employees, global marketing and sales capabilities with a presence in more than 100 countries, a rich and ever-evolving portfolio of pharmaceuticals, biologics and medical devices, and state-of-the-art resources in R&D, manufacturing and safety surveillance that help millions of patients see more clearly, move more freely and express themselves more fully. From our beginnings as an eye care company to our focus today on several medical specialties, including ophthalmology, neurosciences, obesity, urologics, medical aesthetics and dermatology, Allergan is proud to celebrate 60 years of medical advances and proud to support the patients and physicians who rely on our products and the employees and communities in which we live and work.

**Allergan Contacts**
Jim Hindman (714) 246-4636 (investors)
Joann Bradley (714) 246-4766 (investors)
Caroline Van Hove (714) 246-5134 (media)

® and ™ Marks owned by Allergan, Inc.

-more-

EXHIBIT N
PAGE 121

# Exhibit O

## Thomson StreetEvents℠

### AGN - Q2 2008 Allergan Earnings Conference Call

Event Date/Time: Jul. 30. 2008 / 11:00AM ET

EXHIBIT O
PAGE 122

| THOMSON | www.streetevents.com | Contact Us | |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 30. 2008 / 11:00AM, AGN - Q2 2008 Allergan Earnings Conference Call |
|---|

## CORPORATE PARTICIPANTS

**Jim Hindman**
*Allergan - SVP, Treasury, Risk, IR*

**David Pyott**
*Allergan - Chairman, CEO*

**Jeff Edwards**
*Allergan - EVP-Fin., Bus. Devel., CFO*

**Scott Whitcup**
*Allergan - EVP, R&D*

**Joann Bradley**
*Allergan - IR*

## CONFERENCE CALL PARTICIPANTS

**Gary Nachman**
*Leerink Swann - Analyst*

**Gregg Gilbert**
*Merrill Lynch - Analyst*

**Peter Bye**
*Jefferies & Company - Analyst*

**Ronny Gal**
*Sanford Bernstein Research - Analyst*

**Larry Biegelsen**
*Wachovia - Analyst*

**David Buck**
*Buckingham Research - Analyst*

**Frank Pinkerton**
*Banc of America - Analyst*

**Amit Hazan**
*Oppenheimer and Company - Analyst*

## PRESENTATION

**Operator**

Hello, and welcome to the Allergan second quarter 2008 earnings conference call. Following today's presentation there will be a formal question-and-answer session. Today's conference call is scheduled to conclude at 9 a.m. Pacific time. To ensure that we are able to accommodate questions from as many participants as possible we ask that each of you limit to a maximum of two questions. (OPERATOR INSTRUCTIONS) At the request of the Company, today's conference is being recorded. If anyone has any objections, you may disconnect at this time. I would like to introduce today's conference host Mr. Jim Hindman, Senior Vice President, Treasury, Risk and Investor Relations. Sir, you may begin.

EXHIBIT O
PAGE 123

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 30. 2008 / 11:00AM, AGN - Q2 2008 Allergan Earnings Conference Call |
| --- |

**Scott Whitcup** - *Allergan - EVP, R&D*

On the first question, since the R&D date there isn't really much of a further update. The urology division realizes the unmet need. We've updated them on our proposals, what they wanted us to do was come back to them closer to the end of this year. They did signal to us that they'd be willing to look at us filing earlier with less treatment cycles which as you know the issue with overactive bladder is we have many patients where the treatment lasts a year or longer. So if you are wedded to three treatment cycles it makes the Phase III trial extremely long. So they realize that that's a hurdle that they might want to compromise on. But we won't have enough data on ultimate trial design until the end of the year. Your second question on the PDUFA date for the (inaudible) trial, we don't have the exact PDUFA date yet. We expect to hear back from the agency by the end of this quarter with the exact date.

**Ronny Gal** - *Sanford Bernstein Research - Analyst*

And David, going to the line shows, and I'm really impressed with your performance this quarter and one question comes to mind. Is, does that involve broadening the market? Is that primarily from going down marketing to groups of physicians who are currently not using fillers or is it more in a head to head competition with competitors in that market? And in addition to that is the question of Restylane plus Lidocaine. There was some discussion that that formulation will not work. What do you guys think? Maybe the competitive product can be formulated with Lidocaine.

**David Pyott** - *Allergan - Chairman, CEO*

Okay. I think in terms of dermal fillers as I really prefaced almost a year ago, we knew that the use of fillers in the U.S. was much lower than that of Europe. And so we therefore, more than instinctively we had really good models and reason to believe that the market would be very responsive to stimulation. Now, I think when one looks at the very top end of the market in terms of the top quintiles, I dare say Restylane has higher market share because that's where physicians were probably the earlier doctors of the product, built up a loyalty, built up a habit of use with Restylane and indeed their patients as well. So I think a large part of the expansion has been our ability to basically bring JUVEDERM to almost all of our BOTOX injectors and so of course if we can suggest to the physicians and then their patients to use both products side by side, there's a real opportunity for improving facial aesthetics results. In terms of JUVEDERM plus Lidocaine obviously we are very pleased with that, and we always just monitor what's going on with competition, and we know that Q-Med had an equivalent of our R&D day I recollect in May in Sweden and at least at that meeting there was no report of Restylane plus Lidocaine product. Now whether they have one, who knows. You'd have to go and ask them.

**Ronny Gal** - *Sanford Bernstein Research - Analyst*

Thank you. I'll get back in queue.

**Operator**

Our next question comes from Larry Biegelsen, from Wachovia.

**Larry Biegelsen** - *Wachovia - Analyst*

Thank you for taking my question. Just a couple of quick ones. LUMIGAN X, why the delay? Could you also give us an update on the status of the BOTOX labor negotiations? When do you expect a change? And lastly, why are the Department of Justice expenses so high and for how long do you expect this to continue? Thanks.

EXHIBIT O
PAGE 124

| THOMSON | www.streetevents.com | Contact Us | |
| --- | --- | --- | --- |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Jul. 30. 2008 / 11:00AM, AGN - Q2 2008 Allergan Earnings Conference Call |
| --- |

**David Pyott** - *Allergan - Chairman, CEO*

I think these are all pretty short and easy answers. I think regarding LUMIGAN X, I remarked that we are very pleased with the quality of our data package and of course we see frequently the FDA has just been backed up. That's why we have extended the date, Jeff in his comments remarked that we moved out our assumption from Q2 unfortunately into Q3. Regarding BOTOX label discussions, really we can't say anything there definitively. We have obviously submitted an enormous amount of data to the agency which they are reviewing and they will come back in due course with their comments to our recommendations.

I think regarding the DOJ, the best way to think about this is both the time and also you can imagine the word BOTOX features in many documents in this Company because it is our largest product, and of course BOTOX is used in many different areas both on label and of course whilst we're assiduous in avoiding off label promotion there's nevertheless internal documents that talk about future plans as we've been talking about on this call. Things like specificity et cetera and it has broad use backed up by Compendium.

**Larry Biegelsen** - *Wachovia - Analyst*

Any idea how long it will continue, David?

**David Pyott** - *Allergan - Chairman, CEO*

I think it's early days would be really nothing but wild expectation, but of course one knows looking at other cases, these things can take years.

**Larry Biegelsen** - *Wachovia - Analyst*

Thank you.

**Operator**

Our next question comes from David Buck from Buckingham Research.

**David Buck** - *Buckingham Research - Analyst*

Thanks for taking the question. The first one is either for David or Scott. Can you give us a sense of your confidence level into the data for headache BOTOX headache? For David can you talk a little about why you think the cash pay business so far has been holding up ex-U.S.? And why do you think led over the last couple of quarters starting to see more consumer impact on your cash pay businesses? And what role do you think safety concerns and headlines may have had on BOTOX in particular? Thanks.

**Scott Whitcup** - *Allergan - EVP, R&D*

David, this is Scott. I'll take the BOTOX headache. What we've said previously and everyone knows that migraine is a tough area. That said we think learning from the multiple phase programs that we designed the best study to show an effect in the right patient population. So the studies have gone well. They have been conducted well. We remain confident in the design and as we said at our R&D technology review we will have, through a press release the data from the Phase III program by the end of September.

EXHIBIT O
PAGE 125

| **THOMSON** | www.streetevents.com | Contact Us | |
| --- | --- | --- | --- |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# Exhibit P

# News Release



**ALLERGAN**

2525 Dupont Drive
Irvine, CA 92612-1599
(714) 246-4500
www.allergan.com

## ALLERGAN RESOLVES UNITED STATES GOVERNMENT INVESTIGATION
## OF PAST SALES AND MARKETING PRACTICES RELATING TO CERTAIN THERAPEUTIC USES OF BOTOX®

(IRVINE, Calif., September 1, 2010)   Allergan, Inc. (NYSE: AGN) today announced that it has reached a resolution with the United States Department of Justice (DOJ) regarding the previously reported Government investigation into Allergan's past U.S. sales and marketing practices relating to certain therapeutic uses of BOTOX® (onabotulinumtoxinA).

Allergan has been cooperating with the Government in a multi-year investigation in Atlanta, Georgia, regarding the use of BOTOX® for certain therapeutic treatments covering a period that commenced in January of 2000. The parties have resolved all issues involved in the investigation by entering into a global settlement, which includes the following:

Allergan has agreed to plead guilty to a single misdemeanor "misbranding" charge covering the period 2000 through 2005 and pay to the Government $375 million. This misbranding charge is known as a strict liability offense, and does not involve false or deceptive conduct. A prescription drug is deemed misbranded when its labeling does not contain adequate directions for its "intended uses," and, under the Government's view, a use that the U.S. Food and Drug Administration (FDA) has not approved (i.e., an "off-label" use) may be deemed "intended" based on written or oral statements made by the manufacturer. As part of its plea, Allergan has agreed that between 2000 through 2005, its marketing of BOTOX® resulted in intended uses for the therapeutic treatment of headache, pain, spasticity and juvenile cerebral palsy. These uses were off label during the relevant time frame and thus the labeling for BOTOX® did not bear directions for these intended uses, resulting in the product being misbranded. In March 2010, the FDA approved BOTOX® for the treatment of increased muscle stiffness in the elbow, wrist and fingers in adults with upper limb spasticity, the most substantial use during the relevant time period, and thus its label now includes directions for that use. Based on positive Phase III trials announced in September 2008, Allergan has filed for FDA approval of BOTOX® for the treatment of chronic migraine and expects FDA to rule on the application in 2010. Allergan is also in Phase III clinical trials investigating the use of BOTOX® to treat neurogenic and idiopathic overactive bladder. Although BOTOX® is approved in 70 countries around the world, including the United Kingdom, Canada, Brazil, Hong Kong, and recently Japan, to treat symptoms associated with juvenile cerebral palsy, it is currently off label in the United States. Allergan is in discussions with the FDA regarding additional clinical development for juvenile cerebral palsy in the United States.

In addition, Allergan has agreed to pay $225 million to resolve civil claims asserted by DOJ under the civil False Claims Act. The civil settlement is an element of a global settlement that Allergan believes is in the best interest of its stockholders. However, Allergan denies liability associated with these civil allegations and does not believe there is merit to them factually or legally.

To resolve the criminal and civil investigation, Allergan was required by the Government to dismiss Allergan's First Amendment lawsuit pending in Washington, D.C., in which Allergan sought a ruling that it could proactively share truthful scientific and medical information with the medical community to assist physicians in evaluating the risks and benefits if they choose to use BOTOX® off label to treat certain forms of spasticity. Allergan is disappointed that the court was not afforded an opportunity to hear and rule on these important First Amendment issues, as Allergan believes that physicians, patients, manufacturers, payers, and ultimately the quality of evidence-based medicine itself would have benefited from a ruling clarifying the law.

**EXHIBIT P**
**PAGE 126**

Allergan is committed to conducting its business consistent with high ethical standards and in compliance with all applicable laws. In an effort to meet its compliance goals, Allergan has a robust and regularly reviewed and updated compliance program. Allergan has further enhanced its compliance program by developing additional comprehensive policies and procedures, supported by significant technology investments, including its state-of-the-art Business Execution Automated Compliance Navigator (BEACON) compliance system.

As part of its global settlement, Allergan has entered into a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the U.S. Department of Health and Human Services. Under the CIA, Allergan will maintain its current compliance program and undertake a series of compliance-related obligations, including additional monitoring, maintenance of specific written standards, auditing, training, education, reporting and disclosure, for five years. The CIA also provides for an independent third-party review organization to assess and report on Allergan's compliance program.

"This settlement is in the best interest of our stockholders as it resolves all matters at issue in the investigation, avoids substantial costs of litigation, as well as the substantial risks to Allergan associated with Government enforcement action in these matters, and permits us to focus our time and resources on productively developing new treatments for patients and the medical community," said Douglas S. Ingram, Allergan's Executive Vice President.

Allergan currently estimates that it will record total non-recurring pre-tax charges of between approximately $610 million and $615 million in its third fiscal quarter in connection with the global settlement with the DOJ. This amount includes estimated interest and certain attorneys' fees that Allergan is obligated to pay in connection with the global settlement, but excludes Allergan's ongoing administrative legal fees and other costs. Allergan is presently determining the tax treatment of the global settlement charges. As such, the tax impact of such charges cannot be reasonably estimated at this time. Allergan currently expects to pay the global settlement costs in its fourth fiscal quarter.

The criminal resolution is subject to approval by the federal court in Northern District of Georgia, and the civil settlement is contingent upon such approval.

**About BOTOX®**

BOTOX® is a prescription-only medical product that contains tiny amounts of highly purified botulinum toxin protein refined from the bacterium, *Clostridium botulinum*. BOTOX® has a unique, protected molecular structure that stabilizes the core toxin in BOTOX® from degradation. When injected at approved and labeled doses into a specific muscle or gland, BOTOX® neurotoxin is expected to diffuse locally and expected to produce a safe and effective result by producing a localized and temporary reduction in the overacting muscle or gland, usually lasting up to approximately 3 to 6.7 months depending on the individual patient and indication.

BOTOX® was first approved by the FDA 20 years ago for the treatment of strabismus and blepharospasm, two eye muscle disorders, making it the first botulinum toxin type A product approved in the world. Since its first approval, BOTOX® has been recognized by regulatory authorities worldwide as an effective treatment for 21 different indications in approximately 80 countries, benefiting patients worldwide. In the United States, BOTOX® is also approved to treat the abnormal head position and neck pain that happens with cervical dystonia (CD) in adults, symptoms of severe underarm sweating (severe primary axillary hyperhidrosis) when medicines used on the skin (topical) do not work well enough, and increased muscle stiffness in elbow, wrist and finger muscles in adults with upper limb spasticity.

In addition to its therapeutic uses, the same formulation of BOTOX® with dosing specific to glabellar lines was approved by the FDA in 2002 under the trade name BOTOX® Cosmetic (onabotulinumtoxinA).

In addition to 20 years of clinical experience, the safety and efficacy of BOTOX® have been well-established in approximately 50 randomized, placebo-controlled clinical trials and in approximately 11,000 patients treated with BOTOX® and BOTOX® Cosmetic in Allergan's clinical trials . Worldwide, approximately 26 million vials of BOTOX® and BOTOX® Cosmetic have been distributed and approximately 29 million treatment sessions have been performed over the

EXHIBIT P
PAGE 127

past 20 years (1989-2009)[ii]. With approximately 2,100 articles on BOTOX® and BOTOX® Cosmetic in scientific and medical journals,[iii] BOTOX® neurotoxin is one of the most widely researched medicines in the world.

BOTOX® is a prescription medicine that is injected into muscles and used:

- to treat increased muscle stiffness in elbow, wrist, and finger muscles in adults with upper limb spasticity.

- to treat the abnormal head position and neck pain that happens with cervical dystonia (CD) in adults.

- to treat certain types of eye muscle problems (strabismus) or abnormal spasm of the eyelids (blepharospasm) in people 12 years and older.

BOTOX® is also injected into the skin to treat the symptoms of severe underarm sweating (severe primary axillary hyperhidrosis) when medicines used on the skin (topical) do not work well enough.

BOTOX® Cosmetic is a prescription medicine that is injected into muscles and used to improve the look of moderate to severe frown lines between the eyebrows (glabellar lines) in adults younger than 65 years of age for a short period of time (temporary).

It is not known whether BOTOX® is safe or effective in children younger than:

- 18 years of age for treatment of spasticity

- 16 years of age for treatment of cervical dystonia

- 18 years of age for treatment of hyperhidrosis

- 12 years of age for treatment of strabismus or blepharospasm

BOTOX® Cosmetic is not recommended for use in children younger than 18 years of age.

It is not known whether BOTOX® and BOTOX® Cosmetic are safe or effective for other types of muscle spasms or for severe sweating anywhere other than your armpits.

**IMPORTANT SAFETY INFORMATION INCLUDING BOXED WARNING:**

BOTOX® and BOTOX® Cosmetic may cause serious side effects that can be life threatening. Call your doctor or get medical help right away if you have any of these problems after treatment with BOTOX® or BOTOX® Cosmetic:

- **Problems swallowing, speaking, or breathing. These problems can happen hours to weeks after an injection of BOTOX® or BOTOX® Cosmetic usually because the muscles that you use to breathe and swallow can become weak after the injection. Death can happen as a complication if you have severe problems with swallowing or breathing after treatment with BOTOX® or BOTOX® Cosmetic.**

- **Swallowing problems may last for several months. People who already have swallowing or breathing problems before receiving BOTOX® or BOTOX® Cosmetic have the highest risk of getting these problems.**

- **Spread of toxin effects. In some cases, the effect of botulinum toxin may affect areas of the body away from the injection site and cause symptoms of a serious condition called botulism. The symptoms of botulism include: loss of strength and muscle weakness all over the body, double vision, blurred vision and drooping eyelids, hoarseness or change or loss of voice (dysphonia), trouble saying words clearly (dysarthria), loss of bladder control, trouble breathing, trouble swallowing.**

These symptoms can happen hours to weeks after you receive an injection of BOTOX® or BOTOX® Cosmetic.

There has not been a confirmed serious case of spread of toxin effect away from the injection site when BOTOX® has been used at the recommended dose to treat severe underarm sweating, blepharospasm, or strabismus, or when BOTOX® Cosmetic has been used at the recommended dose to treat frown lines.

**EXHIBIT P
PAGE 128**

Source: ALLERGAN INC, 8 K, September 01, 2010                    Powered by Morningstar  Document Research℠

Do not take **BOTOX**® or **BOTOX Cosmetic** if you: are allergic to any of the ingredients in **BOTOX**® or **BOTOX**® **Cosmetic**. See the end of this Medication Guide for a list of ingredients in **BOTOX**® and **BOTOX**® **Cosmetic**; had an allergic reaction to any other botulinum toxin product such as *Myobloc*® or *Dysport*™; have a skin infection at the planned injection site.

**Tell your doctor about all your medical conditions, including if you have:** a disease that affects your muscles and nerves (such as amyotrophic lateral sclerosis [ALS or Lou Gehrig's disease], myasthenia gravis or Lambert-Eaton syndrome).

**Tell your doctor about all the medicines you take,** including prescription and nonprescription medicines, vitamins and herbal products.

**BOTOX**® and **BOTOX**® **Cosmetic** may cause loss of strength or general muscle weakness, or vision problems within hours to weeks of taking **BOTOX**® or **BOTOX**® **Cosmetic. If this happens, do not drive a car, operate machinery, or do other dangerous activities.**

**BOTOX**® can cause serious side effects. Other side effects of **BOTOX**® or **BOTOX**® **Cosmetic** include: dry mouth, discomfort or pain at the injection site, tiredness, headache, neck pain, and eye problems, double vision, blurred vision, decreased eyesight, drooping eyelids, swelling of your eyelids, and dry eyes. Symptoms of an allergic reaction to **BOTOX**® or **BOTOX**® **Cosmetic** may include: itching, rash, red itchy welts, wheezing, asthma symptoms, or dizziness or feeling faint. Tell your doctor or get medical help right away if you are wheezing or have asthma symptoms, or if you become dizzy or faint.

Tell your doctor if you have any side effect that bothers you or that does not go away.

For additional information refer to the Medication Guide. This Medication Guide summarizes the most important information about **BOTOX**® or **BOTOX**® **Cosmetic**. If you would like more information, talk with your doctor.

**Forward-Looking Statement**
This press release contains "forward-looking statements," including the statements by Mr. Ingram, statements regarding Allergan's global settlement with the DOJ, statements regarding Allergan's plea, statements regarding the estimated timing and amount of the payments that Allergan has agreed to make in connection with the global settlement with the DOJ, statements regarding the implementation and effect of the CIA, and other statements regarding the safety, effectiveness and adverse events associated with **BOTOX**® or **BOTOX**® **Cosmetic**.

These statements are based on current expectations of future events. If underlying assumptions prove inaccurate or unknown risks or uncertainties materialize, actual results could vary materially from Allergan's expectations and projections. Risks and uncertainties include, among other things, the risk that the court may not approve Allergan's plea or other aspects of the criminal resolution; the results of any pending or future litigation and Allergan's compliance with the CIA; general industry, biologic and pharmaceutical market conditions; technological advances and patents attained by competitors; challenges inherent in the research and development and regulatory processes; inconsistency of treatment results among patients; potential difficulties in manufacturing; and governmental laws and regulations affecting domestic and foreign operations. Additional information concerning these and other risk factors can be found in press releases issued by Allergan, as well as Allergan's public filings with the Securities and Exchange Commission, including the discussion under the heading "Risk Factors" in Allergan's 2009 Form 10-K and Allergan's quarterly reports on Form 10-Q for the quarters ended March 31, 2010 and June 30, 2010. Copies of Allergan's press releases and additional information about Allergan are available on the World Wide Web at www.allergan.com or you can contact the Allergan Investor Relations Department by calling 1-714-246-4636.

**About Allergan, Inc.**
Allergan, Inc. is a multi-specialty health care company established 60 years ago with a commitment to uncover the best of science and develop and deliver innovative and meaningful treatments to help people reach their life's potential. Today, we have more than 8,000 highly dedicated and talented employees, global marketing and sales capabilities with a presence in more than 100 countries, a rich and ever-evolving portfolio of pharmaceuticals, biologics and medical devices, and state-of-the-art resources in R&D, manufacturing and safety surveillance that help millions of patients see more clearly, move more freely and express themselves more fully. From our beginnings as an eye care company to our focus today on several medical specialties, including ophthalmology, neurosciences, obesity, urologics, medical

**EXHIBIT P
PAGE 129**

aesthetics and dermatology, Allergan is proud to celebrate 60 years of medical advances and proud to support the patients and physicians who rely on our products and the employees and communities in which we live and work.

SOURCE: Allergan, Inc.


**Allergan Contacts**
Caroline Van Hove       714-246-5134 (media)
Jim Hindman             714-246-4636 (investors)
Joann Bradley           714-246-4766 (investors)
Emil Schultz            714-246-4474 (investors)

© 2010 Allergan, Inc. Irvine, CA 92612. ® marks owned by Allergan, Inc.

---

i Allergan data on file; Medical Affairs
ii Allergan data on file; Global Regulatory Affairs
iii Allergan data on file; Global Literature & Information Services

---

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

EXHIBIT P
PAGE 130