# EXHIBIT N

DEF 14A 1 ddef14a.htm DEFINITIVE PROXY STATEMENT

Table of Contents

### SCHEDULE 14A INFORMATION

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549**

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

- ☐ Preliminary Proxy Statement
- ☐ Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
- ☒ Definitive Proxy Statement
- ☐ Definitive Additional Materials
- ☐ Soliciting Material Pursuant to § 240.14a-12

## Allergan, Inc.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

  (1) Title of each class of securities to which transaction applies:

  (2) Aggregate number of securities to which transaction applies:

  (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

  (4) Proposed maximum aggregate value of transaction:

  (5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

  (1) Amount Previously Paid:

  (2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Table of Contents

## CORPORATE GOVERNANCE

**Director Independence**

Our Amended and Restated Bylaws and our Board of Directors Guidelines on Significant Corporate Governance Issues require that a majority of our directors meet the criteria for independence set forth under applicable securities laws, including the Exchange Act, applicable rules and regulations of the SEC and applicable rules and regulations of the NYSE. The NYSE Listed Company Manual and corresponding listing standards provide that, in order to be considered independent, our board must determine that a director has no material relationship with us other than as a director. Our board has reviewed the relationships between us, including our subsidiaries or affiliates, and each board member (and each such director's immediate family members).

Based on its review, our board has affirmatively determined that none of Drs. Boyer, Dunsire and Ryan, Prof. Jones, Messrs. Gallagher, Ingram, Herbert, Lavigne, Ray or Schaeffer or Ms. Hudson currently have any relationship with us other than as a director and each is "independent" within the foregoing independence standards. Mr. Pyott was determined to not be independent based on his service as our Chief Executive Officer. Our board's independence determinations included reviewing Mr. Ingram's service as a strategic advisor to a company with which Allergan has done business and Mr. Schaeffer's service as a member of the board of a company with which Allergan has done business.

Our board has also determined that each member of the Audit and Finance Committee, the Corporate Governance Committee and the Organization and Compensation Committee, respectively, is "independent" under the applicable listing standards of the NYSE and, with respect to members of the Audit and Finance Committee, the audit committee requirements of the SEC. None of the members of these committees is an officer, employee or former employee of us or any of our subsidiaries.

Our Board of Directors Guidelines on Significant Corporate Governance Issues are available on the Corporate Governance & Certificates section of our website at *www.allergan.com*.

**Board Meetings**

Our business and affairs are managed under the direction of our board. Our board held seven full meetings during 2010 and each director attended at least 75% of those meetings when he or she was a member of our board. Directors are also kept informed of our business through personal meetings and other communications, including considerable telephone contact with our Chairman of the Board, Vice Chairman of the Board and others regarding matters of interest and concern to us and our stockholders.

**Executive Sessions**

Non-management directors meet regularly in executive sessions without management. "Non-management" directors are all of our board members who are not our officers and include directors, if any, who are not "independent" by virtue of the existence of a material relationship with us. It is our board's policy that the Vice Chairman of the Board, a non-management director, serve as the lead independent director and, if present, preside over the executive sessions. If not present, a different non-management director is selected by the non-management directors to chair the executive session. Dr. Boyer is the current Vice Chairman of the Board and lead independent director. Executive sessions of our non-management directors are typically held in conjunction with each regularly scheduled board meeting.

**Board Committees**

Our board has a standing Audit and Finance Committee, Corporate Governance Committee, Compensation Committee and Science & Technology Committee. Our board has reviewed, assessed the adequacy of, and approved a formal written charter for each of these committees, each of which is available on the Corporate Governance & Certificates section of our website at *www.allergan.com*.

37

EXHIBIT N, PAGE 205

Table of Contents

*Audit and Finance Committee*

The Audit and Finance Committee is currently composed of Mr. Ray (chairperson), Dr. Ryan, Messrs. Gallagher and Lavigne and Ms. Hudson. Our board has determined that Messrs. Ray and Lavigne meet the definition of an audit committee financial expert, as set forth in Item 407(d)(5)(ii) of SEC Regulation S-K. The Audit and Finance Committee held ten meetings during 2010 and each member of the Audit and Finance Committee attended at least 75% of the total meetings of the committee held when he or she was a member.

Pursuant to the charter adopted for the Audit and Finance Committee, the primary role of the Audit and Finance Committee is to assist our board in its oversight of our financial reporting process. Our management is responsible for the preparation, presentation and integrity of our financial statements, and for maintaining appropriate accounting and financial reporting principles and policies and internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. Our independent registered public accounting firm is responsible for auditing our financial statements and expressing an opinion as to their conformity with generally accepted accounting principles. The Audit and Finance Committee:

- reviews the integrity of our financial statements, financial reporting process and systems of internal controls regarding finance, accounting and legal compliance;

- assists our board in its oversight of our compliance with legal and regulatory requirements;

- assists our board in its oversight of enterprise-wide risk management;

- reviews the independence, qualifications and performance of our independent registered public accounting firm and internal audit department;

- provides an avenue of communication among the independent registered public accounting firm, management, the internal audit department and our board;

- prepares the report that SEC rules require be included in our annual proxy statement;

- reviews and discusses with management and our independent registered public accounting firm our annual audited consolidated financial statements, audit of internal controls over financial reporting and quarterly unaudited financial statements;

- retains, terminates and annually reconfirms our independent registered public accounting firm for the fiscal year;

- meets with our independent registered public accounting firm to discuss the scope and results of their audit examination and the fees related to such work;

- meets with our internal audit department and financial management to:

    - review the internal audit department's activities and to discuss our accounting practices and procedures;

    - review the adequacy of our accounting and control systems; and

    - report to our board any considerations or recommendations the Audit and Finance Committee may have with respect to such matters;

- reviews the audit schedule and considers any issues raised by members of the Audit and Finance Committee, our independent registered public accounting firm, the internal audit staff, the legal staff or management;

38

## Table of Contents

- reviews the independence of our independent registered public accounting firm, and the range of audit and non-audit services provided and fees charged by our independent registered public accounting firm;
- monitors the implementation of our Code of Business Conduct and Ethics for our employees, and receives regular reports from our Chief Ethics Officer, who coordinates compliance reviews and investigates compliance matters;
- through our Chief Ethics Officer pursuant to the procedures set forth in our Code of Business Conduct and Ethics, manages the receipt, retention and treatment of complaints we may receive regarding accounting, internal accounting controls or audit matters and the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters;
- performs an annual self-evaluation;
- pre-approves audit and non-audit services performed by our independent registered public accounting firm in order to assure that the provision of such services does not impair the independent registered public accounting firm's independence;
- reviews, approves or modifies management recommendations on corporate financial strategy and policy and, where appropriate, makes recommendations to our board; and
- discusses with our management the certification of our financial reports by our principal executive officer and principal financial officer.

The report of the Audit and Finance Committee is on page 91 of this Proxy Statement.

*Corporate Governance Committee*

The Corporate Governance Committee is currently composed of Mr. Ingram (chairperson), Drs. Boyer and Dunsire, Prof. Jones and Mr. Schaeffer. The Corporate Governance Committee held five meetings during 2010 and each member of the Corporate Governance Committee attended at least 75% of the total meetings of the committee held when he or she was a member. The Corporate Governance Committee:

- receives reports from management regarding compliance-related matters and provides general compliance oversight;
- reviews and oversees compliance programs related to our Corporate Integrity Agreement;
- considers the performance of incumbent directors;
- considers and makes recommendations to our board concerning the size and composition of our board;
- develops and recommends to our board guidelines and criteria to determine the qualifications of directors;
- considers and reports to our board concerning its assessment of our board's performance;
- performs an annual self-evaluation;
- considers, from time to time, our current board committee structure and membership;
- recommends changes to the amount and type of compensation of board members as appropriate; and
- makes recommendations to our board from time to time as to matters of corporate governance, and reviews and assesses our Guidelines on Significant Corporate Governance Issues.

EXHIBIT N, PAGE 207

**Table of Contents**

The Corporate Governance Committee is responsible for recommending qualified candidates for election as directors, including the slate of directors that our board proposes for election by our stockholders at the annual meeting. In identifying, evaluating and selecting potential director nominees, including nominees recommended by our stockholders, the Corporate Governance Committee engages in the following selection process:

- the Corporate Governance Committee, our Chief Executive Officer or any other board member identifies the need to add a new member to our board with specific criteria or to fill a vacancy on our board. Alternatively, stockholders may recommend a nominee for election to fill a vacancy or as an addition to our board;

- the Corporate Governance Committee initiates a search, working with support staff and seeking input from board members and senior management, and considering stockholder recommendations. The Corporate Governance Committee may hire a search firm if deemed appropriate;

- the initial slate of candidates that satisfy specific criteria and otherwise qualify for membership on our board are identified and presented to the chairperson of the Corporate Governance Committee, or in the chairperson's absence, any member of the Corporate Governance Committee delegated to initially review director candidates;

- the appropriate Corporate Governance Committee member makes an initial determination in his or her own independent business judgment as to the qualification and fit of such director candidate(s) and whether there is a need for additional directors to join our board at that time;

- if the reviewing Corporate Governance Committee member determines that it is appropriate to proceed, our Chief Executive Officer and several members of the Corporate Governance Committee interview prospective director candidate(s);

- the Corporate Governance Committee provides informal progress updates to our board;

- the Corporate Governance Committee meets to consider and approve the final director candidate(s); and

- if approved by the Corporate Governance Committee, the Corporate Governance Committee seeks board approval of the director candidate(s).

Among other things, when assessing a candidate's qualifications, the Corporate Governance Committee looks for the following qualities and skills:

- directors should be of the highest ethical character and share our values;

- directors should have reputations, both personal and professional, that are consistent with our image and reputation;

- directors should be highly accomplished in their respective fields, having achieved superior credentials and recognition;

- in selecting directors, the Corporate Governance Committee will generally seek leaders affiliated or formerly affiliated with major organizations, including scientific, business, government, educational and other non-profit institutions;

- the Corporate Governance Committee will also seek directors who are widely recognized as leaders in the fields of medicine or the biological sciences, including those who have received the most prestigious awards and honors in those fields;

- each director should have relevant expertise and experience, and be able to offer advice and guidance to our management based on that expertise and experience; and

40

- directors should be independent of any particular constituency and be able to represent all of our stockholders, should have the ability to exercise sound business judgment, and should be selected so that our board is a diverse body, with diversity reflecting gender, ethnic background, country of citizenship and professional experience.

The Corporate Governance Committee considers all of the qualities mentioned above when considering a candidate for director, without regard to whether such candidate was nominated by the Chairman of the Board, another director or a stockholder. Stockholders can suggest qualified candidates for director by submitting to us any recommendations for director candidates, along with appropriate biographical information, a brief description of such candidate's qualifications and such candidate's written consent to nomination. All submissions should be sent to the Corporate Governance Committee of Allergan, Inc.'s Board of Directors, c/o Allergan, Inc., Attn: Secretary, P.O. Box 19534, Irvine, CA 92623. We may request from the recommending stockholder or recommending stockholder group such other information as may reasonably be required to determine whether each person recommended by a stockholder or stockholder group as a nominee meets the minimum director qualifications established by our board and is independent based on applicable laws and regulations. Submissions that meet the criteria outlined in the immediately preceding paragraph are forwarded to the chairperson of the Corporate Governance Committee or such other member of the Corporate Governance Committee delegated to review and consider candidates for director nominees.

*Organization and Compensation Committee*

The Organization and Compensation Committee (the "Compensation Committee") is currently composed of Mr. Schaeffer (chairperson), Messrs. Ingram, Gallagher and Ray and Ms. Hudson. Following the 2011 annual meeting of stockholders, Mr. Gallagher will serve as chairperson of the Compensation Committee. The Compensation Committee held eight meetings during 2010 and each member of the Compensation Committee attended at least 75% of the total meetings of the committee held when he or she was a member. The Compensation Committee:

- reviews and approves the compensation of executive officers, including salary and bonus awards;
- establishes, and approves for submission to our board when required, overall employee compensation plans and policies;
- reviews and assesses risks relating to overall employee compensation plans and policies;
- reviews and approves the corporate organizational structure;
- reviews and approves the election of executive officers for submission to our board;
- reviews the performance of corporate officers;
- performs an annual self-evaluation;
- recommends to our board major compensation programs; and
- administers our various compensation and stock option plans.

The Compensation Committee works with an external compensation consultant to assist the Compensation Committee in its duties. Frederick W. Cook & Co. was engaged for 2010 as the compensation consultant for the Compensation Committee. The compensation consultant performs no work for us other than its work providing executive compensation consulting services to the Compensation Committee and reports directly to the Compensation Committee through its chairperson.

41

## Table of Contents

For 2010, the compensation consultant provided the Compensation Committee with:

- market survey data;
- advice regarding competitive levels of executive base salaries, annual performance incentive awards, annual equity awards and executive benefits;
- a comprehensive review of our executive compensation strategy, including reviewing our peer group companies and the criteria for selecting peers, as well as advising on our short- and long-term compensation incentives, our equity compensation strategy and preparation of our annual stock-based compensation guidelines;
- a thorough assessment of our compensation policies and practices to determine whether any risks arising from those policies and practices are reasonably likely to have a material adverse effect on us;
- tally sheets disclosing our executive officers' total compensation (including severance benefits and the value of outstanding equity awards); and
- support for the preparation of our disclosure in this Proxy Statement.

For more information on the processes and procedures followed by the Compensation Committee for the consideration and determination of executive compensation and the role of our Chief Executive Officer in recommending compensation amounts, see the "Compensation Disclosure" section beginning on page 51 of this Proxy Statement.

### *Science & Technology Committee*

The Science & Technology Committee is currently composed of Dr. Ryan (chairperson), Drs. Boyer and Dunsire, Prof. Jones and Messrs. Herbert and Lavigne. The Science & Technology Committee held five meetings during 2010 and each member of the Science & Technology Committee attended at least 75% of the total meetings of the committee held when he or she was a member. The Science & Technology Committee:

- reviews our discovery and development research portfolio, including the relevant underlying science;
- reviews the staffing of key scientific and management positions, including significant changes, within our research and development organization;
- evaluates the investment allocation for our research and development portfolio, including project expenditures;
- reviews the major strategic priorities within our research and development organization and the competitive environment surrounding those priorities;
- reviews variances to our operating plan for major research and development projects;
- monitors the progress of our research and development projects, including milestones;
- reviews the process for research and development patents and our strategic patent portfolio; and
- reviews our major technology-based collaborations, in-licensing and out-licensing agreements.

### Board Leadership Structure

Our board has carefully considered the benefits and risks in combining the role of Chairman of the Board and Chief Executive Officer and has determined that Mr. Pyott is the most qualified and appropriate individual to lead our board as its Chairman.

EXHIBIT N, PAGE 210

**Table of Contents**

In determining whether to combine the roles of Chairman of the Board and Chief Executive Officer, our board closely considered our current system for ensuring significant independent oversight of management, including the following: (1) only one member of our board, Mr. Pyott, also serves as an employee; (2) each director serving on our Audit and Finance Committee, Compensation Committee, Corporate Governance Committee and Science & Technology Committee is independent; (3) Dr. Boyer's role as our Vice Chairman and lead independent director who, when present, presides over the executive sessions of our board; (4) our board's ongoing practice of regularly holding executive sessions without management and under the direction of our Vice Chairman and lead independent director, typically as part of the regularly scheduled board meetings; and (5) our board's flexibility to select, at any time and on a case-by-case basis, the style of leadership best able to meet our current needs based on the individuals available and circumstances present at the time. Our board further noted that the Compensation Committee annually evaluates the Chief Executive Officer's performance and has the sole authority to retain and to terminate compensation advisors.

In determining that we are best served by having Mr. Pyott serve as Chief Executive Officer and Chairman of the Board, our board considered the benefits of having the Chief Executive Officer serve as a bridge between management and our board, ensuring that both groups act with a common purpose. Our board also considered Mr. Pyott's knowledge regarding our operations and the industries and markets in which we compete and his ability to promote communication, to synchronize activities between our board and our senior management and to provide consistent leadership to both our board and our Company in coordinating the strategic objectives of both groups. Our board further noted that the combined role of Chairman of the Board and Chief Executive Officer facilitates centralized leadership in one person so that there is no ambiguity about accountability.

**Board Risk Oversight**

Our board oversees an enterprise-wide approach to risk management that is designed to support the achievement of organizational objectives, including strategic objectives, to improve long-term organizational performance and enhance stockholder value. A fundamental part of risk management is not only understanding the risks a company faces and what steps management is taking to manage those risks, but also understanding what level of risk is appropriate for us. In setting our business strategy, our board assesses the various risks being mitigated by management and determines what constitutes an appropriate level of risk for us. Our board meets with management at least quarterly to receive updates with respect to our operations, business strategies and the monitoring of related risks.

While our board has the ultimate oversight responsibility for the risk management process, various committees of our board also have responsibility for risk management. Our board is advised by the committees of significant risks and management's response via periodic updates. The Audit and Finance Committee oversees our financial risk exposures, including monitoring the integrity of our financial statements, financial reporting process and systems of internal controls, accounting and legal compliance and the independence and qualifications of our independent registered public accounting firm. The Audit and Finance Committee receives an annual risk and internal controls assessment report from our internal audit department. The Audit Committee meets at least quarterly with our financial management, independent registered public accounting firm and legal advisors for updates on risks related to our financial reporting function and also assists our board in its oversight of our compliance with legal and regulatory requirements.

Risks related to our company-wide compensation programs are reviewed by the Compensation Committee. For more information on the Compensation Committee's compensation risk assessment see "Compensation Disclosure – Compensation Risk Management." Our Corporate Governance Committee provides compliance oversight and reports to the full board on compliance and makes recommendations to our board on corporate governance matters, including director nominees, the determination of director independence, board and committee structure and membership. Our Science & Technology Committee helps evaluate the investment allocation for our research and development portfolio and reviews the major strategic priorities within our research and development organization.

EXHIBIT N, PAGE 211

http://www.sec.gov/Archives/edgar/data/850693/000119312511059460/ddef14a.htm                9/1/2011

## Table of Contents

### Code of Business Conduct and Ethics

We have adopted a Code of Business Conduct and Ethics, which contains general guidelines for conducting our business and is designed to help directors, employees and independent consultants resolve ethical issues in an increasingly complex business environment. The Code of Business Conduct and Ethics applies to all directors, consultants and employees, including our principal executive officer and our principal financial officer and any other employee with any responsibility for the preparation and filing of documents with the SEC. The Code of Business Conduct and Ethics covers topics including, but not limited to, conflicts of interest, confidentiality of information and compliance with laws and regulations. A copy of the Code of Business Conduct and Ethics is available on the Corporate Governance & Certificates section of our website at *www.allergan.com*. We may post amendments to or waivers of the provisions of the Code of Business Conduct and Ethics, if any, made with respect to any directors and employees on that website.

### Contacting our Board of Directors

Any interested person, including any stockholder, who desires to contact the current director presiding over the executive sessions or the other board members may do so by writing to the Allergan, Inc. Board of Directors, Attn: Secretary, P.O. Box 19534, Irvine, CA 92623. Communications received will be distributed by our Secretary to the director presiding over the executive sessions or such other board member or members as deemed appropriate by our Secretary, depending on the facts and circumstances outlined in the communication received. For example, if any complaints regarding accounting, internal accounting controls or auditing matters are received, they will be forwarded by our Secretary to the chairperson of the Audit and Finance Committee for review.

### Director Attendance at Annual Meetings

Although we have no policy with regard to board members' attendance at our annual meeting of stockholders, it is customary for, and we encourage, all board members to attend. All of the directors then in office attended our 2010 annual meeting of stockholders.

### Non-Employee Directors' Compensation

Our board believes that providing competitive compensation is necessary to attract and retain qualified non-employee directors. The key elements of director compensation are a cash retainer, committee chair fees, meeting fees and equity-based grants. It is our board's practice to provide a mix of cash and equity-based compensation that it believes aligns the interests of our board and our stockholders. As an employee director, Mr. Pyott does not receive additional compensation for board service. For more information on non-employee director compensation, see the Director Compensation Table beginning on page 87 of this Proxy Statement.

44

Table of Contents

the closing price of our common stock on the grant date. Other awards of stock options and restricted stock are expressed in a number of shares when approved by the Compensation Committee.

Beginning with the 2007 fiscal year, our policy has been that option grant dates for newly hired executive officers and other eligible employees will be two business days after the next quarterly or annual earnings release, as applicable, following the executive officer's or other eligible employee's commencement of employment.

*Compensation Clawback Policy*

The Compensation Committee has adopted a clawback policy, whereby in the case of fraud or other intentional misconduct involving our executive officers or vice presidents that necessitates a restatement of our financial results, we are required to recover any bonus awards or other incentive compensation paid or issued to our executive officers or vice presidents in excess of the amount that would have been paid or issued based on the restated financial results. The Compensation Committee approved this policy after consideration of market practices and to further align the interests of our executive officers and vice presidents with our stockholders.

*Stock Ownership Guidelines*

Our board has approved a stock ownership policy for our executives. In April 2010, the Compensation Committee (i) increased the stock ownership level for our Chief Executive Officer from five times base salary to six times base salary, and (ii) reviewed and re-approved our stock ownership levels of four times base salary for our President (increased from three times base salary in April 2009), three times base salary for the executive vice presidents and two times base salary for corporate vice presidents. Ownership is determined based on the combined value of the following executive holdings: (1) shares owned outright; (2) restricted shares; (3) shares held in benefit plans; and (4) shares held in family trusts for estate planning purposes.

The Compensation Committee annually reviews our executive officers' stock ownership status and the timeline for compliance in connection with our annual meeting of stockholders. In April 2010, the Compensation Committee revised the policy by eliminating the use of 50% of the value of vested "in the money" stock options in calculating whether an executive is in compliance with the stock ownership levels, which is closer in line with market practice and determined that executives who are not in compliance with the stock ownership levels must hold 25% of after-tax post-exercise shares upon any stock option exercise event until compliance with his or her respective stock ownership level is reached. As of November 2010, all of our executive officers were in compliance with the policy. Also in April 2010, the Compensation Committee agreed that executives may, in the Compensation Committee's sole discretion, be granted annual grants of restricted stock or restricted stock units in lieu of (or in addition to) non-qualified stock options to assist with achieving compliance under the new compliance calculation methodology. The Compensation Committee annually reviews our stock ownership guidelines and their consistency with market practices. The tally sheets reviewed by the Compensation Committee also provide information about compliance with the stock ownership guidelines by each named executive officer.

Our board has also approved stock ownership guidelines for directors, which provide that each non-employee director is expected to own our common stock, including phantom shares accrued under our Deferred Directors' Fee program, equal in value to the number of years the director has served on our board since 1989 multiplied by the annual cash retainer fee for each year served. As of December 31, 2010, all non-employee directors met the stock ownership levels.

*Perquisites and Other Benefits*

Beginning in 2007, all major perquisite programs, other than a tax and financial planning allowance of $20,000 for our Chief Executive Officer and our President, $9,000 for Mr. Diradoorian and $10,000 for each other named executive officer were eliminated by the Compensation Committee in order to streamline the administration of

65

EXHIBIT N, PAGE 213